# ORIGINAL

EDWARD H. KUBO, JR. 2499
United States Attorney
District of Hawaii

THOMAS A. HELPER 5676
Assistant U.S. Attorney
Room 6-100, PJKK Federal Building
300 Ala Moana Blvd.
Honolulu, Hawaii 96850-6100
Telephone: (808) 541-2850
Facsimile: (808) 541-3752
E-mail: tom.helper@usdoj.gov

Attorneys for Defendant

FILED IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

JAN 2 3 2007

at __o'clock and __min. __M
SUE BEITIA, CLERK

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| LUCAS BRUNO III, CHRISTOPHER GAHR, FRANK ROBERT PAULSON, CHARLES TURNER, and TOM YOUNG, | CIVIL NO. 03-00567 JMS BMK |
| | DEFENDANT'S DESIGNATION OF DEPOSITION TRANSCRIPT RE: FILBERT CARVALHO; CERTIFICATE OF SERVICE |
| Plaintiffs, | |
| vs. | |
| MICHAEL CHERTOFF, Secretary, DEPARTMENT OF HOMELAND SECURITY, | Trial: February 13, 2007<br>Judge: Hon. J. Michael Seabright |
| Defendant. | |

DEFENDANT'S DESIGNATION OF DEPOSITION TRANSCRIPT
RE: FILBERT CARVALHO

Now comes defendant and hereby designates the following
portions of the deposition transcript of Filbert Carvalho.
Carvalho died in a motorcycle accident in the summer of 2006, and
so is not available to testify in this matter.

Carvalho Deposition

    4:16-5:11

    16:17-17:13

    18:10-13

    18:18-19

    19:3-13

    20:21-25

    21:12-22:7

    23:13-24:23


    49:6-10    Defendant will seek to display the relevant
portion of Exhibit 100, which is the Exhibit 1 quoted in this
portion of Carvalho's testimony, and in the next three excerpts
designated immediately below.

    50:1-20

    70:12-71:2

    71:12-72:5


    79:21-25


    103:3-104:21. Defendant will seek to display Exhibit 106,
which is the Exhibit 5 referred to in this portion of Carvalho's
testimony.

105:21-107:15.  Defendant will seek to display Exhibit 107, which is the Exhibit 6 referred to in this portion of Carvalho's testimony.


107:23-108:16

119:2-25


DATED:  January 23, 2007, at Honolulu, Hawaii.

EDWARD H. KUBO, JR.
United States Attorney
District of Hawaii

By _____
THOMAS A. HELPER
Assistant U.S. Attorney

Attorneys for Defendant

1          IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF HAWAII

3

4    _____ )
                                     )
5    LUCAS BRUNO III, CHRISTOPHER    )    CIVIL NO. 03-00567 DAE/BMK
     GAHR, FRANK ROBERT PAULSON,     )
6    CHARLES TURNER, and Tom Young,  )
                                     )
7              Plaintiffs,           )
                                     )
8         vs.                        )
                                     )
9    MICHAEL CHERTOFF, Secretary,    )    COPY
     DEPARTMENT OF HOMELAND          )
10   SECURITY,                       )
                                     )
11             Defendant.            )
                                     )
12   _____ )

13

     DEPOSITION NOTICED BY: MICHAEL JAY GREEN, ESQ.
14

15            DEPOSITION OF FILBERT CARVALHO

16   Taken on behalf of the Plaintiffs at TSA Maui County

17   Airports Training Center, 33 Lono Avenue, Suite 270,

18   Kahului, Maui, Hawaii, commencing at 8:54 a.m., May 12, 2006

19   pursuant to Notice.

20

21           **THIS TRANSCRIPT IS WORK
           PRODUCT. DISTRIBUTION OF
22         DUPLICATES IS NOT AUTHORIZED.**

23

24   REPORTED BY: GLORIA T. BEDIAMOL, CSR/RPR #262

25

Iwado Court Reporters, Inc. Certified/ Registered Professional Reporters
2233 Vineyard Street, Wailuku, Maui, Hawaii 96793  Federal ID # 99-0230607
Maui (808) 244-9300  Toll Free (800) 241-3376/ Fax (808) 244-8278

IWADO
C O U R T   R E P O R T E R S ,   I N C .

```
 1              Pursuant to Rule 14 of the Rules Governing Court
 2    Reporting in Hawaii, the Reporter's Disclosure was made and
 3    is attached hereto.
 4              Pursuant to Rule 30(b)(4) of the Hawaii Rules of
 5    Civil Procedure, the following is stated for the record:
 6              My name is Gloria Bediamol, Certified Shorthand
 7    Reporter with Iwado Court Reporters, Inc. My business
 8    address is 2233 Vineyard Street, Suite A, Wailuku, Maui,
 9    Hawaii.  Today's date is May 12, 2006.  The time is 8:54
10    a.m.  This deposition is taking place at Iwado Court
11    Reporters.
12              In attendance are: Mr. Green, Ms. Kagawa,
13    Ms. Hevicon and Mr. Helper.
14              The deponent is:
15                        FILBERT CARVALHO,
16              The deponent, having been sworn to tell the truth,
17    the whole truth, and nothing but the truth, was examined and
18    testified as follows:
19                        EXAMINATION
20    BY MR. GREEN:
21         Q.    Say your name, please.
22         A.    Filbert W. Carvalho, Jr.
23         Q.    What's your present business or profession?
24         A.    I work for The Department of Homeland Security,
25    TSA, assigned to the Kahului Airport Maui, I'm an inspection
```

1      investigator for security.

2           Q.    I'm sorry, the first thing you said you do what?

3           A.    I work for the federal government.

4           Q.    And what do you do for them?

5           A.    I'm a security inspections agent.

6           Q.    And then you also say you work for TSA, did you

7      say?

8           A.    Yes, sir.

9           Q.    Who do you get paid by?  Who do you get your check

10     from?

11          A.    TSA.

12          Q.    And do you hold two titles?  In other words, does

13     TSA hire you as an employee of the federal government?

14          A.    Yes, sir.

15          Q.    Have you ever had your deposition taken before?

16          A.    Yes, sir.

17          Q.    What were the circumstances?

18          A.    Criminal cases, civil cases.

19          Q.    When was the last time?

20          A.    Maybe three months ago.

21          Q.    And what was that case about?

22          A.    Civil rights.

23          Q.    Who was suing who?

24          A.    Another employee.  I forget the name.

25          Q.    Another employee for who?

1    Q.    (By Mr. Green)   If you make substantive changes, a

2    judge or jury may know you said "yes" today, and you changed

3    it to "no"; okay?

4    A.    Yes, sir.

5    Q.    Obviously, the questions that are asked, the

6    answers will be given under penalty of perjury, and I know

7    that you are aware of that, yes?

8    A.    Yes, sir.

9    Q.    Anything --   this is the only opportunity you

10   actually get to ask me anything in a deposition, unless it's

11   for clarification.   Is there anything you want to ask me

12   before we begin this thing?

13   A.    No.

14   Q.    You are not on any medication that would impair

15   your ability to understand questions?

16   A.    No.

17   Q.    How far did you go in school?   I think you may

18   have mentioned this, but after high school how far did you

19   go?

20   A.    Some college.

21   Q.    When did you end your college career?   What year

22   was it?

23   A.    I'm still attending.   I ended in '93 and went back

24   briefly.

25   Q.    Good for you.   What are you studying?

1     A.   Criminal science.

2     Q.   Your first employment, and I don't care about

3 working part time, but your first real employment, in your

4 mind, would have been what?  Either during college or after

5 high school, what would it have been?

6     A.   U.S. Army.

7     Q.   When was that?

8     A.   1985 to 1993 February 14th.

9     Q.   Where did you serve?

10    A.   Europe, Central American, North Carolina, Georgia

11 and back home to Hawaii.

12    Q.   And you were with the army?

13    A.   Yes, sir.

14    Q.   Did you ever work for the MPs?

15    A.   Yes, sir.

16    Q.   And when was that?

17    A.   1988, '89 Ford Meade, Maryland.

18    Q.   Arrested people from time to time?

19    A.   Yes, sir.

20    Q.   Got some training in report writing?

21    A.   Yes, sir.

22    Q.   In those days, were you trained to at least, when

23 you make reports, try to put down things you thought were

24 the most important?

25    A.   Yes, sir.

1    Q.    Obviously, you can't write everything down; so

2    that's why you would at least try to write down the most

3    important parts of the report, yes?

4    A.    Yes, sir.

5    Q.    And probably in the army a hundred or more reports

6    as an MP?

7    A.    Not that much, sir.

8    Q.    Fifty?

9    A.    Yes.

10    Q.    Okay.  After the army, where did you go?

11    A.    Department of Public Safety, State of Hawaii.

12    Q.    What years were they?

13    A.    '94 through '96.

14    Q.    Who was your supervisor there?

15    A.    George Sumner (phonetic).

16    Q.    Did you work with Faith Evans?

17    A.    Yes.

18    Q.    What was your position in public safety?

19    A.    I was a corrections officer then became a sheriff.

20    Q.    Lots of reports, right?

21    A.    Yes, sir.

22    Q.    Important again to make sure you write down the

23    things you believe are important, yes?

24    A.    Yes, sir.

25    Q.    Sign your name to report, you are attesting that

1    it's true and accurate to the best of your knowledge?

2         A.    Yes, sir.

3         Q.    What do you do next?  Strike that.  What year do

4    you leave public safety/sheriff?

5         A.    '96 to 2000 I transferred from public safety to

6    DLNR.  I became a Department of Conservation enforcement

7    officer.

8         Q.    You've been in law enforcement how many years, if

9    we include what you do now, how many years have you been in

10   it?

11        A.    From 1985 to the present, sir.

12        Q.    So 22 years or so?

13        A.    Yes, sir.

14        Q.    Over those years, have you had occasion to

15   investigate various forms of misconduct?

16        A.    Yes, sir.

17        Q.    Various forms of criminal violations?

18        A.    Yes, sir.

19        Q.    I'm assuming over those years you've investigated

20   allegations of discrimination of various kinds?

21        A.    Yes.

22        Q.    Violations of people's civil rights?

23        A.    Yes, sir.

24        Q.    Might include over the years age discrimination?

25        A.    Just recently, yes, sir.

1    Q.    Sexual harassment?

2    A.    Yes, sir.

3    Q.    Sex discrimination?

4    A.    Yes.

5    Q.    Race discrimination?

6    A.    Yes.

7    Q.    You kind of know it -- after all these years, you

8    kind of know it when you hear it; right?

9    A.    Yes.

10    MR. HELPER:  I move to strike that last question

11    as vague.

12    Q.    (By Mr. Green)  He understood it, Tom, and he

13    answered it.

14    If you don't understand it, just tell me; okay?

15    I'll tell you something, Brother, there's no tricks in this

16    deposition.  You have a very good lawyer, so if he makes an

17    objection, stop speaking, and then if he tells you not to

18    answer, then you should ignore him and just answer.  But if

19    he tells you not to answer, don't answer and then we'll move

20    on to something else.

21    When do you start at Wackenhut, if you did?  Did

22    you ever work for Wackenhut?

23    A.    Yes.

24    Q.    When was that?

25    A.    Briefly in 2000.

1    Q.    And "briefly" means when?

2    A.    Like three days.

3    Q.    What was the reason you went there?

4    A.    I went there as a law enforcement officer

5    part-time work.

6    Q.    Did you work for Buzzy?

7    A.    Yes.

8    Q.    Do you know Godfrey Ortiz?

9    A.    No.

10    Q.    Kenny Chang?

11    A.    Yes.

12    Q.    So you are there three days, then where do you go?

13    A.    I got a called from the federal air marshal

14    branch, and it was right after 911.

15    Q.    What did you do?

16    A.    I became a federal air marshal.

17    Q.    You flew around?

18    A.    Yes.

19    Q.    What happens after that?

20    A.    I was assigned in Los Angeles, I had the

21    opportunity to return home to Maui, and the inspections

22    division opened up, and I transferred as an inspector to

23    Kahului airport.

24    Q.    What exactly is your definition of "inspections

25    division"?

1    A.    We take care of all the security regulations

2    imposed on the air carriers and airport security, and we

3    take care of the rules and regulations and make sure that

4    everybody is abiding by them.

5    Q.    And that was what year, I'm sorry, that you

6    started doing that?

7    A.    2002 to the present.

8    Q.    Why did you leave state government in 2000?

9    A.    For federal employment.

10    Q.    Ever had any lawsuits filed against you, as a

11    defendant, prior to coming to the airport?

12    A.    No.

13    Q.    You never had, and just correct me, it's kind of a

14    negative question, but I assume during your training you

15    knew never to ignore claims of discrimination; is that

16    right? In other words, if you believe if you were told that

17    someone had been discriminated against, you would not simply

18    walk away and ignore it if your job description was to

19    investigate those kinds of things; right?

20    A.    My job description is not to investigate those.    I

21    am a security investigator inspector.

22    Q.    When you were with Wackenhut even for those days

23    or working for TSA, was it your impression that if you were

24    told about some type of discrimination, racial or otherwise,

25    that you could simply ignore it and not report it to someone

1   else?

2       A.   No, sir.

3       Q.   What did you believe your job would be in that

4   regard?

5       A.   Even ethically, as an employee of the federal

6   government, we're trained to report.

7       Q.   Did you get any training when you went to work

8   for, I'm just going to use TSA, whether you were actually an

9   employee for them, did you have any training?

10      A.   Yes, sir.

11      Q.   What was the training?

12      A.   With reference to?

13      Q.   What kind of training about anything you got from

14  TSA?

15      A.   I was trained --

16      Q.   In the screening area, I'm sorry.

17      A.   In screening?

18      Q.   What happens when I go through the --

19      A.   I was never a screener.  I was always an

20  inspector.  I assisted with the roll-out.  It's a different

21  branch.  I don't know --

22      Q.   What was your job as an inspector?

23      A.   We made sure that the screening and everything was

24  done in accordance with the regulation.

25      Q.   And what regulations or training did you receive

1    regarding those regulations?

2         A.    I went to initially four months, then two and a

3    half months of training in an academy that taught us how to

4    read the CFR, which is the Code of Federal Regulations, and

5    who had to abide by each of those sections:  the air

6    carrier, the airport operator, and us the federal

7    government.

8         Q.    Then when you came back here to Maui, did you get

9    any additional training for your position?

10        A.    No, sir.

11        Q.    Your immediate supervisor would have been here on

12   Maui?

13        A.    At that time, Lowery Leong.

14        Q.    And after that?

15        A.    Howard Tagamori.

16        Q.    When Howard came in, what was Lowery's position?

17        A.    Lowery is the federal security director.

18        Q.    Do they have offices at the airport?

19        A.    Yes, sir.

20        Q.    You have offices at the airport?

21        A.    Yes, sir.

22        Q.    What's your ethnic background?

23        A.    I'm Portuguese/Hawaiian.

24        Q.    Did you instruct any of the people who work for

25   TSA in how to write reports?

1    A.   Yes, sir.

2    Q.   This is October 17, 2002.   It says it's from you,

3    special agent/acting screening manager through Howard

4    Tagamori to Lowery Leong.   Do you remember this?

5    A.   Yes, sir.

6    Q.   Regarding MSF supervisor, Christopher Gahr.   When

7    you just look at this for a moment, it says on the second

8    page at the bottom that this statement was prepared by you

9    on October 17, '02.   Do you see that?

10   A.   Yes, sir.

11   Q.   Was this something that when you look at this, the

12   date that it was prepared, did you have some bullet points

13   that you refreshed your memory from an earlier report, or

14   was this report prepared in its entirety on this date? Do

15   you understand the question?

16   A.   Yes, sir.

17   Q.   Do you know whether you had some notes or some

18   bullet points and then later on, some other day, sat down

19   and prepared this report?

20   A.   Yes, sir.

21   Q.   What happened?

22   A.   Probably out of the manager's log, bullet points,

23   or some notes.

24   Q.   Where would the manager's log be?

25   A.   At the checkpoint.

1    Q.    And so what would be the circumstances that you

2    would have gathered this information to make this report?

3    A.    I believe it was a complaint about -- there was a

4    complaint about him opening up the checkpoint, and then

5    there was a run-in that I had with him when I asked him,

6    through the FSD, asked him to relieve a --

7    Q.    What does that mean, FSD?

8    A.    Federal Security Director Lowery Leong.  When the

9    FSD walked by, he saw a screener with her hand bandaged, and

10   she was basically patting down and hand-wanding people.  And

11   because of limited use of her hand and no dexterity, no

12   feeling, and the public -- we didn't want the public to

13   think that they are being patted down by somebody who was

14   injured that couldn't feel them --

15   Q.    You really lost me with that.  You did not want

16   the public --

17   A.    If you were going through the airport, sir, and I

18   alarmed, and I had this big bandage on the hand, and you

19   knew I couldn't feel anything, and for security reasons, she

20   had no dexterity in her hands --

21   Q.    You know, I heard everything you said, because I

22   know you are speaking English, but I didn't understand any

23   of it.  Is there some regulation about that, about having

24   dexterity in both hands?

25   A.    You have to be able to pat down and feel an item

1  getting people in trouble.  That's really what it's about,

2  right?  Right?

3      A.    No.   Like I said, if we could handle it at a local

4  level, that's what we wanted to do.  Our supervisors handled

5  it.

6      Q.    That appears not to have been Mr. Gahr's style.

7  This guy is writing down everything, and it looks like he is

8  going to go out of state to Washington to report all kinds

9  of people.  At least that's the sense of this black book,

10  right?

11     A.    Yes.

12     Q.    "At 1935 hours after interviewing Harlan, Russell,

13  I went to the checkpoint.  I observed Greenisen, Theresa

14  performing her duties with a bandaged left hand.  I relieved

15  her of her post as I found that she had two dislocated

16  fingers.  The bandage and splints along with medical tape on

17  the left ring and middle finger did not allow for movement

18  or dexterity.  I brought this to the attention of Gahr,

19  Christopher, MSF/SPV, who then became very challenging and

20  insubordinate."

21         What was the challenging and insubordination?

22     A.    He refused to replace her.  He says, I'll take the

23  bandage off of her hand, dah, dah, dah, she can stay here.

24     Q.    I got no idea what the "dah, dah, dah" means.

25     A.    He said, "Just leave her in place.  It's okay."

1  We wanted a doctor's letter.  Why was her hand dislocated?

2  Did she do it at work?  Was it off site? What happened --

3      Q.    He says --

4          MR. HELPER:  Let him finish.

5      Q.    (By Mr. Green)  I'm sorry, go ahead. Are you done

6  with the answer?

7      A.    I guess so.

8      Q.    He wants to take off the bandage --

9          MR. HELPER:  Hang on.  Don't let him cut you off.

10  If you have more to say, finish it.  If he cuts your off,

11  raise your hand.

12      Q.    (By Mr. Green) So if he says she's willing to take

13  off the bandage and she can work, you said, no, let's remove

14  her, and we've got to get a doctor's note or something like

15  that, right?

16      A.    There was a statement called "fitness for duty"

17  when you came in to work.  If you had any injury that

18  hampered you from --  we need to know when it was done.  Was

19  it done when you were working?  Was it done outside and you

20  weren't able to perform your duties?  We had nothing on her.

21      Q.    I got you.

22      A.    So I wanted her off the site.  I wanted to know

23  why, and he wouldn't hear of it.  I said, "Listen, she needs

24  a doctor's note to return to work.  She can't just take it

25  off, now that we know the injury was there.

1    Q.    Did you report this in a writing that went into

2    Mr. Gahr's file, the fact that he had somebody there with a

3    bandaged left hand and dislocated fingers?

4    A.    And that he refused to remove her?  I believe so,

5    yes, sir.

6    Q.    And I want to know, did you put anything in

7    Patty's files regarding discriminatory remarks ever?

8    A.    I'm not sure if any of the other managers did, but

9    I believe she does have something in --

10   Q.    You just lost me.  You're too good of an officer.

11   Didn't you understand the question?

12   A.    I didn't --

13   Q.    Read it back, please.

14   A.    I didn't, no.

15   Q.    Let's take a break.

16       (A recess was taken.)

17   Q.    (By Mr. Green)  Let's go back to Exhibit 1 and I

18   just want to go down to the last paragraph on page 1 of your

19   report.  "Christopher Gahr asked to speak with me at 2115

20   hours regarding security issues."  Did that happen?

21   A.    Yes, sir.

22   Q.    "I had him relieved by another MSF supervisor and

23   asked him to meet me in the TSA office."  Did that happen?

24   A.    Yes, sir.

25   Q.    Who was present besides you and Gahr?

1    first name is, I guess.

2            We were told by them that they knew we were

3    calling Washington and we were told specifically by him that

4    if he ever caught us calling Washington, if he found who it

5    was, that he would terminate us and take care of."

6            Did I read that correctly?

7    A.    Yes, sir.

8    Q.    You have no memory of this happening?

9    A.    That's because it didn't happen, sir.

10   Q.    This is a false statement under oath, right?

11   A.    I didn't say any of this.

12   Q.    Was it ever said in front of you by anyone else?

13   A.    No, sir.

14   Q.    Never heard it?

15   A.    No.

16   Q.    Never heard Patty Igarashi, I guess, ever say

17   "fucking haole" to anybody, right?

18   A.    No, sir.

19   Q.    Give me the October 18, '02 letter, the Chris Gahr

20   letter.

21           Do you know when Chris Gahr was terminated?

22   A.    Not the exact date.

23   Q.    On October 25, '02 is the date we have, and it may

24   or may not be correct, yes?

25   A.    Yes.

1    Q.    Did you ever tell him you would do that?

2    A.    No, sir.

3    Q.    Give me the e-mails please, October 20, 4:32 p.m.

4          (Deposition Exhibit 5 was marked for identification.)

5          You see where it says 4:32 p.m.?  do you have the

6    time?

7    A.    Yes.

8    Q.    It's from Chris Gahr sent Sunday, October 20,

9    2002, 4:32 p.m. to you.  Do you remember getting this?

10   A.    Yes, sir.

11   Q.    Do you remember reading it?

12   A.    Yes, sir.

13   Q.    It says, "Filbert Carvalho:  The letter requesting

14   that I go back on MSF is in the next E-mail."

15         Do you know what he is referring to?

16   A.    Yes, sir.

17   Q.    What is he referring to?

18   A.    He was going to e-mail headquarters and tell them

19   that he wanted to go back on the road and not drop at Maui.

20   Q.    He wanted to leave Maui, right?

21   A.    Yes, sir.

22   Q.    Leave the airport, right?

23   A.    Yes, sir.

24   Q.    "In accordance with our agreement, I trust that

25   the statement against me will be destroyed.  Christopher

```
 1   Gahr."

 2              Was there an agreement?

 3        A.    No, sir.

 4        Q.    Tell me, when you read this, did you respond and

 5   say, "What are you talking about?"?

 6        A.    I immediately printed it, took it to the FSD, who

 7   was present during the meeting, when he tried to get me to

 8   sign something on a legal pad stating that I'd throw away

 9   the documents against him.

10        Q.    I'm missing something.  Did you ever respond to

11   him and say, "What are you talking about?  We had no

12   agreement"?

13        A.    I was told not to.

14        Q.    By whom?

15        A.    Beth Anderson our legal at that time.

16        Q.    She told you not to respond to this?

17        A.    Yes, sir.

18        Q.    So it stood the way it was, "I trust that the

19   statement against me will be destroyed"?

20        A.    I was not, nor was the FSD, in the capacity to

21   destroy any of the write-ups over a deal to relocate.

22        Q.    If you don't understand the question, just tell

23   me.  I just asked you whether or not you ever responded to

24   this.

25        A.    No. I didn't know it was a "yes" or a "no."
```

1      Q.    Do you want her to read back the answer you gave

2   me to the question?

3           MR. HELPER:    There's no question. Let's take two

4   minutes off the record.

5           (There was a discussion off the record.)

6      Q.    One of the things that you told me earlier was

7   that Chris Gahr was not terminated on Maui, right?

8      A.    Yes, sir.

9      Q.    He was terminated where? What are you reading?

10     A.    His receiving station in Oakland.

11     Q.    Did you attempt to have him terminated in Oakland?

12     A.    No, sir, the way it worked was --

13     Q.    Listen to the question.   The question was whether

14   you attempted to have him terminated in Oakland?

15     A.    No.

16     Q.    Did you take any steps to get him terminated in

17   Oakland?

18     A.    No.

19     Q.    Mark this as next, please.

20           (Deposition Exhibit 6 was marked for identification.)

21           This is dated October 21, 2002.   Is that the right

22   date?

23     A.    Yes.

24     Q.    And it's from you to Lisa Baker, TSA Employee

25   Relations?

1    A.   Uh-hm.

2    Q.   Where does she work?

3    A.   She was like our legal prior to Marty. She took

4 care of all of our employee stuff before we were assigned an

5 attorney.

6    Q.   Where are her offices, if you know?

7    A.   California somewhere, sir.

8    Q.   Do you remember drafting this memo?

9    A.   Yes.

10    Q.   Regarding who?

11    A.   Chris Gahr.

12    Q.   "This memo is regarding Mobile Screening Force

13 Supervisor Christopher Gahr, whose performance has been

14 problematic on numerous occasions."

15    A.   Yes.

16    Q.   What was the problematic things on numerous

17 occasions?

18    A.   There was an attachment that went with this that

19 listed the things that he did wrong.

20    Q.   And the things that were listed, which I'll show

21 you, where did you get that information from?

22    A.   From manager's logs an counseling from, I believe,

23 Pat Collins.  Right now, that's all I remember, from Pat

24 Collins.

25    Q.   And the reason you were writing this document to

1  Lisa Baker?

2      A.    Under instruction from the FSD, sir.

3      Q.    "Whose performance has been problematic on

4  numerous occasions.  The incidents involving less than

5  satisfactory performance were brought to Mr. Gahr's

6  attention beginning October 18"; that's right?

7      A.    Yes.

8      Q.    Brought to his attention by whom?

9      A.    Probably myself or Lowery Leong.

10     Q.    Well, don't guess.  Tell me what you brought to

11  his attention before his termination.

12     A.    I showed him the write-up from all the things that

13  he did wrong.

14     Q.    And written up by whom?

15     A.    Patrick Collins.

16     Q.    Things that were not kept in-house?

17     A.    Yes, sir.

18     Q.    Have you ever seen anything in any TSA employee's

19  file that dealt with racial remarks or discriminatory

20  conduct by anyone at TSA against a white male or other white

21  employee?

22     A.    No.

23     Q.    "To document Mr. Gahr's performance, attached

24  please find three TSA Counseling Records, a General

25  Counseling From, an October 17 report written by me, and two

 1  emails sent to me from Mr. Gahr.

 2          "It behooves me" -- I'm reading from paragraph 3.

 3  "It behooves me to report that the decision has been made to

 4  relieve Mr. Gahr from future employment obligations.

 5  Effective immediately, we will no longer employ him here at

 6  Kahului International Airport."

 7          Did I read that correctly?

 8  A.    Yes.

 9  Q.    "Mr. Gahr has contacted MSF operations and has

10  been scheduled for deployment in Oakland, California.  I

11  would like you to review the attached statements and seek

12  grounds for removal."

13          Do you see that?

14  A.    Yes, sir.

15  Q.    Removal from what?

16  A.    From the TSA and MSF.

17  Q.    Where?

18  A.    From being on the MSF.

19  Q.    In Oakland, California?

20  A.    No, removal from TSA and from the MSF.

21  Q.    "His constant failure to perform to instructions

22  and SOP, along with his insubordination has caused

23  inefficiency at our checkpoint."

24          Do you see that?

25  A.    Yes.

1    A.    I'm not sure of the exact date.

2    Q.    Going back to the October 21, 2002 to/from to Lisa

3  Baker, tell me about your discussions with Lowery Leong that

4  you reference in here?

5         MS. KAGAWA:  It's a memo to Lisa Baker.

6         THE WITNESS:  Exhibit 6?

7    Q.    (By Mr. Green)  You said you prepared this under

8  the direction of Lowery Leong, right?

9    A.    Yes.

10   Q.    Tell me what it was, the circumstances of your

11  conversation where he told you to prepare this?

12   A.    Basically, he looked at the write-ups, he looked

13  at the manager's log and everything, and he just told me to

14  prepare a document, send it to legal and see if we can have

15  him removed.

16   Q.    Where did the conversation take place?

17   A.    Downstairs TSA office.

18   Q.    Who was present?

19   A.    I'm not sure.

20   Q.    What did Mr. Leong say to you, as best you can

21  recall?

22   A.    Basically, take whatever I had documented and

23  forward it to Lisa Baker.

24   Q.    Take whatever who had documented?

25   A.    Whatever Patrick had documented against Chris.

*IWADO COURT REPORTERS, INC.*
(808) 244-9300

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

LUCAS BRUNO III, CHRISTOPHER )    CIVIL NO. 03-00567 JMS BMK
GAHR, FRANK ROBERT PAULSON, )
CHARLES TURNER, and TOM    )    CERTIFICATE OF SERVICE
YOUNG,    )
   )
         Plaintiffs,    )
   )
    vs.    )
   )
MICHAEL CHERTOFF, Secretary, )
DEPARTMENT OF HOMELAND    )
SECURITY,    )
   )
         Defendant.    )
_____ )

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that, on the date and by the method of service noted below, a true and correct copy of the foregoing was served on the following at their last known address:

     <u>Served by First-Class Mail and E-mail</u>

       Christopher Gahr        January 23, 2007
       700 E Washington, #81
       Colton, CA 92324

       chrisgahr@aol.com

         Plaintiff Pro Se

DATED: January 23, 2007, at Honolulu, Hawaii.

_____
Coleen Fasaka-Shoda