# ATTACHMENT "1"; LUCAS BRUNO

1           IN THE UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF HAWAII

3

4       -----------------------------------
        LUCAS BRUNO III, CHRISTOPHER GAHR,      )
5       FRANK ROBERT PAULSON, CHARLES           )
        TURNER, and TOM YOUNG,                  )
6                                               )
                    Plaintiffs,                 )  Civil No. 03-00567
7                                               )  DAE/BMK
            v.                                  )
8                                               )
        THOMAS J. RIDGE, SECRETARY,             )
9       DEPARTMENT OF HOMELAND SECURITY,        )
                                                )
10              Defendant.                      )
                                                )
11      -----------------------------------

12

13              DEPOSITION OF LUCAS BRUNO III

14   Taken on behalf of the Defendant, at the TSA Training Room,

15   33 Lono Avenue, Suite 270, Kahului, HI, commencing at 2:00

16   p.m., on Thursday, February 9, 2006, pursuant to Notice.

17

18   BEFORE:    SANDRA J. GRAN, CSR NO. 424

19              Registered Professional Reporter

20

21                        -o0o-

22

23

24

25

```
 1    APPEARANCES:

 2

 3      For the Plaintiffs:    DENISE M. HEVICON, ESQ.

 4                             Attorney at Law

 5                             345 Queen Street, 2nd Floor

 6                             Honolulu, Hawaii  96813

 7                             E-mail:  dhsangster@hawaii.rr.com

 8

 9      For the Defendant:     THOMAS A. HELPER, ESQ.

10                             US Department of Justice

11                             Room 6100 PJKK Federal Building

12                             300 Ala Moana Boulevard

13                             Honolulu, Hawaii  96850

14

15    ALSO PRESENT:            Annette Johnson and Martha Buxton

16

17                             -o0o-

18

19

20

21

22

23

24

25
```

1                              INDEX

2

3

4     EXAMINATION:  LUCAS BRUNO III

5     BY MR. HELPER                                    4

6

7

8     (11/20/02 Counseling Record, EXHIBIT A, marked)      4

9     (11/23/02 Davelyn Counseling Record, EXHIBIT B,      4

10    marked)

11    (11/23/02 Igarashi Counseling Record, EXHIBIT C,     4

12    marked)

13    (10/20/02 Letter, EXHIBIT D, marked)                14

14    (12/9/02 Letter, EXHIBIT E, marked)                 43

15    (Bos Affidavit, EXHIBIT F, marked)                  72

16

17

18

19

20

21

22

23

24

25

```
1                        LUCAS BRUNO III

2                   having first been duly sworn,

3                testified upon his oath as follows:

4

5       (11/20/02 Counseling Record, EXHIBIT A, marked)

6       (11/23/02 Davelyn Counseling Record, EXHIBIT B, marked)

7       (11/23/02 Igarashi Counseling Record, EXHIBIT C, marked)

8                   EXAMINATION:  LUCAS BRUNO III

9    BY MR. HELPER:

10        Q.    Would you please state your name?

11        A.    Lucas Frank Bruno, III.

12        Q.    What is your address?

13        A.    It's -- physical address is 208 Market Street in

14   Wailuku.  The Zip is 96793.  My mailing address is Post

15   Office Box 71, also in Wailuku, Hawaii  96793.

16        Q.    Have you ever had your deposition taken before?

17        A.    No.

18        Q.    Have you ever testified in any court proceeding

19   before?

20        A.    Once when I was in the military they had a case

21   where somebody -- I was the division officer and he was being

22   charged with using drugs and I was called upon to be a

23   character witness on the behavior of this crew member.  I

24   didn't have much to say, but --

25        Q.    Okay.
```

```
 1        A.    -- it was testifying.

 2        Q.    Let me just give you a few rules for testifying in

 3   a deposition.  First of all, you know there's a court

 4   reporter here who is taking down everything anybody says.

 5   Right?

 6        A.    Yes, sir.

 7        Q.    And you're sworn in under the same oath that you

 8   were sworn in with in court.  Do you understand that?

 9        A.    Yes, sir.

10        Q.    And the testimony you give has the same weight and

11   significance as if it was given in court even though there is

12   no judge here.

13        A.    Yes, sir.

14        Q.    There are a couple of rules that are very

15   different from normal conversation, so some people have a

16   hard time with them.  The most basic rule is only one person

17   can speak at a time.  So even though you know exactly where

18   I'm going with a question, you have to wait until I'm done

19   asking it before you answer because, otherwise, the court

20   reporter gets mixed up and then I have to ask the question

21   again and it takes longer, not shorter.  Do you understand

22   that?

23        A.    Yes.

24        Q.    If I have ever cut you before you're done with an

25   answer, make sure you let me know and I'll stop and let you
```

```
 1   finish answering.  Okay?

 2        A.   Yes, sir.

 3        Q.   If at any time you need to take a break, stretch

 4   your legs, talk to your lawyer, go to the bathroom; let us

 5   know and we'll take a break.

 6        A.   Thank you.

 7        Q.   I'm not going to estimate how long this is going

 8   to take because my estimates have been woefully inadequate to

 9   date.

10             You're currently employed as a social worker?

11        A.   Correct, sir.

12        Q.   What is your current salary?

13        A.   It's going to be going up next month.  At this

14   moment -- I can get back to you -- it's about -- it's about

15   31, $3,200 a month.

16        Q.   That's take home or gross?

17        A.   That's gross.  Take home is about $2,300 a month.

18   And then effective next month we've -- I'm moving up to a

19   Senior Probation Officer status, which will be a pay raise.

20   And then we have union adjusted increments, so it's a moving

21   target.

22        Q.   All right.

23        A.   When you say what's my salary, what week?

24        Q.   Okay.  We're here today to take your deposition

25   based on your allegation in a federal lawsuit that you were
```

1   discriminated against on the basis of your race and your age

2   in the course of your employment at TSA Maui; right?

3       A.   Yes, sir.

4       Q.   And you started -- How did you first hear about an

5   opening at TSA?

6       A.   That was fantastic news coverage of TSA is coming,

7   TSA is coming.  And originally it was stated that you would

8   have to work at Wackenhut and that Wackenhut would have first

9   choice of refusal and in placing the guards at the airport

10  here in Wailuku.  I contacted Wackenhut and they said things

11  were up in the air, they still didn't know what was going on.

12  At that time it was six months before they actually started

13  hiring here, more or less, time-wise.  Then there were

14  announcements throughout the newspaper, television,

15  everywhere that TSA was coming and it was going to be an

16  audition of thousands to go in and they would select a few

17  people for a multistage screening.  And I did that.

18      Q.   Where were you employed when you first heard about

19  the TSA openings?

20      A.   I was with the Department of Health as a Social

21  Worker IV.

22      Q.   Okay.  And how long had you been in that position?

23      A.   Not very long at all.

24      Q.   Okay.  Tell me about the process that you went

25  through to become a TSA employee before you showed up at work

```
 1   at Kahului.

 2        A.    There were paperwork procedures that were online

 3   to fill out.  And then I got a call from somebody that said,

 4   Are you interested in being a supervisor in Lanai?

 5             And I said, Yes, I'm still interested.

 6             And they said, Be in Honolulu tomorrow at --

 7             And I said, Wait a second, you know.

 8             If you're not interested, I'm just going down my

 9   list to the next guy.  Yes or no?

10             And so I talked with my supervisor at work and I

11   said I had this opportunity.  And he said, Go for it.  You're

12   crazy up to pass up getting into the federal government.

13             So I reported to Honolulu and went through a --

14   Let's see.  At some point I had to go through a physical test

15   and a computer identification IAD test over here at the

16   Kaanapali hotel.  And that was a prerequisite before getting

17   the phone call and saying, Report to Honolulu.  And I would

18   have to go and look at the dates to see the order, but there

19   was a computer questionnaire that was put out by TSA, there

20   was an initial interview that was done at the hotel, there

21   was also a lifting and visual acuity, and then there was a

22   report to Honolulu for further on training.

23        Q.    All the tests up to the point where you said

24   report to Honolulu, was that at Kaanapali?

25        A.    Correct.  I'm not -- I know the hotel if I saw it
```

1  again, but I don't remember the name offhand.

2      Q.   Okay.   The person who called you with the Lanai

3  opportunity, do you know who that person was?

4      A.   I'm with TSA.   Are you interested?   That was it.

5      Q.   Was there some involvement in this phase that

6  you're talking about now before you came to work by NCS

7  Pearson?   Did you ever hear that --

8      A.   I had heard -- There was so many subcontracts

9  going out.   I believe they were the ones at the hotel that

10  did the physical screening and the questions.   Yes, it -- Now

11  I know where I remember Pearson.   There was forms that you

12  had to fill out at the hotel in addition to what you filled

13  out on the computer.   It was like doing it again.

14          And I got held back after everybody else had left

15  because they were pulling out scenarios like what happens if

16  you have a passenger that refuses to put his coat through the

17  scanner and different kind of scenarios.   And everybody else

18  had left and I was called in and the person that had signed

19  me off, which you probably know, I don't know his name,

20  talked to me about he was impressed with the way I performed

21  and wanted to discuss HR, human resources, that I had put

22  down in my background.

23          And I told him that that's why I was going through

24  this process, that I didn't want to be a screener for the

25  rest of my life, but that I figured that if I was already in

```
 1    the agency when positions opened up, being on the board

 2    assured -- citing human resource management here and working

 3    in HR, that this was my way to get into TSA.

 4              The State's pay system tops out where TSA starts

 5    and --

 6              MS. HEVICON:  I'm going to have to -- Because

 7    this is going to end up --

 8              THE WITNESS:  Too long?

 9              MS. HEVICON:  -- being weeks.  Yes.  I don't

10    even remember the question anymore.  Have you heard of NCS

11    Pearson or what?  Now you're starting to talk about --

12    Please.  We will be here three days.

13              MR. HELPER:  Motion to strike.

14              THE WITNESS:  I'm sorry.

15              MS. HEVICON:  Listen to the question and

16    answer the question.

17              THE WITNESS:  Okay.  I do remember them.

18    BY MR. HELPER:

19         Q.   Okay.  And at some point did anybody with NCS

20    Pearson tell you -- or TSA tell you what sort of job you were

21    going to get when you started for TSA?

22         A.   Yes, sir.

23         Q.   Who told you what?

24         A.   I received written -- written forms saying I would

25    be a supervisor and it would be for Lanai airport.
```

1        Q.    Where did you get that written --

2        A.    In Honolulu during that final -- when we were

3   sworn in and you were now a TSA employee.

4        Q.    Do you still have that piece of paper?

5        A.    It should be part of what I submitted.  I

6   definitely have it, but I thought I had submitted it.

7        Q.    Okay.  We'll look.  I have that here and I look

8   for it during a break.

9        A.    Okay.

10       Q.    And then at some point you got a phone call from

11   Filbert Carvalho, right, saying a different job opportunity?

12       A.    While I was at the airport they were considering

13   opening up an additional lane and I was asked would I

14   consider staying here at Kahului instead of going to Lanai.

15   And I said yeah.  So that was how it changed from Lanai where

16   I had originally been assigned.

17                 MR. HELPER:  Off the record.

18             (Pause in Proceedings:  2:10-2:15)

19                 MR. HELPER:  Back on the record.

20   BY MR. HELPER:

21       Q.    You said you were at the airport when they asked

22   you about staying at Kahului.  What do you mean by "at the

23   airport"?

24       A.    At OGG already working for the 60-hour training in

25   preparation to be forwarded over to Lanai.

```
 1          Q.   Okay.  And so when they asked you to come on board
 2     here, you had been working OJT, on-the-job training, for how
 3     long when that conversation occurred?
 4          A.   I don't know.
 5          Q.   I mean a day?  A week?
 6          A.   I don't know.  I know that I documented in my
 7     documents the change that was perceived by me at the time
 8     when I agreed to stay, so it could be reconstructed by
 9     looking at what I submitted, but --
10          Q.   Well, let's get, you know, your -- Let me give you
11     some of what you submitted.  I think this is your most
12     complete statement.  I'm not going to make it an exhibit.
13          A.   Okay.
14          Q.   I think on the second page it talks about Mr.
15     Carvalho.  And so to the extent you need to refresh your
16     recollection by referring to your own statements, please go
17     ahead.
18          A.   Thank you, sir.
19          Q.   As opposed to saying, It's in my statement, look
20     there.  Because I want to get -- A lot of times the
21     information I want is not in your statement.  A lot of times
22     you remember more under questioning than what's in your
23     statement, so we have to do it both ways.
24                    MS. HEVICON:  Right.
25                    THE WITNESS:  I would have to -- This
```

1    statement was done February three years ago, so this would be

2    a lot fresher.  It says when I reported for orientation.  Let

3    me see what Attachment 6 is.

4    BY MR. HELPER:

5         Q.   All that is is phone numbers.

6         A.   Okay.

7         Q.   I mean, certainly feel free to look, because it's

8    your statement, but --

9         A.   (Pause - referring.)  Here is -- I don't know why

10   I came up with Lanai unless it was that initial telephone

11   call that I received saying, Pack up, go to the hotel, that I

12   was selected for Lanai supervisor.

13        Q.   I think you're handing me a document that refers

14   back to a matter that we discussed earlier, which is your

15   appointment letter; right?

16        A.   Right.

17        Q.   Okay.

18             MS. HEVICON:  Is that this?

19   BY MR. HELPER:

20        Q.   And this says, "Supervisor Transportation Security

21   Screener"?

22        A.   Correct.

23        Q.   Do you know when it was you got this document

24   dated 10/20/02 and signed by a Human Resources representative

25   whose name I can't read?

```
 1          A.    Let me look at this again, please.

 2                   MS. HEVICON:   Why don't you look at my copy?

 3                   THE WITNESS:   (Pause - referring.)   Let me

 4     see what attachment -- On October 20th, 2002, I was offered a

 5     position of appointment.

 6                   MR. HELPER:   Right.

 7                   THE WITNESS:   So it was October 20th, 2002,

 8     that I received this.

 9                   MR. HELPER:   Okay.   I guess we need to make

10     this document Exhibit D, just these.

11                   MS. HEVICON:   I'm sorry, which exhibit?   Oh.

12     You said D, but we haven't -- Oh, these are marked.

13          (10/20/02 Letter, EXHIBIT D, marked)

14     BY MR. HELPER:

15          Q.    So Mr. Carvalho met with you -- The offer to come

16     to Kahului was made by Mr. Cavalho in person to you; right?

17          A.    Correct.

18          Q.    Okay.   One thing, let me ask you to say Kahului as

19     opposed to OGG.

20          A.    Correct.   Kahului Airport on Maui.

21          Q.    OGG is the old FAA, now TSA designation for Maui

22     airport --

23          A.    Correct, sir.

24          Q.    For Kahului.

25                   MS. HEVICON:   Let him finish.
```

```
 1   BY MR. HELPER:
 2        Q.   Do you recall anything about your interaction with
 3   Mr. Carvalho when he offered you the job other than what you
 4   have got in your statement?
 5        A.   No, sir.
 6        Q.   Anything about his demeanor?  Was he friendly?
 7   Hostile?  Glad to have you aboard kind of thing?
 8        A.   I don't remember, sir.
 9        Q.   Okay.  Nothing about that interaction particularly
10   stands out in your mind?
11        A.   No, sir.
12        Q.   Correct?
13        A.   Correct, sir.
14        Q.   Now, you started your on-the-job training on the
15   12th of November; right?
16        A.   (Pause - referring.)  Yes, sir.
17        Q.   And just to sort of summarize your career, you
18   lasted until December the 9th, does that sound about right?
19        A.   About right.  It was very short.
20                  MS. HEVICON:  I'm just trying to see how this
21   story goes.  This is a long letter.
22   BY MR. HELPER:
23        Q.   Page 10 --
24        A.   I tried to be as clear to TSA as possible.
25                  MS. HEVICON:  Yeah, okay.
```

```
 1    BY MR. HELPER:

 2         Q.   Page 10, first full paragraph, third sentence, "On

 3    the afternoon of 12/9/02."

 4         A.   Yes, sir.

 5         Q.   Okay. And so is it fair to say that over that

 6    approximately month you worked maybe 20 days?

 7         A.   I am not sure, sir. I'd have to check the pay

 8    records.

 9         Q.   Well, how many -- Can you give me an estimate of

10    how many days you worked a week during your month at TSA?

11         A.   Five or six a week.

12         Q.   Okay. Did they have you working -- Is it possible

13    you worked six days a week?

14         A.   I don't know, sir. I'd defer to the time sheets.

15         Q.   Okay. What shift were you working during that

16    time?

17         A.   It varied, sir.

18         Q.   Is there a shift you worked more often than

19    others?

20         A.   I'd have to defer to the time sheet. It was three

21    years ago.

22         Q.   Do you remember if you ever worked the night

23    shift?

24         A.   I know I got out when it was dark, but I'm not

25    sure how they designate the shifts. There was some people
```

```
 1    that stayed very late, past 11:00.  I don't believe I ever
 2    stayed past 11:00.  I think I would remember that.
 3         Q.    You don't remember ever closing the airport?
 4         A.    No.  No, sir.  I never closed the airport, sir.
 5         Q.    Okay.  Was there any -- As I understand it, you
 6    were a screener, right, that was the job duties you were
 7    assigned when you started, was screening; right?
 8         A.    I was assigned OJT for 60 hours under several
 9    different areas under that so I could go on to be a
10    supervisor, so I'm not sure -- Could you clarify "screener"?
11         Q.    You were performing the responsibilities or
12    learning the responsibilities of a screener?
13         A.    I was under instruction to learn, yes, sir.
14         Q.    The responsibilities of a screener?
15         A.    Yes, sir.
16         Q.    And you had a number of people training you over
17    that period; right?
18         A.    Yes, sir.
19         Q.    And was there anybody who was consistently
20    training you or who trained you more often than others?
21         A.    I'm going to be longwinded.  Stop me.  Initially
22    they wanted to rush the Molokai and Lanai and Guam people
23    through, so they left me at the gates while they were putting
24    people through and I did hand wanding at the gates.  Then
25    Patti Phaneuf --
```

```
 1          Q.   No, I want to hear this.
 2          A.   Patti Phaneuf was the person that was in charge of
 3     the gates most of the time on that.
 4          Q.   There's a Karin Phaneuf and there's a Patti
 5     Igarashi.
 6          A.   Yes, sir.
 7          Q.   Which one do you mean?  Or somebody else.
 8          A.   Karin Phaneuf.  Patti Igarashi was overall
 9     manager, but the hands-on supervisor was Karin Phaneuf.
10          Q.   So your training got delayed some because of the
11     priorities of getting Lanai and Molokai; right?
12          A.   They were paying per diem.
13               MS. HEVICON:  It's a yes or no question.
14               THE WITNESS:  Yes.
15               MS. HEVICON:  Remember, I start kicking.
16     BY MR. HELPER:
17          Q.   You got written up a number of times in a fairly
18     short period, and the record reflects it.  Let me start with
19     the first write-up.  And, again, if you want to refer to your
20     statement, please do.  Is the first time you got written up
21     November 20th, 2002?
22          A.   (Pause - referring.)  I can go by this because
23     this is -- To my knowledge of written write-ups that I am
24     aware of, I understand there might be others, this is the
25     first one I'm aware of.
```

```
 1          Q.    Is November 20th?

 2          A.    Correct, sir.

 3          Q.    Okay.  Now, you were written up just once on

 4   November 20th that you're aware of?

 5          A.    (Pause - referring.)  Yes, sir.  It was the

 6   combination single --

 7          Q.    The Exhibit A that you're looking at?

 8          A.    Correct, sir.

 9          Q.    Now, as I understand it, you were counseled on

10   November 20th in addition to being actually written up;

11   right?  So there was an oral session with -- an oral

12   counseling from Elizabeth Masuda on November 20th; is that

13   right?

14          A.    Please describe what you mean by "counseling."

15          Q.    Where a supervisor advised you on your

16   performance, that your performance was deficient or

17   inadequate or incorrect in some way.

18          A.    I found out by this, sir, Exhibit A.

19          Q.    Okay.  Now, Exhibit A is a counseling record from

20   Angela Williams; right?

21          A.    Yes, sir.

22          Q.    Didn't Elizabeth Masuda counsel you about ETD

23   screening of laptop computers on November 20th?

24          A.    No, sir.

25          Q.    I'm just looking at your statement.  I'm looking
```

```
 1   at your statement.
 2                  MS. HEVICON:  No, this statement.
 3                  This statement?
 4                  MR. HELPER:  Yes.
 5                  MS. HEVICON:  Oh, it's the last sentence of
 6   page 4, first paragraph.
 7                  MR. HELPER:  Yes.
 8                  MS. HEVICON:  You're saying that's
 9   counseling?
10                  MR. HELPER:  Well, yes.
11                  MS. HEVICON:  All right.  I would call it
12   instructing.
13                  THE WITNESS:  That's why I was clarifying
14   what did you mean by "counseling."
15                  MR. HELPER:  Okay.
16                  THE WITNESS:  She had another person step in
17   and review it with me, so yes.
18   BY MR. HELPER:
19        Q.   Well, she told you you were doing it wrong; right?
20        A.   Yes, sir.
21        Q.   So on November 20th Elizabeth Masuda told you you
22   were wanding wrong; right?
23        A.   Correct, sir.
24        Q.   Did she also tell you that you were not following
25   the ETD procedure for laptops correctly?  Again, talking
```

```
 1    about Elizabeth Masuda on November 20th, 2002.
 2          A.    (Pause - referring.)
 3          Q.    I'm not asking you anything about Exhibit A at
 4    this point.
 5          A.    Okay.  I'm just using it to refresh my mind from
 6    three years ago.
 7          Q.    Okay.
 8          A.    (Pause - referring.)  Yes, sir.
 9          Q.    Now, did you also -- on November 20th did you have
10    on oral session with Angela Williams about anything to do
11    with your performance?
12          A.    Yes, sir.
13          Q.    Elizabeth Masuda, what's her racial background?
14          A.    I have no idea, sir.
15          Q.    From appearance?
16          A.    She didn't look like me, but short of that, I
17    don't know.
18          Q.    How long have you lived in -- You've lived in
19    Hawaii for how long?
20          A.    I have lived in Hawaii since 1980 with some time
21    off on Marshallese islands.
22          Q.    The word "local" --
23          A.    That's a catchall.  I can't say.  Korean,
24    Japanese, Filipino.
25          Q.    Right.
```

```
 1          A.    But what's local?
 2          Q.    Common usage is local?
 3          A.    Yes, sir.  The session with --
 4          Q.    I don't have any more question.  There is no
 5     question right now.
 6          A.    Okay.
 7                     THE WITNESS:  Can I talk to you?
 8                     MR. HELPER:  Sure.
 9               (Pause in Proceedings:  2:33-2:34)
10                     MS. HEVICON:  Okay.  Go ahead.
11     BY MR. HELPER:
12          Q.    Now, it looks to me like from Exhibit A as if
13     Angela Williams at some point gave you this document or
14     somebody gave you this document and you wrote your comments
15     on it?
16          A.    Yes, sir.
17          Q.    Did that occur on November 20th?
18          A.    (Pause - referring.)  Yes, sir.
19          Q.    Now, in your statements -- Let me ask you this,
20     I'm sorry:  As far as you know, is this the only write-up you
21     got for November 20th?
22          A.    Yes, sir.
23          Q.    Okay.  So Angela Williams told you you were going
24     to be written up or told you, Here's your write-up; right?
25          A.    Correct, sir.
```

```
 1            Q.    And nobody else on November 20th told you about

 2     any other write-up on that date; correct?

 3            A.    Correct, sir.

 4            Q.    And did you think at the time you were given the

 5     write-up that she was treating you unfairly, Angela Williams?

 6            A.    No, sir.  She was just relaying this to me.

 7            Q.    Okay.  But did you think that -- I mean, you've

 8     got your response to it, but did you consider at the time she

 9     wrote you up to be -- this is a disagreement -- something of

10     a disagreement between a -- Did you think she was motivated

11     by racial discrimination when she gave you this write-up?

12            A.    Angela?  No, sir.

13            Q.    Do you think that -- Do you have any reason to

14     believe that what she wrote in her portion was not her

15     honestly held belief?

16            A.    I --

17                  MS. HEVICON:  I am going to object at this

18     point because I see right now three different writings on

19     here, so that assumes facts not in evidence that, in fact,

20     she did write that.

21                  MR. HELPER:  Okay.

22     BY MR. HELPER:

23            Q.    Let me ask you:  Did she -- You received this

24     document from Angela Williams with the handwriting -- all the

25     handwriting above the word "Employee Comments"?  All the
```

```
 1    handwriting was on it when you got it; is that right?

 2         A.   Correct, sir.

 3         Q.   And then you wrote in the "Employee Comments"?

 4         A.   Correct, sir.

 5         Q.   Did you see who wrote in the portion above the

 6    term "Employee Comments"?

 7         A.   No, sir.

 8         Q.   Okay.  Did Angela Williams orally relate to you

 9    what is written here in the portion above -- in the

10    "Supervisor Comments" portion?

11         A.   No, sir.

12         Q.   All she did was give you the document?

13         A.   No, sir.

14         Q.   What -- Tell me how it happened.

15         A.   She asked me, "Are you having any difficulties or

16    problems with Elizabeth Masuda?"

17              And I said, "Not that I know of."

18              And she says, "Well, she wrote this up on you,"

19    and she gave it to me.

20         Q.   Okay.  So Angela Williams told you that this was

21    written by Elizabeth Masuda?

22         A.   She didn't say the actual writing was from

23    Elizabeth Masuda.  She just said that she had written me up.

24    I don't know who did the actual writing.

25         Q.   When you say she said that she had written --
```

1           A.    Elizabeth Masuda.

2           Q.    Wait.

3                 MS. HEVICON:   Let him finish the question.

4      BY MR. HELPER:

5           Q.    Who are you referring to with the second "she"?

6           A.    Angela Williams said that Elizabeth Masuda had

7      written me up after asking for clarity, was I having problems

8      with her.

9           Q.    Okay.  And what was your understanding at the time

10     about the supervisory relationship, if any, between Elizabeth

11     Masuda and Angela Williams?

12          A.    My understanding was that Angela Williams was in

13     charge of Elizabeth Masuda.

14          Q.    Okay.  Looking at page 4 of your statement, you

15     say, "I was not given a copy of the write-up."  Does that

16     mean after you inserted your own comments, you were not given

17     a copy?

18          A.    Yes, sir.

19          Q.    Okay.  So you did receive a copy of the document

20     when it had the "Supervisor Comments" on it?

21          A.    Correct, sir.

22          Q.    Okay.  Now, in your training on wanding, how many

23     hours of wanding training had you received prior to November

24     20th?

25          A.    I don't know, sir.

```
 1          Q.    Do you have an estimate?
 2          A.    There were records kept by TSA at the time of
 3    training.  I don't know, sir.
 4          Q.    Do you have an estimate?
 5          A.    No, sir.
 6          Q.    Was it more than four hours of training?
 7          A.    On what day?
 8          Q.    I'm sorry?
 9          A.    On the day of the write-up?
10          Q.    Before the day of the write-up, I'm trying to
11    figure out how many hours of wanding training you had
12    received.
13          A.    I had received training on Oahu that had to be
14    four hours.
15          Q.    Okay.  And then how about training once you got to
16    Kahului?  Did you receive additional training once you got to
17    Kahului on wanding?
18          A.    Yes, in orientation about five minutes saying that
19    we were going to do it differently than we had been taught on
20    Oahu.
21          Q.    Is it your recollection that from the time you
22    started at Kahului and November 20th that you only got five
23    minutes of wanding training?
24          A.    There was specific demonstration of, "This is how
25    we're going to do it" for five minutes in a briefing.  The
```

1    rest was just go out there and if you do something wrong,

2    we'll yell at you, but there was -- Again, what do you mean

3    by "training"?

4        Q.   Okay.  Did you have any practice sessions not on

5    passengers with -- on wanding with just yourself being

6    observed by a supervisor?

7        A.   Elizabeth Masuda had arranged that for me.  And

8    that was the not working on any passengers, but just with

9    each other.  And also at the Honolulu training before being

10   assigned for the follow on OJT training --

11       Q.   Right now I just want to focus on the period that

12   you were at Kahului before November 20th.

13       A.   Yes, sir.

14       Q.   And I'll just ask the question again to make sure

15   we're clear.  Did you receive any training from supervisors

16   where you weren't working with passengers, with real

17   passengers, in that time period?

18       A.   Yes, sir.

19       Q.   And what would that training consist of?

20       A.   A demonstration in orientation of a different way

21   of doing it.  The demonstration provided by someone Elizabeth

22   Masuda had gotten.  And a final training from a Pat Collins

23   saying that -- demonstrating the original Honolulu training

24   that we were using, saying that's what we were going to use.

25       Q.   Okay.  Now, as I understand it, there's two

Lucas Bruno III

```
 1    different basic styles; one called the double L style?

 2          A.    Correct, sir.

 3          Q.    And the other called the W style?

 4          A.    Correct, sir.

 5          Q.    And is it correct that the double L style is the

 6    way you were trained in Honolulu?

 7          A.    Correct, sir.

 8          Q.    And the W style is the way you were trained here?

 9          A.    Correct, sir.

10          Q.    Okay.  And the training that you got at Kahului

11    before November 20th, who did the demonstration at the

12    briefing?

13          A.    Pat Collins, sir.

14          Q.    Okay.  And then Elizabeth -- And he demonstrated

15    the W way; right?

16          A.    Correct, sir.

17          Q.    And then what method did Elizabeth Masuda

18    demonstrate?

19          A.    The W method, sir.

20          Q.    Okay.  And then I think you said Pat Collins

21    demonstrated again?

22          A.    The double L style.  Additionally --

23          Q.    Wait.  I'm not -- I don't have a question.

24    What -- I don't want to cut you off, actually, so go ahead

25    and finish your answer.
```

1        A.    In addition to the double L style, there was a

2    difference in clearing shoes and feet.  Because of the rebar

3    in the floor, they wanted us to rather than go down to the

4    floor and screen, have the person's foot up and just screen

5    underneath without shoes and on the side up to the kneecap,

6    and that way going down to the floor wouldn't trigger.  You

7    could stop just below the kneecap because you had already

8    done the wanding when the person's shoes were being removed,

9    and not have any false alarms go off.  And that was a Pat

10   Collins' innovation that got changed.

11       Q.    Okay.  And then when was it that Pat Collins

12   demonstrated the double L style?

13       A.    I was -- In the retraining of, "This is how we're

14   going" -- I was pulled off the floor with another person and

15   brought into the morning orientation room and the two of us

16   were shown.

17                    MS. HEVICON:    The question was when.

18                    THE WITNESS:    I thought you said where, I'm

19   sorry.  When was?

20   BY MR. HELPER:

21       Q.    The question -- My original question concerned the

22   period before November 20th; right?

23       A.    Yes.

24       Q.    I think you're talking about -- The retraining

25   occurred November 23rd, from my review of the record.  Is

```
 1    that your recollection?

 2         A.   Yes, sir.

 3         Q.   So if we restrict the question to the period at

 4    Kahului before November 20th, you were trained twice -- you

 5    had received training twice, once at a briefing by Pat

 6    Collins demonstrating the W style?

 7         A.   W, yeah.

 8         Q.   And a second time with Elizabeth Masuda

 9    demonstrating the W style?

10         A.   Yes, sir.

11         Q.   And that's it; correct?

12         A.   There was a corrective demonstration and it wasn't

13    screening on each other as much as an explanation.  There was

14    a black gentleman from the training team from Chicago and I

15    don't know his name.

16         Q.   Devery Bailey?

17         A.   Devery, I don't know the last name.

18         Q.   Okay.

19         A.   After I was written up on another occasion because

20    of rivets on -- explaining an additional method with the

21    screening of how to avoid getting into a loop of not being

22    able to clear.  And that was another specific, but it wasn't

23    any practicing one on --

24         Q.   And, again, that was after November 20th; right?

25         A.   Yes, sir.
```

```
 1        Q.    Okay.  So, again, in the period before November
 2   20th --
 3        A.    That's it.
 4        Q.    -- we've got two sessions?
 5        A.    Yes, sir.
 6        Q.    Masuda and Collins both with the W; right?
 7        A.    Correct, sir.
 8        Q.    And then how about training with passengers or
 9   observations of supervisors -- by supervisors while you're
10   doing passengers?  Did you have supervisors watching you
11   specifically -- or, I'm sorry, not watching you,
12   demonstrating things to you with passengers in the period at
13   Kahului before November 20th?
14        A.    Not to my recall, sir.
15        Q.    Did you receive -- Strike that.  Did you have
16   responsibilities for wanding at Kahului before November 20th?
17        A.    (Pause - referring.)  Yes, sir.
18        Q.    And you -- Where were you looking?  You looked at
19   your statement to refresh your recollection.
20        A.    Seeing when did I start and the -- when I was
21   brought down on the floor on the 20th.
22        Q.    So is it fair to say you did over 10 hours of
23   wanding at the concourse gates during the first week of
24   on-the-job training before --
25        A.    Yes, sir.
```

```
 1           Q.    -- before November 20th?

 2           A.    Yes, sir.

 3           Q.    Over 20 hours?

 4           A.    My time was split approximately equally between

 5     baggage search and wanding, so whatever time I worked, about

 6     50 percent would be fair.

 7           Q.    Okay.  And if you worked 40 hours during the week,

 8     that would make about 20 hours?

 9           A.    Yes, sir.

10           Q.    Do you recall anybody criticizing your wanding

11     technique or counseling you or helping you or advising you,

12     giving you any feedback of any sort on your wanding technique

13     during your first week of on-the-job training before November

14     20th?

15           A.    No, sir.

16           Q.    Is it possible somebody counseled or corrected you

17     during that time, but you don't remember at this point?  Or

18     advised you, helped you.

19           A.    It's possible.

20           Q.    Okay.  You're learning -- In this first week of

21     OJT you're being trained on a lot of skills you had never

22     used before; right?

23           A.    No, sir.

24           Q.    Well, you've never been involved -- You had never

25     had a security job of any sort before, had you?
```

```
 1          A.    No, sir.

 2          Q.    In the navy?

 3          A.    Yes, sir.

 4          Q.    What was your job in the navy?

 5          A.    I did the -- at the gangway I was an elicit

 6    intelligence specialist.  I was also shipboard intelligence

 7    officer.  And we have to search people coming on and off

 8    board the ship for contraband.  I was stationed overseas and

 9    did the physical search of baggage and people.

10                Now, what I mean by various new things, again,

11    might need clarification.  I was taught to bag search, which

12    I have done before; and to wand, which I hadn't.  So I was

13    being taught one new skill during that week because that's

14    all I was doing is at the gates, bag search, wanding for the

15    week.

16          Q.    And you weren't yet being taught how to operate

17    the scanners or -- Were you being taught to operate the

18    scanners on your first week?

19          A.    No, sir.

20          Q.    How about the ETD machine?

21          A.    No, sir.

22          Q.    Okay.  When Ms. Masuda talked to you about your

23    wanding technique -- I mean, you acknowledged that on

24    November 20th that you were wanding incorrectly; right?

25          A.    Correct, sir.
```

```
 1          Q.   Okay.  And then in your mind things were fine up
 2   until November 23rd; right?
 3          A.   Correct, sir.
 4          Q.   And then you were counseled a number of additional
 5   times on November 23rd; is that right?
 6          A.   (Pause - referring.)  Correct, sir.
 7          Q.   Let me ask you -- I'm sorry, back to November 20
 8   for a second.  Looking at page 4, first full paragraph about
 9   halfway down, "As I began to write down a response, some of
10   the screeners who had been there for a couple of months told
11   me not to respond to the write-up if I didn't want to get
12   terminated."  Who were those screeners?
13          A.   I don't -- I didn't know their names at the time.
14   I certainly don't know their names now.  As they saw me
15   responding, "Don't do that.  Don't do that."  And it was the
16   people that had arrived in the group before my group got
17   there for training.  They had already gone through their
18   training.
19          Q.   Okay.  Do you recall anything about their racial
20   backgrounds, the people who were telling you this?
21          A.   I don't.
22          Q.   Okay.  I'm sorry, back to November 20th again.
23   You were also counseled that day by a supervisor named Rusty
24   about your wanding technique?
25          A.   Which page, please, sir?
```

```
 1          Q.    I'm looking at page 5.

 2          A.    (Pause - referring.)  Yes.  That's that time I was

 3   telling you that Devery, I believe you said his name was,

 4   assisted me.

 5          Q.    Well, as I look at page 5, it looks like you got

 6   counseling or advice from two supervisors.  Rusty --

 7          A.    Yeah.

 8          Q.    -- talked to you about clearing a rivet on a pair

 9   of pants, right, how to do that?

10          A.    Yes.

11          Q.    And did you know about that before, how to clear a

12   rivet?

13          A.    No.  I was -- The instruction I was given is make

14   sure that every time the wand alarms, you know why it went

15   off and that you have cleared the reason why it has gone off.

16   What "cleared" meant wasn't determined.  I understood

17   "cleared" as it was clear in my mind that I knew what was

18   setting it off.  And at this time they talked about a

19   physical pat being the only accepted way when a wand goes off

20   to clear.

21          Q.    And so was Devery counseling you or talking to you

22   about the same thing that Rusty had just talked to you about,

23   or is this something different?

24          A.    Please allow me a second here.

25          Q.    Yeah.
```

```
 1         A.    (Pause - referring.)  This was a separate -- Rusty
 2    did the rivet and -- I was informed through counseling that
 3    when somebody is going to have their waistband area screened,
 4    they're not allowed to assist in unbuckling and there was a
 5    procedure showed of -- for the first time to me of how they
 6    wanted it done to prevent them from hiding or cupping any
 7    type of weapon in their hand in the process.
 8         Q.    So what Rusty advised you about was how to clear a
 9    rivet; right?
10         A.    Right.  A decorative rivet.
11         Q.    And what Devery advised you about was how to
12    handle someone who has got to unbuckle their pants; right?
13         A.    Correct, sir.
14         Q.    And it's your recollection that you had not been
15    trained on either of those procedures before?
16         A.    That's why I was there, for training.  Yes, sir.
17         Q.    So you had at least three people talk to you about
18    wanding on November 20th; right?  Or four people:  Masuda --
19         A.    The person she had.
20         Q.    -- Masuda, Williams, Rusty and Devery; right?
21         A.    No, sir.  Masuda, the person that she had assisted
22    me.  Angela Williams just said, Here it is.
23         Q.    Okay.
24         A.    And then Rusty and Devery.  And I'm -- I want to
25    check and make sure that was on the 20th.  If you say so, I'm
```

```
 1   sure it was.
 2         Q.   Don't take my word.
 3               MS. HEVICON:  Don't take his word for
 4   anything.  On the record, that is.  Off the record you can.
 5               THE WITNESS:  Okay.
 6   BY MR. HELPER:
 7         Q.   If you look at page 6, it cuts to November 21st
 8   and 22nd.
 9         A.   Okay, sir.
10         Q.   So that confirms that, in fact, you were
11   approached by three supervisors, at least, about your wanding
12   technique on November 20th; right?
13         A.   Correct.
14         Q.   And that was about three separate wanding issues;
15   right?
16         A.   Yes, sir.
17         Q.   Okay.  Did you argue with any of the supervisors
18   who were talking to you about your wanding technique on
19   November 20th?
20         A.   I don't believe I argued, sir.  I asked --
21               MS. HEVICON:  It's a yes or no question.
22               THE WITNESS:  No, sir.
23   BY MR. HELPER:
24         Q.   What was your response when you were -- What was
25   your response to Ms. Williams -- I'm sorry, let me back up.
```

```
 1              Ms. Masuda talked to you about your wanding
 2   technique and about taking laptops over to ETD with the owner
 3   not present; right?
 4        A.    Correct.
 5        Q.    Okay. And did you tell her you thought that that
 6   was an unfair criticism?
 7        A.    I --
 8              MS. HEVICON:   Yes or no question.
 9              THE WITNESS:   I would like you to rephrase
10   that.
11              MS. HEVICON:   It's a yes or no question.
12              THE WITNESS:   No, I --
13   BY MR. HELPER:
14        Q.    Okay. What was your response to Ms. Masuda?
15        A.    To this?
16        Q.    No, no. I'm not asking what you wrote when you
17   got written comments from Ms. Masuda or Ms. Williams. I'm
18   asking what you said when you were orally advised by Ms.
19   Masuda about ETD procedures and wanding techniques.
20        A.    I told her that I had been previously instructed
21   from the lane 3 that ETD was between lane 1 and 2 and if that
22   was tied up, that if the lane was free, I should go and use
23   it. If there were people backed up using it, that I was to
24   visually inspect. And asked her, Had that changed?  Because
25   policies were continually changing and I was just trying to
```

1    clarify, with things changing every day, had that changed

2    that everybody was now supposed to go --

3         Q.    And --

4         A.    I didn't mean it argumentatively.  Just to

5    clarify.

6         Q.    How long do you think you were talking with Ms.

7    Masuda about these issues?

8         A.    How long did it just take me?  Five seconds.

9         Q.    Is that your estimate of how long you were

10   talking?

11        A.    Yes, sir.

12        Q.    How about with Rusty?  What was your response to

13   Rusty when the metal rivet issue arose?

14        A.    I thanked him because I told him that I didn't

15   realize what was meant by clearing, and I thanked him for

16   showing me and assisting me.

17        Q.    And then how about with Devery?  What was your

18   response to him?

19        A.    I, again, thanked him.

20        Q.    Were there other people, new people at the same

21   checkpoint on the November 20th?

22        A.    I'm sure there were because it was a whole

23   training group that had arrived with me.

24        Q.    Did you notice anyone else having the same

25   problems that you were having?

```
 1          A.    There was a person named Tom that was -- we were
 2    being worked in tandem, and -- and I didn't notice anybody
 3    else.
 4          Q.    Do you know what -- Can you give any kind of an
 5    estimate just based on your visual observation of who else
 6    was there -- or, first of all, can you estimate how many
 7    screeners were being trained along with you on November 20th?
 8          A.    I couldn't.
 9          Q.    Ten?
10          A.    Your records would be better than my guess.
11          Q.    You were there; right?
12          A.    I was busy focused on my job, not looking at what
13    was going on.
14          Q.    Were you moving around within a group of new
15    people?
16          A.    A handful, three or four of us, that were working
17    a particular line or going to the gates.
18          Q.    Do you recall the races of any of the other people
19    who were new being trained alongside of you on November 20th?
20          A.    Tom was Caucasian and the other person that was
21    with me was Caucasian and then three locals.
22          Q.    And did you observe anybody else having the issues
23    that you were having with wanding other than Tom that you
24    have already described?
25          A.    The person next -- The Caucasian next to me was
```

```
 1   corrected, but I don't know if -- how many times and
 2   procedure, because I was just worried about trying to learn
 3   with me.  I wasn't at this point seeing, Who else is in
 4   trouble, too?
 5        Q.   Okay.  Let me ask you just generally, are you
 6   aware of anyone else at Kahului who was terminated for
 7   failure to learn wanding?
 8        A.   I don't know why anybody was terminated.
 9        Q.   Okay.  Do you know why you were terminated?
10        A.   I'm told because I was a sexual predator, a racist
11   against Samoans and Japanese, and insubordinate.
12        Q.   Who told you you were a sexual predator?
13        A.   I don't know how that came out, but there was a
14   reference made to that by Phil upon my termination, that
15   there was concerns about that.  But, again, I wasn't allowed
16   to defend myself or give any details.  I wasn't told why I
17   was a racist against Samoans.  I don't know if I would know
18   one, much less be racist towards one.  And that I was
19   insubordinate, which I assumed could be this first exhibit,
20   except that anything I asked was asking for understanding as
21   a trainee to understand the process, not to be insubordinate.
22   There's nothing I refused.  Just an attempt to learn.  I was
23   going to be a supervisor, I needed to know as much as I
24   could.
25        Q.   Were you ever told that you were terminated for
```

```
 1    incorrect wanding procedures?

 2         A.    No, sir.  I correct that.  Let me check and see

 3    with the help of this.  I'm sorry, sir.  December 9th, my

 4    termination during probationary period that was submitted by

 5    Robert Au says that I was counseled, it's determined that my

 6    need for constant supervision is unacceptable, and that my

 7    performance is inappropriate and cannot be tolerated.

 8         Q.    And is --

 9         A.    And in a side bar, it was talked about my racism

10    and inappropriate sexual behavior and my insubordination.

11         Q.    Now, on the -- This document that you are looking

12    at is a two-page document --

13         A.    Correct, sir.

14         Q.    -- dated December 9th, 2002?

15         A.    Correct, sir.

16         Q.    And you received it on that day; right?

17         A.    I received it on the date I was terminated.  Does

18    this say effective today?

19                   MS. HEVICON:  Try looking back at your

20    statement.

21                   MR. HELPER:  No, no.  His signature is dated.

22                   MS. HEVICON:  This one doesn't have a

23    signature.

24    BY MR. HELPER:

25         Q.    Okay.  Let me give you this document that I will
```

```
 1    make Exhibit E?  Was this document Exhibit E given to you by
 2    Filbert Carvalho --
 3          (12/9/02 Letter, EXHIBIT E, marked)
 4          A.   Yes, sir.
 5          Q.   -- at the same time he was advising you of --
 6          A.   Yes, sir.
 7          Q.   But the written documentation doesn't say anything
 8    about sexual predator?
 9          A.   No, sir.
10          Q.   I'm correct, it doesn't say anything?
11          A.   Correct.
12          Q.   I may have asked you this.  This is your signature
13    on --
14          A.   Yes, sir.
15          Q.   -- Exhibit E?
16          Okay.  So on November 23rd you were wanding again;
17    right?  I'm looking at page 6 of your statement.
18          A.   Okay.  (Pause - referring.)  It's pretty safe -- I
19    was wanding every day I was there.  Okay.  I'm on page 6.
20          Q.   And this write-up that you got here that's Exhibit
21    B, is this your handwriting on -- under the "Employee
22    Comments" portion?
23          A.   Yes, sir.
24          Q.   Okay.  And is this an accurate account -- what's
25    she written here an accurate account of your exchange with
```

```
 1     Ms. Gordon?
 2           A.    Let's see.  (Pause - referring.)  Yes, sir.
 3           Q.    Okay.  So let me see if I've got it right of what
 4     happened.  "PM crunch time," does that mean high stress, busy
 5     time?
 6           A.    Correct.
 7           Q.    And Ms. Gordon had to ask you three times before
 8     you moved from a certain position?
 9           A.    She told me to go check with the lead.  I saw it
10     was crunch.  I asked her if she was going to have enough
11     people, and she told me go ahead.  And I went and then got
12     sent back to my position by the lead.  The lead said, "Get
13     back there.  It's crunch."  So I went back to my position I
14     was in.  I didn't realize that that was a write-up until I
15     got this.  And I just, "Okay.  Well, thanks for assisting
16     me," but, again, not argumentative.
17           Q.    Okay.  But I'm just trying to figure out what
18     happened that led to the write-up.
19           A.    Yeah.
20           Q.    Ms. Gordon asked you to move away from a given
21     position?
22           A.    Yes.
23           Q.    And you said, Are you sure you want to do that,
24     essentially?
25           A.    And she said yes and I did.
```

1    Q.    And then it said -- Well, according to -- Just

2    looking at this, it looks like she asked you to move, you

3    asked, "Are you sure you have enough wanders?"  She said yes

4    and she asked you to move again.  You said, "I just wasn't

5    sure if you had enough wanders."  And she asked you a third

6    time and then you moved?

7         A.    Well, I was so jumpy of getting written up every

8    time I turned round, I reiterated that just to let her know

9    that I wasn't being insubordinate, "Okay.  I'm moving.  I

10   just wasn't sure."  But it wasn't being insubordinate as much

11   as that last statement was to make sure that she understood

12   that I wasn't trying to be insubordinate, because I was

13   pretty gun-shy at this point.

14        Q.    And you say Ms. Gordon said she didn't think it

15   really needed a write-up, she told you that?

16        A.    Yes.

17        Q.    When did she tell you that?

18        A.    I don't know, sir, but I would have to defer to

19   what I had written here, which was fresh in my memory.

20        Q.    Well, was it right at the time she gave you the

21   write-up, or some later date?

22        A.    No, no.  It was current with when this was done.

23        Q.    So she apologized at the time she gave you the

24   write-up?

25        A.    Yes, sir.

```
 1        Q.   Did you ever understand that there was any kind of
 2   a policy at TSA Kahului about write-ups or when people got
 3   written up or --
 4        A.   No, sir.  Our understanding from Honolulu training
 5   was that we could not get written up until after we had
 6   passed probation, according to the packet of instructions
 7   that we were given, and that we were going there strictly as
 8   trainees to be instructed.  I assumed all of these
 9   corrections were to better facilitate my performance so that
10   at the end of training I would be fully qualified.  I did not
11   realize that it was a winnowing process, but an opportunity
12   to improve myself until the very end.  And I had no concept
13   of what this was about except an opportunity to improve.
14        Q.   Now, you used the word "probation."  You were
15   actually on probation for the first year of your employment,
16   weren't you?
17        A.   There was -- I was on probation, but there was a
18   probationary training period before the clock started.  And
19   within TSA's packet there was a while in training status, you
20   weren't to be terminated for training, that you were supposed
21   to be trained.
22        Q.   Okay.  And then on November 23rd you had Patti
23   Igarashi -- after you got the write-up from Davelyn Gordon,
24   you got criticized by Ms. Igarashi for your wanding
25   technique?
```

```
 1            A.     (Pause - referring.)  Yes, sir.

 2            Q.     And what was her criticism?

 3            A.     She said that I had touched somebody, which I

 4    thanked her and said I would be more of -- aware of my

 5    actions, that I was not aware that I had touched anybody.

 6    And then she had also talked about the wanding procedure, we

 7    had people take their shoes off and wand them, and about a

 8    seating policy, a seating procedure.  And she corrected me on

 9    that.  Again, thinking this was instructional, not

10    terminational.

11            Q.     Now, also November 23rd you had a training session

12    with Pat Collins; right?

13            A.     Yes, sir.

14            Q.     And was this before or after you got the write-up

15    from Patti Igarashi?

16            A.     This was very close either way.  I'm not sure at

17    this point.

18            Q.     Okay.  And there was another trainee named Herb

19    Moniz that was sort of pulled at the same time?

20            A.     Yes, sir.

21            Q.     And what was Mr. Moniz's race, as far as you could

22    tell?

23            A.     He's Caucasian.

24            Q.     And what was Mr. Collins' demeanor when he was

25    training you on November 23rd?
```

1        A.   It was very matter of fact and to the point and

2   perplexing for me, because he just -- he demonstrated, "This

3   is the way it's supposed to be done by TSA," face forward

4   training. "Let me show you." And then he went through with

5   the double 7's and said, "Now, Patti has told me that you are

6   not wanding down the feet, but that you're wanding around the

7   feet when they're up and that's not according to the policy.

8   This is the way you're supposed to do it." And then he

9   repeated the way Honolulu said to do it, which was confusing

10   because he's the one that had initiated telling us to do it

11   the other way. No reference made that, "This is the way I

12   showed you before. It's changed." He just came in like and

13   had presented what we had been doing as the way it's always

14   been.

15        Q.   Well, you -- And did you raise that with him?

16        A.   I was so gun-shy at this point, sir, I just said,

17   "Thank you," "Yes, ma'am," "No, ma'am" to everybody that

18   looked at me.

19        Q.   In your statement you make a reference to being

20   told that the use of the W was to reinforce the OGG corporate

21   policy that W, Wackenhut, was still in charge. Who told you

22   that?

23        A.   That was around the water fountain corporate

24   knowledge by everybody. There wasn't a particular

25   individual, that was just the buzz.

```
 1          Q.    The rumor?
 2          A.    The buzz, yes.
 3          Q.    Is it fair to call that a rumor?
 4          A.    Yes, sir.  Pervasive rumor.
 5          Q.    Now, as I understand it, after these counselings
 6    on November 23rd, you changed the way you approached
 7    passengers and you sort of kept your distance more in terms
 8    of your wanding.  Is that fair?
 9          A.    Which page, please, sir?
10          Q.    The bottom -- very bottom of page 8.
11          A.    Thank you, sir.
12                (Pause - referring.)  Yes, sir.
13          Q.    Okay.  Page 9 of your statement you say, "Other
14    trainees" -- I'm sorry.  At the bottom of the second full
15    paragraph.  "Other trainees have stated that records tend to
16    appear or disappear after the fact or change in content."
17    Who said that to you?
18          A.    Again, pervasive rumor.
19          Q.    Well, you refer in your statement to the trainees
20    listed on attachment 6.
21          A.    Uh-huh (affirmative response).
22          Q.    Let's look at attachment 6.
23          A.    (Complying.)
24          Q.    It's the very last page, I think.
25          A.    Thank you, sir.  Yes.
```

1      Q.    Who on this list of -- These are all TSA

2   employees, right, on this list of --

3      A.    These are the only ones that I could think of at

4   the time of who might know what was going on.  Not

5   necessarily they agree with me, disagree, but just whoever I

6   could think of.

7      Q.    They're all TSA employees; right?

8      A.    Yes.

9      Q.    And do you know which of these people are trainees

10  or were trainees with you?

11     A.    All of these people on the bottom I believe were

12  trainees with me except Chris Gahr, who was there before me.

13  And on the top of the page, everybody was TSA at my time.

14     Q.    And Karin Phaneuf was not a trainee, was she?

15     A.    She was a trainee supervisor, but I don't know if

16  she actually -- I don't know anybody's real status, sir.

17     Q.    Okay.

18     A.    I think she was in a group before me, but I don't

19  know what anybody's status.  Even the supervisors and leads

20  we never knew from day to day because there was no special

21  emblem, there was no -- People rotated from shifts.  It was

22  difficult.

23     Q.    Does looking at that list help you recall what

24  other trainees told you that records tend to appear or

25  disappear after the fact?

```
 1        A.   No, sir.

 2        Q.   Okay.  Let me ask you on page 10 of your

 3   statement, the very bottom, this is just -- I don't

 4   understand what -- if I'm missing something.  It says, "At

 5   8:50 a.m. on 12/16/02 I crossed paths with Miss Elizabeth

 6   Masuda as she was rushing to an appointment in Wailuku.  I

 7   asked her, When you wrote me up for," and then there's a page

 8   break and it goes to "moved me."

 9        A.   I, unfortunately, had a computer crash and can't

10   retrieve that, but there's obviously something that was

11   supposed to have printed out.

12        Q.   And it goes from -- We have page -- We're not

13   missing a page; right?

14        A.   No, sir.  But it did refer to the write-up when I

15   had abandoned my post and --

16        Q.   What write-up did you ever get for abandoning your

17   post?

18        A.   I don't see it here.

19        Q.   Did you ever see a write-up for abandoning your

20   post?

21        A.   Yes, sir.  That was something that Elizabeth

22   Masuda was told to write me up for and I saw.  Because Patti

23   had ordered me to report and then had ordered Elizabeth

24   Masuda to write me up for not being at the post that Patti

25   Igarashi had ordered me to leave.
```

1          Q.    And was this on November 20th?

2          A.    I don't know, sir.

3          Q.    Okay.

4          A.    I don't know.  I doubt it, speculating.  If it was

5    the 20th, it seems like she would have just added it on.  She

6    didn't limit herself to one charge per paper.

7          Q.    Okay.  And that was not -- the abandoning your

8    post charge was not mentioned in your letter of termination;

9    right?

10         A.    (Pause - referring.)  This is thick.

11                    MS. HEVICON:  I know.  That's your document.

12                    THE WITNESS:  I -- No, I wasn't on

13   methamphetamine or -- Here we go.  Counseling laptops.

14                    (Pause - referring.)  No, sir.  Also --

15   BY MR. HELPER:

16         Q.    "No, sir," what?

17         A.    It wasn't written in there as far as abandoning

18   post.

19         Q.    Okay.

20         A.    And I also asked her if she understood I wasn't

21   trying to be disrespectful.  She said she would acknowledge

22   that, too.

23         Q.    You're talking about Ms. Masuda when you ran into

24   her on the street?

25         A.    When I ran into her, yes.

1       Q.   Okay.   During your time at TSA Kahului did you

2    have any concerns that you were being discriminated against

3    on the basis of your race while you were there?

4       A.   I initially thought that I was being discriminated

5    to be a supervisor and that bizarre things were being done

6    that were obviously discriminatory and other supervisors that

7    were Caucasian, but it wasn't until actual termination that I

8    saw that the discrimination against Caucasians occurred.

9       Q.   What do you mean, things were obviously

10   discriminatory?

11      A.   The local people that would be lounging around

12   against the wall with shirttails out chewing gum, and yet the

13   Caucasian had to be standing up, little tin soldiers.   And

14   the locals would walk around with backpacks from gate to

15   gate, where Caucasians were not allowed to have anything on.

16           The Caucasians were told that it was a security

17   issue to have the TSA uniform on traveling back and forth to

18   work and, therefore, they would either have to wear a jacket

19   on top when traveling or remove their clothes and change to

20   uniform in the bathroom with the public so that they wouldn't

21   be seen in public with their uniforms; where the locals

22   freely walked back and forth across the parking lot and got

23   in their car and were seen around town in their TSA uniforms

24   where Caucasians were warned that that was a firing offense

25   if we had our uniforms on in public.

Lucas Bruno III

1    Q.    Anything else that you recall observing while you

2    were at TSA Kahului that you thought was obviously

3    discriminatory?

4    A.    The corrections that were given were exact and to

5    the letter for the Caucasians, whereas the local people

6    didn't get corrected.  Again, not my concern because I was

7    trying to learn so I could be a supervisor.  I didn't care if

8    anybody else didn't learn.  I was trying to learn.

9    Q.    Any other practices at TSA Kahului that you can

10   recall that were in your mind obviously discriminatory?

11   A.    Not unless otherwise stated in here, sir.

12   Q.    Okay.  So what I have got is locals hanging out

13   with their shirttails out leaning against the wall, locals

14   carrying backpacks, locals wearing their uniforms around

15   town, and locals not being corrected for errors; and in all

16   these categories under your observation Caucasians were

17   treated differently; right?

18   A.    Correct, sir.

19   Q.    You never heard any directly racially

20   discriminatory statements by anyone at Kahului; is that fair

21   to say?

22   A.    That's fair to say.

23   Q.    So you never heard anybody referred to by

24   derogatory racial terms; is that correct?

25   A.    Correct, sir.

```
 1        Q.   Do you consider the term "haole" to be in itself a
 2   discriminatory or racist term?
 3        A.   It's how it's used.  Caucasian can be derogatory
 4   if you use it in a certain way.
 5        Q.   And you never heard the word "haole" used in a
 6   discriminatory or racist way when you were at Kahului?
 7        A.   No, sir.
 8        Q.   Correct?
 9        A.   Correct, sir.
10        Q.   What supervisors criticized Caucasians for -- The
11   shirttails hanging out, is that fair to call that a dress
12   code violation?  I don't want to put words in your mouth, but
13   a couple things are kind of dress code.
14        A.   You're correct.
15        Q.   Okay.  In addition to their shirttails hanging
16   out, it sounds like also maybe their posture or their
17   attitude or their lack of -- they're not working?
18        A.   No.  It was drilled into us the professional
19   appearance, number one, to look like we knew what we were
20   doing to thwart terrorists.  Number two, to not upset
21   passengers that the tax dollars were spent on.  During
22   training, the horde of people that was there, to look sharp.
23   The uniform concern was also an expressed concern of we're
24   worried about security.  You get jumped, somebody gets your
25   uniform on and walks on through; it could be a problem with
```

```
 1   security.  Don't let people know that you're with TSA outside
 2   of the airport.
 3        Q.    Okay.  The in the airport dress code problems, you
 4   know, the people hanging out with their shirttails out, were
 5   those screeners?
 6        A.    Correct, sir.
 7        Q.    Was there also some concern about that there was a
 8   different dress code for the law enforcement or Wackenhut
 9   employees as opposed to the screeners?
10        A.    Not that I'm aware of, sir.  I'm not saying there
11   was or there wasn't.  I'm just not aware of that.
12        Q.    Okay.  But it's your belief that the people -- the
13   local people who were hanging out with their shirttails out
14   were, in fact, federal employees?
15        A.    They were TSA employees in the same uniform I was
16   in.
17        Q.    And did you ever see a Caucasian employee
18   counseled or disciplined or corrected for having their
19   shirttails out?
20        A.    I don't know the specifics.  I know that the
21   Caucasians were constantly corrected for a smart appearance.
22        Q.    When you say you know it, did you see this or did
23   you hear about it?
24        A.    I heard about it.  I've watched Caucasians being
25   told when it would -- not to carry a bag while other local
```

```
 1    people were allowed to carry backpacks on their shoulder.  I
 2    know that as far as the standing about on breaks, Caucasians
 3    were directed to go find someplace that was out of the public
 4    eye so as not to look like a bunch of people were lounging
 5    around; where locals were allowed to do that.
 6         Q.   I need to get you to be more definite in what
 7    you're saying here, because these are some serious assertions
 8    you're making.  So, first of all, I want to just ask you
 9    about what you personally observed.
10         A.   And that's what I was --
11         Q.   Okay.  And then I wanted to figure out who the
12    supervisors involved were who were doing these -- You're
13    using the passive voice were counseled as opposed to telling
14    me who was doing the counseling.  So I need to know who was
15    doing the counseling.  Hold on.  Let me ask the question.
16    And I want to talk about these things one category at a time.
17    And right now I'm just talking about shirttails, not about
18    backpacks.
19              Okay.  So you say locals hung out near the
20    checkpoint with their shirttails out where Caucasians were
21    counseled or criticized, in your observation, for doing the
22    same thing?
23         A.   I can be real direct observation.  I was one.
24         Q.   Okay.  Who counseled you?
25         A.   Patti Igarashi.  I was standing at parade rest
```

1    while she was going on, and she said, "Don't be leaning

2    against the wall." Two local people were leaning against the

3    wall next to me.

4        Q.    Two local employees?

5        A.    TSA screeners on the shift under training with me.

6    And I was two feet away from the wall and I'm told, "Don't be

7    leaning against the wall. The wall doesn't need to be

8    propped up." I'm even where it could be visually mistaken

9    that I'm leaning against the wall.

10       Q.    Did you ever see any other supervisors criticizing

11   Caucasians, but not locals for dress code violations other

12   than Patti Igarashi?

13       A.    No, sir.

14       Q.    Did you see her counseling Caucasians, but not --

15   I'm sorry. It's not just dress code because what you were

16   just talking about was not dress code. Deportment, I guess.

17       A.    Whatever.

18       Q.    Well, we've got to be precise here.

19             MS. HEVICON: Yeah, we do.

20             THE WITNESS: Okay.

21   BY MR. HELPER:

22       Q.    So did you -- Did Patti Igarashi ever criticize

23   any Caucasians other than yourself for leaning against the

24   wall that you observed?

25       A.    No, sir.

```
 1         Q.   Okay.  Did Patti Igarashi ever criticize anyone --
 2    any Caucasian for dress code violations that you observed?
 3         A.   In a group statement in orientation to everyone
 4    not to carry bags.  And then walk past --
 5              MS. HEVICON:  We're talking about shirts
 6    untucked.
 7              THE WITNESS:  Okay.  No.
 8    BY MR. HELPER:
 9         Q.   Backpacks I don't consider a dress code violation.
10              MS. HEVICON:  We're going to get to that.
11              THE WITNESS:  Okay.
12    BY MR. HELPER:
13         Q.   So the question is:  Did you ever see Patti
14    Igarashi criticizing, counseling or correcting a Caucasian
15    employee other than your -- or any Caucasian employee for a
16    dress code violation?
17         A.   No.
18         Q.   Did you observe any TSA supervisor criticizing or
19    correcting any Caucasian employee for a dress code violation?
20         A.   Not to the best of my knowledge.
21         Q.   Did anybody ever get criticized for a dress code
22    violation?
23         A.   I was in a small world.  I don't know.
24         Q.   I don't understand why it's discriminatory, then,
25    that the locals are hanging with their shirttails hanging out
```

1   if the whites -- If nobody is getting criticized for it, how
2   is it discriminatory?

3        A.    The whites are supersense -- hypervigilant of
4   appearing sharp, dressing sharp, and listening to everything
5   that was laid out as far as deportment, appearance and
6   procedures because the word -- word was out that people get
7   fired.  People are going.  Look sharp.  But the locals could
8   walk around without worrying about what the rules are, We're
9   not going to get fired.  So it was selective enforcement of
10  the policy where the Caucasians were taking something that
11  was laid out very seriously because people were getting fired
12  for who knows what and we're getting corrected for who knows
13  what, so --

14       Q.    What you're really saying, though, isn't it, is
15  that it wasn't selective enforcement that you ever saw, it
16  was the rumor of selective enforcement that made people
17  behavior differently in your perception; right?  You never
18  saw any selective enforcement, did you?

19       A.    I saw people that were Caucasians told -- We're
20  not getting into backpacks yet.  The shirttail is only one
21  incident that I saw.  It wasn't a problem rampant throughout.

22       Q.    Okay.  Isn't it correct to say that in terms of
23  dress code violations, you did not see selective enforcement
24  of dress code rules because you never saw any enforcement of
25  dress code rules?

```
 1           A.    That I can speak of only myself.  I don't --
 2                       MS. HEVICON:  Right.
 3    BY MR. HELPER:
 4           Q.    Right.  So I'm saying you never selective
 5    enforcement of the dress code; right?
 6           A.    Correct.
 7           Q.    Is it your testimony that you never saw any
 8    Caucasian person whose dress violated the dress code?
 9           A.    There is one person that had a tattoo and
10    corrected that by wearing a bandage on top of it.  And other
11    than that, I didn't see any Caucasians that violated the
12    dress code, no.
13           Q.    Backpacks.  I know you're itching to get to it.
14           A.    I'm ready for you.
15           Q.    Tell me about what the rules were for backpacks.
16           A.    They --
17           Q.    I'm sorry.  Again, tell me what you saw and tell
18    me who the supervisors involved were?
19           A.    The supervisor of the day -- Which was part of the
20    problem, because everybody got shuffled into different groups
21    and different supervisors.  But basically orientation
22    consisted of a reiteration to not have backpacks, not be
23    wearing jackets over your shoulder.  The TSA uniform would be
24    neat, clean, and visible and not to be encumbered carrying
25    stuff that was not work related like wands or the buckets or
```

1   whatever that were needed.  And that it wouldn't be tolerated
2   to be sloppy in appearance.

3        And the selective enforcement was that if anybody
4   did have a backpack on, that was a write-up if they were
5   Caucasian.  And I was told, but I can't give you names and
6   dates by people that said they had gotten written up for
7   that.  "Be careful.  Don't wear that."  So everybody became
8   self-protective of each other.  Whatever they were written up
9   for became the urban legend of what not to do because that's
10  when you found out what you couldn't do, was when you got
11  written up.

12        So it became very hypervigilant of don't put a
13  jacket on, don't carry anything, don't have a backpack; but
14  yet the local people would traipse right in front of Patti,
15  in front of Pat Collins, in front of any of the day
16  supervisors and nobody said anything, but it was a big thing
17  a couple hours earlier in orientation.  It was a big thing
18  when urban legend had don't do that because that's how you
19  get written up.

20        Q.   Were you ever written up for having a backpack?
21        A.   I was getting written up for doing nothing.  I
22   wasn't about to violate what I knew was wrong.  No, I didn't.
23        Q.   Were you ever written up for --
24        A.   No.
25        Q.   Wait for the question so I get a clean question

```
 1   and answer.  Were you ever written up for carrying a
 2   backpack?
 3        A.    No.
 4        Q.    Did you ever see any supervisor criticizing anyone
 5   for having a backpack, anything to do with backpack?
 6        A.    Only in orientation before it was dispersed.
 7        Q.    That's when they told you the rule, Don't have a
 8   backpack on?
 9        A.    And that it's been seen and it won't be tolerated,
10   yes.
11        Q.    And you never saw that rule enforced against
12   anyone; correct?
13        A.    Correct.
14        Q.    The off -- away from airport -- Hang on a second.
15   The off --
16              MS. HEVICON:  Campus?
17   BY MR. HELPER:
18        Q.    Off airport.  Thank you.  Off airport wearing a
19   uniform, same set of questions.  I'll assume that there was a
20   rule that said you can't wear -- don't wear your uniform.
21   You were told this during orientation?
22        A.    Yes.
23        Q.    And you saw local people wearing their uniforms in
24   town?
25        A.    Post office, grocery, walking through the exit to
```

```
 1   the parking lot in their uniform.

 2        Q.   And do you know of that rule ever being enforced

 3   against anyone?

 4        A.   No.  Just reiterated that it wouldn't be

 5   tolerated.

 6        Q.   Okay.  Did you ever see a Caucasian wearing their

 7   uniform around town?

 8        A.   No.

 9        Q.   Did you ever see a Caucasian carrying a backpack?

10        A.   No.

11        Q.   Did you ever hear of a Caucasian being disciplined

12   for carrying a backpack?

13        A.   I heard of, which was why no one -- the Caucasians

14   weren't doing it.  Can I prove that it was a myth or not?

15   No, I can't.

16        Q.   But you can help us establish whether it's a myth

17   or not by giving us as much information as you have about

18   what you heard.  So if you have any information about who

19   told you this information, what information was given to you,

20   supervisor involved --

21        A.   This is just -- You hear and you absorb it as

22   things not to do and move forward.  My focus wasn't the --

23   you know, if I knew we were going to be here, I would have

24   taken a lot better notes of names, dates, places.  I was

25   there --
```

```
 1         Q.    Welcome to litigation.

 2         A.    I was there to learn.  I was there to be trained.

 3   And I thought in 60 hours I was going to be out of there.

 4   And so --

 5         Q.    Maybe you should read back my question.

 6         A.    I'm terrible with names, dates and places because

 7   that was a different game.

 8               MR. HELPER:   I'm sorry.  You don't have to

 9   read it back.

10               MS. HEVICON:   I was going to say, I don't

11   know if she can find the question.

12   BY MR. HELPER:

13         Q.    What was your understanding of what the

14   off-airport uniform policy was?

15         A.    No uniform.

16         Q.    Don't wear your uniform at all?

17         A.    If you're going to -- The uniform pants were

18   black, black shoes, so you could wear a jacket or something

19   to cover up that you were wearing your uniform top.  Plain

20   black pants, shoes were okay, but don't be seen in your

21   uniform.

22         Q.    Okay.  So you could wear it -- And the shirt is

23   all you're really concerned about because that's what's got

24   the insignia?

25         A.    Right.  If you wore a jacket that fully covered
```

1    up.

2         Q.    Then you were okay?

3         A.    Yes.

4         Q.    Then you said, I think, that there was a different

5    corrections policy applied to locals and Caucasians; right?

6    Can you give me any examples other than your own example

7    about holding up the wall?

8         A.    The wanding, the situation where we pulled by Pat

9    Collins up -- to Caucasians pulled up when afterward I asked

10    all the local people, "How are you wanding?"

11              They go, "Oh, W."

12              "Are you still lifting up the shoes and wanding?"

13              "Oh, yeah."

14              "Did anybody tell you differently?"

15              And I asked a couple of dozen people and the

16    Caucasians said, "Oh, no, no.  We have to wand all the way

17    down to the ground," when I asked them.  And the local people

18    said, "No, no."  Right up there in front of everybody still

19    to this day wanding with the W and around the shoes and

20    "Nobody has ever told us anything."

21         Q.    What was the date -- Was this on November 23rd,

22    right after your corrections, you asked all the people about

23    how they were being trained?

24         A.    Yes.  And the days to follow because I noticed

25    that it -- what I was corrected for was still being carried

1    on by the locals and I was curious, you know, Was this the

2    word didn't get out?  Because if I'm getting disciplined, let

3    me help out and pass the word along.  Hey, I just got

4    disciplined.  Don't do that anymore.  And --

5        Q.    Other than what you perceive as different

6    standards for wanding, did you observe any differences in the

7    way Caucasians and locals were -- how policies were enforced

8    on them at work?

9        A.    No, sir.

10       Q.    Okay.  And when you talked to your -- the other

11   screeners about how they had been trained, you say you talked

12   to a couple dozen?

13       A.    Over a dozen, because we had several groups in the

14   morning when we first would meet for orientation before we

15   broke up to the main entrance area into the gates and they

16   would divide up between the two different wings.  So we had

17   like four groups of people that would consolidate and we

18   would show up early and be able to talk to the different

19   people that would show up.  And --

20       Q.    Would you give me an estimate as to how many were

21   local and how many were Caucasian, the people you spoke to

22   about how they had been trained in wanding?

23       A.    I talked to everybody I could.  I don't know the

24   percentage, sir, but I -- I noticed that it was still

25   continuing on and so I asked.  And it did break down into the

```
 1   local people were still doing it the old way.

 2        Q.   But if there's only one or two local people or,

 3   alternatively, only one or two Caucasians, that's not a big

 4   group, then I think it's fair --

 5        A.   They --

 6        Q.   Hang on.  It would be fair to say that the chances

 7   of it being by chance are greater than opposed to if you

 8   talked to 15 people and seven haoles do it one way and eight

 9   Caucasians do it another.  So that's why it's important that

10   I try to get from you a rough breakdown of the -- who was --

11   how many Caucasians -- Hang on.  Let me just the question.

12            How many Caucasians did you ask in the days --

13   November 23rd or the days following about how they had been

14   trained in wanding?

15        A.   Eight, nine.

16        Q.   How many locals did you ask in the days

17   following -- November 23rd or the days following did you ask

18   how they had been trained in wanding?

19        A.   Ten, 12.

20        Q.   And was it a perfect split, all the haoles had

21   been trained one way, all the locals had been trained

22   another?

23        A.   Yes.  Yes.

24        Q.   You didn't put that in your statement, did you?

25        A.   I didn't think that was important at the time.
```

```
 1    Also, at the time I was not preparing for today, but for
 2    TSA's appeal process three years ago, is what I was writing
 3    my statement for.
 4         Q.    Well, you wrote a 15-page statement; right?
 5         A.    Yes.  To try to help somebody in Washington
 6    understand what's going on in Hawaii, but not from a
 7    grievance position for a court date as much as trying to
 8    understand what's going on here in Hawaii.
 9         Q.    Do you remember the names of any of the people who
10    you asked about how they had been trained on November 23rd
11    and the days following?
12         A.    (Pause - referring.)
13               MS. HEVICON:  Last page.
14               THE WITNESS:  (Pause - referring.)  Marilyn
15    Baldwin, Kathleen McCarthy, Tom Makena.  Harold I know
16    because he was there with me.  Karin Phaneuf, Everett, Lance,
17    Gay Wagner.  There were more because there were people that I
18    didn't even really know that I was just hitting at
19    orientation that I usually did work with, but --
20    BY MR. HELPER:
21         Q.    During the time that you worked at TSA did you
22    tell anyone about the results of the poll you had taken on
23    wanding techniques, wanding training?
24         A.    I let them know that I had been corrected to a new
25    style and had asked if they had, but I didn't let them know
```

```
 1   what my polling results were.

 2           Q.   Did you tell -- You didn't tell anybody?

 3           A.   No.  I just asked, "Have you been showed this new

 4   technique?"  And they either said yes or no.  And I didn't

 5   say, And, furthermore, here's the results of what I'm

 6   finding.  I didn't share that information.

 7                MS. HEVICON:  Is your question:  Did he tell

 8   the other workers about what he learned, or did he tell

 9   management about --

10                MR. HELPER:  I'm asking if he told anybody.

11                MS. HEVICON:  Okay.

12                THE WITNESS:  Certainly not management.  I

13   was so gun-shy because -- I was like a cockroach as far as

14   management being around.  It was get in there, do your job

15   and get out of there.

16   BY MR. HELPER:

17           Q.   Now, when you wrote your 15-page statement, you

18   were writing it to -- after you had filed your EEO complaint;

19   right?

20           A.   I had been on the phone leaving messages to a

21   tape-recorder for a month while all of this was going on

22   without getting results, and then had been terminated.  I was

23   told by EEOC, Hey, sorry, you're not our employee anymore.

24   So that's why I wrote this for an Arlene Ashton, who was

25   handling TSA in Washington, saying, "Look, there's something
```

1   going on here that I would like to present." And -- and that
2   was my motivation.

3             I wanted to work for TSA.  I came there trying to
4   learn and I wanted TSA to know.  The response I got in the
5   review was, Well, I've read -- I've read everything they sent
6   in on me and I would have fired you myself.  So I said, "I
7   don't know what was sent in, but this is -- this is my
8   statement." And I submitted that for consideration because
9   all I want to do is just --

10        Q.   But if you're trying -- Well, at the time --

11             MR. HELPER:  Why don't we go off the record
12   for five minutes.

13        (Pause in Proceedings:  3:57-4:08)

14             MR. HELPER:  Back on the record.

15   BY MR. HELPER:

16        Q.   After your -- or at the time you were terminated I
17   understand that Filbert Carvalho told you that he was
18   concerned about racism and sexual predator, that you were a
19   sexual predators?

20        A.   There was some kind of sexual words and/or actions
21   on or about the airport that I was a racist against Samoans
22   and Japanese, and that I was insubordinate.  And, of course,
23   because I hadn't passed the IAD test, which is a whole
24   'nother story, after the second try.  That I just wasn't cut
25   out for this.

```
 1              It wasn't just this letter.  In addition to this
 2    letter it's like, Don't even try to fight this because of the
 3    racism, because of the sexual predator, the insubordinate and
 4    not passing the IAD test.  Just give this up.
 5         Q.   And did you ever come to learn anything more about
 6    the Samoan or Japanese racism comment?
 7         A.   First time I had heard it.
 8         Q.   No.  After that.
 9         A.   That was it.
10         Q.   So you never saw the statements that were filed
11    during the EEO proceedings?
12         A.   No.
13         Q.   Let me show you.  Mark this as Exhibit F.
14              (Bos Affidavit, EXHIBIT F, marked)
15         A.   So there really was some, okay.
16         Q.   Do you know Susan Bos?
17         A.   I know a Suzanne.  I'm not sure if I know a Susan
18    Bos.
19         Q.   Why don't you just read that paragraph -- well,
20    just read the whole thing and tell me what your reaction is.
21         A.   (Pause - referring.)  I can only think that she
22    might have had me confused with somebody else.  This is
23    things that -- There are certain things that are true, that
24    there is -- I did tell her that I was working with -- that I
25    had worked one time with Japanese where the people in
```

```
 1  Honolulu needed to buy St. Augustine's church, but as far
 2  as -- I've never been to Samoa.  I don't know what this
 3  paragraph whatever is.  And I don't know how I would have
 4  known if they were Japanese or Chinese.  But at least now I
 5  finally know what this is all about.
 6       Q.   If we accomplish nothing else today --
 7       A.   Yeah.  Yeah, okay.  And now I have to try to --
 8  Who's Susan Boss?  But it's interesting that this actually
 9  was -- went in -- filed without me even being aware, being
10  asked what I --
11       Q.   Okay.  So of all the assertions in this Exhibit F
12  about things that you supposedly said, the only -- as you
13  look at it, you might have said something along the lines of
14  the Japanese wanted to buy property in Honolulu, St.
15  Augustine's chapel?
16       A.   Yes.
17       Q.   How about the part about the Japanese Yakasaw?
18       A.   It -- What I did say was that the organized crime
19  had a problem that they had property in Honolulu that was low
20  rise and that they needed the church, which had unlimited
21  height development, so you could put up a hotel.  And that
22  the deal was for them to try to unload their low-rise
23  Honolulu property in order to get the high rise.  And that,
24  again, isn't racist towards Japanese or anything.  This is
25  just a business deal that was being forced upon some people
```

Lucas Bruno III

```
 1    that they had to try to get the church to trade so they could
 2    dump the low-rise property.  I could have said -- if it had
 3    been Italians, I would have said the Mafia or whatever.  It
 4    was not a racist thing as far as it was actually Japanese
 5    organized crime that was involved in a very specific real
 6    estate deal, and that is factual.  The rest of this stuff --
 7         Q.    I haven't asked you a question about that yet.
 8         A.    Okay.
 9         Q.    So as you look at this, you may well have said
10    something about the Japanese wanted to buy property in
11    Honolulu, about St. Augustine's chapel being involved in a
12    Japanese property transaction and about the Yakasaw being
13    involved in the property transaction; correct?
14         A.    Correct.
15         Q.    And the rest of it is --
16         A.    Who knows?
17         Q.    Yeah, okay.  Do you remember Susan Boss or do you
18    have any idea who she is?
19         A.    No, I don't.
20         Q.    Okay.
21         A.    I assume a co-worker.  We floated among each other
22    so frequently.
23         Q.    In your EEO affidavit, and, again, looking back at
24    the big one --
25         A.    Are there any more write-ups I don't know of?
```

```
 1            Q.    I don't know what you know of.
 2            A.    I know these three because I had actually signed
 3    it, but I didn't know about the secret write-ups.
 4                  MR. HELPER:  Let's go off the record for a
 5    second.
 6            (Pause in Proceedings:  4:16-4:18)
 7    BY MR. HELPER:
 8            Q.    Let me ask you if you recognize this document,
 9    March 14th, 2003.
10            A.    (Pause - referring.)
11                  THE WITNESS:  I'm sorry.  I have flipped to
12    page 2 without you having a chance to read page 1.
13                  MS. HEVICON:  That's okay.
14                  THE WITNESS:  Yes, I recognize this.
15    BY MR. HELPER:
16            Q.    Okay.  And now I have got you to recognize it, I'm
17    going to ask you questions about it.
18            A.    But I'll need to borrow it back to answer the
19    question you ask about it.
20            Q.    Okay.  I've got you -- I'm looking at your EEO
21    affidavit, which has been marked up so I'm not going to show
22    it to you, I'm just going to ask you about some statements.
23    It says, "I was made aware by other screeners that shortly
24    before I began working at Kahului Airport, Ms. Patti Igarashi
25    (screening supervisor) stated that she hated haoles and when
```

```
 1    her people returned, she was going to put them in lead
 2    positions.  And I believe Mr. Chuck Karlan, Karin Phaneuf and
 3    Everret Reinhardt heard these remarks."
 4            You never heard any of these remarks?
 5       A.   Happened before I arrived.
 6       Q.   Okay.  This is mainly a repeat of your affidavit,
 7    actually.
 8                 MS. HEVICON:  From the big ass letter.
 9                 MR. HELPER:  Yes.  Not to use complex legal
10    terms.
11                 MS. HEVICON:  I believe that is in my legal
12    dictionary.  It is from Old England.
13    BY MR. HELPER:
14       Q.   I think you said or mentioned earlier that you had
15    complained -- called in complaints about what was going on on
16    some occasions?
17       A.   Yes.  It was just something that didn't feel
18    right.  And my initial calling in was to the EEO line to say,
19    Look, I might be off base here that there's any kind of
20    discrimination or what-have-you, but there's -- I want to
21    talk to you about what's going on here, that I'm getting
22    yelled at, I feel like I'm getting set up for failure and
23    I'm -- I'm concerned to want to just talk about what's going
24    on.  I wasn't leading any class action suit.  I was just
25    concerned about the way I was being treated.  But I couldn't
```

```
 1   get any response from anybody.
 2        Q.    When did you first make a call to anyone about
 3   your concerns about what was happening at Kahului?
 4        A.    I'm sure I recorded it in here.
 5        Q.    I mean, I'm shaking my head no, but you're
 6   certainly welcome to check.  I don't think it's in there.
 7        A.    I know it certainly was in the first couple of
 8   weeks, because I was still -- although the urban legend of
 9   what happened to Chris Gahr as a white supervisor that was
10   history and that I was going to be next was the buzz in the
11   background.
12             But I was still thinking -- I've been through OCS
13   with the military.  I've been through enlisted boot camp.
14   They put you through a lot of pressure to see how you react.
15   I thought, This is so bizarre, they're putting me under
16   bizarre pressure to see how I react.
17             So I did not start calling until at least a week
18   or ten days later to say, Look, I just want to go on record
19   so it doesn't look like after the fact I'm making up this
20   stuff up of a disgruntled, fired employee.  I want to keep
21   you in the loop of what's going on while it's going.  I never
22   got any response.  I talked for a minute, the tape would end
23   on the answering machine, and I never got anybody to call me
24   back.
25        Q.    Was this a local number?
```

```
 1            A.    No.  It was the number given for any problems with
 2      TSA, call our TSA HR number.  And all I could get was an
 3      answering machine.
 4            Q.    And how many times did you call and leave messages
 5      on the answering machine?
 6            A.    Several.  More than a few times.  Not a dozen.
 7      Somewhere --
 8            Q.    Five to ten, maybe?
 9            A.    Yeah, five is a good guess.
10                  MS. HEVICON:  Estimate or guess?
11                  THE WITNESS:  Guess.  I know, I'm not
12      supposed to guess.
13      BY MR. HELPER:
14            Q.    And when you say -- I think you said -- Okay.  And
15      when you didn't get any response from the hot line --
16            A.    None.
17            Q.    And so you didn't tell anybody else about this?
18            A.    I did.  And they say, "Well, we don't, either."
19            Q.    "We don't" -- Oh, okay.
20            A.    Evidently some other people were calling, too, and
21      they never got any response.
22            Q.    Is it fair to say you never put anything in
23      writing about your concerns about discrimination at Kahului
24      until after you had been terminated?
25            A.    I didn't think it was necessary.
```

```
 1          Q.    Yes or no?

 2                MS. HEVICON:    The question is:   Did you?

 3                THE WITNESS:    No, no, no.

 4   BY MR. HELPER:

 5          Q.    Okay.   So you called -- You were concerned enough

 6   about it to call and leave a message, but you didn't think it

 7   was necessary to put anything in writing 'til after you got

 8   fired; is that right?

 9          A.    Didn't know who.

10          Q.    Okay.   You talk about the Chris Gahr urban legend.

11   What was the Chris Gahr -- And urban legend, that's your

12   term; right?

13          A.    Correct.

14          Q.    And what was the urban legend?

15          A.    That Chris Gahr was the first screener to be

16   hired, that he had gotten out to Kahului, and that he had

17   been terminated so that they could bring in a replacement for

18   him.    And that I don't know the specifics, but that he was

19   set up.   That he was targeted so that he could be terminated.

20   I never asked him the specifics.   I don't know the specifics.

21          Q.    Do you know anything about the reasons he

22   actually -- for his termination?

23          A.    No, I don't.

24          Q.    Do you know how the urban legend got started, or

25   is that the nature of an urban legend is you don't know?
```

```
 1        A.    I guess.  I was told that there was somebody --
 2   The actual person that I reported to that told me to come in
 3   was Tom, the manager there, and Tom -- It will come.  And --
 4             MS. HEVICON:   Tom Young?
 5             THE WITNESS:   Yes, thank you, Tom Young.  And
 6   he disappeared.  And then Chris had disappeared.  And I was
 7   told that there was a lot of pressure being put on Rusty and
 8   that I was going to be one of the ones that were going to be
 9   going, that they were working on the white haoles to -- That
10   was the myth, that they were going to be going back to where
11   they belonged so they wouldn't be taking away the locals'
12   jobs.  That was the myth.
13   BY MR. HELPER:
14        Q.    And who told you this myth?
15        A.    It was pervasive.  I don't know a specific person.
16   I can't think of anybody that didn't know of that.
17        Q.    Did you know of anybody who had any firsthand
18   information to support the myth?
19        A.    The people in the group before me coming for
20   training reported that Patti Igarashi had stated that in
21   orientation in front of the group, that basically -- At this
22   point I don't know the words.  I'm sure I wrote it down when
23   it was fresh three years ago.  But it was a rumor of 60
24   people that heard, well, that urban myth might be appropriate
25   and that I should be keep my head up.
```

```
 1           Q.    Okay.

 2           A.    I should have tabbed this better if I would

 3      have --

 4                 MS. HEVICON:  It's his copy, his tab.

 5                 THE WITNESS:  Oh, okay.  It's like -- It's in

 6      here.

 7      BY MR. HELPER:

 8           Q.    I think the document -- If it's in there, it's in

 9      there.  That's fine.

10           A.    Yeah.

11                 MS. HEVICON:  I'll look for it while you guys

12      are talking.

13      BY MR. HELPER:

14           Q.    When did you first speak with Chris Gahr?  Have I

15      asked you that already?

16           A.    No, you haven't.  After I had been terminated,

17      I -- I don't know how contact was established weeks afterward

18      for me to find out what's the process to go -- that I was not

19      getting any call backs, anything with the established process

20      for grievances.  I understood that he had gone through this

21      before and could he kind of like point me out who to call or

22      what to do because I felt like I really had been

23      unjustifiably terminated and I couldn't get anybody to hear

24      my case.

25                 Even at the termination they wouldn't allow me to
```

```
 1    speak on my behalf for what -- for the first time I was being

 2    brought up for because I didn't know that this was being

 3    brought up for termination, I thought this was corrective

 4    action.  And --

 5         Q.   My only question is --

 6                    MS. HEVICON:  When was it?

 7    BY MR. HELPER:

 8         Q.   When did you speak with Chris?

 9                    MS. HEVICON:  I just let him go because I

10    figured this would be your follow-up question.

11                    THE WITNESS:  A few weeks after termination.

12    BY MR. HELPER:

13         Q.   And you don't remember if he called you or you

14    called him?

15         A.   I'm sure I called him because I'm the one that

16    needed the information.

17         Q.   Where did you get his phone number?

18         A.   I don't know.

19         Q.   Did you talk to Tom Young at some point -- And,

20    I'm sorry, let me make clear I don't want to know about any

21    communications that took place in a room between you and the

22    other plaintiffs if your lawyer was present, so exclude that

23    from any answer you give me.  But before you retained a

24    lawyer, did you talk to Tom Young about --

25         A.   No.
```

 1          Q.    Okay.  When did you first meet Tom Young?

 2          A.    I never did meet him.  I don't -- except that

 3    first day that I shook hands and he said, Report back

 4    tomorrow.  And that's the only time I ever saw him, when I

 5    reported to the airport.  I have talked to Tom, Chris and

 6    Chuck, but haven't discussed the case as much as, Have you

 7    gotten paperwork?  I got paperwork that has a certain

 8    deadline.  Do you have -- Just to coordinate.  But I don't

 9    know any of the details of what they're claiming or what's

10    going on with them and I never discussed that with them.

11          Q.    Can you sort of characterize what emotional

12    distress, if any, you felt as a result of your termination?

13          A.    A little anger.  Not the violent, I'm going to go

14    key somebody's car, but it was like I felt that I had been

15    set up.  I so wanted to work and was trying to do good, and

16    then the first real feedback I get besides this is the

17    termination letter and no details of -- I'm told you go

18    through IAD testing three times and, okay, I get two.

19                I'm told about racial and sexual things that I'm

20    not aware of for the first time.  I'm told that I walked away

21    from a site where the person that knows better is six feet

22    away from me and he won't ask her.  And it was just so

23    frustrating.

24                And the emotional distress I guess would be

25    frustration, a little temporary anger.  But then I had a

1   choice of dwelling on that or moving forward, and I wasn't

2   going to like dwell on that.  But that's what happened.

3          Q.   So your emotional reaction to being fired was

4   frustration at not receiving more information, anger at what

5   you have perceived as injustice, but something that you have

6   been able to move on from; is that fair?

7          A.   Yes.  I still have not gotten over the -- the

8   sense of somebody that's been done unfairly to.  It's -- When

9   you really -- you're trying in good faith to accomplish

10  something and you've been set up, I haven't gotten over that.

11         Q.   At one point, and I was looking for it in one of

12  your documents, you compared -- made a reference to a

13  policeman in the Warsaw ghetto.

14               MS. HEVICON:  That's the letter attached to

15  that complaint.

16  BY MR. HELPER:

17         Q.   Do you think that's a fair comparison for your

18  situation?

19         A.   What I was told is obviously -- obviously it can't

20  be that I was discriminated against by haoles because a haole

21  had been one of the people to write me up.  And I said going

22  just on who carries out the actions is the same as Jewish

23  patrols in the ghetto.  You can't say, Oh, Jewish people

24  patrol Jewish people.

25               And I agree that's a fair category, a haole guy

RALPH ROSENBERG COURT REPORTERS, INC.
(808) 524-2090

1    wrote up a haole guy; therefore, by definition it can't be

2    any kind of discrimination against haoles because, look, the

3    haole guy wrote it up.  Well, in its extreme, nobody in their

4    right mind would say there was no discrimination in the

5    Warsaw ghetto.  And I -- That's a sick puppy if they're going

6    to say that.  But then to say, Oh, it was Jewish people that

7    did the policing and the carrying out; therefore, it can't be

8    any discrimination.  I went to extreme case of being able to

9    say it's not discrimination, just say it's argument of haole

10   writing up haole therefore excludes that there was no

11   discrimination.

12        Q.   Is it your belief that there was essentially a

13   conspiracy at the management -- of the whole management at

14   TSA Kahului to get rid of the haoles?

15        A.   I don't know, sir.

16        Q.   But to -- I guess thinking about your analogy to

17   the Warsaw ghetto, I mean, do you think that Pat Collins --

18   Who is the haole who wrote you up, right, or who criticized

19   your techniques?  Do you have any reason to believe that he

20   was participating in a conspiracy to get rid of haoles?

21        A.   I know he was participating to carry out things

22   towards me at Pat Igarashi's bidding.  I don't know how far

23   above it went.  I don't know why Pat Igarashi was tolerated

24   if there wasn't a wink and a nod.  I don't know if it's

25   active.  I don't know if it's -- I don't know if it's

```
 1    malfeasance, misfeasance, nonfeasance, but it wasn't
 2    feasance.
 3                 MR. HELPER:   Let me take five minutes and
 4    look over my notes and I think we're just about done.
 5                 (Pause in Proceedings:   4:39-4:41)
 6                 MR. HELPER:   Back on the record.
 7    BY MR. HELPER:
 8         Q.   After the criticism of your wanding techniques on
 9    November 23rd, you changed your wanding style; right?
10         A.   Correct.
11         Q.   You were I think you used the word "gun-shy" about
12    criticism?
13         A.   Correct, sir.
14         Q.   Tell me what you did specifically differently
15    after November 23rd after the criticisms.
16         A.   The 7 technique, the making sure that nobody was
17    touching, the ever so careful making sure that the wand was
18    close enough to the skin to pick up any metal but not close
19    enough that it actually made contact with the material, the
20    wanding taking off the shoes when I was down at the main
21    entry or -- and running it through the x-ray.  Or upstairs at
22    the gate have them take off their shoes and inspect and wand.
23    And making sure that I fully went down cookie cutter on the
24    outside and on the inside and then the 7's going through the
25    back.
```

 1          Making sure that I had the person hold the belt by

 2  the two tips of the buckle and the tip of the belt out and

 3  suck their stomach in so I could physically go in and search

 4  inside the band or belt, make sure that they weren't having

 5  something that was stuck in there.  Wanding when an alarm was

 6  set off.  The physically pat down that area and make sure it

 7  was clear each time even if it was, you know, something that

 8  should have been obvious, still went through that.

 9          And proceeded to wand at the gates, pretty much

10  the sole wander from this event until the date of firing;

11  which further confused me that I was fired for improper

12  wanding that I was entrusted for another, you know, several

13  weeks to be the sole wander.

14      Q.  Did you ever work with Chuck Turner?

15      A.  Yes, I did.  He was a supervisor for me once.

16  Patti had assigned him to go through the procedures with me

17  because he explained to me that he had been told by Patti

18  Igarashi that I didn't understand and that he was instructed

19  to train me through the explosive detection device.

20          And we went through that and he was a little gruff

21  of, Well, let me show you the way -- It's like, No, I'm going

22  to show you and you do it my -- I said, Okay.  And he says,

23  Okay.  Well, you look like you can do that.  And I'm not sure

24  if he trained me in anything else, it was mainly for that.

25          But he wasn't my normal supervisor.  He was on the

```
 1   floor at the same time supervising as a -- he could have been
 2   a lead, he could have been a supervisor, things rotated on
 3   who was what, but he was on the same shift a lot of times as
 4   me.  And --
 5        Q.   So Chuck Turner at -- with your understanding at
 6   Patti's direction --
 7        A.   Yes.
 8        Q.   -- retrained you on one of the machines?
 9        A.   Yes.
10        Q.   And was it your impression this was essentially
11   remedial training, a brush-up?
12        A.   I was left confused.
13        Q.   It was not -- As far as you knew, was any other
14   new screener asked to go through the training that you were
15   going through?
16        A.   No.
17        Q.   Okay.  Were there any other episodes in which you
18   were trained one on one by a supervisor that we haven't
19   talked about already?
20        A.   Not to my recollection.
21        Q.   Okay.  Have you ever filed an EEO complaint other
22   than the one we're discussing today?
23        A.   No.
24        Q.   Have you ever been fired for a -- from a job for
25   any reason?
```

```
 1          A.    No.  This is it.

 2          Q.    Other than this one.

 3          A.    Uh-huh (affirmative response).

 4          Q.    Have you ever been arrested?

 5          A.    Never.

 6          Q.    Did you work with Frank Paulson at all?

 7          A.    Not to my knowledge.

 8          Q.    Did you know him?  Did you ever meet him as far as

 9     you can recall before you left TSA?

10          A.    Not to my knowledge.

11                     MS. HEVICON:  I'm sorry.

12                (Telephone Interruption:  4:47-4:48)

13     BY HELPER:

14          Q.    Your experience doing pat-downs and bag searches

15     in the navy, when did that end?

16          A.    That ended 1981.

17          Q.    And did you remember the navy way of doing things?

18          A.    Oh, we didn't have wands, but as far as knowing

19     where people could hide stuff and look for stuff, that's

20     pretty much the same; in the crotch, in the sock, in the --

21     you know.

22          Q.    Was there a standard navy operating procedure for

23     doing pat-downs?

24          A.    No, not that I know of.  It was on-the-job

25     training.
```

```
 1           Q.    Was there a navy standard operating procedure for
 2      bag searches?
 3           A.    Yes.
 4           Q.    Was that different -- or do you remember if it was
 5      different from what you learned at TSA?
 6           A.    Basically the same as far as always start at
 7      one -- one layer, one side to make sure that you have covered
 8      everything in your search of the bag and (pause) --
 9                 MR. HELPER:    Thank you very much.
10                 (Deposition concluded at 4:50 p.m.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```