# ATTACHMENT "2"; THOMAS YOUNG

1

1 | IN THE UNITED STATES DISTRICT COURT

2 | FOR THE DISTRICT OF HAWAII

3

4 | LUCAS BRUNO III, CHRISTOPHER )

5 | GAHR, FRANK ROBERT PAULSON, )

6 | CHARLES TURNER, and TOM )

7 | YOUNG, )

8 | )

9 | Plaintiffs, )

10 | )

11 | vs. ) Civil No.

12 | ) 03-00567DAE BMK

13 | MICHAEL CHERTOFF, Secretary, )

14 | DEPARTMENT OF HOMELAND )

15 | SECURITY, )

16 | )

17 | Defendant. )

18 | )

19 | _____)

20

21 | VIDEOCONFERENCED VIDEOTAPED DEPOSITION OF

22 | THOMAS L. YOUNG, Taken on behalf of Defendant, at Room

23 | 6-100, PJKK Federal Building, 300 Ala Moana Boulevard,

24 | Honolulu, Hawaii 96850 commencing at 9:37 a.m., on March

25 | 15, 2006, pursuant to Notice.

RALPH ROSENBERG COURT REPORTERS, INC.
Honolulu, HI (808) 524-2090

2

```
 1        BEFORE:    SHIRLEY L. KEYS, RPR, CM, CSR 383

 2                   Notary Public, State of Hawaii

 3

 4        APPEARANCES:

 5        For Plaintiff:    DENISE M. HEVICON, ESQ.

 6                          345 Queen Street, Second Floor

 7                          Honolulu, Hawaii  96813

 8

 9        For Defendant:    THOMAS A. HELPER, ESQ.

10                          Assistant U.S. Attorney

11                          Room 6-100, PJKK Federal Bldg.

12                          300 Ala Moana Boulevard

13                          Honolulu, Hawaii 96850-6100

14

15        Also Present:    MARTHA BUXTON, Attorney Advisor

16                         Pacific Rim Airports

17                         U. S. Department of Homeland

18                         Security

19                         300 Rodgers Blvd., #45

20                         Honolulu, Hawaii  96819

21

22        The Videographer:  ROBERT WHITMAN

23                           Certified Legal Video Services

24                           1111 Bishop Street, Suite 500

25                           Honolulu, Hawaii  96813
```

RALPH ROSENBERG COURT REPORTERS, INC.
Honolulu, HI  (808) 524-2090

3

1                           I N D E X

2

3

4

5        EXAMINATION BY:                              PAGE

6              Mr. Helper                                5

7

8        EXHIBITS FOR IDENTIFICATION                  PAGE

9        A   Affidavit                                 36

10       B   Letter dated November 21, 2002            37

11       C   Letter dated November 13, 2002            56

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                  RALPH ROSENBERG COURT REPORTERS, INC.
                      Honolulu, HI   (808) 524-2090

4

```
 1              (Disclosure presented to counsel.)
 2                  THE VIDEOGRAPHER:  This is the
 3   deposition of Tom Young in the matter of Lucas Bruno, III
 4   et al versus Michael Chertoff and the Department of
 5   Homeland Security.  We are located at the United States
 6   Attorney's Office at 300 Ala Moana Boulevard, Honolulu,
 7   Hawaii.  My name is Robert Whitman, certified legal video
 8   specialist.  Will counsel please state their names?
 9                  MS. HEVICON:  Good morning.  Denise
10   Hevicon for the plaintiffs and representing Tom Young in
11   this matter.
12                  MR. HELPER:  Good morning.  Tom Helper
13   on behalf of the defendant.  With me is Marti Buxton of
14   TSA.
15                  THE VIDEOGRAPHER:  Today is March 15 in
16   the year 2006, and we are on the record at 9:37 a.m.
17   Would the court reporter please swear in the deponent?
18                  THOMAS L. YOUNG,
19   called as a witness at the instance of Defendant, being
20   first duly sworn to tell the truth, the whole truth and
21   nothing but the truth, was examined and deposed as
22   follows:
23
24                  E X A M I N A T I O N
25   BY MR. HELPER:
```

RALPH ROSENBERG COURT REPORTERS, INC.
Honolulu, HI  (808) 524-2090

5

1      Q.     Mr. Young, good morning.

2      A.     Good morning.

3      Q.     Where are you located right now?

4      A.     I'm in the Kinko's office on 17th Street in

5   downtown Denver.

6      Q.     Okay.  We have agreed to have your deposition

7   taken by videoconference this morning -- this morning

8   Hawaii time, and the court reporter is here present in

9   Hawaii.  I'd just like for counsel to stipulate that

10  that's an acceptable procedure, that this transcript

11  could be used as if the court reporter was present with

12  you and you were sworn in in person.

13                    MS. HEVICON:  So stipulated.

14     Q.     (By Mr. Helper)  Okay.  And have you ever had

15  your deposition taken before?

16     A.     Not really.

17     Q.     What does that mean?

18     A.     No.  Not -- not in this particular incident.

19  I've -- I've been involved in things, you know, earlier

20  in my life in -- in the military and -- but nothing in

21  this manner.

22     Q.     Okay.  But have you been deposed before, have

23  you had your deposition taken in any respect in any case

24  ever?

25     A.     No.  I don't believe so.

                    RALPH ROSENBERG COURT REPORTERS, INC.
                       Honolulu, HI  (808) 524-2090

6

```
 1      Q.    Okay.  Have you ever testified in court?

 2      A.    I have testified in court before.

 3      Q.    In what situations?

 4      A.    Early on in my military career I was a military

 5   policeman.  I -- I went to traffic court many times.  I

 6   was involved in some cases with the military police.

 7      Q.    Okay.  Well, let me just run sort of over the

 8   ground rules of a deposition because they're a little bit

 9   different from a normal conversation, and in addition,

10   we've got the videoconference complication, which adds

11   some wrinkles, but first of all, you're sworn in today

12   with the same oath you'd be sworn in if you were

13   testifying in court.  Do you understand that?

14      A.    I understand that.

15      Q.    And the testimony you give today, even though

16   it may appear to be in a somewhat informal setting has

17   the same weight and significance as if you were giving it

18   in court.  Do you understand that?

19      A.    Yes, I do.

20      Q.    Okay.  There's some rules that are different

21   for talking in a deposition, especially a

22   videoconferenced deposition than in a normal

23   conversation, and the most important one is that only one

24   person can speak at a time.  We have a court reporter

25   present here taking down everything anybody says, and for
```

1   her to get a good, clean record, she can't write down two

2   people talking at once, so that -- that means a couple of

3   things.  One is make sure you let me finish my question

4   before you start to answer, especially with the little

5   bit of delay with the videoconference, it's really

6   important that you pause even if you know exactly where

7   I'm going with an answer -- with a question, that you not --

8   not jump in with an answer, because if you do, it's going

9   to get -- it's going to, believe me, take a lot longer.

10  You understand that?

11      A.    Yes, I do.

12      Q.    And I will sometimes -- I sometimes have the

13  bad habit of pausing in the middle of a question while I

14  think of the next word, and maybe I'll, you know, if I am

15  pausing, I'll hold up my hand or something to let you

16  know that I'm not done with my question yet, okay?

17      A.    Okay.

18      Q.    Now, if I ever jump in and start to ask you

19  another question before you're finished with your answer,

20  make sure you stop me and -- and let me know that you

21  hadn't finished your last answer yet, okay?

22      A.    No problem.

23      Q.    Okay.  Another rule is that you answer with

24  words, not with nods or shakes of the head, not with uh

25  huhs or ut uhs because those are difficult for the court

8

 1   reporter to take it down, okay?

 2        A.    Understood.

 3        Q.    Have you reviewed any documents in preparation

 4   for your deposition this morning?

 5        A.    I reviewed some of the documents that -- that I

 6   had, yes.

 7        Q.    What did you review?

 8        A.    I -- I reviewed the latest ones that I did from

 9   Puerto Rico, the interrogation, I believe is what it's

10   called or --

11                  MS. HEVICON:  Interrogatories?

12        A.    That's right.  And I also reviewed the

13   termination letter that I had received from TSA.

14        Q.    (By Mr. Helper)  Anything else?

15        A.    No, that's it.

16        Q.    Okay.  So you have not reviewed the affidavit

17   you did in support of Chris Gahr's complaint a couple of

18   years ago?

19        A.    I did not.

20        Q.    When's the last time you saw that document?

21        A.    It's probably been a couple years ago.

22        Q.    Okay.  Okay.  Have you had a chance to meet

23   with your attorney before your -- the deposition over the

24   last few days?

25        A.    We spoke on the telephone.

                  RALPH ROSENBERG COURT REPORTERS, INC.
                     Honolulu, HI  (808) 524-2090

9

1    Q.    Okay.  I'm sorry.  One other thing I forgot to

2    mention, is if at any point you need to take a break, to

3    stretch your legs, to talk with your lawyer, please just

4    let me know and we'll gladly do so.  We'll probably try

5    to take breaks every hour or -- or a little bit more to

6    let the court reporter rest her fingers, but if you want

7    to do breaks on top of that, you know, let -- let us

8    know.  I would like to move things along pretty briskly,

9    as I'm -- I'm sure you would, too, though our definitions

10   of briskly might be different.

11       A.    Understood.

12       Q.    Okay.  Other than testifying in connection with

13   your job as a military policeman, have you ever testified

14   in court?

15       A.    No, I have not.

16       Q.    Okay.  When did you -- let me just run through

17   your -- your career briefly.  I've got your interrogatory

18   answers.  Is it correct that the highest level of

19   education you've obtained is a high school diploma?

20       A.    That is correct.

21       Q.    Okay.  And where did you work coming out of

22   high school?

23       A.    I went directly into the navy.

24       Q.    Okay.  And that's when you worked as a -- in

25   the bomb disposal research center?

1    A.    Yes, I did.  I was a -- I was a navy

2  photographer for the research center.

3    Q.    Okay.  And then you worked for the army after

4  that?

5    A.    I -- I spent four year in the navy, I was dis --

6  honorably discharged from the navy and I joined the army

7  about two months later.

8    Q.    Okay.  And what rank did you hold when you left

9  the navy?

10    A.    I was a petty officer third class.

11    Q.    What's that, E -- E what?

12    A.    E -- E4.

13    Q.    Okay.  And then what did you join the army as?

14    A.    I joined the army as a private.

15    Q.    Why did you do that?  Why did you leave one

16  branch of the service and go into another?  What happened

17  in between?

18    A.    I wanted to be -- I wanted to be in the army

19  bomb disposal business, and to be -- to do that in the

20  navy I would have had to have been a diver, navy diver,

21  also, and I'm not real fond of the water.

22    Q.    Okay.  When you left the navy, did you plan on

23  joining the army?

24    A.    I planned on joining the army, yes.

25    Q.    Okay.  So you started as a -- as an E1 in the

RALPH ROSENBERG COURT REPORTERS, INC.
Honolulu, HI  (808) 524-2090

11

1   army?

2        A.    Actually -- actually I started as an E2.  When

3   I finished basic training, the army gave me back my rank

4   of E4 and I was a specialist after about three months, I

5   believe it was.

6        Q.    Okay.  And what rank -- what's the highest rank

7   you attained in the army?

8        A.    I retired as a first sergeant.

9        Q.    Which is E what?

10       A.    E8.  E8.

11       Q.    Okay.  And just briefly, run me through your --

12   your duty stations and years of service.

13       A.    Okay.  My first duty station was Fort Belvoir,

14   Virginia, I was a military policeman.  I had applied for

15   the bomb disposal school.  You -- you had -- you had to

16   be in the army and hold an MOS before you could actually

17   apply for the bomb disposal school, so I was -- I was a

18   military policeman.  That was in 1977.  I started the

19   bomb disposal school in 1978.  I graduated from -- from

20   that school in '79.  I returned to Fort Belvoir and I was

21   assigned to the 57th ordinance detachment EOD and I was --

22   I was there from '70 -- '79 until right around '82, I

23   guess.  In '82 I was selected to go to the ammunition --

24   army's ammunition inspector school, I was stationed at

25   Fort Eustace, Virginia, for -- for a very short time.

1   There was -- there was a critical shortage of bomb

2   disposal technicians.  They put me back into the bomb

3   disposal unit at West Point, New York in 1983, and I

4   served there for two years.  In 1985 I was transferred to

5   Alaska.  I was a -- a member of a two man bomb disposal

6   unit assigned to the army's cold region test center for

7   about two years, and in 1987 I was transferred to Fort

8   Wachuka, Arizona, to the bomb disposal unit there.

9   During that time -- during the time I was assigned to

10  Fort Wachuka, we deployed to the first Desert Storm.  I

11  served as -- I served as the detachment NCO of the unit

12  when we deployed to Desert Storm.  After about a year in

13  Desert Storm, we returned to Fort Wachuka.  Shortly after

14  that, the army inactivated that particular bomb disposal

15  unit and I was reassigned back to Fort Belvoir, Virginia,

16  as the first sergeant of the bomb disposal unit there,

17  and that's where I retired in 1993.

18      Q.    Okay.  And so you got your 20 years?

19      A.    Yeah, just slightly over 20 years.

20      Q.    Okay.  Now, in May of '93 it says you started

21  working as a civilian contractor on bomb disposal, and

22  just again, briefly run through where you've been and

23  where you -- just up till the time you started at TSA

24  Maui in 2002.

25      A.    I -- I went to work at Fort Sill, Oklahoma,

1    right after I retired as a contractor for -- for a
2    civilian company, and we were doing bomb disposal cleanup
3    work on Fort Sill.  I worked there for a little bit more
4    than a year.  We finished the project -- excuse me, the
5    fax is here.

6         Q.    Okay.

7         A.    I'm sorry.

8         Q.    I'd ask you not to look at that while you're --
9    because you'll get distracted while you're talking.

10        A.    Sure, no problem.  I -- after we finished the
11   project at Fort Sill, for a short time I worked in a
12   friend's motorcycle retail business as his sales -- sales
13   manager/general manager.  I was offered the position of
14   area supervisor on the Kahoolawe cleanup project and I --
15   I came to -- I came to Hawaii, I believe it was in 1998
16   to work on the Kahoolawe cleanup project.  I was in what -
17   what the contractor business calls an area manager.  I
18   had approximately about -- oh, anywhere from 125 to 150
19   people working for me on the Kahoolawe cleanup project,
20   bomb disposal technicians, local laborers, local hires
21   from Maui, natural resource people, archeologists, pretty
22   much everybody that worked on the island.  I'm -- I don't
23   remember the exact dates, but I was there for three,
24   maybe -- I guess almost four years, something like that,
25   and I applied on line for the TSA screen manager's

14

1    position at the Kahului airport, and I'm guessing it was

2    about eight months, ten months later I received a call

3    from someone in Washington, DC, saying that I had been

4    selected to take that position on Maui.

5        Q.   And I'm sorry, I think you said where you were

6    from '93 to '98 but I -- I was writing down something

7    else and -- were you doing bomb disposal at that point?

8        A.   In -- from '93 until -- until June of -- of '94

9    I was doing bomb disposal work at Fort Sill.  We

10   completed the project and from '90 -- from probably July

11   until '98, July of '94 till July of '98 I worked as a

12   sales manager and -- and the last year or so general

13   manager of a motorcycle retail business in Sierra Vista,

14   Arizona.

15       Q.   Okay.  And how did you find out about the

16   Kahoolawe project?

17       A.   The project manager was one of the guys I had

18   worked with earlier at Fort Sill, and he called me and --

19   and asked me if I would like come over there as one of

20   the area managers.

21       Q.   And who was that?

22       A.   Well, there were actually two people involved

23   in that.  One was a guy named Pat Patterson, and the

24   second fellow was -- Pat Patterson was the senior -- what

25   we call the senior UXO specialist, and the project

RALPH ROSENBERG COURT REPORTERS, INC.
Honolulu, HI  (808) 524-2090

15

1    manager's name was a -- a George Demetropolis, and

2    they're the two fellows that -- who offered me the

3    position on Kahoolawe.

4        Q.    And these were not federal employees, is that

5    correct?

6        A.    No, they were -- they were also contractors

7    like myself.  We worked for a company called UXB

8    International, who was the prime contractor for the

9    Kahoolawe cleanup.

10       Q.    Okay.  And did you work with any -- work

11   regularly during your time on Kahoolawe with anybody

12   employed with the federal government?

13       A.    On Kahoolawe?

14       Q.    Yes.

15       A.    Yeah.  We worked directly for the navy and

16   there were -- there were about six or eight navy civil

17   servants that worked on Kahoolawe.

18       Q.    Do you recall any of their names?

19       A.    Yeah, I do.  In fact, I just worked with him in

20   Puerto Rico this winter, and now that you asked me his

21   name, I can't remember it.  Carlton Fisk.  His name is

22   Carlton -- Carlton Fisk, he was the senior civil servant

23   on Kahoolawe that we -- we basically answered to.

24       Q.    You're not getting the name mixed up with the

25   baseball player Carlton Fisk, are you?

RALPH ROSENBERG COURT REPORTERS, INC.
Honolulu, HI  (808) 524-2090

```
 1        A.    Oh, no, no.

 2        Q.    No?

 3        A.    His real name is Carlton Fisk.

 4        Q.    Okay.

 5        A.    And he is -- he's a retired navy chief petty

 6   officer.

 7        Q.    Okay.  Sounds like an unusual name.  Okay.  And

 8   why did you decide to leave, or why did you leave the

 9   Kahoolawe project?

10        A.    I -- I wanted to -- it had been a goal of mine

11   to get into civil service.  I had a little bit over 20

12   years federal service with the army and the navy.  If I

13   could have gotten ten additional years, at age 55 I would

14   have been able to retire again at -- at my civil service

15   rank instead of my army rank.

16        Q.    Okay.

17        A.    And there's a -- certainly a financial benefit

18   to doing that.

19        Q.    Any other reason?  So -- so how many -- had you

20   applied for other federal jobs in the time that -- after

21   you left the army?

22        A.    I had never applied for -- I had investigated

23   some jobs.  I had -- I had actually taken the -- not the

24   border patrol but the customs.  I took a test, a written

25   test for customs inspector but I had never applied for
```

1   any other position.

2       Q.   Okay.  Let's jump ahead to the time after you

3   left TSA.  What job did you obtain after -- obtain after

4   that?

5       A.   I -- the day after I was terminated I went back

6   to work on Kahoolawe as a UXO technician two.  Our -- our

7   system is -- we have UXO technician ones, which are

8   basically our apprentices, then we have technician twos,

9   technician threes, which are supervisors.  We have safety

10  officers, we have quality assurance officers, area

11  managers and the senior UXO person of the project.  And I

12  the only position that was open was a technician two

13  position, and that's what I went back to Kahoolawe at.

14      Q.   And how long -- just take me -- walk me through

15  your career in the following months and years.

16      A.   I basically stayed on Kahoolawe until the end

17  of Kahoolawe when the project was completed.

18      Q.   When was that?

19      A.   It was completed in February of '94.

20      Q.   Okay.

21      A.   I'm sorry.  I'm sorry, 2004.

22      Q.   That makes more sense.

23      A.   Yes.  At the end of Kahoolawe I got a position,

24  same thing, bomb disposal cleanup work at the former

25  Lowry Bombing and Gunnery Range here in Aurora, Colorado,

1    so I basically moved myself and my family from Maui to

2    Colorado.  I worked here at the Lowry Bombing Range until

3    August of -- August of 2004, and in August I went to Iraq

4    as a senior UXO supervisor of a team working in Iraq.

5        Q.    And how long --

6        A.    I stayed -- I stayed in Iraq until April of

7    2005.

8        Q.    So how long were you there total in -- in Iraq?

9        A.    About eight months.

10       Q.    Okay.  And then what -- since returning from

11   Iraq, where have you been?

12       A.    I -- I -- when I returned from Iraq, I took

13   about two months off, I worked for a company called URS

14   doing the same exact business at the F. E. Warren Air

15   Force Base in Cheyenne, which is about 100 miles from --

16   from my home here in -- in Aurora.  That closed for the

17   winter last -- the end of October of 2005, and I took a

18   position in Puerto Rico cleaning the former naval bombing

19   range on Viegas Island, which I just returned a couple

20   days ago back here to Colorado because we will be

21   restarting our project at F. E. Warren Air Force Base

22   next week.

23       Q.    Now, how did your salary at Kahoolawe, how did

24   that compare to what you were making at TSA?

25       A.    It was almost identical.  Within a few dollars

1    of being the same.

2        Q.    Okay.  And since starting at Kahoolawe, have

3    you taken any pay cuts or have you gotten pay raises in

4    that time?

5        A.    Well, my -- the -- the position I went back to

6    Kahoolawe, the technician two, was -- that was $13,000 a

7    year less than -- than what I had been making.  Since

8    I've left Kahoolawe, my -- my pay has gone up.  My -- my

9    eight months in -- in Iraq was a very significant pay

10   raise.

11       Q.    As well it should be.

12       A.    What I make -- it wasn't enough.

13       Q.    Okay.

14       A.    What I make now is -- is about equal to what I

15   was making on Kahoolawe when I was an area manager.

16       Q.    Okay.  So let me see if I got this right.  As

17   an area manager, you made a certain amount and then when

18   you switched over to TSA, you were making about the same,

19   then when you left TSA you took a pay cut to get your

20   Kahoolawe -- a different lower level Kahoolawe job?

21       A.    That is correct.

22       Q.    Okay.  And are you including the COLA that you

23   got as a TSA employee in your calculations?

24       A.    Yes, that is also correct.  With -- with the

25   COLA that we received I made about the same -- probably

1    just a little bit less, but almost the same as I had been

2    making on Kahoolawe.

3        Q.    Okay.  Okay.  Where did -- where did you live

4    while you were working on Kahoolawe?

5        A.    I actually rented several different homes, but

6    the -- the last home was in Wailuku.

7        Q.    Okay.  And did you live there on your own?

8        A.    No.  My family was with me, my son, my wife and

9    and myself.

10        Q.    How old is your son now?

11        A.    My son now is 22.

12        Q.    So he was about 14 when you moved to Hawaii?

13        A.    He -- he was a -- he started his freshman year

14    in high school and graduated in -- in Maui, and I think

15    we spent almost another -- well, we did spend another

16    full year after he was out of high school there.

17        Q.    Before you moved to Maui, had you ever lived in

18    any neighborhood or area where Caucasians were the

19    minority?

20        A.    Where they were the minority, probably not

21    where they were the minority.  No.

22        Q.    Had -- had you ever lived in any area with

23    substantial numbers of non Caucasians, any neighborhood?

24        A.    Yes.  The years I was stationed at Fort

25    Wachuka, Arizona, we -- we had certainly a large

1  population of Hispanic people.

2      Q.    Anyplace else?

3      A.    Well, I -- I lived in northern Virginia and the
4  Washington, DC area, and certainly, you know, I guess
5  that almost qualifies as probably being a minority.  The --
6  the -- the black population there is -- is fairly high,
7  so certainly that was a -- a large population of -- of
8  black neighbors in that area.

9      Q.    Where did you live in Virginia?

10     A.    I lived in Alexandria, Virginia the first time.
11  The second time I was stationed there as the first
12  sergeant of that unit, I actually lived inside the
13  Washington -- in the District of Columbia because we had --
14  we had an office on Fort Belvoir, Virginia, we also had
15  an office in the old executive office building on the
16  White House grounds so I -- I needed to be there quite --
17  on a quite regular basis so I -- I actually lived in DC.

18     Q.    Before you came to -- started working at TSA,
19  had you ever had a non Caucasian immediate supervisor?

20     A.    Yes, on several -- several occasions.

21     Q.    What were those occasions?

22     A.    I -- my -- my first sergeant at Fort Wachuka, I
23  was the operations sergeant.  When I first arrived there,
24  he -- he was a black soldier that retired and I took over
25  his position about a year after I was there.  And my team

```
 1   leader when I was first stationed at Fort Belvoir, my --
 2   my team leader was a Puerto Rican soldier that I worked
 3   for for I guess about three years.
 4        Q.    Any other occasions in which you were directly
 5   supervised by a non Caucasian?
 6        A.    Not -- not that I remember.  No.
 7        Q.    Okay.  Okay.  Now, I think you said that you
 8   had heard about an opening at TSA Maui some months before
 9   you actually started work, right?
10        A.    It was -- it was probably almost eight to ten
11   months before I actually started work, yes.
12        Q.    And tell me about the application process that
13   you went through.
14        A.    I -- I applied on line with, with an on line
15   application, and I -- I mailed -- they -- on -- on line
16   they furnished an address to mail a resume to, and that's
17   was the whole process of applying.
18        Q.    Do you recall if that address was a federal
19   government address or a contractor's address?
20        A.    That was a federal government address.
21        Q.    The on line -- the web site that you accessed,
22   do you recall what the web site address was or anything
23   about it?
24        A.    It was -- it was a government web site.
25        Q.    Do you recall any kind of interaction with a NS
```

1     an outfit called NSC Pearson -- NCS Pearson?

2          A.    No.  Because screening managers and above were --

3     were not hired through -- through that contractor system.

4          Q.    Okay.  So you filled out an application and how --

5     how did you know you were going to be a screening

6     manager?

7          A.    I was contacted by telephone by Lowrey Leong,

8     and he asked me a few questions, probably a -- a five

9     minute conversation, and I did hear from him one -- one

10    additional time.  He wanted to verify some -- some of the

11    information, and sometime after that I received a call

12    from a -- a official in Washington, DC who offered me the

13    position.

14         Q.    And tell me about what you recall from your

15    conversations with Lowrey Leong before you got hired.

16         A.    I -- I honestly don't remember a lot of it, but

17    I know he wanted to know if I -- if I was living on Maui,

18    what -- what I was doing on Kahoolawe.  That's basically

19    about all it was.  It was a pretty short conversation.

20         Q.    Did he indicate to you that he had any

21    paperwork or documentation from your application or

22    anything else on your background?

23         A.    He didn't indicate anything like that.

24         Q.    Okay.  Did he indicate anything -- did he

25    indicate that he didn't have any paperwork?

                    RALPH ROSENBERG COURT REPORTERS, INC.
                       Honolulu, HI  (808) 524-2090

24

1      A.    No.   He -- he simply -- I -- I remember him

2    asking me if I -- why -- if I lived on Maui, what were

3    some of my duties on Kahoolawe, and that he was -- he was

4    looking at different -- he did -- he did indicate he was

5    looking at different resumes.

6      Q.    Okay.

7      A.    But he didn't say any more than that, and then

8    like I said, he -- he did call me one additional time.  I

9    I -- I'm not real sure what -- what the second phone call

10   was, I know it was very short, and then I did not hear

11   anything for probably two or three months after that.  I

12   had never -- I never heard anything again until I

13   received a call from Washington, DC saying I had been

14   selected and -- and to report to work.

15     Q.    Okay.  And did you have -- other than your

16   conversation with Lowrey Leong, the two conversations

17   with Lowrey Leong that you've described, did you ever

18   talk to anybody with TSA in any capacity up till the date

19   you showed up for work?

20     A.    I did -- I did have one opportunity.  I went

21   with someone to the TSA.  It was -- it was -- it was a

22   room set up in the -- one of the hotels in Kihei, and

23   they had -- they had a room full of computers for -- for

24   people to come in and apply for screener positions, a --

25   a -- a room full of computers just -- just for people to

RALPH ROSENBERG COURT REPORTERS, INC.
Honolulu, HI  (808) 524-2090

25

1    walk in off the street and set down and fill out an on

2    line application for -- for the screener positions.  And

3    I -- I -- at one time I actually rented a room to a

4    person who -- who went down, and -- and that's who I went

5    with to apply for a position, but there was someone there

6    from -- well, they weren't from TSA though, they were

7    from the FAA that were kind of overseeing this little

8    operation.  They weren't TSA though, but other than that,

9    I never spoke to anyone.

10        Q.    And I think you also mentioned a -- a phone

11   call where they actually tell you -- told you you've been

12   hired, right?

13        A.    Yes.  That's -- that's correct.

14        Q.    And -- and who was that from?

15        A.    That was the -- that was a civil service HR

16   office in Washington, DC.

17        Q.    And did they tell you what job you were being

18   hired for?

19        A.    Yes, they did.

20        Q.    Had Mr. Leong talked to you about a screening

21   manager job when you spoke with him?

22        A.    Yes, he -- yes, he did.

23        Q.    When you applied, did you -- were you applying

24   for a screening manager job or just a job with TSA in the

25   new airport security office or --

26

1      A.    No.

2      Q.    -- did you --

3      A.    No, I applied -- I applied -- I knew I was

4  applying for screener manager.

5      Q.    Okay.  How did you know that?

6      A.    It -- it was a job announcement for that

7  particular position.

8      Q.    Where did you see the announcement?

9      A.    On -- on the government -- government job web

10  page.

11      Q.    Okay.  And was that a web page you checked on

12  occasion to see what was out there?

13      A.    Yeah, I -- I used to check that on a pretty

14  regular basis.

15      Q.    Okay.  And what was your understanding as to

16  what a screening manager did at the time that you were

17  applying and going through the application process before

18  you started?

19      A.    Well, it wasn't a lot of information about what

20  a screener manager did, but it -- it basically said you --

21  you -- you're the shift supervisor for a group of

22  screeners.  It didn't go into really any kind of detail,

23  just -- it just said screener manager, supervise a shift

24  of screeners or something to that effect.  Very -- it was

25  not detailed at all what the duties were.

1    Q.    Now, you're saying screener manager as opposed

2  to screening manager.  Is that your understanding of what

3  your title was, screener manager?

4    A.    My job title, my position was screener manager,

5  as far as I can remember.

6    Q.    Okay.

7    A.    There -- there's --

8    Q.    Okay.  Had you ever done any screening of

9  airline passengers in your life before you started

10  working TSA?

11    A.    Yes.  I -- I had fairly extensive experience

12  doing it.

13    Q.    Where?

14    A.    Both occasions that I was stationed at Fort

15  Belvoir, Virginia, we -- we were the -- our army bomb

16  disposal unit was designated army bomb disposal unit VIP.

17  We were attached to the Secret Service in Washington, DC

18  and we -- we were the -- we were the bomb disposal unit

19  for the Secret Service.  We did all the screening for all

20  the passengers and luggage that went onto Air Force One

21  or any airplane that the Secret Service provide --

22  provided protection for.

23    Q.    So who did you screen getting onto Air -- Air

24  Force One?

25    A.    Anyone that got on that plane other than the

RALPH ROSENBERG COURT REPORTERS, INC.
Honolulu, HI  (808) 524-2090

28

1   president or -- or -- or -- or the -- or his immediate

2   party that traveled in his little inner circle detail.

3   Press people, anyone.  Congressmen, governors, anyone

4   that was getting on Air Force One, and we didn't do it

5   just for Air Force One, we also screened all the people

6   that came onto the White House grounds, also, and all

7   their packages and luggage and things like that.

8        Q.    So any other occasions on which you screened --

9   did any kind of weapons or explosives detection work on

10  people other than your work with the White House?

11       A.    Well, we -- we provided our service for any --

12  any detail they needed in Washington, DC during the

13  campaign periods.  We traveled all over the country with

14  them.  I also provided that service for the State

15  Department security.  They were considered lesser

16  protectees.  The State Department did like the heads of

17  other countries, the Secret Service of course does the

18  president, the vice president and anyone he designates,

19  you know, that needs Secret Service levels protection.

20       Q.    Maybe I can -- let me ask you this way.  What

21  years did you perform screening duties of any sort,

22  whether for getting onto a particular building, getting

23  to a particular building or getting onto a -- an airplane

24  or any context in which you screened individuals for

25  explosives or weapons?  What years did you --

RALPH ROSENBERG COURT REPORTERS, INC.
Honolulu, HI   (808) 524-2090

1    A.    Well, from -- from 1979, April of 1979 until

2    literally the day I retired in May of 2003.

3    Q.    '93?

4    A.    Yeah.  May of 1993.

5    Q.    Okay.

6    A.    Is when I retired.

7    Q.    And how much of your time would you estimate

8    during that 14 year time frame did you spend screening

9    people?

10   A.    More than 50 percent.

11   Q.    Okay.  Now, did you do any screening work

12   following May of 1993?

13   A.    I did not.

14   Q.    Okay.  Now, when you first -- what was your

15   first contact with anybody at TSA Maui after you learned

16   you had been hired?

17   A.    My first contact was I -- I -- I called Lowrey

18   Leong's office and asked if I would be able to come in

19   and meet with him.  I was given a time to come in and

20   I -- I believe this was probably in early October, and I

21   went to his office and I met with him for five minutes

22   probably just a few days before I actually started work.

23   Q.    Okay.  Was anybody -- was anyone else present

24   other than Mr. Leong when you met with him?

25   A.    Yeah, his office was full of people when I got

RALPH ROSENBERG COURT REPORTERS, INC.
Honolulu, HI  (808) 524-2090

```
 1    there.  Well, there's two offices at that particular
 2    time, there was a -- maybe a room by -- 20 by 20 and a
 3    smaller office to the side that was his.  When I knocked
 4    on the door, there were probably four people in the outer
 5    office, there was about a half dozen people in his office
 6    with him, and I was asked to wait outside.  He actually
 7    didn't meet me in his office, he came out and he spoke to
 8    me in the hallway in the airport.
 9        Q.    In the hallway or in this larger of the two
10    rooms you're talking about?
11        A.    No.  In the hallway of the airport.
12        Q.    So you came into the larger room from the
13    hallway, right?
14        A.    From -- I knocked -- I knocked on the door from
15    the hallway of the airport of the larger office, yes.
16        Q.    Did you ever go in that larger office room?
17        A.    I stepped in a couple feet and I -- I was asked
18    to wait outside.
19        Q.    By who?
20        A.    I'm pretty sure it was Fil Carvalho.
21        Q.    Okay.  And I -- is this the occasion when you
22    claimed to have heard someone say something about your
23    race?
24        A.    I -- I -- I don't claim to, I -- I heard it.
25        Q.    Well, okay, tell me what happened.
```

RALPH ROSENBERG COURT REPORTERS, INC.
Honolulu, HI  (808) 524-2090

31

 1      A.    I was asked to stand outside in -- and they

 2  were going to get Mr. Leong to -- to meet with me, and I

 3  actually during that particular incident, I heard two

 4  things.  I heard a woman's voice basic -- yeah, it was a

 5  woman's voice almost immediately as I stepped back out, I

 6  heard a woman's voice say what the fuck, he's -- he's not

 7  he's a -- he's a fucking haole.  And I was a little bit

 8  shocked and -- and within just a few moments of that, I

 9  heard a man's voice say I thought he was a local guy.

10  And honestly, I didn't know what to think at that

11  particular moment.

12      Q.    Okay.  Now, when you looked into the -- this

13  larger of the two rooms you said there was -- there were

14  four people in there, approximately four?

15      A.    Filbert Carvalho was in there, Patti and I -- I

16  don't even remember how to pronounce her last name, but

17  she was also a screening manager, was in there.  There

18  was a secretary who was from a temporary service that was

19  the secretary for that office, and there were probably in

20  in -- in Leong's little office there was probably five or

21  six people, and I believe they were probably from the

22  roll out team that was there getting everything ready to -

23  to go from the Wackenhut security to the new TSA

24  screeners.

25      Q.    Are you talking about the MSF?

RALPH ROSENBERG COURT REPORTERS, INC.
Honolulu, HI  (808) 524-2090

1      A.    Yes.

2      Q.    Okay.

3      A.    Yes.

4      Q.    Did you recognize or -- or did you come to

5  learn the identities of any of the people in -- who you

6  saw in Mr. Leong's -- oh, I'm sorry, yes, in Mr. Leong's

7  office that day?

8      A.    I -- I didn't know really anyone other than

9  Lowrey that was in that office, and I -- I didn't know

10  anyone in any of the two offices, but I did come to learn --

11      Q.    Right.

12      A.    -- who Patti was and who Filbert was and who

13  our secretary was.  Most of the people that were in there

14  probably left, were actually gone before I physically

15  started work.

16      Q.    Okay.  Now, the voice that you heard, the --

17  the two voices that you heard, the male voice -- or the

18  female voice saying fucking haole, did you later identify

19  who you believe said that?

20      A.    I'm -- I'm very much sure it was Patti.

21      Q.    Okay.  And how about the male voice saying I

22  thought he was local or I thought he was from here?

23      A.    I'm very sure it was Filbert Carvalho.

24      Q.    Okay.  And both of them were in the -- the

25  larger of the two offices, right?

33

1      A.    Yes.  They were.

2      Q.    And you could hear these comments through a

3 closed door?

4      A.    Well, the door was still partially open.

5      Q.    Okay.  Was the voice at a volume where you

6 would expect that the people in Mr. Leong's office could

7 have heard it, too?

8      A.    I believe they should have been able to hear

9 it.

10      Q.    Okay.  And you can't identify anybody by name,

11 anyone else who would have heard that statement other

12 than the people you've already named?

13      A.    That is correct.

14      Q.    And the people who were on the mobile screening

15 force, they were -- were they Caucasian?

16      A.    I'm sure some of them must have been.  I -- I

17 really -- I can't say yes or no one way or the other.

18                  MS. HEVICON:  Actually, at this point I

19 want to interject something.  If you're asked a question,

20 please don't guess or speculate as to an answer.  If

21 you're giving an estimate, please let us know that it is

22 an estimate, but just don't out of the blue speculate on

23 something, okay?

24      A.    Okay.

25                  MS. HEVICON:  Thanks.

                    RALPH ROSENBERG COURT REPORTERS, INC.
                       Honolulu, HI  (808) 524-2090

34

1    A.    Okay.

2                    MR. HELPER:   Now you threw me off.

3                    MS. BUXTON:   You -- you were asking

4    about the race.

5    Q.    (By Mr. Helper)   Right.   Right.   What was the --

6    give me a physical description of the secretary who was

7    in the -- the larger of the two rooms?

8    A.    She -- she was -- she was Caucasian.   Other

9    than that, I can't --

10   Q.    How old was she?

11   A.    Middle age, maybe a little bit younger.

12   Q.    Height, weight?

13   A.    Oh, I -- I'm going to have to guess if I give

14   you a description.

15   Q.    Well, you saw -- you have some recollection,

16   you have some picture in your mind of her as you sit here

17   right now?

18   A.    I do.

19   Q.    Okay.   So I think we can call that an estimate

20   even if you want to say it's a very ball park estimate.

21   A.    I would say she was -- I would say she was

22   between five six and five eight, 130 to 140 pounds maybe,

23   30 to 35 years old.

24   Q.    And you would -- when you were a military

25   policeman, you'd have to estimate people's heights and

                    RALPH ROSENBERG COURT REPORTERS, INC.
                      Honolulu, HI   (808) 524-2090

35

1    weights on -- with some regularity, wouldn't you?

2         A.    Yes.

3         Q.    Okay.  And -- and provide physical descriptions

4    of those people -- of people?

5         A.    Yes, but that was many years ago.

6         Q.    Okay.  Okay.  Did you tell anybody about this

7    incident over the next few days, about what -- the

8    incident, and I'm referring to the -- the exchange about

9    your racial background?

10        A.    I did not.

11        Q.    When is the first time you told anyone about

12   this conversation that you'd overheard or this exchange

13   about your racial background that you overheard on your

14   first day or when you met with Mr. Leong for the first

15   time in person?

16        A.    I -- I didn't tell anyone about it.

17        Q.    Well, you put it -- you put it in an affidavit

18   that's dated -- let me look at the date here.  August 8,

19   2003, and that's how I know about it.  So I'm wondering

20   if before August 8 of 2003 you told anyone about the

21   conversation regarding your racial background when you

22   first met with Lowrey Leong?

23        A.    I -- I put it in a letter that I wrote to the

24   TSA civil affairs office very shortly after I was

25   terminated.

36

1      Q.    Okay.  And I'm looking at that letter and I

2    think that's probably was faxed to you, that's November

3    21 of 2002.  Does that sound about right?

4      A.    That -- that's not when I first wrote the

5    letter.  I -- I first wrote the letter in November of --

6    just a matter of a day or two after I was terminated.

7      Q.    Okay.

8      A.    Maybe a week after I was terminated.

9      Q.    Why don't you pick up the fax that I -- that I

10   sent you?

11                  MS. HEVICON:  May I see it?

12                  MR. HELPER:  Yeah.

13                  MS. HEVICON:  Thank you.

14                  MR. HELPER:  And I'm going to ask that

15   this marked -- be marked as Exhibit A.  And as a matter

16   of fact, it's a -- it's really two different documents.

17   I'm going to take -- unstaple it and take it apart.

18                  (Affidavit marked Exhibit A.)

19      Q.   (By Mr. Helper)  This top document is a ten

20   page affidavit with your signature on it, is that

21   correct?

22      A.    That is correct.

23      Q.    The handwritten -- and most of it's

24   typewritten, is that correct?

25      A.    That is correct.

1     Q.    And there's some initials on the bottom of each

2   page.  Are those your initials?

3     A.    That is.

4     Q.    And I --

5     A.    Yes.

6     Q.    I asked that wrong.  You -- you wrote those

7   initials?

8     A.    Yes, I did.

9     Q.    Okay.  And is your signature at the top of the

10   last page, right?

11     A.    Yes.  That's correct.

12     Q.    That entirely illegible scrawl, and then --

13     A.    That is -- yes.  That is correct.

14     Q.    Okay.

15     A.    That's my signature.

16     Q.    And then I think stapled to that is what

17   appears to be a five page letter with the date on it

18   November 21, 2002?

19     A.    Yes, it is.

20                 MR. HELPER:  Okay.  And let me ask our

21   court reporter if she can detach that from her copy and

22   let's make that Exhibit B, so just a little bit of a

23   break here while she works on it.  I'm sorry.

24                 (Letter dated November 21, 2002 marked

25   Exhibit B.)

38

1      Q.    (By Mr. Helper)  Ready?  Okay.  Exhibit B,

2    that's your signature -- I'm sorry, it's not signed,

3    right?  The copy that we have is not signed?

4      A.    That's correct.

5      Q.    Do you recall if you might have mailed this

6    letter without signing it?

7      A.    No.  I believe this letter was signed, this --

8    this letter was signed when I mailed it.  This is the

9    first letter I ever mailed to anyone.

10     Q.    Okay.  I'm not sure it really matters but I --

11   I think that the copy I'd given you is right out of the

12   EEO files, so it seems to be, you know, I can't speak for

13   their recordkeeping, but it seems to be their -- the copy

14   that they were working off of or using.  Do you have any

15   recollection or -- or can you reconstruct how they might

16   have gotten a copy of this unsigned?

17     A.    I -- I do not know how they would have gotten

18   this unsigned letter.

19     Q.    Okay.  Did you -- I -- I take it you only sent

20   one letter to the Office of Civil Rights, is that

21   correct?

22     A.    This is the first letter I sent.  I -- I

23   answered -- they -- they would return letters to me that

24   I answered and provided information.  There were several

25   letters sent back and forth between myself and the Office

RALPH ROSENBERG COURT REPORTERS, INC.
Honolulu, HI  (808) 524-2090

39

1    of Civil Rights.

2        Q.    Now, I have the -- the affidavit that is

3    Exhibit A.  I have that.  Is it your testimony that there

4    was also correspondence between yourself and the Office

5    of Civil Rights?

6        A.    There were other -- there were other documents.

7        Q.    Go off the record just for a second and talk to

8    my co-counsel here and opposing counsel.  Do you have

9    that?

10                      THE VIDEOGRAPHER:  It is now 10:31 and

11   we're going off the record.

12                      (Discussion off the record.)

13                      THE VIDEOGRAPHER:  The time is now

14   10:32 and we're back on the record.

15       Q.    (By Mr. Helper)  Other than Exhibits A, Exhibit

16   B and the correspondence you've had with TSA, have you

17   ever provided any written account to anyone other than

18   your attorneys about your employment at TSA?

19       A.    I have not.

20       Q.    And have you ever kept any notes or journals

21   about your employment at TSA that you didn't provide to

22   any -- that you haven't provided to anyone?

23       A.    I -- I had a notebook at work at TSA that I was

24   not allowed to retrieve when I was terminated.

25       Q.    And I -- I think it's your testimony that it

1  was Mr. Tagomori who told you you could not get that

2  notebook?

3      A.    He -- he refused me to -- he refused permission

4  for me to go into the screening area and retrieve that.

5      Q.    Where was that notebook the last time you saw

6  it?

7      A.    We each had a -- each screening manager had a

8  little mailbox type thing, basket with our names on it,

9  and it was in that basket when I last saw it.

10     Q.    Where were the baskets?

11     A.    They were in the screening area.  There was a

12  small, little office with one desk right near the

13  screening -- near the X-ray machines and the -- in that --

14  that area, in that screening area, and the basket was on

15  the desk.

16     Q.    Well, can you describe the notebook for me?

17     A.    I -- I don't remember, I mean it's just a

18  standard spiral notebook.

19     Q.    Eight and a half by eleven?

20     A.    I don't believe it was that big.

21     Q.    I mean --

22     A.    It -- it was smaller.  It was -- it was a

23  small, maybe eight tall by four or five inches wide,

24  spiral bound notebook.

25     Q.    And what sort of things did you write in this

41

 1   notebook?

 2       A.     I -- I kept notes if I -- if I was told

 3   anything, if -- if any information came down from Filbert

 4   Carvalho.  Filbert would make decisions on -- on certain

 5   screening procedures, different things he wanted us to

 6   do, and -- and I would log it in there.  Some of the

 7   things that I overheard, some of the things that had been

 8   told to me, I had a little section in the back of it that

 9   I kept some notes in that I thought were pretty important

10   at the time.

11       Q.     Okay.  Did you write down in this notebook

12   about overhearing an exchange between Patti and Filbert

13   about your racial background?

14       A.     I did.

15       Q.     When did you make that?  When did you write it

16   down?

17       A.     I wrote that in when I was a party to another

18   conversation with Patti and -- and some screeners that

19   had asked -- a screener -- a married screener couple had

20   asked us some questions and -- and because of what -- the

21   answer that they received from Patti, I had wrote that

22   down, and at that same time that's the first time I

23   remember I added the things I heard previous to that and

24   I said I need to -- I need to keep some notes of some of

25   this stuff.

RALPH ROSENBERG COURT REPORTERS, INC.
Honolulu, HI  (808) 524-2090

1      Q.    And did you show that notebook to anyone ever?

2      A.    I did not.

3      Q.    Okay.  So you wrote both sort of work related

4    instructions in there and then personal concerns as well?

5      A.    I did.

6      Q.    Anything else that you would write in there, in

7    your notebook?

8      A.    No, just -- no.  That was about it.

9      Q.    Okay.  How many pages were written on in this

10   notebook?  You can estimate, obviously.

11     A.    Oh, I'm going to estimate that work related

12   pages there were probably -- oh, probably 15 to 20 pages,

13   and personal notes, about two, two and a half pages.

14     Q.    And when you say -- when you're distinguishing

15   between work related and personal notes, a personal note,

16   as I understand the way you're using it, might be

17   something that -- and a supervisor said to you or

18   something you observed, but it wasn't directly to do with

19   your -- the discharge of your duties.  Is that fair?

20     A.    That's fair.

21     Q.    Okay.  And the work related notes are this is

22   what I need to know to do my job kind of things?

23     A.    Yes.

24     Q.    Okay.  And so looking back at Exhibit B again,

25   does this appear to -- with the exception of your

1    signature being missing from Exhibit B, does this appear

2    to be the letter that you sent to the Office of Civil

3    Rights in November of 2002?

4         A.    Yes, it is.

5         Q.    And would you have mailed this on November 21?

6    Did you mail this on November 21?

7         A.    I -- I think I did mail it on November 21 and I

8    remember I'm -- I mailed it registered mail.

9         Q.    Okay.  And I think you said earlier that you

10   started to write this letter before November 21, right?

11        A.    I did.

12        Q.    When did you start to write the letter?

13        A.    I think it was probably around the 13th, 12th

14   or 13th, 14th, something like that, of -- of November.

15        Q.    Now, when did you learn that your employment

16   was going to be terminated?

17        A.    Well, it was -- it was literally in the middle

18   of one of my shifts in the evening.  I don't remember the

19   exact date, I'd have to look at one of these notes to

20   give you the exact date.

21        Q.    When you say look at one of these notes, what

22   do you mean, you mean look at the --

23        A.    Or this -- I believe it's in this letter, the

24   exact date that I was terminated.

25        Q.    Were you -- I think you said you looked at your

                    RALPH ROSENBERG COURT REPORTERS, INC.
                      Honolulu, HI  (808) 524-2090

1  termination letter.  And you actually have your

2  termination letter available to you now, right?

3       A.   I do.

4       Q.   Okay.  Did you receive the termination letter

5  the same day that you were -- learned you were going to

6  be terminated?

7       A.   I did.

8       Q.   Okay.  And if you want to take a look at that

9  letter, that might refresh your recollection as to the

10  date of that incident.

11       A.   November 13.

12       Q.   Okay.  So am I correct that the first time you

13  told anyone about the exchange between Patti and Filbert

14  about your racial background when you first met -- went

15  to meet with Mr. Leong before you started work, the first

16  time you informed anyone of that, overhearing that

17  conversation was in your letter dated November 21, is

18  that correct?

19       A.   Could I have a moment to speak with Denise?

20                 MR. HELPER:  Yeah.

21                 THE VIDEOGRAPHER:  Off the record?

22                 MS. HEVICON:  Yeah.  I've got to call

23  him.  I'll call you.

24                 THE VIDEOGRAPHER:  The time is now

25  10:41.

45

```
 1                         (Discussion off the record.)
 2                    THE VIDEOGRAPHER:  The time is now
 3    10:50 and we're back on the record.
 4                    MR. HELPER:  And if I could ask the --
 5    what -- what time we went off?
 6                    THE VIDEOGRAPHER:  We went off the
 7    record at 10:41.
 8                    MR. HELPER:  Okay.  So we've been off
 9    the record for about nine minutes here.
10        Q.    (By Mr. Helper)  Do -- I -- I would assume you
11    would want the question repeated?
12        A.    Please.
13                    MR. HELPER:  If I could ask the court
14    reporter to read it back.
15                    (The reporter read back the pending
16    question.)
17                    MS. HEVICON:  Did you hear that?
18        A.    I -- I did.  Well, like I -- speaking with
19    Denise, as I'm sitting here thinking about this, I do
20    remember some additional things that I need to explain.
21        Q.    (By Mr. Helper)  Please.
22        A.    On the -- on the conversation that I overheard
23    outside of the office door, I did talk to Patrick Collins
24    one time, I shared some of that -- what I had heard with
25    him very early on in my employment.  There was a second
```

RALPH ROSENBERG COURT REPORTERS, INC.
Honolulu, HI  (808) 524-2090

46

 1   incident where something was said by Patti that wasn't
 2   appropriate and I had actually -- I do remember telling
 3   Filbert Carvalho about that conversation because I was
 4   there.  I was part of the conversation with this married
 5   screening couple, Patti, myself, and I shared that with
 6   Filbert Carvalho.

 7      Q.   Okay.  Right now I'm just asking you about this --
 8   this comment or the exchange between Filbert and Patti
 9   that you say you overheard before you started work.

10      A.   Yes.

11      Q.   Is it --

12      A.   I -- I shared that conversation with Patrick
13   Collins on one occasion.

14      Q.   And when did you talk to Patrick Collins about
15   the conversation you overheard between Patti and Filbert
16   about your racial background?

17      A.   It -- it was within the first three days.  I
18   believe it was probably the very first day because I was
19   kind of piggy backing with Patrick, he was showing me --
20   kind of showing me the ropes for the first three days.

21      Q.   And what did -- tell me about your conversation
22   with Patrick Collins on that day.

23      A.   Later in the day, I -- after a few hours of
24   being with him, I -- I said basically Patrick, I want to
25   share something that I had heard, kind of see what his

1    thought about it was and -- and I told him and he

2    basically kind of laughed and said well, that's just

3    Patti.  She -- she talks a lot and she says a lot of

4    inappropriate things, and I go they're very

5    inappropriate, and that's -- I just was trying to get a

6    feel if -- if I was being paranoid or if -- if there were

7    other people that thought that way or -- but that was

8    kind of the extent of the conversation.

9         Q.    Okay.  Other than your conversation with

10   Patrick Collins, or -- is it correct that the only person

11   you told about your conversation -- let me start over.

12   The only person you told about overhearing a conversation

13   between Patti and Filbert about your racial background,

14   the only person you told about that while you worked at

15   TSA was Patrick Collins?

16        A.    Yes.  That is correct.

17        Q.    And you didn't tell anybody else about

18   overhearing that conversation until you wrote your letter

19   of November 21, dated November 21 of 2002, correct?

20        A.    That is correct.

21        Q.    Okay.  And now, tell me about was -- was there

22   anything else that occurred during -- I'm sorry.  You

23   said you -- you met with Lowrey in the hallway after you

24   overheard this conversation, right?

25        A.    That is correct.

48

1    Q.   Tell me about that conversation with Lowrey,

2   Lowrey Leong?

3    A.   Pretty basic.  I -- I introduced myself, asked

4   him if there were any SOP type books that I might be able

5   to read or -- or study before I actually started probably

6   two, three days later.  He -- he told me there wasn't

7   anything, there weren't any written SOPs or guidelines or

8   or publications that I could read, and just to show up

9   for work, and then he'd put me with one of the other

10  screening managers and go to work.  It was a very basic,

11  short conversation.

12   Q.   Did he appear to be surprised by your

13  appearance as far at all as you could tell or surprised

14  by anything?

15   A.   He -- actually there was a -- he -- he asked me

16  if I had been a screener, a government screener before

17  and I -- I said no, I came out of the military, I'd been

18  doing what I'd been doing and he was -- he did appear

19  somewhat surprised that I -- I got the impression that he

20  thought I was a screener previous, a government screener

21  previous to -- to this episode or this -- this incident

22  when I met with him.

23   Q.   Well, you were a former government employee who

24  screens people, right?

25   A.   Well, I was -- I was an army bomb squad first

                RALPH ROSENBERG COURT REPORTERS, INC.
                   Honolulu, HI  (808) 524-2090

49

1    sergeant that screened all the luggage and passengers

2    going onto Air Force One and I told -- and -- and I -- I

3    believe we did talk about that, now that -- that I think

4    about it, and -- and we did talk about that.  And -- but

5    he -- he seemed to believe that I was working as a -- not

6    a TSA, but maybe like a Wackenhut screener.

7        Q.    Now, Wackenhut, what does that mean?

8        A.    Well, Wackenhut was the -- the private security

9    company that had been doing the screening at Kahului

10   airport up till the time TSA took over.

11       Q.    And what was your understanding when you met

12   with Mr. Leong for the first time in person as to how

13   recently Wackenhut had been working security at Maui?

14       A.    Well, they -- they were -- they were physically

15   still there.  There were some Wackenhut employees and

16   there were some TSA employees, and at the time we met in

17   the hallway, it was what they call roll out.  TSA was

18   rolling out the new government screeners and Wackenhut

19   was -- each day less and less Wackenhut employees would

20   be at work.

21       Q.    Was it your understanding before you started

22   that there was a period where both Wackenhut -- where

23   Wackenhut screeners and TSA screeners were working the

24   same days at Maui?

25       A.    I -- there were some Wackenhut screeners that

RALPH ROSENBERG COURT REPORTERS, INC.
Honolulu, HI   (808) 524-2090

 1  were doing the screening in the -- behind the scenes, the

 2  luggage screening.  TSA was doing all the screening up

 3  front of the passengers and the carry on luggage.  There

 4  were -- I -- I don't remember if it was just a few days

 5  or -- or a week, but there was a short period where there

 6  were some Wackenhut screeners screening behind the

 7  screens, the luggage that goes on into the belly of the

 8  planes.

 9       Q.    By the time you started at TSA, were there any

10  Wackenhut employees still employed by Wackenhut

11  performing any security work at TSA Maui?

12       A.    I -- the -- the day I began work, I do not

13  believe there were any Wackenhut employees left.

14       Q.    Okay.  Okay.  Can you describe for me sort of

15  the atmosphere when you started about whether it was

16  controlled or, you know, everything was organized, ready

17  to go when you started or -- or the opposite or where on

18  the spectrum of control to chaos you found things when

19  you started?

20       A.    Controlled chaos might be a little bit strong,

21  but it certainly -- there were challenges.  Everyone was

22  new but -- but the employees were very good.  The -- the

23  training that the TSA screeners received, the uniformed

24  screeners that wore uniforms, they were for the most part

25  very qualified.

1    Q.    Was there any confusion about the proper method

2    when you started, were you aware of any confusion about

3    the proper method of screening?

4    A.    There -- there was some confusion about the

5    proper method of screening.

6    Q.    And what was that confusion?

7    A.    There was a TSA SOP book on screening

8    procedures, but it was not followed.

9    Q.    What procedure did -- was followed?

10    A.    Well, it was Filbert's -- Filbert Carvalho's

11    kind of -- he kind of set the standard for -- for the

12    screening efforts, he kind of made up the policy on how

13    it was -- how -- how it was to be done.

14    Q.    How were you trained in terms of how to screen

15    someone?

16    A.    Well, as far as TSA goes, I received no

17    training.

18    Q.    Okay.  During your on the job period with

19    Patrick Collins or with Patti Igarashi, they didn't

20    perform -- they never showed you screening methods?

21    A.    I -- I believe Patrick wanted to, but it was

22    almost impossible.  He was pretty much overwhelmed taking

23    care of little issues that seemed to pop up every second,

24    administrative issues, pay issues, HR issues, scheduling

25    issues.

1    Q.    And is -- is it true to say that that was -- is
2  is it fair to say that was true of just about all the
3  hierarchy that they were dealing minute by minute with
4  issues, a variety of issues that came up minute by
5  minutes in the first few weeks at TSA?

6    A.    Well, I can -- I can speak for the screening
7  managers and below.  I don't -- I'm not sure what the
8  positions above us.  I -- I can't answer that question
9  because I don't know what they were really doing.  They
10  never really spoke to us.

11    Q.    Okay.  So for screening managers and below, you
12  guys were -- when -- when you first started you guys were
13  dealing with a lot of maybe not emergency situations, but
14  minute by minute issues?

15    A.    There were certainly a lot of issues to deal
16  with, but it wasn't unmanageable.  The people were
17  very -- the screeners were very well trained, they --
18  they could function on their own if need be.  The -- the --
19  the uniformed supervisors were very well trained.  They
20  also went to school.  It -- it was a new operation but it
21  it -- it wasn't -- wasn't a bad operation.

22    Q.    So was it your understanding that people were
23  trained by TSA to do things one way and then Filbert had
24  a different method of telling people how to screen?

25    A.    I know he did because he told me that when --

53

1    when the TSA roll out team would leave, when they got out

2    of the scene, got out of the picture, we were -- he was

3    going to train us all to do it the way the -- that he

4    himself and the management wanted it done.

5        Q.    And when did you have this conversation with

6    Filbert Carvalho?

7        A.    Oh, I would -- I believe it was probably

8    towards the end of the first week.

9        Q.    And what did you say?

10       A.    I probably -- I didn't say anything to him.  I --

11   I certainly probably had some thoughts to myself but I

12   didn't -- he was the boss and -- and no uncertain terms

13   he was -- I was told he was the boss.

14       Q.    Did you tell anybody with the MSF that -- about

15   this conversation where -- where Filbert says he was

16   going to change the way -- the screening method after the

17   MSF left?

18       A.    I did not.  They weren't there very many days

19   once I started.  They were there a few more days and then

20   they pretty much all departed.

21       Q.    The method of screening that you used when you

22   were with the army of screening passengers that are about

23   to board an airplane, how similar was that to what you

24   learned from the mobile screening force or what you --

25       A.    It was -- it was very much the same.  The

RALPH ROSENBERG COURT REPORTERS, INC.
Honolulu, HI  (808) 524-2090

54

1  Secret Service method of screening passengers and -- and

2  luggage is pretty much what TSA initially started with.

3  They took Secret Service documents, standard operating

4  procedures and basically turned them into TSA standard

5  operating procedures.

6      Q.    Okay.  Right now I'm just limiting my question

7  to screening passengers as opposed to luggage.  Were you

8  ever -- as I understand it, you were never formally

9  trained by anyone on what TSA procedures were for

10  screening passengers, is that correct?

11     A.    That is correct.

12     Q.    So nobody with mobile screening force did it,

13  nobody with TSA Maui full-time did it, right?

14     A.    That is correct.

15     Q.    Did they give you any kind of informal training

16  or was it just you eyeballed how they were doing it and

17  figured it out that way?

18     A.    That's real accurate.  I -- I -- I watched the

19  screeners doing it each day, I watched the screening

20  supervisors doing it, I read the SOP book that TSA put

21  out several times.

22     Q.    And then -- and then did --

23     A.    I was --

24     Q.    Go ahead.

25     A.    I was just going to say there was certainly no

1    formal training though.

2         Q.    Okay.

3         A.    For me.

4         Q.    Not only no formal training in passenger

5    screening, but actually not even any informal training

6    except for what you could pick up by watching, right?

7         A.    That is correct.

8         Q.    Okay.  And then did in fact while you were at

9    TSA, did you come to learn that -- that the method of

10   screening did change when the mobile screening force

11   left, passenger screening?

12        A.    It -- it did change.  Yes.

13        Q.    And how did you learn that?

14        A.    We would -- we would be given directions from

15   Filbert, sometimes I'd receive them from Patti, sometimes

16   I'd receive them from Patrick when I would come in.

17   Filbert had decided today to change something a certain

18   way or -- or initiate a -- a new procedure, but from

19   Filbert or one of the other screening managers.

20        Q.    Is it your testimony that -- that the method of

21   screening changed from day to day after the mobile

22   screening force left or --

23        A.    It --

24        Q.    I'm sorry, let me -- let me just ask it a

25   different way.  How many -- you started work on -- oh,

RALPH ROSENBERG COURT REPORTERS, INC.
Honolulu, HI  (808) 524-2090

56

1   boy.

2                    MS. HEVICON:   October 20.

3       Q.    (By Mr. Helper)   October 20, according to this.

4   Let's -- let's make this letter, the next letter Exhibit

5   C, and that -- that's the October -- I'm sorry, the

6   November 13 letter that you -- I think you got, right?

7                    MS. HEVICON:   It's the termination

8   letter, Tom.

9       A.    Yes.

10      Q.    (By Mr. Helper)   Okay.

11                   (Letter dated November 13, 2002, marked

12  Exhibit C.)

13      Q.    (By Mr. Helper)   And so that indicates you were

14  appointed on October 20, 2002.   Was that the date you

15  started work?

16      A.    I -- yes, I think it is.

17      Q.    Okay.   And then you were terminated, I think

18  you've testified on November 13, so that gives us about a

19  24 day period in which you were employed by TSA, is that

20  right?

21      A.    That is correct.

22      Q.    How many days of those 24 were you at work?

23      A.    I believe I had two -- I had two periods where

24  I was off two days each so I -- I was only off about four

25  days.   I worked almost every day of those days.

57

1    Q.    So out of, you know, roughly a 20 day work

2    period there, how far into that did the mobile screening

3    force leave or give me your best estimate as to the date

4    the MSF left Maui?

5    A.    My best estimate is that they were all gone by

6    probably October 25.

7    Q.    Okay.  And then at what point did you -- I'm

8    sorry.  So -- so the conversation with Filbert in which

9    he said that the screening method was going to change

10   after MSF left was sometime between the 20th and the

11   25th, right?

12   A.    That is correct.

13   Q.    Of October, right?

14   A.    That is correct.  Yes.

15   Q.    And when after that did someone with TSA tell

16   you that the method of screening was going to change?

17   A.    Oh, almost immediately.  We changed some of the

18   procedures, we initiated new things, we -- we -- we

19   started passenger screening at the individual gates as

20   well as the main check point.  There were little changes

21   almost on a daily basis.

22   Q.    Talking -- just talking for a second about all

23   the changes that you saw during the time there, was there

24   anything done that you felt was a threat or improper or a

25   danger to national security in the way that the -- the

RALPH ROSENBERG COURT REPORTERS, INC.
Honolulu, HI  (808) 524-2090

58

1   passenger screening method was being changed?

2       A.   Not -- not a threat to national security, but

3   it made for a very complicated workplace.

4       Q.   Well, having -- I'm not talking about the

5   practice of changing from day to day, I -- I think I

6   understand what you're saying that that would be

7   confusing and -- and make it hard to deal with, but did

8   you ever believe that any individual change that was

9   being made was improper in any way?

10      A.   There were some things that I thought were

11  improper.

12      Q.   What did you think -- what changes were made in

13  the passenger screening method that you thought were

14  improper?

15      A.   Well, in the passenger -- in passenger

16  screening, I'm -- I'm not saying that we changed anything

17  that made it less secure.  There were policy changes that

18  just caused problems.

19      Q.   Give me an example.

20      A.   For instance --

21      Q.   Go ahead, thank you.

22      A.   Well, for instance, within -- within hours of --

23  within hours of the mobile screening force departing

24  Maui, someone made the decision that the -- the -- many

25  of the supervisors that were hired as supervisors and

                RALPH ROSENBERG COURT REPORTERS, INC.
                   Honolulu, HI  (808) 524-2090

59

1    assistant supervisors would be -- they simply would be

2    demoted and new supervisors appointed, uniformed

3    supervisors.

4        Q.    Are you talking about lead -- lead screeners?

5        A.    Lead -- lead screeners and screener

6    supervisors.  The -- within hours of the mobile team

7    departing, a list came out and said these are the new

8    supervisors, these are the new lead screeners, made no

9    sense whatsoever, caused chaos, caused bad morale

10   throughout the entire screening force and just didn't

11   make sense.

12       Q.    So if we look just at the passenger screening

13   procedures, there were changes made at -- on various

14   occasions after the mobile screening force left that

15   changed the method of how passengers were screened,

16   right?

17       A.    Well, I'm -- I'm not sure that it changed so

18   much the method -- excuse me.  We -- we were still

19   providing a quality product, but if we're -- we're

20   putting forth three times the effort to do the same

21   mission.  Many hurt feelings, very bad morale --

22       Q.    Okay.  Well --

23       A.    And --

24       Q.    But Mr. Young, I -- I think your -- I'm trying

25   to focus on a fairly narrow area to start with anyway,

RALPH ROSENBERG COURT REPORTERS, INC.
Honolulu, HI   (808) 524-2090

60
1   and that is changes in the method in which passengers

2   were screened.  So just -- just talking about that area

3   for a second.  Did that change after the mobile screening

4   force left?

5       A.      There certainly were changes made.  Can I give

6   you an individual example?  I'm not sure I can remember

7   the exact things that -- that were changed, but changes

8   were made in the screening method.  Yes, there were.

9       Q.      Okay.  And if I understand it, your testimony,

10  you don't think that any of the changes made airport

11  security -- or threatened airport security or made flying

12  less secure, is that correct?

13      A.      That is correct.

14      Q.      Okay.  Though just the practice of changing

15  policy, changing the screening method was something of a

16  strain on the people who had to do the screening, right?

17      A.      Well, and not only was it a strain on the

18  people that had to do the screening, I believe they were

19  illegal changes.

20      Q.      Okay.  What changes were made that you think

21  were illegal?

22      A.      There was a -- there was an attempt to change

23  who -- the -- the screen -- the lead screeners and the

24  screening supervisors were hired by that contract

25  employment agency.

RALPH ROSENBERG COURT REPORTERS, INC.
Honolulu, HI  (808) 524-2090

1      Q.    Okay.  I'm -- I'm just asking you about the

2   method of passenger screening.  Was there --

3      A.    I -- I cannot -- I can't give you -- I can't

4   give you an individual activity that was changed.  I -- I

5   there certainly were changes made.

6      Q.    Okay.

7      A.    The method of screening, people -- the amount

8   of people we used was changed.  Instead of screening

9   everyone -- well, we did screen everyone at the secure --

10  main security point but we started screening people at

11  the individual gates.

12     Q.    How about --

13     A.    There were --

14     Q.    Okay, go ahead.

15     A.    I'm -- I'm just saying there were changes made,

16  I don't know that I can remember the individual, each

17  individual change that was made.  I don't, but -- and

18  there were definitely changes made.

19     Q.    Was there any change in the -- the method of

20  wanding that was being used?

21     A.    Again, there were changes in the method of

22  wanding.  I'm not sure -- I -- I don't remember how we

23  changed it.  I -- I know we -- I didn't change it but I

24  know the method of wanding was changed.  There were --

25  yes, there were changes, and -- and unfortunately, there

62

1   was changes made by many different people that if they

2   would change at nine o'clock in the morning, I came to

3   work at three, I had no idea that the guys had been told

4   to do something differently.

5       Q.   Just talking about the passenger screening

6   methods, as I understand it, you don't recall any

7   particular change that was made in the method of

8   screening passengers, is that correct?

9       A.   That's correct.

10      Q.   Do you recall or can you give me an estimate as

11  to how many changes were made over the 15, 17 day period

12  after the mobile screening force that you were there?

13      A.   Well, I think it's fair to say that there were

14  several changes every day.  I had an incident involving

15  my own self with an airline pilot.  We were told the

16  first couple days an airline pilot -- well, anyone could

17  ask, anyone at any time can ask for a private screening.

18  If someone came through and asked for a private

19  screening, we would simply take them to the side, we --

20  we had a very small, little cubicle type office.  If --

21  if that was acceptable, we'd do their private screening

22  there.  If that wasn't, they could ask to go to a private

23  office.  We could take a male passenger to the -- to the

24  rest room and screen him in there or in our office.  In

25  fact, I was -- one of the things in my termination letter

RALPH ROSENBERG COURT REPORTERS, INC.
Honolulu, HI   (808) 524-2090

 1  says I improperly screened an airline pilot.  I was told

 2  at the very moment that it was happening to do it a

 3  certain way by Filbert Carvalho, and then it was placed

 4  in my termination letter that I'd done that improperly,

 5  but I did it exactly like we had done the day before.

 6  And it had been changed literally overnight.

 7      Q.    Was it your perception that a lot of people

 8  were confused by the changes in policies that were being

 9  made at TSA Maui?

10      A.    That's an accurate perception.  Yes, I -- I was

11  that is true.

12      Q.    And did you perceive that there was any racial

13  differences in how changes got communicated, in other

14  words, were --

15      A.    Oh.

16      Q.    Well, let me -- let me just ask that.  Was

17  there any difference in the way -- racial difference in

18  the way changes got communicated?

19      A.    I -- I -- I absolutely believe that that is

20  true.

21      Q.    What did you see?

22      A.    Information was passed to Patti that never came

23  to me, was never shared with me.  Information was passed

24  to certain screeners, the uniformed screeners that wasn't

25  passed to Caucasian uniformed screeners.

1      Q.    Tell me how you know that.

2      A.    Because I -- I would come to work -- you either

3   started at 4:45 in the morning as a screening manager or

4   you started at 3:15 in the afternoon.  I would be -- I

5   would come in at 3:15 and I would be basically

6   supervising the screening operation in the main security

7   area, and one of the screeners would come up to me and

8   say well, we -- we don't do that, we don't do that

9   anymore that way, and I'm like what do you mean?  Patti

10  told us last night at midnight not to do it that way

11  anymore.  I was never informed of that.  We -- we had a --

12  we had a -- we had a log book that we could place notes

13  for oncoming screening managers.  There was never

14  anything in the log book when I would come to work.

15     Q.    How do you know that non Caucasian screeners

16  were told changes in screening methods that Caucasian

17  method -- Caucasian screeners were not told?

18     A.    They would simply come to me and ask me how

19  come we weren't told that we weren't checking for

20  fingernail files or -- or small changes, subtle changes.

21  They -- they would be briefed and some of the Caucasian

22  screeners were not.  They would simply come to me and ask

23  we were never told this.

24     Q.    Did you ever have a non Caucasian screener tell

25  you that they had not been informed of a change in

65

1  policy?

2       A.     Not that I can remember.

3       Q.     How many Caucasian screeners came to you and
4  said that they had -- there was a change in policy of
5  which they were not aware?  How many times did that
6  happen?

7       A.     Oh, it -- it probably in that basic three week
8  period, it probably happened at least on eight to ten
9  different occasions.

10      Q.     And were these eight to ten different Caucasian
11  screeners or was it the same Caucasian screener on more
12  than one occasion telling you they had not been informed
13  of a change in policy?

14      A.     Well, I'm -- I'm going to estimate that it -- I
15  don't -- again, I don't remember exactly, but it
16  certainly was more than a couple.  It was several
17  different screeners that came to me.

18      Q.     Okay.  Do you recall the identities of any of
19  the screeners, the Caucasian screeners who came to you
20  and said that they were -- there was a policy change of
21  which they had not been informed?

22      A.     I can remember two supervisors, a female
23  screener supervisor named Ann Werstler, and I remember
24  his first name, his first name was Rusty.  He's a retired
25  why I remember him, he's a retired New York City Port

RALPH ROSENBERG COURT REPORTERS, INC.
Honolulu, HI  (808) 524-2090

66

1    Authority policeman who was also a supervisor.

2        Q.    Rusty Harlan?

3        A.    I believe so.  Yes.

4        Q.    Okay.  I take it you never saw -- well, did you

5    ever see any kind of a meeting or a briefing in which

6    policy changes were announced?

7        A.    I -- I -- in the three weeks I was there, I

8    only attended one briefing with all of management.

9        Q.    Well -- how about -- I'm not talking about all

10   of management, how about just maybe even a huddle or a

11   beginning of shift meeting where Pat Collins or Patti

12   Igarashi or anyone would say okay, this is a change we're

13   making in -- in --

14       A.    Yes, I did -- I did witness some -- some

15   meetings like that.

16       Q.    How many meetings like that were you present

17   at?

18       A.    I was probably at three to five, I'm

19   estimating.

20       Q.    Okay, so there were --

21       A.    Meetings.

22       Q.    And -- and who conducted those meetings?

23       A.    Well, we would as training managers if we had

24   new information to pass along.  Fil Carvalho probably did

25   the majority of them though.

RALPH ROSENBERG COURT REPORTERS, INC.
Honolulu, HI  (808) 524-2090

1    Q.    Okay.  And your understanding at the time was

2    he was sort of the -- the resident expert on screening?

3    A.    He was the resident expert at the airport.  He

4    was a FAA special agent that was stationed at the

5    airport.

6    Q.    And did the -- the three to five meetings in

7    which policy changes were discussed, where did they take

8    place?

9    A.    Some of them took place in a conference room

10   that belonged to -- I believe it belonged to Hawaiian

11   Airlines upstairs in the airport, and some would be right

12   on the screening floor right on -- in the security area.

13   Q.    Okay.  How many of the meetings -- the three to

14   five meetings you're talking about, you're estimating, do

15   those include the meetings at which you informed your

16   screeners about changes in methods?

17   A.    Yes.

18   Q.    Did you -- other than those three to five

19   meetings, did you have any sessions in which you told

20   your screeners hey, I just found out, guys, there's a

21   change, don't do this, do that?

22   A.    Yes.  That happened.

23   Q.    And on how many occasions would you inform your

24   screeners of changes outside of the three to five

25   meetings we were talking about earlier?

RALPH ROSENBERG COURT REPORTERS, INC.
Honolulu, HI  (808) 524-2090

68

1    A.    Not -- not very often, because to back up just

2    a little bit, I -- I piggy backed three days with Patrick

3    Collins and I piggy backed three days with Patti, so I --

4    I was there or I may or may not have been in the meetings

5    that they conducted, but I certainly didn't say anything

6    because they were kind of running the show at that point.

7    I -- I didn't have a lot of meetings or opportunities to

8    have meetings with the screeners by myself.

9        Q.    So you were present at three to five -- three

10   to five meetings at which policy changes were passed down

11   to the screening force, right?

12       A.    I was.

13       Q.    And those -- most of those meetings were

14   conducted by Fil Carvalho, right?

15       A.    That's correct.

16       Q.    And Patti Igarashi and Patrick Collins also

17   participated or -- or led some of the time, is that

18   right?

19       A.    They -- they would lead or -- or participate

20   some of the times, correct.

21       Q.    And these were meetings at which all the

22   screeners on the shift were present, is that correct?

23       A.    No.  Not -- not necessarily all of them.  I

24   would say the majority of them but -- but certain -- some

25   some guys could come, some guys were still doing

RALPH ROSENBERG COURT REPORTERS, INC.
Honolulu, HI  (808) 524-2090

69

1   screening operations, not always -- not everyone got to

2   come.

3       Q.   Did you notice any racial breakdown in who was

4   and wasn't at the meetings?

5       A.   I -- I -- I don't recall that I noticed that.

6       Q.   So it's not your testimony that the Caucasians

7   were given one set of instructions and the non Caucasians

8   were given another instructions, that's not your

9   testimony, is it?

10      A.   That's -- that's not my testimony, but I

11  believe I -- well, I know I saw information, I -- I know

12  there were periods when some Caucasian supervisors did

13  not get the same information other -- other supervisors

14  got.

15      Q.   But at the meetings at which you were

16  physically present, you did not see any difference in the

17  way Caucasian and non Caucasian screeners and supervisors

18  were informed of policy changes, is that correct?

19      A.   Not at the meetings I was present at.

20      Q.   So I'm correct?

21      A.   Yes.

22      Q.   Okay.  And your perception that Caucasian

23  supervisors and screeners were receiving different

24  information or were treated differently in the way they

25  were informed of policy changes, that perception is based

1    on the fact that eight to ten Caucasian screeners came to

2    you and said they had not been informed of policy changes

3    and you got no such complaints from non Caucasian

4    screeners, is that correct?

5        A.    That is correct.

6        Q.    Is there any other basis to your perception

7    that Caucasian and non Caucasian screeners were treated

8    differently in the way they were informed of policy

9    changes?

10       A.    Not in policy change matters, no.

11       Q.    Okay.  And I -- I think to be fair, you've got

12   other reasons that you've articulated for believing that

13   there was a racial discrimination, but just with regard

14   to that -- you -- you've told me what you -- I -- I think

15   I've got it.  Okay.  So that's not a question.  And you

16   never were -- you never perceived that Caucasians were

17   given one method of wanding and non Caucasians were --

18   were given another method of wanding, is that correct?

19       A.    I -- I -- I did not observe that.

20       Q.    You never saw any difference in the way

21   Caucasians and non Caucasians were trained to wand,

22   correct?

23       A.    Correct.

24       Q.    Did anybody ever complain to you that

25   Caucasians were being trained one way and non Caucasians

1    were being trained another in wanding?

2        A.    I don't remember anyone complaining to me.

3        Q.    Okay.  We've been going for awhile here, why

4    don't we take a -- a five minute break?

5                    THE VIDEOGRAPHER:  The time is now

6    11:32 and we're going off the record.  This is the end of

7    tape one.

8                    (Discussion off the record.)

9                    THE VIDEOGRAPHER:  The time is now

10   11:45 a.m.  This is the start of tape two and we're back

11   on the record.

12       Q.    (By Mr. Helper)  Mr. Young, can you give me the

13   racial breakdown of the screeners that you supervised

14   into Caucasians and non Caucasian?

15       A.    I'm -- again, I'm estimating, but I -- I would

16   believe it was probably real close to 50/50.

17       Q.    And how many people are we talking about under

18   your supervision?

19       A.    Early on, my -- my first early days of say the

20   first week, I believe we had upwards of 140 people

21   working, but we very rapidly thinned that down to

22   probably only again, an estimate, about 60 people per

23   shift.

24       Q.    And how was that thinning down done?

25       A.    Well, they just -- they simply -- there were

                RALPH ROSENBERG COURT REPORTERS, INC.
                    Honolulu, HI  (808) 524-2090

72

1   some people that -- that did actually quit early on after

2   just a matter of a few days of work.  I -- I remember a

3   small number of people being terminated, but they simply

4   started rotating the shifts the way it was really

5   designed to be.  They kind of had everyone working

6   initially to get everything on -- on line.

7       Q.   So you had a -- a total of -- well, I'm sorry.

8   On a given shift after you were done with your piggy

9   backing, as you called it, with Mr. Collins or Miss

10  Igarashi, how many screeners or supervisors worked under

11  you on a given shift, estimate?

12      A.   Just there should have been at least two

13  supervisors, uniformed supervisors.  I'm estimating,

14  should have been about four, four to six lead screeners

15  and probably close to 40 to 50 screeners.

16      Q.   So we're talking ball park 50 or 60 people,

17  right?

18      A.   Yes.

19      Q.   And when you said earlier that you had eight to

20  ten Caucasian screeners come to you with concerns that a

21  policy had not been explained to them, that's eight to

22  ten out of this 50 or -- or 60 so -- or so people, right?

23      A.   That is correct.

24      Q.   Okay.  I'm sorry, it wasn't eight to ten

25  people, it was eight to ten occasions on which screeners

1   came to you and it may have been multiple times by one --

2   an individual screener?

3       A.    Over -- over a period of two to three weeks.

4       Q.    Okay. Okay. I want to turn to Exhibit C,

5   which is the termination letter, and just go through

6   what's alleged in there and -- and get your reaction

7   sentence by sentence. And let me just -- well, I'm just

8   going to ask you questions, and to the extent you need to

9   refer to the Exhibit C, please do. Were you --

10      A.    Okay.

11      Q.    Were you counseled on October 27, 2002?

12      A.    I was counseled on October 27.

13      Q.    Okay. And were you counseled about the chain

14  of command on October 27, 2002?

15      A.    The -- the subject was the chain of command.

16      Q.    Were you counseled about showing favoritism

17  with screeners on October 27, 2002?

18      A.    Was not. I never heard that until I saw this

19  termination letter.

20      Q.    Okay. Were -- were there screeners at -- that

21  worked under you who you knew in any capacity before you

22  started work at TSA?

23      A.    Yes.

24      Q.    How many?

25      A.    Two.

74

1    Q.    And who was that?

2    A.    One screening supervisor named Ann Werstler and

3    a screener named -- her name was Shelly Ann Hee.

4    Q.    And her nickname was Kiki?

5    A.    Kiki.

6    Q.    And how did you know Ann Werstler before you

7    started working at TSA?

8    A.    Ann worked -- well, both of them worked on

9    Kahoolawe.

10   Q.    And did you ever supervise either one of them?

11   Well, how -- how well did you know these two women?

12   A.    I did not know Ann very well.  I knew Shelly

13   Ann Hee very well.  Ann -- Kiki or Shelly Ann, she never

14   worked on a shift ever when I was a screening manager.

15   Ann did work on several different days with me, and I

16   actually brought that to Fil Carvalho's attention.

17   Q.    You're talking about when he gave you this

18   letter on -- on November 13 of '03 -- of '02?

19   A.    No.  Before -- before he -- the first time I

20   knew that they had scheduled Ann to work with me, I

21   brought it to Fil's attention that her and I had worked

22   together on Kahoolawe and he said there would be

23   certainly no problem.

24   Q.    Okay.  When you say you knew Kiki very well,

25   she -- did she actually live with you for a time?

RALPH ROSENBERG COURT REPORTERS, INC.
Honolulu, HI   (808) 524-2090

75

```
 1        A.     She rented a room in our house when she first
 2    started working on Kahoolawe.
 3        Q.     And how long -- and I meant to say live in your
 4    house, I didn't mean to imply, you know, living with you
 5    in some kind of a romantic relationship, but how long did
 6    Kiki rent a room from you?
 7        A.     Probably, I'm -- I'm estimating, just a little
 8    bit over a year.
 9        Q.     Is she somebody you'd characterize as a pretty
10    close friend?
11        A.     Well, we -- we lost touch a long time ago.  We
12    were good friends at that time.
13        Q.     But it's your testimony that you two never --
14    you never supervised her throughout the time you worked
15    at TSA?
16        A.     I never supervised her.  I do -- I do not
17    remember her ever working a shift when I worked.
18        Q.     And so -- but it's two separate issues, all
19    right.  One, she -- she might be working a shift at the
20    same time as you without you being her supervisor, right,
21    or is that not possible?
22        A.     No.  I -- I would have known if she was there.
23    I mean as training manager I'm responsible for everyone
24    that's working, and she did not work a shift when I was
25    screening manager.
```

RALPH ROSENBERG COURT REPORTERS, INC.
Honolulu, HI  (808) 524-2090

76

1      Q.    Okay.  Did anybody ever complain to you they

2   thought you were showing favoritism to any particular

3   employee, any -- any sub --

4      A.    No one.

5      Q.    Any subordinate employee?

6      A.    No one ever came to me on any occasion on that

7   subject.

8      Q.    So what is your recollection of the counseling,

9   what occurred at the counseling on October 27 of 2002?

10     A.    I was asked to come into the office by Howard

11  Tagomori and it was Howard and Lowrey Leong in there.

12  They asked me how things were going, I said I thought

13  they were going pretty well.  They asked me if I

14  understood the chain of command.  I said I did understand

15  the chain of command.  Howard asked me to explain the

16  chain of command.  I said well, I work directly for

17  Filbert Carvalho, and the best of my knowledge, Filbert

18  worked directly for Howard.  And in the middle of this

19  conversation as I was answering this question, he became

20  very upset, he cussed at me, told me to shut my mouth,

21  and that -- that I needed to learn the chain of command.

22     Q.    When you say he cussed at you, give me the

23  quote of what he said.

24     A.    He said shut your fucking mouth and learn the

25  chain of command.

RALPH ROSENBERG COURT REPORTERS, INC.
Honolulu, HI   (808) 524-2090

1    Q.    What did -- did he tell you what he thought you

2    had done wrong with respect to the chain of command?

3    A.    Yes.

4    Q.    What?

5    A.    He told me that Patti had explained to him that

6    the night before I was trying to undermine Fil's

7    authority.  Filbert had -- Filbert had briefed -- briefed

8    me on overtime and that there was no overtime allowed,

9    period.  After a shift, we would -- we would try to have

10   an after shift meeting with all the employees, five, ten

11   minutes.  Fil would generally run those meetings if he

12   was there.  He ran that particular meeting that night, he

13   spoke for about 30 minutes past the ending time of a

14   shift.  When he left the room, of course I had 60 or 70

15   screeners who wanted to know about were they going to get

16   the 30 minutes overtime.  Patti had walked into the room

17   in the middle of this meeting, and when she came up, she

18   got near me and I said Patti, do you think I should -- do

19   we need to say something to Fil so he knows that he's

20   going over the time?  That's all that was said.  But in

21   this counseling meeting with Howard and Lowrey Leong,

22   Howard explained to me that Patti came to him and said I

23   was undermining Fil's authority trying to -- something

24   along -- something to the conversation regarding the

25   conversation her and I had that evening before.

1    Q.    Did -- at that meeting or -- or at any time did
2    you learn what Patti had said that you had done at the
3    meeting the night before?

4    A.    Just only what Howard told me, that she had
5    come to Howard and she was concerned that I was trying to
6    undermine Fil's -- Fil's authority.

7    Q.    And is it accurate that -- is it your testimony
8    that you didn't say anything to the assembled screeners
9    the night before the counseling?

10   A.    I don't believe I spoke at all.  Fil was the
11   only one that spoke in that meeting.

12   Q.    And -- okay.  And did Lowrey Leong say anything
13   during the October 27 counseling session?

14   A.    I don't recall him saying anything.

15   Q.    How long did the counseling last?

16   A.    Probably less than five minutes.

17   Q.    And this -- the shut your fucking mouth
18   comment, is that -- did I get that right, is that what he
19   said, Mr. Tagomori?

20   A.    I'm sorry?

21   Q.    Is it your testimony that Howard Tagomori said
22   shush your -- shut your fucking mouth?

23   A.    Howard Tagomori told me to shut my fucking
24   mouth.

25   Q.    Okay.  And was this out of the blue or was this

RALPH ROSENBERG COURT REPORTERS, INC.
Honolulu, HI  (808) 524-2090

79

1  was there any kind of a heated exchange that led to that

2  or -- or how did that happen?

3     A.    It was completely out of the blue.  He -- he

4  asked me if I understood the chain of command and to

5  explain it to him.  I -- I said -- I started to explain

6  it and literally out of the blue he just erupted and --

7  and screamed at me.

8     Q.    Anything else that occurred during that meeting

9  that you can recall?

10    A.    I don't recall anything else.  Howard told me

11 go back to work.

12    Q.    Okay.  Were you counseled on October 28, 2002?

13    A.    I was not counseled.  No.  I was not counseled

14 on October 28.

15    Q.    Were you ever counseled in this time, around

16 that time about switching shifts improperly?  Anybody

17 ever discuss that issue with you?

18    A.    Filbert discussed this with me, it was not the

19 October 28 though.  He -- he discussed it out in the

20 screening area during work during the day.  He did -- did

21 ask me about why I changed shifts.  He -- he never

22 indicated in any fashion or form that it was a counseling

23 session or anything like that.

24    Q.    And what was the -- had you switched shifts

25 recently when -- when Fil had talked to you about --

80

1    A.    I -- I did shift -- I did switch a shift with

2    Patti, and this is one of these things that I know there

3    were certainly other issues involved.  I had mentioned --

4    I had mentioned one day that my son played football for

5    Maui High School and Patti, if I remember the

6    conversation right and -- and I believe I do, she -- she

7    said well, you should go to your son's football game, and

8    I go well, no, I'm working that evening.  And she goes

9    well, why don't we switch shifts?  She goes and you can

10   go to your son's football game, and I go no, I'd rather --

11   things were kind of chaotic, I said I'd rather just work

12   the shift, I'm missing one game is not the end of the

13   world.  She goes no, you don't understand.  I need to

14   switch a shift, I need a -- a certain night off, and if

15   you would work this night for me, I would work this night

16   for you.  I -- I said well, if -- if you need to switch,

17   I have no problem with that.  I even offered to -- I

18   offered to go and tell -- talk to Fil about it or Howard

19   and she -- she told me there was no need, that screening

20   managers were able to make pen and ink changes to the

21   schedule.  I said I'd feel more comfortable talking to --

22   at least telling Fil that we were going to do this.  She

23   said we're screening managers, we don't need to do this.

24   She'd been there much longer than I had been, she had

25   been there with Wackenhut.  I assumed and assumed wrong

RALPH ROSENBERG COURT REPORTERS, INC.
Honolulu, HI   (808) 524-2090

81

1    that -- that it was okay and then Fil did come to me one

2    day and said you -- you cannot change shifts after the

3    fact.

4        Q.    So did you have any understanding about any

5    kind of -- before you changed shifts, had you ever been

6    told of any kind of shift change policy applicable to

7    anybody at TSA Maui?

8        A.    I was not -- had no knowledge of any policy

9    whatsoever on that subject.

10       Q.    Okay.  So do you know what the date was that

11   you shift -- changed shifts with Patti Igarashi?

12       A.    I -- I do not remember the date, but I -- I

13   know it was a Saturday because all the high school

14   football games, or my son's football game was on a

15   Saturday evening.  But I don't remember the day.

16       Q.    Do you recall if the date that you ended up

17   working for Patti was before or after the Saturday that

18   she worked for you?

19       A.    Oh, I worked the day -- I worked before.  I

20   worked her shift before I took the day off for my son's

21   game.

22       Q.    And was the discussion with Fil Carvalho after

23   both shifts had been -- after both of you had -- had

24   worked each other's shifts?

25       A.    It was -- it was a couple days after we --

RALPH ROSENBERG COURT REPORTERS, INC.
Honolulu, HI  (808) 524-2090

82

1    after both.

2        Q.    After the Saturday?

3        A.    Yes.

4        Q.    Okay.  And do you recall how far in advance of

5    the Saturday you guys agreed to do the shift change, the --

6    the shift switch?

7        A.    It -- again, it's an estimate, but it was

8    sometime probably two to three days prior to either one

9    of us.

10        Q.    And then you were -- I think you were pretty

11    definitive that -- or definite that you were not

12    counseled on October 28 about the shift change or -- ask

13    that again.  What is your best estimate of when Fil

14    Carvalho talked to you about the shift change you had

15    done with Patti Igarashi?

16        A.    I -- I believe it was -- it was closer to the

17    end of the month, maybe the 30th.

18        Q.    Okay.  How long did that conversation last

19    where Fil Carvalho was talking to you about concern,

20    expressing concern to you about the way you changed

21    shifts with Patti?

22        A.    Fairly short conversation after he told me that

23    we -- we -- he didn't want us doing that, I -- I told him

24    that I didn't know that -- that -- that there was any

25    kind of policy.  He told me -- I said, you know, did I

RALPH ROSENBERG COURT REPORTERS, INC.
Honolulu, HI  (808) 524-2090

83

1   cause a big deal, he said it's not a big deal, don't

2   worry about it, you worked Patti's shift, she worked your

3   shift, just bring it to my attention in the future if you

4   change again.

5      Q.   Was he courteous during this conversation,

6   Mr. Carvalho?

7      A.   Yes.  Very much.

8      Q.   October 29, were you counseled on October 29?

9      A.   No, I was not.

10     Q.   What do you mean when you used the word

11  counseling?

12     A.   Well, I -- I -- counseling to me means someone

13  would come to me or I would go to someone and -- and say

14  this is a situation that's happened, it -- it was

15  improper or -- or done wrong or -- or could be good

16  counseling but, you know, you did wrong, this is what you

17  did wrong, this is what you need to do to correct

18  yourself.

19     Q.   On October 29, did someone talk to you about

20  being unavailable during peak flow time at the check

21  point?

22     A.   They did not.

23     Q.   When did you become aware that anyone might

24  have concerns about your unavailability during peak flow

25  time at a check point?

RALPH ROSENBERG COURT REPORTERS, INC.
Honolulu, HI  (808) 524-2090

84

1    A.    When I received this termination letter.

2    Q.    Okay.  Were you ever counseled about failing to

3    control a situation in which a passenger became irate

4    over a prohibited item?

5    A.    Was not.

6    Q.    Did anybody ever discuss -- there was such a

7    situation in which a passenger became irate over an item

8    being confiscated, right?

9    A.    Yes, there was.

10   Q.    And in that incident, it was a lighter that was

11   being confiscated?

12   A.    Yes, it was.

13   Q.    And it was a male passenger, right?

14   A.    Yeah.  Yes.  A -- a husband and wife couple.

15   Q.    But it was the male who became irate, right?

16   A.    Yes.

17   Q.    And he actually came through the metal detector

18   into an area that he wasn't supposed to be in, is that

19   right?

20   A.    Well, no.  He was -- he was a passenger, he was

21   a ticketed passenger.  He -- he came through the metal

22   detector.  His -- he set off the metal detector, and at

23   that point, then they -- they go to the individual

24   wanding and where today they take your shoes off and

25   things like that, and at that time he -- he took out a --

RALPH ROSENBERG COURT REPORTERS, INC.
Honolulu, HI   (808) 524-2090

85

```
1   a cigarette lighter from his pocket and -- and produced
2   what had set off the metal detector.
3       Q.   And it was required that that item be
4   confiscated, right?
5       A.   Well, it -- it needed to be -- you -- you can't
6   take it on the airplane.  It doesn't necessarily have to
7   be confiscated.  He could give it to someone to take
8   outside, he could -- if he was someone that lived on the
9   island, he could put it in his car, just can't take it
10  through the security check point onto the airplane.
11      Q.   Okay.  And do you recall who the screener was
12  or any of the screeners were who were involved in
13  screening this passenger?
14      A.   I can picture the screener, but I remember the
15  incident very clearly.  Filbert Carvalho --
16      Q.   Wait a second.
17      A.   -- and Lowrey Leong --
18      Q.   Wait.  Make sure you're -- you're listening to
19  my question here.  The only question I had for you is
20  whether you recall the screener who was involved.
21      A.   I -- I don't have his name, but I -- I -- I can
22  picture the person who was involved with it.
23      Q.   And give me a physical description.
24      A.   He was one of the -- one of the screeners from
25  Maui, he was a lead screener.  I believe he -- he is
```

RALPH ROSENBERG COURT REPORTERS, INC.
Honolulu, HI  (808) 524-2090

1  probably Filipino.

2      Q.    Can you give me a height or age or --

3      A.    30 years old, five foot eight.  I -- I'm almost

4  positive he was one of the guys that was in the Hawaiian

5  National Guard.

6      Q.    And tell me about what you recall, how -- how

7  you became aware that there was a problem.

8      A.    I -- at the time that it happened, I was in the

9  cubicle, and I was actually doing a private -- I was

10  basically supervising a private screening of a lady with

11  a large box of jewelry in the cubicle off to the side of

12  the screening area.  That particular incident happened,

13  Fil Carvalho, Lowrey Leong were both in the screening

14  area standing next to the X-ray machine.  And why I

15  remember this is that's fairly unusual, they don't

16  normally come out there.  When the screener told this

17  fellow he had to either surrender his lighter or -- or do

18  something else with it, he did become very irate, very

19  upset.  And when he became very upset, Fil Carvalho was

20  standing two feet away when this happened, he stepped

21  forward, he identified himself as a special agent, he --

22  he -- he showed this passenger his badge and told him

23  that he must calm down and that he had two options,

24  surrender the lighter or -- or get rid of it.  By the

25  time he had spoken to this passenger, I excused myself

1   from the cubicle, I came out, went into the screening

2   area, and he was very, very upset.  I brought him and his

3   wife over to some chairs that we had next to the cubicle

4   and asked them to -- to -- to have a seat and let me

5   explain -- what -- what needed to be done.  And what I

6   suggested to the -- to this fellow was that -- this

7   lighter was a gold plated, very expensive, very

8   sentimental lighter for this fellow.  It wasn't a throw

9   away Bic lighter.  I told him that he could go back to

10  the airline that he was ticketed with, ask them if they

11  would mail it, mail it back to his home of record.  And

12  he actually stayed there in the security area, his wife

13  we let out the side little door, she went back to the

14  airlines with the lighter, and the airlines did agree to

15  mail that lighter back for him.  She came back, we

16  rescreened her, we finished screening him and he went on

17  his flight.

18      Q.    Okay.  So as I understand your testimony,

19  you're saying that Mr. Carvalho talked to the irate

20  passenger before you ever did, right?

21      A.    He -- he was the second person, yes.  He talked

22  to him before I did.

23      Q.    Okay.  And then you talked with the passenger

24  after Mr. Carvalho had finished?

25      A.    Within just seconds.  It took me about ten

RALPH ROSENBERG COURT REPORTERS, INC.
Honolulu, HI   (808) 524-2090

88

```
 1   seconds to get from the cubicle over to where this

 2   incident was happening.

 3       Q.   Do you recall who was in the -- I think you

 4   said you were supervising a private screening of a woman

 5   with jewelry, right?

 6       A.   Yes.  Yes.

 7       Q.   And who were you supervising who was doing that

 8   screening?

 9       A.   I -- I honestly don't remember.

10       Q.   And did it -- is it your testimony that no one

11   ever expressed concern to you about the way you'd handled

12   the situation until November 13?

13       A.   That is correct.  I actually spoke with -- Fil

14   spoke about that incident in the after -- after work

15   meeting that evening and that -- that it was handled well

16   but we needed to expect as -- as the weather warmed up,

17   as it -- as it got hotter and people come in more tired

18   and irritable, that we would see more of these incidents --

19   we could see more of these incidents.  When Fil was done

20   speaking to the group of screeners, I asked Fil was there

21   anything else -- could I have done something different,

22   my solution of having the airlines mail the lighter home

23   to him and he -- he said no, everything was fine, just be

24   prepared for the possibility of more incidents like this

25   happening.
```

1    Q.    So after the incident with the irate passenger,

2    it's your testimony that Fil Carvalho told a group of

3    screeners that the incident had been handled well?

4    A.    He said it was handled well, that the initial

5    screener did a very good job in -- this man was very

6    emotional and he told -- Fil told everyone in our group

7    that the initial screener that dealt with him did a very

8    good job.

9    Q.    And he -- did he say anything about your role

10   in the -- in the process?

11   A.    He -- he didn't state -- he -- I -- I point

12   blank asked him did -- is there something else I could

13   have done, should I have done something else?  No, he

14   said it was handled okay, just be prepared for more

15   incidents.

16   Q.    That comment, that statement was in a one on

17   one exchange between yourself and Mr. Carvalho, right?

18   A.    It was one on one but it was in the briefing

19   room with other screeners present.

20   Q.    Do you know if any of the other screeners would

21   have heard Mr. Carvalho tell you that you'd done

22   everything okay?

23   A.    Certainly possible.  I don't know that they

24   did, but it's possible.

25   Q.    Do you recall any of the screeners who were

RALPH ROSENBERG COURT REPORTERS, INC.
Honolulu, HI  (808) 524-2090

1   there?

2       A.      I just -- I remember -- I remember the -- the

3   first screener that dealt with him, but I don't remember

4   other people.

5       Q.      And the -- the screening -- the proper

6   procedures for screening of a pilot, were you ever

7   counseled before November 13 about failing to file proper

8   procedures for screening of a -- private screening of a

9   pilot?

10      A.      Was not.

11      Q.      What did -- were you ever -- did Mr. Tagomori

12  ever talk to you about a pilot screening issue?

13      A.      Mr. Tagomori never spoke to me about that

14  issue.

15      Q.      Okay.  I'm just looking at your statement here.

16  This is Exhibit B, bottom of the second page.

17  Mr. Tagomori stated another screener manager reported to

18  him that I had not properly screened the pilot.  So that

19  sounds to me like maybe you were counseled at some point

20  about a screening, a pilot screening situation.

21      A.      Well, no.  He -- he told me that at the

22  termination meeting when he presented this termination

23  letter.

24      Q.      I understand.  Okay.  And is it your testimony

25  that Mr. Carvalho never expressed any concerns to you

1  about the way you screened the pilot?

2      A.    Never spoke a word of it.  May I say something

3  else?

4      Q.    Sure.

5      A.    I screened -- I screened the pilot in direct --

6  in -- in accordance with Fil's direct instructions.

7  Fil's the one who told me to screen the pilot the way we

8  screened the pilot.

9      Q.    Okay.  October 31, you admit that this was your

10  mess up that -- not -- not showing up to work, is that

11  fair to say?

12      A.    That is very correct.

13      Q.    Okay.  And your explanation in your -- well,

14  your explanation is that you got confused about what day

15  of the week it was, that you thought you were -- it was a  --

16  it was Friday and you had an afternoon shift scheduled

17  for Friday?

18      A.    I -- I did, yes.  I -- I thought I was

19  scheduled for the afternoon shift when I was in fact

20  scheduled for the morning shift.

21      Q.    And were you counseled about that?

22      A.    I -- I had a conversation when I arrived --

23  when I got to the airport that morning I went straight to

24  the office.  Howard Tagomori was there, he knew I was

25  late, I went to him, I -- I said, you know, Howard, I

1  apologize, I'm late -- I don't, you know, I didn't have
2  an excuse other than I simply got the shifts wrong and he
3  he -- his response was he wanted to know if I had a
4  drinking problem.  And of course, I don't even drink, but
5  I said no, I don't have a drinking problem, I simply made
6  a mistake, I apologize for it.  I'm a retired army first
7  sergeant, I -- I don't come to work late.  He says okay,
8  don't let it happen again, go to work.

9      Q.   And how many -- well, what was his demeanor
10 during that conversation?  What was Mr. Tagomori's
11 demeanor during this conversation when you came up --
12 came late to work?

13     A.   He -- he was okay.  He -- he wasn't upset, he
14 wasn't -- I was somewhat surprised that he -- he didn't
15 seem tremendously upset.

16     Q.   How many times in your career at TSA did you
17 speak with Mr. Tagomori?

18     A.   I only spoke with him on I believe four
19 occasions in the three weeks.  I actually only spoke with
20 him four -- four separate times.

21     Q.   Okay.  And one was the counseling about the
22 chain of command, one was the time you were late, one was
23 the time you were being terminated and what was -- was
24 there --

25     A.   Well, Mr. -- Mr. Tagomori never spoke to me

RALPH ROSENBERG COURT REPORTERS, INC.
Honolulu, HI  (808) 524-2090

1    about the chain of command.  That was Filbert Carvalho.

2        Q.    Who was it that you say said shut your fucking

3    mouth?

4        A.    That was Howard.  Oh, I'm sorry.  Howard spoke

5    to me about the chain of command but not -- yes, I'm

6    sorry -- I'm -- I'm -- I misspoke.  He spoke to me about

7    the chain of command.  That was the only issue he -- he

8    ever spoke to me about.

9        Q.    Okay.  So I'm trying to get the -- your -- your

10   estimate is that he spoke with you four times.  I'm just

11   trying to nail down what those four were.  One is the

12   chain of command counseling, one is the not showing up

13   for work discussion, one is -- he was present at the

14   termination discussion, right?

15       A.    He was -- yes.

16       Q.    Okay.  So that was the third.  What's -- what

17   other time did you interact with Mr. Tagomori?

18       A.    When -- when early on he came out one day and

19   introduced himself and -- and said hello and that -- that

20   really was it.

21       Q.    So is it your testimony he only cussed at you

22   once just during the discussion about --

23       A.    He -- he --

24       Q.    Hang on.  Wait, wait, wait.

25                      MS. HEVICON:   Tom --

                   RALPH ROSENBERG COURT REPORTERS, INC.
                      Honolulu, HI   (808) 524-2090

1   A.   Yes.

2   Q.   (By Mr. Helper)  Is it your testimony that

3   Howard Tagomori swore at you only once and that was

4   during the counseling about chain of command?

5   A.   That's -- no.  There was two occasions.

6   Q.   What was the other one?

7   A.   During -- during this termination letter,

8   period.

9   Q.   What happened during --

10   A.   Was the second.

11   Q.   -- that meeting?

12   A.   When -- when he called me in the office,

13   initially Fil Carvalho was in there with us, and he gave

14   me this letter to read, and I realized immediately that a

15   couple of these alleged incidents that I -- I -- I was

16   supposed to be involved in were because of Fil's

17   directions to do something a certain way.  And I asked --

18   I asked Fil to speak about it, and when I did, Fil -- Fil

19   looked at his watch and said oh, I got to be at some --

20   some meeting and excused himself and left the room.  And

21   I basically -- I said I'd really like Fil to be in this

22   room because he is certainly knowledgeable about several

23   of these incidents in here, and then -- and actually gave

24   me the directions to do some of these things and I want

25   him in the room and -- and Howard -- you -- I -- I don't --

1   again, I don't remember the exact words, but he cussed

2   and said no, I didn't -- I would -- he would do this

3   counseling, this termination counseling and, you know,

4   Fil did not need to be in the room, and he used several

5   cuss words.  That he was qualified to do it himself.

6        Q.    How long was the termination -- discussion

7   about your termination on November 13 of 2002, the

8   meeting?

9        A.    Probably -- probably five minutes.

10       Q.    Who was present at any point during that

11   meeting other than yourself, Mr. Carvalho and

12   Mr. Tagomori?

13       A.    No one else.

14       Q.    Okay.  The conversation that you related about

15   the counseling regarding the chain of command where

16   Mr. Tagomori said shut your fucking mouth, did you tell

17   anybody about that statement prior to your letter of

18   November 21, 2002?

19       A.    I believe I shared that with Patti.

20       Q.    What did you --

21       A.    Before the letter.

22       Q.    Okay.  What do you recall telling Patti about

23   the counseling regarding the chain of command?

24       A.    Well, I -- I knew Patti -- I knew Patti had

25   told him because Patti was the only one I spoke to that

1    evening before, and after I left there and later on in

2    the -- the day, I saw Patti and I said Patti, I'd like to

3    speak to you, I -- I said I just got my butt chewed out

4    about our conversation last night and -- and she was like

5    what do you mean?  And I said well, I -- I was in the

6    office and -- and Howard screamed at me, told me to shut

7    my fucking mouth, I didn't understand the chain of

8    command, I needed to know what the chain of command was,

9    and I said Patti, you -- you obviously said something to

10   him and you said something that wasn't correct, because

11   what he's yelling at is not true.  And she basically blew

12   me off, told me I didn't know what I was talking about,

13   and that was the end of our discussion.

14       Q.    Other than telling Patti Igarashi about Howard

15   Tagomori telling you to shut your fucking mouth, did you

16   relate Mr. Tagomori's statement to anyone else before

17   your November 21 statement?

18       A.    I did not.

19       Q.    And you understand when I use the phrase

20   anyone, I'm talking about anyone inside of work, outside

21   of work, in the world, right?

22       A.    I -- I -- I did not share it with anyone.

23       Q.    Okay.  What I want to do next is make a -- I'm

24   going to -- I want to go through a procedure, I'm going

25   to make some lists of events, and what I'm going to do is

```
 1   ask you to relate all the incidents in which you heard
 2   people make racial comments at TSA, all the incidents in
 3   which you believed people of different races were treated
 4   differently, and I think there's a third category I'll
 5   get to, but what I want do with both -- with all -- with
 6   these categories is first of all just get a list of all
 7   the incidents and -- and then we'll discuss each incident
 8   one by one, but what I want to do first is get the list
 9   down, okay?
10        A.    Okay.
11        Q.    So the first thing I want to ask you is name
12   all the individuals at TSA Maui who you heard make racial
13   racially discriminatory comments of any sort.
14        A.    Well, Fil -- Filbert Carvalho and -- and Patti.
15        Q.    Those are the only two?
16        A.    Those are the only two that -- that I heard --
17        Q.    Okay.
18        A.    -- use a racial remark.
19        Q.    Now, the use of the term haole, do you consider
20   that a -- in itself a discriminatory comment, statement,
21   word?
22        A.    No, I do not.
23        Q.    Okay.  So somebody could say to you oh, that
24   haole guy over there and -- and you would not take
25   offense at that?
```

98

1    A.    No.  I would not.

2    Q.    Okay.  That's a common racial -- or common

3    descriptive identifier that doesn't necessarily have any

4    racist intent behind it, right?

5    A.    I heard it four years on Kahoolawe used every

6    day.

7    Q.    In a non -- in a way that didn't bother you at

8    all?

9    A.    In a nonoffensive way, yes.

10   Q.    Okay.  And so tell me how many times you heard

11   Fil Carvalho make racist statements, racial -- racial

12   comments.

13   A.    I only heard Fil Carvalho one time.  Actually,

14   you know, I -- I misspoke.  I actually never heard -- I

15   heard Fil Carvalho say he's not a local person.  I never

16   heard him say F'ing haole or anything like that.

17   Q.    So --

18   A.    It was actually only Patti.

19   Q.    So the only comment that you -- you heard from

20   Filbert Carvalho that concerned you at all was the

21   comment on the day -- on the day before you started work

22   in which he said to Patti I thought he was local?

23   A.    Yes.

24   Q.    Okay.  And then the only other comments that

25   came from anyone at TSA that you thought were racially

RALPH ROSENBERG COURT REPORTERS, INC.
Honolulu, HI  (808) 524-2090

1    discriminatory were statements by Patti Igarashi?

2        A.    That is correct.

3        Q.    And how many statements by Patti did you hear?

4        A.    I believe there were four separate incidents.

5        Q.    Okay.  Let's take them -- let's -- let's make a

6    list and tell me sort of in shorthand what -- what the

7    incidents were.

8        A.    Well, the first -- first one would be when --

9    when I was outside the office on my very first day.

10       Q.    And I think you've talked about that, I think

11   I've gotten your testimony.

12       A.    Yes.  And I believe the second incident was

13   when the married couple approached Patti and myself

14   inquiring about when they may be paid.

15       Q.    Was that Everett Reinhardt?

16       A.    I'm sorry?

17       Q.    Was that Everett Reinhardt, one of the people --

18   one of the Caucasian screeners who came to you?

19       A.    Yes.  Yes, it was.

20       Q.    Okay.

21       A.    And they -- they had approached us and it had

22   been --

23       Q.    Okay.  Right now we're just making a list.

24       A.    Okay.  Okay.

25       Q.    What's the next one?

1      A.     The -- the third incident Patti was -- Patti

2    was speaking about previous Wackenhut employees not

3    getting positions with TSA and that she -- she thought

4    that was wrong and that they had hired F'ing haoles when

5    they should have been hiring local people.

6      Q.     Okay.  And then when was the fourth occasion?

7      A.     I -- I believe there were only three.

8      Q.     Okay.  You might want to take a minute and look

9    over your statements, and I had thought that there was

10   probably one other, and I want to make sure I get your

11   complete testimony so --

12     A.     Okay, I'll look at it.

13                   MS. HEVICON:  Are you talking about

14   section A, page four?

15                   MR. HELPER:  Well, I think starting

16   page three actually in the affidavit.  No, no.

17                   MS. HEVICON:  Yes.

18     Q.     (By Mr. Helper)  Mr. Young, I think it might be

19   most helpful for you to look at your affidavit starting

20   on page three.  This is Exhibit A.

21     A.     Okay.  Yeah, there were four.

22     Q.     Well, it looks like there might even be more

23   than that, right, if -- if she -- I mean if we get onto

24   page two -- I'm sorry, page four, you say she would

25   scream you fucking haoles across the entire screening

1    area and that this happened many times.

2        A.    Yes, she did.  I do remember that now.

3        Q.    Okay.  So what's your best recollection as to

4    how many -- do you -- do you know why it is that you

5    would have forgotten Patti Igarashi screaming you fucking

6    haoles many times?

7        A.    Well, it's been a long, long time ago since --

8    since this happened.  I've -- I've been -- been in a lot

9    of places and done a lot of things since then.

10       Q.    Okay.  So what's your best recollection now,

11   having spent a little time looking at your -- your

12   affidavit as to how many times you heard Patti Igarashi

13   making racial comments?

14       A.    Well, I'm going to say for sure on five

15   occasions.  She -- she would -- she would -- she used it

16   more times, but I don't know if I can put a number of

17   incidents.

18       Q.    Well, is there -- fucking haole, that statement

19   is a racially discriminatory remark, right?

20       A.    It is.

21       Q.    Okay.  I mean no matter -- virtually no matter

22   what the context or -- I'm sorry, when you heard Patti

23   Igarashi say fucking haole, you interpreted that as a

24   racist statement, right?

25       A.    I did.

1       Q.    Okay.  Who else heard, that you know of, from

2    seeing someone within earshot, who else heard Patti

3    Igarashi say fucking haoles?

4       A.    Certainly other screeners heard it because I

5    had actually had screeners come to me and say that they

6    were concerned that the passengers were hearing it.  Now,

7    she wasn't in the -- in the general screening area when --

8    when I had -- I had several screeners come to me and say

9    we believe passengers can hear Patti, what she's talking

10   about.  In that particular occasion, she wasn't

11   necessarily upset or mad, she was simply using the term.

12   She had, I guess for lack of a better word, some of her

13   buddies from previous Wackenhut screening days, work

14   experience, that -- that she would kind of chum with and --

15   and kind of hang out during the work shift with and back

16   and forth conversation.  It was used several times, the --

17   the word haole and fucking haole.  And I had a couple,

18   two, three different screeners come to me and say we

19   believe that some of the passengers can hear Patti in

20   what she's saying out here.

21      Q.    Who were the screeners who complained to you or

22   or said that to you?

23      A.    I -- I don't have names.

24      Q.    Descriptions?

25      A.    Not that I can remember now.

RALPH ROSENBERG COURT REPORTERS, INC.
Honolulu, HI   (808) 524-2090

1      Q.    Okay.  But as I understand your affidavit
2   anyway, there were occasions, many occasions on which
3   Patti Igarashi would say fucking haoles, not just in a
4   small group where she might be overheard by passengers
5   but screaming it over a fairly broad area.  Is that your
6   recollection?
7      A.    I -- I did witness that.
8      Q.    How many times did you witness that?
9      A.    More than once.  Several times.
10      Q.    Can you give me an estimate as to -- as you sit
11   here today how many times you heard Patti Igarashi scream
12   fucking haoles across the screening area?
13      A.    At least three times.
14      Q.    Do you recall anyone else who was working any
15   of the shifts or anybody else who would have overheard
16   that, Patti Igarashi screaming fucking haoles across the
17   screening area?
18      A.    Oh, I'm -- I'm sure Ann Werstler, the
19   supervisor, had heard it, I'm sure Rusty, the supervisor,
20   had heard it.
21      Q.    Okay.  Anybody else who you can identify now?
22      A.    No one that I can identify.
23      Q.    And when I say identify, I -- I mean either by
24   name or by description?
25      A.    No, I -- I don't have any other --

RALPH ROSENBERG COURT REPORTERS, INC.
Honolulu, HI  (808) 524-2090

104

1    Q.    Okay.

2    A.    -- names or descriptions.

3    Q.    Okay.  Okay.  So that the complete list of

4    times that you heard Patti Igarashi make racist

5    statements or statements that you interpret to be racist

6    was first the time you overheard her say that she thought

7    you were local or that you were a fucking haole before

8    you got hired, the statement after the Reinhardt couple

9    approached you about a pay issue, a comment she made to

10   you about previous Wackenhut employees deserving the jobs

11   over haoles, and then statements she made about haoles or

12   fucking haoles in the screening area either sort of

13   broadcast by screaming or in conversations with her

14   buddies.  Is that a complete list?

15   A.    And then she -- she -- when I asked her a

16   question one day, she -- she said to me you -- you F'ing

17   haoles ask too many questions.

18   Q.    Other than that, do I have a complete list now?

19   A.    That is a complete list.

20   Q.    Okay.

21   A.    Best of my recollection, that's complete.

22   Q.    Okay.  Now, this -- the conversation with the

23   Reinhardts, as I understand it, the Reinhardts approached

24   you and Patti together about -- with a concern about when

25   they were going to get their paychecks, right?

RALPH ROSENBERG COURT REPORTERS, INC.
Honolulu, HI  (808) 524-2090

1    A.    They -- they actually approached me first,

2    asked me -- Patti was standing just a few feet away, I

3    don't believe she heard what their question was.  They

4    walked -- I -- I told them I would try to find something

5    out for them and get back.  As soon as they walked away,

6    Patti turned to me, what do those fucking haoles want

7    now?

8    Q.    Did anybody -- go ahead.

9    A.    That was one of the occasions where I was

10   pretty upset and I -- I -- I said Patti, best of my

11   recollection, I said Patti, that's -- you know, that's

12   wrong.  That's not appropriate language for anyone to

13   use, and -- and on that particular occasion I -- I said

14   to her we're federal employees now.  We're -- we're not

15   Wackenhut employees, we're not -- we're federal

16   employees, and I believe I told her on that occasion it's

17   not only wrong and inappropriate, it's against federal

18   civil rights rules and regulation laws to -- to talk to

19   people like that.

20   Q.    What was her response?

21   A.    She started complaining about -- she started

22   complaining to me about the fact that they'd hired these

23   people and brought them from the mainland.  If they would

24   have hired more local people, Hawaiian people, that

25   Hawaiian people were used to doing without, with less and

106

1   that they would understand that there could be problems

2   getting their pay on time, and they -- local Hawaiian

3   people wouldn't be complaining about not being paid.

4       Q.    Anything else you recall from that conversation

5   about the Reinhardts' concern about their pay?

6       A.    Not that I can recall.

7       Q.    I take it the -- as -- as far as you could

8   tell, the Reinhardts themselves did not overhear Patti

9   say the fucking haole comment, right?

10      A.    No, they did not.

11      Q.    Did anybody else that you could tell overhear

12  any of the conversation you had with Patti after the

13  Reinhardts left?

14      A.    No.   I believe we -- we went off to the side of

15  the screening area to have the conversation.

16      Q.    Was this on a day when you were piggy backing

17  with Patti?

18      A.    I'm -- I'm almost positive it was, yes.

19      Q.    Okay.  So this would have been in your first

20  week of work at TSA, right?

21      A.    This would have been my fourth, fifth or sixth

22  day.

23      Q.    Okay.

24      A.    One of those.

25      Q.    Because your first -- because your first three

RALPH ROSENBERG COURT REPORTERS, INC.
Honolulu, HI  (808) 524-2090

1    days you were Pat Collins and your next three you were

2    with Patti?

3        A.    Yes.

4        Q.    Okay.  Now, the situation with the Wackenhut

5    employees, did you have an understanding that you -- you

6    knew that Patti Igarashi had until just a couple of weeks

7    previously been a Wackenhut employee, right?

8        A.    She -- she shared that information with me.

9        Q.    Was it your understanding that any of the other

10   screeners, leads, screening supervisors were former

11   Wackenhut?

12       A.    Yes.  I -- I knew -- I knew -- I don't believe

13   there were any supervisors, but there were leads that

14   were former Wackenhut employees.

15       Q.    And who were they?  Who were the leads?  Who

16   were the former Wackenhuts?

17       A.    There was a lady, I remember her first name as

18   Evelyn.  Actually, that's the only person that I remember

19   was a former Wackenhut and also a lead supervisor.

20       Q.    How about Pat Collins?

21       A.    Well, he was a Wackenhut, but he was a

22   screening manager.

23       Q.    Okay.

24       A.    Just like I was.

25       Q.    Okay.  The previous -- the comment that Patti

                RALPH ROSENBERG COURT REPORTERS, INC.
                     Honolulu, HI  (808) 524-2090

1   made about previous Wackenhut employees, that was -- as I

2   understood it, that was different conversation from the

3   conversation about the -- following the Reinhardts'

4   concerns or are you --

5        A.   Yes, it was.

6        Q.   Okay.  So Patti said something about the former

7   Wackenhut people after the Reinhardts left and she also

8   said something about former Wackenhut people on another

9   occasion?

10       A.   On -- on a separate occasion, she shared with

11  me her -- her concerns that many of the former Wackenhut

12  employees had not been offered positions with TSA and

13  that was, in her opinion, some of the problems that were

14  going on were because they had brought in outside haole

15  people.

16       Q.   Now, were the -- the -- the Wackenhut people --

17  were they the -- the people who she'd worked with at

18  Wackenhut, was that -- were there some Caucasians in that

19  group?

20       A.   If there were, I -- I don't believe I ever met

21  them.  They were mostly local people.

22       Q.   So did -- tell me as close as you can what

23  exactly Patti said about Wackenhut versus -- versus local

24  versus outsiders versus haoles, I mean what -- what were

25  the -- her words, as best you can recall?

RALPH ROSENBERG COURT REPORTERS, INC.
Honolulu, HI  (808) 524-2090

109

1    A.    The best of my recollection is she -- she
2    shared that she thought local people would have been able
3    to adjust to the -- the situation at work.  Some of the
4    people did not receive paychecks for six or seven weeks.
5    And that local people, she -- she -- on several occasions
6    she shared with me that local people were used to doing
7    with less and -- and would be better suited for it, they
8    understand -- they understand the local culture better
9    than -- than someone -- a Caucasian person from the
10   mainland, or -- or from anywhere.  That they would fit in
11   better and they would understand how everyone lives in --
12   in Hawaii and -- and it was really bad that she -- she
13   just thought it was horrible that TSA hired all these
14   local people and -- and I asked her one time, I said
15   well, how come more Wackenhut people didn't get hired,
16   why did they not apply, and she shared that many of them
17   had applied but they had not passed the initial exams to -
18   to get into the system.  And she also shared with me that
19   she had -- she looked really bad because she had promised
20   many people that they'd be coming on board with her from
21   Wackenhut and -- and because of the system that they had
22   that she now -- she had lost face with many of the local
23   people in getting them positions.

24   Q.    Was it your understanding that Patti Igarashi
25   made an exception or -- or would treat Caucasians who had

RALPH ROSENBERG COURT REPORTERS, INC.
Honolulu, HI   (808) 524-2090

110

1   lived on Maui for a long time or were born and raised in

2   Hawaii, that she would treat those people essentially as

3   locals?

4       A.   Well, she told me -- she told me when I -- I

5   challenged her one time, I told her I did not like the

6   term fucking haole.  Her and myself in a private

7   conversation, I said Patti, I -- I'm offended when you

8   use that term, I know other people are, and she made it a

9   point to say well, you've lived here for three or four

10  years, you're a local person.  I said I'm still a haole

11  and I still am offended and it's -- it's not a term to

12  use, and I totally believe, you know, she was just trying

13  to get out of the situation she had talked herself into

14  by saying well, you're different, you've lived here

15  three, four years.  She didn't -- she truly didn't mean

16  anything other than just trying to get me to be quiet

17  about my complaint to her that she was using

18  inappropriate terms and language and offending people.

19      Q.   In the way she treated people, did you see that

20  she treated Caucasians from Hawaii better than Caucasians

21  from the mainland?

22      A.   I -- I didn't see that.  I -- if -- if she did,

23  I did not see it and I don't -- I can't answer that.

24      Q.   Okay.  Did you -- I -- I think you said in one

25  of your statements, that you complained -- you tried to

RALPH ROSENBERG COURT REPORTERS, INC.
Honolulu, HI  (808) 524-2090

 1    complain to Howard Tagomori about Patti's use of racial

 2    terms during the chain of command counseling.  Is that

 3    correct?

 4        A.    I did not bring it up in that counseling with

 5    Howard Tagomori.  I brought it up to -- I brought it up

 6    to Filbert Carvalho.

 7        Q.    When did you bring up -- bring it up to

 8    Filbert?

 9        A.    I -- to be exact, I actually brought it up to

10    Patrick Collins first, and then I brought it up to

11    Filbert on a second occasion fairly early, maybe like the

12    end of my first week, because I had witnessed some --

13    some pretty nasty things being said.

14        Q.    Okay.  So I -- I think you've talked about

15    telling Patrick Collins about your concerns about Patti

16    and -- right?  You testified about that already?

17        A.    Right.

18        Q.    And Patrick Collins after you complained to him

19    about Patti's racist statements, he said roughly that

20    that's the way she is?

21        A.    He said that's Patti being Patti and -- but he

22    also told me be very careful how -- what I say around

23    her.  Something to that effect.

24        Q.    Do you recall anything else that Patrick

25    Collins said when you told him that you were concerned

112

1    about Patti's racial comments?

2        A.    No.    Basically just that was Patti being Patti.

3        Q.    Okay.    And then what was the setting in which

4    you brought it up to Filbert Carvalho about Patti making

5    racial comments?

6        A.    I knew Patti had -- I knew Patti -- I knew that

7    Patti was trying to cause some problems for me.    I think

8    she was trying to make herself look better by making me --

9    trying to make me look worse and I -- I went to Fil and

10   and I -- I said I know Patti has been talking about me,

11   she's made up -- she said whatever, and I said she's --

12   on several occasions she's used some very inappropriate

13   language.    And he -- he was sort of like Patrick was.    He

14   said well, that's just Patti being Patti, she's -- she's

15   that way, she doesn't mean any -- any harm, but if it

16   continues, you know, let me know, or something to that

17   effect.

18       Q.    Did you ever talk --

19       A.    He didn't seem very concerned.

20       Q.    Did you ever talk to Mr. Carvalho again after

21   that one time about if it happens again, about Patti's

22   racial comments?

23       A.    No.    I don't -- I don't believe -- I -- I think

24   I was terminated before I had an opportunity to ever say

25   anything again.

RALPH ROSENBERG COURT REPORTERS, INC.
Honolulu, HI   (808) 524-2090

1    Q.    Okay.  So fairly early on in your employment,

2    you talked to both Patrick Collins and Filbert Carvalho

3    on one occasion each about Patti's racial comments,

4    right?

5    A.    I did.

6    Q.    And neither of them expressed very much

7    concern.  Is that correct?

8    A.    I think they -- they did not express very much

9    concern.

10    Q.    And Fil Carvalho said well, if she keeps it up,

11    let me know, right?

12    A.    That's pretty much correct, yes.

13    Q.    And before you ever brought it up again to

14    Mr. Carvalho, you'd been terminated?

15    A.    Yes.

16    Q.    And those are the only two people in the TSA

17    hierarchy who you ever told about Patti Igarashi's racist

18    comments, right?

19    A.    That is correct.

20    Q.    Did you ever tell -- before you were

21    terminated, did you ever tell anyone else outside the TSA

22    hierarchy about Patti's racist comments?

23    A.    I did not.

24    Q.    Okay.  So you never told any of your

25    subordinate employees, never told Rusty Harlan or Ann

114

1    Werstler or any of those people about it?

2        A.    I don't -- I did not tell them about it, but

3    they certainly mentioned it to me on several occasions.

4        Q.    Mentioned what?

5        A.    That Patti used inappropriate language and

6    racial comments, inappropriate racial comments.

7        Q.    Okay. That's our next list. Tell me all the

8    people who told you or -- that Patti was -- well, tell me

9    all the people -- let me do this a different way. Did

10   anybody complain to you about hearing racial comments

11   from anyone other than Patti?

12       A.    Could you say that again, please?

13       Q.    Did anybody complain to you about racial

14   comments from anyone other than Patti?

15       A.    From anyone other than Patti? No.

16       Q.    Okay. So is -- is it correct to say that the

17   only person who TS employees complained to you was making

18   racial comments was Patti Igarashi?

19       A.    That is true.

20       Q.    Okay. Now, tell me all the people who made

21   that complaint to you. Just list off the names.

22       A.    Rusty, Ann Werstler, there was another female

23   supervisor, I don't remember her name, she was a previous

24   United Airlines employee.

25       Q.    What was her -- what did she look like?

RALPH ROSENBERG COURT REPORTERS, INC.
Honolulu, HI  (808) 524-2090

115

1      A.    Blonde lady, medium height.

2      Q.    Angela Williams?

3      A.    Yes.

4      Q.    Okay.

5      A.    Yes.  Angela.  She wasn't a screener supervisor

6   initially but she became a supervisor.  She had dark

7   hair.

8      Q.    Davelyn?

9      A.    Five foot --

10     Q.    Davelyn Gordon?

11     A.    Yeah.  That's her name, yes.  She -- she came

12  to me, also.

13     Q.    Davelyn Gordon came to you and said that Patti

14  Igarashi is making racist comments?

15     A.    She -- she had the conversation with me where

16  she shared her feelings that she didn't know, you know,

17  if it was -- if she should try to do something about it,

18  if -- if I -- but she did.  She shared -- she shared on

19  an occasion that she was concerned about some of the

20  comments that were being made.

21     Q.    Now, Davelyn is local, right?  Or do you know?

22     A.    I don't.  I -- I don't even know.

23     Q.    Okay.  What did Davelyn tell you about what

24  Patti was saying?

25     A.    That -- well, that just the inappropriate

RALPH ROSENBERG COURT REPORTERS, INC.
Honolulu, HI  (808) 524-2090

1   comments that she was using and many people were scared

2   of Patti.

3       Q.   Wait.  Wait a second.  I'm -- right now I'm

4   just asking you about what Davelyn Gordon told you.  And

5   did she say Patti is -- she used the phrase inappropriate

6   comments or was she more specific about what the

7   inappropriate comments were?

8       A.   I'm -- I'm going to say she said inappropriate

9   comments, inappropriate language.

10      Q.   Did she -- did Davelyn indicate that Patti was

11  making inappropriate racial comments?

12      A.   I'm going to just have to say it was

13  inappropriate comments because I can't -- I just can't

14  remember.

15      Q.   Okay.  How about Rusty, what did Rusty tell you

16  about what Patti was saying?

17      A.   Rusty I'm sure -- I'm -- I'm positive Rusty

18  mentioned that she made inappropriate racial comments.

19      Q.   Ann, how about Ann?

20      A.   Ann, same thing, that Patti used inappropriate

21  racial language.

22      Q.   And how about Angela?  Same thing?

23      A.   Same thing.

24      Q.   Okay.  And would they -- did any of these folks

25  quote her as saying fucking haoles or quote any of the

RALPH ROSENBERG COURT REPORTERS, INC.
Honolulu, HI  (808) 524-2090

117

1    comments that she made to you?

2        A.    I believe Ann and Rusty both quoted her and

3    some of the comments she had made, yes.

4        Q.    And what were the quotes they gave you?

5        A.    That she -- she had called people F'ing haoles

6    and just upset at the number of Caucasian screeners that

7    were working there was wrong, it should be local people.

8        Q.    Did Rusty, Ann or Angela, did any of them

9    complain that they personally had been called fucking

10   haole?

11       A.    I don't -- I don't recall them ever telling me

12   that.

13       Q.    And you yourself, Patti never said to you --

14   she never called you a fucking haole, right, correct?

15       A.    Yes, she did.  Yes, she did.

16       Q.    When did she do that?

17       A.    Yes.  I asked her a question one day and -- and

18   she turned to me and she said you fucking haoles ask too

19   many questions.

20       Q.    Other than that, that was the one occasion

21   where she called you a fucking haole, right?  That was

22   the only occasion?

23       A.    That, and then when she was in the office and I

24   was waiting outside the door.

25       Q.    Okay.  Rusty, Ann Werstler, Angela Williams,

                    RALPH ROSENBERG COURT REPORTERS, INC.
                       Honolulu, HI  (808) 524-2090

118

1    Davelyn Gordon, those -- is that a complete list of the

2    people who complained to you about Patti making racist

3    comments?

4         A.    That is a complete list of the people I can

5    remember.  There were screeners that came to me, but I

6    cannot remember a name and I can't give you a description

7    of them.

8         Q.    Okay.  Next thing I want to do is get a list of

9    all the ways in which you think Caucasians and non

10   Caucasians were treated differently from one another in

11   the course of what you saw personally or what you knew of

12   from your employment at TSA.  And I think we've talked

13   about the training issue already or the way information

14   was passed out to people.  Other than that, can you tell --

15   tell me all the ways in which you think Caucasians were

16   treated differently from non Caucasians?

17        A.    I think there was three -- there were three

18   separate situations.  One, when we -- when we had to pick

19   people to -- to go to the individual gates and do the

20   screening of passengers at the gates, Patti was pretty

21   much in charge of that operation.  It was almost a little

22   bit of a reward to be on that particular mission because

23   it got you out of the main screening area and you got to --

24   you got a little bit more break because you -- you

25   weren't constantly screening people, only when the flight

RALPH ROSENBERG COURT REPORTERS, INC.
Honolulu, HI  (808) 524-2090

```
 1   was departing.  And I -- I observed Patti picking her
 2   favorite -- some of her favorite screeners, which were --
 3   I'm going to say 100 percent were local people.  They
 4   were people that worked with her at Wackenhut previously,
 5   but they were definitely local people.  And that was sort
 6   of a little bit of a benefit to get selected for that,
 7   that mission.  Second incident, we had to select people
 8   to send them to additional training to run the baggage
 9   screening operation behind the scenes and it was an
10   additional training and it was done -- it was done in
11   Lahaina by a special team that came in to train, and I
12   believe those people were picked by -- by Fil and Patti,
13   probably Patti's recommendations, and again, if there
14   were any Caucasian people selected for that, I wasn't
15   aware of that.  They were locals.  And a third situation,
16   we -- we had to send some people on temporary duty to
17   some of the other airports.  We sent people to Tahiti, we
18   sent people to the Big Island because they were short
19   screeners, and again, it was kind of a special deal
20   because they received quite a bit of overtime pay, they
21   received per diem for their time there, and again, they
22   were almost always local people and not Caucasian
23   screeners selected for those missions.
24        Q.    Mr. Young, I -- I do want to get your complete
25   testimony on this subject.  I think that there are a
```

1   couple of incidents that you related in -- in your

2   various statements in addition to what you've just told

3   me including the way lead screeners were picked, or

4   changes were made in the lead screener assignments, and

5   there are probably a couple others.  What I want to do

6   right now is take another five minute break and ask you

7   to look at your statements and make sure, and if you want

8   to talk to your lawyer about whether you've got a

9   complete list, because I really do want to make sure that

10   this is -- you tell me about everything here.  This is

11   pretty important stuff for me.  So let's take a five

12   minute break.

13       A.    Okay.

14       Q.    And please go over your affidavit, and if you

15   want to talk to your attorney, please do.

16               MS. HEVICON:  Okay.  I'm going to --

17   I'm going to step outside, Tom, so read them and then

18   call me if you need to.

19       A.    Okay.

20               MS. HEVICON:  You got my number.

21               THE VIDEOGRAPHER:  The time is 1:06,

22   we're going off the record.

23               (Discussion off the record.)

24       Q.    (By Mr. Helper)  What I'm trying to do is get --

25   get from you a list of all the incidents in which you

 1    thought Caucasians were treated differently from non

 2    Caucasians, and you gave me three instances.  Do you have

 3    any more?

 4         A.    Well, after reading the notes, I do remember

 5    now on uniform violations --

 6         Q.    Just -- just give me the list.  Uniform

 7    violations is the fourth item.  What -- anything else?

 8         A.    No, I think that's it.

 9         Q.    Well, how about the promotions?

10         A.    Well, yeah.  That's a whole separate issue

11    though.

12         Q.    Well, excuse me.  I'm --

13         A.    No problem.

14                    MS. HEVICON:  We're eating Cheetos.

15                    MR. HELPER:  I think it's -- I think

16    there ought to be -- and there's probably something in

17    the federal rules and civil procedures that says don't

18    eat Cheetos when you're wearing a microphone but --

19                    MS. HEVICON:  It's all part of my

20    master plan to throw him off.

21                    MS. BUXTON:  Your microphone is going

22    to be orange.

23                    MR. HELPER:  Okay.  I won't -- I'll

24    stop.  I'm sorry.

25         Q.    (By Mr. Helper)  What I'm asking you for is a

 1   list of all the way -- all the occasions in which you saw

 2   Caucasians being treated differently from non Caucasians,

 3   and I think you've said in declarations or -- that you

 4   saw a change in the supervisors where some supervisors

 5   were demoted and others were -- other people were

 6   promoted into supervisor positions.

 7       A.   Yes.  They -- uniforms being one, the promotion

 8   policy which they put into place but got rescinded, and

 9   just on normal daily screening operations and then maybe

10   we've already covered this one, but there are three other

11   ways I saw Caucasian employees being treated different.

12       Q.   And -- and that was the ways you talked about

13   with the way they were picked to do certain duties?

14       A.   Well, that's -- well, no.  That's an additional

15   one.  These are three -- after looking at this brief, I

16   see three other instances.

17       Q.   Okay.  And what are those, those three?

18       A.   The uniform violations.  Caucasian screeners

19   would be constantly corrected, counseled if you -- I

20   guess is the -- what they were being done, but for the

21   same things.  Caucasian screener would come in with a

22   flower behind her ear and just get, you know, land

23   blasted for it, and -- and a local person come in with a

24   flower behind her ear and walk right past Patti or Fil

25   Carvalho and not a word was said about it.  Earrings,

1    jewelry, all -- all being uniform issues.

2        Q.    Okay.

3        A.    On the promotions, the -- the -- the lead
4    screeners and the screener supervisors were hired by the
5    contract service that hired all the TSA employees around
6    the country.  They were hired for lead screener or
7    supervisor.  They came with a document saying they were a
8    supervisor.  At some point as we went along, I want to
9    believe it was the beginning of my second week, we were
10   told that these people would no longer be supervisors and
11   they furnished a new list of lead screeners and
12   supervisors who were on -- I'm almost sure all were local
13   people, and that kind of back fired.  The -- the people
14   that were originally hired to be supervisors filed
15   complaints, they -- some of them I think called
16   Washington, DC, and we got a directive back from
17   Washington, DC that the people -- individual airports did
18   not have the authority to just randomly remove all their
19   supervisors and place their own hand picked people in
20   those positions.

21       Q.    Okay.  Okay.  Now --

22       A.    Third issue --

23       Q.    Go ahead.

24       A.    The third -- the third issue -- I lost my train
25   of thought now.  Oh, I -- I -- just normal daily

                 RALPH ROSENBERG COURT REPORTERS, INC.
                      Honolulu, HI   (808) 524-2090

 1  screening activities.  There were three or four lanes of
 2  people being screened by three or four different
 3  screeners, and over on one side of the room someone could
 4  be using -- and we did talk about this earlier, it could
 5  be using the wand a certain way, it could be having a
 6  person stand a certain way.  In the middle of the room
 7  there would be a Caucasian screener doing the very same
 8  exact thing and -- and Patti in most -- I believe all
 9  cases, Patti would go over there and -- and really, you
10  know, get after this person for doing the same exact
11  thing that screeners on either side were doing.  It could
12  be as simple as the way they held the wand, the way they
13  asked the person to stand and hold their arms outright.
14  But there was certainly a difference -- the local, local
15  screeners weren't doing it wrong, the Caucasian screeners
16  weren't doing it wrong, but she would make a point to
17  point out to the Caucasian screeners she thought they had
18  done it wrong or should be doing it a -- a better or
19  maybe in a different fashion.
20      Q.   Okay.  Let me make sure -- is that -- is that --
21  are we done with the list?
22      A.   Yes.
23      Q.   Okay.  So let me make sure I've got a -- a
24  complete list of all the occasions on which you saw
25  Caucasians being treated differently from non Caucasians.

125

1    First -- and -- and I've got six items on my list.  One,

2    the way people were picked to go to the gates, two, the

3    way people were picked to go to Lahaina, three, the way

4    people were picked to go to other airports in Tahiti,

5    including Tahiti, four, uniform violations, the way those

6    were handled, five, the way the promotions were handled,

7    and six, just the way people were counseled or

8    disciplined for their on the job actions.

9        A.    Yes.

10       Q.    That's a complete list of all the occasions in

11   which you saw Caucasians being treated differently from

12   non Caucasians?

13       A.    Yes.

14       Q.    Okay.  Let's go through them one by one.

15   Picking people to go to the gates, this was done by

16   Patti, right?

17       A.    Patti was in charge of that detail.

18       Q.    And is this -- how many times did you see Patti

19   picking who would go to the gates and who wouldn't?

20       A.    Probably four -- four, maybe five days in a row

21   before I left.

22       Q.    Meaning -- was this during the piggy backing

23   time or a different time?

24       A.    No, this was -- this was at a different -- this

25   was my third week there.  Patrick and I were sharing the

                    RALPH ROSENBERG COURT REPORTERS, INC.
                        Honolulu, HI  (808) 524-2090

126

1    duties in the main screening area, Patti -- Patrick would

2    work the morning shift, I'd work the afternoon shift.

3    Patti would be supervising the gate screening personnel.

4    She may come in and work maybe four hours in the morning,

5    she'd depart, she'd come in and work maybe four or five

6    hours in the afternoon and split her day up a little bit.

7        Q.    And what was the reason -- what was your

8    understanding of the reasoning for having people screened

9    at the gates as well as at the front of the airport?

10       A.    It was -- the reason was never shared with me

11   why they chose to do that particular procedure.

12       Q.    Okay.  And you don't have any understanding,

13   you -- you can't think of any reason yourself why that

14   would be true, why they would do that?

15       A.    No.

16       Q.    Okay.

17       A.    I -- I -- I don't know why they did that.

18       Q.    Okay.  Did you ever ask?

19       A.    I -- I don't believe I ever asked, no.

20       Q.    And the people who were picked to go to the

21   gates, as far as you could tell, and -- and I'm sorry,

22   you saw the -- you saw Patti going through the -- the

23   picking of who would go to the gates four times, right?

24       A.    Four times.

25       Q.    And how many people were picked to go to the

1  gates?

2      A.    I'm going to -- somewhere between probably 15

3  and 20 people.

4      Q.    And your -- and -- and how would the -- the

5  picking be done, would it be like everybody standing in a

6  big room and Patti would say you, you, you go, or --

7      A.    No.

8      Q.    -- names on a list or what?

9      A.    No.   The -- the night before she would provide

10  a list of who she wanted for the next day to work the

11  gates, and we would notify those screeners that they'd be

12  working with Patti at the gates on the following day.

13     Q.    And was it your understanding that -- I mean

14  was it your perception that she picked people, she -- she

15  would pick Wackenhut people, people she had worked with

16  at Wackenhut to -- to work under her on the gates?

17     A.    Well, I won't necessarily say they were

18  Wackenhut but they were local people.   They were -- they

19  were not Caucasian people.

20     Q.    Okay.   Were they primarily Wackenhut people?

21     A.    There certainly probably -- I know there was

22  one or two, but I really -- I don't know how many really

23  were Wackenhut.   Out of those -- out of the group she

24  picked, I don't have the ability to tell you that they

25  were Wackenhut.   They were local people though.

1    Q.    Did you know at the time that you were there at

2  TSA who were former Wackenhut and who wasn't or did you

3  just know some people were and some people weren't

4  without really knowing which individuals those might be?

5    A.    I knew a handful because they -- they would

6  share that they had formerly worked for Wackenhut, but

7  not very many.  Less than probably five or six.

8    Q.    Okay.  How many people -- how many times were

9  people picked to go to Lahaina?  Was it just once?

10    A.    Just once for I believe about a seven day

11  training course.

12    Q.    Okay.  And it's your perception that again,

13  that was all local people?

14    A.    I -- I do not remember one Caucasian being

15  selected for that.

16    Q.    Okay.  And we're -- we're throwing around this

17  term local a lot.  Is it your definition when you use the

18  word local, that you mean non Caucasian person from

19  Hawaii?

20    A.    Non Caucasian.

21    Q.    Okay.  But from Hawaii, non Caucasian from

22  Hawaii, right?

23    A.    Right.

24    Q.    I mean because you could be a -- a Japanese

25  person visiting, a Japanese tourist and you're not local,

RALPH ROSENBERG COURT REPORTERS, INC.
Honolulu, HI  (808) 524-2090

1    right?

2        A.    Right.

3        Q.    I mean a Japanese tourist would not be local,

4    correct?

5        A.    Right.  Right.

6        Q.    Okay.  Who -- and -- and what was the procedure

7    for who would be picked to go to Lahaina?

8        A.    Again, I'm not real sure.  I -- I believe it

9    was a list of names that Patti provided Fil Carvalho, and

10    Patti and Fil Carvalho selected the guys that -- guys and

11    gals that got chosen to go to this training in Lahaina.

12        Q.    Going back to this issue of how -- how people

13    were picked to go to the gates, it's your understanding

14    that Patti made the list, right?

15        A.    Patti made the list for that.

16        Q.    How -- how do you know?

17        A.    Because she would come to me with the list and --

18    and it was certainly in her handwriting and say these are

19    the people I want to use tomorrow.

20        Q.    Okay.  And as far as -- and it sounds like you

21    were a little less sure that it was Patti who picked the

22    people who go -- went to Lahaina?

23        A.    I'm -- I'm less sure, yes.

24        Q.    Okay.  What's -- why do you think it was Patti?

25        A.    Because many of them were her -- were the

130

 1    screeners who in the three weeks I was there, it was very

 2    easy to see where her favorites, I guess.

 3        Q.    Can you tell me -- tell me any -- any of the

 4    individuals who you thought were her favorites?

 5        A.    I don't have a name, I couldn't even provide a

 6    description.

 7        Q.    But --

 8        A.    They -- they weren't Caucasian.

 9        Q.    Okay.  I'm not sure I can read my own

10    handwriting here.  You say that there was different

11    treatment of the way Caucasians and non Caucasians were

12    sent to -- was it just Tahiti or was it other airports

13    including Tahiti?

14        A.    It was other airports.  We -- we sent them to

15    Kauai, the Big Island, I know we sent a team to Tahiti.

16        Q.    Okay.

17        A.    I don't remember if we sent anywhere else.

18        Q.    On how many occasions did you see or were you

19    knowledgeable about the procedures where TSA screeners

20    were picked to go to other airports?  How many times?

21        A.    Probably just twice.  One time was Tahiti and

22    one time was for screeners for Kauai and -- and the Big

23    Island.

24        Q.    Okay.  And who did the picking for the Tahiti

25    trip?  Do you know?

                    RALPH ROSENBERG COURT REPORTERS, INC.
                        Honolulu, HI   (808) 524-2090

1     A.    I'm -- I'm sure the final decision was probably

2    made by Fil Carvalho, but I believe Patti certainly had

3    influence.  I -- I know she did, I saw her going around

4    with Fil and -- and approaching people and asking them if

5    they would go to Tahiti or the Big Island or -- or -- or

6    Kauai.

7     Q.    Okay.  And was it your perception again that

8    only local people were asked to go to Tahiti, the Big

9    Island, or we'll -- let's stick with Tahiti for -- for --

10   for now?

11     A.    I never saw anyone but local people go on these

12   Tahiti-Hawaii missions.

13     Q.    Would you see them lined up to get on the plane

14   or how would you know who --

15     A.    Because they wouldn't -- they wouldn't be on my

16   shift the -- the next day.  I mean Patti and Fil would go

17   through the screening area talking to people, asking them

18   if they wanted to go on this mission, if they could go on

19   the mission.  People would constantly come to me and ask

20   if I had any details, what date were they leaving, how

21   long would they be there.  It was pretty obvious who was

22   going and who was not.

23     Q.    Okay.  The uniform violations, did you ever see

24   Patti reprimand or counsel or criticize any local

25   employee for any uniform violation?

1     A.    I saw her talk to someone about covering up a

2   tatoo.  Tatoos weren't supposed to be visible.  If they

3   were on your arm, you had to cover them somehow.

4     Q.    Estimate how many times that you observed Patti

5   expressing any kind of concern to a Caucasian employee

6   about anything to do with the dress code?

7     A.    Six to ten times.

8     Q.    And you saw her criticizing local -- a local

9   employee on one occasion?

10     A.    On one occasion.

11     Q.    Okay.  And were there other dress code

12   violations that she could -- I'm sorry, how many -- and --

13   and how many -- was this -- was this just in the three

14   days you were piggy backing with -- with her or was this

15   on other days where you guys were working the same time

16   as well?

17     A.    This was on other days, also.  The majority of

18   them would be when I was piggy backing with her, but when

19   we would change shifts with each other, we would have an

20   hour to an hour and a half of overlap time with each

21   other.

22     Q.    Okay.

23     A.    So I observed it on some occasions then, also.

24     Q.    Okay.  So after you got done piggy backing,

25   there -- you might have spent a total of maybe 15 or 20

1    hours working the same shift as Patti?

2        A.     Maybe a little bit longer because I would be

3    there for eight or ten hours when she would be operating

4    the gate screening operation.

5        Q.     Okay.

6        A.     So it could have been more hours than that.

7        Q.     Okay.  Do you remember any of the -- well, let

8    me ask you this.  The Caucasian employees who -- who

9    Patti criticized for dress code violations, were they in

10   fact in violation of the dress code?

11       A.     Yes.

12       Q.     And I think in this list, I may have asked you

13   this before, but this list we've compiled of the way

14   Caucasians and non Caucasians were treated differently,

15   we've talked mainly about Patti.  Were there other

16   supervisors who treated Caucasians and non Caucasians

17   differently other than Patti?

18       A.     No.

19       Q.     Okay.  So Patti Igarashi is the only supervisor

20   at TSA who you observed treating Caucasians worse than

21   non Caucasians, is that correct?

22       A.     That is correct.

23       Q.     Okay.  Okay.  And -- okay.  Now, this

24   promotions issue, can you name -- can you tell me any of

25   the supervisors who lost supervisory positions at TSA

                    RALPH ROSENBERG COURT REPORTERS, INC.
                        Honolulu, HI   (808) 524-2090

134

1    Maui?

2        A.    Well, initially just about everyone that

3    started as a supervisor or as a lead supervisor for

4    probably a period of three or four days lost their job.

5    They -- they came up with a complete new list of

6    supervisors and lead supervisors and told these people

7    they were now filling those positions and -- and told the

8    former supervisors they were demoted to screeners.  And

9    after three, four days, it could have been just a little

10   bit longer, word came down that they had no authority to

11   change these supervisors around, so everyone that started

12   again was supervisors and lead supervisors and the local

13   people that had been placed in those positions went back

14   to being screeners, so now you had two groups of people

15   very upset.

16       Q.    So who were the screeners, the supervisor

17   screeners who for a short time lost their supervisory

18   positions?

19       A.    I -- I -- almost everyone that held the

20   position.

21       Q.    But can you name any of them?

22       A.    I -- I don't -- I can name three or four people

23   who did lose their position, Rusty, Ann Werstler, there

24   was a lead, she was a local, local woman, I don't know

25   her name but she had been a prior -- she was a

                RALPH ROSENBERG COURT REPORTERS, INC.
                    Honolulu, HI   (808) 524-2090

1    correctional officer before she started at TSA.  She kept

2    her position, Angela kept her position.  I believe there

3    were four, maybe five that kept their positions.

4        Q.    Elizabeth Masuda, was she a -- the former

5    corrections --

6        A.    Yes.

7        Q.    -- officer?

8        A.    Yes.

9        Q.    Do you recall there being confusion about who

10   was supposed to be a supervisor and who wasn't?  Do -- do

11   you recall an incident, any occasion in which management

12   was asking people what sort of appointment they received -

13   received -- received from the -- the contractor?

14       A.    I -- I remember the situation.  There was --

15   there appeared to be confusion.  I don't know why because

16   these people came to us with a formal contract that they

17   were given before -- as part of their hiring process and

18   it clearly stated what position they were to be -- to --

19   to start at.  And why management was confused about that

20   is beyond me.  It was -- there was no -- there should

21   have been not -- not even the slightest amount of

22   confusion.

23       Q.    Did you have --

24       A.    These people were -- these people were -- came

25   to work with a contract in their hand and it clearly

136

1  defined the position they were hired for.  The confusion

2  resulted when the local management decided that they did

3  not want those people to be supervisors but they chose

4  theirselves the people they wanted in those positions.

5      Q.    And do you have an understanding as to who made

6  that decision as to who was going to be the new

7  supervisor?

8      A.    I -- I honestly don't know who made that

9  position.  I -- I assume that it was Lowrey Leong.  They

10  came and asked us if we would recommend people to be new

11  supervisors.  Of course I had only been there a very

12  short time, I didn't know very many people, so those

13  decisions, those recommendations were Patti, Patrick

14  Collins and Fil Carvalho made those recommendations.

15      Q.    Who -- who asked you for your recommendation?

16      A.    I believe Fil Carvalho asked me for my

17  recommendation if I -- if I thought I could recommend

18  some of the people I had been working with for

19  supervisors.

20      Q.    And did you make any recommendations?

21      A.    I -- I did not because I had read many of these

22  contract letters that these current supervisors had,

23  because this was common knowledge that they were trying

24  to make this switch, and people would bring these letters

25  in and show them to me and it clearly stated that they

RALPH ROSENBERG COURT REPORTERS, INC.
Honolulu, HI  (808) 524-2090

137

1   had been hired by the federal government for that

2   specific position.  It did not say anything that anyone

3   had the ability to just randomly replace them with

4   someone else.

5        Q.    Did you have an understanding that the

6   information that was in the contracts, there was no list

7   available to the management of who was supposed to be in

8   what position and the only way they could get that

9   information was to actually ask people to bring in their

10  contracts so that management could see what they'd been

11  appointed to?

12       A.    That's what we were told, that there was not an

13  individual list provided to management and I believe it

14  was on my second day, because that's what -- on my second

15  day of piggy backing with Fil, with Patrick Collins, he

16  asked me to collect everyone's letter that they brought

17  in.  Everyone that had been hired as a lead or a

18  supervisor brought their letter, their contract letter

19  in.  I collected them, I gave them to Fil Carvalho, so on

20  on that second day, management knew exactly who was lead

21  and who was a supervisor.

22       Q.    And then it's your understanding that some of

23  the people who had letters saying you are appointed to

24  being a lead screener, they would -- they were taken out

25  of that position and put onto -- just as -- as screeners,

138

1    right?

2        A.    Yes, they were.  Most of them were.

3        Q.    The way that -- and -- and I'm sorry, you -- I --

4    I take it you never saw any list of people who were

5    supposed to be -- one -- one master list sort of people

6    who were supposed to be the supervisors, right?

7        A.    I didn't see the list, but I know a list was

8    created from all the individual contracts.

9        Q.    Okay.  The way -- I think you talked about the --

10   the inconsistent application of the procedures, the way

11   that Patti would criticize people, Caucasians for

12   violating the rules when there hadn't really been a

13   violation, is that right?

14       A.    No, I -- I -- there may have been a violation,

15   but there was also a violation two -- two rows over, but

16   she would ignore that person and only correct the

17   Caucasian screener.

18       Q.    How many times did you see Patti Igarashi

19   correct a non -- I'm sorry, a Caucasian screener for any

20   violation of the rules?

21       A.    A half a dozen times, six times.

22       Q.    Did you ever see her correcting a non

23   Caucasian?

24       A.    Only on one occasion.

25       Q.    And were all seven of these occasions where she

                    RALPH ROSENBERG COURT REPORTERS, INC.
                        Honolulu, HI  (808) 524-2090

1    corrected a screener legitimate violations of the rules?

2        A.    They -- they were.  Yes.

3        Q.    Okay.  So I guess your criticism is not that

4    she would criticize Caucasians, it's that she would let

5    non Caucasians slide?

6        A.    Yes.

7        Q.    Okay.  And did you have any access to the

8    writeups that Patti Igarashi did of various employees?

9        A.    I didn't -- I didn't have any access to her

10   writeups.

11       Q.    Now, what was your understanding as to the

12   writeup policy when you were there?

13       A.    I was -- I was told the writeup policy was to --

14   if you observe someone doing something wrong, you would

15   write up a letter or a counseling letter and place it in

16   their official file.

17       Q.    And this was -- were you told to write up

18   individuals even for what you might consider to be

19   relatively minor infractions?

20       A.    I was -- I was told by Fil Carvalho one day

21   that we needed to write up everything we saw because we

22   had too many employees and we needed to eliminate some of

23   them.

24       Q.    And did he tell you to treat Caucasians

25   differently from non Caucasians in the way you were --

1   you were writing up -- writing them up?

2       A.    He did not.

3       Q.    Did he give you any indication or hint to you

4   in any way that you should do such a thing?

5       A.    He did not.  No.

6       Q.    Did anybody else?

7       A.    No one -- no one -- no one in management said

8   anything to me.  I had heard rumors that people in

9   management had -- had put the word out to write up

10  Caucasian people.

11      Q.    But that's all you have, you don't have any

12  first hand knowledge of such a statement being made,

13  correct?

14      A.    I do not have any first hand knowledge.

15      Q.    Okay.  When Patti Igarashi corrected the

16  Caucasian employees for violating the rules, how did she

17  do it?  What was her demeanor, her manner?

18      A.    She was less than professional about it.  I --

19  I saw -- I saw a range of being almost professional to

20  being totally unprofessional in -- in other instances.

21      Q.    I'm going to go back to this writeup issue for

22  a second and ask you about something in your declaration --

23  I'm sorry, your affidavit, which is Exhibit A, and I'm

24  looking at page seven.  Exhibit A?

25      A.    Okay.

                    RALPH ROSENBERG COURT REPORTERS, INC.
                        Honolulu, HI  (808) 524-2090

1    Q.    And is -- I -- I think you were probably

2    referring to this meeting earlier.  This is the meeting

3    that you were talking about in the second full paragraph

4    that begins at one point in the meeting when you said

5    Mr. Carvalho said that he wanted writeups so -- in -- in

6    the file so they could get rid of employees.  This is the

7    meeting you're talking about that happening?

8        A.    Yes.

9        Q.    So the statement by Mr. Carvalho that employees

10   should be written up so that TSA could get rid of them

11   was made in the presence of you, Miss Igarashi and

12   Mr. Collins, right, and Mr. Carvalho?

13       A.    Yes.  Yes.

14       Q.    Okay.  And then it says -- and then you've got

15   at the bottom of that paragraph something crossed out,

16   when I pressed the issue, Mr. Tagomori said God damn it,

17   that is because that is the way I want it.  Did that

18   happen?

19       A.    No.  No.  He was not in that -- he was not in

20   that meeting.  This -- this was -- I don't know how --

21   why she put that in that paragraph because he was not in

22   that meeting.

23       Q.    So this affidavit is typed up by someone with

24   the civil rights office, is that right, or the contract

25   EEO investigator named Justi Rae Miller?

142

 1      A.    Yes.

 2      Q.    And she took your statement and -- or she

 3  talked to you and then typed something up and sent it to

 4  you?

 5      A.    Yes.

 6      Q.    Okay.  And so that you made some corrections

 7  and initialed them all and one of the -- this is one of

 8  the -- just one of the corrections you made?

 9      A.    Yes.

10      Q.    Okay.  That makes sense.  Now, this corrective

11  from Washington about their promotions, who told you that

12  Washington had told management that they couldn't change

13  all the supervisors?

14      A.    Fil -- Fil Carvalho.

15      Q.    Okay.  Did Fil Carvalho ever tell you how

16  management was deciding who should be made a -- a

17  supervisor and who shouldn't?

18      A.    He did not share any information on that

19  subject with me, no.

20      Q.    But he did ask for your opinion on that

21  subject, right?

22      A.    He asked if I wanted to recommend anyone from

23  the groups of people I had been working with.

24      Q.    Okay.  And you did not make -- you -- you did

25  not make any recommendations because you hadn't been

                    RALPH ROSENBERG COURT REPORTERS, INC.
                       Honolulu, HI  (808) 524-2090

143

1    there long enough, right?

2        A.    I didn't make any recommendations because I

3    didn't know the people very well, and I also knew that

4    people had legitimate contracts and positions already.

5        Q.    Okay.  Did you ever -- were you aware of some

6    kind of a hotline or complaint line for TSA employees?

7    While you --

8        A.    I was aware -- yes, I was aware of a TSA

9    hotline, I think it was called.

10       Q.    Did you ever call that hotline?

11       A.    I never called the hotline.

12       Q.    Okay.  Did you ever -- did you have any contact

13   with the MSF -- did anybody with the MSF ever tell you to

14   be concerned about management or to watch out or

15   management is racist or anything like that?

16       A.    They did not tell me that management would --

17   was racist, but they -- they did not speak highly of

18   management.  They told me some of the best screeners that

19   they had dealt with in their experience traveling around

20   the country, but very, very poor management.

21       Q.    And who told you that?

22       A.    One of the supervisors from the roll out team

23   from the -- the mobile team, Caucasian man, 35 to 40

24   years old.  I don't know his name.

25       Q.    Do you recall what airport he was from

                    RALPH ROSENBERG COURT REPORTERS, INC.
                      Honolulu, HI  (808) 524-2090

144

1   originally?

2       A.    He was from Florida, but the exact airline or

3   airport, I don't remember.

4       Q.    Tampa maybe?

5       A.    It -- it could be but --

6       Q.    Okay.

7       A.    I'm kind of guessing.

8       Q.    Okay.  In your Exhibit B on page three, you

9   talk about -- do you have that?

10      A.    Yes, uh huh.

11      Q.    And it says the underline or section A period,

12  I request you contact some of the MSF screening force,

13  some of the members of that team complimented the Kahului

14  Airport for having some of the best screeners they have

15  seen but also said that we have the worst management of

16  any airport.  I will provide some names and numbers for

17  you to contact.  Do you know if you ever provided names

18  and numbers to the civil rights office?

19      A.    I did not.  I had -- I had several names at

20  that time, but I did not provide it to anyone and I don't

21  know what's become of that in the past three, four years.

22      Q.    The list?

23      A.    The -- the names, yeah, and the names of the

24  people that were there.

25      Q.    Okay.  I am just about done, but I do need to

145

```
 1   take a -- a look at my notes and make sure there's

 2   nothing I'm -- I'm omitting and eat some Cheetos, so --

 3                   MS. HEVICON:  Before I eat them all.

 4                   MR. HELPER:  Let's go off the record a

 5   few minutes.

 6                   MS. HEVICON:  Okay, I was just going to

 7   ask you about that.

 8                   THE VIDEOGRAPHER:  Off the record.  The

 9   time is now 1:56, we're going off the record.

10                   (Discussion off the record.)

11                   THE VIDEOGRAPHER:  The time is now two

12   p.m. and we are back on the record.

13       Q.    (By Mr. Helper)  Mr. Young, do you know

14   Christopher Gahr?

15       A.    I have spoken with him.  I know of him, but I

16   have not met him.

17       Q.    Okay.  I -- I want to ask you questions, you --

18   you may or maybe not have had conversations in which

19   yourself and some of the other plaintiffs were present

20   along with your lawyer.  I don't want you to tell me

21   about any conversation where the only people in the room

22   were you and another plaintiff and a lawyer.  But

23   excluding those conversations, how did you first get in

24   contact with Mr. Gahr, first speak with him?

25       A.    He -- he actually called, called me and told me
```

146

1    about what he was attempting to do and -- and to contact --

2    he was attempting to contact an attorney and discuss what

3    he thought his situation was and he -- I guess from

4    talking to other screeners he had learned about me and

5    some of my situation I guess, and that I had been

6    terminated and was asking basically if I was interested

7    in sharing some of my information with the attorneys or

8    getting involved in this or something along those lines.

9        Q.    Was this after you'd been -- was this after

10   you'd been terminated?

11       A.    Yes.

12       Q.    How long after you were terminated did Mr. Gahr

13   get in touch with you?

14       A.    Estimate about -- about a year.

15       Q.    Okay.  So this is after you had made complaints

16   yourself about what had happened at TSA?

17       A.    Yes.

18       Q.    Okay.  And had you heard of Mr. Gahr while you

19   worked at -- you -- you never met Mr. Gahr while you were

20   employed at TSA, correct?

21       A.    No.  I -- I did not meet him but I had heard

22   some stories.  Some stories were shared with me about

23   him.

24       Q.    And one of the stories you've related in your

25   declaration or your affidavit about a conversation you

RALPH ROSENBERG COURT REPORTERS, INC.
Honolulu, HI  (808) 524-2090

1   had with Mr. Collins, right?

2       A.    Right.

3       Q.    And Mr. Collins told you that Mr. Gahr had been

4   fired for failing to change batteries in the radio.  Is

5   that what he -- Mr. Collins told you?

6       A.    I was -- yes.  Yes.  That's basically what he

7   told me.

8       Q.    And is that the only thing Mr. Collins told

9   you, the only reason Mr. Collins gave to you for why

10  Mr. Gahr was fired?

11      A.    That's about the only thing he told me.  He

12  didn't share much more than that.

13      Q.    Did anybody else talk to you about why Mr. Gahr

14  was fired other than Mr. Collins?

15      A.    Yes.  Patti, Patti mentioned -- Patti and I

16  were looking at something one evening, we were discussing

17  a -- a situation, a procedure we wanted maybe changed or

18  something, and I had come up with an idea, I -- I really

19  don't even remember what it was, it was something to do

20  with the outbound check point.  We -- we -- there was a

21  single TSA person on this exit point.  And I had made a

22  suggestion, and Patti -- I -- I remember this quite

23  clearly, Patti mentioned about all you F'ing haoles are --

24  you think alike, you're alike, and I was what are you

25  talking about now, Patti, and she brought up the story

1   about Mr. Gahr when he was there as a supervisor had come

2   up with kind of the same idea or something along the same

3   line.  And she just made the comment he -- he came up

4   with the same stupid idea and we had to fire him, and I

5   think I -- my response to her was something along the

6   lines of damn, I hope I don't make that same mistake

7   then.  Joking, you know.

8       Q.    This had something to do with the proper

9   protocol for a doorway?

10      A.    We -- something to do with the exit doorway

11  downstairs where arriving passengers came out.  There's --

12  there was a TSA person there, screener to make sure no

13  one came through there, that everyone went through the

14  proper entry point and got screened.  And it was just

15  something to do -- maybe getting them a different

16  location, putting them in a different location.  I

17  honestly don't remember the exact details, but it was --

18  wasn't a big deal, but he -- because of my suggestion,

19  she brought up the story about this Christopher Gahr,

20  that he had to be terminated, and that all of us F'ing

21  haoles must think alike.

22      Q.    Did she tell you what the stated reason was for

23  Mr. Gahr's termination?

24      A.    She -- she did.  She told me that he was

25  terminated because he destroyed government property.

1    Q.    Did -- did she tell you any more than that?

2    A.    I believe she shared with me that he had left

3   the radio on overnight and -- and that the batteries had

4   gone dead.

5    Q.    And that --

6    A.    And that was the reason, was a reason for

7   termination.

8    Q.    And letting the batteries go dead was,

9   according to what she was saying anyway, destruction of

10   government property?

11    A.    Yes.  And -- and I do remember that she said

12   there were other things that he had done, but that was

13   the only thing they could actually write him up for and

14   to terminate him for.

15    Q.    Anybody else who told you about anything to do

16   with Chris Gahr's termination or his employment at TSA?

17    A.    Well, the conversation I had with Patrick

18   Collins, we had just -- we had just got in a shipment of

19   our radios, and probably my second night, maybe my third

20   day, second evening with Patrick, he asked me to go put

21   these new batteries in the chargers and plug them in, he

22   said make sure you plug them in, make sure they get

23   charged, one guy got terminated for leaving a --

24   batteries go dead.  And I laughed, you know, I thought he

25   was joking with me, and he goes no, I'm not joking.  We

1   actually terminated someone for leaving a radio on

2   overnight.  And then with that information and with what

3   Patti shared with me sometime later, I realized they were

4   talking about the same person.

5        Q.    Did anybody else talk to you about Mr. Gahr or

6   his termination?

7        A.    Not that I -- I do not recall anyone else ever

8   saying anything.

9        Q.    Okay.  Did anybody ever say anything to you

10  that Mr. Gahr was terminated, or one of the reasons he

11  was terminated was for failing to secure a check point?

12       A.    I did not hear that story.  No.

13       Q.    Okay.  How about did you ever -- while you were

14  employed at TSA, I don't think you overlapped with

15  Charles Turner at all, or did you?

16       A.    I -- I don't believe so, but the early days we

17  had over 140, 150 guys working a single shift.

18       Q.    Do you know Charles Turner now?

19       A.    I -- I know who he is.

20       Q.    Have you met him?

21       A.    Yes.  I've met him.

22       Q.    Where have you met him?

23       A.    I -- I met him at the airport.

24       Q.    When did you meet him?

25       A.    Sometime during the three weeks I worked there.

1    Q.    Oh, okay.  Did you ever supervise Charles

2    Turner?

3    A.    I -- I believe I did.

4    Q.    Are you able to offer any opinion as to how

5    good a worker he was?

6    A.    I want to make sure I'm talking about the right

7    person.  His wife was also a screener?

8    Q.    You may be thinking of Frank Paulson.

9    A.    Frank Paulson, yes.  I -- I'm positive I know

10   and met Charles Turner but I -- I couldn't tell you

11   anything about him.

12   Q.    Okay.  Do you know an employee named Lucas

13   Bruno?

14   A.    The name is certainly familiar, but again, I --

15   I can't put a face with the name.

16   Q.    Have you suffered any particular emotional

17   distress from what happened to you at TSA Maui?

18   A.    Well, I was certainly stressed but I -- I -- I

19   don't have any medical problems that I know of.  I -- I'm

20   going to have to say no.

21   Q.    Okay.  And you -- you -- I think you said you

22   were literally back to work, you were back to work

23   literally the next day after your termination?

24   A.    I was, and if I -- I know -- I know I -- I

25   probably shouldn't even add anything else, but Howard

152

1    Tagomori tried to convince me to resign instead of being

2    terminated because I'd never work again, and I just

3    thought it was kind of funny.

4        Q.    This was at your termination meeting?

5        A.    At my termination meeting at the end of it he --

6    he -- he sort of pondered for a moment and he says, you

7    know, you really ought to just resign because you're

8    never going to be able to get a job again.  And I -- I --

9    I was very upset, I knew many things that were in this

10   termination letter were completely falsified and I said

11   no, you terminated me, I want to stay terminated, I will

12   not resign, and I did go back to work the very next day.

13       Q.    Okay.  All right.  Mr. Young, I really

14   appreciate your patience and your time today.

15                  MS. HEVICON:  Okay.

16       A.    You're very welcome.

17                  MS. HEVICON:  We're done.

18                  THE VIDEOGRAPHER:  The time is now 2:12

19   p.m.  We're going off the record and this concludes

20   today's deposition.

21                  (Deposition concluded at 2:12 p.m.)

22

23

24

25

                    RALPH ROSENBERG COURT REPORTERS, INC.
                       Honolulu, HI   (808) 524-2090
     MAR 2 1 2006