# ATTACHMENT "3"; PATTI IGARASHI

1

1     IN THE UNITED STATES DISTRICT COURT

2          FOR THE DISTRICT OF HAWAII

3

4   LUCAS BRUNO III,              )
    CHRISTOPHER GAHR, FRANK       )
5   ROBERT PAULSON, CHARLES       )
    TURNER and TOM YOUNG,         )
6                                 )
              Plaintiffs,         )
7                                 )
        vs.                       ) CIVIL NO.03-00567 DAE/BMK
8                                 )
    MICHAEL CHERTOFF,             )
9   Secretary, DEPARTMENT         )
    OF HOMELAND SECURITY,         )
10                                )
              Defendant.          )
11  _____)

12

13

14       DEPOSITION OF PATTI M. IGARASHI

15   Taken on behalf of the Plaintiffs, pursuant to

16   Notice, on Tuesday, June 20, 2006, commencing at

17   10:55 a.m., at the offices of Michael Jay Green,

18   345 Queen Street, Second Floor, Honolulu, Hawaii

19   96813.

20

21

22

23

24

25

2

1     APPEARANCES:

2         For Plaintiffs:

3             MICHAEL JAY GREEN, Esq.
              DEBRA A. KAGAWA, Attorney at Law
4             DENISE HEVICON, Attorney at Law
              345 Queen Street, Second Floor
5             Honolulu, Hawaii  96813
              (808) 521-3336
6
          For Defendant:
7
              THOMAS A. HELPER, Esq.
8             Office of the United States Attorney
              PJKK Federal Building
9             300 Ala Moana Boulevard, Room 6100
              Honolulu, Hawaii  96850
10            (808) 541-2850

11

12    REPORTED BY:

13        Don A. Ross, CSR No. 250
          Notary Public, State of Hawaii
14

15

16                        -o0o-

17

18

19

20

21

22

23

24

25

3

1                          I N D E X

2

3       EXAMINATION:                              PAGE

4       BY MR. GREEN                              4

5

6

7

8

9       EXHIBITS FOR IDENTIFICATION:

10      Exhibit 1                                 121
        (Memo to Leong, Lowrey from
11      Carvalho, Filbert, 10/17/02)

12      Exhibit 2                                 148
        (Bonnie Tanner documents)
13
        Exhibit 3                                 183
14      (Memo to Christopher Gahr from
        Howard Tagamori, 10/25/02)
15
        Exhibit 4                                 184
16      (Lizabeth M. Masuda Affidavit)

17

18

19

20

21

22

23

24

25

4

```
 1      (Pursuant to Rule 14, of the Rules Governing
 2      Court Reporting in Hawaii, the reporter's
 3      disclosure was made and is attached hereto.)
 4                      PATTI M. IGARASHI
 5      having been called as a witness and being first
 6      duly sworn to tell the truth, the whole truth and
 7      nothing but the truth, was examined and testified
 8      as follows:
 9                      EXAMINATION
10      BY MR. GREEN.
11           Q.   Say your name.
12           A.   Patti Igarashi.
13           Q.   Spell it for the court reporter,
14      please.
15           A.   P-a-t-t-i, middle initial M,
16      I-g-a-r-a-s-h-i.
17           Q.   What is your current business or
18      profession?
19           A.   I'm a health information tech with the
20      Maui Memorial Medical Center.
21           Q.   How long have you had that position?
22           A.   Three years.
23           Q.   Have you had any other employment
24      during those three years?
25           A.   No.
```

5

1          Q.    You've been gone from TSA for three
2     years?
3          A.    Yes.
4          Q.    Have you had your deposition taken
5     before?
6          A.    No.
7          Q.    You're sure?
8          A.    No.
9          Q.    Well, this is a deposition.   That's a
10    great start.
11              A deposition is a procedure where
12    there's a court reporter, generally outside the
13    setting of a courtroom, and lawyers come together
14    and they have the right to ask you questions and
15    you give the best answers you can under oath.
16              And a transcript like the ones that are
17    on this table are prepared of the questions and
18    answers and anything the lawyers say.  Okay?
19         A.    [Nodding Head.]
20         Q.    Yes?
21         A.    Okay.
22         Q.    That's called a deposition.
23              Do you have any memory of ever being
24    involved in a deposition-type proceeding before
25    today?

6

```
 1          A.    Yes.

 2          Q.    And when was that?

 3          A.    In the eighties or nineties.  Got into

 4     a car accident.

 5          Q.    I see.  Were you a witness, plaintiff

 6     or defendant?

 7          A.    Plaintiff.

 8          Q.    You sued somebody?

 9          A.    Yes.

10          Q.    And the lawyers for the person who you

11     sued were taking your deposition?

12          A.    Yes.

13          Q.    Any other times that you were deposed

14     or had your deposition taken?

15          A.    No.

16          Q.    I'm going to go through some of the

17     rules.  And they're actually very important rules

18     for a deposition.  Okay?

19          A.    Okay.

20          Q.    The first thing is that your answers

21     are under oath.  And that's no different than

22     whether a --  the court reporter administered the

23     oath -- whether a judge did or a clerk of the

24     court.

25                Once you swear to tell the truth, if
```

1    you don't and someone can prove that your answers

2    were intentionally false, potentially, you being

3    at least be investigated or charged for giving a

4    false statement under oath, which some people

5    call perjury.  You understand that?

6         A.   Yes.

7         Q.   It's really important that you

8    understand the questions because you're going to

9    be answering the questions.  And if you're giving

10   an answer thinking that the question I ask means

11   something other than what it did, you're going to

12   wind up having a transcript that shows answers

13   that are not responsive, but it's going to seem

14   as though you answered the question knowingly.

15   Okay?

16        A.   Okay.

17        Q.   So if you don't understand the

18   question, you should tell me "I don't

19   understand," and I'll try to make it into a form

20   that you do understand.  Okay?

21        A.   Okay.

22        Q.   In depositions, the lawyers are really

23   not interested in your just purely guessing at an

24   answer.  Okay?

25        A.   Okay.

8

```
 1            Q.   And if I ask you a question and it
 2       requires you just to really guess, you should
 3       tell me, "You know what, this is just a guess,"
 4       and then we can move on to something else.
 5       Okay?
 6            A.   Okay.
 7            Q.   But deponents -- and the word they use
 8       for someone that's being deposed is
 9       "deponent" --  deponents are entitled to give
10       answers based on their education, their
11       experience, training and knowledge that they may
12       have gained through life experiences or from a
13       particular job that they've been involved in over
14       a number of years.  Okay?
15            A.   Okay.
16            Q.   So that if I ask you a question that
17       calls for you to give your best answer based on
18       reasonable beliefs you have based on your work,
19       let's say, at Wackenhut or TSA, you can do that.
20       Okay?
21            A.   Okay.
22            Q.   You should allow me to ask the question
23       and complete my question before you answer so we
24       don't talk over each other.  Will you do that?
25            A.   Okay.
```

1          Q.   You should answer the question in an

2     audible way, which means a "yes" or a "no" or

3     explain your answer as opposed to nodding your

4     head or things like that because this court

5     reporter may take down a nod as a "yes" and you

6     may really mean "no."  You understand that?

7          A.   Okay.

8          Q.   This case looks like it's definitely

9     going to go to trial, so you'll be testifying

10    before a federal jury probably sometime in the

11    first week of August.

12          And the reason I tell you that is

13    because if you give a different answer in front

14    of the jury than you give today, under certain

15    circumstances, the judge will allow me to direct

16    your attention to what you said today, the

17    question I asked and the answer you gave under

18    oath.  And if it's different, some jurors may

19    take a look at you and think that you're changing

20    your answer intentionally to help yourself or

21    help your friends who have been sued in this

22    case.  You understand that?

23          A.   Yes.

24          Q.   A transcript will be prepared of this

25    deposition.  And your lawyer, I'm sure, will go

1    over the transcript with you.

2              And you have the right to make changes

3    to answers if you so desire.  Okay?

4         A.   Okay.

5         Q.   Some of the changes that you make may

6    be what lawyers call substantive changes.  For

7    example, if you say "yes" to something today and

8    you change it to "no" when you review your

9    transcript, jurors have a right to hear that and

10   they can determine whether or not there's a

11   reason why you changed the answer.

12             For example, maybe you don't like what

13   you said in your deposition or maybe it sounds

14   kind of bad and you wanted to change it before

15   you got to court.  You understand that?

16        A.   Yes.

17        Q.   So your lawyer will explain all those

18   good things to you when he goes over the

19   deposition with you.  Okay?

20        A.   Okay.

21        Q.   From time to time, your lawyer may make

22   objections.  Sometimes he dozes off and sometimes

23   he doesn't hear the questions.  But if he's alert

24   and he makes an objection, you should stop

25   answering immediately and then he will make his

1   objection.  You should then -- after he's

2   finished objecting, you can answer the question

3   unless he tells you not to answer the question.

4   And we'll wait to see if that happens.  Okay?

5        A.   Okay.

6        Q.   Have you reviewed any documents to

7   prepare yourself for this deposition?

8        A.   No.

9        Q.   He hasn't shown you anything?

10        A.   Nothing.

11        Q.   Shameful.

12             Have you had a chance to speak with him

13   before you came in today?

14        A.   Yes.

15        Q.   How long did you talke to him?

16        A.   I got in at about nine.

17        Q.   Have you had an opportunity to speak to

18   anyone else that you would have worked with at

19   Wackenhut or TSA about this case in the last

20   thirty days?

21        A.   No.

22        Q.   Have you read --  you haven't read any

23   of the depositions that have been taken so far?

24        A.   None.

25        Q.   Haven't spoken to Todd Imori or any of

12

1    the other current employees of TSA about this

2    case?

3         A.   No, sir.

4         Q.   Are you on any kind of medication or

5    things that would make it difficult for you to

6    understand the questions?

7         A.   No.

8         Q.   Any reason that we can't go on with

9    this?

10        A.   No.

11        Q.   Other than the fact that you may not

12   want to.

13             But is there any physical reason that

14   you can't?

15        A.   No.

16        Q.   Where did you go to high school?

17        A.   Baldwin.

18        Q.   That's on Maui?

19        A.   Yes.

20        Q.   You a local girl?

21        A.   Yes.

22        Q.   Born and raised on Maui?

23        A.   Yes.

24        Q.   Do you have family that lives on Maui?

25        A.   Yes.

13

1      Q.   Do you have family living on any of the
2   other islands?
3      A.   Yes.
4      Q.   Large family?
5      A.   Yes.
6      Q.   "Large" to me means maybe twenty or
7   thirty people that are part of your family.
8      A.   Yes.
9      Q.   Do you have any Caucasians in your
10  family?
11     A.   Yes.
12     Q.   Who would that be?
13     A.   My cousin's boyfriend.
14     Q.   Are they married?
15     A.   No.
16     Q.   Do you have anyone that's married in
17  your family to a male Caucasian?
18     A.   Yes.  But he's deceased.
19     Q.   He died under strange circumstances or
20  normal circumstances?
21     A.   Normal.
22          MR. HELPER:  Objection.
23          Vague.
24     Q.   BY MR. GREEN:  You went to Baldwin.
25          And did you go on to school after

14

1    that?

2         A.    Yes.

3         Q.    Where did you go?

4         A.    Cannon's Business College.

5         Q.    What year did you complete that?

6         A.    1979.

7         Q.    And the reason you went there, I guess,

8    was in hopes that you would get employment in

9    something related to the business college, what

10   you learned.

11        A.    Yes.

12        Q.    Were you able to get a job?

13        A.    Yes.

14        Q.    What did you do?

15        A.    I was employed at the police station

16   doing driver's licensing as a clerk.

17        Q.    What years were those?

18        A.    1979 to '81, maybe.

19        Q.    How much a week were you earning

20   about?  What was the pay scale for that kind of

21   stuff?

22        A.    Maybe ten dollars an hour.

23        Q.    Were you married at the time?

24        A.    No.

25        Q.    Do you have any children?

15

```
1        A.    Yes.
2        Q.    How many did you have at the time?
3        A.    Oh, I'm sorry.  At that time, no.
4        Q.    You left that job why?
5        A.    It was a temporary position only.
6        Q.    Where did you go from there?
7        A.    The Sheraton Maui Hotel.
8        Q.    Doing what?
9        A.    Front desk.
10             MR. GREEN:  Off the record.
11             (Discussion off the record.)
12             MR. GREEN:  Go back on.
13       Q.    BY MR. GREEN:  What year did you go
14   work for the hotel?
15       A.    1982 to 19 -- no.  I have to...
16       Q.    Take your time.
17       A.    Early eighties to late nineties.
18       Q.    And what were the various positions you
19   had at the hotel?
20       A.    Front desk, accounts receivable,
21   purchasing and engineering secretary.
22       Q.    How much contact did you have with
23   hotel visitors in your various positions over
24   there?
25       A.    A lot.
```

16

1       Q.   Front desk, obviously, you saw people

2   checking in and checking out all the time.

3       A.   Yes.

4       Q.   Mostly tourists?

5       A.   Yes.

6       Q.   Mainland tourists?

7       A.   Yes.

8       Q.   And front desk for how long?

9       A.   About a year and a half.

10       Q.   Would you say that the employees at the

11   hotel that you worked with at the front desk and

12   the other jobs were predominantly local people?

13           MR. HELPER:   Objection.

14           Vague.

15       Q.   BY MR. GREEN:   What he's saying is what

16   "local people" may mean to you or may mean to

17   me.

18           Do you have some understanding what the

19   word "local" means?

20       A.   Yes.

21       Q.   What does it mean to you?

22       A.   Anybody born and raised here or not

23   being Caucasian.

24       Q.   How about someone that was simply

25   raised here but not born here, would that also

17

1   qualify?

2       A.   Local.

3       Q.   That would be local.

4           But it would be someone, whether they

5   were born and raised here or came here and lived

6   for a while -- non-Caucasian would be a

7   definition of "local" to you?

8       A.   Yes.

9       Q.   The work you had after the front desk,

10  did you have contact with hotel visitors at the

11  time?

12      A.   No.

13      Q.   So, basically, front desk was really

14  the most contact you had?

15      A.   Yes.

16      Q.   And did you have any training from the

17  hotel prior to going to work for them?

18      A.   No.   Training was done after you were

19  hired.

20      Q.   What kind of training did you get?

21      A.   Telephone, guest services...

22      Q.   Let me make it easier for you.

23           The training that I think you think I'm

24  referring to, and correct me if I'm wrong, is

25  simply training to do the job.  Right?

18

1          A.    Yes.

2          Q.    In other words, whatever your job

3    description was at the front desk, you received

4    training on how to be more efficient in doing

5    what you did?

6          A.    Yes.

7          Q.    Training, I assume -- and maybe I

8    shouldn't -- but you get some training on how to

9    interact with visitors?

10         A.    Yes.

11         Q.    Was there any kind of training that you

12   had specifically from the hotel that dealt with

13   the fact that the people that would be visiting,

14   checking in and staying there would be basically

15   Mainland people?

16         A.    No.

17         Q.    Nothing that dealt with ethnicities and

18   how to treat those people --

19         A.    No.

20         Q.    -- things like that?

21         A.    No.

22         Q.    Nothing about how they may expect

23   things that are different than maybe local

24   people --

25         A.    Yes.

19

```
 1          Q.    -- anything like that?

 2                Tell me what you remember about that.

 3          A.    Back then, a lot of them came over not

 4   realizing that we had buildings.

 5          Q.    What does that mean?

 6          A.    Some of them really thought we lived in

 7   grass shacks.

 8          Q.    I see.  That was probably in the

 9   eighties?

10          A.    Yes.

11          Q.    They got a little bit more educated as

12   the years went by?

13          A.    Yes.

14          Q.    Did you have any training, on-the-job

15   training or from anyone else at the hotel,

16   regarding conduct that might constitute

17   discrimination against either co-employees or

18   visitors?

19          A.    Yes.

20          Q.    First of all, what were the

21   circumstances of the training that you received?

22          A.    What do you mean by "circumstances of

23   the training"?

24          Q.    Where were you trained?

25          A.    At the hotel.
```

```
 1          Q.   Did they have a seminar or a group

 2     meeting or was it one on one?  What kind of

 3     training?

 4          A.   It was groups.

 5          Q.   And that was shortly after you were

 6     hired?

 7          A.   Yes.

 8          Q.   Was there anything in writing they ever

 9     gave you regarding discriminatory practices,

10     things that should not be done, as opposed to --

11          A.   No.

12          Q.   -- just the meeting?

13          A.   Yes.

14          Q.   Do you remember anything that they told

15     you about conduct that could be considered

16     discriminatory?

17          A.   It was hotel policy calling the guests

18     by their names, so at the front desk, you're

19     going to have to remember everybody.

20          Q.   I think the question I asked you was

21     whether you had any training on what conduct

22     would constitute discrimination.

23          A.   No.

24          Q.   Did you have any of that?

25          A.   No.
```

21

1        Q.    You worked on how many different shifts
2    at the hotel on the front desk?
3        A.    Two.
4        Q.    Do you remember back then whether or
5    not out of the presence of maybe some of the
6    guests that you or some of the other people that
7    worked at the front desk referred to people as
8    haoles?
9        A.    Yes.
10       Q.    It happened all the time, right?
11       A.    Yes.
12       Q.    And I guess to you, perhaps, in growing
13   up, "haole," did that mean anything derogatory to
14   you?
15       A.    No.
16       Q.    It just meant kind of what?
17       A.    Light skinned.
18       Q.    I mean, you have people that are not
19   white that can be light skinned, right?
20       A.    True.
21       Q.    So would that refer to light-skinned
22   people that were other than Caucasian?
23       A.    Yes.
24       Q.    And from time to time at the front desk
25   for the years you were there, you'd get kind of

22

1    angry at any of the tourists, any of the guests?

2         A.   Yes.

3         Q.   It happens from time to time, right?

4         A.   Yes.

5         Q.   Sometimes they were just plain rude,

6    right?

7         A.   Yes.

8         Q.   Did you ever growing up, and this is

9    not just at the hotel, but growing up and maybe

10   through your first working career, and that's up

11   through the hotel days, get the impression that

12   Mainland people kind of look down on local

13   people?

14        A.   Sometimes.

15        Q.   I mean, maybe that was something that

16   you discussed with your family sitting around;

17   they think local people are kind of stupid?

18        A.   Sometimes.

19        Q.   Not as sophisticated as they are?

20        A.   Yes.

21        Q.   Talk down to local people?

22        A.   A little bit.

23        Q.   Sometimes can be cocky or arrogant to

24   local people?

25        A.   Sometimes.

23

1       Q.   And sometimes people are just plain

2    rude.  Right?

3       A.   Sometimes.

4       Q.   And I'm going to guess that from time

5    to time before you left that hotel, you or one of

6    the other people you worked with used the word

7    "fucking haole."  I'm sure you did that.

8    Right?

9       A.   I don't recall.

10      Q.   Well, let's stop for a second.

11           How far did you go in school after the

12   business --

13      A.   Two years.

14      Q.   Let's just stop for a moment and think

15   about this.

16           You've used the word "fucking haole" in

17   your lifetime.  Right?

18      A.   Yes, I have.

19      Q.   You've used it many times.  Right?

20      A.   I could have.

21      Q.   Sure.  So back then at the hotel,

22   either you using the word "fucking haole" to

23   refer to a non-local person who you were angry at

24   or co-employees in your presence referring to

25   non-local people, you've heard the word "fucking

24

1     haole" used before.  Right?

2              MR. HELPER:  Objection.

3              Assumes facts not in evidence about her

4     being angry.

5              MR. GREEN:  Sorry?

6              MR. HELPER:  Assumes facts not in

7     evidence about her being angry.

8              MR. GREEN:  Whatever.

9         Q.   BY MR. GREEN:  You've heard the term

10    "fucking haole" used before?

11        A.   Yes.

12        Q.   This is before you went to work for

13    Wackenhut or TSA, right?

14        A.   Yes.

15        Q.   And you used the term, yes?

16        A.   Yes.

17        Q.   Were you ever trained at the hotel to

18    report any co-employees who used that term?

19        A.   No.

20        Q.   Were you ever written up at that hotel

21    for using derogatory words regarding various

22    races?

23        A.   No.

24        Q.   Never counseled for that?

25        A.   No.

25

```
 1          Q.    Was there a policy at the hotel to

 2    write up co-employees if they spoke like that?

 3          A.    No.

 4          Q.    So, now, you leave the hotel in what

 5    year?

 6          A.    '96.

 7          Q.    And what's the reason you leave?

 8          A.    The hotel closed for renovation.

 9          Q.    And did you have plans on returning

10    after renovation or were you going to get another

11    career?

12          A.    I was planning on returning.

13          Q.    Did that happen?

14          A.    No.

15          Q.    Where did you go?

16          A.    I went to Aloha Airlines.

17          Q.    What did you do there?

18          A.    Contract service agent.

19          Q.    What does that mean?

20          A.    We handle the flights for Aloha's

21    contracts.

22          Q.    First of all, how many years did you do

23    that?

24          A.    Six.

25          Q.    Salary about what?
```

```
 1          A.    Seven dollars.

 2          Q.    Big time, right?

 3          A.    Yes, sir.

 4          Q.    When you went to the airlines, they

 5     have written policies and procedures, do they?

 6          A.    Yes.

 7          Q.    Kind of a handbook?

 8          A.    Yes.

 9          Q.    And did you ever read the handbook?

10          A.    Yes.

11          Q.    That handbook has a section regarding

12     discrimination, does it not?

13          A.    Yes.

14          Q.    Was it your understanding or belief at

15     the time you went to work for the airlines that

16     an employer could not refuse to hire you based on

17     your race, ethnicity, gender, things like that?

18          A.    Yes.

19          Q.    That you had certain --  did you

20     believe you had certain constitutional rights

21     that protected you from that kind of treatment?

22          A.    Yes.

23          Q.    That you could not be fired for reasons

24     of ethnicity, age, race, things like that?

25          A.    Yes.
```

1          Q.    And there was also a policy, and
2     correct me if I'm wrong because I could be, that
3     employees were trained or told that they were not
4     to discriminate against co-employees or
5     passengers or customers for race, gender, things
6     like that.  Right?
7          A.    Yes.
8          Q.    Never to use inappropriate
9     discriminatory language.  Right?
10         A.    Yes.
11         Q.    Were you trained to report that conduct
12    if it --  if you heard it?
13         A.    [No audible response.]
14         Q.    Why are you laughing?
15         A.    No.
16         Q.    Was that a funny question?  Why are you
17    smiling?
18         A.    No.
19         Q.    So there was no training that if you
20    heard a co-employee, for example, referring to a
21    customer or co-worker as a fucking Jap or a
22    fucking haole or things like that, no training to
23    either orally report it to a supervisor or reduce
24    it to writing, yes?
25         A.    None.

28

```
 1          Q.    Did you ever hear co-employees refer to
 2    passengers or co-employees in derogatory racial
 3    ways?
 4          A.    Yes.
 5                MR. HELPER:  Object.
 6                You're talking about Aloha now?
 7                MR. GREEN:  Yes, I'm there, buddy.
 8                MR. HELPER:  Your question was not.
 9                MR. GREEN:  It was such a good
10    question.  It really was.
11          Q.    BY MR. GREEN:  So you've heard it from
12    time to time when you worked at the airlines all
13    those years, right?
14          A.    Yes.
15          Q.    I'm just going to guess that you heard
16    employees refer to each other like that from time
17    to time.  Yes?
18          A.    Yes.
19          Q.    And sometimes maybe jokingly, in your
20    mind.  Right?
21          A.    Yes.
22          Q.    "You fucking haole, what are you
23    doing," things like that, right?  Not to be mean
24    or nasty; just joking?
25          A.    Yes.
```

29

1      Q.    That's how you understood it from time

2   to time?

3      A.    Yes.

4      Q.    Or maybe somebody would say, "You

5   fucking Chinaman" or "You fucking chink" or "You

6   Filipino" --  things that people might joke about

7   amongst each other.  Right?

8      A.    Yes.

9      Q.    Then there were times, I'm assuming,

10  where you actually heard people angry and use

11  those terms --

12     A.    Yes.

13     Q.    -- from time to time.

14           Did you ever actually hear an employee

15  actually say it to a customer?

16     A.    Yes.

17     Q.    And tell me what you remember about

18  that.

19     A.    They just blew up.

20     Q.    They got angry at a customer --

21     A.    Yes.

22     Q.    -- and referred to them as "fucking

23  haole"?

24     A.    Yes.

25     Q.    More than one time?

30

1        A.    Maybe.

2        Q.    Any other ethnic -- maybe some other

3    ethnic comments?

4        A.    Yes.

5        Q.    And when that happened?

6             First, how did you learn of it, unless

7    you were actually present and heard it?

8        A.    I heard it.

9        Q.    And when you heard it, if you know, did

10   anything happen to that employee regarding

11   termination, suspension, write-ups, anything like

12   that that you're aware of?

13       A.    I'm not aware of any.

14       Q.    Do you remember whether you reported it

15   to a supervisor?

16       A.    I did not.

17       Q.    Did you ever while you were working at

18   the airlines --  were you ever aware of any

19   employees reporting that kind of conduct,

20   racially derogatory remarks, to a supervisor --

21       A.    No.

22       Q.    -- about another employee?

23       A.    No.

24       Q.    Do you at least have a good-faith

25   belief today that any of the employees at the

31

1    airlines were terminated or suspended for using

2    racially derogatory remarks toward anyone else?

3         A.    I don't know.

4         Q.    So you leave the airline and you go

5    where?

6         A.    Wackenhut.

7         Q.    Wackenhut.  It's for Buzzy Chang?

8         A.    Yes.

9         Q.    Kenny Chang?

10        A.    I don't know Kenny.

11        Q.    You know Godfrey Ortiz?

12        A.    No.

13        Q.    When do you go work for Wackenhut?

14        A.    I don't know the exact date.

15        Q.    Give me your best estimate.  I'm not

16   going to hold you to it.

17        A.    2001.

18        Q.    When did Wackenhut start business at

19   the airport, if you know?

20        A.    I don't know.

21        Q.    Do you have an idea as far as when you

22   applied how long they had been there?

23        A.    No.

24        Q.    And why did you apply?

25        A.    Because there was going to be an

32

1       opening for a checkpoint manager.

2              Q.    How did you find that out?

3              A.    Mark Warner.

4              Q.    Who is he?

5              A.    He's with Wackenhut on the Mainland.

6              Q.    How were you in contact with him or he

7       with you?

8              A.    Via Fil Carvalho.

9              Q.    When you were working for the airline,

10      did you know Fil Carvalho?

11             A.    Yes.

12             Q.    How did you know him?

13             A.    From working at the checkpoint.

14             Q.    Wackenhut checkpoint?

15             A.    Yes.

16             Q.    I may have misunderstood.  I thought

17      that you learned about the job from this

18      gentleman on the Mainland through Fil Carvalho.

19             A.    Yes.

20             Q.    How did that happen?

21             A.    We were ground security coordinators

22      and we did shift work in the checkpoint.

23             Q.    Was this for Wackenhut?

24             A.    For Aloha Airlines.

25             Q.    Tell me a little bit about what your

33

1    job duties were.

2         A.    We sat there and made sure that they

3    were adhering to the ground security

4    coordinator's directives.

5         Q.    That was with the airlines?

6         A.    Yes, sir.

7         Q.    Did you receive training for that job?

8         A.    Yes.

9         Q.    First of all, who gave you the

10   training?

11        A.    Aloha Airlines corporate office in

12   Honolulu.

13        Q.    How long was the training?

14        A.    Eight hours once a year.

15        Q.    Once a year.

16              How were you trained?  What kinds of

17   things did they teach you?

18        A.    Everything from guest service to

19   procedures to threats.

20        Q.    First of all, what are procedures?

21        A.    Procedures for the airlines on what to

22   do.

23        Q.    In what circumstance?

24        A.    If a bomb was on the plane, who would

25   be called.

34

1        Q.    And you volunteered to go, I assume.

2    Strike that.

3            If there was a bomb report, what did

4    that mean?  Who would go to report that?

5        A.    Yes?

6        A.    What about the gate itself --  when I

7    say "the gate," it's a bad word.

8            Did they have metal detectors in those

9    days?

10           Were people screened before they were

11   allowed through?

12       A.    No, not at the gate.

13       Q.    Was there some kind of screening?

14       A.    At the checkpoint.

15       Q.    And that's where you were working?

16       A.    Yes.

17       Q.    And the period of time you worked there

18   was how long at the checkpoint?

19       A.    A couple of months.

20       Q.    Was there wanding going on at the

21   checkpoint at that time?

22       A.    Yes.

23       Q.    Were you trained in wanding?

24       A.    Yes.

25       Q.    Was that part of the eight hours?

35

```
 1          A.    Yes.
 2          Q.    And then you got some on-the-job
 3    training?
 4          A.    Yes.
 5          Q.    When did you meet Carvalho?
 6          A.    While I was at Aloha, he was part of
 7    FAA.
 8          Q.    Was he superior to you?
 9          A.    Yeah.
10          Q.    In other words, were there times you
11    would report to him?
12          A.    No.
13          Q.    But his position, at least in your
14    mind, was superior to the position you had?
15          A.    Yes.
16          Q.    How much were you making there?
17          A.    At Aloha?
18          Q.    When you were at the checkpoint, how
19    much were you getting?
20          A.    Same money.
21          Q.    How much did you say?
22          A.    Seven-forty-seven.
23          Q.    At the checkpoint itself, did you do
24    wanding?
25          A.    No.
```

36

1       Q.    What exactly did you do?

2       A.    Sat there.

3       Q.    Doing what?

4       A.    Watching.

5       Q.    What were you looking for?

6       A.    Making sure that every passenger who

7    alarmed was wanded.

8       Q.    And the reason you were trained to do

9    that?

10      A.    Because we were ground security

11   coordinators for the airlines.

12      Q.    And you want to make sure that the

13   airport is safe for travelers.  Right?

14      A.    Yes.

15      Q.    You want to make sure that no one gets

16   injured or hurt going into the airport.  Right?

17      A.    Yes.

18      Q.    And were you trained to look for

19   anything in particular or just if the alarm goes

20   off, make sure that they're checked?

21      A.    And if the ETD went off, we made sure

22   that someone responded.

23      Q.    Tell me what an ETD is.

24      A.    It's a little machine that they swipe

25   and they put it in, and it reads whether there's

1    any explosives on your person.

2           Q.    Did you get some training in that

3    device?

4           A.    In Honolulu, yes.

5           Q.    We're still talking about with the

6    airlines now.  Right?

7           A.    Yes.

8           Q.    What training did you get?

9           A.    How it was used, what it detected.

10          Q.    Were you trained on how to use it?

11          A.    Yes.

12          Q.    And in the big scheme of things, when

13   we're talking about an alarm going off when

14   people go through a checkpoint or wanding people,

15   were there certain things that, at least based on

16   your training, you should be more aware of as a

17   potential danger to the traveling public?

18          A.    Yes.

19          Q.    What kinds of things?

20          A.    When the alarm went off and what we had

21   to do.

22          Q.    "The alarm," being?

23          A.    The walk-through metal detector or the

24   electronic tracing device.

25          Q.    Did you notice from time to time that

38

1    you were there that some people just got plain

2    angry at the people who were working at the

3    checkpoint?

4         A.    Yes.

5         Q.    And they were rude from time to time?

6         A.    Yes.

7         Q.    And sometimes just irate?

8         A.    Yes.

9         Q.    Was there some procedure at the

10   airlines then if there was an out-of-control

11   passenger, what the protocol would be to try to

12   calm them down?

13        A.    It would be to call the manager of the

14   specific airline.

15        Q.    Do you remember who the manager was

16   back then for Aloha?

17        A.    There were four or five different

18   ones.

19        Q.    If it was it necessary to have to call

20   the police or someone that was there, security?

21        A.    Yes.

22        Q.    You called it -- is it "ETD"?

23        A.    Yes.

24        Q.    That is a device that could potentially

25   alert you and others at security of what

39

1    potential dangers?

2         A.    Explosives.

3         Q.    And, basically, what is it telling you,

4    based on your training?

5              When you just say "explosives," I mean,

6    what could be a scenario based on your training

7    where that device might alert or tell you

8    something may be wrong?  What are you looking

9    for?

10        A.    The machine looks for it.  You just

11   respond to the alarm.

12        Q.    But based on your training, if the

13   machine responds, what is it responding to, to

14   your knowledge?

15        A.    Gunpowder, dynamite, any kind of

16   explosives.

17        Q.    Does it mean, based on your training,

18   that someone may have touched explosives?

19             In other words, if I go through with a

20   suitcase or a briefcase and the handle responds,

21   does it mean that there may be an explosive in

22   the briefcase as opposed to maybe the person

23   who's carrying the briefcase had recently touched

24   an explosive?  It could be either one of those,

25   right?

40

 1          A.    Both, yes.

 2          Q.    That sounds to me in the big picture as

 3     a potentially serious thing.  Yes?

 4          A.    Yes.

 5          Q.    Of course, you knew it was serious back

 6     with Aloha.  Right?

 7          A.    Yes.

 8          Q.    The training you got for that device

 9     was about how long?

10          A.    It was within the eight hours.

11          Q.    I mean, it either goes off or doesn't

12     go off.  Right?

13          A.    Yes.

14          Q.    If it goes off, then what happens?

15          A.    You have to call the manager of the

16     airline.

17          Q.    How difficult is it, at least to your

18     way of thinking, to learn the procedure for using

19     that device?

20          A.    It's not difficult.

21          Q.    Pretty simple, right?

22          A.    Yes, sir.

23          Q.    Someone paying attention, with a brain,

24     if they get the same kind of training you got,

25     they should understand how to work the machine.

41

1    Right?

2         A.    Yes.

3         Q.    Were you aware of any rule or

4    regulation that if a security person was unable

5    to operate or learn that device, it could be

6    grounds for suspension or a write-up or things

7    like that?

8              MR. HELPER:  Objection.

9              Vague as to time.

10             MR. GREEN:  When she was working for

11   the airlines.

12             MR. HELPER:  Okay.

13             THE WITNESS:  Yes.

14        Q.    BY MR. GREEN:  What did you learn?

15        A.    They needed to understand how to use

16   the machine.  And it was always the supervisor in

17   the checkpoint for Wackenhut that handled the

18   resolution of the alarm.

19        Q.    Did you ever meet anybody at that time

20   in your career that just didn't seem to be able

21   to know how to use the machine?

22        A.    No.

23        Q.    During the time that you said --  I may

24   be thinking of something you said before --  but

25   you heard derogatory terms back and forth at the

42

1   checkpoint regarding passengers and

2   co-employees.  Correct?

3        A.   Yes.

4             MR. HELPER:  Objection.

5             Vague as to the term "derogatory."

6             Move to strike.

7             MR. GREEN:  Okay.

8        Q.   BY MR. GREEN:  You understand what I

9   meant by "derogatory"?

10       A.   Yes.

11       Q.   When he says "vague," Ms. Igarashi, it

12  really doesn't matter if he understands the

13  question, if it's vague to him.

14            He wants to protect you to make sure

15  it's not vague to you.

16            So "derogatory" in the sense of the

17  question was -- "derogatory," to me, is calling

18  people what I've suggested before, fucking haole,

19  fucking Jap, fucking something else.

20            You understood that when you answered

21  the question?

22       A.   Yes.

23       Q.   So it happened from time to time,

24  right?

25       A.   Yes.

43

1        Q.    So when do you start with Wackenhut?

2        A.    The early eighties.

3        Q.    Is that something --

4        A.    No.  I'm sorry.  I take that back.

5   2000, late nineties.

6        Q.    And the reason you started with them as

7   opposed to the airlines was?

8        A.    I was offered a manager's position.

9        Q.    Bigger money, right?

10       A.    Yes.

11       Q.    Who offered you the job?

12       A.    Mark Warner.

13       Q.    That's right, the guy from the

14   Mainland.  Right?

15       A.    Yes.

16       Q.    And that was suggested to you by

17   Carvalho, right?

18       A.    Yes.

19       Q.    Were you and he friends back in the

20   days when you were working security at the

21   airlines?

22       A.    We worked together.

23       Q.    How often would you see him?

24       A.    Once a month.

25       Q.    But would you ever take breaks

44

1    together?

2        A.    No.

3        Q.    Ever been to his house?

4        A.    No.

5        Q.    Has he ever been to your house?

6        A.    No.

7        Q.    Never went out socially with him?

8        A.    No.

9        Q.    Were you married at the time?

10       A.    Yes.

11       Q.    So he says this may be -- words to the

12    effect -- "This may be a good opportunity for

13    you.  Wackenhut is looking for somebody.  Give it

14    a try."  Right?

15       A.    Yes.

16       Q.    And the pay scale for Wackenhut was

17    about?

18       A.    Eighteen dollars an hour.

19       Q.    Almost triple what you were making,

20    right?

21       A.    Yes.

22       Q.    So where do you apply?

23       A.    At the Wackenhut office in Kahului.

24       Q.    And you get the job based on your

25    application?

45

1          A.    Yes.

2          Q.    Did you put down your experience as

3     security at Aloha Airlines as part of your

4     application?

5          A.    Yes.

6          Q.    To your knowledge, were any

7     write-ups -- what I mean by "write-ups," either

8     positive or negative -- that you were aware of

9     while you were working security at the time you

10    applied for Wackenhut?

11         A.    No.

12         Q.    So you start with Wackenhut.

13               Was your first place you worked at

14    Honolulu Airport?

15         A.    No.

16         Q.    Maui?

17         A.    Maui Airport.

18         Q.    The security work you did was at Maui

19    Airport, also?

20         A.    Yes.

21         Q.    Is that the only airport you ever

22    worked for doing security?

23         A.    Yes.

24         Q.    Who was running the airport for

25    Wackenhut on Maui at the time?

46

1          A.    Buzzy Chang.

2          Q.    Who was your immediate supervisor?

3          A.    I can't remember his name.

4          Q.    Did you have more than one?

5          A.    No.

6          Q.    What was your title when you began

7     working?

8          A.    Checkpoint manager.

9          Q.    What were the duties and

10    responsibilities of a checkpoint manager?

11         A.    Scheduling, monitoring of the

12    checkpoint employees that they were following the

13    FAA directives.

14         Q.    Tell me what that means.

15               First of all, when you say "employees,"

16    what would be the jobs of those employees that

17    you were monitoring?

18         A.    Screeners.

19         Q.    And a screener means what?

20         A.    Someone who screens checkpoint

21    passengers and their carry-on bags.

22         Q.    How do they do that?

23         A.    Through the walk-through metal

24    detector, the hand wand and the ETD.

25         Q.    Basically, three functions?

47

1          A.    Yes, sir.

2          Q.    I assume if you can't perform any of

3     those functions, you shouldn't be doing the job.

4     Right?

5          A.    Yes, sir.

6          Q.    And, to your knowledge, at Wackenhut,

7     did those people who were screeners sometimes

8     alternate positions they would take at the

9     screening section?

10               In other words, some people would wand,

11    some people would do the ETD and some people

12    would do something else?

13         A.    Yes.

14         Q.    And they would kind of rotate, right?

15         A.    Yes.

16         Q.    When you went to work for Wackenhut,

17    was there another handbook that you received that

18    was different than the airlines?

19         A.    Yes.

20         Q.    And did that handbook deal with

21    progressive discipline, if you remember?

22               In other words, if you do something

23    bad, depending on how bad it is, there could be

24    progressive discipline?

25         A.    No.

48

```
 1          Q.    If you know, did Wackenhut have
 2   counseling for employees that maybe had not
 3   followed a proper procedure or rule?
 4          A.    I'm not sure.
 5          Q.    Have you ever been counseled when you
 6   were with Wackenhut?
 7          A.    Yes.
 8          Q.    What were you counseled for?
 9          A.    The scheduling.
10          Q.    How were you counseled?  What was the
11   beef?
12          A.    That I was scheduling too many
13   screeners on at one time.
14          Q.    What did that mean to you when they
15   said, "You know what" --
16          A.    I was looking at passenger load and
17   times of the nights and doing my schedule that
18   way.
19          Q.    And they told you that's not right?
20          A.    Yes.  They wanted me to just divvy it
21   up.
22          Q.    How?
23          A.    Three shifts.
24          Q.    That's it?
25          A.    Yes.
```

49

1      Q.   How was it that you first learned that

2   they weren't satisfied with the procedure you

3   were following?  How did you first learn about

4   that?

5      A.   When we turned in our payroll.

6      Q.   Who talked to you?

7      A.   Buzzy Chang.

8      Q.   And was this like a one-on-one thing?

9      A.   It was a phone call.

10      Q.   And that you deemed that to be

11   counseling, yes?

12      A.   Yeah.

13      Q.   Okay.  At Wackenhut, aside from

14   counseling, were there things that maybe were

15   called write-ups if an employee did something

16   wrong?

17      A.   Yes.

18      Q.   What kinds of things would you be

19   written up for, just based on things you observed

20   and your years there?

21          MR. HELPER:  "You," meaning a generic

22   employee or --

23          MR. GREEN:  Her.

24          MR. HELPER:  What kinds of things she

25   was written up for?

POWERS & ASSOCIATES  (808) 536-2001

50

```
 1              MR. GREEN:  No.  What kinds of things
 2    was she aware of that --
 3              THE WITNESS:  Not showing up for work.
 4         Q.   BY MR. GREEN:  Was that like a bad
 5    thing?
 6         A.   Yes.
 7         Q.   Let's say that you were my supervisor
 8    and you scheduled me to work at three o'clock on
 9    a Saturday and I'm playing golf, I just don't
10    show up.  What happens, based on your experience
11    at Wackenhut?
12         A.   You were talked to.
13         Q.   By who?
14         A.   Myself.
15         Q.   Were there things at Wackenhut that
16    were zero-tolerance things, as far as you know?
17              And that means to me if you do it,
18    you're out.
19         A.   Theft.
20         Q.   That's not a good thing, right?
21         A.   No.
22         Q.   You steal and get caught, even if you
23    want to pay the money back, you're out?
24         A.   Yes.
25         Q.   What about things like falling asleep
```

POWERS & ASSOCIATES   (808) 536-2001

51

1    on the job?

2        A.    I didn't incur any of that.

3        Q.    No, no.  You look like you're wide

4    awake to me.

5            But I'm just saying, were you ever

6    aware of an employee that fell asleep when they

7    were supposed to be at a checkpoint or check

8    area?

9        A.    No.

10       Q.    Did you have some understanding, based

11   on your training or experience there, you fall

12   asleep, you're getting fired as opposed to a

13   write-up or something like that?

14       A.    I'm sure you'd be written up.

15       Q.    The write-up procedure at Wackenhut, if

16   you were written up, how would you know you were

17   written up?

18           In other words, was there a procedure

19   where somebody would give you a copy of the

20   write-up or say, "You know what, Patti, you've

21   been written up for various things"?

22       A.    You would be given a copy.

23       Q.    That was your understanding as to the

24   procedure at Wackenhut?

25       A.    Yes.

52

1        Q.   And the procedure, I guess, and correct

2   me if I'm wrong, at least in your mind, people

3   would get a copy so they could do better next

4   time.  Right?

5        A.   Yes.

6        Q.   If you're written up, you know what you

7   did wrong and you can try to straighten it out.

8   Right?

9        A.   Yes.

10       Q.   So we have the counseling where you

11  know you should change your behavior or

12  procedures.  Yes?

13       A.   Yes.

14       Q.   We have write-ups that you were to get

15  copies of so you could be a better employee.

16  Right?

17       A.   Yes.

18       Q.   And then sometimes were there

19  suspensions?

20       A.   Yes.

21       Q.   Were you ever suspended --

22       A.   No.

23       Q.   -- at Wackenhut?

24            How many write-ups were you aware that

25  you got, if any?

53

```
 1          A.    One.
 2          Q.    That wasn't the scheduling.
 3                What was that for?
 4          A.    That was the scheduling.
 5          Q.    So he spoke to you on the phone and he
 6     wrote you up?
 7          A.    Yes.
 8          Q.    Ever use the word "fucking haole" when
 9     you were working at Wackenhut?
10          A.    Yes.
11          Q.    For passengers sometimes?
12          A.    Yes.
13          Q.    Co-employees sometimes?
14          A.    Yes.
15          Q.    When you use --  how long did you work
16     at Wackenhut?
17          A.    A year.
18          Q.    So you maybe used it a couple dozen
19     times, more or less?
20          A.    I don't know.
21          Q.    But it was more than once, yes?
22          A.    Could be.
23          Q.    And the area where it could be, would
24     that have been in the checkpoint area where you
25     were telling me about?
```

54

```
 1          A.    No.

 2          Q.    Where would that have been?

 3          A.    While I was at Wackenhut?

 4          Q.    Yeah, when you said "fucking haole."

 5          A.    Outside on my break.

 6          Q.    Who would you say it to?

 7          A.    Probably a tourist that was getting

 8   upset.  I didn't say it to him.

 9          Q.    You would say it about him?

10          A.    Yes.

11          Q.    Did anybody ever write you up, to your

12   knowledge?

13          A.    No.

14          Q.    Did any supervisor ever discourage you

15   from using that language?

16          A.    No.

17          Q.    No co-employee told you, "You know

18   what, Patti, you shouldn't talk like that"?

19          A.    No.

20               MR. GREEN:  Off the record.

21               (Discussion off the record.)

22                    (Recess taken.)

23               MR. GREEN:  Regarding Ms. Igarashi, in

24   answers to interrogatories --

25               MR. HELPER:  Are we on the record?
```

55

```
 1              MR. GREEN:  Yes, we're on the record.
 2              This is Defendant Michael Chertoff's
 3      response to plaintiffs' first request for answers
 4      and for production of documents and/or things.
 5              Number 8, the question is [Reading]:
 6              "Copies of all complaints made or
 7              reported against Patti Igarashi during
 8              her employment with TSA and
 9              documentation of any and all action
10              taken in response to said complaints,
11              including, but not limited to,
12              disciplinary action against
13              Ms. Igarashi."
14              The answer is [Reading]:
15              "Documents responsive to this request
16              will be produced shortly."
17              We have not gotten those.
18              And I want to know whether you have
19      checked and they do not exist or they're still
20      outstanding.
21              MR. HELPER:  I'm sure they exist.  I'm
22      sure we have a file someplace that can be
23      provided.
24              MR. GREEN:  This deposition will not
25      end until we get that information.
```

56

1          MR. HELPER:  Well, certainly --

2          MR. GREEN:  If it has to be continued,

3     it will be continued.

4          MR. HELPER:  This is the first I heard

5     that that was a condition precedent to the

6     deposition going forward.

7          And I object to this deposition being

8     called back.

9          MR. GREEN:  You can say that.  But I

10    have no intention of completing this deposition.

11          [Cell phone rings.]

12          I'm not taking any calls.  Turn it

13    off.

14          MR. HELPER:  Counsel, I would ask that

15    you complete all other areas of the deposition so

16    that area is segregated in case you don't get

17    what you want.

18      Q.   BY MR. GREEN:  Ms. Igarashi, did you

19    receive a handbook from Wackenhut when you went

20    to work there?

21      A.   Yes.

22      Q.   And did that handbook, if you know,

23    define certain rule infractions and corresponding

24    discipline for those infractions?

25      A.   No.

57

1        Q.   Did you get a handbook from TSA when

2  you went to work for them?

3        A.   No.

4        Q.   They have no handbook or you didn't get

5  one?

6        A.   I don't recall one.

7        MR. GREEN:  Let me just say, if there

8  is a handbook, I would also need to have a copy

9  of that before I complete this deposition.

10       MR. HELPER:  I think we produced

11  employee training materials, but I don't know

12  whether it included a handbook.

13       MR. GREEN:  Could you read my last

14  question, please.

15       (Record read by the reporter.)

16        Q.   BY MR. GREEN:  Were you ever told by

17  anyone at Wackenhut that matters that dealt with

18  discriminatory remarks such as "fucking haole" or

19  derogatory comments about other races should not

20  be reduced to writing, but should be kept

21  in-house?

22        A.   No.

23        Q.   Does the word "in-house" have any

24  meaning to you, the word I used?

25        A.   In the office?

POWERS & ASSOCIATES   (808) 536-2001

58

1          Q.   Yeah.  And do you know whether there

2     was a procedure if racially derogatory remarks

3     were made and write-ups followed, that it would

4     be reported to Washington or someone out of the

5     state of Hawaii?

6               MR. HELPER:  At Wackenhut?

7          Q.   BY MR. GREEN:  At Wackenhut.

8          A.   No.

9          Q.   If there was something written up

10    regarding derogatory racial remarks, was it

11    reported to Buzzy Chang or someone above him who

12    owned or operated Wackenhut?

13         A.   No.

14         Q.   Who are some of the other people that

15    you worked with on your shifts for Wackenhut,

16    some of the other co-employees that you worked

17    with.

18         A.   [No audible response.]

19         Q.   Do you just remember some of the

20    names?

21         A.   Evelyn Silva; Jarrad Kohanohano; Mailyn

22    Potter; Kathy Kuloya; Denise Vogel.

23         Q.   Do you know Pat Collins?

24         A.   Yes.

25         Q.   Did he work with you at Wackenhut?

59

1       A.   Yes.

2       Q.   Did you ever hear him use the word

3    "fucking haole"?

4       A.   Yes.

5       Q.   He used it a lot, didn't he?

6       A.   Yes.

7       Q.   Referring to co-workers from time to

8    time?

9       A.   No.

10      Q.   Referring to passengers from time to

11   time?

12      A.   Yes.

13      Q.   He said it -- where was he actually at

14   the times you heard him say it?

15      A.   I don't recall.

16      Q.   Would it have been while he was

17   working, like at a checkpoint?

18      A.   No.  Probably outside on a break.

19      Q.   Were you ever aware of him being

20   disciplined for that?

21      A.   No.

22      Q.   This is Wackenhut, you understand.  I'm

23   talking about Wackenhut.

24      A.   Wackenhut, no, never.

25      Q.   You didn't work with him at Wackenhut?

60

1          A.    No.   I did work with him at Wackenhut.

2     I didn't discipline him.

3          Q.    But he did use the word "fucking

4     haole"?

5          A.    Yes.

6          Q.    He mentioned in his deposition that

7     there were times in his life he used the word

8     "nigger."

9                Have you ever heard him use that word

10    when he was at Wackenhut?

11         A.    No.

12         Q.    He said he's used the word in the past

13    referring to Japanese sometimes as "fucking Japs"

14    or "Japs."

15               Did you ever hear him use that word?

16         A.    Yes.

17         Q.    And that would be at Wackenhut, right?

18         A.    Yes.

19         Q.    What were the circumstances that you

20    heard him use that term?

21         A.    Just out of conversation.

22         Q.    Referring to passengers, if you know?

23         A.    I don't recall.   It was usually just

24    conversation.

25         Q.    But he used the word "Jap"?

61

```
 1          A.    Yes.
 2          Q.    What about the word "chink"?
 3                He said he used --
 4          A.    Never heard that.
 5          Q.    And the years that he was working with
 6    you at Wackenhut would have been what years?
 7          A.    That one year that I was there.   I
 8    don't know the exact date.
 9          Q.    2000?
10          A.    I think we're in the 2000's.
11          Q.    He said he's used the word "gook" in
12    his lifetime.
13                Did you ever hear --
14          A.    No.
15          Q.    Do you know what a kike is?
16          A.    No.
17          Q.    "Kike" is a derogatory word for a
18    Jewish person, like "nigger" would be for an
19    Afro-American.
20                Ever hear him use that term?
21          A.    No.
22          Q.    So you then transfer or apply for TSA.
23    Is that right?
24          A.    Yes.
25          Q.    When you were -- before I go on to
```

62

1    TSA, do you know Kristi Joslin?

2         A.    Yes.

3         Q.    Did she work for Wackenhut?

4         A.    Yes.

5         Q.    During the time you were there?

6         A.    Yes.

7         Q.    Did you ever write her up?

8         A.    Yes.

9         Q.    What kinds of things?

10        A.    Not showing up for work.

11        Q.    She didn't show up lots of times, did

12   she?

13        A.    Yeah.

14        Q.    That was considered, I guess, to be

15   something that would not be tolerated.

16        A.    Yes.

17        Q.    Do you know if she was disciplined at

18   Wackenhut for not showing up to work?

19        A.    Yes, she was.

20        Q.    She worked with you always at TSA,

21   right?

22        A.    Yes.

23        Q.    Didn't show up lots of times there,

24   also, did she?

25        A.    Yes.

63

```
 1          Q.   Do you know Bonnie Tanner?

 2          A.   Yes.

 3          Q.   She worked with you at Wackenhut?

 4          A.   No.

 5          Q.   Just TSA?

 6          A.   Yes.

 7          Q.   Before I forget the question, Bonnie

 8     Tanner, her ethnicity, as far as you know, is

 9     what?

10          A.   Japanese.

11          Q.   Do you know whether she was born or

12     raised on --

13          A.   I don't know.

14          Q.   Kristi Joslin, what's her ethnic

15     background?

16          A.   She's local.

17          Q.   Local girl.

18               So now you apply for TSA.

19               And your best memory of when you began

20     was when?

21          A.   Early 2000.

22          Q.   "Early" means what?

23          A.   '99 -- 2000 --  I take that back.  Late

24     nineties.

25          Q.   Until how long?
```

64

1    A.    For a year.   Maybe '98 to '99.

2    Q.    You only worked for TSA for one year?

3    A.    I'm sorry.   Not TSA.   Wackenhut.

4    Q.    Let's go to TSA.   How long did you work

5    there?

6    A.    Eighteen months.

7    Q.    And the reason you went over to TSA

8    what was what?

9    A.    Because the checkpoint was being turned

10   over from private contractor to TSA.

11   Q.    Was the pay scale about the same?

12   A.    No.

13   Q.    Was it more or less?

14   A.    Way more.

15   Q.    How much is "way more"?

16   A.    I don't know.   Forty-five thousand

17   dollars a year.

18   Q.    As opposed to?

19   A.    Eighteen dollars an hour.

20   Q.    But at least in your mind, it was

21   substantially more?

22   A.    Yes.

23   Q.    And the reason you applied was in part

24   salary.   And any other reason?

25   A.    To get into the federal government

65

```
 1    system.
 2         Q.    Why did you want to do that?
 3         A.    For my retirement.
 4         Q.    And when you applied, can you think of
 5    the names of any other people that were already
 6    at TSA that you had worked with at Wackenhut that
 7    were already there at TSA when you actually went
 8    over to TSA?
 9         A.    None, no.
10         Q.    Were there people that came over with
11    you?
12         A.    No.
13         Q.    Pat Collins, did he come to TSA before
14    or after you?
15         A.    After.
16         Q.    How much after?
17         A.    About four months.
18         Q.    And he worked with you about what,
19    fourteen months?
20         A.    Yes.
21         Q.    And his conduct regarding "fucking
22    haole" and saying things like that or "fucking
23    Japs" was the same as it was at Wackenhut, wasn't
24    it?  He said the same things?
25         A.    Yes.
```

66

1      Q.   When you went to work for TSA, did you

2   have some kind of training before you actually

3   began?

4      A.   No.

5      Q.   Was there like a general briefing for

6   all new employees where you'd be in a room and

7   supervisors would basically tell you about your

8   job?

9      A.   For me or the employees as screeners?

10     Q.   The screeners.

11     A.   No.

12     Q.   You never met with a group of people

13  with new employees where they discussed job

14  description or conduct that was acceptable or not

15  acceptable?

16     A.   For just me?

17     Q.   You could have been part of the group

18  they were talking to.

19     A.   Yes, there was.

20     Q.   Where was that?

21     A.   Up in the meeting room of Hawaiian

22  Airlines.

23     Q.   Who conducted that meeting?

24     A.   Fil.

25     Q.   Fil who?

67

```
 1          A.   Carvalho.

 2          Q.   The same Fil Carvalho who suggested you

 3     apply for work at Wackenhut?

 4          A.   Yes, sir.

 5          Q.   And what did you understand his job

 6     title to be when you were at TSA?

 7          A.   He was working with FAA.

 8          Q.   And what basically did he go over as?

 9          A.   I'm sorry.  When he was at TSA?

10          Q.   Yes.

11          A.   He was --  I don't know his exact

12     title.  I'm sorry.

13          Q.   That's okay.

14               Did you believe him to be a superior to

15     you?

16          A.   Yes.

17          Q.   Who were your immediate superiors when

18     you worked there?

19          A.   Bobby Au.

20          Q.   Bobby Au came from the federal

21     government?

22          A.   No.  Bobby Au was with the Honolulu

23     Police Department.

24          Q.   What was his job title as you knew it

25     to be?
```

68

```
 1            A.    He was assistant federal security
 2       director, screening.
 3            Q.    What did that actually mean?
 4            A.    He was my boss.
 5            Q.    I'm sorry.  Your actual job
 6       description, your title was what?
 7            A.    Screening manager.
 8            Q.    What is the function of a screening
 9       manager?
10            A.    To monitor the checkpoint.
11            Q.    Which would mean --
12            A.    And the screening functions.
13            Q.    Which would mean you would monitor
14       certain employees, yes?
15            A.    Yes.
16            Q.    And the people that were subordinate to
17       you during your time there would be who, the
18       people you would be watching and monitoring?
19            A.    The supervisors, leads and screeners.
20            Q.    The supervisors were who?
21            A.    Rusty Harlan, Angela Williams, Dave
22       Gordon, Debbie Daily.  And that's all I remember.
23            Q.    And below the supervisors that you
24       managed, who would some of those people be?
25            A.    Those were the leads.
```

69

```
 1          Q.    Hold it.   What does "lead" mean?
 2          A.    They -- there are supervisors who
 3   monitor the checkpoint and the leads.   There are
 4   leads that monitor groups of the screeners.
 5          Q.    Monitor in what way?
 6          A.    Making sure everybody gets breaks, fed
 7   and is doing the screening functions as noted.
 8          Q.    Were you trained by Mr. Carvalho or
 9   anyone else as to what conduct that you observed
10   among the co-employees, either people above you,
11   equal to you or below you, that should be
12   reported?
13          A.    No.
14          Q.    In other words, written up.   Never told
15   things that should be written up or not written
16   up?
17          A.    By Fil.
18          Q.    Yes.
19          A.    Yes.
20          Q.    What kinds of things did he tell you?
21   We're talking about things that should be written
22   up that you observed.
23          A.    That I needed to watch the wanding
24   process and the amount of people that were being
25   wanded at the same time.
```

1      Q.   And your understanding as to why you

2   were supposed to do that?

3      A.   So that they could be retrained and it

4   made known to them what they were doing wrong.

5      Q.   So that if you saw something that was

6   being done wrong, what were you trained to do

7   when you made those observations?

8      A.   Talk to the supervisor and have them

9   make the correction and necessary retraining.

10      Q.   And the kinds of things that they might

11   be doing wrong would be what?

12      A.   Improper wanding.

13      Q.   Yes.

14      A.   Cross-gender wanding.

15      Q.   What does that mean?

16      A.   We had to be wanded gender to gender.

17   But in the very beginning, we didn't have enough

18   females to male ratios, so sometimes a female had

19   to wand a man and sometimes a man had to wand a

20   woman.

21      Q.   Anything else?  Any infractions that

22   should be reported so people can actually get

23   some guidance or training so they do it properly

24   the next time?  Anything else you can think of?

25      A.   That's all.

71

1      Q.   What about this ETD thing, did you see

2    anything at the airport that you can recall with

3    TSA where people responsible to perform that

4    function just weren't able to do it?

5      A.   No.

6      Q.   People falling asleep at the job at

7    TSA, did you ever see that happen?

8      A.   No.

9      Q.   You're sure, now?

10      A.   I don't remember anyone falling

11    asleep.

12      Q.   Never remember writing anybody up for

13    that?

14      A.   Don't recall.

15      Q.   Do you ever remember writing up anyone

16    when you worked as a --  whatever your job title

17    was at TSA?

18      A.   Yes.

19      Q.   Who did you write up?

20      A.   We wrote up a lot of people.

21      Q.   Give me some names.

22      A.   I can't give you names.  I don't recall

23    exactly.

24      Q.   Male and female?

25      A.   Yes.

72

1              Q.    How many were Mainland white people as

2         opposed to local people?  Can you give me an idea

3         what the percentage would be?

4              A.    I can't give you a percentage on that.

5              Q.    Were there certain infractions or

6         violations or procedures you were trained about

7         that would be more --  the violations of those

8         would be more important than others?

9                    Does that make any sense to you, that

10        question?

11             A.    No, it doesn't.

12             Q.    In other words, if you saw an employee

13        at TSA asleep on the job as opposed to someone

14        who left their work area unclean, were you

15        trained that certain things you had to be more

16        diligent about reporting or counseling on as

17        opposed to others?

18             A.    Yes.  Sleeping would be worse than

19        cleaning.

20             Q.    Right.  And not being able to work the

21        ETD properly would probably be worse than

22        cleaning up your area.  Right?

23             A.    Yes.

24             Q.    Did you see people lose their temper at

25        passengers from time to time?

73

1          A.    Yes.

2          Q.    Do you remember the names of any of

3     those people --

4          A.    No.

5          Q.    -- just offhand?

6                Did you ever hear any TSA employees

7     swear at a passenger, curse at them?

8          A.    Yes.

9          Q.    Are you aware --  that happened more

10    than one time, I assume.  Right?

11         A.    I'm sure.

12         Q.    Maybe happened periodically each week

13    or --

14               MR. HELPER:  You're talking about her

15    personal knowledge that saw?

16               MR. GREEN:  Yeah.

17               THE WITNESS:  No.

18         Q.    BY MR. GREEN:  Had you heard about it?

19         A.    Yes.

20         Q.    Are you aware of anyone that was fired

21    for snapping or cursing at a passenger?

22         A.    No.

23         Q.    Are you aware of anyone that was ever

24    written up, suspended or fired for using the word

25    "fucking haole" or other derogatory racial

POWERS & ASSOCIATES    (808) 536-2001

74

1     remark?

2          A.    No.

3          Q.    How many times when you were at the

4     airport did the airport have to be closed down,

5     if ever, because of a breach of security?

6          A.    Two or three times.

7          Q.    And do you remember the circumstances

8     as to why that happened?

9          A.    The ETD went off and we didn't resolve

10    it soon enough.

11         Q.    Tell me what that means.

12         A.    The alarm went off, but the bag was

13    already gone.  The screener didn't catch it.

14         Q.    How does that happen?

15               For some reason, the screener is

16    unaware that the alarm went off, and the

17    passenger just goes on their way?

18         A.    Their bag is handed back before the

19    alarm resolves itself.

20         Q.    And the passenger is in the airport?

21         A.    Yes.

22         Q.    Which, obviously, there are inferences

23    of all kinds of bad things that could happen?

24         A.    Yes.

25         Q.    Are you aware of any particular

POWERS & ASSOCIATES   (808) 536-2001

1    employee where that occurred?

2         A.   No.

3         Q.   Do you know of any employee that was

4    fired for that reason?

5         A.   No.

6         Q.   Do you know what happened?

7         A.   To who?

8         Q.   That the ETD alarm went off and the

9    passenger got into the airport.  Yes?

10        A.   Yes.

11        Q.   Were you ever there working in that

12   area when it happened and it was missed by

13   somebody?

14        A.   Yes.

15        Q.   To your knowledge, whoever missed it,

16   that person could be identified as the person who

17   is responsible, yes?

18        A.   Yes.

19        Q.   And that person, to your knowledge, was

20   not terminated for making that mistake on one

21   occasion?

22        A.   No.

23        Q.   Were you ever, to your knowledge, given

24   a copy of a complaint or write-up made against

25   you with the TSA?

76

1        A.    No.

2        Q.    Was your personnel file ever shown to

3   you at any time before you were terminated or you

4   quit?

5        A.    No.

6        Q.    Ever spoken to or counseled while you

7   were with TSA for any reason?

8        A.    Yes.

9        Q.    Who counseled you?

10       A.    Howard Tagamori, Fil Carvalho, Robert

11  Au.

12       Q.    Were there any complaints that you were

13  aware of that were made about you or against

14  you?

15       A.    Yes.

16       Q.    Any complaints that deal with you being

17  a racist?

18       A.    Yes.

19       Q.    Who made those complaints.

20       A.    Joanne and Everette Reinhardt, Susan --

21       Q.    The Reinhardts are husband and wife?

22       A.    Yes.

23       Q.    They're Mainland Caucasians, aren't

24  .  they?

25       A.    I don't know.

77

1         Q.    They certainly were Caucasian, right?

2         A.    Yes.

3         Q.    And you tell me, I guess, that in your

4  discussions about the Reinhardts, if you had

5  them, with co-employees, there was no discussion

6  about them being from the Mainland?

7         A.    No, never.

8         Q.    Never talked to them as to where they

9  grew up or went to school?

10        A.    No, sir.

11        Q.    They complained about you, to your

12  knowledge, in what regard?

13        A.    They made a phone call.

14        Q.    To who?

15        A.    Someone in Washington.

16        Q.    And said what about you, to your

17  knowledge?

18        A.    That I didn't like haoles.

19        Q.    Did they also say you referred to them

20  from time to time as "fucking haoles"?

21        A.    Not to my knowledge.

22        Q.    Anyone else that you're aware of that

23  made a complaint about you being a racist besides

24  the Reinhardts?

25        A.    Susan Bowles, maybe.

78

1          Q.    Sews Bowles is a Caucasian?

2          A.    Yes.

3          Q.    If you know, was she raised or educated

4     on the Mainland as opposed to --

5          A.    I don't know.

6          Q.    How did you learn about this

7     complaint?

8          A.    Via Lowrey Leong.

9          Q.    Let's start --  let me go back to the

10    Reinhardts.

11               If you worked at TSA for eighteen

12    months, how long had the Reinhardts, to your

13    knowledge, been working at TSA before they called

14    Washington?

15         A.    A week.

16         Q.    Do you have any reason to believe they

17    didn't like you before they called Washington?

18         A.    Yes.

19         Q.    What was the reason you think they

20    didn't like you?

21               MR. HELPER:  Objection.

22               Calls for speculation.

23               MR. GREEN:  If she has an opinion, she

24    can give it.

25         Q.    BY MR. GREEN:  Go ahead.

1            MR. HELPER:  Go ahead.

2            THE WITNESS:  They didn't seem as --

3       when I tried to talk to them, they were very

4       aloof and --

5            Q.   BY MR. GREEN:  Just like you said --

6       go ahead.

7            A.   They didn't care what I had to say.

8            Q.   Just like you said you've noticed at

9       the hotel you worked at and the airport, there

10      were certain Mainland Caucasians that you

11      believed looked down at local people.  Right?

12           A.   Yes.

13           Q.   And this happened to be a couple that

14      you believed looked down at you.  Right?

15           A.   Yes.

16           Q.   And that's the reason you called them

17      "fucking haoles"?

18           A.   I did not call them that.

19           Q.   Did you ever refer to either one of

20      them as "a fucking haole"?

21           A.   No.

22           Q.   Did you ever call any employee "a

23      fucking haole"?

24           A.   No.

25           Q.   You're sure about that, right?

80

1        A.   I may have said the word, but I didn't

2   pertain it to anyone in particular.

3        Q.   Just "fucking haoles" in general?

4        A.   Yes.

5        Q.   So the Reinhardts were there about a

6   week.

7        Did they work together on the same

8   shift, if you know?

9        A.   Yes.

10       Q.   So you referred to them as "fucking

11   haoles," but not necessarily to their face?

12       A.   I didn't refer to them as "fucking

13   haoles."

14       Q.   How did you learn about this call to

15   Washington?

16       A.   Lowrey Leong called me into his

17   office.

18       Q.   And said what?

19       A.   He read me everything.

20       Q.   What does that mean?

21       A.   Told me off.

22       Q.   You had been at TSA how long?

23       A.   About a month.

24       Q.   But you used the word "fucking haoles"

25   after he read you off, right?

81

1          A.    Yes.

2          Q.    And, I guess, hoped that you wouldn't

3     get caught.  Right?

4               MR. HELPER:  Objection.

5               Assumes facts not in evidence.

6          Q.    BY MR. GREEN:  Did you hope you

7     wouldn't get caught when you used the term

8     again?  Or reported is maybe a better word.

9          A.    Maybe I just say it.

10         Q.    Maybe it's just part of the way you

11    are.  Right?

12         A.    Could be.

13         Q.    Now, what did he tell you?

14              Stop for a minute.

15              When he read you off, what did he say

16    to you?

17         A.    He told me off.

18         Q.    What does that mean?

19         A.    He yelled at me.

20         Q.    I got that, but I haven't --

21         A.    He yelled and yelled about if I had

22    said that, I better stop.  If I didn't stop, I'd

23    be fired.

24         Q.    Never written up, to your knowledge,

25    about that, though, were you?

82

1        A.    Probably was.  Never saw it.

2        Q.    You don't know whether you were or you

3    were not, right?

4        A.    I don't know.

5        Q.    And there was another person you said

6    that complained about you being a racist.  Who

7    was that?

8        A.    Susan Bowles.

9        Q.    What was her job?

10              First of all, what were the Reinhardts'

11   jobs?

12       A.    Screeners.

13       Q.    How long did they last?

14       A.    They're still there.

15       Q.    Good.

16              And this other lady, what was her job

17   description?

18       A.    Screener.

19       Q.    And you have some information that she

20   complained about you being a racist?

21       A.    Same kind of call that the Reinhardts

22   made.

23       Q.    That you were what?

24       A.    That I didn't like haoles.

25       Q.    And your understanding is she made a

83

1    call to Washington?

2        A.    She called someone.

3        Q.    How did you learn that?

4        A.    Lowrey Leong.

5        Q.    How did you find out from Mr. Lowrey

6    Leong that she made this phone call?

7        A.    Got called in the office.

8        Q.    Was this before or after the

9    Reinhardts?

10       A.    After.

11       Q.    The first person who read you the riot

12   act was who?

13       A.    Lowrey.

14       Q.    I'm sorry.  The supervisor who was

15   yelling at you, "Don't ever do it again or you'll

16   be fired."

17       A.    Lowrey.

18       Q.    And then he calls you in again?

19       A.    And he tells me the same thing again.

20       Q.    But I guess he didn't keep his promise

21   to you and fire you.

22       A.    Oh, he did keep his promise.

23       Q.    Were you fired because of that?

24       A.    Yeah, I guess.

25       Q.    Well, don't guess.

84

```
1              Were you fired because they said you
2       were a racist?
3           A.   No.
4           Q.   So when he told you "If you say it
5       again, you're going to be fired" he told you it
6       was reported you said it again, and he didn't
7       fire you.  Isn't that what happened?
8                MR. HELPER:  Objection.
9                Assumes facts not in evidence, saying
10      it.
11               MR. GREEN:  You lost me.
12               MR. HELPER:  You're assuming facts not
13      in evidence about what he said to her.
14               MR. GREEN:  She's already told me what
15      he said.
16               MR. HELPER:  She did not.
17               MR. GREEN:  Read back the answer about
18      what he said.
19               (Record read by the reporter.)
20          Q.   BY MR. GREEN:  So, now, according to
21      him and this other woman, you did it again.
22      Right?
23          A.   Yes.
24          Q.   Didn't get fired, did you?
25          A.   No.
```

85

1          Q.    And aside from those two people, there

2     were other people who accused you of being a

3     racist?

4          A.    I don't know.

5          Q.    Never counseled again?

6          A.    No.

7          Q.    Never suspended for calling people, I

8     guess -- what did he say he found out that was

9     reported to Washington and then back to him?

10         The Reinhardts and this other lady,

11     what do they say that you did or said that made

12     them believe you didn't like white people?

13         A.    They just said I didn't like haoles.

14         Q.    Did he ask you if you said anything to

15     the Reinhardts?

16         A.    Yes.

17         Q.    Did he ask you if you called them "a

18     fucking haole"?

19         A.    Yes.

20         Q.    You said you did, right?

21         A.    I didn't call them "fucking haole."

22         Q.    When he asked you if you called them

23     "fucking hales," what did you say?

24         A.    I said I did not call them that.

25         You already asked me this question.

POWERS & ASSOCIATES  (808) 536-2001

86

```
 1          Q.    Well, I'm a little bit old.  I forget.
 2                When he said to you that if you do it
 3    again, you'll be fired, what did you understand
 4    he was talking about?  Do what again?
 5          A.    Claiming that I had said they were
 6    "fucking haoles."
 7          Q.    That's what I'm getting at.  The
 8    Reinhardts claim you called them "fucking
 9    haoles."  Right?
10                MR. HELPER:  Objection.
11                Calls for speculation.
12          Q.    BY MR. GREEN:  Did he say that to you?
13          A.    No.
14          Q.    I'm trying to understand, so if you
15    could help me --
16          A.    He said --
17          Q.    Let me finish the question.
18                I'm trying to understand, madam, how he
19    could tell you you'd be fired if you called the
20    Reinhardts "fucking haoles."
21                Where did he get that information from,
22    if you know?
23          A.    I don't know.
24          Q.    But he said it was reported to him from
25    Washington or from the Reinhardts to Washington
```

87

1     you called them "fucking haoles."  Right?  That's

2     what he said to you?

3          A.   Yes.

4          Q.   And you, of course, denied it.  Right?

5          A.   Yes.

6          Q.   And you had used the word "fucking

7     haoles," but just not about them or to them.

8     Right?

9          A.   Yes.

10         Q.   What's the woman's name, the second

11    person?

12         A.   Susan Bowles.

13         Q.   She apparently felt, if you know, based

14    on Lowrey talking again, you called her a

15    "fucking haole."  That's what she thought.

16    Right?

17         A.   Yes.

18         Q.   And you're denying it again.  Right?

19         A.   Yes.

20         Q.   What did he say?  "Try not to say it

21    again" or words to that effect?

22         A.   Might have.

23         Q.   And, of course, you kept saying it from

24    time to time, referring to Caucasians as "fucking

25    haoles."  Right?

88

```
 1          A.    I don't know.

 2          Q.    Maybe you did; maybe you didn't.

 3     Right?

 4          A.    Maybe.

 5          Q.    The truth is, there are certain white

 6     people you just don't like.  Right?

 7          A.    Untrue.

 8          Q.    You like them all?

 9          A.    As far as I know.

10          Q.    Okay.  So "fucking haole" is just kind

11     of a term of endearment to you, is it?

12          A.    Yeah.

13          Q.    Okay.  Good.

14                When you were -- as you were growing

15     up, I'm assuming the school you went to is a

16     local school.  Right?

17          A.    Yes.

18          Q.    When you hear the name "Michael Green,"

19     do you have an image of an ethnic background?

20          A.    Yes.

21          Q.    What is it?

22          A.    Caucasian.

23          Q.    When you hear the name "Debra Kagawa,"

24     do you have an understanding of ethnic

25     background?
```

1          A.    Yes.

2          Q.    Maybe her father could be Japanese, her

3     mother could be something else, but there's some

4     Japanese in there somewhere if that's her natural

5     parents.  Right?

6          A.    Yes.

7          Q.    How about "Tom Young," the name

8     "Young," do you have some vision as to the name

9     "Young" and what ethnicity that could be?

10         A.    Local.

11         Q.    Local Chinese, right?

12         A.    Uh-huh.

13         Q.    Right?

14         A.    Yes.

15         Q.    So we got you over at TSA for about

16    eighteen months.

17              By the way, the reason you were

18    terminated, to your knowledge, has nothing to do

19    with being a racist.  Right?

20         A.    Yes.

21         Q.    Yes, it does not?

22         A.    It does not.

23         Q.    Give me that letter from Carvalho.

24    There's a letter in there about discrimination.

25              No one, including Mr. Carvalho, ever

90

1    said to you do not put discriminatory remarks in

2    writing, but keep it in-house or words to that

3    effect?  You never heard that when you worked at

4    TSA?

5         A.    I don't remember that.

6         Q.    Now, is there an office somewhere at

7    the airport in Maui --

8              Whose office is it, Deb?  Lowrey

9    Leong's office?

10              He has an office?

11        A.    Yes.

12        Q.    You've been in that office from time to

13   time?

14        A.    Yes.

15        Q.    Why do you go down there?

16        A.    Because that's where we work out of, as

17   well.

18        Q.    How do you work out of there?  What do

19   you do there?

20        A.    We do our paperwork in the office.

21        Q.    What kind of paperwork would you be

22   doing?

23        A.    All kinds of paperwork.

24        Q.    When would you be doing that paperwork?

25        A.    All during the course of your shift.

91

```
 1              Q.   So you would leave the checkpoint area

 2      and go down there and do paperwork?

 3              A.   Yes.

 4              Q.   What kinds of things would you be

 5      writing?

 6              A.   All kinds of things.

 7              Q.   Like what?  I don't know what that is.

 8      What does that mean?

 9              A.   Doing my reports.

10              Q.   The reports would include what?

11              A.   Whatever Lowrey wanted reported.

12              Q.   And who uses the office other than

13      people like yourself who write reports?

14                   Whose office is it, actually?

15              A.   It was Lowrey's office.

16              Q.   Any would anybody else share that

17      office on a permanent basis --

18              A.   No.

19              Q.   -- during that time?

20                   When new employees would come into TSA,

21      these would be people that, I guess, would be

22      people that would screen, would you have some

23      information that some people were coming --  new

24      people were coming in?

25              A.   Yes.
```

92

1    Q.   How would you get that information?

2    A.   We would receive a list from Bobby

3    Peters.

4    Q.   Who is Bobby Peters?

5    A.   She is like an office manager.

6    Q.   And how long had she been at TSA, if

7    she had been, before you?

8    A.   She was hired right after me.

9    Q.   You were aware that Tom Young was to

10   report for work at the Maui airport?

11   A.   Yes.

12   Q.   You knew he was a local Mainland?

13   A.   No.

14   Q.   You didn't know that?

15   A.   No.

16   Q.   When did you find out?

17        MR. HELPER:   You said, "local

18   Mainland."

19        MR. GREEN:   That was a really stupid

20   question.

21   Q.   BY MR. GREEN:   Did you know he was from

22   the Mainland?

23   A.   No.

24   Q.   Where did you think he was from, if you

25   thought anything?

93

1          A.    I thought he was from here.

2          Q.    Did you know how he was processed, in

3      other words, where he made application to come to

4      the airport?

5          A.    No.

6          Q.    Did you know what he was hired to do?

7          A.    Yes.

8          Q.    What did you think he was hired to do?

9          A.    Screening manager.

10          Q.    Did you think he was Chinese?

11          A.    No.

12          Q.    Never occurred to you; that is what

13      you're saying to me?

14          A.    No.

15          Q.    No?

16          A.    No.

17          Q.    When you saw the name Tom Young, you

18      didn't think he was a local guy?

19          A.    I did.

20          Q.    Did you think he was a local Chinese?

21          A.    No.

22          Q.    Or could be local Chinese?

23          A.    No.

24          Q.    But you certainly thought he was

25      local?

94

1          A.    Yes.

2          Q.    What made you think that?

3          A.    Just by the name.

4          Q.    Do you remember when he reported to

5     work?

6          A.    I don't remember the date.

7          Q.    Well, his employment was October 20th,

8     it appears, 2002.  Does that refresh your memory?

9          A.    Okay.

10         Q.    Do you remember the first time you ever

11    saw him?

12         A.    At the doorway.

13         Q.    At the office?

14         A.    Yes.

15         Q.    Did you know when --  when you look at

16    these employees that are coming in, new

17    employees, do you get any background of these

18    employees as to prior job experience?

19         A.    No.

20         Q.    Did you ever know that Mr. Young worked

21    for the president of the United States government

22    in screening for Air Force One?

23         A.    No.

24         Q.    You didn't know that?

25         A.    No.

95

1          Q.    Didn't know that he worked at the White

2     House screening people and packages and things

3     like that?

4          A.    No.

5          Q.    You know that he lasted at the airport

6     about twenty-eight days?

7          A.    Yes.

8          Q.    I will tell you what he says, and you

9     tell me whether that's your memory or it's not

10    your memory.

11              He says when he reported to work, he

12    went into that office near the entrance and said,

13    "I'm Tom Young," and someone asked him to wait

14    outside.

15              Do you remember any words to that

16    effect?

17         A.    Yes.

18         Q.    Who told him to wait outside?

19         A.    I did.

20         Q.    And, incidentally, you and Tom Young

21    have spoken in each other's presence from time to

22    time while you worked and he worked at the

23    airport?

24         A.    Yes.

25         Q.    In other words, he perhaps would

96

1    recognize your voice when he heard it.  Right?

2              MR. HELPER:  Objection.

3              Calls for speculation.

4         Q.   BY MR. GREEN:  You've spoken in front

5    of him a number of times.  Right?

6         A.   Yes.

7         Q.   He says that you told him to wait

8    outside.  And he heard you say, "What the fuck?

9    He's a fucking haole."

10             He swore to that under oath.

11             Did you say words to that effect?

12        A.   No.

13        Q.   You wouldn't do anything like that.

14   Right?

15        A.   No.

16        Q.   Well, see, what I'm trying to

17   understand, Ms. Igarashi, is, if you have

18   admitted today under oath -- we're going to break

19   in a moment --  if you admitted today under oath

20   you've referred to people as "fucking haoles"

21   before, is there any reason you're telling me you

22   would never have said "He's a fucking haole" --

23        A.   Would I tell --

24        Q.   -- if it wasn't in his presence?

25        A.   No, I didn't say that.

97

1      Q.   But it's not something that you were

2    not inclined to say about other white people from

3    time to time.  Right?

4      A.   True.

5      Q.   I'm going to read to you what he says,

6    and then we'll take a break.

7           His deposition was on March 15th,

8    2006.  And I'm going to read to you from page

9    29.  This is under oath, Ms. Igarashi, the same

10   way you took your oath today.

11          Starting on page 30.  I'm going to read

12   the questions and answers.  Page 30, I'm going to

13   start at the top of the page.  He's saying

14   [Reading]:

15              "Well, there's two offices at

16              that particular time, there was

17              a -- maybe a room by 20 by 20 and

18              a smaller office to the side that

19              was his."

20          And he's referring to Lowrey Leong's

21   office.

22          Is that about the size of the office?

23     A.   Yes.

24     Q.   [Reading]:

25              "When I knocked on the door, there

98

1              were probably four people in the outer

2              office, there were about a half dozen

3              people in his office with him, and I

4              was asked to wait outside."

5          You were the one that asked him to wait

6      outside, yes?

7          A.   Yes.

8          Q.   And there were other people that you

9      remember being in the office at that time?

10         A.   I don't remember other people being in

11     there.

12         Q.   [Reading]:

13              "He actually didn't meet me in his

14              office, he came out and he spoke to

15              me in the hallway in the airport."

16          And he's talking about Lowrey.

17              "Q.   In the hallway or in this

18              larger of the two rooms you're talking

19              about?"

20          He says [Reading]:

21              "No.   In the hallway of the airport.

22              Q.   So you came into the larger

23              room from the hallway, right?

24              A.   From --  I knocked -- I knocked

25              on the door from the hallway of the

99

1    airport of the larger office, yes.

2    Did you ever go in that larger office

3    room?

4    A.   I stepped in a couple of feet and

5    I -- I was asked to wait outside.

6    Q.   By who?

7    I'm pretty sure it was Fil Carvalho.

8    Q.   Okay.  And I -- is this the

9    occasion when you claimed to have heard

10   someone say something about your race?

11   A.   I -- I -- I don't claim to, I --

12   I heard it.

13   Well, okay, tell me what happened.

14   I was asked to stand outside in --

15   and they were going to get Mr. Leong

16   to -- to meet with me, and I actually

17   during that particular incident, I

18   heard" --

19   I'm reading page 31.

20     -- "I heard two things.  I heard a

21   woman's voice basic -- yeah, it was

22   a woman's voice almost almost

23   immediately as I stepped back out,

24   I heard a woman's voice say what the

25   fuck, he's -- he's not -- he's a --

1              he's a fucking haole.  And I was a

2              little bit shocked and -- and within

3              just a few moments of that I heard a

4              man's voice say I thought he was a

5              local guy.  And honestly, I didn't

6              know what to think at that particular

7              moment."

8         Now, I read on page 31.  The answer was

9    from line 1 to line 11.

10        Was there another person in the office

11   that said "I thought he was a local guy,"

12   referring to Mr. Young?

13        A.   I don't remember.

14        Q.   Maybe yes, maybe no?

15        A.   I don't remember.

16        Q.   I understand you said that.

17             The question is, maybe it happened and

18   maybe it didn't; you just don't remember.

19   Right?

20        A.   Yes.

21        Q.   The question at line 12 [Reading]:

22             "Okay.  Now, when you looked into

23             the -- this larger of the two rooms

24             you said there was -- there were four

25             people in there, approximately four?

```
 1              Filbert Carvalho was in there, Patti

 2              and I -- I don't even remember how

 3              to pronounce her last name, but she

 4              was also a screening manager, was in

 5              there."

 6         Were you a screening manager at the

 7    time?

 8    A.    Yes.

 9    Q.    [Reading]:

10              "There was a secretary who was from

11              a temporary service that was the

12              secretary for that office."

13         Was there a temporary secretary in

14    there?

15    A.    There was a full-time secretary.

16    Q.    [Reading]:

17              "And there were probably in -- in --

18              in Leong's little office there was

19              probably five or six people, and I

20              believe they were probably from the

21              roll out team that was there getting

22              everything ready to -- to go from the

23              Wackenhut security to the new TSA

24              screeners."

25         Were there from time to time roll-out
```

102

1    people there?

2         A.    Yes.

3         Q.    [Reading]:

4               "You're talking about the MSF?

5               A.    Yes."

6               This is on page 32 [Reading]:

7               "Did you recognize or -- or did you

8               come to learn the identities of any

9               of the people in -- who you saw in

10              Mr. Leong's -- oh, I'm sorry, yes,

11              in Mr. Leong's office that day?

12              I -- I didn't know really anyone

13              other than Lowrey that was in that

14              office, and I -- I didn't know anyone

15              in any of the two offices, but I did

16              come to learn --

17              Right.

18               -- who Patti was and who Filbert was

19              and who our secretary was.  Most of

20              the people that were in there probably

21              left, were actually gone before I

22              physically started work."

23              The question at line 16 on page 32

24    [Reading]:

25              "Okay.  Now, the voice you heard --

POWERS & ASSOCIATES   (808) 536-2001

103

1              the-- the two voices that you heard,

2              the male voice -- or the female voice

3              saying fucking haole, did you later

4              identify who believe said that?

5              I'm -- I'm very much sure it was

6              Patti.

7              Okay.  And how about the male voice

8              saying I thought he was local or I

9              thought he was from here?

10             I'm very sure it was Filbert

11      Carvalho."

12             I've finished reading at line 23.

13             When I read you this, does that refresh

14      your memory?

15        A.    No.

16        Q.    Not at all?

17        A.    No.

18        Q.    But when he accuses you of calling him

19      "a fucking haole," that is the same words you

20      were counseled by Lowrey Leong on two prior

21      occasions, yes, calling white people "fucking

22      haoles," yes?

23        A.    Yes.

24             MR. GREEN:  Okay.  Let's take a break

25      for a few minutes.

POWERS & ASSOCIATES  (808) 536-2001

```
 1           MR. HELPER:  Let's stay on the record.
 2    I want to stay on the record and get an estimate
 3    from you as to what your plans are.
 4           MR. GREEN:  I've got at least two more
 5    hours.
 6           Listen, you can be shocked, but she's
 7    the main witness.
 8           MR. HELPER:  No.  I'm shocked because
 9    earlier you told me two hours.
10           MR. GREEN:  As they say in Chicago,
11    it's that way sometimes.  So it's going to be
12    what it is.
13           And we can take a break for a few
14    minutes.
15                     (Recess taken.)
16           MR. GREEN:  Back on the record.
17       Q.  BY MR. GREEN:  I was reading you some
18    of the sworn testimony by Tom Young regarding
19    this first occasion to meet with you at the
20    airport when he checked in for work.
21           I want to read you some more of what he
22    said under oath.  I'm going to read you from page
23    101 of Mr. Young's deposition.  This is lines 10
24    to 25.  The question [Reading]:
25                "Okay.  So what's your best
```

105

1    recollection

2                now, having spent a little time looking

3                at your -- your affidavit as to how

4                many times you heard Patti Igarashi

5                making racial comments?

6                Well, I'm going to say for sure on five

7                occasions. She -- she would -- she

8                would --  she used it more times, but

9                I don't know if I can put a number of

10               incidents.

11               Well, is there -- fucking haole, that

12               statement is a racially discriminatory

13               remark, right?

14               It is."

15               So would you agree that you've

16   certainly used the word "fucking haole" on a

17   number of occasions.  Right?

18        A.    Yes.

19        Q.    How many areas are there at the

20   checkpoint in Maui where you would work in your

21   official capacity?

22        A.    Two.

23        Q.    Have you ever yelled the word "fucking

24   haoles" across the checkpoint on a numbrer of

25   occasions, at least three?

```
 1          A.    No.

 2          Q.    Tom Young says under oath on page 103,

 3    I'll read you lines 1 to 13 [Reading]:

 4                "Q.   Okay.  But as I understand your

 5                affidavit anyway, there were occasions,

 6                many occasions on which Patti Igarashi

 7                would say fucking haoles, not just in

 8                a small group where she might be

 9                overheard by passengers but screaming

10                it over a fairly broad area.  Is that

11                your recollection?

12                I -- I did witness that on.

13                How many times did you witness that?

14                More than once.  Several times."

15                On line 10 page 103 [Reading]:

16                "Can you give me an estimate as to --

17                as you sit here today how many times

18                you heard Patti Igarashi scream fucking

19                haoles across the screening area?

20                At least three times."

21                Is that a correct statement under

22    oath?

23          A.    No.

24          Q.    You never said the word "fucking

25    haoles" across the checkpoint area?
```

107

```
 1          A.    No.

 2          Q.    Never raised your voice and said that?

 3          A.    No.

 4          Q.    So he's either mistaken or lying,

 5    right?

 6          A.    Yes.

 7                MR. HELPER:  Objection.

 8                Calls for speculation.

 9                MR. GREEN:  It's one or the other.

10          Q.    BY MR. GREEN:  Were there times

11    where -- Mr. Young was a subordinate to you, was

12    he?

13          A.    No.

14          Q.    Would he ever ask you questions while

15    you were working together?

16          A.    No.

17          Q.    Never did?

18          A.    No.

19          Q.    Can't think of a single time, can

20    you --

21          A.    No.

22          Q.    -- that he would ask you questions?

23                Did you ever say, "You fucking haoles

24    ask too many questions" to Tom Young?

25          A.    No.
```

108

```
 1          Q.    Page 104, this is what he swore to,
 2     lines 3 through 17.  The question is [Reading]:
 3                      "Okay.  Okay.  So that the complete
 4                 list of times that you heard Patti
 5                 Igarashi make racist statements or
 6                 statements that you interpret to be
 7                 racist was first the time you
 8                 overheard her say that she thought
 9                 you were local or that you were a
10                 fucking haole before you got hired,
11                 the statement after the Reinhardt
12                 couple approached you about a pay
13                 issue, a comment she made to you about
14                 previous Wackenhut employees deserving
15                 the jobs over haoles, and then
16                 statements she made about haoles or
17                 fucking haoles in the screening area
18                 either sort of broadcast by screaming
19                 or in conversations with her buddies.
20                 Is that a complete list?
21                 And then she -- she -- when I asked
22                 her a question one day, she -- she
23                 said to me you -- you f'ing haoles
24                 ask too many questions."
25                 Is that a true statement?
```

109

1          A.    No.

2          Q.    Never happened, right?

3          A.    No.

4          Q.    Do you know of any reason that

5    Mr. Young didn't like you?

6          A.    No.

7          Q.    When you met Mr. Young, did you realize

8    at any time before he was fired that he did not

9    grow up i n the islands?

10         A.    No.

11         Q.    You never thought that maybe he was a

12   Mainland person, right?

13         A.    No.

14         Q.    You remember you told me about the

15   Reinhardts calling Washington --

16         A.    Yes.

17         Q.    -- and you were counseled that

18   apparently you shouldn't use the word "fucking

19   haoles"?

20         A.    Yes.

21         Q.    Mr. Young says --  did the Reinhardts

22   ever ask you about their pay?

23         A.    No.

24         Q.    You feeling okay?

25         A.    Yes.

110

```
 1          Q.   Because you don't seem to remember very
 2    much after the break.
 3          A.   I'm answering your questions.
 4          Q.   I know.  You don't remember anything.
 5    Every answer you've given me since the break is
 6    "I don't know."
 7               MR. HELPER:  Objection.
 8               Mischaracterizes her statements.
 9          Q.   BY MR. GREEN:  The Reinhardts, didn't
10    they ever ask you about their pay that you can
11    recall?
12          A.   No.
13          Q.   Did you say to Tom, "What do those
14    fucking haoles want now?"
15          A.   No.
16          Q.   Do you know Charles Turner?
17          A.   Yes.
18          Q.   Who is Charles Turner?
19          A.   One of the screeners.
20          Q.   Ethnic background, if you know?
21          A.   Caucasian.
22          Q.   A haole, yeah?
23          A.   If you want to use the word.
24          Q.   You're the one who uses the word.  I
25    just want to --
```

```
1          A.   Don't you?

2          Q.   You don't get a chance to ask me

3     questions.

4               Was he someone who you would refer to

5     as a haole?

6          A.   Yes.

7          Q.   Any reason he doesn't like you?

8          A.   No.

9          Q.   Well, this is what he says under oath.

10              Give me his deposition.

11              His deposition was taken on February

12    8th, 2006.

13              Was he at TSA before you were hired

14    there?

15         A.   No.

16         Q.   He came in after?

17         A.   Yes.

18         Q.   Was he there when you left?

19         A.   Yes.  No, he wasn't there.

20         Q.   Was he fired while you were there?

21         A.   Yes.

22         Q.   Do you know how long he remained?

23         A.   Remained where?

24         Q.   At TSA.

25         A.   No.
```

112

1        Q.  Did you ever hear anyone at TSA say

2  "There are no fucking haole men that are going

3  to take our jobs"?

4        A.  No.

5        Q.  You sure that you never heard that?

6        A.  I'm sure.

7        Q.  He says under oath on page 51, lines 7

8  to 10, this is what he swore to [Reading]:

9             "Was there a later point in time

10            when she did?"

11            Let me go back further [Reading]:

12             "Did you -- she use any racial terms

13            in talking to Everret Reinhardt?

14            A.   Not at that point in time.

15            Q.   Was there a later point in

16            time when she did.

17            A.   She used racial terms all the

18            time.  One of her favorite comments

19            was calling us all a bunch of fucking

20            haoles.  Excuse the language.  But as

21            directed towards someone specific, I

22            don't recall."

23            Is that accurate?

24        A.  No.

25        Q.  You didn't refer to Caucasians

113

1    generally as "fucking haoles"?

2         A.   Not at the checkpoint.

3         Q.   At any place, did you refer to white

4    people as "fucking haoles"?

5         A.   Sometimes.

6         Q.   That was kind of standard for you?

7              MR. HELPER:  Objection.

8         Q.   BY MR. GREEN:  Was that kind of

9    standard?  Or when you were not at the checkpoint

10   and not working, did you use the term "fucking

11   haoles"?

12        A.   No.

13        Q.   Did you use the term at least once a

14   day?

15        A.   No.

16        Q.   Certainly, at least once a week.

17   Right?

18        A.   Yes.

19        Q.   And that was for eighteen months,

20   right?

21             You were there eighteen months, right?

22        A.   Yes, I was.

23        Q.   Did you know Lucas Bruno?

24        A.   Yes.

25        Q.   Who is Lucas Bruno?

114

1        A.    He's a screener.

2        Q.    Caucasian?

3        A.    Yes.

4        Q.    From the Mainland?

5        A.    I don't know.

6        Q.    Did you ever tell Charles Turner to

7    write up Lucas Bruno?

8        A.    I could have.

9        Q.    Did you say "Write up things and make

10   negative comments about him"?

11       A.    No.

12       Q.    Did you ever refer to him as "a fucking

13   haole"?

14       A.    No.

15       Q.    Did you ever yell at him in front of

16   the other employees?

17       A.    No.

18       Q.    He swore under oath, that's Mr. Turner,

19   on page 61, starting at line 25 [Reading]:

20            "Who else was present" --

21            Let me go back a little bit to put it

22   in perspective.

23            Was there a time when Lucas Bruno went

24   over to you and handed his wand to someone else

25   and you yelled at him for not having his wand

POWERS & ASSOCIATES   (808) 536-2001

1      with him?

2           A.    No.

3           Q.    Was there a time that he then came over

4      to you with his wand and you yelled at him for

5      bringing his wand with him?

6           A.    No.

7           Q.    Never happened?

8           A.    No.

9           Q.    And if he says it happened, he's

10     mistaken or lying?

11          A.    Yes.

12          Q.    Can you think of any reason why these

13     white males that are involved in this lawsuit are

14     accusing you of being a racist?  Can you think of

15     any reason.

16          A.    No.

17               MR. HELPER:  Objection.

18               Calls for speculation.

19               MR. GREEN:  If she can think of one,

20     she can tell me.

21          Q.    BY MR. GREEN:  He says -- Mr. Turner

22     says at page 61, line 25, this is Mr. Turner --

23     let me go back to page 61, line 6 [Reading]:

24               "What did you see in terms of

25               Ms. Igarashi's interaction with

116

1        Lucas Bruno that made you think he

2        was treating him unfairly?

3        Her yelling at him.

4        How many occasions did she yell at

5        him?

6        A.    Three that I can recall.

7        Q.    Over the course of how many days?

8        Was it all within the same day.

9        I would say three within a course of a

10       week period of time.

11       Q.    What was she yelling at him

12       about?

13       Again, the specific one I remember is

14       wanding.   Another one was about the

15       loading.   I remember one was up towards

16       the gates and it had something to do

17       with the gates.

18       Q.    And how long -- if you can give me

19       an estimate, how long was the -- were

20       these interactions between Mr. Bruno

21       and Ms. Igarashi?   How long would she

22       be yelling at him.

23       About five minutes each time.

24       Who else was present that you recall

25       during the times Ms. Igarashi was

117

1              yelling at Mr. Bruno?

2              Well, when she was yelling at him

3              regarding the loading, everybody at

4              the checkpoint was present, which is

5              about 30 to 40 employees."

6         Do you remember that incident,

7    Ms. Igarashi?

8         A.    No.

9         Q.    Didn't happen or you just don't

10   remember?

11        A.    I don't remember.

12        Q.    It didn't happen?

13        A.    I don't remember.

14        Q.    You don't remember it happening; is

15   that what you're saying?

16        A.    Yes.

17        Q.    He continues [Reading]:

18              "When she was yelling at him regarding

19              the wanding, that was at the

20              checkpoint, so we had about 20 or 30

21              employees then.  And then I remember

22              when she was up by the gates, I think

23              Karin" --

24              Karin, K-a-r-i-n, do you know who that

25   is?

118

```
1          A.    Yes.

2          Q.    Who is that?

3          A.    Karin Phaneuf.

4          Q.    [Reading]:

5                "... I think Karin was in the area and

6                there was about four or five of us

7                coming out of a gate area when she was

8                berating him.

9                Q.   The loading incident, do you

10               recall if there were any supervisors

11               other than yourself and Ms. Igarashi

12               herself there?

13               I think Gary was there and I think

14               Rusty was there."

15               Who's Gary and Rusty, if you know?

16         A.    Gary Levitt, Rusty Harlan.

17         Q.    Did you used to say --  use the term

18   "fucking haoles" under your breath when you were

19   at the checkpoint?

20         A.    No.

21         Q.    He says, this is Mr. Turner again, on

22   page 62, lines 19 through page 63, starting at

23   line 19 [Reading]:

24               "And then the incident at the gates,

25               what supervisors were present other
```

119

1          than yourself and Mr. Phaneuf?"

2          Do you know who that is?

3     A.    That's Karin Phaneuf.

4     Q.    [Reading]:

5          "... what supervisors were present

6          other than yourself and Ms. Phaneuf?

7          A.    Just me and Ms. Phaneuf.

8          Q.    Just the two of you.  During her

9          criticisms or berating or yelling at,

10         however you want to select your verb,

11         interactions with the eight Caucasian

12         employees who we have been talking

13         about, did she ever use racial

14         terminology with any of these

15         employees?"

16         He says on page 63, line 2 [Reading]:

17         "She turned around and made the

18         comment -- and she has a habit of doing

19         that, turning around after she berates

20         someone, she would turn around under

21         her breath and say fucking haoles."

22         Did things likes that used to happen

23   with you?

24    A.    No.

25    Q.    Would you wait to say "fucking haoles"

120

1    until you were out of the checkpoint, out of the

2    area?

3        A.   No.

4        Q.   Where would you say "fucking haoles"?

5        A.   In my car.

6        Q.   It wasn't at the airport?  You never

7    used the word "fucking haole" at the airport?

8        A.   I could have.

9        Q.   Maybe you did and maybe you didn't.

10   Right?

11       A.   Maybe I did and maybe I didn't.

12       Q.   Once a week for eighteen months, you

13   may have said it at the airport about other

14   employees.

15       A.   I must have said it in front of Chuck

16   Turner every time.  I should have watched him.

17       Q.   Should have watched who?

18       I'm sorry.  What did that mean?  Should

19   have watched who?

20       A.   Maybe Chuck Turner wasn't doing his job

21   if he was so busy watching me.

22       Q.   Does that have something to do with him

23   being a fucking haole?

24       A.   No.

25       MR. HELPER:  Objection, counsel.

121

1          Argumentative.

2          MR. GREEN:  I just wanted to know if it

3     had to do with him being a fucking haole.

4          Mark this, please.

5              (Plaintiffs' Exhibit 1 was

6              marked for identification.)

7          Q.   BY MR. GREEN:  This is a letter, dated

8     October 17th, 2002, to Lowrey Leong, through

9     Howard Tagamori, from Filbert Carvalho, regarding

10    MSF Supervisor Mr. Gahr.

11         Do you know Mr. Gahr?

12         A.   Yes.

13         Q.   Did he work with you?

14         A.   Yes.

15         Q.   Were you his supervisor?

16         A.   I was his checkpoint manager on that

17    shift.

18         Q.   Over him?

19         A.   Yes.

20         Q.   Caucasian male?

21         A.   Yes.

22         Q.   Over forty?

23         A.   I don't know.

24         Q.   Did you like him?

25         A.   No.

122

1      Q.   Did you ever call him "a fucking

2    haole"?

3      A.   No.

4      Q.   What was it that you didn't like about

5    him?

6      A.   I didn't like him.

7      Q.   But you told me that.

8           What was it that you didn't like about

9    him?

10     A.   He didn't have a "we" attitude.   There

11   was no teamwork when it came to Chris Gahr.

12     Q.   He was kind of aloof, was he?

13     A.   No.

14     Q.   Arrogant?

15     A.   No, no, he was not aloof.   Arrogant.

16     Q.   Something you've seen over the years

17   about how Caucasians treat local people?

18     A.   No.

19     Q.   Well, the arrogance was how?   What did

20   he do that made you think he was arrogant?

21     A.   There was no teamwork when it came to

22   Chris Gahr.

23     Q.   And you were a team player?

24     A.   I was.

25     Q.   And you kind of looked out for your

123

1    team, did you?

2         A.    I looked out for the entire checkpoint.

3         Q.    That would include the white ones and

4    the local ones, right?

5         A.    Yeah.

6         Q.    This is what Mr. Carvalho writes

7    through Mr. Tagamori to Mr. Lowrey Leong.  He

8    says in paragraph 1 [Reading]:

9               "At approximately 1900 hours on

10              October 17th, 2002, I was approached

11              by TSA Screener Harlan, Russell."

12              Did he work under you, Harlan,

13   Russell?

14        A.    Yes.

15        Q.    Was he haole?

16        A.    Yes.

17        Q.    Mainland haole?

18        A.    I don't know.

19        Q.    [Reading]:

20              "He wanted to talk to me about my

21              briefing and how I handled issues

22              regarding discriminatory remarks and

23              management issues.  He felt my actions

24              were in good faith and he was

25              satisfied.  I had asked the screeners

124

1          to confide in the administration and

2          allow time for correction within the

3          management team."

4          Did Mr. Carvalho ever say that to you?

5    A.    No.

6    Q.    Anything that had to do with

7    discrimination, it should be handled within the

8    administration and allow time for correction?

9    A.    No.

10   Q.    Do you know anyone else that was

11   corrected by Mr. Leong other than yourself about

12   saying "fucking haoles"?

13   A.    No.

14   Q.    He then says [Reading]:

15          "I had also asked for time and

16          understanding..."

17          And he's talking about what he said to

18   Russell.  [Reading]:

19          "I had also asked for time and

20          understanding as I would address

21          these issues and felt documentation

22          was not warranted."

23          Do you see that?

24   A.    [Examining.] Yes.

25   Q.    Did Mr. Carvalho or anyone else ever

125

1    say not to put in writing anything that had to do

2    with racial remarks made to co-employees or

3    tourists?

4        A.    No.

5        Q.    Did you file complaints against Tom

6    Young?

7        A.    No.

8        Q.    Never spoke to anybody about him by

9    reporting misconduct?

10       A.    No.

11       Q.    Well, did you tell Howard Tagamori that

12   Tom Young was trying to undermine Filbert

13   Carvalho's authority?

14       A.    No.

15       Q.    Never said that.

16            Did Tom Young ever ask you if screeners

17   should get paid overtime because they were in a

18   briefing after hours?

19       A.    No.

20       Q.    You don't remember that there was a

21   briefing and Mr. Young turned to you and asked

22   for overtime?

23       A.    No.

24       Q.    Did you report to Howard Tagamori that

25   Mr. Young was violating the chain of command?

126

1      A.    No.

2      Q.    Did Mr. Young ask you if you had

3   reported him to Howard Tagamori?

4      A.    No.

5      Q.    Did he talk to you about a counseling

6   session he had with Howard Tagamori and asked you

7   if you had said something to Howard Tagamori?

8      A.    No.

9      Q.    Did you kind of say, "You don't know

10  what you're talking about, Tom"?

11     A.    No.

12     Q.    Was there a shift change between you

13  and Tom Young?

14     A.    Yes.

15     Q.    What was the shift change?

16     A.    Tom wanted to work --  to have the

17  night off and work my shift.

18     Q.    What did you say?

19     A.    Yes.

20     Q.    It was okay with you, right?

21     A.    Yes.

22     Q.    Did you get written up for that?

23     A.    Yes.

24     Q.    Did you see the write-up?

25     A.    No.

127

1    Q.   How do you know you were written up?

2    A.   I got talked to in the office.

3    Q.   I asked you if you were written up.

4         Did you ever see a write-up?

5    A.   No.

6    Q.   Who talked to you about it?

7    A.   Howard Tagamori.

8    Q.   Was that before or after Lowrey talked

9    to you about using the word "fucking haole" to

10   two of the screeners?

11   A.   After.

12   Q.   Not suspended, were you?

13   A.   No.

14   Q.   Tom Young says, and I'll read to you

15   from his deposition, page 79, the question at

16   line 15 [Reading]:

17             "Were you ever counseled at this

18             time, around that time about

19             switching shifts improperly?  Anybody

20             ever discuss that issue with you?

21             A.   Filbert discussed this with me.

22             It was not the October 28 though.

23             He -- he discussed it out in the

24             screening area during the day.  He

25             did -- he did ask me about why I

128

1           changed shifts.  He -- he never
2           indicated in any fashion or form that
3           it was a counseling session or anything
4           like that.
5               Q.   And what was the -- had you
6           switched shifts recently when -- when
7           Fil had talked to you about it?
8               A.   I did.  I did switch a shift with
9           Patti.  And this was one of these
10          things that I know there were certainly
11          other issues involved.  I had mentioned
12          one day that my son played football for
13          Maui High, and Patti, if I remember the
14          conversation, and I believe she said,
15          well, you should go to your son's
16          football game."
17              Did that happen?
18          A.   Yes.
19          Q.   [Reading]:
20              "And I go, well, no, I'm working
21          that evening.  And she goes, why
22          don't we switch shifts?  She says,
23          you can go to your son's football
24          game and I can --  and I'd rather --
25          and I go, no, I'd rather things were

129

```
 1              not chaotic.  I said I'd rather just --
 2              missing one game is not the end of
 3              the world.  She goes, no, you don't
 4              understand.  I need to switch a
 5              shift."
 6         .    Did you?
 7    A.   No.
 8    Q.   You didn't tell him that, then?
 9    A.   No.
10    Q.   [Reading]:
11              "I need a certain night off, and if
12              you would work this night for me, I
13              would work that night for you."
14              Did you say that to him?
15    A.   No.
16    Q.   Did you need a night off ever?
17    A.   No.
18    Q.   [Reading]:
19              "If you need to switch I have no
20              problem with that."
21              That's what you said to him.
22              [Reading]:
23              "I offered to go talk to Fil about
24              it or Howard.  She told me there was
25              no need, that screening managers were
```

130

```
 1                 able to make pen-and-ink changes to

 2                 the schedule."

 3                 Is that true?

 4      A.    No.

 5      Q.    Could screening managers make pen-and-

 6   ink changes?

 7      A.    No.

 8      Q.    [Reading]:

 9                 "I said I'd feel more comfortable at

10                 least telling Fil what we're doing.

11                 She said we're screaming managers.

12                 We don't need to do that."

13                 Did you say that?

14      A.    No.

15      Q.    [Reading]:

16                 "She had been there much longer than

17                 I had.  She had been there with

18                 Wackenhut.  I assumed wrong that it

19                 was okay, and then Fil come to me

20                 one day and said you cannot change

21                 shifts after the fact."

22                 Did you know he was written up for

23   that?

24      A.    No.

25      Q.    Did you ever tell Mr. Young after he
```

131

1    was written up -- or the time after you changed

2    shifts that you said to him, "You don't get

3    chewed out over that stuff" and "You have to have

4    the right friends"?  Did you say words to that

5    effect?

6        A.    No.

7        Q.    You don't know what I'm talking about

8    when I say that?

9        A.    No, sir.

10       Q.    You said that you didn't really like

11   Chris Gahr.  Right?

12       A.    Yes.

13       Q.    He seemed aloof to you.  Right?

14       A.    No.

15           MR. HELPER:  Objection.

16       Q.    BY MR. GREEN:  What was the word you

17   used?  "Arrogant," was that the word?

18       A.    Yes.

19       Q.    What was it he did that you thought was

20   arrogant?

21           MR. HELPER:  Objection.

22           Asked and answered.

23       Q.    BY MR. GREEN:  Answer again.

24       A.    He's not a team player.

25       Q.    And you consider that to be arrogant?

132

1          A.   Yes.

2          Q.   Anybody else that you didn't think was

3     a team player?

4          A.   No.

5          Q.   Chris Gahr seemed to be a team player?

6          A.   No.

7          Q.   Tom Young seemed to be a team player?

8          A.   Yes.

9          Q.   This is an affidavit.  This is a sworn

10    statement from Tom Young, which he swore to on

11    August 8th, 2003.

12              You haven't seen a copy of this,

13    right?

14         A.   No.

15         Q.   He says on page 3 of a ten-page

16    affidavit -- this is the question [Reading]:

17              "Were the management officials,

18              Mr. Carvalho, Patti Igarashi, Lowery

19              Leong aware of complainant's race,

20              color, sex, and national origin when

21              complainant worked there?"

22              That's the question to Mr. Young.

23    [Reading]:

24              "I know that they were aware as

25              they made mention of his race,

1          color, sex and national origin."

2              This is his affidavit regarding

3      Christopher Gahr.

4              MR. HELPER:  Whose affidavit, counsel?

5              MR. GREEN:  Tom Young's.

6          Q.   BY MR. GREEN:  And this is what

7      Mr. Young says regarding Christopher Gahr

8      [Reading]:

9              "In my first few days, I was supposed

10             to do on the job training 'shadowing'

11             another manager."

12             Is that the procedure?

13         A.   Yes.

14         Q.   [Reading]:

15             "I was asking questions about

16             everything to learn my job.

17             Ms. Igarashi said, 'you fucking

18             haoles are all the same.  You want

19             to know everything.'"

20             You wouldn't have said something like

21     that, would you?

22         A.   No.

23         Q.   You wouldn't have said "you want to

24     know everything."

25             But "fucking haoles" you would have

1    said at some point in time, right?

2         A.   Yes.

3              MR. HELPER:  Objection.

4              Asked and answered.

5              MR. GREEN:  I can keep asking her about

6    "fucking haoles" all the time, counsel.

7              She has admitted to saying the phrase

8    "fucking haoles" on occasion.

9              MR. HELPER:  You've asked the same

10   question over and over.

11             It's becoming argumentative and it's

12   becoming abusive.

13             MR. GREEN:  This case is about her and

14   racism.

15             MR. HELPER:  I know that's what you

16   want it to be about, counsel.

17             MR. GREEN:  Did you read the

18   complaint?

19             MR. HELPER:  I --

20             MR. GREEN:  Let's move on.

21             MR. HELPER:  I'm not done with my

22   objection.

23             I'm making my objection that you are

24   abusing the witness with the repeated questions

25   that have been asked about the use of the word

1       "fucking haole."

2               MR. GREEN:  That's your objection?

3               MR. HELPER:  It is.

4               MR. GREEN:  Fine.

5       Q.    BY MR. GREEN:  [Reading]:

6               "On another occasion when I suggested

7               the proper protocol for a doorway she

8               said to me, 'you white guys must think

9               alike.'"

10              Have you ever used the word "white

11      guys"?

12      A.    No.

13      Q.    Did he ever suggest a different

14      protocol for something that happened at a

15      doorway?

16      A.    I don't know.

17      Q.    Well, he would have said it to you.

18      A.    I don't know.

19      Q.    You don't remember?

20      A.    I don't remember.

21      Q.    [Reading]:

22              "'You white guys must think alike.

23              We had this other white guy from

24              the Mainland who wanted to do the

25              same thing.'"

136

1              Do you know about another white guy

2     that wanted to change protocol --

3          A.    No.

4          Q.    -- at a doorway?

5          A.    No.

6          Q.    [Reading]:

7                "Of course, in both instances, she

8                was talking about Complainant."

9                That was Mr. Gahr.

10               Does that refresh your recollection?

11         A.    No.

12         Q.    This is Tom Young [Reading]:

13               "She went on to say, 'We had to fire

14               him.  I knew he wouldn't work out.'"

15               Did you ever say to anyone you knew

16    Gahr wouldn't work out?

17         A.    No.

18         Q.    Do you know of anyone at the airport

19    that was fired within thirty days or less at the

20    airport?

21         A.    No.

22         Q.    [Reading]:

23               "'I knew the minute he walked in

24               here he is from the Mainland.  He

25               is a goofy white guy and wanted to

137

```
 1                    make a lot of changes, so we had
 2                    to fire him.'"
 3                    You're laughing, but it's not that
 4          funny.
 5                    Did you say that to Mr. Young about
 6          Mr. Gahr?
 7               A.   No.
 8               Q.   Did you ever call anyone "a goofy white
 9          guy"?
10               A.   No.
11               Q.   [Reading]:
12                    "My response was 'just let me know if
13          I make a similar mistake.'"
14                    Did he ever say that to you?
15               A.   No.
16               Q.   This is on page 4 of ten of his
17          affidavit [Reading]:
18                    "Ms. Igarashi often used the word
19                    haole.  There was no question about
20                    how she meant the term haole.  It
21                    was derogatory and demeaning.  She
22                    would scream 'you fucking haoles'
23                    across the entire screening area.
24                    This was not once, but many times.
25                    Even when I tried to explain to her
```

138

1                    that I was offended by her use of

2                    the term, she did not get it."

3                    Did Tom Young ever tell you that he was

4          offended buy the use of the term "haole"?

5          A.    No.

6          Q.    Did anyone ever tell you that?

7          A.    No.

8          Q.    Only Mr. Leong when he spoke to you.

9     Right?  That would be the only time?

10         A.    Yes.

11         Q.    Were you aware that Tom Young or anyone

12     filed EEOC complaints --

13         A.    No.

14         Q.    -- for discrimination?

15         A.    No.

16         Q.    This is also in his sworn statement

17     [Reading]:

18                    "Ms. Igarashi told me those

19                    things" --

20                    The question was [Reading]:

21                    "Were you aware that Complainant" --

22                    That's Gahr.

23                    -- "brought EEO issues to the attention

24                    of management?

25                    Yes, I knew.  After Ms. Igarashi told

139

```
 1              me those things about white people and
 2              haoles, et cetera, there were other
 3              employee issues.  It was a wreck
 4              management-wise at OGG."
 5              What's "OGG," if you know?
 6         A.   Maui.
 7         Q.   [Reading]:
 8              "Some employees were not paid for
 9              weeks on end."
10              Is that true?
11         A.   I don't know.
12         Q.   You don't know if employees' checks
13    were late?
14         A.   I don't know.
15         Q.   You never heard anything about that?
16         A.   Never did.
17         Q.   No one ever complained to you about
18    that?
19         A.   They were paid.
20         Q.   I'm sorry.  I didn't ask you that.
21              If you don't understand the question,
22    tell me.
23         A.   I don't understand the question.
24         Q.   Were employees paid late, if you know?
25         A.   I don't know.
```

140

```
 1          Q.   Did the Reinhardts ever come to you
 2    because their checks were a week or two late?
 3          A.   No.
 4          Q.   They never asked you about their
 5    checks?
 6          A.   No.
 7          Q.   This is what Tom Young says under oath
 8    [Reading]:
 9               "Two married employees came to me
10               and asked about getting paid" --
11               I'm sorry?
12          A.   They didn't get their pay in Honolulu.
13          Q.   What does that mean?
14          A.   They were here for training.  They were
15    paid during the training.  They didn't get that
16    check.
17          Q.   The check was late?
18          A.   I don't know if they ever got it.
19          Q.   How do you know they didn't get their
20    check?
21          A.   They might have said something about
22    it.
23          Q.   Yeah, they said it to you.  They said
24    something to you about not getting their check.
25               Is it coming back to you now?
```

141

1        A.    Yes.

2        Q.    Okay.  And that's when I suggested to

3   you when they said it, you made a comment about

4   "You fucking" --  "What do you fucking haoles

5   want?"

6        A.    No.

7        Q.    But you remember they may have come to

8   you about their check?

9        A.    Yes.

10       Q.    Good.  [Reading]:

11             "Two married employees" --

12             This is under oath.  This is what Tom

13   Young says [Reading]:

14             "Two married employees came to me

15             asked about getting paid as they

16             were broke and had not been paid

17             for six weeks."

18             Do you remember that now?

19       A.    No.

20       Q.    You don't remember them saying they

21   were broke?

22       A.    No.

23       Q.    You don't remember them saying they

24   hadn't been paid for six weeks?

25       A.    No.

142

```
 1          Q.    [Reading]:

 2                "Ms. Igarashi saw them approach me

 3                and asked, 'what did those fucking

 4                haoles want?'"

 5                Did you say that to Tom Young --

 6          A.    No.

 7          Q.    -- referring to the Reinhardts?

 8          A.    No.

 9          Q.    [Reading]:

10                "I pulled her to the side and told

11                her that the employees were upset

12                that she was calling them 'fucking

13                haoles.'  She asked if I was going

14                to file a complaint against her too."

15                Did you ask Tom Young if he was going

16     to file a complaint against you --

17          A.    No.

18          Q.    -- for being a racist?

19          A.    No.

20          Q.    Never did?

21          A.    No.

22          Q.    You understand you're under oath.

23     Right?

24          A.    Yes.

25          Q.    [Reading]:
```

143

1           "She said, 'oh, yeah, that fucking

2           haole we fired also filed a complaint

3           against me'" --

4                MR. HELPER:  We're going to take a

5      break here.  I think the witness is pretty

6      upset.  I think she should be.

7                MR. GREEN:  I understand she's upset.

8      So are my clients.

9                THE WITNESS:  Good.  Good-bye.

10                    (Recess taken.)

11                MR. GREEN:  Back on the record.

12           Q.   BY MR. GREEN:  Ms. Igarashi, you don't

13      have a lawyer here.  Right?  I mean, this

14      gentleman doesn't represent you.  Is that your

15      understanding?

16                MR. HELPER:  That's a question I'll

17      handle.

18                I'm representing her to the extent that

19      we're here in the scope of her government

20      employment.

21                MR. GREEN:  I'm under the impression

22      that you are not representing her.

23                MR. HELPER:  I'm not representing her

24      in her personal capacity, that's correct.

25           Q.   BY MR. GREEN:  Did you have a

144

```
 1      conversation with this lawyer during the break?
 2            A.    Uh-huh.
 3            Q.    You've had two breaks and you've had
 4      two conversations with him.  Right?
 5            A.    Right.
 6            Q.    What did he say to you?
 7                  MR. HELPER:  Objection.
 8                  I instruct the witness not to answer
 9      the question.
10                  MR. GREEN:  Based on?
11                  MR. HELPER:  Attorney-client
12      privilege.
13            Q.    BY MR. GREEN:  The second break, did he
14      talk to you again?
15            A.    Yes.
16            Q.    What did he say to you?
17                  MR. HELPER:  Same objection.
18                  Don't answer the question.
19                  That's completely improper, counsel.
20      You ought to know that.
21                  MR. GREEN:  You made your objection.
22                  I have the right to ask the question.
23            Q.    BY MR. GREEN:  Are you happy that these
24      people that are suing are upset?
25            A.    [No audible response.]
```

145

```
 1           Q.    Does that make you feel good?

 2                 MR. HELPER:  Objection.

 3                 Argumentative.

 4                 MR. GREEN:  It's not argumentative.

 5           Q.    BY MR. GREEN:  Answer the question.

 6                 Are you happy that these people are all

 7    upset about getting terminated?

 8           A.    No.

 9           Q.    Because when you said you were upset

10    and I said "so are my clients," you said,

11    "Good."  Do you remember saying that?

12           A.    Yes.

13           Q.    What was good about that?  That they

14    were upset?

15           A.    They're making me upset, too, so we're

16    all even.

17           Q.    Mr. Young says in completing his answer

18    number 7 on page 4 of his affidavit [Reading]:

19                 "She asked if I was going to file

20                 a complaint against her too.  She

21                 said, 'oh, yeah, that fucking haole

22                 we fired also filed a complaint

23                 against me.'"

24                 Do you know any people that were

25    terminated that filed a complaint against you --
```

146

1          A.   No.

2          Q.   -- other than in this case?

3          A.   No.

4          Q.   Again, referring to -- that's Mr. Gahr

5     that he's referring to.  He says [Reading]:

6               "I reiterated that I was not filing

7               a complaint, but thought she needed

8               not to use the term haole as it was

9               offending me and the workforce."

10              Did he say that to you?

11         A.   No.

12         Q.   [Reading]:

13              "However, within ten minutes,

14              Mr. Tagamori, deputy director of

15              screening, called me into the office

16              and was screaming at me about the

17              chain of command and did I not know

18              anything.  Ms. Igarashi would complain

19              to him and he would take it out on me.

20              I tried to explain to him that

21              Ms. Igarashi was using the word haole

22              and calling employees fucking haoles,

23              but he would not hear of it."

24              You don't know anything about that

25    conversation?

1       A.    No.

2       Q.    While you were working at TSA, did you

3  believe that certain employees, local employees,

4  were disciplined differently than white

5  employees?

6       A.    No.

7       Q.    You didn't think there was disparate

8  treatment in how white employees were reprimanded

9  or treated as opposed to local employees for

10  rules violations?

11       A.    No.

12       Q.    Let me have all that stuff on that

13  lady.

14            I asked you about Bonnie Tanner.   Do

15  you remember that?

16       A.    Yes.

17       Q.    And Ms. Tanner was a transportation

18  security screener?

19       A.    Yes.

20       Q.    And Ms. Tanner, as I understand it,

21  worked there during the time that you worked

22  there.

23       A.    Yes.

24       Q.    You wrote her up from time to time, or

25  at least once, did you?

148

1          A.    Yes.

2          Q.    What did you write her up for?

3          A.    I don't remember.

4          Q.    I'll show you in a minute.

5                We'll mark this as an exhibit.

6                     (Defendant's Exhibit 2 was

7                     marked for identification.)

8          A.    [Examining.]

9          Q.    Before we get into this, are you aware

10    of any complaints that were made against

11    Mr. Young or Mr. Gahr or any other white male

12    employees at TSA for leaving their area unclean,

13    leaving empty water bottles or things like that?

14         A.    No.

15         Q.    Were you aware of any complaints that

16    were made against any white male employees for

17    raising their voice at co-employees in the

18    screening area?

19         A.    No.

20         Q.    The top of this letter, if you want to

21    go along with me, the date is August 21st, 2003.

22    This is to Bonnie Tanner, transportation security

23    screener, from Robert Au, assistant federal

24    security director, Kahului Airport.  The subject

25    is termination during probationary period.

149

1              Do you see that?

2      A.    [Examining.] Uh-huh.

3      Q.    Do you know how long the probationary

4    period was at TSA for security screeners?

5      A.    No.

6      Q.    No idea?

7      A.    No.

8      Q.    Were you on a probationary period when

9    you went in there and were hired?

10     A.    No.

11     Q.    It starts off on the cover sheet

12   [Reading]:

13              "On September 29, 2002, the

14              Transportation Security Administration

15              hired you as a transportation security

16              screener in the excepted service."

17              Were you aware she was hired as a

18   transportation security administrator?

19              I'm sorry.  As a screener?

20     A.    Yes.

21     Q.    And how often did you work with her?

22     A.    Three or four times a week.

23     Q.    He then says [Reading]:

24              "Your appointment is subject to

25              completion of a one-year probationary

1          period.  Employees may be terminated

2          during their probationary period

3          because their work performance or

4          conduct fails to demonstrate their

5          fitness or qualifications for continued

6          employment."

7      Do you see that?

8      A.   [Examining.] Yes.

9      Q.   When you were yelled at or reprimanded

10  by Lowrey Leong, did he ever tell you the use of

11  the word "fucking haole" demonstrated the lack of

12  fitness or qualifications for your continued

13  employment?

14      A.   No.

15      Q.   He then says, this is from Robert Au

16  [Reading]:

17          "I have decided to terminate your

18          TSA employment.  Your termination

19          will be effective close of business

20          on the date you receive this notice."

21      When you were reprimanded by Mr. Lowrey

22  Leong, how long had you been working at TSA?

23      A.   I don't remember.

24      Q.   You only worked there eighteen months.

25          Was it within your first year?

```
 1          A.    Yes.

 2          Q.    Paragraph two [Reading]:

 3                "Specifically, on August 19, 2003,

 4                you were assigned to the OGG checkpoint

 5                in lane No. 4 to do a bag search and

 6                you failed to follow TSA [Standard

 7                Operating Procedures' at the Explosive

 8                Trace Detection (ETD) equipment."

 9                Do you see that?

10          A.    [Examining.] Yes.

11          Q.    Lane 4, did you work lane 4 from time

12    to time?

13          A.    Yes.

14          Q.    Apparently on August 19th of 2003, it

15    says she failed to receive a response from the

16    ETD equipment before returning property to a

17    passenger, which resulted in an alarm for TNT

18    after the passenger retrieved his property and

19    walked off in to the sterile area.

20                Do you see that?

21          A.    [Examiing.] Yes.

22          Q.    To your knowledge, that had happened

23    another time, hadn't it?  Not necessarily for

24    this particular employee.  But there were

25    screeners where somebody walked off after the
```

152

1    device activated.  Right?

2         A.    I don't remember.

3         Q.    Never happened that you can remember?

4         A.    It could have.

5         Q.    You told me earlier that there was a

6    time that it happened and somebody walked off.

7              MR. HELPER:  That was this one.

8         Q.    BY MR. GREEN:  Was it this one?

9         A.    Maybe.

10        Q.    That's a pretty serious violation, yes?

11        A.    Yes.

12        Q.    Based on your training and experience,

13   that might be a little more serious than yelling

14   at an employee?

15        A.    Yes.

16        Q.    More serious, you think, than calling

17   someone "a fucking haole"?

18        A.    Yes.

19        Q.    More serious than leaving bottles,

20   water bottles, in an area or leaving dirt or

21   something in your area?

22        A.    Yes.

23        Q.    More serious than maybe not wanding

24   properly?

25        A.    Yes.

153

```
 1          Q.   And then it says [Reading]:
 2               "You then failed to acknowledge the
 3               TNT alert on the ETD for a period of
 4               approximately fifteen minutes, and
 5               shortly thereafter, you again failed
 6               to properly screen a laptop computer
 7               with the ETD equipment."
 8               Sounds pretty serious, right?
 9          A.   [Examining.] Yes.
10          Q.   Do you have any personal knowledge of
11     this?
12               MR. HELPER:   I'm not sure she knows
13     what --
14          Q.   BY MR. GREEN:   Did it happen in front
15     of you, what he's complaining about?
16          A.   No.
17          Q.   [Reading]:
18               "You intentionally conducted improper
19               screening procedures or allowed
20               property to bypass required screening
21               and your actions were recorded by
22               cameras stationed at the checkpoint."
23               Did I read that properly?
24          A.   [Examining.] Yes.
25          Q.   [Reading]:
```

1                    "Your failure to follow TSA 'Standard

2                    Operating Procedures' compromised

3                    security at the checkpoint that

4                    resulted in a lockdown of the OGG

5                    airport for approximately an hour."

6                    Do you see that?

7          A.    [Examining.] Yes.

8          Q.    Pretty serious stuff, would you agree?

9          A.    Yes.

10         Q.    Do you know if Ms. Tanner had had at

11    least seventeen prior violations or complaints

12    for violating procedures before she was fired for

13    this lockdown at the airport?

14         A.    I don't know.

15         Q.    Do you know whether people on probation

16    have a right to appeal or grieve procedures

17    regarding their termination?

18         A.    I don't know.

19         Q.    Well, see, this letter is dated August

20    21st, 2003 that I read you.

21              And if you look at paragraph two again,

22    madam, you will see that the date is August 19th,

23    2003, where in lane 4 she failed to follow TSA

24    standard operating procedures at the explosive

25    trace detection equipment.  Do you see that?

155

1          A.    [Examining.] Yes.

2          Q.    Let's go to the next letter, which is

3     November, 2002, about eight months before that.

4     This is a three-day suspension.  That's the

5     subject.  It's from Howard Tagamori to Bonnie

6     Tanner.  [Reading]:

7                "You are hereby notified you will

8                be suspended for a period of three

9                calendar days beginning on November

10               18, 2002.  You are to return to duty

11               on November 21, 2002.  The reasons

12               for this suspension are:"

13               Did I read that correctly?

14         A.    [Examining.] Yes.

15         Q.    You were never suspended, you said.

16    Right?

17         A.    No.

18         Q.    Never counseled other than the two

19    times you've told me.  Right?

20         A.    Yes.

21         Q.    Reason 1, this is for the three-day

22    suspension -- Bonnie Tanner is a local girl,

23    right?

24         A.    Yes.

25         Q.    [Reading]:

156

1           "On November 6, 2002, you were

2           assigned to the Main Exit post and

3           failed to stop a female, Sun-Ye Kao,

4           from entering the stairwell and going

5           into the sterile area."

6           You see that?

7      A.   [Examining.] Yes.

8      Q.   Tell me what that means.

9      A.   She entered from a stairwell and went

10  into the sterile area.

11     Q.   "Sterile area"?

12     A.   Yes.

13     Q.   What is a sterile area?

14     A.   Inside of the airport.

15     Q.   This lady apparently walked through an

16  exit post into the airport.  Right?

17     A.   Yes.

18     Q.   I mean, if they don't get the woman,

19  that could be grounds, if you know, for closing

20  down the airport again.  Right?

21     A.   Yes.

22     Q.   That's how people bring bombs into the

23  airport.  Right?

24     A.   Yes.

25     Q.   Guns, knives and things that could hurt

1    themselves and other people.  Right?

2         A.   Yes.

3         Q.   Do you think that's pretty serious?

4         A.   Yes.

5         Q.   It appears she got a three-day

6    suspension for that, yes?

7         A.   Yes.

8         Q.   You think that's more serious than not

9    wanding properly?

10        A.   Yes.

11        Q.   You think that's more serious than

12   snapping at a co-employee about their wages or

13   what shift they should be working?

14        A.   Yes.

15        Q.   He says [Reading]:

16             "This breach was caught on camera

17             and the dispatcher watched the female

18             enter the area and notified Law

19             Enforcement Officers, who stopped

20        the individual as she exited."

21             Did I read that right?

22        A.   [Examining.] Yes.

23        Q.   [Reading]:

24             "When Ms. Kao was interviewed, she

25             indicated that you were present,

158

1              sitting on a chair, at the Main Exit

2              when she entered the stairwell."

3         Do you see that?

4    A.   [Examining.] Yes.

5    Q.   Do you know how long Ms. Tanner had

6    been working at the airport as of November 13th,

7    2002?

8    A.   No.

9    Q.   Do you know how long -- did I just ask

10   that, how long she had been at TSA?

11         MR. HELPER:  Yes.

12   Q.   BY MR. GREEN:  [Reading]:

13         "Your actions, as indicated above,

14         were inappropriate and could have

15         resulted in the evacuation of the

16         terminal, if not for the cameras and

17         dispatcher, and will not be tolerated.

18         As a TSA screener, you are expected

19         to be attentive to the areas of which

20         you are responsible for at all times."

21         You see that?

22   A.   [Examining.] Yes.

23   Q.   You would agree that it could have

24   caused the evacuation of the airport.  Right?

25   A.   Yes.

159

1       Q.    And it appears she was disciplined.

2   Right?

3       A.    Yes.

4       Q.    She apparently missed three days of

5   work for that, yes?

6       A.    Yes.

7       Q.    He says [Reading]:

8             "It is hoped that this suspension

9             will serve to impress upon you the

10            seriousness of your actions and that

11            future discipline will not be

12            necessary.  However, be advised that

13            your repetition of any future

14            misconduct may lead to further and

15            severe corrective action, up to

16            and including, your removal from

17            the TSA."

18      A.    Do you see that?

19      A.    [Examining.] Yes.

20            MR. HELPER:  "More severe corrective

21   action."

22            MR. GREEN:  Thank you.

23      Q.    BY MR. GREEN:  I just want to turn all

24   the way to where it has [Reading]:

25            "TSA Counseling Record.  Supervisor

160

```
 1              Name Patti Igarashi.  Employee Name
 2              Bonnie Tanner.  11/6/02, 1713 hours.
 3              Reasons for counseling:  Security
 4              breach Main Exit.  Administrative
 5              supervision.  Female entered Main
 6              Exit."
 7       A.    "Suspension."
 8       Q.    "Suspension."  I'm sorry.  [Reading]:
 9              "Administrative suspension.  Female
10              entered Main Exit."
11              Is that, if you know, something
12     different or is that the same --
13       A.    That's the same.
14       Q.    -- event?
15       A.    That's the same.
16       Q.    So you were there, were you?
17       A.    I was working.
18       Q.    And when you found this out, you wrote
19     her up, did you?
20       A.    Yes.
21       Q.    Remember writing up anyone else?
22       A.    Yes.
23       Q.    Who else did you write up?
24       A.    I remember writing people up, but I
25     don't remember exactly who.
```

161

1        Q.    Never for using derogatory racial

2   language, right?  Never anybody up for that,

3   right?

4        A.    I don't remember.

5        Q.    Well, you told me you didn't earlier.

6   You remember?  You've never written up a

7   co-employee for using words like "fucking haole"

8   or --

9        A.    Oh, no.

10       Q.    And that language, derogatory language

11   racially, was used from time to time by other

12   employees in your presence.  Isn't that true?

13       A.    Yes.

14       Q.    We then have --  this is October 13th,

15   about a month later, a TSA counseling record.

16   Supervisor's name is Jason Thomas, yes?

17       A.    [Examining.] Yes.

18       Q.    And what was his relationship as far as

19   his --  the work that he did at the airport

20   regarding you?

21            In other words, were you lateral?  Was

22   he above you, below you?

23       A.    Jason Thomas was part of the mobile

24   screening force.

25       Q.    Were you a supervisor of his?

162

1       A.   No.

2       Q.   Was he a supervisor of yours?

3       A.   No.

4       Q.   [Reading]:

5            "Using wrong ETD swab (test swab)."

6            Now, that's the stuff where people can

7   bring bombs in.  Right?

8       A.   Yes.

9       Q.   [Reading]:

10           "Supervisor Comments:  Using test

11           swab contaminates what is being

12           ETD'd."

13           Read me what that says.

14      A.   [Reading]:

15           "Using test swab contaminates what

16           is being ETD'd."

17      Q.   What's that mean?

18           MR. HELPER:  Objection.

19           Calls for speculation.

20      Q.   BY MR. GREEN:  Don't you know what that

21   means?

22           Do you have an opinion?

23      A.   Yes.

24      Q.   What does that mean?

25      A.   There's a test swab to test the machine

163

1    and there's a regular swab to test the bags.

2        Q.    "Using test swab contaminates what is

3    being ETD'd," what does that mean?

4        A.    She used the wrong swab.

5        Q.    You have some training, I guess, before

6    you do this swabbing test.  Right?

7        A.    Yes.

8        Q.    So you would expect by October 13th,

9    she would have had that training.  Right?

10            MR. HELPER:  Objection.

11            Calls for speculation?

12        Q.    BY MR. GREEN:  You would expect that,

13    right, if she had been working there a few

14    months?

15        A.    Yes.

16        Q.    [Reading]:

17            "Everyone should know the difference

18            from swabs from initial training."

19            You see that?

20        A.    [Examining.] Yes.

21        Q.    Well, pretty serious offense, yes?

22        A.    Yes.

23        Q.    What we've got is this local girl

24    Bonnie Tanner, she lets somebody go into a

25    sterile area without stopping her.  Now, a month

164

1    later, she's using the wrong swab test.  Yes?

2         A.    [Examining.] A month earlier.

3         Q.    A month earlier, she's using the wrong

4    swab test.  Right?

5         A.    Yes.

6         Q.    Do you know if she got fired?

7         A.    No.

8         Q.    It says [Reading]:

9               "Employee Comments:  My training

10              did not cover the difference between

11              the two swabs.  Now I know about the

12              difference, which is the" --

13              What does that say?

14        A.    "Holes."

15        Q.    [Reading]:

16              -- "which is the holes and the color

17              of the container."

18              What does that mean, if you know?

19        A.    The test swabs is a piece --  the ETD

20   swabs are round, circular.  It appears like --

21   it's like --  it's like a napkin, but it's solid

22   [Demonstrating.]

23        Q.    I think I understand what you mean.

24              MS. HEVICON:  A cleansing patch?

25              THE WITNESS:  Yes, it's like that.  But

165

1    it's paper thin.  And in the center of the test

2    swab, one of them has a dot, a tiny little

3    pinhole dot.  The other one has a circle.  And

4    the color of the container, there's a label.  One

5    is red and one is white.

6         Q.    BY MR. GREEN:  She used the wrong one?

7         A.    Yes.

8         Q.    Of course, by doing that, what could

9    have occurred?

10         A.    She could have contaminated the machine

11   and it gave a reading of positive, explosives.

12         Q.    And that, apparently, was the wrong

13   reading?

14         A.    Yes.

15         Q.    Let's go back to the next one.  This is

16   November 11th, the next one.

17              No.  Let's move on to February 11th,

18   2003.  You see that?

19         A.    [Examining.]  Yes.

20         Q.    February 11th, "Transportation Security

21   Administration, General Counseling Form."

22              You see that?

23         A.    [Examining.] Yes.

24         Q.    She's still a screener, and the name of

25   the person on the counseling form is Bonnie

```
1    Tanner.   [Reading]:

2              "OBSERVATIONS, Date and

3              Circumstances.   1648 hours" --

4              What does that say?

5              MS. HEVICON:  I think it's repetitive.

6         Q.   [Reading]:

7              "Shows a lack of skills in areas of

8              wanding."

9              Did I read that right?

10        A.   [Examining.] "Repetitively."

11        Q.   Thank you.

12             Does that at least seem to you, based

13   on your training, that this woman on more than

14   one time didn't seem to demonstrate skills

15   necessary at wanding?

16             MR. HELPER:  Objection.

17             Lack of foundation.

18        Q.   BY MR. GREEN:  Does it appear that way

19   to you?

20        A.   No, it doesn't.

21        Q.   [Reading]:

22             "Repetitively shows a lack of skills

23             in areas of wanding.  Consistently

24             requested that lead..."

25        A.   [Examining.] "Send."
```

1   Q. "Send a female"?

2   A. [Reading]:

3     "... to wanding area when male

4     wanderer wasn't busy and should

5     have been utilized to watch the

6     walk-through metal detector while

7     she wanded females."

8   Q. What does that all mean?

9   A. Bonnie didn't want to wand, so she

10 asked the lead; and what they do is they have to

11 swap off positions.  So that female came in to do

12 the wanding, and she went out to stand by the

13 metal detector.

14   Q. Was she allowed to ask?

15   A. She asked for the lead.  She requested

16 the lead.

17   Q. Was that proper procedure?

18   A. Yes.

19   Q. The lead can decide whether or not

20 they're going to wand or someone else can wand?

21   A. Yes.

22   Q. [Reading]:

23     "Since 48 hours she has" --

24   A. [Examining.] "1448."

25   Q. What did I say?

168

```
1        Q.   [Reading]:
2             "Since 1448 hours she has shown no
3             initiative in every area, as expressed
4             by 0830 and 0500 screens and leads."
5             Do you have some understanding what
6    that reference is, "shown no initiative in every
7    area"?
8             MR. HELPER:  Objection.
9             Lacks foundation.
10       Q.   BY MR. GREEN:  You can answer.
11       A.   She was having a problem through the
12   morning because these are the different shifts.
13   Five o'clock was one shift.  Eight-thirty was
14   another.  And, apparently, since 1448 she did not
15   show initiative in any area.
16       Q.   What does that mean, if you know?
17       A.   It means she just didn't want to do any
18   of the rotation.
19       Q.   She just didn't want to do her job?
20       A.   Yes.
21       Q.   [Reading]:
22            She is not able to perform duties
23   without training.  She is, therefore, kept off of
24   key positions as X-ray and loading.
25       Q.   [Reading]:
```

169

1                "While her customer service skills

2                she lacks rapport with" --

3                Is that "teammates"?

4        A.    [Examining.] "Teammates."

5        Q.    [Reading]:

6                -- "and civil rapport."

7                Did I read that correctly?

8        A.    Yeah.

9        Q.    I mean, that kind of conduct shouldn't

10    be tolerated.  Correct?

11            MR. HELPER:  Objection.

12            Lack of foundation.

13        Q.    BY MR. GREEN:  I mean, that's not

14    supposed to happen.  Right?

15            MR. HELPER:  Objection.

16            Lacks foundation.

17        Q.    BY MR. GREEN:  Go ahead.  Is that

18    right?

19            MR. HELPER:  And vague.

20        Q.    BY MR. GREEN:  Let me put it this way.

21    Strike the question.

22            This is a violation of procedure, is it

23    not, at the airport?

24        A.    This counseling form?

25        Q.    Yeah, complaining about what she did,

170

1    she's violating procedure at the airport?

2         A.    This wasn't a violation.

3         Q.    What would you call it, not wanting to

4    do what she was supposed to do in the rotation?

5    What would you call that?

6         A.    Being insubordinate.

7         Q.    Okay.  To her supervisors, right?

8         A.    Yes.

9         Q.    We're not done with her yet.  Let's

10   look at the next one, which is February 28th,

11   '03.

12              You told me that she had been

13   insubordinate or she had not shown up for work

14   from time to time.

15        A.    I'm sorry?

16        Q.    February 21st, '03 incident report --

17   I mean, it appears monthly we have --

18        A.    21st?

19        Q.    Yes.  It appears so far monthly we have

20   write-ups on this woman Bonnie Tanner so far,

21   yes?  It seems like it's monthly, right?

22        A.    Yes.

23        Q.    February 21sts, '03, 1500, the manager

24   is Patrick Collins.

25              You remember Patrick, right?

171

```
 1            A.   Yes.

 2            Q.   You mentioned that he used the word

 3       "fucking Jap" at Wackenhut.

 4                 Did he use that term at TSA also that

 5       you could hear --

 6            A.   No.

 7            Q.   -- from time to time?

 8            A.   No.

 9            Q.   Only "fucking haole"?

10            A.   Yes.

11            Q.   The type of incident, "Remedial

12       training of screener."  [Reading]:

13                      "On Thursday, February 20, after

14                 observing screener Bonnie Tanner

15                 wand a passenger, screening manager

16                 Patrick Collins asked me, screening

17                 supervisor Angela Williams, to see

18                 that she received instruction to

19                 correct poor technique."

20                 You see that?

21            A.   [Examining.]  Yes.

22            Q.   Has it been your experience that when

23       screeners wand improperly or they're doing

24       something incorrectly, at least the TSA

25       supervisors would try to give them some special
```

172

1      help so they could get it right?

2              A.    Yes.

3              Q.    I mean, it wasn't just grounds to fire

4      someone.  Right?

5              A.    Right.

6              Q.    They wanted to make sure that the

7      public was, apparently, safeguarded and they did

8      their job right.  Yes?

9                   MR. HELPER:  Objection.

10                  Lacks foundation.

11             Q.    BY MR. GREEN:  That's your

12     understanding, right?

13                  MR. HELPER:  Same objection.

14             Q.    BY MR. GREEN:  Answer the question.

15             A.    [No audible response.]

16                  MR. GREEN:  Read her the question.

17                  (Record read by the reporter.)

18                  THE WITNESS:  Yes.

19             Q.    BY MR. GREEN:  [Reading]:

20                  "Specifically clearing waist,

21                  letting pax..."

22             A.    [Examining.]  "Clearing waist."

23             Q.    Read the whole thing.

24             A.    [Reading]:

25                  "Specifically clearing waist,

173

1                letting pax lower arm sooner and

2                clearing from waist to knees."

3     Q.   And that's a method of wanding, is it?

4     A.   Yes.

5     Q.   This manager says [Reading]:

6                "I advised Bonnie that she was to

7                shadow screener Cindy Garcia and

8                observe her technique.  Bonnie was

9                teamed with Cindy under lead Karin..."

10    A.   [Examining.] "Phaneuf."

11    Q.   "Phaneuf."  Read the rest of it.

12 You're better at reading it than I am.

13    A.   [Reading]:

14                "It was an extremely busy afternoon.

15                At approximately 1530, lead screener

16                Karin Phaneuf advised me and supervisor

17                Davelyn Gordon that Bonnie had not

18                been receptive to instruction, also

19                that she had been somewhat

20                uncooperative regarding lane rotation

21                and task assignment.  I spoke to Bonnie

22                and she told me she did not know what

23                she was doing wrong.  I advised her

24                the 3 points that needed correction,

25                clearing waistband, pax lowering arms

174

1          sooner and clearing waist."

2          Q.    If if we just drop down --

3                MR. HELPER:  I think it continues to

4      the next page.

5          Q.    BY MR. GREEN:  The next page.  If you

6      drop down on the next page, continue on page 2

7      [Reading]:

8                "I advised her to use this as

9                an opportunity to strengthen her

10               skills and avoid disciplinary

11               action.  I also advised her she

12               was bordering on insubordinate

13               behavior by questioning Karin

14               Phaneuf's directions."

15               Did I read that correctly?

16         A.    [Examining.] Yes.

17         Q.    Let's go ahead to 3/5 --  I'm sorry.

18     To April 9th, 2003.  This is from you.  April

19     9th, 2003.

20               Is that your signature?

21         A.    [Examining.] Yes.

22         Q.    [Reading]:

23               "Bonnie Tanner was called into the

24               office to address our safety concerns

25               with her wearing a jade bangle bracelet

175

1              on her left wrist."

2              Why was that a concern?

3         A.   It could get stuck in the equipment.

4         Q.   She was trained, I assume, if you know,

5    not to have that kind of jewelry when she was

6    working?

7         A.   No.

8         Q.   [Reading]:

9              "I am not a certified jeweler,

10             however, from my past experience,

11             I know how to remove or assist a

12             person in removing their bracelets."

13             Did I read that correctly?

14        A.   [Examining.] Yes.

15        Q.   Apparently, you offered to remove the

16   bracelet for her, and she says it's not going to

17   come off.  "I tried everything."

18             You offered to help her?

19        A.   Yes.

20        Q.   Did you get the bracelet off?

21        A.   Yes.

22        Q.   You then at the bottom said [Reading]:

23             "I reminded her that this policy

24             was being enforced for any screener

25             who is wearing any other item on

176

1              their wrists, with the exception of

2              wristwatches."

3              You see that?

4        A.   [Examining.] Yes.

5        Q.   So far I have not seen any suspensions

6   other than when they had to close down the

7   airport.  Would you agree?

8        A.   Yes.

9        Q.   She seems to be counseled a lot,

10  though, doesn't she?

11       A.   Yes.

12       Q.   Turn to the page "Transportation

13  Security Administration, Kahului International

14  Airport."  This is dated --  "General Counseling

15  Form."

16       A.   [Examining.] 5/1.

17       Q.   Bonnie Tanner again, screener?

18            MR. HELPER:  Hang on a second,

19  counsel.  I see a 4/25 --  I got it.

20            THE WITNESS:  The date of the

21  counseling.

22       Q.   BY MR. GREEN:  [Reading]:

23            "Date and Circumstances:

24            4/25/03.  Penny Miller and Bonnie

25            Tanner on deck of main checkpoint

177

1              (Lane 4) debating incident which

2              occurred between them earlier that

3              day.  Essentially both screeners

4              were speaking in an inappropriate

5              volume of voice (i.e. Verbal

6              altercation) while on checkpoint

7              floor during passenger flow.

8              Manager, Patrick Collins, stepped

9              in and diffused the situation."

10         Do you see that?

11    A.    [Examining.] Yes.

12    Q.    I'm just assuming that airport

13    employees at the airport are not supposed to be

14    having a verbal altercation in front of

15    passengers.  Right?

16    A.    Yes.

17    Q.    Another counseling [Reading]:

18              "Screeners Tanner and Miller were

19              advised that under no circumstances

20              is this type of behavior (i.e. Loud

21              talking, finger pointing, escalated

22              tempers, arguing) permitted/appropriate

23              while in uniform and while on

24              checkpoint floor."

25              That was a ruling or regulation,

178

1    right?

2                MR. HELPER:  Objection.

3                Lacks foundation.

4        Q.   BY MR. GREEN:  Is that a rule or

5    regulation, as you knew it to be; she shouldn't

6    be doing that?

7        A.   I don't think it is a rule or

8    regulation, but they shouldn't be doing that

9    while working on the checkpoint floor.

10       Q.   Just common sense, I take it.  Right?

11       A.   Yes.

12       Q.   When we talk about raising voices and

13   pointing fingers, how would you compare that to

14   using the word "fucking haole," just in your

15   opinion?

16             If you were the supervisor and heard

17   these people pointing fingers and yelling at each

18   other as opposed to another employee referring to

19   passengers as "fucking haole," how would you

20   equate the two violations.

21                MR. HELPER:  Objection.

22                Assumes facts not in evidence and is

23   irrelevant.

24       Q.   BY MR. GREEN:  Is one more serious than

25   another, in your opinion?

179

1        A.   Both are not right.

2        Q.   Is one more serious than the other?

3        A.   I don't know.

4        Q.   Let's turn to April 25th, '03.

5        A.   [Examining.] That's the same one.

6        Q.   Okay.   This is April 25th.   This is a

7   little bit more complete.   The checkpoint

8   supervisor is Dave Lynn.   He says [Reading]:

9             "I was tending the metal detector

10            and Bonnie was tending baggage" --

11       A.   This goes with the counseling.

12       Q.   This is a little bit more complete.

13   [Reading]:

14            "I was tending the metal detector

15            and Bonnie was tending baggage" --

16            Are you paying attention?

17       A.   Yes.

18       Q.   Okay.   Good.   [Reading]:

19            -- "Bonnie was tending baggage

20            loading into X-ray. She had called

21            out an L-1 once."

22            What does that mean?

23       A.   L-1.

24       Q.   What does that mean?

25       A.   Lane 1.

180

1          Q.   [Reading]:

2               "I reiterated L-1 to confirm.  She

3               yelled back obviously agitated 'I

4               said L1.'  That was the beginning.

5               A couple of passengers down the line

6               came an individual making their second

7               trip through the checkpoint for an

8               unauthorized item.  She called out" --

9               Can you read what that?

10         A.   [Examining.] "Secondary screening."

11         Q.   [Reading]:

12              "As the individual started into

13              the metal detector she yelled out

14              'L-1,' so I sent him into wanding.

15              I entered the" --

16              What is that word?

17         A.   [Examining.] Metal detector, "M.D."

18         Q.   [Reding]:

19              -- "and asked her 'L-1, right?'

20              This upset her."

21              Let's look at the next one for

22    Ms. Tanner.  This is on -- which date is this?

23    This is May 7th.  Turn to May 7th.

24         A.   [Examining.] This is the continuation

25    of that [Indicating.]

POWERS & ASSOCIATES    (808) 536-2001

1            MR. HELPER:  Wait a second.

2        Q.  BY MR. GREEN:  Just part of it.

3            MR. HELPER:  Wait for question.

4        Q.  BY MR. GREEN:  Turn to May 7th.

5    There's another one for Bonnie Tanner.

6    [Reading]:

7                "Observations:  5/7/2003 at

8                approximately 1515 while working

9                WTMD" --

10               What is that?

11       A.  Walk-through metal detector.

12       Q.  [Reading]:

13               -- "failure to adhere to proper

14               screening procedure."

15               Do you see that?

16       A.  [Examining.] Yes.

17       Q.  Am I reading that correctly?

18       A.  Yes.

19       Q.  How many times, if you know, are people

20   to be counseled on knowing how to wand people

21   before they are suspended or terminated, if you

22   know?

23       A.  I don't know.

24       Q.  Remember I asked you earlier whether

25   you thought various white Mainland employees were

182

1      treated differently than local employees as far

2      as termination, suspension or other rules or

3      infractions?  Remember when I asked you earlier?

4           A.   I think so.

5           Q.   You didn't think that occurred, right?

6           A.   What didn't occur?

7           Q.   That the white males from the Mainland

8      were treated differently as far as how they were

9      counseled or treated for violation of rules and

10     regs.

11          A.   No.

12          Q.   You're unaware of any difference,

13     right?

14          A.   Yes.

15          Q.   [Reading]:

16               "Screener, Bonnie Tanner, was working

17               at the walk-through on lane 1 and was

18               notified by the loader on that lane

19               that a female passenger had a pacemaker

20              device.  Screener, Bonnie Tanner,

21               neglected to make a positive hand off

22               (i.e. Notify wander) that passenger

23               required pat down method of screening

24               versus wanding due to medical

25               condition.  Subsequently, wanding

183

1              procedure was started on passenger

2              (back side of passenger wanded not

3              front side of passenger)."

4              Did I read that correctly?

5         A.   [Examining.] Yes.

6         Q.   You see, now, eventually, even though

7    these may be a little bit out of line, it appears

8    that Ms. Tanner was, I think, counseled about

9    seventeen times before she was finally terminated

10   for the airport being closed down on or about

11   August 19th, 2003.  Do you see that?

12        A.   Yes.

13             MR. HELPER:  Objection.

14             Lacks foundation, assumes facts not in

15   evidence.

16             Move to strike.

17             MR. GREEN:  Mark this as next, please.

18                  (Plaintiffs' Exhibit 3 was

19                  marked for identification.)

20                       (Recess taken.)

21             MR. HELPER:  I want to put something on

22   the record here.

23             What I'd like to do, in talking with

24   the witness, she does have child-care issues

25   right now.  What I'd like to do is go to two-

184

```
 1      thirty, a half hour.

 2              MR. GREEN:  Fine.  Kids are more

 3      important.

 4              MR. HELPER:  If you get to a good break

 5      point where you're --

 6              MR. GREEN:  I can make it to

 7      two-thirty.

 8              I've asked the deponent to set aside

 9      the last exhibit I gave her.

10              Would you mark this.

11                  (Plaintiffs' Exhibit 4 was

12                  marked for identification.)

13      Q.   BY MR. GREEN:  This is a sworn

14      affidavit from a woman named Lizabeth Masuda that

15      was sworn on August 25th, '03.

16              Do you know who she is?

17      A.   Yes.

18      Q.   Who is she?

19      A.   She was a lead screener.

20      Q.   And that means what?

21      A.   She's underneath the supervisors.

22      Q.   Was she underneath you?

23      A.   Yes.

24      Q.   And you worked with her how often

25      during your employment?
```

185

1          A.    Not very long because I was on night
2     shift and she was on days.
3          Q.    She's a local lady?
4          A.    Yes.
5          Q.    Born and raised on Maui or Hawaii?
6          A.    Yeah.
7          Q.    She says that her name is Lizabeth
8     Masuda and she's a female of Japanese/Hawaiian
9     descent, born August 22nd, '56, U.S. citizen, was
10    employed as a lead screener at the Transportation
11    Security Administration at Kahului Airport from
12    September 29th, 2002 to July, 2003.
13             She says -- of course, you know Lucas
14    Bruno.  Right?
15         A.    Yes.
16         Q.    [Reading]:
17               "When Lucas Bruno first began work
18               at the airport, I was his lead
19               screener."
20               Is that accurate?
21         A.    Yes.
22         Q.    [Reading]:
23               "I did the initial tracking of his
24               training to prep him for testing.
25               I did write Mr. Bruno up several

1          times, but I do believe he was

2          trainable."

3          Did you believe Mr. Bruno was

4     trainable?

5          A.   I wasn't in the beginning training.

6          Q.   At any time, did you form an opinion as

7     to whether you thought he was trainable?

8          A.   I thought we needed to work with him.

9          Q.   She says [Reading]:

10          "However, on many occasions I was

11          told by Ms. Patti Igarashi, a

12          screening manager, to write

13          Mr. Bruno up.  When I wrote up

14          Mr. Bruno, it was because I saw

15          him do something that was not

16          standard operating procedure.

17          When Patti Igarashi instructed me

18          to write up Mr. Bruno, she had no

19          specific reason for writing him up.

20          She clearly did not like Mr. Bruno."

21          Did I read that correctly?

22          A.   [Examining.] Yes.

23          Q.   Of course, you said you didn't like

24     Mr. Bruno.

25          A.   I didn't say that.

187

 1          Q.    Did you like Mr. Bruno?

 2          A.    I didn't know Lucas Bruno.

 3          Q.    Did you ever tell Ms. Masuda to write

 4    him up?

 5          A.    Yes.

 6          Q.    For what?

 7          A.    Not screening properly.

 8          Q.    So you worked with him from time to

 9    time?

10          A.    No.  I worked on the shift.

11          Q.    How do you know he was not screening

12    properly?

13          A.    I was standing at the checkpoint

14    watching.

15          Q.    So there were times that you worked at

16    the checkpoint with him?

17          A.    Yes.

18          Q.    How many times would you say that was?

19          A.    I couldn't say.

20          Q.    More than a dozen?

21          A.    Yes.

22          Q.    Nor than two dozen?

23          A.    No.

24          Q.    Did you like him or not like him or

25    have no opinion?

188

```
 1          A.    I had no opinion.

 2          Q.    She then says [Reading]:

 3                "On one occasion when Ms. Igarashi

 4                demanded that I write up Mr. Bruno,

 5                she stated that I needed to learn

 6                that it was brown for brown or white

 7                for white, and that I would find

 8                myself on lane 5 if I didn't make the

 9                right choice."

10                Did you say that?

11          A.    No.

12          Q.    Have you ever used "brown for brown,"

13    that terminology?

14          A.    No.

15          Q.    "White for white"?

16          A.    No.

17          Q.    What's lane 5?

18          A.    Lane 5 is the departure gate as you're

19    coming out of the airport.

20          Q.    It's kind of like being exiled, right,

21    being moved away from --

22          A.    No.  It's harder work all by yourself.

23          Q.    [Reading]:

24                "There was no lane 5 at the

25                airport, and this phrase was
```

189

1                understood to refer to being

2                terminated."

3                Was that your understanding of what

4       "lane 5" meant?

5            A.   No.

6            Q.   Did you ever tell someone they'd end up

7       in lane 5?

8            A.   No.

9            Q.   [Reading]:

10               "Whenever Patti demanded that I write

11               someone up, it was always a white male

12               screener."

13               Did you ever ask any employee to write

14      up a local person?

15           A.   Yes.

16           Q.   Who?

17           A.   I don't know exactly who.

18           Q.   Can you think of any local person?

19           A.   Kristi Joslin.

20           Q.   She's a local person?

21           A.   Yes.

22           Q.   Was she raised on Maui or did she come

23      from the Mainland?

24           A.   She was raised on Maui.

25           Q.   [Reading]:

190

```
 1                    "Whenever Patti demanded that I
 2               write someone up, it was always a
 3               white male.  She would say things
 4               such as 'I want them out.'"
 5               Did you say things like that to
 6      Ms. Masuda?
 7          A.   No.
 8          Q.   [Reading]:
 9                    "There was never a single instance
10               when Patti would tell me to keep an
11               eye on or write up a non-Caucasian."
12               Did you ever ask her to write up a non-
13      Caucasian?
14          A.   I don't know.
15          Q.   [Reading]:  "I don't remember the
16               specific date" --
17               This is number 4.
18                    -- "but it was the first date that
19               the airport was federalized.
20               Ms. Patti Igarashi gave a briefing
21               to the crew."
22               Did you do that?
23          A.   Yes.
24          Q.   [Reading]:
25                    "Ms. Igarashi stated there were
```

191

```
 1                too many whites."
 2                Did you say that to Ms. Masuda?
 3          A.    No.
 4          Q.    [Reading]:
 5                "She further stated that local people
 6                needed to provide for their families,
 7                and we have outsiders taking these
 8                jobs away."
 9                Did you say that?
10          A.    No.
11          Q.    Remember I suggested or asked you
12     earlier, "Did you say or ask are the fucking
13     haoles going to take our jobs?"
14          A.    I don't remember.
15          Q.    You don't remember whether you said
16     that?
17          A.    I didn't say "taking jobs away."
18          Q.    Did you say anything about "No fucking
19     haoles are going to be at this airport"?
20          A.    No.
21          Q.    Did you ever say that --
22                MR. HELPER:  So the record is clear,
23     you're saying "I don't remember" to whether he
24     asked you that before?
25                THE WITNESS:  Right.
```

192

1      Q.    BY MR. GREEN:   [Reading]:

2            "I consistently heard Patti Igarashi

3            make negative comments about

4            non-locals, calling them stupid,

5            accusing them of taking jobs away,

6            and referring to them as haoles."

7            Did you call white people stupid?

8      A.    No.

9      Q.    Number 5 [Reading]:

10           "I also heard Patti make comments

11           to Pat Collins when they had

12           disagreements.  She stated 'just

13           remember who got you this job, haole,

14           if it weren't for me getting you this

15           job you'd have to go back to the

16           mainland.'".

17           Did you get Pat Collins his job?

18     A.    No.

19     Q.    Did you recommend him for his

20   employment?

21     A.    Yes.

22     Q.    To who?

23     A.    Lowrey Leong.

24     Q.    And he was at Wackenhut at the time?

25     A.    Yes.

POWERS & ASSOCIATES   (808) 536-2001

193

```
 1          Q.    Let's go back to --  this is the last
 2    area before we leave for the day.
 3              I asked you just to put it in some
 4    reference, Ms. Igarashi, as to whether or not you
 5    thought that white male employees were treated
 6    differently as far as sanctions they received, as
 7    far as how they were treated if they violated
 8    rules or regulations.  Remember I said that to
 9    you?
10          A.    Yes.
11          Q.    You said you didn't know anything about
12    that.  Right?
13          A.    Yes.
14          Q.    Look back at the exhibit I gave you,
15    the termination letter of October 25th, 2002, to
16    Christopher Gahr from Howard Tagamori.
17              For your edification, Mr. Gahr worked
18    at the airport for about --  Christopher Gahr
19    arrived at the airport on October 13th, 2002.  He
20    was terminated twelve days later.  Did you know
21    that?
22          A.    No.
23          Q.    Well, let's see why he was terminated.
24    This is from Howard Tagamori.
25              What was his position at the airport.
```

194

1    Assistant federal security director?

2        A.   Yes.

3        Q.   [Reading]:

4             "Discharge during probationary

5             period."

6             And let me just take you back to all of

7    the write-ups we had for Bonnie Tanner during her

8    probationary period.  Remember those?

9        A.   Yes.

10       Q.   He says, Mr. Tagamori, to Mr. Gahr

11   [Reading]:

12            "On March 31, 2002, you were given

13            a conditional appointment to the

14            excepted service with the

15            Transportation Security Administration

16            as a Supervisory Transportation

17            Security Screener.  All new hires

18            must complete a one-year probationary

19            period.  Employees may be terminated

20            during their probationary period for

21            unacceptable performance or for

22            conduct issues."

23            You see that?

24       A.   [Examining.] Yes.

25       Q.   Same thing as Ms. Tanner, right, during

1    the probationary period?

2         A.    Yes.

3         Q.    Same rules should apply to her as this

4    white male Mr. Gahr.   Right?

5              MR. HELPER:   Objection.

6              Lacks foundation.

7              THE WITNESS:   Yes.

8         Q.    BY MR. GREEN:   [Reading]:

9              "On October 17, 2002, specifically,

10             you were the assigned shift supervisory

11             for the evening shift.   You were

12             instructed to calibrate the ETD

13             machine, lock all ETD cabinets, place

14             keys in metal box in file cabinet, put

15             away all checkpoint equipment, and log

16             all lost and found items at the end of

17             your shift."

18             Did I read that correctly?

19        A.    [Examining.]  Yes.

20        Q.    [Reading]:

21             "Upon opening the checkpoint on

22             October 18, 2002, it was discovered

23             that all ETD cabinets were not locked,

24             keys had not been put away, checkpoint

25             equipment was lying on chairs and

1              scattered about the wanding area.

2              Further, all checkpoint radios were

3              left on all night.  Therefore, the

4              radios were either not functioning

5              or indicated that the batteries

6              needed to be replaced."

7              Did I read that right?

8       A.    [Examining.] Yes.

9       Q.    Sounds like at least in some of these

10   radios, the batteries had worn down.  Right?

11      A.    Yes.

12      Q.    Because this guy, I guess, left them on

13   all night.  Right?

14      A.    Yes.

15      Q.    Just based on your training and

16   experience and looking at the rules and

17   regulations, would you equate this conduct the

18   same way as an employee allowing someone to walk

19   into the sterile area in the airport?

20      A.    No.

21            MR. HELPER:  Objection.

22            Lacks foundation.

23            Move to strike.

24      Q.    BY MR. GREEN:  [Reading]:

25            "This included the WASI radio used

197

1              to maintain communication with plane

2              side screening."

3              You see that?

4       A.    [Examining.] Yes.

5       Q.    Sounds like someone should be counseled

6  for this kind of conduct, doesn't it?

7              MR. HELPER:  Objection.

8              Lacks foundation.

9       Q.    BY MR. GREEN:  Do you believe, based on

10 your training and experience, that people should

11 be counseled for this kind of stuff?

12      A.    He should have locked the ETD cabinets.

13      Q.    Right.  And when he didn't, he should

14 be counseled and at least told what he did wrong,

15 right?

16      A.    Yes.

17      Q.    [Reading]:

18              "Also, on October 17, 2002" --

19              The same day.

20              -- "a screener, under your supervision,

21              was observed performing her duties with

22              a bandaged left hand."

23              Do you see that?

24      A.    [Examining.] Yes.

25      Q.    That's pretty tough stuff, isn't it?

198

1          I mean, is that the kind of conduct

2    that someone should get fired for, in your

3    opinion?

4          MR. HELPER:  Objection.

5          Lacks foundation.

6    Q.    BY MR. GREEN:  Answer the question.

7    A.    The bandaged left hand?

8    Q.    Yeah.  That's what it says, she was

9    performing duties with a bandaged left hand.  Do

10   you see that?

11   A.    [Examining.] Yes.

12   Q.    [Reading]:

13         "Upon inquiring, it was discovered

14         that the screener had two dislocated

15         fingers.  Mr. Carvalho relieved her

16         of her post, has the bandage, splint

17         and medical tape did not allow for

18         movement or dexterity.  Mr. Carvalho

19         instructed her to supply medical

20         certification upon full use of both

21         hands.  You challenged this decision,

22         insisting that the bandage, splints,

23         and medical tape could be removed.

24         Mr. Carvalho explained that a screener

25         using one hand was unacceptable and

199

1              should have been corrected by the

2              supervisor."

3              You see that?

4        A.    [Examining.] Yes.

5        Q.    You remember when we talked about

6    Ms. Tanner, she was someone that was screening

7    improperly, right?

8        A.    Yes.

9        Q.    She was someone who refused to screen

10   from time to time, right?

11       A.    Yes.

12       Q.    Someone who just didn't come to work

13   sometimes, yes?

14       A.    Yes.

15       Q.    [Reading]:

16              "Mr. Carvalho further explained the

17              issues on public perception, mobility

18              and dexterity."

19              You see that?

20       A.    [Examining.] Yes.

21       Q.    Would you believe that yelling at a

22   co-employee in front of other employees gives a

23   bad public perception?

24       A.    Yes.

25       Q.    Pointing fingers and yelling, bad

200

 1     public perception?

 2          A.   Yes.

 3          Q.   [Reading]:

 4               "You disagreed, becoming challenging

 5               and insubordinate."

 6               Do you see that?

 7          A.   [Examining.] Yes.

 8          Q.   You remember that note from him to

 9     Ms. Tanner that her conduct was bordering on the

10     insubordinate?  I read it to you.  Remember

11     that?

12          A.   Yeah.

13          Q.   Now, two days later [Reading]:

14               "On October 19 and 20, 2002, you

15               again failed to follow procedures

16               and direction by not properly

17               calibrating ETD machine and not

18               placing keys in appropriate place

19               as directed."

20               You see that?

21          A.   [Examining.] Yes.

22          Q.   [Reading]:

23               "Your conduct, as described above,

24               is unacceptable and will not be

25               tolerated.  Therefore, it is my

201

1              decision to separate you from your

2              position at the TSA effective the

3              close of business on the day you

4              receive this notice."

5              You see that?

6         A.   [Examining.] Yes.

7         Q.   You still think there wasn't disparate

8    treatment between white males and local people,

9    madam?

10             MR. HELPER:  Objection.

11             Lacks foundation.

12        Q.   BY MR. GREEN:  You still believe it?

13   Yes or no.

14        A.   [No audible response.]

15             MR. GREEN:  The record should show she

16   hasn't answered.

17             THE WITNESS:  Say it again.

18        Q.   BY MR. GREEN:  You still believe there

19   was not disparate treatment between white males

20   working at the TSA and local people?

21             MR. HELPER:  Objection.

22             Lacks foundation.

23        Q.   BY MR. GREEN:  Go ahead.

24        A.   Bonnie is a screener.  Chris Gahr is a

25   supervisor.

202

1          Q.    So that would be okay?

2          A.    No.   The supervisors have more

3     responsibility.

4          Q.    I've read to you the violations they

5     sent to him and he got terminated for.   Right?

6          A.    I don't know about the instances.

7          Q.    I just read them to you.

8               MR. HELPER:   Counsel, let her finish.

9          Q.    BY MR. GREEN:   Go ahead.

10         A.    The supervisors have more

11    responsibilities.

12         Q.    Do supervisors ever get counseled?

13         A.    Yes.

14         Q.    Do they ever get suspended if they need

15    to be suspended?

16         A.    I don't know if they are.

17         Q.    Do you know if he was ever counseled

18    before short of being terminated?

19         A.    I don't know.

20         Q.    Do you know if he was ever told of a

21    single violation before he was terminated?

22         A.    I don't know.

23         Q.    Does it appear to you that he was

24    treated differently from Bonnie Tanner?

25         A.    Yes.

203

1              MR. GREEN:  All right.  You can go see

2       your children.

3              THE WITNESS:  Thank you.

4          (The deposition was adjourned at 2:10 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25