# ATTACHMENT "4"; CHARLES TURNER

1              IN THE UNITED STATES DISTRICT COURT

2                   FOR THE DISTRICT OF HAWAII

3

4        ----------------------------------
         LUCAS BRUNO III, CHRISTOPHER GAHR,     )
5        FRANK ROBERT PAULSON, CHARLES          )
         TURNER, and TOM YOUNG,                 )
6                                               )
                 Plaintiffs,                    )  Civil No. 03-00567
7                                               )  DAE/BMK
             v.                                 )
8                                               )
         THOMAS J. RIDGE, SECRETARY,            )
9        DEPARTMENT OF HOMELAND SECURITY,       )
                                                )
10               Defendant.                     )
                                                )
11       ----------------------------------

12

13                 DEPOSITION OF CHARLES P. TURNER

14     Taken on behalf of the Defendant, at the TSA Training Room,

15     33 Lono Avenue, Suite 270, Kahului, HI, commencing at 1:14

16     p.m., on Wednesday, February 8, 2006, pursuant to Notice.

17

18     BEFORE:    SANDRA J. GRAN, CSR NO. 424

19                Registered Professional Reporter

20

21                            -o0o-

22

23

24

25

```
 1   APPEARANCES:

 2

 3   For the Plaintiffs:   DENISE M. HEVICON, ESQ.

 4                         Attorney at Law

 5                         345 Queen Street, 2nd Floor

 6                         Honolulu, Hawaii  96813

 7                         E-mail:  dhsangster@hawaii.rr.com

 8

 9   For the Defendant:    THOMAS A. HELPER, ESQ.

10                         US Department of Justice

11                         Room 6100 PJKK Federal Building

12                         300 Ala Moana Boulevard

13                         Honolulu, Hawaii  96850

14

15   ALSO PRESENT:         Annette Johnson and Martha Buxton

16

17                              -o0o-

18

19

20

21

22

23

24

25                                  .
```

RALPH ROSENBERG COURT REPORTERS, INC.

(808) 524-2090

```
 1                              INDEX

 2

 3

 4    EXAMINATION:   CHARLES P. TURNER

 5    BY MR. HELPER                                     4

 6

 7

 8                             EXHIBITS

 9    (2/25/03 General Counseling Form, EXHIBIT A, marked)   95

10    (3/11/03 Letter, EXHIBIT B, marked)                   118

11    (Statement by Nashly Leslie, EXHIBIT C, marked)       131

12    (Statement by Kahealani Aruda, EXHIBIT D, marked)     131

13    (Statement by Pamela Wilson, EXHIBIT E, marked)       131

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                        CHARLES P. TURNER
 2                  having first been duly sworn,
 3                 testified upon his oath as follows:
 4
 5                 EXAMINATION:  CHARLES P. TURNER
 6  BY MR. HELPER:
 7      Q.   State your name, please.
 8      A.   Charles Phillips Turner, T-U-R-N-E-R.
 9      Q.   And what is your current residence address?
10      A.   My current residence address is 140 Uwapo,
11  U-W-A-P-O, Road, No. 42-201, Kihei, Maui, Hawaii  96753.
12      Q.   Have you ever had your deposition taken before?
13      A.   Yes, sir.
14      Q.   On how many occasions?
15      A.   Numerous.
16      Q.   What sort of cases or what occasions?
17      A.   Dealing with people that I have arrested,
18  situations like that; lawsuits regarding civil matters
19  regarding corporates, corporations, things like that.
20      Q.   Give me a rough estimate of how many times you
21  have had your deposition taken.
22      A.   I would say about 10 to 15 times.
23      Q.   When was the most recent?
24      A.   The most recent deposition I gave was about two
25  years ago on the mainland in Los Angeles regarding my mother.
```

```
 1    I was a witness to her being injured over at the Marriott in
 2    Lahaina.
 3         Q.    In?
 4         A.    Lahaina.
 5         Q.    And you were living in California at the time you
 6    gave that deposition?
 7         A.    No.  I was visiting my mom in California at the
 8    time when I gave that deposition.
 9         Q.    Okay.  She brought suit in California?
10         A.    She brought suit in Hawaii.
11         Q.    How did you happen to have your deposition taken
12    in California?
13         A.    There was a -- Hawaii was playing USC over there
14    and the attorneys happened to be going over there that
15    weekend for the game, the two attorneys from Honolulu.  And
16    she lives in Burbank and since the accident is unable to fly
17    and they wanted to depo her at the same time, so I flew over.
18         Q.    Okay.  You were a private investigator for quite a
19    while; is that right?
20         A.    Yes.
21         Q.    And you also were a store detective, is that a
22    fair characterization of one of your jobs?
23         A.    Same thing.
24         Q.    Well, as a store detective would -- you just work
25    for the store; right?
```

```
 1            A.    Yes, sir.

 2            Q.    And as a private investigator you might have all

 3    kinds of different clients; right?

 4            A.    No, sir.  I was working for the Hughes family as a

 5    private investigator in their supermarkets and also for their

 6    family.

 7            Q.    How many of your depositions concerned work as --

 8    work for the Hughes company?

 9            A.    Most of them, sir.

10            Q.    Okay.  Have you ever testified in a case in which

11    you were a party, either a plaintiff or a defendant?

12            A.    Yes, sir.

13            Q.    And what was that?

14            A.    I was being sued by my ex-girlfriend, the mother

15    of my daughters' boyfriend.

16            Q.    And this is the case you referred to I think in

17    your deposition interrogatories that you say was dropped?

18            A.    Yes, sir.

19            Q.    What was the name of that case?

20            A.    His name was Crooks, my name was Turner.

21            Q.    Crooks, C-R-O-O-K-S?

22            A.    Yes.

23            Q.    Where was that case brought?

24            A.    Los Angeles County.

25            Q.    Do you have any paperwork currently in your
```

```
 1    possession regarding that case?

 2         A.    No, sir.

 3         Q.    Okay.  Who was your attorney?

 4         A.    Jason Marshall out of Van Nuys.

 5         Q.    And who was the attorney for Mr. Crooks?

 6         A.    I don't know, sir.

 7         Q.    When was that case dropped?

 8         A.    We're going in the -- I would estimate in the

 9    early '80's.

10         Q.    Okay.  Now, because you have had your deposition

11    taken before, it may not be necessary for me to go over the

12    basic rules, but let me go ahead anyway.  We have a court

13    reporter here who is taking down everything anyone says in

14    the room.  You understand that; right?

15         A.    Yes, sir.

16         Q.    And you're sworn in with the same oath that you

17    would be sworn in were you testifying in court.  Do you

18    understand that?

19         A.    Yes, sir.

20         Q.    And your testimony today, even though there is no

21    judge present, has the same weight and significance as if it

22    were given in court.  Do you understand that?

23         A.    Yes, sir.

24         Q.    And rules for depositions are a little bit

25    different from normal conversation.  Only one person can
```

```
 1   speak at a time.  So even if you know absolutely where I'm
 2   going with my question, wait until I'm done before you start
 3   to answer, that way we'll get a clean record.  Make sure you
 4   answer with words instead of uh-uhs or uh-huhs or shakes or
 5   nods of the head because the court reporter can't take that
 6   down.  If at any time I stop you or I jump in with a question
 7   before you're done with your last answer, let me know and
 8   I'll stop and let you finish your answer.  Okay?
 9        A.   Yes, sir.
10        Q.   Any questions before we go any further?
11        A.   No, sir.
12        Q.   Okay.  If you need to take a break to talk to your
13   attorney, go to the bathroom, let me know.  We've got a
14   bathroom key over here.  It's a wild guess, but I'm
15   estimating we'll probably be three hours.  That is just a
16   guess because I do have a lot of stuff I want to talk to you
17   about.
18             Let me start by going over your employment
19   history.  You have given some of that in the interrogatory
20   answers, but I want to get a little bit more in the way of
21   details.  Let me ask you a very general question.  Up until
22   the time that you started working for the government in
23   2002 -- 2002 is the date you started working for TSA; is that
24   right?
25        A.   Yes, sir.
```

```
 1           Q.    Up until that date did you ever leave any job
 2    against your will? Were you ever fired from any job?
 3           A.    I was laid off.
 4           Q.    Okay.   Were you ever fired for cause, for a
 5    particular act or omission?
 6           A.    Not to my knowledge.
 7           Q.    Okay.   Your job as a self employed photographer in
 8    Burbank, describe for me what you did as a photographer.
 9           A.    I did head shots.   I did family portraits and
10    outdoor photography.
11           Q.    Anything else?
12           A.    Such as?
13           Q.    Anything.
14           A.    Just the photography.   I worked as a bodyguard
15    for -- and driver for the Hughes family at the same time.
16           Q.    Any other photography that you did other than what
17    you have described?
18           A.    Just general photography; anything and everything.
19    If -- I boudoir photography.
20           Q.    What does that mean?
21           A.    Boudoir?   That's where usually a lady would like
22    something like a nude, seminude, something like that.  Classy
23    type stuff.
24           Q.    Classic or classy?
25           A.    Classy.
```

1          Q.    Is "boudoir" sort of a term of art or a term in
2     the photography business?

3          A.    Yes, it is.

4          Q.    Okay.

5          A.    And did children's work.  Anything and everything
6     dealing with photos.  Animals.  Weddings, occasionally did
7     weddings.

8          Q.    Can you give me an estimate as to how much of your
9     time when you were a self-employed photographer in Burbank --
10    or how many of your jobs were boudoir-type jobs?

11         A.    How many or -- How many as far as -- I don't
12    understand.

13         Q.    What proportion of your photographic work was
14    spent on boudoir work when you were self-employed in Burbank?

15         A.    I would say about 30 percent of the time.

16         Q.    What made you -- You moved to Honolulu -- I'm
17    sorry.  Let me back up a second.

18               You left Ralph's Grocery because the company was
19    bought out?

20         A.    The company was bought out and all of us were laid
21    off by Ralph's.  I was asked to stay over for a six-month
22    period of time for transition and then eventually I was laid
23    off.

24         Q.    And was this when Becky Carr was your supervisor
25    in the six-month period?

1       A.   Becky Carr had been with human resources.  She,

2   again, was taken over to the Ralph's company and I reported

3   to her and a gentleman by the name of Mike Waters.  Mike

4   Waters was the director of security.  Becky Carr was the one

5   who can verify continuation of employments.

6       Q.   I think you have in your deposition Mike Walters.

7   I don't know which one is correct.

8       A.   Mike Waters.

9       Q.   Waters.  Why did you move to Hawaii?

10      A.   I was recruited by the Fujuki family to move to

11   Hawaii to work in Maui as a receiving auditor providing

12   undercover information to the president of the company, Mr.

13   John Fujuki, Jr.

14      Q.   And what does that mean, "receiving auditor"?

15      A.   I was responsible for auditing the receivers,

16   verifying that they were doing their jobs.  He had an

17   inventory control problem in which --

18      Q.   Is this -- Go ahead.

19      A.   He had an inventory control problem in which I was

20   assigned to find out what happened with his inventory.

21      Q.   Is that inventory control problem a polite word

22   for employee theft?

23      A.   Dealt with employee theft.  Dealt with external

24   theft.

25      Q.   And did you make any particular determinations in

1  the course of your work as to what the cause of the inventory

2  control problem was?

3      A.    I did, and I reported them back to him.

4      Q.    What were your conclusions?

5      A.    It was an ongoing problem that he had.  It was

6  done with weekly reports as far as his personnel and why he

7  was losing so much inventory.  He subsequently promoted me to

8  be over the people that were involved, to be the operations

9  manager.

10     Q.    And you held that position until about July of

11  2001?

12     A.    Yes, sir.

13     Q.    You said laid off due to financial problems within

14  the company.  What does that mean?

15     A.    They ran into a cash shortage, a cash flow

16  problem.  The father had passed away, the son had tooken over

17  the company and they just ran into -- I was making 60,000 a

18  year.  There was a counterpart that was in Oahu that was

19  making the same, if not more and they just -- he was able to

20  do my job at the same time.

21     Q.    So he started doing two jobs?  The Oahu guy took

22  over your job and did his job as well?

23     A.    Yeah, when I was laid off.

24     Q.    And after that you went to Minit Shop Stores for

25  about eight months?

```
 1        A.    Minit Stop.

 2        Q.    Minit Stop?

 3        A.    Uh-huh (affirmative response).

 4        Q.    Minit Shop is what it says in your

 5   interrogatories.  And were you -- You said you ran the

 6   convenience store/gas station.  Did you supervise anybody in

 7   that position?

 8        A.    Yes, sir.

 9        Q.    How many people?

10        A.    About 20.  Fifteen to 20, all females.

11        Q.    Okay.

12        A.    The only other male I had was my -- I take that

13   back.  I had two males; one was the assistant manager that I

14   was given and one was the buyer's son for the company.

15        Q.    What hours did you work there?

16        A.    I worked anywhere from 4:00 a.m. all the way up to

17   8:00 at night, so the hours varied.  I usually putting in a

18   12-hour day.

19        Q.    What -- Did you have a particular shift that you

20   generally worked?

21        A.    I was generally in the store by 5:00 in the

22   morning and I was out by -- hopefully by 3:00.  So generally

23   5:00 to 3:00, Monday through Friday.

24        Q.    Okay.  And then you went to Four Seasons; right?

25        A.    Yes, sir.
```

14

```
 1        Q.    And what were your job responsibilities at Four

 2   Seasons?

 3        A.    Well, I was working at Four Seasons at the same

 4   time I was working at Minit Stop.  I worked at Four Seasons

 5   part time in security, and then after that there was an

 6   opportunity for front desk on the graveyard shift.  It was

 7   standard hours from about 10 o'clock at night until 6:00 in

 8   the morning.  I took that opportunity to get some solid

 9   hours.  I had a better pay rate with union benefits -- or,

10   correction, hotel benefits similar to union benefits.

11        Q.    Did you supervise anyone at Four Seasons?

12        A.    No, sir.

13        Q.    And then you left because of a better job at TSA?

14        A.    Yes, sir.

15        Q.    How did you find out about the TSA openings?

16        A.    Newspaper advertisement and I applied online.

17        Q.    Where did you send your application to online?

18   Was it just through the Internet?

19        A.    Yes.

20        Q.    Was there any address there?

21        A.    Yes, sir.  I sent it through the Internet, as far

22   as I know, to Washington or wherever it was going to.

23        Q.    Was it -- Do you recall if it was a TSA website or

24   a contractor website that you went through?

25        A.    It was a Department of Transportation website.
```

```
 1          Q.   And did you have any -- What happened next after
 2     you sent your application in?
 3          A.   I was contacted to come in for some testing.  I
 4     went to the Sheraton Hotel for I believe two days worth of
 5     testing.  Did the testing and then subsequently they called
 6     us back for interviews.
 7          Q.   And what time frame was this testing?  Do you
 8     remember the month?
 9          A.   I believe it was the month of August.
10          Q.   2002?
11          A.   2002.
12          Q.   When did you submit your application, do you know?
13          A.   No, sir.
14          Q.   A couple of months prior or --
15          A.   It would be a month prior.
16          Q.   Okay.  And then you say after the testing -- Well,
17     who was present at the testing when you went through that?
18          A.   Hundreds of people.  I don't know their names or
19     anything like that.  It was an open-type testing.
20          Q.   Anybody administering the testing that you
21     recognized later on?
22          A.   No, sir.
23          Q.   That you ever had any interaction with again, as
24     far as you know?
25          A.   No, sir.
```

```
 1            Q.    Okay.  Your interview, who interviewed you?
 2            A.    A female gal from Los Angeles, I think.  That's
 3    all I know.
 4            Q.    Do you know who she was employed by?
 5            A.    I believe she was employed by -- and she said
 6    something dealing with Lockheed.
 7            Q.    Did you ever hear of an outfit called MCS Pearson?
 8            A.    That's it, yes.
 9            Q.    Okay.  So your best recollection is you were
10    interviewed by somebody from MCS Pearson?
11            A.    Correct.  And they said something about MCS
12    Pearson being affiliated with Lockheed because from Burbank I
13    know Lockheed.
14            Q.    Tell me what the interview consisted of.
15            A.    As far as I recall, it was a question-and-answer
16    type interview; what would you do in this type of
17    hypothetical situation, how would you handle a briefcase that
18    was left unattended in the airport.
19            Q.    How long was the interview?
20            A.    About half an hour to 45 minutes.
21            Q.    What's your next interaction in connection with
22    your job application with -- your next interaction with
23    anybody concerning the job?
24            A.    I received a phone call from someone who offered
25    me the job, told me that I would have to be on a plane within
```

```
 1   two days to Honolulu.

 2         Q.    Where were you at the time?

 3         A.    At the Four Seasons.

 4         Q.    Okay.  And who was that that called you, do you

 5   know?

 6         A.    No, sir.

 7         Q.    Was anybody else present at your interview in

 8   August other than the MCS Pearson woman?

 9         A.    No, sir, other than -- No one was in the same

10   room.

11         Q.    Right.

12         A.    We had hundreds of applicants.  It was an

13   application and screening process where you went from one

14   point to another.  You had health paperwork to fill out in

15   one room.  The next room you had eye exams.  The next room

16   you had another type of an exam.  They ran through a battery

17   of tests.

18         Q.    Okay.  But the only face-to-face interview you had

19   was with this woman?

20         A.    Yes, sir.

21         Q.    Okay.  And then there was a level of additional

22   testing as well?

23         A.    Yes, sir.

24         Q.    And some of this is -- Strike that.  When you were

25   offered the job over the telephone, what position were you
```

```
 1   offered?

 2         A.    Lead screener.

 3         Q.    And what did you understand "lead screener" to

 4   mean?

 5         A.    I asked about that.  They said that I would be in

 6   charge of a screening lane or screening area.

 7         Q.    Did they tell you how many people you would be --

 8   if any, that you would be supervising?

 9         A.    No.

10         Q.    Did you have an understanding that you would be

11   supervising anyone?

12         A.    Yes, sir.

13         Q.    Okay.  So did you give notice at Four Seasons?

14         A.    Yes, sir.

15         Q.    How much notice did you give them?

16         A.    A day.  They were not too happy with that.

17         Q.    And what did your -- How long were you in Honolulu

18   for?

19         A.    Two weeks.

20         Q.    And what happened during that two weeks?

21         A.    Training with the Pearson company as far as on

22   procedures and policies that we were trained to do.

23         Q.    And who trained you?  Do you recall anybody's

24   name?

25         A.    No, sir.
```

```
 1          Q.   Was it your understanding that they were Pearson
 2   employees, TSA employees, both?
 3          A.   I believe they were all Pearson employees.  Again,
 4   I remember the Lockheed, something to do with Lockheed.
 5          Q.   Okay.
 6          A.   I don't know whether that's a parent company or
 7   not.
 8          Q.   And then the two-week training, are we now in
 9   September of '02?
10          A.   We're still in September.
11          Q.   When you say still in September, what do you mean?
12          A.   When we wound up on Maui was at the bottom part of
13   September, end part of September.
14          Q.   When you say "when we wound up on Maui," what do
15   you mean?
16          A.   I was with the first group that went through.
17          Q.   So when you say "wound up," do you mean when you
18   ended up on Maui?
19          A.   Yes, sir.  When we were returned back to Maui to
20   start our screening duties.
21          Q.   Okay.  That was late September when you first
22   started?
23          A.   Yes, sir.
24          Q.   Okay.  And tell me about your first day at work.
25   What happened?  Just walk me through.
```

```
 1        A.    Walked in -- I had been assigned to the evening
 2   shift.  Came in, we met outside, had orientation, got to know
 3   who our training crew was.  We had a mobile screening force
 4   there and they introduced themselves.  And then we got taken
 5   into the checkpoint area.  We were introduced to Patti later
 6   that shift.
 7        Q.    And did you have an understanding when you started
 8   your first day in late September of 2002 that -- did you have
 9   an understanding that you were going to be receiving
10   additional training?
11        A.    Yes, sir.
12        Q.    What was your understanding?
13        A.    That the mobile screening force would be training
14   us.
15        Q.    And what's the mobile screening force?
16        A.    It was screeners that were picked throughout the
17   United States and assigned to work with us.  They were
18   assigned to Maui for a short-term period of time.  They were
19   staying at the Sheraton Hotel.  And that they were there to
20   help us learn and acclimate ourselves as to the procedures
21   and policies that was installed by the Department of
22   Transportation.
23        Q.    Okay.  Name the individuals as best you can from
24   the mobile screening force who were present on your first day
25   of work.
```

```
 1          A.    I'm sorry, sir, I don't remember any of their
 2   names.
 3          Q.    You don't remember anybody?
 4          A.    No.  It's too long ago.
 5          Q.    Do you remember, was there somebody in particular
 6   in charge?
 7          A.    Again, it was too long ago.  There was a
 8   supervisor in charge, I believe he was out of Tampa, Florida.
 9          Q.    Okay.  And you also said you met Patti.  Who is
10   Patti?
11          A.    Patti Igarashi.  She is the manager.
12          Q.    When you say "the manager," what do you mean?
13          A.    On my night shift she was the manager that was in
14   charge.
15          Q.    Okay.  On the night shift when you first started
16   was there -- were there any levels of supervision between
17   yourself and Patti Igarashi?
18          A.    Yes.  There were supervisors.
19          Q.    And who were the supervisors that you met on your
20   first day?
21          A.    Again, the gentleman from Florida was a
22   supervisor.  He had a couple leads that were there.  I
23   believe one was from St. Paul, Minnesota; the other one was
24   from Chicago.  And they were the acting leads running the
25   individual lines showing us how to x-ray items and things.
```

```
 1        Q.   Okay.  Is it your understanding that the mobile
 2   screening force people were acting under Patti Igarashi?  Was
 3   that your understanding on your first day of work?
 4        A.   No, sir.
 5        Q.   What was your understanding as to the chain of
 6   command?
 7        A.   That was kind of blurred.  We knew that the mobile
 8   screening force was there to facilitate us learning, but we
 9   knew that eventually that we were -- we reported, in essence,
10   to Patti.
11        Q.   Okay.  What understanding did you have on your
12   first day of work as to Patti's role in your training?
13        A.   None that I knew of.
14        Q.   So was it your understanding on your first day of
15   work that your training would be conducted entirely by the
16   mobile screening force?
17        A.   Yes, sir.
18        Q.   And did you have an understanding as to when you
19   would start to be reporting to people permanently assigned to
20   Kahului Airport?
21        A.   No, sir.  No one told us when we would be
22   reporting to anybody, nor who we would be reporting to.
23        Q.   How many people other than yourself, if you can
24   estimate, started work the same day you did?
25        A.   Estimate, about 50.
```

```
 1              Q.   And was it your understanding at the time that all
 2     these people were new to the work that they were doing?
 3              A.   Yes, sir, because we were all either -- some of us
 4     were screeners, some of us were leads, some of us were
 5     supervisors, and we were all mixed together.
 6              Q.   And the chain of command would be supervisors on
 7     top, then leads, and then screeners; right?
 8              A.   Correct.
 9              Q.   And you're in the middle as a lead; right?
10              A.   Yes, sir.
11              Q.   Did you have an understanding up to the first day
12     of your work as to how you were selected as a lead?
13              A.   I believe it was based on experience, that's what
14     I was led to believe, as far as experience, background
15     checks, things like that.
16              Q.   Okay.  Anything else you recall from your first
17     day of work?
18              A.   A lot of confusion.
19              Q.   Okay.  What was the -- Describe for me what
20     confusion you faced on the first day or you saw on the first
21     day.
22              A.   Policies and procedures, which policies and
23     procedures we were told to follow as far as screening of
24     passengers, how you did it.  A lot of questions how to
25     properly bag search.  Procedures regarding what you're
```

```
 1    looking for on the x-ray machine.  Also how to communicate

 2    with the passengers and get them to put the proper items in

 3    the proper locations; things like this.

 4         Q.    And did you have any interaction with Patti

 5    Igarashi that first day other than meeting her?

 6         A.    No, sir.

 7         Q.    Okay.  Did you have any interactions that first

 8    day with anyone who later was in your supervisory chain?

 9         A.    Other than Ann and Rusty, that's it.  Ann and

10    Rusty were my two supervisors.

11         Q.    Okay.  And you're talking about Ann Wertzler?

12         A.    Yes, sir.

13         Q.    And also known as Ann Quinones?

14         A.    I don't know her by that name.

15         Q.    Ann Wertzler was the name you knew her by?

16         A.    Yes, sir.

17         Q.    And Rusty is Rusty Harlan?

18         A.    Yes, sir.

19         Q.    And you met both of them on the first day?

20         A.    I had met Ann before in training.

21         Q.    Okay.  How often had you interacted with Ann

22    Wertzler in training?

23         A.    She sat two people next to me, so we talked quite

24    a bit during training.

25         Q.    Okay.
```

```
 1           A.    On a daily basis, I would say.

 2           Q.    One thing -- One area I forgot to go into at the

 3    intro, have you reviewed any documents in preparation for

 4    your deposition today?

 5           A.    The only thing that I reviewed was the

 6    interrogatories, the responses that I gave to the

 7    interrogatories.

 8           Q.    How about your affidavits that you filed along

 9    with your formal or informal EEO complaints?

10           A.    No, sir.

11           Q.    When is the last time you looked at those?

12           A.    I don't remember.

13           Q.    Okay.  Have you spoken to anyone other than your

14    attorneys in preparation for your deposition today?

15           A.    Just like I mentioned, again, like Robert Paulson,

16    Mr. Luke Bruno.  Before I came over here, we all met with my

17    attorney.

18           Q.    I don't want you to tell me -- If there was a

19    meeting where your attorney and other plaintiffs were

20    present, don't tell me about that.

21           A.    Okay.

22           Q.    Other than such meetings, have you talked to

23    anybody about your -- or in preparation for your deposition

24    today?

25           A.    No.
```

```
 1          Q.    When is the last time you saw Mr. Bruno not in the
 2   presence of your attorney?
 3          A.    I'd be hard-pressed to say.  Over two years ago.
 4          Q.    Okay.  And how about Mr. Paulson?
 5          A.    Again, over two years ago.
 6          Q.    How about telephone conversations with either Mr.
 7   Bruno or Mr. Paulson where your attorney was not on the line?
 8   When is the last time you spoke with either of them?
 9          A.    With Mr. Paulson, over two years ago, I would say.
10   And Mr. Bruno, about a week ago, a week and a half ago when I
11   got notification of the deposition.
12          Q.    And what kind of -- What were the contents of that
13   conversation?
14          A.    Asking whether he had been served notice, also, as
15   far as the deposition.
16          Q.    How long was that conversation?
17          A.    Short.  Maybe five minutes.
18          Q.    How about Christopher Gahr, when is the last time
19   you talked with him outside the presence of your attorney?
20   And by "presence" I mean including having your attorney
21   present on the phone.
22          A.    Six to nine months ago.
23          Q.    What was the context of talking with Mr. Gahr six
24   to nine months ago?
25          A.    Status of the case and asking me to go to Iraq for
```

```
 1    a job.
 2          Q.    What kind of a job?
 3          A.    Something to do with security.
 4          Q.    Were you interested, curious at all?
 5          A.    Not really.  I'm too old for it.
 6          Q.    When you say you talked about the status of the
 7    case, what does that mean?
 8          A.    If he had heard from the attorneys.
 9          Q.    Okay.
10          A.    If he knew --
11          Q.    Did you call him or did he call you?
12          A.    He called me.
13          Q.    Where was he when he called you; what's your
14    understanding?
15          A.    My belief was that he was in California.
16          Q.    Okay.  And how about Tom Young, when was the last
17    time you had any contact with Tom Young outside the presence
18    of your attorney?
19          A.    Over two years ago, and that was at work for -- at
20    TSA.
21          Q.    Okay.  Back to Ann Wertzler.  Is she somebody you
22    considered a friend?
23          A.    No, sir.
24          Q.    Acquaintance?
25          A.    A work acquaintance.
```

```
 1          Q.   Okay.  Did you ever socialize with Ann Wertzler?

 2          A.   No, sir.

 3          Q.   She worked the night shift for much of your tenure

 4   at TSA?

 5          A.   Yes, sir.

 6          Q.   And she was your immediate supervisor for much of

 7   that time?

 8          A.   Yes, sir.  Rusty was four days a week, she was one

 9   day a week, one to two days a week, so it was predominantly

10   Rusty.

11          Q.   As your supervisor?

12          A.   Yes, sir.

13          Q.   So they worked other days, but your interaction

14   was mainly Rusty?

15          A.   Correct.  And I would see Ann one or two days a

16   week.

17          Q.   And is it correct that you first met Rusty Harlan

18   on your first day of work at TSA?

19          A.   I would say, sir.  I may have run into him over at

20   training, but I couldn't be 100 percent on that.

21          Q.   Now, we're here today because you're alleging that

22   your termination from TSA was based on your race and your

23   age; right?

24          A.   Yes, sir.

25          Q.   That is your allegation; correct?
```

```
1              A.   Yes, sir.

2              Q.   When did you first become concerned during your

3    employment at TSA about race or age description?

4              A.   Within the first few days.

5              Q.   What happened to make you concerned?

6              A.   A comment that Patti Igarashi made --

7                   MR. HELPER:   Let's go off the record a

8    second.

9                   (Interruption in Proceedings:  1:49-1:49)

10                  MR. HELPER:   Back on the record.

11                  THE WITNESS:   Patti made a comment to all of

12   us about the second or third day in where she had gathered us

13   all in a group and she made the comment, "I don't know where

14   all you people have come from."   She goes, "You're obviously

15   not from Maui.   We're going to teach you how to be more aloha

16   spirit," that type of comment.   Then she asked us to bring in

17   all our birth certificates and passports to show where we

18   came from, because it was obviously that we were not from

19   Maui.

20   BY MR. HELPER:

21             Q.   When you say she told us all, who do you mean?

22             A.   All the screeners that were there.

23             Q.   How many people were present at this meeting?

24             A.   I'd say about 30 to 40 of us.

25             Q.   And when you say "screeners," I take it you mean
```

1    screeners and up the hierarchy; right?

2         A.    Screeners, leads, supervisors.  Because we hadn't

3    been appointed leads or supervisors as of yet.  We were not

4    acting in that capacity.  Patti made sure that we knew that

5    she was not happy with the people that they had been selected

6    for her.  She asked us in the middle of one of the meetings,

7    "How many of you are -- have been told that you're screeners?

8    How many of you have been told that you're leads?  How many

9    of you have been told that you're supervisors?  You leads and

10   supervisors, don't get use to those titles.  We will decide

11   who our leads and supervisors are going to be."

12        Q.    Okay.  What was it about her statements that day

13   that made you concerned -- I take it everything you told me

14   so far made you concerned about racial discrimination; is

15   that right?

16        A.    Correct.  It also made me concerned about job

17   security.  I had just given a -- I had just left a job

18   without giving them any notice, I couldn't use them to go

19   back as a reference, and now I may -- I've got myself into a

20   situation where I have no job security at all.

21        Q.    Patti Igarashi's comment earlier in your tenure at

22   TSA about teaching people the aloha spirit, did you take that

23   to have a -- some kind of a coded racial meaning?

24        A.    I didn't take it -- I took it at face value, okay,

25   that she wanted us to be more friendly. ·

```
 1        Q.   Okay.  So that comment by itself didn't give you

 2   much concern?

 3        A.   It gave me concern because everybody had been

 4   overly friendly to the guests.

 5        Q.   "The guests" meaning the passengers?

 6        A.   Yes.

 7        Q.   Okay.  When you say "overly friendly," what do you

 8   mean?

 9        A.   Hello.  How you doing?  You know, talking to them

10   and getting them to be comfortable with the wait that we were

11   going through, okay, because we were new at the checkpoint

12   and going through large lines of passengers and there was an

13   extreme amount of wait.

14        Q.   Okay.  You used the phrase "overly friendly."  Did

15   you think that the screeners at Maui at the beginning were

16   being too friendly to the passengers?

17        A.   No, I did not.

18        Q.   Okay.

19        A.   Everybody was saying, Hello.  Aloha.  How you

20   doing?  You know.  Sorry, but you need to take off your shoes

21   and, you know.  Oh, put your bags up here.  Lay them down

22   this way.  And we were just being friendly with the people,

23   and that's how come it surprised me when she said that we

24   were -- that we didn't have any aloha spirit.  I was

25   surprised because I thought we had a lot of aloha spirit.
```

```
 1        Q.    The comment about supervisory roles, did you have
 2   an understanding at that point or at any point that there had
 3   been paperwork -- a contradiction between the promises made
 4   to some people about what jobs they were going to have and
 5   what jobs they were actually entitled to under the paperwork?
 6        A.    I don't know.  I didn't know anything.  Okay?  I
 7   took it for the information she said, okay, that she would be
 8   assigning, you know, the leads and screeners -- or the
 9   leaders and supervisors.
10              And this upset -- When she made the comment, the
11   mobile screening force members were there.  This upset them.
12   And they said they would be calling on an 800 number to
13   Washington and let them know what the situation was.
14        Q.    And these -- You don't recall the names of any of
15   these MSF folks; right?
16        A.    No.
17        Q.    Okay.  When did the MSF folks say they were going
18   to be calling Washington?
19        A.    That day.
20        Q.    And was that in the same meeting or in some other
21   venue?
22        A.    In another venue after the meeting.  They told us
23   that they would be making phone calls because they could see
24   that we were very highly upset and concerned.
25        Q.    Did these -- Was it your understanding that the
```

1    MSF was going to make phone calls about Patti's statements

2    about supervisory assignments because you guys were upset and

3    they wanted to check it out, or because they believed Patti

4    had made some sort of a mistake?

5        A.    They believed that Patti was overstepping her

6    authority.

7        Q.    And why do you -- Tell me what you recall about

8    statements by an MSF person -- First of all, who made the

9    statements by physical description?

10       A.    Female, white, about mid 20's.  I believe she was

11   from like Iowa, somewhere in the Midwest.  And she had made a

12   comment that they would be calling and verifying that the

13   information that Patti was saying was incorrect, that you

14   guys -- you guys were hired at certain levels and that she

15   couldn't take it away from you.

16       Q.    Okay.

17       A.    And a gentleman, blond-haired gentleman, about six

18   foot two.  He was from Minnesota, St. Paul.  Very good

19   attitude.  He was a lead over there.  Glasses.  He had

20   mentioned also that he would be making some phone calls and

21   not to be so concerned with it because he did not think that

22   she had the authority to change who was assigned leads and

23   who was assigned supervisors.

24       Q.    Did Patti Igarashi say -- At this meeting early in

25   your tenure at TSA when she was discussing supervisory

```
 1    assignments, did she say that she would be making the
 2    assignments later on?
 3         A.    Yes.
 4         Q.    Okay.  Not that other people in the TSA hierarchy
 5    would be doing it, but that she personally would be doing it?
 6         A.    Correct.
 7         Q.    And did you learn at any point during your tenure
 8    at TSA that people had supervisory assignments taken away
 9    from them?
10         A.    No, I didn't learn at that point in time that
11    anybody had taken any type of supervisory -- I was new.
12         Q.    No, no.  I'm asking at any point, not just during
13    this first few days.  I'm talking about at any point during
14    your tenure at TSA did you understand that anybody had a
15    supervisory assignment taken away from them?
16         A.    People were put in and out of supervisory
17    positions on a regular basis.  It depends on -- Like one gal,
18    she had been a supervisor before with Wackenhut.  She was
19    only qualified as a screener by the hiring process.  When she
20    came there, Patti put her as an acting supervisor.
21         Q.    What is the source of your knowledge as to her
22    qualifications, the former -- I'm sorry.  Let me back up.  Do
23    you remember this former Wackenhut supervisors's name?
24         A.    I don't.
25         Q.    Silva, by any chance?
```

```
 1          A.    Maybe.  I don't know.

 2          Q.    Can you describe her?

 3          A.    Local, Filipino-Oriental mix.  I guess you would

 4   call it hapa.  That's about it.

 5          Q.    How old?

 6          A.    Thirties.

 7          Q.    And what is the source of your knowledge about

 8   what she was qualified to do?

 9          A.    She told us.

10          Q.    What did she tell you?

11          A.    She told us that she had only qualified as a

12   screener through the application process.  She also mentioned

13   to us how Patti -- before the testing had begun, she had

14   given them the test information and had her and the rest of

15   the screeners be prepared for the testing for the application

16   process.

17                Now, when I had gone through the process, I had

18   been told by the NSC Pearson people that all that information

19   was supposed to be completely confidential and you could be

20   fired for divulging it.  And I thought it was kind of strange

21   that Patti was giving it to people -- the Wackenhut people

22   ahead of time so they could qualify and know what was on the

23   tests.

24          Q.    Your understanding of what Patti did regarding the

25   test -- the testing is based on what this former Wackenhut
```

```
 1   supervisor told you?

 2        A.   Yes.

 3        Q.   Do you have any other source of information for

 4   that assertion?

 5        A.   Patti herself.

 6        Q.   Patti said what?

 7        A.   Patti said, "I can't believe these people didn't

 8   get in.  I gave them all this help and they didn't even get

 9   anywhere."

10        Q.   And did she describe what she meant by "help"?

11        A.   She made a comment about she had told them

12   everything that was on the test.

13        Q.   When did Patti Igarashi say that she had told the

14   former Wackenhut screeners what was on the test?

15        A.   About two weeks after we had been there.  During

16   the two -- the second week, I believe, she said that comment.

17        Q.   When you say people were moved in and out of

18   supervisory positions a lot -- Is that a fair summary of what

19   you said?

20        A.   Yes.

21        Q.   There's something called an acting supervisor; is

22   that correct?

23        A.   Yes.

24        Q.   Acting lead?

25        A.   Acting lead.  This gal that I had mentioned was
```

```
 1    made an acting supervisor.  Another one, the son of one --
 2         Q.   An acting lead or acting supervisor?
 3         A.   Acting supervisor.  The gal was made into an
 4    acting supervisor.  The son of one of the TSA members, he
 5    was -- I want to say his -- I believe his name is Brandon,
 6    okay, was made into an acting lead.  His dad was part of the
 7    upper management in TSA.
 8         Q.   The former Wackenhut supervisor who you say was
 9    made an acting supervisor, who did she supervise?
10         A.   Who did she supervise?
11         Q.   Yes.
12         A.   She supervised at the time the baggage area.
13         Q.   Okay.  She didn't supervise you; correct?
14         A.   Correct.  I was at the checkpoint.
15         Q.   And how long --
16         A.   Correction.  Correction.  She didn't supervise me
17    when I was at the checkpoint.  When I was assigned to the
18    baggage area, she was my supervisor in the baggage area.
19         Q.   And how long -- or how often were you assigned to
20    the baggage area?
21         A.   Only during my last two weeks there.
22         Q.   Other than the statement from Patti Igarashi and
23    from the former Wackenhut supervisor whose name you can't
24    recall, do you have any source for your assertion that Patti
25    Igarashi gave testing information to the Wackenhut screeners
```

Charles Turner

```
 1   before the tests?
 2        A.    Only from herself and from the other person I have
 3   already mentioned; that's it.
 4        Q.    Okay.  And your belief is that she actually gave
 5   them testing materials?
 6        A.    No, sir.
 7        Q.    What is your assertion?
 8        A.    Is describing what was on the test.  Giving them
 9   words, because one part of the word was English, as far as
10   understanding English, the connotation of certain words in
11   the English language.  And going over to them with English
12   skills.  They had a problem with that.
13        Q.    Okay.  Did you feel like -- based on what you
14   learned of what Patti did, that she was giving the Wackenhut
15   people an unfair -- unfair help?
16        A.    Yes, sir.
17        Q.    Why do you say that?
18        A.    Because we were told by the TSA -- the Pearson
19   people that information regarding the testing was completely
20   confidential and that we would be terminated if we divulged
21   it.
22        Q.    What other supervisors other than yourself --
23   "supervisors" meaning leads, supervisors, managers -- were
24   present at this initial meeting where you say that Patti made
25   the comment about whether or not supervisory assignments
```

Charles Turner

```
 1    would be permanent?  What other supervisors were there?
 2         A.    I know Karin was there.  Karin was another lead.
 3    She was present at that point in time.
 4         Q.    If you remember last names, say them; but if you
 5    don't remember, say you don't remember because otherwise it
 6    could get real confusing.
 7         A.    I don't remember her last name.
 8         Q.    Okay.
 9         A.    She was ex-FAA.
10         Q.    Karin Phaneuf?
11         A.    There you go.  She was present at that point in
12    time.  I don't recall anybody else in particular.
13         Q.    Patrick Collins?
14         A.    Patrick Collins was a manager.
15         Q.    Right.  I included him in the --
16         A.    Uh-huh (affirmative response).  Well, I remember
17    him making comments about the Washington way and how we were
18    going to do it the way on -- the Maui way.
19         Q.    And?
20         A.    He didn't make the comments regarding where we
21    were from.  It was just Patti making those comments and then
22    Patti requesting us to bring in our birth certificates or
23    passports because she wanted to know where we were all from
24    because obviously we weren't from Maui.
25         Q.    And right now I'm just trying to figure out who
```

Charles Turner                                                                  40

1    else was present at the meeting, what other supervisors were

2    present at the meeting besides yourself, Ms. Igarashi and

3    Patrick Collins.

4         A.    He wasn't there when she made those comments.

5         Q.    He was not there?

6         A.    No.

7         Q.    How do you know?

8         A.    Because I remember her making the comments and he

9    was not there.

10        Q.    Was he present during any part of that meeting?

11        A.    No, sir, he wasn't.

12        Q.    How --

13        A.    Not that I recall.

14        Q.    How is it that you recall at this point at a

15   meeting with 40 or 50 people who was and wasn't there?

16        A.    I recall that Patti was there specifically because

17   Patti made the comments and I remember being surprised by

18   them, that a person in management would be asking for that

19   information considering we had just gone through the

20   screening process where they needed all our background

21   information and we provided that to everybody for Washington,

22   for Pearson people.  So it was surprising to me that she

23   would require us to bring in our Social Security cards and/or

24   passports/birth certificates to show where we were from.  It

25   didn't make any sense to me other than that she was keeping

```
 1     it for her own personal files here on Maui.
 2          Q.   My question was:  How is it you remember that Pat
 3     Collins wasn't there?
 4          A.   Because she stuck in my mind and she was the only
 5     supervisor, the only manager there at the time.  Patrick
 6     worked day shifts.  Okay?  Patti worked night shifts.  This
 7     was at the end of one of our shifts and it was about 11:00 or
 8     11:30 at night.
 9          Q.   Russel Harlan, was he there?
10          A.   Rusty?  I don't know whether he was there or not.
11          Q.   How about Ann Wertzler?
12          A.   I don't remember whether she was there or not.  I
13     know that Karin was there, because I know that we had
14     discussed it.
15          Q.   Had you met -- What was Karen's job?  She was a
16     lead, also?
17          A.   Yes.
18          Q.   Had you met her in the course of training?
19          A.   No.
20          Q.   When did you first meet Karin Phaneuf?
21          A.   When we were assigned to Maui.
22          Q.   So on the job?
23          A.   Yes.
24          Q.   Okay.  Do you know whether or not Patti was told
25     by persons above her to get birth certificates or passports?
```

```
 1          A.   No.

 2          Q.   Do you have any reason to know one way or another

 3     whether that's true?

 4          A.   No.

 5          Q.   Okay.  But your belief at the time was that she

 6     essentially had a racial motivation for requesting birth

 7     certificates and passports; right?

 8          A.   It came out that way.

 9          Q.   And that continues to be your interpretation

10     today; right?

11          A.   Yes.

12          Q.   Okay.  What's the next thing that happened that

13     made you concerned about race or age discrimination at

14     Kahului?

15          A.   There was a gentleman by the name of Everret and

16     he was a screener, and she was constantly yelling at him and

17     writing him up.

18          Q.   Okay.  So why did that concern you about racism?

19          A.   Because he was white, he was tall, and he was

20     elderly.

21                    MS. JOHNSON:  He was what?

22                    THE WITNESS:  Elderly.  When I say "elderly,"

23     I mean over 40.

24                    MS. HEVICON:  Some people --

25                    MR. HELPER:  Off the record.
```

```
 1              (Pause in Proceedings:  2:10-2:25)

 2                   MR. HELPER:  Back on the record.

 3   BY MR. HELPER:

 4        Q.   Before we took a break I think you were starting

 5   to tell me about an interaction between Patti Igarashi and

 6   Everret Reinhardt; correct?

 7        A.   Correct.

 8        Q.   Let me ask you just a few general questions first.

 9   During the course of your time at Kahului TSA did you observe

10   anything done by anyone other than Patti Igarashi to make you

11   believe that that person was taking some action based on

12   race?

13        A.   No.

14        Q.   So Patti is the only one?

15        A.   Yes.

16        Q.   Okay.  And I think in your affidavits in various

17   spots you've said you saw her treating Caucasians badly on a

18   number of occasions; right?

19        A.   Correct.

20        Q.   And that would be your testimony today, too, is

21   you saw her treating Caucasians badly a number of times?

22        A.   Yes, sir.

23        Q.   And why don't we make a list of those people to

24   the extent you can remember?  And let me just make clear, I'm

25   not -- I do want you to give me your best recollection.  I'm
```

1  going to be going over your affidavits later and asking you
2  about specific things.  So on a question like this I'm not
3  going to say, Oh, my God, you left one out, but there are
4  some parts if you omit -- if you testify something
5  significant at trial you haven't told me about today, that's
6  fair game.

7          But other than Mr. Reinhardt, who did you
8  personally observe Patti Igarashi treating poorly when you
9  felt that treatment was not deserved?

10  A.    Bob Lucas.  The way how she handled her
11  conversations with Chris Gahr.  How she dealt with
12  predominantly most of the white people there.  There was not
13  that many supervisors or leads that were of ethnicity on
14  there, and that's one reason why it concerned me when she
15  made the comments regarding who she was going to decide who
16  was going to be the supervisors and leads.  Most of the local
17  employees, the ethnic employees, local, were screeners.  And
18  even at the screener level, there would be certain
19  accommodations done for the ethnic employees versus the white
20  employees, such as Kenny was always being --

21  Q.    Okay.  I don't want to cut you off when you're
22  responding to my question, but I don't think you're
23  responding to my question at this point.  Right now I'm just
24  asking for a list of the Caucasians that you think she
25  mistreated.  And you have given me Everret Reinhardt, Bob

```
 1   Lucas, and Chris Gahr as names.  And a general category of
 2   others, but no names.
 3        A.   Don't recall individual names.  Don't recall -- I
 4   remember individuals, but I don't grasp their names.
 5        Q.   Russel Harlan?
 6        A.   No.  Russ was -- Russ was a supervisor.  I was not
 7   privy a lot to their conversations.  I know that Russ did not
 8   think highly of Patti by his comments that he had directed to
 9   us.  I know Gary, who also was a lead to begin with, was
10   written up by her and then subsequently he became cozy with
11   her to an extent.
12        Q.   Gary Levitt?
13        A.   Yes.  Who is now a supervisor at Kahului Airport.
14                  MS. HEVICON:  Gary Levitt?
15                  MR. HELPER:  A different Gary Levitt.
16                  MS. HEVICON:  Not the attorney who works in
17   my office.
18                  MR. HELPER:  A different Gary.
19   BY MR. HELPER:
20        Q.   Other than Everret Reinhardt, Bob Lucas, Chris
21   Gahr and Gary Levitt, do you recall personally observing
22   instances of Patti Igarashi mistreating Caucasian
23   supervisors?
24        A.   My supervisors would be Rusty --
25        Q.   Let me ask the question again and just make sure
```

```
 1    when I say "supervisors," I mean that as a -- with a small S,
 2    anybody with supervisory responsibility; not supervisor
 3    capital S as someone in the TSA organizational chart with
 4    that title.  Do you understand what I mean?
 5         A.   No.
 6              MS. HEVICON:  Do you mean leads?
 7    BY MR. HELPER:
 8         Q.   When I say "supervisor," I mean anybody who has
 9    supervisory responsibilities, including a lead, a supervisor
10    as TSA uses it, and a manager.
11         A.   Okay.  I think I know what you're asking.
12         Q.   Let me ask the question again.  Using the broad
13    definition of the word "supervisor," did you see Patti
14    Igarashi mistreating any Caucasian employees -- I'm sorry,
15    Caucasian supervisors other than Everret Reinhardt, Bob Lucas
16    and Chris Gahr?  Oh, and Gary Levitt.
17         A.   I remember an incident, but I don't know the
18    gentleman's name.
19         Q.   What was that incident?
20         A.   Where she was berating him in front of all of us
21    over something on the checkpoint.  I don't remember the
22    gentleman's name.
23         Q.   What was she berating him about?
24         A.   Something to do with him deciding when to take his
25    lane to lunch.
```

```
 1          Q.   Do you recall when in your tenure at TSA this
 2   occurred?
 3          A.   I would say within the first month I was there.
 4          Q.   Did you ever see Patti Igarashi treating a
 5   non-Caucasian employee improperly?
 6          A.   No.
 7          Q.   You never saw Patti Igarashi ever yell at a
 8   non-Caucasian?
 9          A.   Not that I recall.
10          Q.   I asked that question poorly.  Did you ever see
11   Patti Igarashi yell at a non-Caucasian employee?
12          A.   Not that I can recall.
13          Q.   Okay.  Did you ever see Patti Igarashi yell at or
14   mistreat -- I'm sorry, strike that.  Did you ever see Patti
15   Igarashi mistreat a non-Caucasian employee in any way?
16                    MS. HEVICON:  Objection; vague and ambiguous.
17   Can you define "mistreat"?
18   BY MR. HELPER:
19          Q.   Do you know -- Do you have a definition in your
20   head of "mistreat"?  Do you know what mistreatment is?
21          A.   I didn't see her berate another -- a non-Caucasian
22   employee in my presence that I can currently remember.
23   Again, we're going back over two years and it wouldn't have
24   stuck in my mind as much as people in my class.
25          Q.   So you have a -- You're more likely to remember a
```

 1    Caucasian being mistreated than a non-Caucasian being

 2    mistreated; is that fair to say?

 3         A.    I remember that when -- the non-Caucasians were

 4    not mistreated, they were pampered by Patti, so I don't

 5    remember a specific incident of her yelling at any of them.

 6         Q.    But I think there -- Is it fair to say that you're

 7    more likely to remember a Caucasian being treated improperly

 8    in your mind than a non-Caucasian being treated improperly?

 9         A.    No.    I would have remembered anybody been

10    mistreated, but I don't remember at any point in time a

11    non-Caucasian being mistreated.

12         Q.    Okay.  Do you remember -- Do you ever remember

13    Patti Igarashi yelling or mistreating in any way -- When I'm

14    saying "mistreat," I mean where you have thought at the time,

15    This isn't right.

16                MS. HEVICON:    Kicking them in the head, those

17    types of things.

18                MR. HELPER:    No.    I mean much broader than

19    that.

20    BY MR. HELPER:

21         Q.    Where you felt this person, this employee is being

22    treated unfairly.  Did you ever see her treat any employee

23    unfairly -- I'm sorry, strike that.

24                Did you ever see her treating a Caucasian

25    employee -- yelling at them for something they deserved?

```
 1          A.    I would see her yelling at them and berating them
 2    for something that they have done.
 3          Q.    Right.
 4          A.    However, her management skill was lacking in that
 5    she should have been counseling them in a closed environment
 6    rather than -- not in front of everybody, and yelling is -- I
 7    don't agree with yelling and screaming at someone at any
 8    point in time.
 9          Q.    Okay.
10          A.    It's not a good management style.
11          Q.    Did you ever see Patti Igarashi berating -- Strike
12    that.  So you saw Patti Igarashi berate employees for errors
13    they really had made; right?
14          A.    At times.
15          Q.    Okay.  Let's talk about the specific incidents.
16    And I'm not sure I ever got a definite answer to this:  Other
17    than Everret Reinhardt, Bob Lucas, Chris Gahr and Gary
18    Levitt, did you ever see her treating a supervisor, meaning
19    anyone with supervisory responsibility, unfairly or
20    improperly other than those four individuals?
21          A.    I believe there was another gentleman.  I don't
22    recall his name.
23          Q.    Right.
24          A.    Who was a lead.
25          Q.    And you told me about that before?
```

```
1         A.    Right.

2         Q.    Other than those five, do you recall her treating

3    any Caucasian supervisor unfairly or improperly?

4         A.    Not that I can recall.

5         Q.    Okay.  Everret Reinhardt, what did she do to him?

6         A.    He was a screener, okay, not a supervisor, okay,

7    but she got on him regarding how to wand someone and just

8    laid into him one side -- up and down the other side in front

9    of the entire line that he was screening for.  Then she wrote

10   him up, called him into the office and gave him the write up.

11   And as he was pointing out, he hadn't done what she was

12   saying that he had done.

13        Q.    Okay.  How much of this conversation were you

14   present for?

15        A.    I was on another line when the incident occurred.

16   I had his wife working on my lane.  And when the incident

17   occurred, I was working on my side -- This was in October,

18   okay, and we had just first started and we were in the

19   process of training.  And she just lit into him and it was

20   loud enough for the entire checkpoint to hear.

21        Q.    And do you remember what Patti Igarashi said?

22        A.    She was complaining to him about not letting a

23   person -- or letting a person by without properly wanding

24   them or something like this.  And he was trying to interject

25   to her and point out to her that he hadn't handled that
```

1     person, that this other person had done it, and she didn't

2     want to hear about it.

3         Q.   Did you she use any racial terms in talking to

4     Everret Reinhardt?

5         A.   Not at that point in time.

6         Q.   Was there a later point in time when she did?

7         A.   She used racial terms all the time.  One of her

8     favorite comments was calling us all a bunch of fucking

9     haoles.  Excuse the language.  But as directed towards

10     someone specific, I don't recall.

11         Q.   Okay.  I know I've asked you a variation of this

12     question a bunch of times, but let me expand it a little bit

13     from the supervisor category.

14         A.   Okay.

15         Q.   Other than Reinhardt, Lucas, Gahr, Levitt and

16     somebody whose name you can't remember, did you ever see her

17     mistreating or treating unfairly any Caucasian employee at

18     TSA?

19         A.   Yes.

20         Q.   Okay.  And who?

21         A.   Like Mark Twain, that's the best way I can

22     describe him.  He was originally -- I think he passed away

23     recently.

24                  MS. HEVICON:  Archibald, Glen Archibald?

25                  THE WITNESS:  Yeah, Glen.

```
 1   BY MR. HELPER:
 2        Q.   I want a list of the names at this point.  Other
 3   than the people you have mentioned and Glen Archibald --
 4        A.   I know Glen.  I'm running into -- I know two other
 5   incidences, but I don't know the people's name.
 6        Q.   So now we're up to eight Caucasians who you
 7   personally observed being mistreated; right?
 8        A.   Correct.
 9        Q.   And we're talking about four screeners:
10   Reinhardt, Archibald, and two unnamed; right?
11        A.   Correct.
12        Q.   And four supervisors with a small S:  Lucas, Gahr,
13   Levitt, and a person whose name you can't remember?
14        A.   Correct.
15        Q.   That's a complete list as far as you can recall as
16   you sit here today of the people that you saw Patti Igarashi
17   mistreating?
18        A.   To the best of my ability, but, again, I don't
19   recall names or particular things.  Again, it was over two
20   years ago.
21        Q.   Was the Everret Reinhardt incident, was there --
22   Was there just one incident with each of these persons?
23        A.   No.
24        Q.   How many -- Who had more than one incident?
25        A.   Mr. Reinhardt had at least three that I am aware
```

```
 1    of.

 2         Q.    How many that you observed?

 3         A.    The one.

 4         Q.    Okay.  How are you aware of the other two?

 5         A.    Through other screeners.

 6         Q.    Okay.  Right now let me list -- We may get into

 7    the secondhand area later, but for now let's just stick with

 8    what you personally observed.

 9         A.    Okay.  One with Mr. Everret, one with Mr.

10    Levitt --

11         Q.    Was there anybody who you observed more than one

12    incident for?

13         A.    Not that I can recall at the present time.

14         Q.    Okay.

15         A.    Except for maybe Mr. Lucas.  I remember a couple

16    of times -- a couple times I'd come in there and he would be

17    getting it from Patti.  It was a regular thing.

18         Q.    And what was his position, Mr. Lucas?

19         A.    He was a supervisor originally hired for Lanai,

20    but I guess they must have overhired or something because he

21    didn't get to go to Lanai.

22         Q.    And how long -- or when did you work with Mr.

23    Lucas?

24         A.    I started in November and I believe it ended in

25    December.
```

```
 1          Q.    He started in November; right?

 2          A.    Yes.  He started after us.

 3          Q.    Right.

 4          A.    He was in the second or third training class.

 5          Q.    And what happened between Mr. Lucas and Ms.

 6    Igarashi?

 7          A.    She was constantly berating him.  I mean, I don't

 8    think he ever did anything to her satisfaction.

 9          Q.    So what sort of things would she criticize him

10    for?

11          A.    Screening as far as wanding.

12          Q.    Anything else?

13          A.    Bag search procedures.

14          Q.    Anything else?

15          A.    And that he was not loading fast enough for her

16    specifications.

17          Q.    Loading on the --

18          A.    -- conveyor belt for the CRT.

19          Q.    CRT mean?

20          A.    Cathode-ray tube.  That's the x-ray that is for

21    the -- when you walk through the line.

22          Q.    The carry-on --

23          A.    Right.

24          Q.    Just for the court reporter we've got to spell

25    these things out.
```

```
 1            A.    Uh-huh (affirmative response).
 2            Q.    Okay.  And from what you could see, was there
 3    anything wrong with Mr. Lucas's performance?
 4            A.    Other than his needing to be trained properly --
 5    Okay?  With proper training, he did fine, once you trained
 6    him.
 7            Q.    Was he making errors or do you know whether he was
 8    making errors just prior to when Ms. Igarashi was criticizing
 9    him?
10            A.    No, he wasn't making errors.  When I saw her
11    yelling at him regarding loading faster, he was doing the
12    best he could do.
13            Q.    Where was he working during the time immediately
14    before Ms. Igarashi was berating him?
15            A.    As far as?
16            Q.    In relation to you.
17            A.    He was on my checkpoint line.
18            Q.    So was he under your supervision?
19            A.    Yes, he was --
20            Q.    Okay.
21            A.    -- even though he had a supervisor title, because
22    he was in training.
23            Q.    Okay.
24            A.    And each time that they were underneath my
25    supervision, I had to write up evaluation reports on them.
```

```
1         Q.   So this would have been after you had been on the
2    job for a month or a little bit more?
3         A.   Yes, sir.
4         Q.   And you thought his performance was okay?
5         A.   Yes, sir.  And I wrote it up as such.  And that's
6    when Patti was upset with me for writing it up in a positive
7    note.
8         Q.   What did she say about your positive write-up of
9    Mr. Lucas?
10        A.   I was told to be more critical of the employees,
11   to be more negative.
12        Q.   "Of the employees" meaning who?
13        A.   The trainees.
14        Q.   What did Patti Igarashi say to you about your
15   evaluations?  Tell me in --
16        A.   She told me that I needed to watch the employees
17   more.  She specifically specified Mr. Lucas, that they were
18   concerned about his ability to perform and that she wanted me
19   to write up negative comments regarding him.
20        Q.   Did she ask you -- Did you think she was asking
21   you to make up negative comments about him?
22        A.   Yes.
23        Q.   What did she say that gave you that impression?
24        A.   That they were concerned about his ability to be a
25   supervisor and they were concerned about him and she told me
```

1    to keep a good eye on him and to write up on my evaluations

2    negatives.

3         Q.    And what did you say?

4         A.    I told her that I could only write up what I saw.

5         Q.    Do you remember anything else she said in this

6    conversation?

7         A.    No, not at that point in time.

8         Q.    Other than Mr. Lucas, did she ever name any

9    particular employee who she was concerned about -- any

10   employee under your supervision that you evaluated that she

11   was concerned about?

12        A.    Yes, there was another gentleman.

13        Q.    Who was that?

14        A.    I don't recall his name.

15        Q.    Could you give me a description?

16        A.    White male about five ten.  He really didn't fit

17   into the screening process.  It overwhelmed him.  And I did

18   write up negative on him because he just couldn't get with

19   it.  And he was subsequently -- He lasted only about a week.

20        Q.    So you shared Patti Igarashi's concern about that

21   employee?

22        A.    I did on that one.

23        Q.    Okay.

24        A.    Okay.  If there was a concern about Mr. Bruno, I

25   would have brought it up.

```
 1          Q.   Mr. Bruno?

 2          A.   Lucas Bruno.

 3               MS. HEVICON:  Yeah.  Actually, can we just

 4     get something straight here, because we started out with

 5     somebody named Bob Lucas, but were you that whole time

 6     talking about Lucas Bruno?

 7               THE WITNESS:  Yeah, Lucas Bruno.

 8               MS. HEVICON:  I was going to ask him about

 9     that during a break.

10               MR. HELPER:  That helps a lot.  That clears a

11     lot of things up because I never heard anything about Bob

12     Lucas before.

13               THE WITNESS:  Yeah, Lucas Bruno.

14     BY MR. HELPER:

15          Q.   Okay.  We spent the last 20 minutes or so

16     discussing a phantom employee named Bob Lucas; right?

17          A.   Correct.  Which is --

18          Q.   And under your attorney's prompting, you've

19     recognized the fact that's somebody else; right?

20          A.   Correct.  Bob Lucas is my misinterpretation.  It's

21     Lucas Bruno.

22          Q.   Let me look over my notes with that in mind

23     because I have been taking down notes furiously thinking

24     we're talking about more than one person.

25          A.   Sorry about that.
```

```
 1        Q.    It's okay.  So is Lucas Bruno the only employee
 2   that Patti Igarashi talked to you about writing up who you
 3   felt didn't deserve being written up?
 4        A.    In a supervisor manner, yes.  She also approached
 5   me about writing up -- or a statement for her regarding my
 6   supervisor.
 7        Q.    Who was that?
 8        A.    Ann Wertzler.  About a month before I was
 9   terminated she had approached me and wanted me to write up
10   about how Ann was mistreating the employees.
11        Q.    And --
12        A.    Ann being the supervisor, Wertzler, and I refused.
13        Q.    What was Patti's concern as expressed to you about
14   the way Ann Wertzler was treating the employees?
15        A.    Her tact in talking with them, her approach, how
16   she dealt with them on an individual basis.
17        Q.    Did you feel like there was any merit to Patti
18   Igarashi's concerns as expressed to you about Ann Wertzler?
19        A.    Some, but I wasn't going to be writing up a
20   statement for Patti because I felt that I -- if I did, it
21   would somehow come back and haunt me.  I did not feel that it
22   would be giving a statement to someone who was doing an
23   unbiased investigation.
24        Q.    Okay.  Other than Ann Wertzler or Lucas Bruno and
25   somebody whose name -- Well, strike that.  So Ann Wertzler,
```

```
 1    you shared some of Ms. Igarashi's concerns about Ms.

 2    Wertzler's performance; is that fair to say?

 3         A.   Yes.

 4         Q.   But you didn't trust Ms. Igarashi enough to give

 5    her a written statement of what your concerns were; right?

 6         A.   Correct.

 7         Q.   Okay.  And with Lucas Bruno, is it fair to say you

 8    didn't share Ms. Igarashi's concerns?

 9         A.   Correct.

10         Q.   Okay.

11         A.   Now, the other employee that you were talking

12    about, I shared my concerns with Rusty regarding him and his

13    failure to perform job duties, so Rusty was aware of it,

14    also.  I dealt mainly with Rusty on him, not Patti.

15         Q.   Okay.  Was there any general write-up policy of

16    which you were aware at TSA Kahului?

17         A.   Such as?

18         Q.   Written, oral, anything.  Did you ever get any

19    instruction in any form about when somebody should or

20    shouldn't be written up?

21         A.   No.

22         Q.   Did anybody tell you early in the process or early

23    in your tenure at TSA that we had to doc -- that the

24    supervisors should document errors or problems with the

25    employees after they got out of training?
```

```
 1           A.   No.

 2           Q.   Never heard anything from anyone that you can

 3    recall on a general policy as to when write-ups should be

 4    done; is that your statement?

 5           A.   Correct.

 6           Q.   What did you see in terms of Ms. Igarashi's

 7    interaction with Lucas Bruno that made you think she was

 8    treating him unfairly?

 9           A.   Her yelling at him.

10           Q.   How many occasions did she yell at him?

11           A.   Three that I can recall.

12           Q.   Over the course of how many days?  Was it all

13    within the same day?

14           A.   I would say three within a course of a week period

15    of time.

16           Q.   What was she yelling at him about?

17           A.   Again, the specific one I remember is wanding.

18    Another one was about the loading.  I remember one was up

19    towards the gates and it had something to do with the gates.

20           Q.   And how long was -- if you can give me an

21    estimate, how long was the -- were these interactions between

22    Mr. Bruno and Ms. Igarashi?  How long would she be yelling at

23    him?

24           A.   About five minutes each time.

25           Q.   Who else was present that you recall during the
```

1    times that Ms. Igarashi was yelling at Mr. Bruno?

2         A.    Well, when she was yelling at him regarding the

3    loading, everybody at the checkpoint was present, which is

4    about 30 or 40 employees.  When she was yelling at him

5    regarding the wanding, that was at the checkpoint, so we had

6    about 20 or 30 employees then.  And then I remember when she

7    was up by the gates, I think Karin was in the area and there

8    was about four or five of us coming out of a gate area when

9    she was berating him.

10        Q.    The loading incident, do you recall if there were

11   any supervisors, small S, other than yourself and Ms.

12   Igarashi herself there?

13        A.    I think Gary was there and I think Rusty was

14   there.

15        Q.    During the time at the -- where Ms. Igarashi was

16   talking to Mr. Bruno about his wanding, what other

17   supervisors were there other than yourself?

18        A.    Again, I believe Gary and Rusty were there.

19        Q.    And then the incident at the gates, what

20   supervisors were present other than yourself and Ms. Phaneuf?

21        A.    Yes, just me and Ms. Phaneuf.

22        Q.    Just the two of you.  During her criticisms or

23   berating or yelling at, however you want to select your verb,

24   interactions with the eight Caucasian employees who we have

25   been talking about, did she ever use racial terminology with

```
 1   any of those employees during those incidents?

 2        A.    She turned around and made the comment -- and she

 3   has a habit of doing that, is turning around after she

 4   berates someone, she turned around and underneath her breath

 5   she'll say, "Fucking haoles."

 6        Q.    How many times did you observe or did you hear Ms.

 7   Igarashi say "fucking haoles" in any context?

 8        A.    The problem I run into is it was quite frequent as

 9   she would say it, depending on whether she's giving

10   discipline to someone or whether she's upset about something.

11   Okay?  I heard it maybe a total of ten times while I was

12   there at the airport.

13        Q.    Do you consider the term "haole" by itself to be

14   offensive?

15        A.    Define by yourself -- by itself.  Just the word?

16        Q.    I'm asking for your reaction.  Do you consider the

17   word "haole" by itself to be offensive?

18        A.    It depends on the context of what it's used in

19   reference to.

20        Q.    Okay.  So it can be used in an unoffensive way?

21        A.    If it's defined in a dictionary, yeah.  I mean,

22   I -- I don't follow your point.

23        Q.    I'm asking for your own reaction to the use of the

24   word "haole."  Are you offended by -- if someone calls you

25   "that haole guy"?
```

```
 1        A.    Not as it being a -- used as a description of a
 2   foreigner in Hawaiian in Hawaii.  If it's used in a
 3   derogatory nature as a racial slur, yes, I am offended by it.
 4        Q.    And how do you tell whether or not it's used as a
 5   racial slur?  How do you tell?
 6        A.    The tone, the mannerisms of the voice as they
 7   project it, the language and the syntax that it's done in.
 8                MS. HEVICON:  The use of the word "fucking."
 9                MR. HELPER:  That's a clue.
10                MS. HEVICON:  Just a guess.  I don't know.
11   BY MR. HELPER:
12        Q.    What did you see Ms. Igarashi do regarding
13   Christopher Gahr that you thought was unfair or improper?
14        A.    There was a explosive trace detection alarm that
15   went off on my line.  The trainee that was learning how to
16   use the ETD had a positive hit for an explosive.  So we
17   had -- there are certain policies and procedures that you go
18   through to isolate it.  We had the hit.  It was on the
19   outside of the bag.  So we recalibrate the machine, you check
20   on the inside of the bag.  If you get another hit, you have
21   to then take all the items out and do each item individually.
22   Okay?
23                We had the first hit.  We had the second hit.
24   Chris was notified as we got the first hit, so as -- Since it
25   was my line, I notified Chris, "Okay, I got a hit on the ETD.
```

1    I need to have you reset it." He came over, he was certified
2    at that point to reset. She swiped the inside, it hit again.
3    So he had to re --

4         Q.   When you say "she" --

5         A.   She being the trainee. Okay. It hit again on the
6    inside, so he reset it then. At that point in time, he did a
7    couple of the items on the inside of the bag and it hit.
8    Now, it's a three time hit on an ETD. At that point in time
9    he asked the people about where they were staying, what they
10   were doing.

11            Patti came over and started complaining about the
12   delay, that we were inconveniencing the guests. And she took
13   a -- the bag, started piling back into the bag, zipped it
14   closed and let the guest go. Now, Chris was concerned
15   because he hadn't cleared the alarm. In order to clear the
16   alarm, you have to then swipe the individual items to
17   determine where you were getting the reading from. She
18   didn't allow him to do this and this was, as he pointed out
19   to her, policy and procedure and that she wasn't following
20   it. She didn't care about that. She was just getting the
21   guest away. And they got into a big discussion about it and
22   that was the last day I saw Chris at the checkpoint.

23        Q.   Who else witnessed the conversation between Mr.
24   Gahr and Ms. Igarashi?

25        A.   Again, the entire checkpoint.

```
 1        Q.   Any --
 2        A.   Twenty to 30 people.  I don't know who was there
 3   that night.
 4        Q.   Do you know if any other supervisors were there
 5   other than yourself?
 6        A.   I don't know and it would be speculation on my
 7   part.
 8        Q.   Did you report this incident to anyone?
 9        A.   Yes.
10        Q.   Who to?
11        A.   The 800 number that I had to Washington.
12        Q.   And who -- what was your understanding as to what
13   that 800 number --
14        A.   That was for human resource issues and policy
15   issues and that it would be investigated by Washington, is
16   what my understanding was when I was talking to the people,
17   that they would refer it to someone.
18        Q.   And did you ever -- anybody ever follow up with
19   you on that?
20        A.   No, never.  Not on any of the phone calls that we
21   made to Washington.  The only follow-up that we had because
22   of our phone calls to Washington was when we were all taken
23   into the TSA office, our entire shift, we were told by Patti
24   Igarashi and the guy who was supposedly the special agent in
25   charge of the TSA working for Leong, and --
```

```
 1           Q.    Mr. Carvalho?

 2           A.    That's him.  Okay.  Philippe or whatever his first

 3    name is, I guess.

 4                 We were told by them that they knew that we were

 5    calling Washington and we were told specifically by him that

 6    if he ever caught us calling Washington, if he found who it

 7    was, that he would terminate us and take care of.

 8           Q.    Who was present during that conversation?

 9           A.    The entire shift.

10           Q.    And what supervisors would that have included?

11           A.    I believe Ann was there and I believe Karin was

12    there.

13           Q.    Rusty Harlan?

14           A.    No.  He doesn't work the same time Ann does, not

15    generally.

16           Q.    Other than the disagreement between Mr. Gahr and

17    Ms. Igarashi about the clearing of the EDT alarm and related

18    matters, did you see any interactions where you thought Ms.

19    Igarashi was treating Mr. Gahr improperly?

20           A.    Yes.

21           Q.    When?

22           A.    The day prior.  Okay.  Mr. Gahr was there, he was

23    training us on procedures.  And she goes, "That's not how we

24    do it here on Maui."  And she under -- undercut his comments

25    in front of everybody.
```

1      Q.   What procedures was she talking about?

2      A.   How to wand people.

3      Q.   And what was her -- Was this yelling or a curt

4  tone of voice, or what was she saying?  How was she acting at

5  this point?

6      A.   I guess you would call it a curt tone of voice.

7  She was putting him down, putting him in his place, quote,

8  unquote.  Okay?  "This is how we do things here.  You're from

9  the mainland, you don't know how we do things."

10     Q.   And is that a quote from her?

11     A.   Yes.

12     Q.   And who else was present at this interaction?

13     A.   Again, the entire group.

14     Q.   And what supervisors would that have included?

15     A.   I don't remember.

16     Q.   Other than these two instances where you saw what

17 you have just described between Mr. Gahr and Ms. Igarashi,

18 any other instances between the two of them?

19     A.   No, not that I can recall.

20     Q.   Okay.  Now, I think you asserted in one of your

21 statements that at some point Ms. Igarashi was throwing

22 things with regard -- in these incidents with Mr. Gahr; is

23 that right?

24     A.   I'd have to review it, but I don't remember that

25 offhand.

```
 1          Q.   As you sit here today, you don't remember Mr.

 2   Gahr -- I'm sorry, Ms. Igarashi throwing things while she was

 3   criticizing Mr. Gahr?

 4          A.   Throwing things back into the bag, was the --

 5          Q.   Okay.

 6          A.   She was throwing everything into the bag of the

 7   customer to get them out.

 8          Q.   Okay.

 9          A.   That was the time that she was throwing -- She was

10   very visibly upset with him then.

11          Q.   So other than throwing things back in the bag, you

12   don't recall Ms. Igarashi throwing things while she was

13   criticizing Mr. Gahr on either of these occasions; right?

14          A.   No.

15          Q.   I'm correct; right?

16          A.   Correct.  You're correct.  I don't recall that

17   other than throwing everything back into the bag.

18          Q.   Okay.

19          A.   I think there was other instances with her and

20   Chris, but I don't recall them at this point in time.

21          Q.   Incidents that you observed?

22          A.   I believe so.  I remember something else happening

23   and I just can't remember it right now.

24          Q.   What was the supervisory chain between yourself

25   and Mr. Gahr, the supervisory relationship?
```

Charles Turner

```
 1              A.    He was our training supervisor.  He came in to
 2   replace the gentleman from Florida.  Okay.  He was there and
 3   it was my understanding that he was going to home port there
 4   and be -- he was -- he had told us that he was going to be
 5   the manager, home port, he had been promised a manager's spot
 6   there and that he was going to be our manager.
 7              Q.    "Manager" meaning whose job -- Would you have a
 8   formal job title for that?
 9              A.    The Patti spot.
10              Q.    Okay.  Screening manager?
11              A.    Screening manager.  He was going to be a screening
12   manager.
13              Q.    Does that mean replacing Patti or working
14   alongside her, your understanding from what he told you?
15              A.    It sounded as if he was going to be working
16   alongside her.
17              Q.    Okay.
18              A.    They had Pat Collins, Patti, and then Chris Gahr.
19              Q.    Okay.  Did you ever see any interactions between
20   Patrick Collins and Chris Gahr that stand out in your mind
21   now?
22              A.    No.
23              Q.    Were you ever aware of Patrick Collins criticizing
24   or writing up Chris Gahr?
25              A.    Different shift.
```

```
 1          Q.    Were you ever aware --

 2          A.    No, I was never aware.

 3          Q.    Okay.  Did Chris Gahr ever complain to you about

 4     Patti?

 5          A.    Yes.

 6          Q.    What did he say?

 7          A.    That she was not following policies and procedures

 8     regarding the ETD and if I would write up a statement for

 9     him.

10          Q.    Did you write up a statement for him?

11          A.    Yes, I did.

12          Q.    What happened to that statement?

13          A.    I don't know.

14          Q.    What did you do with it after you wrote it up?

15          A.    I believe I gave it to Chris.

16          Q.    How long a statement?

17          A.    A page.

18          Q.    You didn't keep a copy for yourself?

19          A.    Not that I remember.

20          Q.    You don't -- Well, is the last time you saw a copy

21     of that statement when you gave it to Mr. Gahr?

22          A.    Yes.

23          Q.    And was that --

24          A.    Handwritten.

25          Q.    Was this within just a day or so of the incident
```

 1   occurring?

 2        A.   Yes, sir.

 3        Q.   Okay.  Did Mr. Gahr complain to you about anything

 4   to do with Ms. Igarashi other than that she was not following

 5   procedures?

 6        A.   No, sir.

 7        Q.   Did Chris Gahr complain to you about any

 8   supervisor at TSA Kahului other than Ms. Igarashi?

 9        A.   No, sir.

10        Q.   Did he ever tell you that he thought anybody at

11   TSA Kahului was racist?

12        A.   No, sir.

13        Q.   What did you see in terms of Ms. Igarashi's

14   treatment of Mr. Levitt?

15        A.   Mrs. -- Patti got on Gary about something, I don't

16   know exactly what it was, but, again, here she was yelling at

17   him in the middle of the checkpoint.  She later called him to

18   the office.  And when he came out of the office, he told me

19   he had been written up.  He was very upset about it.  And

20   it -- at the time it was going around that you couldn't be a

21   white male over six foot because you might be getting written

22   up right away by Patti, and that was a standing thing that

23   everybody was talking about.

24        Q.   Gary Levitt was your peer at that point?

25        A.   Correct.

1      Q.    Did you see the behavior that led to Patti

2  Igarashi criticizing him?

3      A.    No, sir.

4      Q.    So do you -- you don't know as you sit here today

5  whether or not Gary Levitt had done something wrong that led

6  Ms. Igarashi to write him up; correct?

7      A.    Correct.  He was running the lane next to me.

8      Q.    Okay.  So you didn't like her style in the way she

9  criticized him; correct?

10      A.    Her management style was very hostile.

11      Q.    Okay.

12      A.    Created a very hostile work environment.

13      Q.    Mr. Archibald -- I'm sorry.  Is there anything

14  else you can recall about your observation of what happened

15  with -- between Ms. Igarashi and Mr. Levitt that you haven't

16  testified already about?

17      A.    No.

18      Q.    Did he tell you when he came out of the office

19  what he had been written up for?

20      A.    I believe he did.

21      Q.    But you don't remember as you sit here today?

22      A.    No.

23      Q.    Correct?

24      A.    Correct.

25      Q.    Did he say anything about not being a -- that if

74

```
 1   you were a haole over six foot you would get written up?
 2        A.   He made a comment regarding that and I believe he
 3   also said that he was going to have to change his tack with
 4   her and he was concerned about keeping his job.
 5        Q.   What did that mean, "change his tack"?  What did
 6   he say about changing his tack?
 7        A.   He just said he was going to have to change his
 8   demeanor with her and his tack with her.  And my impression
 9   was that he was going to be starting to kiss her ass.
10        Q.   And he didn't say kiss her ass; right?
11        A.   No.
12        Q.   He said changing his tack?
13        A.   Right.
14        Q.   And you said he said something along the lines you
15   can't be a haole over six feet, but do you recall -- what do
16   you recall about his words that he used?
17        A.   I just recall that the going comment at that point
18   in time at the checkpoint was that if you were a haole over
19   six feet, white haole -- or white person over six feet, that
20   you were going to -- you're susceptible to getting written
21   up.  It was obvious that all the guys were getting written
22   up, Everret, Gary, the other guy that was there, all because
23   it looked like it was racially motivated.
24        Q.   To your knowledge, did Patti Igarashi ever write
25   up a non-Caucasian?
```

| | |
|---|---|
| 1 | A.    Not that I'm aware of.  Okay?  The only incident |
| 2 | that I can think of where she had gotten involved with |
| 3 | something was when one of the local girls fell asleep at the |
| 4 | exit and let -- shut down the whole airport.  We had to flush |
| 5 | the airport, rescreen everybody, and that wound up with only |
| 6 | a two-week suspension for the girl. |
| 7 | Q.    Do you remember who that was? |
| 8 | A.    I don't recall. |
| 9 | Q.    And what is the source of your knowledge about the |
| 10 | two-week suspension? |
| 11 | A.    Because she was out of the checkpoint for two |
| 12 | weeks and then she was reassigned to baggage and came back to |
| 13 | us in the baggage area.  And when we had talked to her |
| 14 | subsequently, Are you okay?  Everything all right?  She says, |
| 15 | Yeah, they gave me a two-week suspension. |
| 16 | Q.    Mr. Archibald, what did you see happen between him |
| 17 | and Ms. Igarashi? |
| 18 | A.    She berated him in front of everybody because a |
| 19 | young lady had come through, she was wearing a sweater and we |
| 20 | had been told to tell people to put their sweaters on the |
| 21 | conveyor belt; that's what he told her to do.  She did and |
| 22 | she was wearing a skimpy blouse.  She came through and Patti |
| 23 | thought it was very unprofessional to have the lady take off |
| 24 | her sweater when she was wearing such a small, tiny blouse. |
| 25 | Q.    Was there only one incident between Igarashi and |

```
 1  Mr. Archibald that you observed?

 2       A.   No.

 3       Q.   What were the others?

 4       A.   Others --

 5       Q.   How many others were there?

 6       A.   Quite a few.  She didn't like him and it became

 7  very evident Ann did not like him.  Ann was -- Ann wrote him

 8  up at one point in time for ogling someone that came through

 9  his checkpoint, his line.  And as he pointed out, he goes,

10  The gal comes through.  I'm standing there at the meter.  I

11  have to look at her when she walks through.  He goes, That's

12  my job description.  He goes, I don't know how you expect me

13  not to look at someone when they're walking through the

14  meter.

15            On write-ups you weren't allowed to express your

16  opinion.  There was no -- From what I understand with the

17  write up policies, you got written up, that's it, there's no

18  appeal process.

19       Q.   Were you present for the interaction between Ms.

20  Igarashi and Mr. -- I'm sorry, was Ms. Igarashi present when

21  Ms. Wertzler criticized Mr. Archibald?

22       A.   Yes.

23       Q.   Were you present?

24       A.   Yes.

25       Q.   Okay.  Did you see Mr. Archibald doing anything
```

```
 1   inappropriate?

 2       A.   No.  Neither did the whole checkpoint.  Again,

 3   policy was to berate employees at the checkpoint in front of

 4   other employees.

 5       Q.   When you say "policy," you mean that was Ms.

 6   Igarashi's practice?

 7       A.   Yes.

 8       Q.   Did you observe anyone other than Ms. Igarashi

 9   berating employees at the checkpoint?

10       A.   Ann.

11       Q.   Anyone else?

12       A.   No.

13       Q.   How often did Ann Wertzler berate employees at the

14   checkpoint?

15       A.   Occasionally.

16       Q.   Meaning once a week?  Once a shift?

17       A.   I'd say once a week, twice a week.  I didn't work

18   that -- I tried to not work that much with Ann.

19       Q.   But you thought her beration of employees was

20   inappropriate; right?

21       A.   Correct.

22       Q.   Your observations of interactions between Ms.

23   Igarashi and Mr. Archibald, there were just two times?

24       A.   Between Patti and Archibald?

25       Q.   Yes.
```

```
 1            A.    No, numerous times.

 2            Q.    I'm sorry.  What were the other times?

 3            A.    Were in meetings ahead of time as far as at

 4     briefings.  There would be comments made at briefings before

 5     shift started.

 6            Q.    What comments did Ms. Igarashi make about Mr.

 7     Archibald at meetings?

 8            A.    Telling him not to do certain things, telling him

 9     to do certain things.  Make sure you do this, make sure you

10     do that.  You may not understand, but this is what I'm

11     telling you to do.  And then if it's policy and procedure

12     changes, of course, we would be asking questions as to why,

13     and we were berated for asking questions as to why.  And if

14     it didn't make sense, Glen had a habit of making sure and

15     going, That doesn't make sense to me.  And he'd ask why we're

16     doing this, and then he'd get an earful back.

17            Q.    And these were meetings where the whole shift was

18     present?

19            A.    Correct.

20            Q.    Okay.  Now, we've talked about the screeners who

21     were you think criticized unfairly including Mr. Reinhardt

22     and then there were two others whose names you didn't

23     remember; right?

24            A.    Correct.

25            Q.    And who were they?  I'm sorry.  What happened
```

```
 1   with --

 2        A.    Something to do with wanding and -- was one of the

 3   issues.  And another one was dealing with the walk-through.

 4   We have a walk-through metal detector and the person -- you

 5   have to face the walk-through metal detector at all times,

 6   that's procedure, and one of the guys had turned his back.

 7        Q.    One of the --

 8        A.    One of the two gentlemen that you're talking

 9   about.

10        Q.    One of the two screeners?

11        A.    Right.  Had turned his back to the machine.

12        Q.    Okay.

13        A.    Okay.  And she lit into him regarding it.

14        Q.    So it was, in your mind, a fair subject to

15   criticize him about, but you didn't like the way she

16   expressed the criticism?

17        A.    Not the tact.  And when you saw she's doing and

18   criticizing him about turning his back to the machine where

19   you have a local gal one lane over with her back to the

20   machine.

21        Q.    So you -- Is it fair to say that it's fair to

22   criticize a screener for turning their back to the metal

23   detector?

24        A.    It is fair to criticize, but at the same time it

25   has to be an even playing field where you're criticizing
```

```
 1   both, not just one.
 2        Q.   Right.  But it's fair for a supervisor to
 3   criticize a screener for turning their back on the metal
 4   detector; right?
 5        A.   Correct.
 6        Q.   But you didn't like the fact that -- the way she
 7   did or your perception that she was applying the policy -- or
 8   the criticisms unfairly; right?
 9        A.   Correct.
10        Q.   And did you say anything at the time about what
11   about this lady over here who's doing the same thing?
12        A.   Not if I wanted to keep my job.
13        Q.   So you didn't do it?
14        A.   No, not at all.
15        Q.   The walk-through -- I'm sorry.  That was the
16   walk-through incident; right?
17        A.   Correct.
18        Q.   And then there was a wanding, a screener who got
19   criticized for wanding?
20        A.   Correct.
21        Q.   And was that criticism -- Had he done anything
22   wrong?
23        A.   No.
24        Q.   Okay.  Describe that screener for me.
25        A.   White male, five ten, five eleven, that's about
```

1    all I can remember.  Different shift.  He didn't work on my

2    night shift.  He was a mid shift.

3        Q.    How did you happen to observe this interaction?

4        A.    Because we came in at 3 o'clock, they get off at

5    8:00.

6        Q.    Okay.  And are you working the gates together at

7    this point, the station together?

8        A.    We're working the checkpoint.  When their group is

9    usually having -- Mid shift usually has one checkpoint lane.

10   I usually -- We usually have two for the evening shift.  Me

11   and Gary run it or me and Nick.

12       Q.    Okay.  And so what did Patti do regarding the

13   screener's wanding?

14       A.    She just yelled at him.  The, you know, tone, No,

15   you don't do it that way, you do it this way.  Get it

16   together.  That bit.  Berated him in front of everybody.

17       Q.    And do you know whether or not her criticisms

18   were -- whether he was, in fact, wanding properly?

19       A.    Changing -- We were taught one way how to wand

20   from Washington.  After the training crew left, we were

21   taught another way by Pat Collins and Patti and we were told

22   that that was the way how they wanted it done.  And this

23   person had just come back from Honolulu where he had been

24   taught the way how they wanted him to do it there.

25       Q.    So he was not wanding the way --

```
1           A.    -- Patti wanted him to.

2           Q.    Okay.  So just so I get the question clear:  The

3    Caucasian screener who you saw criticized was not wanding the

4    way that Patti Igarashi and Pat Collins believed was the

5    appropriate way; correct?

6           A.    Correct.  Instead of making an L across the back

7    and coming down in which we had been taught in Washington to

8    do and then come back and do another L, they wanted us to

9    just do a simple W and that's it.  So he was practicing the

10   L's and taking a little bit too much time with the guests.

11          Q.    Okay.  The breakdown on the night shift -- On any

12   given evening you have about 30 employees working the night

13   shift; is that right?

14          A.    Yes, sir.

15          Q.    Can you give me a rough estimate of the racial

16   breakdown?

17          A.    I'd say 60-percent local and about 40-percent

18   haole or white.

19          Q.    Okay.

20          A.    As we've been using the term "haole."

21          Q.    And I understand that this is a rough estimate,

22   but is that fairly constant over the months that you worked

23   there?

24          A.    Off and on, yeah.

25          Q.    What do you mean by "off and on"?
```

```
 1         A.    It depends on the volume of traffic, who was out
 2    on sick leave and stuff like that.
 3         Q.    Okay.  And the 30 employees we're talking about,
 4    that includes both supervisors and non-supervisors; right?
 5         A.    Correct.  Out of the supervisors, we were all
 6    white.
 7         Q.    Okay.  You're using "supervisors" back in the
 8    narrow sense; right?
 9         A.    Right.  As far as supervisors and leads, we were
10    all white except for day shift you had Elizabeth Suda.  Okay?
11    She worked in like a day shift, yeah.
12         Q.    But if we use the term "supervisors" to mean
13    anybody with supervisory responsibility, then Patti would be
14    a supervisor; right?
15         A.    Correct.
16         Q.    Did you receive sexual harassment training from
17    TSA?
18         A.    Not that I am aware of.  I signed off, I believe,
19    on a sexual harassment declaration form.
20         Q.    What was that?
21         A.    That as part of the new hire packet that you would
22    sign off on that you would abide by the policies and
23    procedures regarding sexual harassment.
24         Q.    Did you know what the policies and procedures
25    regarding sexual harassment were when you signed that?
```

1           A.    No.

2           Q.    Did you have an understanding at the time -- In

3    your previous employment had you received sexual harassment

4    training?

5           A.    Not per se.  Generally, but it's nothing like a

6    set class on it.  You would receive papers, you look over it,

7    you review it and you sign it.

8           Q.    What was your understanding at the time you

9    started at TSA about what sexual harassment was?

10          A.    Inappropriate comments, inappropriate touching

11   that the person didn't want to have made to them or directed

12   towards either the same sex or opposite sex.

13          Q.    When you say "inappropriate," what did you

14   understand that to mean?

15          A.    Well, with us at TSA, we were not allowed to touch

16   the breasts or the genital region at all when we were doing

17   any type of pat downs or searches, that would have been

18   inappropriate.

19          Q.    How about inappropriate comments?  What was your

20   understanding when you were working at TSA as far as what

21   would be an inappropriate comment?

22          A.    Anything that could be judged offensive as far as,

23   you know, you don't say, Hey, baby, come on, or something

24   like that.  No type of come-on type comments.

25          Q.    Did you understand that explicit sexual

```
 1   discussions would be inappropriate comments --
 2        A.   Correct.
 3        Q.   -- at the time you worked at TSA?
 4        A.   Yes.
 5        Q.   Did you understand that you could be fired for
 6   sexual harassment at the time you worked at TSA?
 7        A.   Correct.
 8             MR. HELPER:  Okay.  Why don't we take a short
 9   break because we've been going and the court reporter's
10   fingers.
11             (Pause in Proceedings:  3:31-3:41)
12   BY MR. HELPER:
13        Q.   Just a couple of things I wanted to go back over.
14   How many times did you call Washington, the hot line number
15   that you had been given?
16        A.   Four or five at least.
17        Q.   Okay.  And were those -- all those calls
18   concerning something that Patti Igarashi had done?
19        A.   Yes.
20        Q.   Don't answer too quick because how about Carvalho,
21   did you complain about Mr. Carvalho's instruction to you not
22   to call?
23        A.   At the same time because Patti was in the room
24   with him.
25        Q.   Okay.  What were the four or five calls that
```

Charles Turner

 1   you -- complaints you made to the hot line?

 2        A.   Regarding -- I know one was regarding the -- One

 3   was regarding the request for the paperwork as far as the

 4   birth certificate, passport. Another one was the comment

 5   regarding the -- who was going to be supervisors and who

 6   wasn't. Another one was regarding how she was dealing with

 7   her management style and berating employees. Another one was

 8   regarding Mr. Carvalho, like you were mentioning, and the

 9   calls to Washington. And the other time I was calling after

10   they had asked for our other jobs that we had, information

11   regarding our other employment.

12        Q.   Who was asking you for information about your

13   other employment?

14        A.   We were told by Patti that we had to bring in --

15   we had to fill out this sheet of form if we had any other

16   outside jobs or if we owned other businesses.

17        Q.   Did you -- What was wrong with that, in your mind?

18        A.   It was prying into my personal life, what I did

19   outside work. And the comments were also something about

20   having, well, any other -- outside of work, if we find it any

21   conflict, you're going to have to quit it and discontinue it.

22        Q.   With regard to that, Patti Igarashi's request for

23   information about other jobs, what action did you hope

24   Washington would take?

25        A.   I didn't see the purpose of it, that's why I

```
 1   asked.  And Washington -- When I talked to the person at
 2   Washington, my question was whether it was relevant to our
 3   employment.
 4        Q.   Okay.  Tell me about what sort -- what happened
 5   when you called Washington.  Was it -- Did you give your
 6   name?  Did the other person on the other end give their name?
 7   Just tell me about generally --
 8        A.   The other person would give their name.  We'd talk
 9   to them.  We'd tell them which airport we were at and they
10   would pull up the file regarding that airport.  And usually
11   the response that we got was, Oh, you guys have been really
12   calling in, or, Oh, we've got a lot of complaints regarding
13   this airport.  And they would take our complaint, our
14   questions, whatever it was.  It was supposed to be kept of a
15   confidential nature.
16        Q.   Would you give your name?
17        A.   The first time I called in, no.
18        Q.   Okay.  How about subsequent times?
19        A.   Yes.
20        Q.   Okay.  Is the order that you gave me earlier, you
21   listed off the five times, was that in chronological order?
22        A.   No.
23        Q.   The first one you said -- The first one you listed
24   was the request for paperwork, Patti Igarashi's request for
25   birth certificates and passports.  Was that the first call
```

Charles Turner 88

1  you made to the hot line?

2        A.    No.

3        Q.    What was the first call that you made?

4        A.    The first call that I made was when she made the

5  comments regarding our status as far as leads and

6  supervisors.

7        Q.    Okay.   Were all the calls you made to the -- I'm

8  sorry, to the hot line made within the first few weeks of

9  your employment?

10       A.    Within the first month.

11       Q.    Okay.   So October -- September or early October of

12  2002?

13       A.    Yes, sir.

14       Q.    Did anybody with the mobile screening force give

15  you any kind of warnings or cautions or advice about dealing

16  with management at Kahului?

17       A.    Try not to make waves, was what we were told.

18       Q.    And who told you that?

19       A.    Mobile screening force.

20       Q.    Who?

21       A.    The gentleman from Tampa, the gentleman from St.

22  Paul, Minnesota.

23       Q.    Did they give you any advice -- anybody from the

24  mobile screening force give you any advice about dealing with

25  particular individuals at Kahului?

1       A.    Just try to stay out of Patti's way.  It was kind
2    of universally known to stay out of Patti's way.
3       Q.    Did anybody with the mobile screening force tell
4    you anything -- raise any concerns about racial
5    discrimination at Kahului?
6       A.    They were concerned about how the treatment was
7    being given out by Patti, how she was -- her management
8    style, the people that she was targeting and selecting, and
9    they said that they were going to be referring that to
10   Washington.
11      Q.    Okay.  Did anybody with the mobile screening force
12   say that they believed Patti Igarashi was making decisions on
13   a racial basis?
14      A.    Not in so many words, but, yes, they did, that it
15   was possibly racially motivated.
16      Q.    And this, again, was the person from Tampa or the
17   person from St. Paul or both?
18      A.    I think both made those comments.
19      Q.    Okay.
20      A.    They said that they would be contacting someone in
21   Washington regarding it.
22      Q.    The statement -- or your concerns about Patti
23   Igarashi possibly giving test information to testees, to
24   former Wackenhut employees, did you ever report that to
25   anybody?

```
 1        A.    Yes, I did.

 2        Q.    Who did you report that to?

 3        A.    On the phone number to Washington, so that would

 4   be a sixth one.

 5        Q.    Okay.  Were you ever asked to bring in your

 6   appointment letter?

 7        A.    Yes, I believe at some point in time I was.

 8        Q.    Do you recall when that was?

 9        A.    Within the first few weeks of me being there.

10        Q.    Who asked you to bring in your employment letter?

11        A.    I can't recall.

12        Q.    Patti?  Patti would have --

13        A.    If it -- I don't know.  I can't recall.

14        Q.    Somebody above you in the supervisory chain?

15        A.    Yes.

16        Q.    And so that would mean --

17        A.    Either Ann or Patti.

18        Q.    Okay.  And do you recall any explanation being

19   given to you for why they needed your appointment letter?

20        A.    No.

21        Q.    Was an explanation given and you may have

22   forgotten it, or just no explanation?

23        A.    No explanation given.

24        Q.    Did you ever -- Were you ever told by anyone that

25   there were significant problems in getting information out of
```

1   MCF Pearson about who was really supposed to be a supervisor

2   and who wasn't?

3       A.   No.

4       Q.   You never heard that?

5       A.   No.

6       Q.   And then -- I know I've asked you a lot about

7   these eight individuals who you saw Patti Igarashi berating,

8   criticizing.  The last thing I need to -- hopefully the last

9   thing to do is just get a time frame on each of these

10  interactions.  So I'm going to go back over them briefly and

11  see if I can do it in fairly quick fashion.  You saw Everret

12  Reinhardt being berated by Patti Igarashi in the October time

13  frame of 2002?

14      A.   September, October.

15      Q.   Okay.  Lucas Bruno, I think the record reflects

16  that he was there just for a short time in the middle of

17  November.  Does that fit with your recollection?

18      A.   Yes, sir.

19      Q.   Okay.  Chris Gahr was there for a short time in

20  mid October, in October of 2002.  Does that fit with your

21  recollection?

22      A.   Yes, sir.

23      Q.   You saw Gary Levitt being criticized by Patti

24  Igarashi again in the early stages?

25      A.   Yes, sir.

```
 1        Q.   Glen Archibald, when was that?

 2        A.   Early to mid stages.

 3        Q.   Okay.  And the screener who was criticized

 4   regarding his wanding, was that in the early stages as well?

 5        A.   I would say November.  I believe it was Lucas

 6   Bruno's group.

 7        Q.   Okay.  And then how about the screener who was

 8   criticized by Patti regarding a walk-through?

 9        A.   That was right around November.

10        Q.   Okay.  And, you know, I'm not sure --

11             MR. HELPER:  Off the record for a second.

12             (Pause in Proceedings:  3:52-3:53)

13   BY MR. HELPER:

14        Q.   So is it fair to say that all the instances

15   that -- in which you saw Patti Igarashi inappropriately

16   treating TSA employees occurred in November of 2002 or

17   earlier?

18             MS. HEVICON:  Objection; misstates his

19   testimony.

20   BY MR. HELPER:

21        Q.   I'm not trying to trick you here.  I'm --

22             MS. HEVICON:  Not Archibald, was his

23   testimony.

24   BY MR. HELPER:

25        Q.   I thought you just said Glen Archibald was
```

```
 1   November?
 2          A.    All the way through.
 3                    MS. HEVICON:  He said early to --
 4                    THE WITNESS:  Because --
 5                    MS. HEVICON:  -- mid his time there.
 6                    THE WITNESS:  Glen, she was riding Glen all
 7   the way through to when they suspended him.
 8   BY MR. HELPER:
 9          Q.    When was Glen Archibald suspended?
10          A.    I would say December or January.
11          Q.    Okay.  Other than Glen Archibald -- Is it fair to
12   say that all the instances in which you saw Patti Igarashi
13   inappropriately treating TSA employees occurred in November
14   2002 or earlier?
15          A.    Correct.
16          Q.    Okay.  And then Glen Archibald was all the way up
17   through the time he was put on leave and --
18          A.    Right.
19          Q.    Okay.  And Glen Archibald was on your shift; is
20   that right?
21          A.    Yes.
22          Q.    Did you have any concerns about his performance at
23   all?
24          A.    None.
25          Q.    Did any supervisor other than Patti express
```

```
 1    concerns about Glen Archibald's performance?

 2         A.   Just Ann.

 3         Q.   And you talked about that?

 4         A.   I talked about that.  After a couple incidents and

 5    everything like that, me and Rusty had a conversation

 6    regarding Glen.

 7         Q.   Tell me about that conversation.

 8         A.   He was concerned about Glen and -- becoming bitter

 9    about the situation that was happening between him, Patti and

10    Ann and was concerned about his morale.

11         Q.   Okay.  Did Rusty say that he thought that Patti's

12    criticisms were unfair?

13         A.   He didn't say that they were unfair.  They were --

14    Just, again, we were discussing the way how they were given.

15    Because we didn't go into particulars, okay?  It was just a

16    matter that -- how it was berated in front of everybody.  And

17    I mentioned to Rusty that I would take Glen on my lane any

18    time.  In case anybody else didn't want to have him, I'll

19    have him.

20         Q.   Okay.

21         A.   Because I knew Glen could do the job.

22         Q.   Now, when is the first time you became aware that

23    management had concerns about you and sexual harassment?

24         A.   Well, if I remember correctly, I was suspended in

25    March.
```

```
1         Q.   Was it the first -- Let me just give you the
2    document and then let me ask the court reporter to mark this
3    Exhibit A.  Have you seen this document before?
4         (2/25/03 General Counseling Form, EXHIBIT A, marked)
5         A.   Yes.
6         Q.   And what is this document?
7         A.   This is a General Counseling Form.  I saw it when
8    section 9 was not filled out.
9         Q.   And this had -- reflects a date of February 25th,
10   2003, on the second page?
11        A.   Yes.
12        Q.   Does this tell you -- Is this the first time you
13   became aware that management had concerns about you and
14   sexual harassment?
15        A.   Yes.
16        Q.   Okay.  Had you ever been counseled by Patti
17   Igarashi about sexual harassment before February 25th of
18   2003?
19        A.   No.
20        Q.   Had any of your subordinant employees ever said
21   anything to you about your conduct towards them that made you
22   in your own mind concerned about sexual harassment?
23        A.   No.  The only comments that was ever generated
24   towards me of a sexual nature was from one of the screeners,
25   her name's Nashly, and this was at a bar after-hours at work.
```

```
 1            Q.    And what time frame was this?

 2            A.    Meaning after-hours?

 3            Q.    No, no.  Month.  What month?

 4            A.    I would say in -- I think it was in the month of

 5     December.

 6            Q.    Okay.  Now, when you got Exhibit A, box 8 was

 7     filled in?

 8            A.    (Pause - referring.)  No.  Box 8 and box 9 were

 9     not filled in.

10            Q.    What was given to you -- What was given to you on

11     February 25th, 2003?

12            A.    The front of this form.  It was discussed with me

13     at that point in time regarding allegations.  I asked for

14     copies, to see copies of the written allegations.  I asked to

15     see copies of the written statements of anybody making

16     towards me.

17            Q.    I'm just asking you what was on the form.

18                  MS. HEVICON:  This form here.

19                  THE WITNESS:  Nothing except my name and I

20     was given at that point in time an opportunity to write right

21     in here.

22     BY MR. HELPER:

23            Q.    And you're looking at page 2?

24            A.    Uh-huh (affirmative response).

25            Q.    And let me just ask you to -- Box 11, that's your
```

Charles Turner

```
 1   handwriting; right?
 2        A.    Box 11 is my handwriting.
 3        Q.    Most of it I can read, but some of it I'm not sure
 4   about so let me ask you to read your own handwriting in box
 5   11.
 6                   MS. HEVICON:  Out loud?
 7                   MR. HELPER:  Yes.  Thank you.
 8                   THE WITNESS:  Oh, you want me to read it?
 9                   MR. HELPER:  Yes.
10                   THE WITNESS:  "I disagree with this action
11   and comments contained therein.  I wish to have a copy of
12   this notice so a formal written reply can be compiled.  Most
13   of these statements were taken out of content when off duty
14   and at a bar with fellow employees.  A supervisor was present
15   and was making jokes and comments, too, but this was not
16   brought up.  Patti was soliciting comments from employees
17   over two weeks ago about me, trying to write me up for
18   harassment.  This I received -- This I received" -- Let's see
19   here.  I can't read here.
20                   MS. HEVICON:  It looks like "discussed."
21                   MR. HELPER:  Yeah.
22                   THE WITNESS:  "This I received, discussed
23   with my supervisor and let him know what I had heard.  I had
24   been repeatedly singled out for special treatment since being
25   here as a lead.  Patti is the manager that has restricted my
```

```
 1   job duties with -- without doing it to other leads.  Wish to

 2   have a copy of any statement, this notice, et cetera so I can

 3   prepare a formal letter in response."

 4   BY MR. HELPER:

 5       Q.   After reading this, are you sure that box 8 was

 6   not filled in?

 7       A.   Box 8 was not filled in at the time.

 8       Q.   When you say -- in your comments say, "I disagree

 9   with this action and the comments contained therein," if

10   there's no comments contained therein, what are you

11   disagreeing with?

12       A.   I believe I'm disagreeing with section 9.  I

13   believe that's Rusty's writing, if I am correct, and I

14   believe that's all he had on there.

15       Q.   Earlier you said that box 9 was not filled in,

16   though.

17       A.   Yeah, but now it's coming to me that I think that

18   box 9 was written, okay, because he said, "Inappropriate

19   statements made to female screeners in the past couple of

20   months."  I asked when, what, and he couldn't provide me with

21   any of the comments or statements.

22       Q.   Well, again, in box 11 it says, "Most of these

23   statements were taken out of context."

24       A.   Uh-huh (affirmative response).

25       Q.   What statements were you referring to if you
```

```
 1   didn't know of any particular statements?

 2        A.    The statements that were discussed with Rusty.

 3        Q.    So Rusty did tell you about particular statements?

 4        A.    He told me at this point in time that someone had

 5   said that I invited them over to my house to take a shower.

 6   And I pointed out to him that I have two showers in my front

 7   driveway, that it is very common for people to come by and

 8   take showers in my front driveway because that's a common

 9   thing here on the beach in Maui.  When you go surfing, you

10   come over and wash your boards down usually with a hose that

11   we have in our front driveway and also people take showers in

12   the front driveway.  That happens all the time, since I live

13   at a tourist facility.  That's not uncommon.

14        Q.    Right now I'm just trying to find out what you

15   knew at the time you wrote your statement in box 11.

16        A.    That's what I'm telling you.

17        Q.    As opposed -- I certainly will give you a chance

18   to talk about explaining particular comments, but let's try

19   to keep it focused on a fairly narrow issue right now.  Is it

20   your testimony that what you're looking at in box 8, that

21   you've never seen that before today?

22        A.    Correct.

23        Q.    That's your sworn testimony?

24        A.    Yes.

25        Q.    Who else was present at the counseling session on
```

Charles Turner    100

```
 1    February the 25th?
 2         A.    Me and Rusty.
 3         Q.    Was Howard Tagomori there at any point?
 4         A.    Not at that point.  I set up an appointment within
 5    a week to go and see him regarding it.
 6         Q.    And Robert Au also -- The later appointment Robert
 7    Au was present at, also?
 8         A.    I don't know who that gentleman is.
 9         Q.    You don't know who Bobby Au is?
10         A.    No.
11         Q.    Never heard the name Bobby Au before?
12         A.    I think he's either in charge of screening or
13    something, one of the two guys, but Howard said he was
14    sitting in on his behalf.
15         Q.    Anybody present other than Rusty Harlan at your
16    counseling session on February the 25th?
17         A.    Patti.
18         Q.    Okay.  Did Patti speak at all during the session?
19         A.    Not that I can recall specifically.
20         Q.    Okay.  What did -- Tell me the context in which
21    you were called in to -- for this counseling session.
22         A.    I had been warned about two weeks prior that Patti
23    was soliciting comments regarding me.  I had been transferred
24    from the checkpoint to baggage.  When I reported for the
25    baggage duty at 1600 hours, everybody was given assignments
```

```
 1    for checkpoint or baggage except for myself.  Rusty said, Oh,
 2    we want to see you in the office.  At that point in time by
 3    this conation in the way how he was saying it, I knew I was
 4    finished.
 5         Q.   Let's go back to being transferred to baggage.
 6    What -- Who told you you were being transferred to baggage?
 7         A.   Rusty.
 8         Q.   Did he tell you why?
 9         A.   He told me I was going over to baggage to help out
10    over there, they needed help.
11         Q.   Who told you that Patti was soliciting comments or
12    statements?
13         A.   I was told by one of the guys who used to be with
14    the mobile screening force.
15         Q.   Who is that?
16         A.   I don't know his name, okay.  Big black guy.  He
17    was the supervisor, interim manager.
18         Q.   Devery Bailey?
19         A.   There you go.  I was told by him that Patti was
20    soliciting.  I was told by Teresa and by Jo Ann and by
21    Elizabeth, a blond-haired gal by the name of Elizabeth that
22    Patti had been asking and soliciting people to make comments
23    about me.
24              Everybody knew that Nashly was going to be the
25    next supervisor or next lead because of the pizza parties
```

```
 1    that Patti was throwing in her back room.  Nashly was a
 2    regular attendee, same as Pam.  And since Pam was going out
 3    with Brandon, which was someone's relation at TSA, she was
 4    also going to be the next one.
 5         Q.   Pam, what's her next name?
 6         A.   I have no idea.
 7         Q.   She was a screener?
 8         A.   She was a screener.  She was the one that was
 9    talking to me about the daughter and the beach they go down
10    to.
11         Q.   Pam Wilson?
12         A.   Yes.  And Nashly is the other screener.  And so
13    when I arrived to work, they were giving out assignments.  I
14    didn't get an assignment and was asked to go to the office.
15         Q.   But the earlier period in which you were told that
16    Patti was soliciting statements, what do you recall -- what
17    did Devery say to you about that?
18         A.   He told me that Patti was asking all the female
19    employees to make statements about me because she was tired
20    of me.  She had come up to me a month prior and asked me to
21    write out a statement regarding Ann and I had told her no.
22    And I just could not be there anymore because I wasn't a team
23    player, in her book.
24         Q.   And these were all things that Devery told you?
25         A.   Yes.
```

Charles Turner
103

```
 1          Q.   That Devery told you that the reason -- What was
 2    Devery's -- If he told you, what was the source of his
 3    knowledge about this?
 4          A.   From what he's hearing from other screeners and
 5    from Patti.  I asked him, "Am I going to get fired?"  And he
 6    said no.  "Am I going to be suspended?"  No.  He hadn't heard
 7    anything, quote unquote, other than the fact that Patti was
 8    soliciting people.  I had heard it from three -- like I say,
 9    three other females.  These are all --
10          Q.   And those three are Jo Ann somebody?
11          A.   Jo Ann.
12          Q.   Who?
13          A.   I don't know her last name.  We don't go by last
14    names.
15          Q.   Teresa?
16          A.   Teresa.
17          Q.   Is that Teresa Korinson?
18               MS. HEVICON:   I'm sorry, what was the last
19    name.
20               MR. HELPER:   Korinson.
21    BY MR. HELPER:
22          Q.   Some of these people worked for you; right?
23          A.   Yes.
24          Q.   So you would know a lot of their last names?
25          A.   No.  We don't go by last names.
```

```
 1          Q.    They got name tags on?

 2          A.    They got name tags on that says Teresa.

 3          Q.    And who is the third employee?

 4          A.    Elizabeth.

 5          Q.    And Elizabeth, describe her.

 6          A.    Older, blondish brown hair.

 7                MS. HEVICON:  Not elderly, though; right?

 8                THE WITNESS:  No, she is elderly.  She's --

 9   All three of these ladies were in their 40's, 30's to 40's.

10   BY MR. HELPER:

11          Q.    Okay.  And did you understand from these three

12   people that Patti Igarashi was asking people to put down in

13   statements things that she had learned from other sources, or

14   that she was asking things -- these people to make things up

15   or something else?

16          A.    She was threatening their jobs that they want --

17   that she wanted me gone.  And that she was threatening their

18   jobs to make things up, to make comments.

19          Q.    Did anybody tell you firsthand that, Patti

20   Igarashi threatened me?

21          A.    No.

22          Q.    So all your knowledge is --

23          A.    Secondhand.

24          Q.    -- secondhand that somebody told you that Patti

25   Igarashi had threatened a third person? ·
```

```
 1            A.    Right.

 2            Q.    Or a fourth person, I don't know how we're

 3     counting.

 4            A.    Uh-huh (affirmative response).

 5            Q.    Is that right?

 6            A.    Correct.

 7            Q.    Okay.  Do you know secondhand -- firsthand,

 8     secondhand, thirdhand, any hand of anybody who was asked --

 9     who Patti Igarashi asked to make a statement about you who

10     declined?

11            A.    Again, I believe all three of them.

12            Q.    You believe that Jo Ann, Elizabeth and Teresa were

13     all asked to make statements about you and declined?

14            A.    Yes.  Or were approached to make statements.

15            Q.    Okay.

16            A.    And they had nothing to say other than that I

17     was -- always acted in a professional manner.

18            Q.    That's what they told you?

19            A.    Uh-huh (affirmative response).

20            Q.    Yes?

21            A.    Yes.

22            Q.    Okay.  Did you ever make sexually explicit

23     comments to anyone working under your supervision while on

24     the job?

25            A.    No.  Never would.
```

```
 1          Q.   Okay.  Do you have a photography business?
 2          A.   I do.
 3          Q.   Did you have a photography business at this time?
 4          A.   Yes, I did.
 5          Q.   Did you talk to your subordinates about taking
 6   pictures of them?
 7          A.   No, I would not.
 8          Q.   You never asked any of your subordinant employees
 9   if you could take pictures of them?
10          A.   No.
11          Q.   I'm correct you never did?
12          A.   I never asked and never would.
13          Q.   Okay.
14          A.   To be honest with you, the quality is not there.
15          Q.   You mean the women aren't good-looking enough to
16   be worth taking pictures of?
17          A.   Yes.
18          Q.   Okay.
19               MS. HEVICON:  Unlike the quality of women in
20   this room.  Let's just put that on the record.
21               THE WITNESS:  True.
22               MS. HEVICON:  You should have been saying
23   that yourself, you know.  I know lawyers are here.
24   BY MR. HELPER:
25          Q.   Did you ever talk to any of your subordinates
```

1    about three-way sexual activity?

2        A.    No, sir.

3        Q.    Did you ever ask any of your subordinant employees

4    to call you at home?

5        A.    No, sir.  Well, let me reclarify that.  We had --

6    When we were having problems with Patti, that was the

7    discussion, and everybody was trading numbers of everybody

8    else.  So at times I -- you know, one of the girls would go,

9    Oh, can I get your number so I can give you a call and talk

10   and discuss things at work?  But other than -- If you're

11   saying if I was giving my phone number out to have someone

12   call me regarding anything of a sexual nature or anything

13   like that, no.

14       Q.    At some point did you learn the identity of the

15   people who were complaining about you?

16       A.    Yes.

17       Q.    When did you learn that?

18       A.    I learned about that about two weeks before I was

19   suspended.

20       Q.    So you knew -- Did you have an understanding at

21   the time of this February 25th counseling with Russel Harlan

22   and Patti Igarashi as to what the complaints that the three

23   individuals were making were?

24       A.    Yes.

25       Q.    Specifically?  In other words, about what

Charles Turner
108

```
 1    particular comments you had made?
 2         A.    No, I did not have a -- and I did not get
 3    presented with a written statement from them even though I
 4    asked to see what they had specifically said that I said.
 5         Q.    At some point did you learn of some of the
 6    allegations, some specific -- Before looking at this
 7    statement today, the box 8 in Exhibit A, were you ever told
 8    any particular statement that was attributed to you by the
 9    three women who were complaining?
10         A.    No.    Other than I was told that one of the girls
11    was complaining -- I may be misinterpreting your question.
12    Okay?  You want to rephrase it again for me?
13         Q.    No, I think you were about to go down the road I
14    was looking for, so why don't you go ahead.
15                   MS. HEVICON:  I think so.
16                   THE WITNESS:  One of the girls was making an
17    allegation that I had invited her over to my house to take a
18    shower.  Okay?
19                   MR. HELPER:  Okay.
20                   THE WITNESS:  One of the other girls the
21    allegation was that I had asked her to pose for me or
22    something.  And the third one was I guess on the same thing.
23    Okay?
24    BY MR. HELPER:
25         Q.    Posing?
```

```
 1          A.    Yeah.  And like I had mentioned to Rusty, one, any
 2    comments that I would make couldn't have been made at work.
 3    And I pointed out to him that since November I had been
 4    assigned to the back of the checkpoint against the wall.  I
 5    was the only screener that was assigned to the very back wall
 6    by Patti, the only lead.  I had to run my line from back
 7    there.  I couldn't go and screen packages, I couldn't go and
 8    work the x-ray machine, I couldn't wand, I couldn't run any
 9    of the other position duties.  I was assigned to the back
10    wall.  So for me to have made these comments to anybody, I
11    would have had to yell them across a busy check stand in
12    front of 20 to 30 employees.
13          Q.    Now, do you call the middle area away from the
14    wall, do you call it the well?  Is that the term that's used
15    for the area between the lanes?
16          A.    The area between the lanes in the middle section
17    is usually the well.  I'm in the back.
18          Q.    Right.  Is it your testimony -- I just want to
19    make sure I've got the terminology right before I start
20    asking you questions.  So the well is the middle area between
21    the lanes, sort of?
22          A.    Uh-huh (affirmative response).
23          Q.    And are the metal detectors, are those in the
24    well?  Are those considered a boundary of the well?
25          A.    They're a boundary of the well.  The metal
```

Charles Turner                                                    110

1    detectors are at the very front of the area, okay, when you

2    walk in.  You have the conveyor belts there --

3         Q.    When you say "the front," do you mean --

4         A.    Before the x-ray machine.

5         Q.    The front from a passenger's point of view?  The

6    first thing that a passenger encounters?

7         A.    Correct.  The first thing the passenger encounters

8    is the conveyor belt.  They're instructed to put shoes and

9    bags and everything.

10        Q.    I've done it a million times.  You don't have to

11   tell me.  I just want to get the definition of the well.

12        A.    The well is in the middle.

13        Q.    Once the passengers go through the metal

14   detectors, they're in the well?

15        A.    No.

16        Q.    Where does the well start?

17        A.    The well is the inside of the screening area that

18   the screeners are in.

19        Q.    Aren't there screeners past -- Where does the well

20   start from a passenger's point of view?

21        A.    At the beginning of the conveyor belts.

22        Q.    Okay.  And where does the well end?

23        A.    At the end search table.

24        Q.    Okay.  And it's your testimony from November

25   through February, November 2002 through February 2003 you

1  never went in the well?

2       A.    No.   I was not allowed to be inside the well with

3  my other screeners.  I was on the outside.

4       Q.    But did you -- I'm not asking what the rules were.

5  I'm asking what you did.

6       A.    I occasionally went in there when they would call

7  in that they had problems with items.  That was part of my

8  job responsibilities, to go and look at their x-ray image.

9  So I would have to get inside the well in order to look at

10  the x-ray image.  And then I would have to deal with a

11  particular problem and get out of the well in an adequate

12  amount of time because I was not supposed to be there at all

13  except for handling problems.

14       Q.    And can you give me an estimate of how long in a

15  given shift you might spend in the well after you were told

16  to stay out of the well?

17       A.    Less than five minutes.

18       Q.    Okay.

19       A.    For the entire shift.

20       Q.    Okay.   How were the teams selected at the

21  beginning of the shift, deciding who would work under which

22  lead?

23       A.    It started out with us being assigned as far as

24  who the people were to be assigned.  Then Ann changed it and

25  she decided to have the leads pick their teams.  Then after

```
 1   two weeks of that, she changed it back where she was going
 2   to --
 3        Q.   Let me -- So I don't have to go back through it
 4   again, give me time frames when you say two weeks this, two
 5   weeks that and then start over.  Let me ask the question
 6   again.
 7        A.   Okay.
 8        Q.   At various times how it was decided which
 9   screeners worked with which leaders?
10        A.   It was decided by generally assigned to begin with
11   in October.  It was -- You were assigned to particular
12   people.  Then Ann --
13        Q.   When you say you were assigned, who assigned?
14        A.   Supervisors would assign, either Rusty or Ann.
15        Q.   Okay.
16        A.   Then it was switched up so that the leads could
17   pick their people.  Okay?  I was generally the lead that
18   would also go to the gate in the evening time, so I would
19   take a mixture of a good portion of females versus males so I
20   would have adequate wanders when we went up to the gate.
21   Okay?
22             MS. HEVICON:  When was that time?  He's
23   asking you to give times, too, when things change.
24             THE WITNESS:  Okay.  That was in October.  In
25   November it got changed by Ann to where we would pick them.
```

```
 1   And then for about a month we went where we were picking them

 2   and then Rusty decided that he wanted to start assigning

 3   everybody, him and Ann were going to assign everybody, so in

 4   December they started assigning everybody.

 5   BY MR. HELPER:

 6       Q.   And did that continue to be true from December

 7   through February --

 8       A.   Yes.

 9       Q.   -- that you didn't pick your own team, that your

10   team was assigned to you by Rusty and/or Ann?

11       A.   Correct.

12       Q.   Did you -- Did anybody explain to you why that

13   policy changed?

14       A.   No.

15       Q.   When you were picking your team or picking your

16   screeners, what -- where was that done?

17       A.   In the upstairs office, Honolulu -- or Aloha

18   office.

19       Q.   And would the screeners be present?

20       A.   Yes.

21       Q.   So it's sort of like choosing up sides in

22   basketball?

23       A.   Yes.  And that's what the problem was, that's how

24   come it changed, because some people were getting picked at

25   the last moment and it -- it affected morale.
```

```
 1          Q.    Okay.  Did you have a tendency when you were
 2    picking to pick any particular screeners that you can recall?
 3          A.    Yes.
 4          Q.    Who did you tend to pick?
 5          A.    Bob and Ron.  Bob, he subsequently became a lead.
 6    Ron was a handyman, built a couple different things.  Both
 7    older gentlemen.  I picked also Teresa and I want to say Jo
 8    Ann.  I picked -- every now and then I would pick one of the
 9    gals, her name started with a K.  I can never pronounce it.
10          Q.    Kaheala?
11          A.    That's it.  I would pick her and usually Steve,
12    since they were going out together.
13          Q.    Okay.  The older gentlemen, tell me their first
14    names again.  Bob and Ron?
15          A.    Yeah.
16          Q.    And you don't remember their last names?
17          A.    Ron Beck, Bob -- Allard?
18          Q.    Allard?
19          A.    Yeah.
20          Q.    And you're suggesting -- you're tentative about
21    this?
22          A.    Yeah.  All of it is all suggestive.  It's a couple
23    years ago, so I don't know for sure their last names.
24          Q.    Is it your testimony that you did not tend to pick
25    Nashly Leslie?
```

1          A.    Nashly?  I picked Nashly when her and Kahea were

2     hanging out together.  I picked those two together if Steve

3     was not working the shift.

4          Q.    How about Pamela Wilson?

5          A.    Generally no.

6          Q.    Are there any records that reflect who was picked

7     to work with which leads on a given day?

8          A.    Yes.

9          Q.    Where are those?  What sort of records were those?

10    Did you fill them out at the end of the shift?

11         A.    No.  It was records that the supervisors filled

12    out.

13              Nashly and Kahea was about the same age, that's

14    one reason why when I -- I picked them rather than Steve

15    because I think Kahea was going out with Steve.

16         Q.    Do you remember Steve's last name?

17         A.    He still works there.

18         Q.    That's not my question.

19         A.    I just --

20              MS. HEVICON:  It's an unusual last name.  You

21    don't know who he's talking about right off the top?

22              THE WITNESS:  I don't know.  He still works

23    there.  I don't know.

24              MS. HEVICON:  Kahea's boyfriend.

25              THE WITNESS:  There you go.

```
 1                     MR. HELPER:  Off the record for a second.

 2           (Pause in Proceedings:  4:25-4:29)

 3                     MR. HELPER:  Let's go back on the record just

 4   for a second.

 5   BY MR. HELPER:

 6        Q.   Mr. Turner, I think you've indicated that you

 7   haven't really had a chance to read the typewritten portion

 8   of Exhibit A yet; is that correct?

 9        A.   Correct.

10        Q.   Okay.  I wanted you to do that just to make sure

11   that you were correct that this is the first time you've seen

12   that document, that portion of the document.

13        A.   (Pause - referring.)

14        Q.   Let me just give you another document.  Well, let

15   me ask you:  Is that -- is it your testimony that this is the

16   first time you've seen that, you've read that?

17        A.   Yes.

18        Q.   Okay.  The allegation at the bottom of the first

19   paragraph of box 8, it was reported that you wanted to hook

20   one of the female screener's boyfriend up with a stripper or

21   two and implied that you could do it as a threesome.

22                     MS. HEVICON:  I believe that's a striper.

23                     THE WITNESS:  Striper?

24                     MS. HEVICON:  Some sort of fish, I believe.

25   /////
```

```
 1  BY MR. HELPER:

 2      Q.   Well, is this the first -- is it your testimony

 3  that this is the first time you've heard of an allegation

 4  that you were charged -- I'm sorry.  Start all over again.

 5           Is today the first time you've heard the charge

 6  that you offered to hook one of your female screener's

 7  boyfriend up with a stripper?

 8      A.   Correct.

 9                MS. HEVICON:  How about a striper?

10                THE WITNESS:  A striper, too.

11                You'll notice that I -- As far as reading

12  goes, notice that I have to use glasses.  Okay?  I can read

13  the bottom in section 8.  Okay?  And that's one reason why my

14  handwriting is off.  A lot of times I can't see my

15  handwriting after I write it.  Okay?

16                MR. HELPER:  Okay.

17                THE WITNESS:  So I need to have my glasses in

18  order to read.  Okay?  A lot of times at the checkpoint, I

19  didn't have my glasses.  So if I was presented with this at

20  any point in time, I can't read this right here without my

21  glasses.  And I know when I was suspended I didn't have my

22  glasses.

23  BY MR. HELPER:

24      Q.   So Mr. Harlan didn't tell you anything about a

25  complaint from one of the screeners that you had said
```

```
 1    something about getting her boyfriend with a stripper and

 2    doing it as a threesome?

 3         A.    No, sir.

 4         Q.    Mr. Harlan didn't tell you that?

 5         A.    No, not as far as I know.  I don't recall him

 6    telling me.  He may have said something like me doing a

 7    threesome or something like that, and I would have told him,

 8    Yeah.  No way.

 9         Q.    Let me give you another document and ask this be

10    marked as Exhibit B?  Let me just ask you to read the second

11    paragraph.

12              (3/11/03 Letter, EXHIBIT B, marked)

13         A.    (Pause - referring.)

14         Q.    Let me ask you first:  Do you recognize this

15    document?

16         A.    Yes.

17         Q.    And your signature is on the fourth page of this

18    document?

19         A.    (Pause - referring.)  Yes.

20         Q.    Pretty clearly from reading this document, you

21    were aware, in fact, of the allegations against you; right?

22         A.    Yes.  I must have forgotten -- I must have gotten

23    it switched up between No. 8 and No. 9.  I remember there was

24    a white section on the front page, okay, and I must have

25    already taken a look at this.  This jogs my memory.
```

```
 1          Q.   So is it your testimony now that on February 25th,
 2    in fact, box 8 was filled in on Exhibit A?

 3          A.   Correct.

 4          Q.   Okay.

 5          A.   And that box 9 was not, then.

 6          Q.   Okay.  Now, I note that in your rebuttal in box 11

 7    you don't deny making any of the comments; right?

 8          A.   I deny making some of the comments and they were

 9    taken out of contents (sic) and are -- And as you'll see in

10    the third paragraph, they're innocent comments of a social

11    nature, and I point that out.

12          Q.   Okay.  What I would like you to do, I think, is go

13    through box 8 and tell me which comments you believe you

14    made, but were taken out of context and -- Yeah.

15          A.   (Pause - referring.)  Well, the comments about the

16    beach, okay, were all taken out of contents.  I mentioned

17    that I lived near where she went and that she could come by

18    and wash off her boards and, also, if she wanted to use I

19    think the pool and Jacuzzi, she could do that, and also take

20    the showers on the outside part.  There was no mention of me

21    having her come in my place.

22          Q.   I'm just asking you to identify which statements

23    were taken out of context; which comments were made by you,

24    but were taken out of context by the people criticizing you.

25          A.   The one regarding the draft on the working shifts
```

```
 1   was taken out of contents.

 2         Q.   Let me -- I'm sorry.  Let me try to do this

 3   another way.

 4                 MS. HEVICON:  This is hard.

 5   BY MR. HELPER:

 6         Q.   I'm just going to go through these comments one by

 7   one and ask you if you made it.  Did you say to Pamela

 8   Wilson, "What beach do you and daughter go to?  Maybe I can

 9   meet you there"?

10         A.   I would say the first part of it, What beach do

11   you go to?  Which ones do you go to?  Which ones do you surf?

12   Oh, that's right down the way from me.  But I didn't ask to

13   meet them there.

14         Q.   Did you say, "You can take a shower at my place

15   after the beach" to Pamela Wilson?

16         A.   You can take a shower at my place.  I was

17   referring to the front driveway and also mentioned to her at

18   the same time about her washing off her boards in the front

19   driveway of my house because I have two showers located

20   there.

21         Q.   Did you say to any of your screeners, "If you ever

22   want to get away, you can come down to my house.  I have a

23   pool and a Jacuzzi"?

24         A.   No.  Okay?

25         Q.   Did you ever say to any of your screeners, "You
```

```
 1   don't go to sleep right away after work, do you?"  And when
 2   the screener said no, "So why don't you call me when you go
 3   to home, because I don't go to sleep, either"?
 4        A.   No.
 5        Q.   Anything like that?  Any exchange you would have
 6   had with any of your screeners that was anything like that?
 7        A.   Nothing, no.  Nothing that would be there at all.
 8        Q.   Did you ever say to any of your screeners, "You
 9   should call me up, then we can talk about what happened with
10   your boyfriend"?
11        A.   If I know they have a boyfriend, why would I be
12   soliciting them to call me?
13             MS. HEVICON:  That's not the question.
14   BY MR. HELPER:
15        Q.   Did you ever say that?
16        A.   I'm sorry, but there would be no way for me to
17   solicit them to call me like that.
18        Q.   Did you ever ask your screeners anything like,
19   "You should call me up, then we can talk about what happened
20   with your boyfriend"?
21        A.   No.
22        Q.   Did you ever say to any of your screeners, "I have
23   to know what kind of guys you look for"?
24        A.   No.
25        Q.   Did you ever say to any of your screeners, "You
```

```
 1   know age doesn't matter to me"?
 2        A.   No.
 3        Q.   Did you ever say to any of your screeners, "Just
 4   let me know if you ever want to meet up.  I'd just call in
 5   sick so we can go to the beach.  I feel a little sickness
 6   coming on now.  Ha, ha"?
 7        A.   No.
 8        Q.   Anything like that?
 9        A.   No.
10        Q.   And I think you have already said that -- Well,
11   did you ever say -- tell any of your screeners that you could
12   hook their boyfriend up with a stripper or two and imply that
13   you could do it as a threesome?
14        A.   No.
15        Q.   And I take it that the comments that you did make
16   regarding the beach were made at a bar?
17        A.   Correct.
18        Q.   And I think you say in your statement that's
19   Exhibit B -- you actually do address the stripper comment and
20   I think imply that you did make it, so I don't know if you
21   want to look at that and refresh your recollection at the top
22   of page 2.
23        A.   You'll notice on there I never said I made it.  I
24   find this comment taken out of context in the middle of a
25   joke.  She made a comment about having a lap dance for her
```

```
 1    boyfriend, okay, in Vegas and everything like that and
 2    wanting to know where to hook up and get a stripper to give a
 3    lap dance for her boyfriend.
 4         Q.   And who -- In your statement it says, "The female
 5    made a comment about going to Las Vegas."  Who is the female?
 6         A.   Nashly.
 7         Q.   Okay.  How many times did you and Nashly drink
 8    together in the same group of people?
 9         A.   Twice.
10         Q.   What bar?
11         A.   Ale House.
12         Q.   How many times did you go out drinking with groups
13    of people from TSA in your --
14         A.   Twice.
15         Q.   Who else would have heard the comment about going
16    to Las Vegas and getting a lap dance for her boyfriend?  Who
17    else was in the circle in which this conversation was being
18    held?
19         A.   I think Teresa was there.  I think Russ Harlan was
20    there.  I believe the black guy from the TSA training force
21    was there.
22         Q.   Devery?
23         A.   Devery, okay.  And I know that Pam was there with
24    Brandon.
25         Q.   So Russ Harlan was -- the guy who counseled you
```

Charles Turner                                                    124

```
 1    was present at the time that Nashly said something about
 2    going to Vegas and getting a lap dance for her boyfriend?
 3         A.   Correct.
 4         Q.   And that's -- Is he the acting manager referred
 5    to --
 6         A.   I believe that was -- that was the Devron. He's
 7    the acting manager. He was running the manager spot.
 8         Q.   Okay.
 9         A.   And this was also at the same time she made her
10    comment about the playboy thing.
11         Q.   "She" meaning again Nashly?
12         A.   Nashly. Okay? And I don't drink. At this bar I
13    only had one beer.
14         Q.   Two beers you say here.
15         A.   One, maybe two beers. Okay? Two beers. I don't
16    drink. These girls got hammered and were engaged in other
17    things afterwards that we heard about.
18         Q.   And this is -- that's what you address in the
19    third paragraph?
20         A.   Uh-huh (affirmative response).
21         Q.   Going to another -- Who told you these rumors?
22         A.   Everybody at the checkpoint. It was going all
23    around the checkpoint the next day.
24         Q.   So --
25         A.   Numerous people.
```

```
 1          Q.    Including?

 2          A.    (No audible response.)

 3          Q.    Names?

 4          A.    I don't know.  I don't recall as far as

 5   individuals.  Probably Teresa, Jo Ann, the gals that I was

 6   talking to all the time.  But, I mean, these are comments

 7   going all over the place.

 8          Q.    When is the last time you talked to Teresa?

 9          A.    Years ago.

10          Q.    How about Jo Ann?

11          A.    Years ago.  Elizabeth heard the same thing.

12          Q.    And I take it it's still your testimony that you

13   never made any sexual comments to any of your screeners at

14   work?

15          A.    Correct.  And also I want to point out that I

16   never had conversations without having another TSA employee

17   with me, okay, to these employees.

18          Q.    You would never have a one-on-one conversation

19   with a screener?

20          A.    No.  These allegations were made and these

21   comments, okay, there was other -- there was another person

22   there with me, either the supervisor Rusty or Devlon, the

23   black guy, was there or -- you know, with me.  We were

24   sitting at the same table.

25          Q.    But you certainly had one-on-one conversations
```

1   with your screeners at work; right?

2        A.   Usually over the checkpoint, yeah, I would talk to

3   them and tell them regarding work issues, but that's it.

4   Nothing like a one-on-one where we're sitting in a secluded

5   office somewhere.

6        Q.   After you were transferred to baggage in February

7   '03, did you go back -- did you work at the checkpoint at all

8   after that?

9        A.   Irregularly.  Occasionally brought in with a team

10  from the baggage section to run it.

11       Q.   Okay.  Did Rusty Bailey counsel on February 25th

12  about staring at female passengers?

13       A.   No.

14       Q.   Did you ever stare at female passengers in a

15  sexually suggestive way?

16       A.   No.

17       Q.   Did you ever stare at female passengers longer

18  than male passengers?

19       A.   No.  Sounds like the same allegations that were

20  brought up against Glen by Patti and Ann.

21       Q.   When you observed the women at the bar touching

22  each other's breasts, who was that?

23       A.   Nashly and Pamela.

24       Q.   Kahea was not at the bar, was she?

25       A.   No.

RALPH ROSENBERG COURT REPORTERS, INC.
(808) 524-2090

```
 1          Q.    You understood -- Did you understand that Kahea
 2     was also making allegations about you?
 3          A.    Yes.  And I also understand that she was made to
 4     do that under the form of intimidation or coercion that if
 5     she did not do so, her job would be terminated.
 6          Q.    If you look at page -- the third page of your
 7     statement, it says, "On 2/22/03 two of these females were
 8     sent to Kona on a TDI."  Who were they?
 9          A.    I know one of them was Nashly and the other one
10     was Ms. K.  They were both going together.
11          Q.    Next paragraph, "I would like to point out that
12     two of the female screeners making these comments are trying
13     to be promoted to a leader position," and to your belief,
14     that's Pamela and Nashly?
15          A.    Right.  Then I got it wrong and it was Pam and
16     Nashly.  Pam and Nashly --
17          Q.    Wait a second.  What did you get wrong?
18          A.    I got wrong as far as on 2/22 the two screeners
19     were sent to Kona on a TDI.
20          Q.    Well, I don't want to read -- I don't want to tell
21     you how to testify, but I don't read these two -- I'm not
22     sure that the two screeners in the third paragraph are really
23     necessarily the same as the two screeners in the fourth
24     paragraph.
25          A.    Okay.  Okay.  The two that left on 2/22 I could
```

```
 1   swear are Nashly and Ms. K.  Okay?
 2                   MS. HEVICON:  Kaheala.
 3                   THE WITNESS:  Yeah.  The two female screeners
 4   that are trying to make lead screener positions were Pam and
 5   Nashly, because they were hanging out in the pizza parties
 6   with Patti all the time.  And Pam is the same one -- No, it
 7   wasn't Pam.  It was Nashly who was the one that made the
 8   allegation about Glen.
 9   BY MR. HELPER:
10        Q.   Okay.  Other than these incidents or this
11   counseling on the February 25th and the following weeks, has
12   anybody ever accused you of sexual harassment?
13        A.   No.  Your -- Repeat that to me, sir.
14        Q.   Other than this instance with TSA --
15        A.   Right.
16        Q.   Other than the TSA, has anybody ever accused you
17   of sexual harassment?
18        A.   Yes, sir.
19        Q.   When was that?
20        A.   That was subsequently in my next job with Secure
21   Toss.
22        Q.   What happened with that incident?
23        A.   That incident was that they had an opening for one
24   of the Honolulu police officers.  He left Wackenhut.  And I
25   worked for a gentleman from Honolulu who's an ex-police
```

```
 1   lieutenant for Honolulu.  And in order to create a position
 2   for his buddy, they made up an allegation saying that I was
 3   soliciting one of the guards to be a model for me and they
 4   terminated me.
 5        Q.   Who was the guard that you were alleged to be
 6   soliciting?
 7        A.   I don't know her name, sir.  And I know that she
 8   had -- I run an ad as far as -- an advertisement for models,
 9   and that's how she called.  And I told her no because it
10   would be a conflict of interest.
11        Q.   So there was a security guard who called you and
12   asked you to photograph her?
13        A.   Right.
14        Q.   And you declined?
15        A.   Correct.
16        Q.   And who is the person who was responsible for
17   terminating you?
18        A.   Chang is his name, Kenny Chang.  He's an
19   ex-Honolulu police lieutenant, used to work with -- What did
20   he say?  Bobby Au, I guess, used to be the chief of police
21   for Honolulu.  Or was it Howard Tagomori?  One of the two.
22   He had mentioned that he knew either one of those two.
23        Q.   Do you do any -- I think you mentioned earlier
24   that you -- boudoir photography is classy?
25        A.   Yeah.
```

```
 1          Q.   Do you ever do any frankly pornographic
 2    photograph?
 3          A.   Depends on your definition and taste.  Define
 4    pornography to me.
 5          Q.   Did you ever submit photographs to sexually
 6    explicit magazines?
 7          A.   Define your definition of sexually explicit
 8    magazines.  I mean, I do a lot of different magazines.  Which
 9    ones in particular are you looking for?
10          Q.   Why don't you tell me what magazines you have
11    submitted photographs to?
12          A.   Maximum, Stuff, Gear, FHM, LFP, Gallery, Genesis,
13    Playboy, Perfect.
14          Q.   You have submitted photography to all of these
15    magazines, or you've actually had photographs published by
16    all these magazines?
17          A.   I have submitted to all those magazines.  I have
18    been published in quite a few of those.
19          Q.   Which ones have you been published?
20          A.   LFP, Genesis and Gallery.
21          Q.   What does LFP stand for?
22          A.   Larry Flint Productions.
23          Q.   Were you submitting photographs to LFP, Genesis or
24    Gallery while you were employed at TSA?
25          A.   Yes.
```

```
 1                        MR. HELPER:  I want to take about a
 2    two-minute break.
 3            (Pause in Proceedings:  4:53-5:18)
 4            (Statement by Nashly Leslie, EXHIBIT C, marked)
 5            (Statement by Kahealani Aruda, EXHIBIT D, marked)
 6            (Statement by Pamela Wilson, EXHIBIT E, marked)
 7                        MR. HELPER:  Okay.  So C is the longest one.
 8    D is the one that begins, "These are the types of things that
 9    Chuck would say to me," and E is the one that says, "I
10    started as an OJT."
11                        MS. HEVICON:  Okay.
12    BY MR. HELPER:
13            Q.   Mr. Turner, I take it that these are -- this is
14    the first time you have seen the documents that are now
15    labeled as Exhibits C, D and E?
16            A.   Yes, sir.
17            Q.   Let's start with Exhibit C.  I know you can read
18    that, but the signature on the last page, let me represent to
19    you that it's a document from TSA files from a screener named
20    Nashly Leslie, eight pages -- seven pages in length.  And I'm
21    just going to ask you about some of the allegations made in
22    these letters and ask for your reaction.
23            A.   Okay.
24            Q.   Did you ever say to Nashly anything about having a
25    waterfall photo shoot in Hana with lesbian girls?
```

```
 1        A.   No.

 2        Q.   Did you ever have a waterfall shoot up in Hana?

 3        A.   Did I ever have a waterfall shoot in Hana?

 4        Q.   Yes.

 5        A.   I have lived on island for six years.  Yes, sir.

 6        Q.   Did you have a waterfall shoot in Hana with models

 7   or girls in the February 2003 time frame?

 8        A.   No, sir.

 9        Q.   How do you know?

10        A.   Because I know what I was shooting at that point

11   in time.  I have not gone to Hana with too many models, okay,

12   over to that side of the island.  I have never taken two

13   models at the same time over to Hana.

14        Q.   Have you had any waterfall shoots other than in

15   Hana with two girls?

16        A.   Yes, sir, just recently this month, but they

17   weren't lesbians.

18        Q.   Okay.  Did you have any waterfall shoots in the

19   February 2003 time frame with anyone?

20        A.   No, sir.

21        Q.   Do you have any calendar or business schedule that

22   would tell us when you have done photo shoots, what the

23   subjects were?

24        A.   No, sir.

25        Q.   Did you ever talk to Nashly about how you used to
```

```
 1   be a private investigator?
 2         A.    I mentioned to Nashly -- I believe I mentioned to
 3   Nashly when we were at the party about me being a private
 4   investigator.
 5         Q.    Did you ever tell Nashly that you had a lot of
 6   ties with female strip clubs?
 7         A.    No.
 8         Q.    Do you have a lot of ties with female strip clubs?
 9         A.    No.
10         Q.    Do you have any ties with female strip clubs?
11         A.    No.
12               MS. HEVICON:  Do you wish you had ties with
13   female strip clubs?
14               THE WITNESS:  Yes.
15               MS. HEVICON:  Sorry.
16               THE WITNESS:  They're not allowed on island.
17   BY MR. HELPER:
18         Q.    How about in Las Vegas?  Do you have any ties with
19   female strip clubs in Las Vegas?
20         A.    No.  I've been to one, and that's it.
21         Q.    Do you know any female strippers or did you know
22   any female strippers in 2003?
23         A.    No, I don't think so.
24         Q.    And you never invited -- Did you ever invite
25   Nashly or Pam to your house?
```

```
 1        A.    Not to come inside my house, no.  I made a comment

 2   regarding the outside showers and the outside areas where

 3   they can wash off their boards at.  I made that comment to

 4   Pam and we were at the party at the time.

 5        Q.    Did you ever tell Nashly -- ask Nashly if she had

 6   any friends that look or act like her?

 7        A.    No.

 8        Q.    Anything like that?

 9        A.    No.

10        Q.    Did you ever suggest that you would go to Hilo

11   with her?

12        A.    No.  I don't generally travel off island.

13        Q.    Do you know people in Las Vegas?

14        A.    No.

15        Q.    Did you ever used to run strip clubs in Las Vegas?

16        A.    No.

17        Q.    Do you have a website?

18        A.    No.  I have a My Space account now I just created

19   this last year.

20        Q.    Have you sold calendars?

21        A.    Yes.

22        Q.    What type of calendars have you sold?

23        A.    Sold a bikini calendar and a nude calendar through

24   2004 through Paradise Spice.  That's a store here on island.

25        Q.    Did you ever tell Nashly about having pictures on
```

```
 1   a website?
 2         A.    No.  I did not have a website.
 3         Q.    Did you have your pictures posted anyplace on the
 4   web in 2003?
 5         A.    No, not in 2003.  Not in the part of the time that
 6   I was with TSA.  In the end of 2003 we sent out our
 7   publication run for our calendar run in November, so November
 8   of 2003 it would be the calendar that was posted then at the
 9   website through Paradise Spice only.
10         Q.    Did you -- Do you take girls into your home who
11   have nowhere to go?
12         A.    No.
13         Q.    Do you take girls into your home at all to live
14   with you on a short-term basis?
15         A.    I have taken friends in that have wound up with no
16   place to go, and those being males and females at times.
17         Q.    Did you ever tell Nashly about this, that you
18   recall, taking friends in?
19         A.    That I -- I would not be telling her that.
20   There's no reason for me to.  Okay?
21                     MS. HEVICON:  It's a yes or no question.
22                     THE WITNESS:  I made -- I may have made a
23   comment in the party that I have friends that come by.
24   BY MR. HELPER:
25         Q.    Never said anything about good -- the best looking
```

```
 1    girls coming into your house who have nowhere to go?

 2         A.    No.

 3         Q.    You've never said that?

 4         A.    No.

 5         Q.    I'm correct?

 6         A.    Correct.

 7         Q.    Okay.  At any time while you were working at TSA

 8    did your ex come over in the middle of the night?

 9         A.    Ex what?

10         Q.    Ex-wife.

11         A.    I've never been married.

12         Q.    Ex-girlfriend?

13         A.    I have a lot of ex-girlfriends, but, I mean,

14    you're saying when did my ex-girlfriend come over and see me

15    in the middle of night.  In which -- clarification of when

16    and which girl.

17         Q.    Let's just start with this:  Did you ever tell

18    Nashly that your ex came over after you got off work, about

19    3:00 or 4:00?

20         A.    No, I don't -- I would not be discussing my

21    personal life with a subordinant employee or any other

22    employee.

23         Q.    So I take it your reaction to this is that it's

24    mainly lies?

25         A.    Yes.
```

```
 1          Q.   Exhibit C?

 2          A.   Yes.

 3          Q.   Do you recognize Nashly's handwriting?

 4          A.   No, sir.

 5          Q.   Exhibit D, looking at -- Did you ever suggest to

 6    Kahealani Aruda that she should bring her daughter down to

 7    your place?

 8          A.   No.

 9          Q.   Did you ever say, "I'm mad at you.  Why don't you

10    call me?"

11          A.   No.

12          Q.   Anything like that?

13          A.   No.

14          Q.   Did you ever ask any of your subordinant employees

15    to set you up with one of their friends?

16          A.   No.

17          Q.   Am I correct that Nashly Leslie was one of your

18    subordinate employees?

19          A.   Nashly was one of my subordinate employees.

20          Q.   Same with Kahealani and Pamela?

21          A.   At times.

22          Q.   Did you ever ask Pam Wilson about whether she was

23    dating Gary Levitt or Robert Vickers?

24          A.   No.

25          Q.   Did you tell her, Pamela Wilson, "Patti hates me.
```

```
 1    She has it out for me.  It's obvious"?
 2         A.   I would say probably.
 3         Q.   Did you ever ask Pam Wilson what beach she and her
 4    daughter go to?
 5         A.   We were in discussions at a bar.
 6         Q.   Okay.
 7         A.   And it was -- I think we have already covered
 8    that.
 9         Q.   Okay.  Not at work?  You didn't do it at work?
10         A.   No.
11         Q.   Correct?
12         A.   And it wasn't just about her and her daughter.  It
13    was a discussion in general.
14         Q.   Did you ever ask Pamela Wilson to call you?
15         A.   No.
16         Q.   Did you ever mention massage oil to Pamela Wilson?
17         A.   No.
18         Q.   Did you ask her repeatedly -- Did you ask on
19    Valentine's Day about what she got for Valentine's Day?
20         A.   No.
21         Q.   Did you ever ask her out to a restaurant, Pamela
22    Wilson?
23         A.   No, I did not ask Pam out to a restaurant.
24         Q.   Did you ever talk about going out to eat sushi
25    with her?
```

```
 1            A.    Not only her, but a group.  And this was in a
 2   group that we were going to be planning a sushi party to
 3   Sushi Go in a group.
 4            Q.    And who else was in that group?
 5            A.    All the night shift people.  We were having a
 6   discussion regarding it.  They were talking about planning a
 7   party.  I mentioned, Well, if you guys like sushi, you can go
 8   to Sushi Go.  There's a place over in Kihei on Wednesdays
 9   nights.  And I also mentioned that it's over in Kahului and
10   we should have a sushi party.  This was with -- I think Rusty
11   was there, Gary was there, about 20 to 30 screeners.  She was
12   not targeted specifically: It was a general comment.
13            Q.    Have you approached anyone to join this lawsuit
14   who is not already -- who has not already brought suit, who
15   is not in it already right now?
16            A.    All I know is the plaintiffs that we have in it.
17   I don't know who else is involved as far as witnesses go.
18            Q.    My question is:  Have you ever asked anyone
19   whether they wanted to sue TSA as part of this lawsuit?
20            A.    No.
21            Q.    Have you ever suggested such a thing to anyone,
22   that they might want to join the lawsuit?
23            A.    No, not that I can recall.
24            Q.    When is the last time you saw Patty Igarashi?
25            A.    Two years ago.
```

```
 1          Q.   When she was still at TSA?

 2          A.   Yes.

 3          Q.   Were you still at TSA at the time, too?

 4          A.   'Til the last time I saw her, then I wasn't.  I

 5     was suspended the day -- the last time I saw her.

 6          Q.   Was it the day you were suspended that you saw

 7     her?

 8          A.   Yes.

 9               MS. HEVICON:  For the record, that was three

10     years ago; right?

11               THE WITNESS:  Yeah.  Two, three.

12               MS. HEVICON:  An anniversary coming up.

13     BY MR. HELPER:

14          Q.   And at the counseling session, was Earl Owens

15     there for any part of it, the February 25th counseling

16     session?

17          A.   May have been in and out.

18          Q.   In and out.  How long did that session last with

19     Russel Harlan?

20          A.   About ten minutes.

21          Q.   Okay.  How about Gary Levitt?

22          A.   I don't think he was there.  I don't recall.

23          Q.   Okay.

24          A.   No, I would say that Gary was not there because

25     who else was running the checkpoint.
```

```
 1          Q.    The employee who -- The screener whose name you
 2    couldn't recall, the male screener, was that Duane Fawkner?
 3          A.    It might have been.
 4          Q.    I was looking through your statements.  Is Duane
 5    Fawkner a Caucasian?
 6          A.    Duane Fawkner is a Caucasian and he was having
 7    problems with Patti.
 8          Q.    Is he probably one of the screeners whose name you
 9    couldn't recall?
10          A.    Correct.
11          Q.    Do you recall if he was the walk-through screener
12    or the wanding screener?
13          A.    I think he was the walk-through.
14          Q.    Okay.  You mentioned that on one occasion you saw
15    a local employee turn her back to the metal detector.  Did
16    Patti observe that?
17          A.    Yes.
18          Q.    How do you know?
19          A.    She was standing right there.  She was chewing out
20    Duane for the same thing.
21          Q.    Okay.
22          A.    And she looked over at the girl, gave her stink
23    eye, and the girl turned.
24          Q.    Okay.  And other than that occasion, were there
25    occasions where you believe a local employee should have been
```

```
 1    counseled, talked to by Patti, but wasn't?

 2         A.   Correct.

 3         Q.   How many times did you see that happen?

 4         A.   Numerous.

 5         Q.   What are sort of things did you see?

 6         A.   Failing to screen passengers properly, failing to

 7    stop people and process them properly such as, you know, they

 8    got something on the image ray machine, it comes down, they

 9    can't find it so they let the package go through.  Okay?

10    That's a procedure thing that they're not following through

11    on.

12         Q.   Wait.  Let me stop you a second.  I know you're

13    not done with your list; right?

14         A.   Right.

15         Q.   Okay.  These were people under your supervision;

16    right?

17         A.   No.

18         Q.   Okay.  Let's restrict it for a second to people

19    under your supervision.  Were there occasions where local

20    screeners committed errors for which they should have been

21    counseled and Patti stopped you from counseling them?

22         A.   I didn't have the authority to counsel anybody.  I

23    didn't have the authority to write people up.

24         Q.   Counseling, what do you mean by -- When you say

25    you didn't have the authority to counsel people, what do you
```

```
 1   mean by "counsel"?

 2        A.   I can mention it to them, Hey, turn around and do

 3   this, and coach them; but I didn't have the authority to

 4   write them up, issue them a warning or anything like that.  I

 5   didn't have that authority.  The only thing I could do is if

 6   one of my screeners didn't operate or violate something, is

 7   report it to Ann or Rusty and then from there they would take

 8   it to Patti or whoever the appropriate manager is.

 9        Q.   Did Ann or Rusty have the authority to write

10   somebody up?

11        A.   Yes.

12        Q.   Did you ever ask anyone for -- Did you tell

13   anybody in the chain above you that one of your subordinates

14   should be written up?

15        A.   Yes.

16        Q.   And was it ever not done?

17        A.   Yes.

18        Q.   Okay.  Tell me the circumstances.

19        A.   Mary Salazar had left her position on the

20   screening position and left the walk-through unattended and

21   customers were walking through.  And I had mentioned it to

22   her to keep an eye on it and make sure to be there.  She all

23   of a sudden had to rush off and get lunch from someone and

24   left it unattended again.  This was right after I had told

25   her to make sure that it's always covered.  So I mentioned it
```

Charles Turner                                                          144

```
 1   to Ann.  Ann mentioned it to Patti and Patti decided not to

 2   do anything about it.

 3        Q.   How do you know that Ann mentioned it to Patti?

 4        A.   I watched her.

 5        Q.   Were you within hearing distance?

 6        A.   Yes.

 7        Q.   What did Ann say to Patti?

 8        A.   That I had given Mary a previous warning regarding

 9   standing at the monitor and that subsequently within a couple

10   of minutes she went to go get lunch and left the monitor

11   open.

12        Q.   And what was Patti's reaction?

13        A.   I'll talk to her about it.  Don't worry, I'll talk

14   to her about it.  Okay?  And it was completely different than

15   if I had mentioned that it had been -- If I had mentioned it

16   had been Glen or one of the other guys, I know for sure she

17   would have immediately jumped on it and wrote the person up.

18   As it was, Patti never got a write-up.

19             MS. HEVICON:  Mary or Patti?

20             THE WITNESS:  Mary never got a write-up.  Her

21   and Patti ended up kicking in the back room, anyway, and

22   having pizza that night.

23   BY MR. HELPER:

24        Q.   Any other instances in which you asked one of your

25   employees be written up and it wasn't done?
```

```
 1        A.    Kenny, who is a local male, he was assigned to an
 2   exit and he left the exit unguarded.  And that's a definite,
 3   you don't leave your post.  Even though he had a valid
 4   excuse, he needed to go to the restroom, he needed to
 5   communicate to us somehow that he needed to go.  He didn't,
 6   he left it unattended for a few minutes and then he came back
 7   to it.  And that needed to be written up.  And I told Patti
 8   about it, and she just ignored it.
 9        Q.    You told Patti directly about this one?
10        A.    Yes, because it was of a serious nature where it
11   could have caused a shutdown on the airport.
12        Q.    What was the time period -- Do you remember
13   Kenny's last name, by any chance?
14        A.    No, I don't.
15        Q.    What time period was this?
16        A.    This was in December.
17        Q.    How about with Mary Salazar?
18        A.    Again, I would say in December.  December or
19   January, I would say, on both of those because the time just
20   flows through.
21        Q.    Any other instances other than the Kenny instance
22   and the Mary Salazar instance of you seeking or asking that
23   local employees be written up and the write-up not being
24   done?
25        A.    No.
```

```
 1         Q.    Were there any times in which you suggested that a
 2    Caucasian employee be written up?
 3         A.    Yes.
 4         Q.    How many?
 5         A.    That one gentleman that we were talking about that
 6    I don't remember his name that I had referred to Rusty and
 7    Patti had also mentioned to me to keep an eye on him.  And he
 8    definitely needed to be written up.
 9         Q.    So is it correct that you only recommended three
10    write-ups in your career?
11         A.    Correct.
12         Q.    Other than the allegations of sexual harassment at
13    TSA and at the more recent position -- Tell me the name of
14    that one again.
15         A.    Secure Toss.
16         Q.    Secure Toss.  Have you ever been accused of sexual
17    harassment?
18         A.    One time I believe in LA at one point in time for
19    a gal I did an interview with.  She said that I came on to
20    her.  She didn't know that we had a hidden microphone there
21    and that went right out the window.  And that was an
22    interview that we were doing for a theft investigation.
23         Q.    Was that while you were with Hughes?
24         A.    Yes.  And it went right out the window fast.
25         Q.    Who would have looked into that investigation for
```

1    Hughes?

2         A.    Becky Carr.

3         Q.    Okay.  The Secure Toss allegation, did you get a

4    written notice of termination?

5         A.    I got a written notice of termination and I

6    believe I appealed it to the Unemployment and they said --

7    they came back with a ruling that there was, what was it,

8    grounds -- not reasonable grounds for discharge for whatever.

9         Q.    You got Unemployment benefits?

10        A.    Oh, yes.  Completely.

11        Q.    What was -- In the claim that the security guard

12   made, was it you asked her to a photo shoot?

13        A.    She had -- I had asked her to model for me, yes.

14        Q.    Anything more graphic than modeling in her

15   allegation against you?  I'm not asking if it was truth.

16        A.    Her allegation was that I had asked her to do nude

17   modeling for me.

18        Q.    Anything more graphic than that?

19        A.    That's it.

20        Q.    And do you know if any investigation was done of

21   the allegation?

22        A.    No, it wasn't.  Well, they said they did an

23   investigation, but, actually, it wasn't because they never

24   interviewed any of my witnesses nor checked -- did any type

25   of background check into it.

```
 1                     MR. HELPER:  Okay.  Let me try to get you to
 2   your plane.
 3                     MS. HEVICON:  I can always catch the next
 4   one.
 5             (Pause in Proceedings:  5:44-5:46)
 6                     MR. HELPER:  Back on the record.
 7   BY MR. HELPER:
 8        Q.   You said -- I'm looking at your interrogatory
 9   answers August 2005 to November 2005 the Sultron Company and
10   it says -- this is in response to the question, "Reason for
11   leaving," you've got the sentence, "Notice I was being cased,
12   probationary period."
13        A.   Uh-huh (affirmative response).
14        Q.   What does that mean?
15        A.   I notified them that I was being cased.  Casing is
16   where somebody is setting you up for a robbery.
17        Q.   Okay.
18        A.   I was carrying 100,000 to 200,000 worth of jewelry
19   per day with this company unarmed, and it presented me with a
20   very highly risky environment and I let them know that.
21        Q.   So were you terminated or did you --
22        A.   At that point in time we separated under
23   probationary.  Because I told them I didn't want to carry it
24   into that type of a situation again, and they said they would
25   find someone else.  So since I was still under probation,
```

```
 1   they decided to let me go under a probation.
 2        Q.   What does that mean, "let me go"?  Why couldn't
 3   you just quit?
 4        A.   Because if I quit, then I don't get Unemployment
 5   benefits.
 6        Q.   Okay.  So they agreed to terminate you?
 7        A.   Yes.
 8        Q.   Okay.  And you don't remember the name of this
 9   woman at Secure Toss who made the allegation against you?
10        A.   No.
11        Q.   Correct, you don't?
12        A.   I do not.
13        Q.   Do you know what the date of the allegation was?
14   Around July 2004, I assume?
15        A.   Yes, sir.
16        Q.   And is Ray Romero the person who terminated you?
17        A.   Ray Romero was my vice president.  He was not the
18   actual person who terminated me.  It was Kenny Chang.
19        Q.   Who is it that you say knows somebody at TSA or
20   said that --
21        A.   Kenny Chang.
22        Q.   Your interrogatory answers say, "Payroll dispute
23   regarding overtime/fraudulent sexual harassment claim."  What
24   does this mean?  What does that mean, "payroll dispute
25   regarding overtime"?
```

```
 1        A.    They owed me $9,000.  They still owe me $9,000 for
 2   overtime.  I told them if I didn't get it by the end of July,
 3   I was not going to be there anymore.
 4        Q.    When did you tell them that?
 5        A.    In the beginning of July.
 6        Q.    When did the sexual harassment allegation arise in
 7   relation to that statement?
 8        A.    At the end of July.
 9              MR. HELPER:  Okay.  Two minutes to look over
10   my notes.
11              MS. HEVICON:  Sure.
12        (Pause in Proceedings:  5:48-4:50)
13              MR. HELPER:  Just a couple other things.
14   BY MR. HELPER:
15        Q.    At the time you were terminated from TSA you were
16   still in your probationary period; is that right?
17        A.    No, not that I was aware of.
18        Q.    Were you ever told that there was a one-year
19   probationary period?
20        A.    I thought there was only a 90-day probationary
21   period.  Then someone mentioned a year probationary period.
22   Then they also mentioned a five-year probationary period.
23   And no one could tell us as far as the human resources
24   department which was correct.
25        Q.    Did you ever, to your knowledge, get any written
```

```
 1    notice of how long you would be on a probationary period?
 2         A.    Not that I recall.
 3         Q.    Did Patti Igarashi ever talk to you about body
 4    odor?
 5         A.    No.
 6         Q.    Did any of your supervisors talk to you about body
 7    odor?
 8         A.    Oh, I take that back.  Correction.  Me and Russ
 9    had talked about at one point in time regarding one of the
10    other employees who had mentioned it.  And he had mentioned,
11    Well, at times, you know, you get to smell a little bit.
12               I had mentioned, Okay, fine.  I'll make sure to
13    have cologne, extra cologne.
14               And he goes, Well, how you going to approach it
15    with this guy?
16               And I told him, I'm going to approach it the same
17    way.  I go, We're going to have to try to get him some extra
18    cologne or something.
19         Q.    And this was a conversation you had with Russel
20    Harlan?
21         A.    Yes.
22         Q.    Do you remember what time frame this was in?
23         A.    December.  And I remember that was also when I was
24    helping out -- He had sent me to baggage or something like
25    that and I remember I had been moving a bunch of bags and I
```

```
 1    came back to him.
 2         Q.    Who is the other employee, the employee whose body
 3    odor you were --
 4                    MS. HEVICON:    The smelly guy?
 5                    THE WITNESS:    The smelly guy.    I don't
 6    remember.    I remember that the conversation was about a third
 7    party.
 8    BY MR. HELPER:
 9         Q.    Let me just make sure I've got something right,
10    because I -- As you sit here today, your best recollection is
11    that you saw Patti Igarashi dealing inappropriately with
12    eight Caucasian employees; right?
13         A.    Correct.
14         Q.    And we've talked about all those allegations at
15    some length; right?
16         A.    Yes.
17         Q.    And that's all you can remember as you sit here
18    today, is those eight?
19         A.    Yes.
20         Q.    Okay.    And we're talking about a total of about a
21    dozen incidents involving those eight persons, maybe a few
22    more than a dozen?
23         A.    Yes, sir.
24         Q.    Okay.    And all but one of those incidents
25    happened -- Well, no.    Let me strike that.    The incidents
```

```
 1    regarding all but one of those employees occurred in November
 2    2002 or earlier; right?
 3         A.    No, I would say December, because I don't know
 4    exactly when Duane's was.
 5         Q.    Okay.  And you -- Other than Patti Igarashi, you
 6    never saw anything that gave you concern that other
 7    employees -- other supervisors were racially discriminatory;
 8    right?
 9         A.    Correct.
10         Q.    Okay.  And one of the bases for you believing that
11    Patti Igarashi was discriminating against Caucasians is your
12    belief or the fact that you didn't see her writing up locals;
13    right?
14         A.    I wouldn't have privilege to her -- seeing her
15    writing up anybody.
16         Q.    Okay.  All right.  Do you have any
17    understanding -- Okay.  Take writing up out of it.  Is it
18    fair to say that one important basis for your belief that
19    Patti Igarashi was discriminating on the basis of race is the
20    fact that you never saw her disciplining locals?
21         A.    Correct.
22               MR. HELPER:  Okay.  Thank you very much.
23    Appreciate your patience with me.
24               (Deposition concluded at 5:55 p.m.)
25
```