# ATTACHMENT "5"; PATRICK COLLINS

.

1           IN THE UNITED STATES DISTRICT COURT

2               FOR THE DISTRICT OF HAWAII

3

4                                        )
                                         )
5    LUCAS BRUNO III, CHRISTOPHER        )   CIVIL NO. 03-00567 DAE/BMK
     GAHR, FRANK ROBERT PAULSON,         )
6    CHARLES TURNER, and TOM YOUNG,      )
                                         )
7                    Plaintiffs,         )
                                         )
8               vs.                      )
                                         )
9    MICHAEL CHERTOFF, Secretary,        )
     DEPARTMENT OF HOMELAND              )
10   SECURITY,                           )
                                         )
11                   Defendant.          )
                                         )
12   _____ )

13
     DEPOSITION NOTICED BY: MICHAEL JAY GREEN, ESQ.
14

15              DEPOSITION OF PATRICK COLLINS

16   Taken on behalf of the Plaintiffs at TSA Maui County

17   Airports Training Center, 33 Lono Avenue, Suite 270,

18   Kahului, Maui, Hawaii, commencing at 1:11 p.m., May 12, 2006

19   pursuant to Notice.

20

21

22

23

24   REPORTED BY: GLORIA T. BEDIAMOL, CSR/RPR #262

25

**JWADO**

Iwado Court Reporters, Inc. Certified/ Registered Professional Reporters          COURT REPORTERS, INC.
2233 Vineyard Street, Wailuku, Maui, Hawaii 96793  Federal ID # 99-0230607
Maui (808) 244-9300. Toll Free (800) 241-3376  Fax (808) 244-8278

```
 1                A P P E A R A N C E S

 2

 3
     For the Plaintiffs Lucas Bruno III, Christopher Gahr, Frank
 4   Robert Paulson, Charles Turner and Tom Young:

 5              Michael Jay Green, Esq.
                345 Queen Street, Second Floor
 6              Honolulu, Hawaii 96813

 7              Debra A. Kagawa, Esq.
                345 Queen Street, Second Floor
 8              Honolulu, Hawaii 96813

 9              Denise Hevicon, Esq.
                345 Queen Street, Second Floor
10              Honolulu, Hawaii 96813

11
     For the Defendant Department of Homeland Security:
12
                Thomas A. Helper, Esq.
13              Office of the United States Attorney
                PJKK Federal Building
14              300 Ala Moana Blvd., Rm. 6100
                Honolulu, Hawaii 96850
15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    I N D E X

 2   EXAMINATION BY:                              PAGE

 3   MR. GREEN                                      4

 4

 5

 6

 7                  E X H I B I T S

 8   EXHIBIT              DESCRIPTION              PAGE

 9
     1         General Counseling Form             50
10             C. Gahr

11   2         Resume - Patrick Collins            51

12   3         TSA Counseling Record - C. Gahr     51
               10/19/02
13
     4         TSA Counseling Record - C. Gahr     60
14             10/20/02

15

16

17

18

19

20

21

22

23

24

25
```

*IWADO COURT REPORTERS, INC.*
(808) 244-9300

1          Pursuant to Rule 14 of the Rules Governing Court

2    Reporting in Hawaii, the Reporter's Disclosure was made and

3    is attached hereto.

4          Pursuant to Rule 30(b)(4) of the Hawaii Rules of

5    Civil Procedure, the following is stated for the record:

6          My name is Gloria Bediamol, Certified Shorthand

7    Reporter with Iwado Court Reporters, Inc. My business

8    address is 2233 Vineyard Street, Suite A, Wailuku, Maui,

9    Hawaii.  Today's date is May 12, 2006.  The time is 1:11

10   p.m.  This deposition is taking place at Iwado Court

11   Reporters.

12          In attendance are: Mr. Green, Ms. Kagawa,

13   Ms. Hevicon and Mr. Helper.

14          The deponent is:

15                    PATRICK COLLINS,

16          The deponent, having been sworn to tell the truth,

17   the whole truth, and nothing but the truth, was examined and

18   testified as follows:

19                       EXAMINATION

20   BY MR. GREEN:

21      Q.   Say your name, please?

22      A.   Patrick L.  Collins, C-O-L-L-I-N-S.

23      Q.   Mr. Collins, have you had your deposition taken

24   before?

25      A.   Yes, sir.

| | | |
|---|---|---|
| 1 | Q. | When was the last time? |
| 2 | A. | I've had depositions taken several times. |
| 3 | Q. | When was the last time it?  Could not have been |
| 4 | more than one in a day? | |
| 5 | A. | I've had -- I guess I'll have to ask you the |
| 6 | question was on the deposition -- | |
| 7 | Q. | The last time you were deposed. |
| 8 | A. | On any case? |
| 9 | Q. | On anything. |
| 10 | A. | Three years ago, four years ago. |
| 11 | Q. | What was the nature of that case? |
| 12 | A. | One of the law enforcement cases.  I did one for |
| 13 | TSA.  I had a phone deposition taken. | |
| 14 | Q. | The case for TSA, when was your memory that you |
| 15 | were deposed? | |
| 16 | A. | I would say three years ago. |
| 17 | Q. | Do you remember who the plaintiff was in that |
| 18 | case? | |
| 19 | A. | Katherine Walker. |
| 20 | Q. | We have heard about her.  Were you named as a |
| 21 | defendant in that case? | |
| 22 | A. | I don't know. |
| 23 | Q. | How many TSA cases were you involved in as a |
| 24 | deponent, if it was more than that one? | |
| 25 | A. | Just the one that I'm aware of. |

1      Q.   First, are you familiar with the rules or

2  procedures for a deposition?

3      A.   Yes, sir.

4      Q.   Let me just go through them briefly.

5      A.   Yes, sir.

6      Q.   Please make sure that you understand the question

7  I ask you before you answer it; okay?

8      A.   Yes, sir.

9      Q.   If you don't understand the question, you tell me,

10  and I'll try to rephrase it so you do understand it; okay?

11     A.   Yes, sir.

12     Q.   The court reporter is taking down the questions,

13  you giving answers under oath, so you want to make sure that

14  you are answering the question that I'm asking you; okay?

15     A.   Yes, sir.

16     Q.   At some point in time, you'll have an opportunity

17  to look at a transcript of your deposition.  You can make

18  changes if you deem fit; okay?

19     A.   Yes, sir.

20     Q.   If you make what we call substantive changes -- in

21  other words if you answer a question no today, and then you

22  change the transcript to say yes, if the case goes to trial

23  a judge or jury may be able to know that under oath today

24  you were asked a question under oath, you said yes, months

25  after that you changed it to no; okay?

```
1        A.    Yes, sir.

2        Q.    So it's important that you understand the

3   question, like I said, and you give an answer that you

4   intend to give; okay?

5        A.    Yes.

6        Q.    Obviously, you know this deposition is given under

7   penalty of perjury.  Do you understand that?

8        A.    Yes.

9        Q.    Is there any reason we can't go forward, any

10  medication or things like that?

11       A.    No, sir.

12       Q.    Do you have any questions you want to ask before

13  we go ahead?

14       A.    No, sir.

15       Q.    One other thing we want to do is make sure we

16  don't talk over each other.  So let me finish the question

17  and then I'll try to let you finish the question, because I

18  have a tendency to speak quickly; okay?

19       A.    Yes, sir.

20       Q.    If your lawyer makes an objection during the

21  deposition, you should stop answering immediately, and he

22  will make the objection.  If he advises you not to answer, I

23  suggest you trust his advice.  He is a very good lawyer;

24  okay?

25       A.    Yes, sir.
```

```
1          MR. HELPER:  Typically, though, just go ahead and
2   answer.
3        Q.   (By Mr. Green)  In looking over your background,
4   you are highly decorated marine in Vietnam?
5        A.   I'm a decorated marine, yes, sir.
6        Q.   I'm not surprised that you didn't want to say
7   highly decorated, but you are -- you have the campaign
8   medal, service medal, and defense medal?
9        A.   Yes, sir.
10       Q.   Police officer in Minnesota?
11       A.   Yes, sir.
12       Q.   How many years?
13       A.   32.
14       Q.   Kind of cold, isn't it?  You went to work for
15  Wackenhut in October 4, 2002, yes -- or January 31, 2002 to
16  October 4, 2002?
17       A.   Yes, sir.
18       Q.   And what was it that caused you to apply to
19  Wackenhut, if you did?
20       A.   I had to make up social security credits.  And due
21  to the situation after 911, after having been involved in
22  law enforcement for as long as I had been in, I wanted to
23  somehow get back into the game in protecting the citizens.
24  It's what I've been doing all my life.
25       Q.   What was your job?
```

1    A.    I started out as a ticket checker.

2    Q.    And then?

3    A.    Screener.

4    Q.    Who trained you to be a screener?

5    A.    Wackenhut gave us a basic class and then we did

6  the OJT at the checkpoint.

7    Q.    What is OJT?

8    A.    On-the-job training.

9    Q.    How long did you have on-the-job training?

10   A.    Couple of weeks.

11   Q.    And after on-the-job training and becoming a

12  screener, what else did you do, if anything, as far as your

13  job description for Wackenhut?

14   A.    I later became a CSS and then did training for

15  Wackenhut.

16   Q.    What is a CSS?

17   A.    Checkpoint security supervisor.

18   Q.    What kind of training did you get?

19   A.    All the aspects from basic screener school, when

20  we hire new people, to any SOP changes that came along, or

21  changes in procedure that came along.

22   Q.    During your career, either as a marine or

23  certainly as a police officer, I assume you were trained to

24  make reports?

25   A.    Yes, sir.

1      Q.    Reports that dealt with perhaps interviewing

2  various witnesses or defendants or things like that, right?

3      A.    Yes, sir.

4      Q.    Were you trained to do reports when you went to

5  work for Wackenhut? In other words, how a report should be

6  prepared?

7      A.    Very sketchily.

8      Q.    Was there a system, you were aware of, where if

9  you saw something you believed to be done improperly by

10 another employee that you were told to report those things?

11     A.    We were told to report them but not necessary any

12 writing.

13     Q.    Were there times, based on your training, you were

14 told to report things in writing as opposed to just orally?

15     A.    Yes.

16     Q.    What would be the circumstances where you would

17 report something in writing?

18     MR. HELPER:  You are talking just about his

19 Wackenhut training?

20     Q.    (By Mr. Green)  Only Wackenhut so far.

21     A.    I was instructed by my manager to make reports on

22 incidents that she wanted documented.

23     Q.    Did she tell you what incidents she wanted

24 document?

25     A.    Sometimes she did, yes.

1    Q.   Would that be a situation where you would report
2    it orally, then she would tell you to reduce it to writing?
3        A.   Yes, sir.
4        Q.   In other words, the decision was hers to reduce it
5    to writing?
6        A.   Yes, sir.
7        Q.   Were you given any training at Wackenhut regarding
8    sexual discrimination, race discrimination, those kinds of
9    things?
10       A.   I was not trained by Wackenhut under those
11   subjects.
12       Q.   Were you trained by anyone, in your work
13   experience before you went there to Wackenhut, about those
14   kinds of civil rights issues?
15       A.   Yes, sir.
16       Q.   Who trained you?
17       A.   Different agencies when I was with the PD.
18       Q.   Did you have some understanding, at least in your
19   mind, as to what conduct could potentially be some type of
20   discrimination, whether it's age, whether it's ethnicity,
21   those kinds of things?
22       A.   Yes, sir.
23       Q.   The training you said was with the police
24   department in Minnesota?
25       A.   Yes, sir.

1     Q.    Let's just deal with race discrimination for a
2  moment. What was your understanding as to things that may
3  constitute that kind of conduct?
4     A.    There would be racial discrimination.
5     Q.    What kinds of things, at least in your mind when
6  you went to Wackenhut, might constitute that type of
7  discrimination?
8     A.    Not promoting a person because of their race, not
9  allowing them to work in certain areas because of it, or
10  giving them what one might call the bad jobs or sloppy jobs
11  because of their race.
12     Q.    When did you come to Hawaii?
13     A.    We moved to Hawaii in August of 2001.
14     Q.    When you moved to Hawaii, you moved from where to
15  what island in Hawaii?
16     A.    Moved from Minnesota to Maui.
17     Q.    In your lifetime, before you came to Hawaii, do
18  you believe you personally experienced race discrimination?
19     A.    Yes.
20     Q.    In what aspect?
21     A.    When I was in the marines.
22     Q.    What kind of discrimination?
23     A.    Because I was white, and I got treated poorly by a
24  number of black marines.
25     Q.    Were these supervisory people or just

1  contemporaries?

2      A.   Both.

3      Q.   Just dealing with what you believe to be race

4  discrimination was a conduct as opposed to just words.  And

5  I want to deal with conduct first, and that's somebody

6  calling you something racially in your opinion?

7      A.   Yes.

8      Q.   What was the conduct that you believed to be

9  discriminatory?

10     A.   Finding things wrong with my equipment or my men

11  that really wasn't true because I was the race that I was.

12     Q.   All right.  So you were comfortable, based on your

13  training and experience, which may include the way you were

14  brought up, that you believed the things they were doing to

15  you was racially based?

16     A.   Yes, sir.

17     Q.   Forgetting about the treatment, the conduct that

18  you saw, verbally were you ever exposed to what you believed

19  to be racial discrimination?

20     A.   Oh yes, sir.

21     Q.   In what aspect?

22     A.   Same as I described to you before, but I

23  experienced that all through my police career.

24     Q.   Were there words use?

25     A.   Yes, sir.

| | | |
|---|---|---|
| 1 | Q. | What kind of things were said to you? |
| 2 | A. | Cracker, white bread, fucking harp. |
| 3 | Q. | I haven't heard that.  What is that? |
| 4 | A. | What was that? |
| 5 | Q. | The last one you said, fucking what? |
| 6 | A. | Harp. |
| 7 | Q. | I don't know that word is. |
| 8 | A. | A harp is a person of Irish descent. |
| 9 | Q. | A harp? |
| 10 | A. | Harp, H-A-R-P. |
| 11 | Q. | What other kinds of things? |
| 12 | A. | Fucking ganuf (phonetic). |
| 13 | Q. | That's an interesting word. |
| 14 | A. | Ganuf, it's a Jewish word.  It means non-Jewish. |
| 15 | Q. | Well, actually ganuf means a thief or a pig, or |

16  something like that.

17       A.    Or goy, I'm sorry.

18       Q.    That's what she says to me all the time.  I want

19  to just focus in on the police department first.  When you

20  experienced either the verbal discrimination or the conduct

21  discrimination that you've talked about, what was your rank

22  in the department, when you first started experiencing what

23  you believe --

24       A.    Patrol officer.

25       Q.    Did you ever report the conduct?

| | | |
|---|---|---|
| 1 | A. | No, it's just part of doing business. |

 1     A.   No, it's just part of doing business.

 2     Q.   You sucked it up, more or less?

 3     A.   No, just part of doing business.

 4     Q.   What does that mean to you?

 5     A.   It means that if people call you names like that,

 6 the courts tell you that because you're a police officer you

 7 have to accept it.

 8     Q.   Did you have any fellow officers that called you

 9 racial epithets?

10     A.   No.

11     Q.   Were you ever in a work situation where you

12 believed you were discriminated against based on your

13 ethnicity or race?

14     MR. HELPER:  Other than what he talked about in

15 the military?

16     Q.   (By Mr. Green)  Well, the military, did you report

17 that?

18     A.   Yes, sir, I did.

19     Q.   And who did you report it to?

20     A.   My lieutenant.

21     Q.   Was anything done about it?

22     A.   Absolutely nothing.

23     Q.   Did you feel that after -- at any time after you

24 reported that kind of discrimination, that you were

25 retaliated against?

1       A.   No.

2       Q.   Were you concerned about retaliation before you

3    actually went public, more or less, and complained about

4    things that were said or done to you?

5       A.   No.

6       Q.   You come to Hawaii, and when you come to Hawaii,

7    how long is it before you go to work for Wackenhut?   How

8    long were you actually in the islands?

9       A.   Four months, five months, something like that.

10   August or January.

11      Q.   Did you know anyone that had lived here prior to

12   you coming here?

13      A.   Few people, yeah.

14      Q.   Anyone you would consider to be a friend?

15      A.   Acquaintances.

16      Q.   Were you ever told, either before you came here or

17   while you were here, that there may be prejudice against

18   Caucasians in Hawaii?

19      A.   The term I was told was that it was a closed

20   society.

21      Q.   What did you take that to mean?

22      A.   That it would take a while for people to open up

23   to you.

24      Q.   Did you have children when you came here?

25      A.   They didn't come with us.

```
 1        Q.   Do you have any family here children, whether it's
 2   nieces, nephews, or things like that?
 3        A.   My nephew is currently here.
 4        Q.   How old was your nephew when he first came here?
 5        A.   When my nephew first came here.  He had to be a
 6   little lad like 7 or 9.
 7        Q.   Did he go to school here?
 8        A.   Yes, he did.
 9        Q.   Who did he live with?
10        A.   His mom and dad.
11        Q.   Were you ever part of any discussion with his mom
12   and dad -- what was the relationship to you, the mom and
13   dad?
14        A.   The father is my brother.
15        Q.   Any discussions -- strike that.  Public school?
16        A.   I don't know.  I know it wasn't private, but it's
17   not necessarily public.  It's on a military base, so I don't
18   know what it is.
19        Q.   Any discussions that you were ever part of with
20   your brother or his wife about their child being
21   discriminated against because he was white?
22        A.   He isn't white.
23        Q.   What is he?
24        A.   Chinese.
25        Q.   Pure Chinese?
```

1      A.    Chinese, English, I think.

2      Q.    Ever discussions about discrimination that he

3   experienced in school?

4      A.    In Hawaii?

5      Q.    Yes.

6      A.    I don't recall that.

7      Q.    How about in other places he had been?

8      A.    Yes.

9      Q.    Where?

10     A.    Alabama.

11     Q.    You bet.  Just, in your impression, how did that

12   affect your brother and his wife?

13     A.    My brother and his wife are a mixed-race couple,

14   so they've just kind of learned to live with it.

15     Q.    But, I mean, how do you think, if it did affect

16   them, the fact that their child was perhaps being called

17   names or being discriminated against because of his

18   ethnicity?

19           MR. HELPER:  Objection, calls for speculation.

20     Q.    (By Mr. Green)  Have you talked to him?

21     A.    Could you reword that?

22     Q.    I'm trying to understand, if you had a discussion

23   with your brother and his wife about how they felt about

24   their child being discriminated against in Alabama because

25   of his race, any discussions like that?

1    A.    We probably talked, yeah.

2    Q.    When you came to Hawaii, at least in your mind,

3    did you have a belief that people who discriminated against

4    someone racially in the workplace can certainly affect the

5    person being discriminated against emotionally or things

6    like that?

7    A.    I would guess that would affect people.

8    Q.    Have you ever heard the word "haole" before?

9    A.    Yes, sir.

10   Q.    Did you hear it at Wackenhut?

11   A.    Uhm-hm.

12   Q.    Under what circumstances?

13   A.    Just in conversations.

14   Q.    That you were a part of or you heard other people

15   in conversation with?

16   A.    Both.

17   Q.    Did you believe it, at any time, when the word

18   "haole" was used, and I don't mean simply haole, maybe it

19   was phrased in conjunction with "fucking haole" or "that

20   damned haole," or things like that, was there ever a time at

21   Wackenhut where the word "haole" was used either to you in

22   your presence where you thought it was a derogatory term?

23   A.    No.

24   Q.    Never?

25   A.    No, not that I recall.

1      Q.   Do you think that people who use the "haole" --
2   what circumstances was it used?
3      A.   Just different description of people.
4      Q.   Description as being white, I assume, right?
5      A.   Nonislander, yeah.  White, basically.
6      Q.   You don't believe that haole refers to all
7   nonislanders?
8      A.   No.
9      Q.   It refers to white nonislanders?
10     A.   Uh-hm.
11     Q.   Yes?
12     A.   To the best of my knowledge, yes.
13     Q.   And the reason you transferred from Wackenhut to
14  TSA?
15     A.   Money.
16     Q.   And you went through some training?
17     A.   Yes, sir.
18     Q.   What was the training?
19     A.   It had been continuous, ongoing training.
20     Q.   What were you trained to do?
21     A.   Screening manager.
22     Q.   What does that mean?
23     A.   Oversee the screening workforce and make sure that
24  they follow the regulations and SOPs.
25     Q.   Was the training different for Wackenhut than it

```
 1   was for TSA in screening?

 2        A.   No.

 3        Q.   Did they wand people the same way at Wackenhut as

 4   they did at TSA?

 5        A.   Sometimes.

 6        Q.   Were they trained differently, if you know?  Were

 7   you trained differently at Wackenhut to wand people as

 8   opposed to TSA?

 9        A.   As a Wackenhut trainer, I was trained by TSA to

10   follow their procedures.  That's what I trained.

11        Q.   When you were writing reports in the military or

12   as a police officer, you had some training, you said, in

13   writing reports?

14        A.   Yes, sir.

15        Q.   Generally, reports are done contemporaneous to the

16   event?  As close as possible, yes?

17        A.   Yes, sir.

18        Q.   I mean, if you arrest somebody on January 1st in

19   the early morning hours, you get a chance to make your

20   reports perhaps at the end of the shift, you want to make

21   the report as close to the incident as possible, right?

22        A.   You try to, yes.

23        Q.   Generally, you would not write a report a month

24   later or two months later referring back to something that

25   happened earlier, right?
```

1    A.    I've done that, yeah.

2    Q.    You have done that?

3    A.    Oh, yes.

4    Q.    Under what circumstances?

5    A.    When you are reconstructing facts that happened a

6  long time before or an incident that's come up that was not

7  reportable at the time is now reportable.

8    Q.    I have no idea what you just said.  You tell me an

9  incident that was not reportable that was reportable two or

10  three months later.

11    A.    You stop a person for speeding and you have a

12  conversation with them, and maybe an officer does a roll-by

13  or a back-up with you, he is there or not.  And when you're

14  all done, you go on your way, you don't think anymore about

15  it --

16    Q.    Or you write a ticket?

17    A.    -- might have given a warning.  A month later the

18  person makes a complaint of misbehavior or improper conduct

19  or something.  So now you are playing catch up.  You are

20  writing a report you thought was not important but now it

21  has to be reported.

22    Q.    Let's take that a step further.  If something

23  appears to be important at the time, you want to record the

24  things that you believed to be the most important things?

25    A.    Yes, sir.

1      Q.    You've seen incidents, have you, where people have
2   falsified reports?

3      A.    Yes, sir.

4      Q.    People that may have motive to falsify reports?

5      A.    Yes, sir.

6      Q.    Have you ever heard the word "fucking haole" used
7   at TSA?

8      A.    Probably.

9      Q.    Do you find that term offensive?

10     A.    Depends on the circumstances it's used in.

11     Q.    Tell me any circumstance it's not offensive when
12   they refer to someone as a "fucking haole"?

13     A.    That's not what you asked me.

14     Q.    I thought I did.  What were the circumstances you
15   heard the word "fucking haole"?

16     A.    I heard it in conversations in passing, somebody
17   telling a joke.

18     Q.    We can take our time.  In passing conversations,
19   tell me what you remember about the term "fucking haole"?

20     A.    It would be in passing conversation.

21     Q.    You got help me with that.  You remember passing
22   conversations.  Tell me what you remember?

23     A.    If I gave you details, I would have to lie to you,
24   and I'm not going to do that.  I just know that I've heard
25   that in passing conversation that was not offensive to me.

1       Q.    Did they call you a fucking haole?

2       A.    That would be offensive to me.

3       Q.    Right.  But apparently the one that was not

4   offensive to you was because they were referring to someone

5   else, I guess, right?

6       A.    In a general term, yeah.

7       Q.    Do you remember who it was that uttered those

8   words?

9       A.    No.

10      Q.    The lawsuit you were involved in was a sexual

11  racial discrimination case, wasn't it, the one where you had

12  your deposition taken?

13      A.    I don't recall what it was.  It was some kind EEO

14  complaint.

15      Q.    How long ago was it?

16      A.    Three years.

17      Q.    That's right.  And it was Patty Igarashi calling

18  somebody a fucking haole.  Does that refresh your memory?

19      A.    No, sir, it does not refresh my memory.

20      Q.    Tell me who you can remember, if you can, using

21  the word "fucking haole"?

22            MR. HELPER:  Asked and answered.

23      Q.    (By Mr. Green)  No, I did not.  Go ahead.  Who

24  used the word "fucking haole" or how many people did?

25      A.    I know I've used it.

```
 1        Q.    Talking to who?

 2        A.    Probably one of the guys at work.

 3        Q.    Do you think that's funny?

 4        A.    In my context it would be, yeah.

 5        Q.    You think that's a joke?

 6        A.    Do I think it's a joke?

 7        Q.    To say someone is a "fucking haole." Do you

 8   think --

 9        A.    That's not what you asked me, sir, once again.

10              MR. GREEN:  Give him the question back that I

11   asked.

12                 (The record was read.)

13        Q.    (By Mr. Green)  Tell me what would be funny in

14   your context?

15        A.    Talking about some tourists that were lost and

16   wandering around or something.

17        Q.    Just keep going.  Tell me about tourists wandering

18   around or something.  Tell me how it came out of your mouth

19   "fucking haole" regarding that incident?

20        A.    It would have to be, like I said, a passing remark

21   as far as --

22        Q.    You're making a passing remark to who?

23        A.    Another person I'm working with.

24        Q.    Another TSA employee?

25        A.    Uh-hm.
```

1      Q.   Yes?  And you were referring to maybe a tourist or
2    someone that's from the mainland?

3          A.   Uh-hm.

4          Q.   And you were referring to them as a "fucking
5    haole"?

6          A.   Uh-hm.

7          Q.   Is that a "yes"?

8          A.   Yes, sir.

9          Q.   Do you ever talk about "fucking niggers"?  Have
10   you ever use that word?

11         A.   Yes, sir.

12         Q.   Under what circumstances?

13         A.   When I was angry at a black person.

14         Q.   Didn't mean it to be funny, did you?

15         A.   It's been said to be funny at times.  I'd never
16   put it that way.

17         Q.   I'm trying to understand how calling an
18   Afro-American a "fucking nigger" can be amusing.  Can you
19   explain that to me?

20         A.   Certainly.  There's all kinds of --

21         Q.   Tell me.

22         A.   I think if you listen to any Richard Pryor tapes
23   you'll hear it.

24         Q.   Tell me how you thought it was used, the word
25   "fucking nigger"?

```
 1        A.    That's not what you asked me, sir, once again.

 2        Q.    That's exactly what asked you.  You used the word

 3   "fucking nigger" tell me the circumstances?

 4        A.    I told you.  I probably used it in anger.

 5        Q.    Well, when you used it in anger, were you trying

 6   to be mean?

 7        A.    No.

 8        Q.    You are angry, you are calling someone a fucking

 9   nigger.  What were you trying to convey to them by saying

10   that?

11        A.    Once again, that's not what you asked me.  And I

12   said -- and I will --

13        Q.    I'm asking you know --

14        A.    I did not call anybody to their face "fucking

15   nigger." You asked me if I used the term, and I said yes.

16        Q.    So you were talking about a black person and

17   calling them a fucking nigger in anger, right?

18        A.    Yes.

19        Q.    What does a nigger mean to you?

20        A.    A person that's black.

21        Q.    It's a disgusting word for a black person, right?

22        A.    Uh-hm.

23        Q.    Is that a "yes"?

24        A.    Yes, sir.

25        Q.    You called Japanese Japs ever?
```

1       A.   You bet.

2       Q.   Under what circumstances?

3       A.   Talking about Japanese.

4       Q.   You think that's a derogatory term?

5       A.   No.

6       Q.   How about chinks?  You use the word for Chinaman

7   ever?

8       A.   I have.

9       Q.   Spics for Spanish people?

10      A.   I have.

11      Q.   Can you think of any racial person, ethnic

12   background you know where you haven't used -- how about spic

13   for Latinos?  Maybe you've used that from time to time?

14      A.   I already answered that.  I already said yes.

15      Q.   I maybe missed that one.  Jews kikes?

16      A.   Probably.

17      Q.   Are you a racist?

18      A.   No.

19      Q.   Do you think it's acceptable to use those words

20   for the ethnic groups I've mentioned?  Do you think that's

21   acceptable?

22      A.   No.

23      Q.   But you did it anyway?

24      A.   I did it in the past, yes.

25      Q.   When you worked for TSA, I think you said you used

| | | |
|---|---|---|
| 1 | | the word "fucking haole"? |
| 2 | A. | Yes, sir. |
| 3 | Q. | And you used it to another TSA person? |
| 4 | A. | I believe so. |
| 5 | Q. | And were you written up for that? |
| 6 | A. | No. |
| 7 | Q. | Have you ever heard anyone at TSA use the word |

"fucking haole" besides you?

| | | |
|---|---|---|
| 9 | A. | Probably. |
| 10 | Q. | Who was it? |
| 11 | A. | I could not tell. |
| 12 | Q. | What were the circumstances? |
| 13 | A. | Once again, probably in a passing conversation. |
| 14 | Q. | Did you write them up? |
| 15 | A. | No. |
| 16 | Q. | Why? |
| 17 | A. | It was a passing conversation. |
| 18 | Q. | So that's okay with you, if it's in passing |

conversation, to refer to some ethnic group such as white
people as "fucking haoles," right?

| | | |
|---|---|---|
| 21 | A. | Yes, sir. |
| 22 | Q. | Anybody at TSA talk to you about any passengers as |

fucking niggers or use the word "nigger" without the word
"fucking" while you worked for TSA in Maui?

| | | |
|---|---|---|
| 25 | A. | Not that I know of. |

| | | |
|---|---|---|
| 1 | Q. | Maybe yes, maybe no? |
| 2 | A. | I don't believe so. |
| 3 | Q. | How about Jap? Anybody at TSA refer to any |

4 passengers or people walking through the airport as Japs in

5 your presence?

| | | |
|---|---|---|
| 6 | A. | I believe so. |
| 7 | Q. | Never wrote them up, did you? |
| 8 | A. | It's not a derogatory term, in my opinion. |
| 9 | Q. | I understand what you're opinion is, but you never |

10 wrote them up, right?

| | | |
|---|---|---|
| 11 | A. | No. |
| 12 | Q. | Your lawyer is about to throw up; okay? And how |

13 about Chinese chinks? Anybody say that at TSA?

| | | |
|---|---|---|
| 14 | | MR. HELPER: Move to strike that comment about -- |
| 15 | Q. | (By Mr. Green) You can strike it. |
| 16 | A. | Not to my knowledge. |
| 17 | Q. | You got a wife? |
| 18 | A. | Yes, sir. |
| 19 | Q. | Did she ever use the word "fucking haole" ever? |
| 20 | A. | That's none of your business. |
| 21 | Q. | Oh, it's my business. Answer the question. |
| 22 | A. | No. |
| 23 | Q. | Answer the question or you'll be back here again |

24 and you'll pay for it this time.

25        Does your wife use the word "fucking haole"?

1     A.    Not that I know of.

2     Q.    Well, you just lied to me, didn't you?

3     A.    No.

4     Q.    Then why would you tell me it's none of my

5 business and then tell me --

6     A.    Because it's none of your business of what

7 transpires between me and my wife.  It has nothing to do

8 with this case.

9     Q.    Well, it has to do with your perception of racial

10 discrimination, my friend.  Anyone in your family refer to

11 black people as niggers?

12     A.    You bet.

13     Q.    Who?

14     A.    My father.

15     Q.    That's where you learned it, right?

16     A.    Probably.

17     Q.    Your family refer to Japanese as Japs?

18     A.    Yes.

19     Q.    Are you still pissed off at them for World War II?

20     A.    (Witness laughs.)

21     Q.    Is that a funny question?

22     A.    Yes, sir, it is.

23     Q.    Are you still pissed at them?

24     A.    I'm not pissed off at the Japanese, no.

25     Q.    You think black people are better off in Africa?

1        A.    No, sir.  I don't --

2        Q.    No opinion on that?

3        A.    I think I answered your question.

4        Q.    No opinion on that?

5        A.    I said no.  I don't think they're any better one

6    way or the other.

7        Q.    How long have you known Patty Igarashi?

8        A.    It had been probably from February of 2002 on.

9        Q.    Have you ever heard her use the word "fucking

10   haole"?

11       A.    I don't know.  I don't know.

12       Q.    Let me see if I can help you.  I'll read to you

13   from -- I'm going to read to you from a transcript of a

14   deposition by Thomas Young.  I need the other guy's -- it's

15   a deposition taken of Thomas Young.  It was taken March 15,

16   2006.  Let me strike that for a minute.  I'm curious because

17   my mother would like to know.  When did you use the word

18   "kike"?

19       A.    Probably when I was a teenager.

20       Q.    Referring to who?

21       A.    Somebody from St. Louis Park.

22       Q.    A Jew?

23       A.    I don't know that for sure.  They were from

24   St. Louis Park.

25       Q.    What would the word "kike" mean to you?

1      A.    At that time, it meant a person from St. Louis
2   Park.
3      Q.    Let me see, anyone in St. Louis Park would be a
4   kike potentially to you?
5      A.    Uh-hm.
6            MR. HELPER:   Hang on, vague as to time.
7      Q.    (By Mr. Green)   St. Louis Park, what years are we
8   talking about?
9      A.    Probably in the mid '60s.
10     Q.    St. Louis Park was a predominantly Jewish area,
11  wasn't it?
12     A.    Uh-hm.
13     Q.    Is that a "yes"?
14     A.    Yes, sir.
15     Q.    And you and your friends, from time to time, would
16  refer to them as "those kikes from St. Louis Park"?
17     A.    Yes, sir.
18     Q.    Anybody ever knock you on your ass when you called
19  them that?
20     A.    Once again, that's not what you asked me.
21     Q.    I just asked you a question, has anybody ever
22  knocked you on your ass when you called them a kike?
23     A.    I've never called anybody a kike.
24     Q.    Just about them, right?
25     A.    Yes, sir.

1        Q.    March 15, 2006, deposition of Thomas Young.  This

2    is what he says -- he is talking about his first day coming

3    to the airport here.  He is talking about knocking on the

4    door of Mr. Leong's office.

5              "When I knocked on the door" -- I'm reading from

6    page 30, line 4.  "When I knocked on the door, there were

7    probably four people in the outer office.  There were about

8    a half a dozen people in his office with him.  I was asked

9    to wait outside.  He actually didn't meet me in his office.

10   He came out and spoke to me in the hallway in the airport."

11             Have you been in that office before, Leong's

12   office?

13       A.    The one at the time?

14       Q.    Yes.

15       A.    Yes, that's our office now.

16       Q.    Who offices in there besides Leong, if anyone?

17       A.    At the time?

18       Q.    Yes.

19       A.    Everybody used it.

20       Q.    Patty Igarashi used it too from time to time?

21       A.    Occasionally.

22       Q.    "In the hallway" -- the question is:  "In the

23   hallway or in this larger of the two rooms you're talking

24   about?

25             "Answer:  No, in the hallway of the airport.

1              "Question:  So you came into the larger room from

2    the hallway, right?

3              "Answer:  I knocked.  I knocked on the door from

4    the hallway of the airport of the larger office.  Yes.

5              "Did you go into that larger office room?

6              "Answer:  I stepped in a couple of feet.  I was

7    asked to wait outside.

8              "Question:  By whom?

9              "I'm pretty sure it was Fil Carvalho."

10             Do you know Mr. Carvalho?

11       A.    Yes, sir.

12       Q.    Have you ever heard him use the word "haole"?

13       A.    Yes, sir.

14       Q.    Have you ever heard him use the word "fucking

15   haole" perhaps?

16       A.    I wouldn't be able to guess.

17       Q.    Don't guess.  Maybe yes, maybe no, right?

18       A.    Yeah.  Maybe yes, maybe no.

19       Q.    Good.  "I'm pretty sure it was Fil Carvalho.

20             "Question:  Okay.  Is this the conversation when

21   you claimed to have heard someone say something about your

22   race?"

23             His answer, "I don't claim to.  I heard it.

24             "Question:  Well, tell me what happened?

25             "Answer:  I was asked to stand outside.  They were

1  going to get Mr. Leong to meet with me.  And I actually,

2  during the particular incident, I heard two things.  I heard

3  a woman's voice.  It was a woman's voice almost immediately

4  as I stepped back out. I heard a woman's voice say, 'What

5  the fuck?' He's a fucking haole. I was a little bit shocked

6  and within a few moments of that, I thought he was a local

7  guy.  And honestly, he says, I don't know what to think at

8  that particular moment."

9        Does that answer that I read to you about a

10  woman's voice saying, "He's a fucking haole," does that

11  refresh your memory as to ever hearing Patty Igarashi using

12  that term about a white person?

13       A.  No.

14       Q.  "Question:  Now, when you looked into this larger

15  of the two rooms, there were four people in there,

16  approximately four?

17       "Answer:  Fil Carvalho, Patty -- I don't remember

18  how to pronounce her last name, but she was also a screening

19  manager was there, there a was a secretary, who was from a

20  temporary service, that was the secretary for that office,

21  there was probably in Leong's office, there was probably

22  four or five or six people.  I believe they were probably

23  from the roll-out team, they were getting ready to go from

24  Wackenhut security to the new TSA screeners."

25       It then goes on to say that the person who said

1   "fucking haole" on page 32, he was sure it was Patty.  And

2   the voice that said "I was sure he was a local guy" was Fil

3   Carvalho.

4           Have you ever heard anyone else use the word

5   "haole" referring to white people or mainlanders other than

6   Carvalho and perhaps Patty?

7           MR. HELPER:  Let me object to the extent that that

8   question assumes that he then used that phrase.

9       Q.   (By Mr. Green)  He's already said he has.  Just so

10  we're clear, you've heard Carvalho use the word "haole," you

11  told me that, right?

12      A.   Yes, sir.

13      Q.   You've heard Patty use the word "haole," right?

14      A.   Yes, sir.

15      Q.   And you don't remember whether the word "fucking"

16  was in front of the word "haole" with her, right?

17      A.   I think I would have remembered it, but I don't

18  believe so.

19      Q.   Let me just tell that you we had testimony this

20  morning from Mr. Carvalho.  What was his relationship to you

21  at TSA?

22      A.   His relationship, he was kind of our boss but not

23  officially.

24      Q.   He says, Over the years there have been at least

25  15 lawsuits, and some of those are allegations of Patty

1   Igarashi talking about fucking haoles.  Does that help you

2   remember whether you ever heard her say it?

3        A.    I told you I don't recall that.

4        Q.    You still don't?

5        A.    No.

6        Q.    Did you have any training at TSA as to what

7   incidents should be documented and what should not be

8   documented?

9        A.    No.

10        Q.    Were you ever trained to notify any of the

11   employees if you wrote them up for anything?  In other

12   words, if you wrote something bad that I did, would you be

13   trained to at least let me know, I wrote you up, and I'm

14   putting it in your file?

15        A.    That changed several times.

16        Q.    How did it change?

17        A.    First, we were supposed to give them copies of

18   things like that, then we weren't required to.

19        Q.    When were you supposed to?  What year?

20        A.    At the very beginning, it changed several times

21   whether we were --

22        Q.    Let's start at the beginning.  What year were you

23   supposed to?

24        A.    I started with TSA in October of 2002.

25        Q.    And were you supposed to give people copies of

1    complaints or write-ups?

2         A.    Yes and no.  It changed several times in short

3    periods of time.

4         Q.    Let's start with the yes part.  When were you

5    supposed to?

6         A.    When we were instructed to give them written

7    copies of the complaint.

8         Q.    Who instructed you to do that?

9         A.    Bobbie Pierce (phonetic).

10        Q.    And what was his position?

11        A.    She is an administrative officer.

12        Q.    When did that change?

13        A.    Probably within a short time after she told me.

14        Q.    What does a "short time" mean?

15        A.    Couple of days maybe.

16        Q.    Who told you to change it?

17        A.    Bobbie Pierce.

18        Q.    Did she tell you why?

19        A.    No, we were just changing procedures.

20        Q.    Did it change back again?

21        A.    Eventually, it did, yes.

22        Q.    Well, "eventually" being when?

23        A.    I would have to guess at that answer, but it would

24    be sometime later in the summer.

25        Q.    Of 2002?

```
 1        A.    Yes, probably.

 2        Q.    When you say "guess," are we talking about a

 3   reasonable guess or just a flat out cold guess by the seat

 4   of your pants?

 5        A.    It would have to be pretty much of a cold guess,

 6   yes.

 7        Q.    I'm reading to you from the February 8, 2006

 8   deposition of Charles Turner.  Do you know Charles?

 9        A.    I know of him, yes.

10        Q.    Did you ever meet him?

11        A.    Uh-hm, yes, sir.

12        Q.    Is he a Caucasian?

13        A.    Yes, sir.

14        Q.    Came here --

15        A.    He appeared to be, I should say.

16        Q.    Sorry?

17        A.    He appears to be.

18        Q.    He came here from the mainland to work for TSA?

19        A.    That I don't know.

20        Q.    He says on page 63 to this question:  "How many

21   times did you observe or did you hear Ms. Igarashi say

22   "fucking haoles" in any context?

23              "Well, the problem I ran into was that it was

24   quite frequent, as she would say it depending on whether

25   she's giving discipline to someone or whether she's upset
```

1   about something.  I'd hear it maybe a total of 10 times

2   while I was there at the airport."

3           He says that under oath.  Does that help you

4   remember anything about Ms. Igarashi talking about using the

5   word "fucking haoles"?

6       A.    I told you I don't have any independent

7   recollection of ever hearing that.

8       Q.    I'm trying to refresh your memory.  Everyone seems

9   to remember so far, and I just want to know if you do.

10          MR. HELPER:  Let me object.  That's argumentative

11   and mischaracterizes previous testimony.

12      Q.    (By Mr. Green)  That's exactly right, the

13   objection.

14          Can you remember at any time that white males were

15   fired or terminated from TSA that other TSA employees were

16   asked to write reports documenting misconduct of those

17   terminated employees?

18      A.    Yes.

19      Q.    Tell me what you remember about that?

20      A.    I was asked to reconstruct a report on Mr. Young.

21      Q.    Who told you to reconstruct it?

22      A.    It would be have either been Mr. Tagamori or Fil

23   Carvalho.

24      Q.    What was the report first that you were asked to

25   reconstruct?  Let's talk about what the report was

1    initially.

2         A.    The initial report?

3         Q.    Yes.  Before you reconstructed it.

4         A.    It was a memo to Fil Carvalho regarding some

5    problems I was having with Mr. Young's closing of the

6    checkpoint.

7         Q.    What were the problems?

8         A.    Keys were left out, machines left on, place left

9    dirty, EDT is not properly taken care of.

10        Q.    Did you wrote those reports up at the time you saw

11   those thing?

12        A.    Yes, sir -- well, within a short time, yeah.

13        Q.    What does that mean?

14        A.    Within a day or two.

15        Q.    Were you asked to reconstruct those?

16        A.    Yes, sir.

17        Q.    How much after you wrote those reports were you

18   asked to reconstruct them?

19        A.    Several months.

20        Q.    And that would be after, if you know, there was an

21   EEOC complaint filed by Mr. Young?

22        A.    I have no idea.

23        Q.    Well, you know he filed one, don't you?

24        A.    I do now, yes.

25        Q.    You did not know back then in 2002 or 2003?

1       A.    At the time of reconstructing the report, I knew

2    there was some type of complaint.  I didn't know what it

3    was.

4       Q.    You were asked by Mr. Tagamori to document some

5    things and rewrite the reports?

6             MR. HELPER:  Object to the word "rewrite."

7       Q.    (By Mr. Green)  Or reconstruct. Is that the word

8    you want to use?

9       A.    Yes, sir.

10      Q.    How did you reconstruct them?

11      A.    Tried to pull them out of my memory as best as I

12   could.

13      Q.    I beg your pardon?

14      A.    I tried to pull it out of my memory as best as I

15   could.

16      Q.    Pull what out of your memory?

17      A.    What the problems were, and I think I probably

18   referred to some logs or shift summaries.

19      Q.    Well, you have the reports you wrote initially?

20      A.    No, they were gone; that's why I reconstructed it.

21      Q.    You told me that you submitted some reports within

22   a day or so of seeing certain misconduct by Mr. Young, yes?

23      A.    I didn't say "misconduct," no.

24      Q.    What do you call it?

25      A.    I told him -- I told you that it was problems that

```
 1   I encountered with his closing of the checkpoint.

 2        Q.   He was doing something wrong, right?

 3        A.   Not doing things properly.

 4        Q.   Is that the same thing as doing something wrong?

 5        A.   Not necessarily, in my opinion.

 6        Q.   Okay.  He was doing things improperly, and it was

 7   sufficient enough for you to write them down, yes?

 8        A.   Yes, sir.

 9        Q.   What did you do with them when you wrote them

10   down?

11        A.   Turned them in.

12        Q.   To who?

13        A.   Either Fil or Tagamori into the office.

14        Q.   And then they disappeared?

15        A.   They lost them, yes.

16        Q.   Because you're telling me you wrote them?

17        A.   I know I wrote them.

18        Q.   Well, you say you did.  And then they came to you

19   and said, You're going to have to reconstruct these because

20   we don't have them anymore, right -- or words to that

21   effect?

22        A.   Not even close.

23        Q.   Well, you tell me what the words were?

24        A.   The words were, "when I tell you people to write

25   reports, I want the reports written."
```

1      Q.   And, of course, a long-time cop you know, Hey,
2   man, I already wrote the reports, right?
3      A.   I told my superior that I had written reports.
4      Q.   Yeah, and because you were so experienced in
5   making reports, you made them as detailed as you could at
6   the time to cover the incident you were writing about,
7   right?
8      A.   I did the best job I could.
9      Q.   Yes.  And now the reports are no longer are in
10   existence apparently, right?
11      A.   Right.
12      Q.   Yeah, I mean, you said, I guess, Hey, where are my
13   reports, right?
14      A.   I told them I had already written those reports.
15      Q.   And they seemed to have been misplaced, right?
16      A.   Yes, sir.
17      Q.   So then months later you had to go back and try to
18   remember those things, right?
19      A.   I have to try to reconstruct the report.
20      Q.   And did the best you could?
21      A.   Yes, sir.
22      Q.   How many reports did you reconstruct?
23      A.   Just the one that I know of.
24      Q.   How many incidents were reconstructed in that one
25   report?

| | | |
|---|---|---|
| 1 | A. | I believe it covered a couple of nights. |
| 2 | Q. | I'm going to take a break, but I want to ask you |

3  this.  We've covered Afro-Americans, we've covered Japanese,
4  we've covered Chinese, we've covered whites, we've covered
5  Jews.  Any other ethnic groups you can just kind of throw
6  out there that you can remember saying something about their
7  race or ethnicity that I missed?

8     A.   I probably could give you an entire list.

9     Q.   Just give me some more because it came out of your
10 mouth.  We got anything else you can think of?

11    A.   Certainly.

12    Q.   Give me so more?

13    A.   Pollock.

14    Q.   Pollock, that's for Polish people, right?

15    A.   Uh-hm.  Boehunk (phonetic).

16    Q.   What?

17    A.   Boehunk (phonetic).

18    Q.   What's a boehunk?

19    A.   A boehunk is from like middle Europe.

20         MR. HELPER:  Eastern Europe.

21    Q.   (By Mr. Green)  What do you use for Hawaiians?
22 What kind of words do you use sometimes to refer to
23 Hawaiians or local people.

24    A.   Local people.

25    Q.   But you must call them something if you get mad at

1    them, right?

2         A.    You asked me if I'd ever used those terms.  I've

3    used those terms.  I'm a big boy now, I try to avoid using

4    those term.  I don't use derogatory terms for Hawaiian

5    people.

6         Q.    But you've used them for all of the ethnic groups

7    I've mentioned so far, right?

8         A.    During my lifetime, you bet.

9         Q.    Of course, even at TSA you used the terms

10   referring to white people, right?

11        A.    I used the term "haole," yes.

12        Q.    And "fucking haole," right?

13        A.    Yes, sir.

14               MR. GREEN:  I have to take a break.

15                  (A recess was taken.)

16        Q.    (By Mr. Green)  Back on the record.  Have you ever

17   used the word "gook"?

18        A.    Probably.

19        Q.    More than once, right?

20        A.    Probably.

21        Q.    What's a "gook"?

22        A.    In the term that most people consider --

23        Q.    The way you used it, what's a "gook"?

24        A.    Chinese.

25        Q.    How about Japanese?

| | | |
|---|---|---|
| 1 | A. | No. |
| 2 | Q. | Korean? |
| 3 | A. | No. |
| 4 | Q. | Are you friends with Patty Igarashi, were you? |
| 5 | A. | Yes. |
| 6 | Q. | Maybe go out and have drinks with her after work |
| 7 | from time to time? | |
| 8 | A. | Never. |
| 9 | Q. | Been to your home? |
| 10 | A. | Yes. |
| 11 | Q. | How many times has she been to your home? |
| 12 | A. | Two or three. |
| 13 | Q. | A friend of yours, right? |
| 14 | A. | Yes, sir. |
| 15 | Q. | You never found her to be offensive, did you? |
| 16 | A. | Did I find her offensive? |
| 17 | Q. | Was she offensive to people? |
| 18 | A. | No, sir. |
| 19 | Q. | Do you know someone named Elizabeth Masuda? |
| 20 | A. | Yes, she was a former screener. |
| 21 | Q. | She worked for TSA? |
| 22 | A. | She did. |
| 23 | Q. | Were there times that you and Patty got into |
| 24 | disagreements on the job from time to time? | |
| 25 | A. | No. |

```
 1        Q.   Did she ever say to you words to the effect, "Hey,

 2   fucking haole, I got you your job.  Remember that I can get

 3   you fired."  Did she say that?

 4        A.   I have no recollection of that whatsoever.   I

 5   probably would remember a statement like that.

 6        Q.   I would hope so, yeah.  Did she ever tell you she

 7   got you your job, remember that she can get you fired?

 8        A.   No, sir.

 9        Q.   Who was Bobbie Peters?

10        A.   Bobbie Peters was the admin officer of TSA.

11        Q.   What does that mean?

12        A.   I have no idea.  She works at the office and

13   handles the administrative stuff.

14        Q.   Is she still there?

15        A.   Yes, sir.

16        Q.   I'm almost done.  Have you ever seen a copy of the

17   EEOC complaint that was filed by Christopher Gahr --  Tom

18   Young, I'm sorry?

19        A.   I may have, but I would have to look at it to see

20   whether it is or not.

21        Q.   It's an exhibit.  Can you find -- do you have it

22   over there?  It's Exhibit 4 of Carvalho's.

23             MR. HELPER:  Shall I show this to the witness?

24             MR. GREEN:  Just ask him if he's seen a copy of it

25   before.
```

1          MR. HELPER:   There are different parts to it.   You
2   may want to leaf through all the pages.

3      Q.   (By Mr. Green)   Have you seen a copy of that?
4      A.   No, sir, I have not.
5      Q.   Mark this as the next, please.
6          (Deposition Exhibit 1 was marked for identification.)
7          This is going to be Exhibit 1 to this deposition.
8   Do you recognize the handwriting that appears on Exhibit 1
9   to your deposition?
10     A.   Yes, sir.
11     Q.   Whose handwriting is that?
12     A.   That's mine.
13     Q.   What were the circumstances that you prepared
14  this?
15     A.   This was done after I was having problems with
16  Mr. Gahr not functioning like I wanted him to.
17     Q.   The letter that's attached, is that your
18  handwriting?
19     A.   Yes, sir.   I would not address it as a letter.
20     Q.   Do you know anyone who works at TSA that has one
21  arm or part of an arm?
22     A.   Part of an arm?
23     Q.   The arm is missing from the elbow down?
24     A.   Not off the top of my head, no, sir.
25     Q.   Mark this as the next one, please.   This is his

1    resume.

2              (Deposition Exhibit 2 was marked for identification.)

3              Mark this as the next one as 3.

4              (Deposition Exhibit 3 was marked for identification.)

5              Plaintiff's 2 is a TSA counseling record -- 3,

6    I'm sorry.  Is this your handwriting?

7         A.    Yes, sir, on 3.

8         Q.    This is dated October 19, 2002.  Is that the one

9    you have?

10        A.    That's Exhibit 3 in front of me, yes.

11        Q.    Patrick Collins; employee name, Christopher Gahr;

12   failure to follow work direction improper procedure?

13        A.    Yes, sir.

14        Q.    Is this one of the reconstructed documents?

15        A.    No, sir.

16        Q.    Did someone can ask you to prepare this?

17        A.    I don't believe so.  He may have.

18        Q.    If it may have, who would the person that may have

19   asked you to do it?

20        A.    Fil Carvalho.

21        Q.    Did he -- during your training for TSA, did anyone

22   ever tell you to log incidents that you believe to be

23   workplace violations?

24        A.    No, sir.

25        Q.    Would that be a decision that you would make?

1        A.    Yes, sir, under work direction or --

2        Q.    If you thought there was --

3              MR. HELPER:   I'm sorry, I'm not sure that that

4    answer was clear.

5              THE COURT REPORTER:   Yes, I did not get that last

6    part of the answer.

7        Q.    (By Mr. Green)   What was the answer?

8        A.    I said I would do it under work direction or, yes,

9    if I thought it was significant I would write it down.

10       Q.    When you say "work direction," what does that

11   mean?

12       A.    If an AFSD or another person in administration

13   told me to document something, I would.

14       Q.    Who has told you, if they have, in the past to

15   document things?

16       A.    Who has told me in the past?

17       Q.    Yes, if someone has.

18       A.    Several people have.

19       Q.    Like who?

20       A.    AFSD Tagamori, AFSD Au, FSD Leong, Fil Carvalho,

21   ASI Harlan, ASI Williams, probably just about everybody over

22   at Triangle Square, at one time or another, asked me to

23   document something.

24       Q.    Can you tell me any counseling records you

25   prepared and submitted for any TSA employees other than

1    white male employees, say, from 2002?

2         A.    Can I tell you about some --

3         Q.    Yeah, tell me certain people.

4         A.    I'm sure there are several.

5         Q.    Just tell me any.  The record should show he is

6    thinking.

7         A.    I'm not drawing a blank.  I'm just trying to be

8    honest with you, Counselor.  I do so few actual counselings

9    myself because my supervisor does them.

10        Q.    We're talking 2002 to 2003.

11        A.    Eddie Kaupe (phonetic) would have been one.

12        Q.    What did you write him up for?

13        A.    Attendance.

14        Q.    Anything else?

15        A.    Tardy, I think.  And I think I'm drawing a blank

16   as far as --

17        Q.    Anyone besides that employee?

18        A.    I'm sure there is, yeah.

19        Q.    Can you think of any? Any nonwhite male employees.

20        A.    Not right off the top of my head, but I know I

21   have.

22        Q.    You just can't remember right now?

23        A.    Yeah.

24        Q.    Was that person terminated, Eddie?

25        A.    Yes, he was.

1        Q.    What was he terminated for, if you know?

2        A.    To the best of my knowledge, it was a background

3    investigation violation.

4        Q.    What does that mean?

5        A.    There was something in the background that was not

6    right.

7        Q.    In other words, he may have falsified in his

8    application or found something in his background where they

9    found he was not suitable?

10            MR. HELPER:  Objection, lacks foundation.

11       Q.    (By Mr. Green)  Is that your understanding?

12            MR. HELPER:  Go ahead and answer.

13            THE WITNESS:  Yeah, it would be something wrong

14   with the background that the background investigation turned

15   up.

16       Q.    (By Mr. Green)  But it was not related to what you

17   wrote about him in your report?

18       A.    To the best of my knowledge, no.

19       Q.    This is Exhibit 8.

20            MR. HELPER:  Carvalho Exhibit 8.

21       Q.    (By Mr. Green)  Thank you.  Do you recognize this?

22       A.    Yes.

23       Q.    Mr. Young was terminated in November 13, 2002; is

24   that your memory?  Your lawyer seems to agree with me that

25   seems like it was November 13th.  Let's work with that date,

1   shall we?

2        A.   Yes, sir.

3        Q.   His EEOC complaint was filed March 24, 2003.   We

4   can work with that as being accurate; okay?

5        A.   Yes, sir.

6        Q.   June 6, 2003, this is the date of your typewritten

7   report, right?

8        A.   Yes.

9        Q.   Was this the one you were asked to reconstruct?

10       A.   Yes, sir.

11       Q.   And who asked you to reconstruct it, did you say

12   Howard Tagamori?

13       A.   It had to have been either Howard or Filbert or

14   Mr. Au, but I could not tell you which one.

15       Q.   Mr. Who?

16       A.   Mr. Tagamori, Mr. Au, A-U, or Mr. Carvalho.

17       Q.   Did they tell you, either of them or any of them,

18   why they wanted you to reconstruct this?

19       A.   I believe I told you earlier that Mr. Leong had

20   already scolded myself about not writing reports, and we

21   advised him that we had written reports, then they told us

22   to reconstruct it.

23       Q.   I'm sorry, I'm trying to understand why he asked

24   you to reconstruct this in June of 2003 regarding Thomas

25   Young who had been gone for seven months.

1          Do you have a memory as to why he told you to
2    reconstruct what you wrote about him in June of 2003?
3          A.    No, he told me to do it, and he already scolded me
4    for not doing it originally, which I told him I had.
5          Q.    It seems to me, and see if you disagree with this,
6    that they must have been looking for things about Mr. Young
7    and his file and did not find any, yes?
8               MR. HELPER:  Objection, calls for speculation.
9          Q.    (By Mr. Green)  Does that seem reasonable to you?
10         A.    It seems to me that there was some type of a
11   complaint, as I told you before.
12         Q.    You're talking about an EEOC complaint?
13         A.    Some kind of complaint.  I didn't know about EEOC
14   one way or the other.
15         Q.    Let me try to put this question to you fairly and
16   see if you understand it.  When they asked you to
17   reconstruct a report, you told me, you said, you had already
18   written the reports, right?
19         A.    Yes, sir.
20         Q.    And no one seemed to know where they were, right?
21         A.    Right.
22         Q.    So does it seem reasonable to you, if they could
23   not find them, they would not have known you ever wrote the
24   reports.  Does that sound reasonable to you?
25         A.    Sure.

1          MR. HELPER:  Objection, lacks foundation --

2     Q.   (By Mr. Green)  You can answer the question.

3          MR. HELPER:  Counsel, please don't talk over my

4   objection.

5     Q.   (By Mr. Green)  I'm sorry.  Your answer is sure,

6   right?

7     A.   Certainly.  That sounds reasonable.

8     Q.   Yes.  They, in fact, told you they had never seen

9   your reports, didn't they?

10    A.   That's not correct.

11    Q.   What did they tell you they knew you knew, if

12  anything, about reports you made about Tom Young?

13    A.   Mr. Leong scolded us for not writing reports when

14  he wanted them written.  He wanted written reports in a

15  timely fashion.

16    Q.   I did --

17    A.   If you would let me finish.  Fil Carvalho advised

18  Mr. Leong that those reports had been written because Fil

19  had used them as part of his report; therefore, Mr. Leong

20  and those folks knew then that I had originally written a

21  report.  And asked me to reconstruct it.

22    Q.   I see. So then you reconstructed Exhibit 8 from

23  memory; is that right?

24    A.   Memory and I believe there may have been a shift

25  summary or shift logs that may have had some of the data in

```
 1   it.

 2        Q.   You just don't know where that is, if there was?

 3        A.   If there were shift summaries --

 4        Q.   Strike the question.  Did you use any documents to

 5   refresh your memory to reconstruct this report?

 6        A.   I believe I used either a shift summary or a log.

 7        Q.   Are you sure?

 8        A.   Reasonably sure; but once again, that's a long

 9   time ago.

10        Q.   You're just not positive?

11        A.   Right.

12        Q.   Take a look at Plaintiffs 3.  I just showed you 3.

13   It's in front of you.  This is your supervisory comments

14   Christopher Gahr from you, EDT not logged off at the end of

15   shift, ETD calibration not done to TSA standards, ETD

16   recording procedure not done properly or completely, ETD

17   calibrating log done improperly.  Then you, on the back, you

18   wrote key to lane 3 x-ray not placed in proper place.  X1

19   key was placed on ring with other something for x-ray.

20             Do you see that this handwriting is yours?

21        A.   You cut off part of that.  Did you intentionally

22   do that?

23        Q.   I can't read your handwriting.

24        A.   You left off where on the first asterisk there,

25   that's a sentence, "place at closing.  Unable to locate key
```

```
 1    to turn on machine at opening of checkpoint.  Search tables
 2    on lane 1 & 2 dirty at opening of checkpoint.
 3              Asterisk number 2, "Key was placed on ring with
 4    other key for x-ray.  Keys should be on separate rings per
 5    machine.  Supervisor did not leave note/explanation of
 6    location of new key."
 7       Q.    Did you counsel Mr. Gahr about this?
 8       A.    I attempted to talk to him about it.
 9       Q.    What does that mean?
10       A.    I attempted to talk to him about it.
11       Q.    You did or you did not?
12       A.    I attempted to.
13       Q.    He would not listen to you?
14       A.    No, sir.
15       Q.    He would not listen to you?
16       A.    No, sir.
17       Q.    You felt this to be sufficient enough to do a
18    counseling records; is that right?
19       A.    Yes, sir.
20       Q.    Did you show him a copy of this at any time?
21       A.    Yes, sir.
22       Q.    When was that?
23       A.    When we sat down and talked to him.
24       Q.    Who is "we"?
25       A.    Gerry Yamada.
```

1              Do you have the spelling on that, ma'am?

2              THE COURT REPORTER:   Yes.

3              THE WITNESS:   Fil Carvalho, Patty Igarashi and

4  myself.

5     Q.   (By Mr. Green)   Where was that conversation?

6     A.   In the outer room of the lower TSA office.

7     Q.   What time was this?   Not the hour of the day but

8  what month?

9     A.   In October, I think.

10    Q.   Was this at the time of his termination in

11  November -- in October, right around the time of his

12  termination?

13    A.   I would assume so, but I didn't know when he was

14  terminated.

15    Q.   When you sat down and talked to him, you were

16  basically telling him, or people in your presence, This is

17  why we're terminating you for these reasons, right?

18    A.   That's absolutely incorrect.

19    Q.   I want you to take a look at the next please.

20       (Deposition Exhibit 4 was marked for identification.)

21       This is your handwriting?

22    A.   Yes, sir.

23    Q.   October 20, 2002?

24    A.   Uh-hm.

25    Q.   This is the TSA counseling record,  Failure to

1    follow proper procedure - failure to follow word direction

2    from you about Chris Gahr, tables dirty on the FTD lane 1

3    and lane 2?

4        A.    ETD.

5        Q.    Is that a violation of something?

6        A.    ETD.   Yes, sir.

7        Q.    What's the violation of having dirty tables?

8        A.    Sampling tables have to be kept clean from

9    contamination.

10       Q.    Do you have the letter from Patty talking about

11   her being counseled about -- look at 3.   This is a

12   handwritten note from Patty Igarashi to Carvalho.   It's

13   regarding Chris Gahr.   Look at paragraph --  she says?

14       A.    Paragraph what?

15       Q.    3.   "Upon his debriefing of the PM shift, he spoke

16   about keeping a clean checkpoint.   He did not want to see

17   drinks or water bottles all over and the cubicle should be

18   cleaned from items that are visible from the outside.   I did

19   not make any mention at that time.   I feel I would have been

20   inappropriate in front of the screeners."

21           Do you see that?

22       A.    Yes, sir.

23       Q.    That's the very conduct, I guess, the cleanliness

24   issue, that you wrote him up about apparently, right?

25       A.    Yes and no.

1    Q.   Well, you see, this is 10/18 that she's

2  complaining about it, and she's talking about something that

3  happened on 10/16 and then 10/20, you say you wrote a

4  counseling record in part because his tables were dirty.

5  Talking about Christopher Gahr, right?

6           MR. HELPER:  Let me object.  The question assumes

7  facts not in evidence in the use of the word "complaining"

8  about what she was complaining about at the time she wrote

9  the note, Exhibit Carvalho 3.  Calls for speculation, too.

10          MR. GREEN:  He's already answered.  Go ahead.

11          MR. HELPER: What was the answer?

12          THE COURT REPORTER:  I didn't hear his answer over

13 the objection.

14    Q.   (By Mr. Green)  The answer was "yes," right?

15    A.   No, sir.

16    Q.   Fine.  Do you have an answer to the question?

17    A.   Can you read the question back?

18    Q.   The same thing you were counseling him about,

19 about the dirty areas; is that right?

20          MR. HELPER:  Same objection.

21          THE WITNESS:  But what I answered, sir --  not

22 really.  They are two different issues.

23    Q.   (By Mr. Green)  Are we talking about the

24 cleanliness of the area of the tables.  Are they similar to

25 what Patty is saying Chris Gahr counseled her about?

1           MR. HELPER:  Same objection.

2           THE WITNESS:  I don't know that Chris Gahr can

3     counsel a manager.

4       Q.    (By Mr. Green)  Well, he spoke to her about that.

5     Do you see that?

6       A.    Right. This is talking about cleanliness at the

7     checkpoint which, in our terms, would be the entire area.  I

8     talked about a procedure on the stainless steel tables.

9       Q.    You like your job?

10      A.    Yes.

11      Q.    Getting promoted from time to time?

12      A.    No.

13      Q.    Did you have any concerns or did you discipline --

14    do you know anything about shift changes without approval at

15    TSA?

16      A.    Shift changes without approval?

17      Q.    I'll read it to you.  "Switched shifts without

18    approval.  First, I had never been told how the" -- this is

19    the affidavit from Mr. Young -- "I had never been told how

20    the shift change procedures worked.  I had mentioned to

21    Mr. Collins that I would like to attend my son's football

22    game but would not be able to do so.  Ms. Igarashi was told

23    this by Mr. Collins and she asked me if I wanted to change

24    shifts."

25           Is there some procedure that allows or disallows

```
 1  for shift changes?

 2              MR. HELPER:  Objection, vague as to time.

 3        Q.    (By Mr. Green)  During October 28, 2002.

 4        A.    You have to notify our supervisor.

 5        Q.    And if you don't?  If you just do shift changes

 6  without notifying your supervisor, is that some kind of

 7  violation?

 8        A.    It would be of our procedures, yes, sir.

 9        Q.    You would Patty would know that procedure by

10  October 20, 2002, right?

11              MR. HELPER:  Objection, calls for speculation --

12        Q.    (By Mr. Green)  Wouldn't you think so?

13        A.    I would assume so.

14        Q.    Mr. Igarashi was --  "I had mentioned to

15  Mr. Collins that I would like to attend my son's football

16  game but would not be able to do so. Ms. Igarashi was told

17  this by Mr. Collins and she asked me if I wanted to do shift

18  changes."

19              Did that happen, if you know?  Was there a shift

20  change between Igarashi and Tom Young?

21        A.    If I may, Counselor, shift change means what

22  happens when we change shifts from day shift to mid shift.

23  The term that should have been used by him was a swap or a

24  switch off.  That's why you're a little confusing when you

25  first started reading.
```

| 1 | Q. | Well, let's assume that what I meant, a swap or a |
|---|---|---|

1     Q.   Well, let's assume that what I meant, a swap or a

2  switch off.  Do you know if that actually happened between

3  Igarushi (sic) -- I'm sorry.

4     A.   Igarashi.  I believe it did.

5     Q.   He says in his affidavit, "She is actually the one

6  who did the changes to the schedule."

7          Do you know whether that's true?

8     A.   I haven't the faintest idea.

9     Q.   Do you know if she got written up for that?

10    A.   I haven't the faintest idea.

11    Q.   And you don't know if she was disciplined, right?

12    A.   I have no idea.

13    Q.   Do you know a woman named Tina Perez?

14    A.   Yes, sir.

15    Q.   Who was she?

16    A.   She was a screener.

17    Q.   Did she work under your direction?

18    A.   For a while, yeah.

19    Q.   Did she work under your direction in 2003 around

20  June?

21    A.   Yes, sir.

22    Q.   How about Uilani Danley?  Do you know her?

23    A.   Yes, sir.

24    Q.   Did she work under your direction?

25    A.   For a time.

1      Q.    Around June 2003?

2      A.    Yes, sir.

3      Q.    Did you ask either one of those women or both of

4   those women to reconstruct reports?

5      A.    I don't have any recollection of actually asking

6   them to reconstruct a report.

7      Q.    Exhibit 11 Carvalho, please.  Actually Exhibits

8   11, 12 and 13, just so he has more.

9           Have you ever instructed any of your TSA

10  subordinates on how to prepare reports?

11     A.    TSA employees?

12     Q.    Yeah, the ones that were subordinate to you.

13     A.    Have I ever asked them to what?

14     Q.    Have you ever instructed them about how to write

15  reports?  How they should be done?

16     A.    Yes, sire.

17     Q.    To try to make them as contemporaneously as

18  possible?

19     A.    Yes.

20     Q.    To be as accurate as possible?

21     A.    Yes.

22     Q.    Here is one from Uilani Danley regarding Tom Young

23  on June 12, 2003 about seven months after he was fired.  She

24  says, "To the best of my knowledge, there was an incident

25  that happened on the 1st week of my employment with TSA."

1          Do you know when her first week was?

2     A.    It would have been in October or November.

3     Q.    Yeah.  About how many months was that?  About
4  seven months earlier she is writing on the first week of her
5  employment in October 2002.  "Two of my fellow employees
6  Tina Perez and Denise Vogel both had questions regarding
7  their schedules with our manager Tom Young.  Throughout the
8  course of the day, Tom Young had made his way back to the
9  checkpoint area, Denise Vogel approached him regarding her
10 schedule.  Tom replied back in a very unprofessional manner
11 yelling at Denise that he had told her that he would get
12 back to her and to stop asking him about the schedule.
13 Denise then told him that it was the first time she had ever
14 spoken to him regarding the schedule since that morning. He
15 then stated that he had been mistaken her for someone else."

16         Do you see that?

17    A.    Yes, sir.

18    Q.    Did you ask her to reconstruct this?

19    A.    I have no recollection of that, sir.

20    Q.    Has it been your experience working at TSA that
21 employees recreate events seven months after they have
22 happened for the first time?

23    A.    In the one case we had where the reports were
24 missing, yes.

25    Q.    What case is that?

1        A.    The one we're talking about right now.

2        Q.    Which one?

3        A.    Young.

4        Q.    Do you have any information that this report was

5    ever filed or missing, the one that's been signed by Uilani

6    Danley, the one that's prepared June 12, 2003?

7        A.    I told you I have no recollection of the report,

8    giving her instructions to write it.

9        Q.    So you have no idea whether this was created for

10   the first time seven months after her hire, right?

11       A.    Yes, sir, that's correct.

12       Q.    Take a look at 12 and 13.  Based on your training

13   as a police officer, I just want to ask you if they look a

14   little similar to you. This is June 13th, the next day after

15   Danley wrote the June 12th report.  Start with Exhibit 12

16   first.  This is Tina Perez. You said she worked for you

17   right around June of 2003?

18       A.    Uh-hm.

19       Q.    What was her position there?

20       A.    She was a screener.

21       Q.    Her supervisor would have been who?  Would Young

22   have been one of her supervisors?

23       A.    Supervisor is a distinct rank in TSA.  Tom Young

24   was a manager.

25       Q.    Would she be insubordinate to him?

1       A.    Yes.

2       Q.    "To the best of my knowledge," she says, "during

3    the first week of my employment with TSA I witnessed an

4    incident that happened in the checkpoint."

5             Do you see that?

6       A.    Uhm-hm.

7       Q.    Is that a "yes"?

8       A.    Yes.

9       Q.    Now look at Exhibit 13.  This is Uilani Danley,

10   June 13, 2003.  "To the best of my knowledge, I witnessed an

11   incident that occurred during my 1st week with TSA."

12            Do you see that?

13      A.    Yes, sir.

14      Q.    Exact same language.  Do you see that?

15      A.    Appears to be pretty close, yes, sir.

16      Q.    What is not exact?

17      A.    I'll try to read it and -- they're not exact

18   words.

19      Q.    What's missing?

20      A.    Start out with, "To the best of my knowledge,

21   during the first week..." the other one said, "I witnessed

22   an incident that occurred during my first week," so they are

23   not identical.

24      Q.    They are pretty close?

25      A.    They are summarizing the same event it looks like.

1    Q.   Excuse me, do you see any summarization in what I
2    just read to you?  It's a precursor to what they are about
3    to write, isn't it?

4        A.   Yes, sir, but it is not identical.  You said
5    identical.

6        Q.   "I witnessed an incident" -- this is from Exhibit
7    12 -- "I witnessed an incident that happened in the
8    checkpoint."

9             Do you see that?

10       A.   Yes, sir.

11       Q.   This is on 12.  "It involved Tom Young, the
12   manager, and an irate passenger. This passenger was yelling,
13   swearing at the screeners and making obscene gestures with
14   his middle finger regarding his butane lighter that is a
15   prohibited item.  Tom Young was the first person to approach
16   the passenger to try and control the situation.  When I
17   looked back at the passenger because he was still very
18   irate, Tom Young was nowhere to be found and Filbert
19   Carvalho was now handling the passenger."

20            Do you see that?

21       A.   Yes, sir.

22       Q.   Do you have personal knowledge of this incident?

23       A.   No, sir.

24       Q.   Did you tell Tina Perez to reconstruct this?

25       A.   I have no recollection of that, sir.

1      Q.    Are you saying you don't remember, or are you
2  telling me you did not do this?

3      A.    I have no recollection of giving her an order to
4  write this report.

5      Q.    Does that mean you may have, but you just don't
6  remember, or you know you didn't?

7      A.    I have no recollection of giving her that order.

8      Q.    Does that mean you may have done it and don't
9  remember, or you know you didn't do it?

10     A.    I could have done it.

11     Q.    That didn't hurt so much did it?  Look at Exhibit
12  13.  "To the best of my knowledge, I witnessed an incident
13  that occurred during my 1st week with TSA.  It involved Tom
14  Young and a passenger that had brought a prohibited item a
15  torch lighter into the checkpoint.  This male passenger was
16  acting totally irate, yelling, swearing at the screeners,
17  and making obscene gestures using his middle finger.  Tom
18  Young was there on scene, but could not control the
19  situation, because the next thing that I saw was Filbert
20  Carvalho taking over calming the man down so that he could
21  proceed to the gates.  Tom was no where to be seen."

22            Did I read that correctly?

23     A.    Yes.

24     Q.    Did you tell Uilani Danley to recreate this
25  incident?

1       A.      I have no recollection of giving her an order to
2   write this report.

3       Q.      Same answer as what I asked you about Tina Perez,
4   maybe you did, maybe you didn't?

5       A.      I would go with that, yes, sir.

6       Q.      Exhibit 10 Carvalho. Do you recognize this
7   incident report Screener Denise Vogel?

8       A.      Do I recognize it? No, sir.

9       Q.      Checkpoint Tom Young. It talks about, "Per
10  instruction from scheduling manager Gerry Yamada, I
11  approached Tom Young for the following days schedule,
12  however, he was overwhelmed by the goings on so I excused
13  myself and said, 'I would return at the end of my shift.'
14  When I did, he blew up and yelled 'You asked me that ten
15  times already.' I said, 'Whoa wait a minutes not me, this
16  is only my second time and because he was not able to do it
17  earlier.' He finally gave me my schedule and that was that.
18  Uilani Danley witnessed this incident. This incident
19  happened right outside the former Manager's cubicle. He
20  yelled over the cubicle to me."

21          Did I read that correctly?

22      A.      Yes.

23      Q.      Have you seen a copy of this before?

24      A.      No, sir.

25      Q.      When did she say it happened, look at the upper

1   left?

2           MR. HELPER:  Objection, the document speaks for

3   itself.

4       Q.   (By Mr. Green)  It doesn't speak to anything.

5   He's got to read it.

6       A.   First week November 2003, time 0830.

7       Q.   You know Mr. Young was gone for many, many months

8   when she said this occurred, right?

9           MR. HELPER:  Objection, misstates the testimony as

10  to what the document says.

11      Q.   (By Mr. Green)  Did you ask Vogel to prepare this?

12      A.   Not to my knowledge.

13      Q.   Maybe yes, maybe no?

14      A.    I would be stronger on this one. I don't have any

15  recollection of this whatsoever.

16      Q.   Did you work with Vogel at Wackenhut?

17      A.   Yes.

18      Q.   Did you work with Uilani Danley at Wackenhut?

19      A.   Yes, sir.

20      Q.   How long did you know them by June of 2003?

21      A.   They came to work at Wackenhut in the early --

22  it's, I guess, early summer of 2002.

23      Q.   Did you know Tina Perez from Wackenhut?

24      A.   Yes, sir.

25      Q.   Did you go out with any of those people, all or

1    any of them, socially after work or anything like that?

2        A.    No.

3        Q.    Have they been to your house?

4        A.    No, sir.

5        Q.    Have you been to their house?

6        A.    I've been to Denise Vogel's house.

7        Q.    Was Tina Perez there?

8        A.    No.

9        Q.    Uilani Danley there?

10       A.    No.

11       Q.    Why were you at her house ?

12       A.    Her house was for sale, she was no longer an

13   employee of TSA, and my daughter was looking for a home.

14   She lived about two blocks down from us in a housing area.

15       Q.    So you were looking at her house --

16       A.    I took my daughter to see her house.

17       Q.    Do you have any understanding as to why, some time

18   after the EEOC complaint was filed, they were reconstructing

19   reports or complaints about Tom Young, do you have any

20   information about why that's happening?

21       A.    I can only speculate.

22       Q.    If it's a pure guess, don't do that.  Did you ever

23   discuss it with Tagamori or anyone else as to why they were

24   reconstructing events that related to Tom Young after he was

25   gone?

1    A.    The only one I knew about the reconstruction was

2  mine, and that's I assume that there was some type of

3  complaint or heard there was some type of a complaint of the

4  nature I did not know, and I was told to do mine.

5    Q.    Tina Perez began working for TSA --  are they

6  still employed there?

7    A.    Tina Perez is TSA but not here.

8    Q.    What about Uilani Danley?

9    A.    She is presently here.

10   Q.    Where is Tina Perez?

11   A.    Tina Perez, I believe, is in Las Vegas.

12   Q.    You have seen or have you seen Igarashi since

13 she's been separated from TSA?

14   A.    Couple of times.

15   Q.    Where have you seen her?

16   A.    I saw her at, like, the mall once.

17   Q.    Just ran into her?

18   A.    Yeah.

19   Q.    And?

20   A.    I saw her when she was at her parents house.  We

21 were driving by, she was out in front, so we stopped and

22 chatted.

23   Q.    Do you know that was her parents' house?

24   A.    Yeah.

25   Q.    Been to her parents' house?

1      A.    Twice, yeah.

2      Q.    Do you know her phone number?  Don't tell me you

3  don't if you do.

4      A.    I don't know it.  I probably have it recorded

5  somewhere.  I don't have it.

6      Q.    Do you know where she lives?

7      A.    Not now, no.

8      Q.    Where are her parents' living?

9      A.    It's the same house.  I could not give you an

10  address.  It's the location.

11     Q.    What street?

12     A.    I think it's on Papa Avenue.

13     Q.    Papa?

14     A.    Yeah, I think so.

15     Q.    Did she ever tell you why she left TSA?

16     A.    I know why she left TSA.

17     Q.    Tell me why?

18     A.    She was terminated.

19     Q.    Why?

20     A.    To the best of my knowledge, for some type of

21  problem with a DEA agent and some suspects on an airplane.

22     Q.    You tell me what you know about that, the problems

23  with the suspect or DEA agents?

24     A.    I will tell you the information that I have.

25     Q.    From who?

1      A.   I heard it from Russ Harlan.

2      Q.   Who is that?

3      A.   He is currently an ASI.  He used to be a TSA

4 supervisor.  I heard it from another one or two people.  It

5 may have been Mr. Au or Mr. Tagamori, but I could not say

6 for sure, and I heard Patty discuss it.

7      Q.   Tell me what she said about her termination?

8      A.   The incident or about her termination?  Which one?

9      Q.   What she said about why she was terminated.

10     A.   She was terminated, she said, because of an

11 incident where a DEA agent instructed her that he wanted TSA

12 to search the belongings and the persons that he believed

13 were carrying drugs or drug money that he had not -- he

14 either missed or had not followed them correctly, but they

15 were in the airport on an airplane.  They pulled the people

16 off the aircraft, searched them, found, to the best of my

17 knowledge, incriminating things, whether it was dope and

18 money or just money or just dope.  I think it was both.

19 That, of course, is improper criminal procedure.  And she

20 was then disciplined for going beyond the scope of her job.

21     Q.   Do you know she was terminated shortly after this

22 complaint was filed?

23     A.   If she was, she was.

24     Q.   Well, you've talked to her about this case,

25 haven't you?

1       A.   About this case?

2       Q.   Yeah, this case.  The fact that you filed a

3  lawsuit alleging racial discrimination against her?

4       A.   She told me that a couple of people, five or six,

5  had filed a complaint against her -- or not a complaint but

6  a lawsuit.

7       Q.   Alleging racial discrimination?

8       A.   I don't remember if that came up.  It might have

9  though.

10      Q.   Accusing her of calling them fucking haoles,

11  remember that?

12      A.   No, sir.

13      Q.   What did she tell you, if anything, about the

14  allegations of racial discrimination?

15      A.   They accused her of setting them up to fail

16  because of their race.

17      Q.   Did she ever tell you, When I was using the word

18  "fucking haole," I was kidding and people thought I was

19  serious or words to that effect?

20      A.   No.

21      Q.   Anything else girls?  Any other employees you

22  asked to reconstruct any other reports regarding this case,

23  Tom Young, or any cases?

24      A.   Not that I know of, sir.

25           MR. GREEN:  Okay.  Have a nice day.

1              (The deposition concluded at 2:45 p.m.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25