# ATTACHMENT "6"; FILBERT CARVALHO

1          IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF HAWAII

3

4                              )
                               )
5    LUCAS BRUNO III, CHRISTOPHER   )   CIVIL NO. 03-00567 DAE/BMK
     GAHR, FRANK ROBERT PAULSON,    )
6    CHARLES TURNER, and Tom Young, )
                               )
7              Plaintiffs,      )
                               )
8              vs.             )
                               )
9    MICHAEL CHERTOFF, Secretary,   )
     DEPARTMENT OF HOMELAND     )
10   SECURITY,                 )
                               )
11             Defendant.      )
                               )
12   _____)

13   DEPOSITION NOTICED BY: MICHAEL JAY GREEN, ESQ.

14

15          DEPOSITION OF FILBERT CARVALHO

16   Taken on behalf of the Plaintiffs at TSA Maui County

17   Airports Training Center, 33 Lono Avenue, Suite 270,

18   Kahului, Maui, Hawaii, commencing at 8:54 a.m., May 12, 2006

19   pursuant to Notice.

20

21

22

23

24   REPORTED BY: GLORIA T. BEDIAMOL, CSR/RPR #262

25



Iwado Court Reporters, Inc. Certified/ Registered Professional Reporters          COURT REPORTERS, INC.
2233 Vineyard Street, Wailuku, Maui, Hawaii 96793  Federal ID # 99-0230607
Maui (808) 244-9300  Toll Free (800) 241-3376  Fax (808) 244-8278

```
 1                    A P P E A R A N C E S

 2


 3
     For the Plaintiffs Lucas Bruno III, Christopher Gahr, Frank
 4   Robert Paulson, Charles Turner and Tom Young:

 5              Michael Jay Green, Esq.
                345 Queen Street, Second Floor
 6              Honolulu, Hawaii 96813

 7              Debra A. Kagawa, Esq.
                345 Queen Street, Second Floor
 8              Honolulu, Hawaii 96813

 9              Denise Hevicon, Esq.
                345 Queen Street, Second Floor
10              Honolulu, Hawaii 96813

11
     For the Defendant Department of Homeland Security:
12
                Thomas A. Helper, Esq.
13              Office of the United States Attorney
                PJKK Federal Building
14              300 Ala Moana Blvd., Rm. 6100
                Honolulu, Hawaii 96850
15

16

17

18

19

20

21

22

23

24

25
```

1                        I N D E X

2   EXAMINATION BY:                                    PAGE

3   MR. GREEN                                             4

4

5

6

7                      E X H I B I T S

8   EXHIBIT              DESCRIPTION                   PAGE

9      1      Memo: 10/17/02 to L. Leong from          47
             F. Carvalho
10
       2      Depo excerpt of Charles Turner           48
11
       3      Memo: 10/18/02 to F. Carvalho            80
12           From P. Igarashi

13     4      Formal Complaint of Discrimination       89
             T. Young
14
       5      E-mail to F. Carvalho from C. Gahr      103
15
       6      Letter to L. Baker from F. Carvalho     105
16           To Lisa Baker, TSA Employee Relations
             10/21/02
17
       7      Memo: 10/25/02 to C. Gahr from          111
18           H. Tagamori

19     8      Memo: 6/6/03 to R. Au from P. Collins   121

20     9      Affidavit of Tom Young                  123

21    10      Incident Report                         139

22    11      Written Statement - Uilani Danley       141
             6/12/03
23
      12      Written Statement - Tina Perez 6/13/03  143
24
      13      Written Statement - Uilani Danley       143
25           6/13/03

1          Pursuant to Rule 14 of the Rules Governing Court

2   Reporting in Hawaii, the Reporter's Disclosure was made and

3   is attached hereto.

4          Pursuant to Rule 30(b)(4) of the Hawaii Rules of

5   Civil Procedure, the following is stated for the record:

6          My name is Gloria Bediamol, Certified Shorthand

7   Reporter with Iwado Court Reporters, Inc. My business

8   address is 2233 Vineyard Street, Suite A, Wailuku, Maui,

9   Hawaii.  Today's date is May 12, 2006.  The time is 8:54

10  a.m.  This deposition is taking place at Iwado Court

11  Reporters.

12         In attendance are: Mr. Green, Ms. Kagawa,

13  Ms. Hevicon and Mr. Helper.

14         The deponent is:

15                   FILBERT CARVALHO,

16         The deponent, having been sworn to tell the truth,

17  the whole truth, and nothing but the truth, was examined and

18  testified as follows:

19                    EXAMINATION

20  BY MR. GREEN:

21     Q.    Say your name, please.

22     A.    Filbert W. Carvalho, Jr.

23     Q.    What's your present business or profession?

24     A.    I work for The Department of Homeland Security,

25  TSA, assigned to the Kahului Airport Maui, I'm an inspection

1   investigator for security.

2       Q.   I'm sorry, the first thing you said you do what?

3       A.   I work for the federal government.

4       Q.   And what do you do for them?

5       A.   I'm a security inspections agent.

6       Q.   And then you also say you work for TSA, did you

7   say?

8       A.   Yes, sir.

9       Q.   Who do you get paid by?  Who do you get your check

10  from?

11      A.   TSA.

12      Q.   And do you hold two titles?  In other words, does

13  TSA hire you as an employee of the federal government?

14      A.   Yes, sir.

15      Q.   Have you ever had your deposition taken before?

16      A.   Yes, sir.

17      Q.   What were the circumstances?

18      A.   Criminal cases, civil cases.

19      Q.   When was the last time?

20      A.   Maybe three months ago.

21      Q.   And what was that case about?

22      A.   Civil rights.

23      Q.   Who was suing who?

24      A.   Another employee.  I forget the name.

25      Q.   Another employee for who?

```
 1        A.    TSA.

 2        Q.    What's the name of the employee?

 3        A.    I don't remember.  There's been several, sir.

 4        Q.    How far did you go in school?

 5        A.    College.

 6        Q.    How long have you been working for the federal

 7   government?

 8        A.    A total of 11 years.

 9        Q.    And during that time, have you done investigations

10   for the federal government?

11        A.    Yes, sir.

12        Q.    Have you done investigations for TSA?

13        A.    Yes, sir.

14        Q.    Before, and I'll get into this a little bit, but

15   have you done investigations for other agencies?

16        A.    Yes, sir.

17        Q.    You write reports?

18        A.    Yes, sir.

19        Q.    You don't remember who the person was three months

20   ago?

21        A.    There's been several, sir.

22        Q.    Take your time.

23        A.    I've done interrogatories --

24        Q.    I don't care about those. I only care about the

25   deposition.  You take your time because we're going to go
```

7

```
 1   through the rules of a deposition.  But you need to know,
 2   and you probably were told, that everything you say this
 3   lady is taking down.  Do you understand that?
 4        A.   Yes, sir.
 5        Q.   And my guess is, is this case is going to go to
 6   trial.  At some point, some jury or some judge may know that
 7   I asked you who you were deposed about three months ago, and
 8   you're telling me you don't know.  Is that what you are
 9   saying?
10        A.   Sir, there are several names.
11        Q.   You think about it, and then you tell me, if you
12   can remember, who the person was that sued TSA for civil
13   rights violations.
14        A.   (The witness pauses.)
15        Q.   Let's do it this way.  They call you officer?  I
16   want to make sure I call you by the right title.
17        A.   Just by my name, sir.
18        Q.   Mr. Carvalho, if it comes to you, you just yell it
19   out to me; okay?  What was the nature of the complaint that
20   you were deposed about?
21        A.   Civil rights.
22        Q.   That means a lot of things.
23        A.   Yeah, the supervisor had done a wrong where she
24   was assigned with a supervisor who she claimed that slept
25   with her husband, and she wanted to be separated on shifts.
```

1    Q.   So she was suing, was it, TSA and/or Wackenhut or

2    the federal government?  Who were the defendants?

3         A.   The ombudsman in civil rights against TSA.

4         Q.   That was a few months ago?

5         A.   Yes, sir.

6         Q.   Who was her supervisor?

7         A.   Davelyn Gordon.

8         Q.   And she worked where?

9         A.   TSA.

10        Q.   Where though?

11        A.   Screening workforce on Maui.

12        Q.   Generally, if you can remember, how many civil

13   rights cases have you testified at trial or in deposition in

14   the last three years that involved an employee of TSA?

15        A.   Seven.

16        Q.   Seven.  And you've been with TSA how many years

17   and/or the federal government at the airport?

18        A.   Eleven years with the federal government; at this

19   airport, four years.

20        Q.   Maybe 15 civil rights cases or more over those

21   years by employees?

22        A.   Yes, sir.

23        Q.   Did you ever review any of the complaints in those

24   cases?

25        A.   Yes, sir.

1     Q.     How many of those cases involved the Maui airport?

2     A.     All of them that I reviewed.

3     Q.     Can you remember some of the individuals, if there

4  were individuals, named in those lawsuits?

5     A.     Yes, sir, but I'm having trouble with one right

6  now.

7     Q.     That's okay.  By the way, let me just say, I kind

8  of do these things informally, depositions.  I have a very

9  raspy voice, and I have no disrespect for you.  I want you

10  to know that.  I don't mean to sound arrogant or cocky.

11  It's just the way I speak, so I want you to know from the

12  jump that I mean you no disrespect; okay?

13     A.     Cool.

14     Q.     Pat Iragashi (sic), was she ever named as a

15  defendant?

16     A.     Yes, sir.

17     Q.     How many times over the years?

18     A.     Several times.  No accurate counts.  She was

19  mentioned several times.

20     Q.     Did any of those cases have to do with racial

21  discrimination?

22     A.     Yes, sir.

23     Q.     In any of those cases, did anyone accuse Patty

24  Iragashi -- am I pronouncing that right, Deb?

25          MS. KAGAWA:  Igarashi.

1    Q.   (By Mr. Green)   Igarashi -- of calling someone a
2    fucking haole?

3    A.   Yes, sir.

4    Q.   How many times do you think that came up?

5    A.   Three.

6    Q.   Were all of those people, the plaintiffs, were
7    there allegations of fucking haole all white men?

8    A.   Yes, sir.

9    Q.   Were all of those men, men that were from the
10   mainland initially, and what that means to me is, I mean you
11   can be from the mainland and moved 20 years ago, but I mean,
12   let's say, within six months of coming to the airport, was
13   that about the time frame or less of those males?

14   A.   Not all.

15   Q.   Some?

16   A.   Yes, sir.

17   Q.   Of the people that -- I'm only talking about civil
18   rights cases now -- where the word "fucking haole" came up,
19   were all of those employees terminated, to the best of your
20   knowledge?

21   A.   No.

22   Q.   Were some of them terminated?

23   A.   Yes, sir.

24   Q.   During those years or months of those cases, the
25   fucking haole cases, what was your job description at the

1  airport?

2     A.    I was still an inspector and briefly I was

3  assigned as a temporary screening manager.

4     Q.    What interaction, if any, would you have had with

5  that woman, Ms. Igarashi, during those cases, the

6  allegations of those cases?

7     A.    I had some oversight over the screening

8  operations, so she was a manager, so she actually reported

9  through me.

10     Q.    I'm going to jump around a little bit, and I'm

11  going to come back to this if I can remember later on.  What

12  is the earliest you can remember in time that there was any

13  allegation against that woman that dealt with calling

14  someone -- when I say "fucking haole," I don't want you to

15  just disregard, so I don't mislead you, is the word just

16  haole.  So when I talk about "fucking haole," will you just

17  considering that phrase as opposed to the word "haole."  Do

18  you understand the question?

19     A.    Yes, sir.

20     Q.    Will you just focus on the words "fucking haole"?

21     A.    Yes, sir.

22     Q.    Did the word "haole" come up in allegations

23  against her without using the derogatory word "fucking"?

24     A.    No, sir. The only complaint was --

25     Q.    The fucking haole?

1        A.    Yes, sir.

2        Q.    And during those times before the lawsuits were

3   filed, were you ever aware of allegations made by any TSA

4   employee, or maybe even Wackenhut employee, accusing her of

5   calling them a fucking haole before the lawsuit?

6              MR. HELPER:    Let me object, vague.  You used "the

7   lawsuit," do you mean this particular lawsuit?

8              MR. GREEN:    No, no.  Thank you, Tom.  I'm going to

9   go through the rules a little further.  I just got carried

10  away. I want to explain what we're doing here.

11       Q.    (By Mr. Green)  Did you become aware of complaints

12  about that woman, not in this lawsuit but the other lawsuits

13  we've talked about, the fucking-haole lawsuits, before those

14  lawsuits were filed, did you become aware of people saying

15  she's saying these things about me or about other people or

16  people complained about her conduct?

17       A.    Not the phrase "fucking haole," but there was

18  other things brought to my knowledge, yes, sir.

19       Q.    About her being perhaps a racist about different

20  things?

21       A.    About her using the phrase "my people."

22       Q.    What did you believe the tenor of "my people"

23  meant, if you investigated it or had an opinion, what did

24  that mean to you?

25       A.    "My people" --

1            MR. HELPER:  Objection, lacks foundation.

2        Q.   (By Mr. Green)  Go ahead, you can answer.

3        A.   She came from another organization Wackenhut, and

4   they were coming to work for TSA.  Some of them, the

5   incumbents, which were going to come from Wackenhut that

6   tested and came over, meaning "my people" that she used to

7   work for prior to.

8        Q.   If we focus on the racist comments that we talked

9   about, the haole comments, did you become aware of

10  allegations she had talked to people like that before

11  lawsuits were filed against her and others?

12       A.   No.

13       Q.   To your knowledge, was she ever counseled or

14  reprimanded before this lawsuit about her calling people

15  "fucking haoles" or other racist terms?

16            MR. HELPER:  Objection, lacks foundation.

17       Q.   (By Mr. Green)  You can answer the question.

18       A.   I have no knowledge.

19       Q.   Did you ever report her to anyone about that kind

20  of conduct, talking to people in a racist manner?

21       A.   The report I made, sir, was with reference to the

22  term "my people," and I handled the counseling directly and

23  reported to my chain of command.

24       Q.   Is there something that was set up back then about

25  counseling employees like Ms. Igarashi if they used

1   derogatory or defamatory or discriminatory terms?

2       A.   Absolutely.

3       Q.   Is that found somewhere?

4       A.   In our code of ethics and our management

5   guidelines --

6       Q.   And --

7            MR. HELPER:   Let him finish.

8            THE WITNESS:   And our management guidelines, yes,

9   sir.

10      Q.   (By Mr. Green)   Let's go back to where I started

11  about the rules of the deposition.   It's important that you

12  understand the questions, and the answer you give is

13  responsive; okay?

14      A.   (Witness nods head.)

15      Q.   You have to answer.

16      A.   Yes, sir.

17      Q.   If you don't understand the question, tell me

18  because the court reporter is taking down everything, and

19  you don't want to be in a situation where you look at a

20  transcript one day and you have an answer that you read that

21  you gave, and you certainly did not mean to give that answer

22  to the question.   So if you have any issues with

23  understanding my question, tell me and I'll try to rephrase

24  it for you; okay?

25      A.   Yes, sir.

1        Q.    It's important that you answer the question
2    audibly, instead of nodding your head, because she's kind of
3    concentrating on what she's doing, and if you shake your
4    head one way, she's liable to take down a "yes," and you may
5    mean a "no."  So just answer audibly; okay?
6        A.    Yes, sir.
7        Q.    At some point, after your deposition, the court
8    reporter will prepare a transcript, and you are going to get
9    a chance to review it, and you'll have an opportunity to
10   make changes?
11       A.    Yes.
12       Q.    Certain changes some court's consider it to be
13   substantive changes.  In other words, if you say "yes" to
14   something today --
15       A.    Bonnie Tanner.
16       Q.    Who is that?
17             MS. HEVICON:  He shouted out the name.
18       Q.    (By Mr. Green)  Bonnie.  Good.  I have no idea
19   what I asked you about her, but thank you.
20       A.    The ombudsman made contact with me to give a brief
21   interrogatory on why she was --
22             THE COURT REPORTER:  Excuse me, could you slow
23   down.
24             THE WITNESS:  Sorry.  I gave a telephonic
25   interrogatory on why she was terminated.  Sorry about that.

1     Q.    (By Mr. Green)   If you make substantive changes, a

2  judge or jury may know you said "yes" today, and you changed

3  it to "no"; okay?

4     A.    Yes, sir.

5     Q.    Obviously, the questions that are asked, the

6  answers will be given under penalty of perjury, and I know

7  that you are aware of that, yes?

8     A.    Yes, sir.

9     Q.    Anything --  this is the only opportunity you

10 actually get to ask me anything in a deposition, unless it's

11 for clarification.  Is there anything you want to ask me

12 before we begin this thing?

13    A.    No.

14    Q.    You are not on any medication that would impair

15 your ability to understand questions?

16    A.    No.

17    Q.    How far did you go in school?  I think you may

18 have mentioned this, but after high school how far did you

19 go?

20    A.    Some college.

21    Q.    When did you end your college career?  What year

22 was it?

23    A.    I'm still attending.  I ended in '93 and went back

24 briefly.

25    Q.    Good for you.  What are you studying?

1          A.    Criminal science.

2          Q.    Your first employment, and I don't care about

3    working part time, but your first real employment, in your

4    mind, would have been what?  Either during college or after

5    high school, what would it have been?

6          A.    U.S. Army.

7          Q.    When was that?

8          A.    1985 to 1993 February 14th.

9          Q.    Where did you serve?

10         A.    Europe, Central American, North Carolina, Georgia

11   and back home to Hawaii.

12         Q.    And you were with the army?

13         A.    Yes, sir.

14         Q.    Did you ever work for the MPs?

15         A.    Yes, sir.

16         Q.    And when was that?

17         A.    1988, '89 Ford Meade, Maryland.

18         Q.    Arrested people from time to time?

19         A.    Yes, sir.

20         Q.    Got some training in report writing?

21         A.    Yes, sir.

22         Q.    In those days, were you trained to at least, when

23   you make reports, try to put down things you thought were

24   the most important?

25         A.    Yes, sir.

1    Q.   Obviously, you can't write everything down; so

2  that's why you would at least try to write down the most

3  important parts of the report, yes?

4    A.   Yes, sir.

5    Q.   And probably in the army a hundred or more reports

6  as an MP?

7    A.   Not that much, sir.

8    Q.   Fifty?

9    A.   Yes.

10   Q.   Okay.  After the army, where did you go?

11   A.   Department of Public Safety, State of Hawaii.

12   Q.   What years were they?

13   A.   '94 through '96.

14   Q.   Who was your supervisor there?

15   A.   George Sumner (phonetic).

16   Q.   Did you work with Faith Evans?

17   A.   Yes.

18   Q.   What was your position in public safety?

19   A.   I was a corrections officer then became a sheriff.

20   Q.   Lots of reports, right?

21   A.   Yes, sir.

22   Q.   Important again to make sure you write down the

23  things you believe are important, yes?

24   A.   Yes, sir.

25   Q.   Sign your name to report, you are attesting that

```
 1    it's true and accurate to the best of your knowledge?

 2        A.   Yes, sir.

 3        Q.   What do you do next?  Strike that.  What year do

 4    you leave public safety/sheriff?

 5        A.   '96 to 2000 I transferred from public safety to

 6    DLNR.  I became a Department of Conservation enforcement

 7    officer.

 8        Q.   You've been in law enforcement how many years, if

 9    we include what you do now, how many years have you been in

10    it?

11        A.   From 1985 to the present, sir.

12        Q.   So 22 years or so?

13        A.   Yes, sir.

14        Q.   Over those years, have you had occasion to

15    investigate various forms of misconduct?

16        A.   Yes, sir.

17        Q.   Various forms of criminal violations?

18        A.   Yes, sir.

19        Q.   I'm assuming over those years you've investigated

20    allegations of discrimination of various kinds?

21        A.   Yes.

22        Q.   Violations of people's civil rights?

23        A.   Yes, sir.

24        Q.   Might include over the years age discrimination?

25        A.   Just recently, yes, sir.
```

```
 1        Q.    Sexual harassment?

 2        A.    Yes, sir.

 3        Q.    Sex discrimination?

 4        A.    Yes.

 5        Q.    Race discrimination?

 6        A.    Yes.

 7        Q.    You kind of know it -- after all these years, you

 8   kind of know it when you hear it; right?

 9        A.    Yes.

10              MR. HELPER:   I move to strike that last question

11   as vague.

12        Q.    (By Mr. Green)  He understood it, Tom, and he

13   answered it.

14              If you don't understand it, just tell me; okay?

15   I'll tell you something, Brother, there's no tricks in this

16   deposition.  You have a very good lawyer, so if he makes an

17   objection, stop speaking, and then if he tells you not to

18   answer, then you should ignore him and just answer.  But if

19   he tells you not to answer, don't answer and then we'll move

20   on to something else.

21              When do you start at Wackenhut, if you did?  Did

22   you ever work for Wackenhut?

23        A.    Yes.

24        Q.    When was that?

25        A.    Briefly in 2000.
```

```
 1        Q.   And "briefly" means when?

 2        A.   Like three days.

 3        Q.   What was the reason you went there?

 4        A.   I went there as a law enforcement officer

 5   part-time work.

 6        Q.   Did you work for Buzzy?

 7        A.   Yes.

 8        Q.   Do you know Godfrey Ortiz?

 9        A.   No.

10        Q.   Kenny Chang?

11        A.   Yes.

12        Q.   So you are there three days, then where do you go?

13        A.   I got a called from the federal air marshal

14   branch, and it was right after 911.

15        Q.   What did you do?

16        A.   I became a federal air marshal.

17        Q.   You flew around?

18        A.   Yes.

19        Q.   What happens after that?

20        A.   I was assigned in Los Angeles, I had the

21   opportunity to return home to Maui, and the inspections

22   division opened up, and I transferred as an inspector to

23   Kahului airport.

24        Q.   What exactly is your definition of "inspections

25   division"?
```

1      A.    We take care of all the security regulations
2  imposed on the air carriers and airport security, and we
3  take care of the rules and regulations and make sure that
4  everybody is abiding by them.

5      Q.    And that was what year, I'm sorry, that you
6  started doing that?

7      A.    2002 to the present.

8      Q.    Why did you leave state government in 2000?

9      A.    For federal employment.

10     Q.    Ever had any lawsuits filed against you, as a
11  defendant, prior to coming to the airport?

12     A.    No.

13     Q.    You never had, and just correct me, it's kind of a
14  negative question, but I assume during your training you
15  knew never to ignore claims of discrimination; is that
16  right? In other words, if you believe if you were told that
17  someone had been discriminated against, you would not simply
18  walk away and ignore it if your job description was to
19  investigate those kinds of things; right?

20     A.    My job description is not to investigate those.  I
21  am a security investigator inspector.

22     Q.    When you were with Wackenhut even for those days
23  or working for TSA, was it your impression that if you were
24  told about some type of discrimination, racial or otherwise,
25  that you could simply ignore it and not report it to someone

1  else?

2      A.   No, sir.

3      Q.   What did you believe your job would be in that

4  regard?

5      A.   Even ethically, as an employee of the federal

6  government, we're trained to report.

7      Q.   Did you get any training when you went to work

8  for, I'm just going to use TSA, whether you were actually an

9  employee for them, did you have any training?

10     A.   Yes, sir.

11     Q.   What was the training?

12     A.   With reference to?

13     Q.   What kind of training about anything you got from

14 TSA?

15     A.   I was trained --

16     Q.   In the screening area, I'm sorry.

17     A.   In screening?

18     Q.   What happens when I go through the --

19     A.   I was never a screener.  I was always an

20 inspector.  I assisted with the roll-out.  It's a different

21 branch.  I don't know --

22     Q.   What was your job as an inspector?

23     A.   We made sure that the screening and everything was

24 done in accordance with the regulation.

25     Q.   And what regulations or training did you receive

1  regarding those regulations?

2     A.   I went to initially four months, then two and a

3  half months of training in an academy that taught us how to

4  read the CFR, which is the Code of Federal Regulations, and

5  who had to abide by each of those sections:  the air

6  carrier, the airport operator, and us the federal

7  government.

8     Q.   Then when you came back here to Maui, did you get

9  any additional training for your position?

10    A.   No, sir.

11    Q.   Your immediate supervisor would have been here on

12 Maui?

13    A.   At that time, Lowery Leong.

14    Q.   And after that?

15    A.   Howard Tagamori.

16    Q.   When Howard came in, what was Lowery's position?

17    A.   Lowery is the federal security director.

18    Q.   Do they have offices at the airport?

19    A.   Yes, sir.

20    Q.   You have offices at the airport?

21    A.   Yes, sir.

22    Q.   What's your ethnic background?

23    A.   I'm Portuguese/Hawaiian.

24    Q.   Did you instruct any of the people who work for

25 TSA in how to write reports?

```
 1          A.   No, sir.

 2          Q.   Was it your understanding, based on your training

 3   and experience, that reports generally should be prepared

 4   contemporaneously to the event?

 5          A.   Yes, sir.

 6          Q.   And what would "contemporaneously" mean to you?

 7          A.   On time, accurate.

 8          Q.   Have you had occasion to review reports at any

 9   time that were made by others regarding violations of the

10   airport which could include discrimination complaints?

11          A.   Discrimination, no, sir.

12          Q.   What kind of reports have you reviewed that were

13   made by others?

14          A.   Infractions being security doors not being locked,

15   other security-related incidences.

16          Q.   Who would make those reports?

17          A.   Air carriers, employees, airport operators.

18          Q.   When we talk about employees -- let's talk about

19   employees, airport operators all being employees for the

20   sake of the question.  Are those people or some of those

21   people, do they work in the area of screening?

22          A.   No.

23          Q.   Any of them work in that area?

24          A.   Yes.

25          Q.   Has it been your experience on Maui that people
```

1  have made reports, types of complaints, that have been weeks
2  or months after the event?

3      A.   Yes, sir.

4      Q.   And when is the first time you saw that -- a
5  report made weeks or months after the event allegedly
6  occurred?

7      A.   I have seen reports redocumented because of either
8  loss or used as a time line to refresh someone's memory.

9      Q.   What does that mean, "as a time line to refresh
10 someone's memory"?

11     A.   Chronologically, even myself, I write down bullets
12 or reminders, so later on when I do compile a report, I have
13 things that will refresh my memory.

14     Q.   At least based on your experience in writing
15 reports, you would put down bullets so those events would be
16 fresh in your memory in time to when the event took place;
17 is that right?

18     A.   Yes, sir.

19     Q.   And then later on, you might prepare a more
20 thorough report, so if you needed to refresh your memory
21 later on or testify or be able to explain it, you had the
22 report, yes?

23     A.   Yes, sir.

24     Q.   I'm talking about, and it probably wasn't a good
25 question, I'm talking about for the first time report, not

1   bullet points, I'm talking about a first time complaint, a
2   report of misconduct against another employee that was made
3   for the first time weeks or months after the alleged event.
4   Have you seen that happen since you've been at the airport?
5            MR. HELPER:  Let me object to the term "made" as
6   vague.  Do you mean written?
7            MR. GREEN:  Well, yeah, that's what I mean.
8            THE WITNESS:  By myself or by --
9        Q.   (By Mr. Green)  No, by others.
10       A.   Not that I recall.
11       Q.   Did you read the reports in this case?
12       A.   Yes, sir.
13       Q.   Did you notice reports that are made weeks or
14   months after --
15       A.   I noticed typos on mine, yes, sir.
16       Q.   I don't care about typos.  I care about the actual
17   body of complaints prepared weeks or months after the event.
18       A.   Yes, sir.
19       Q.   First time you ever saw that, right?
20       A.   Yes, sir.
21       Q.   Before you came in today, obviously you had a
22   chance to speak with Tom, right?
23       A.   Yes.
24       Q.   Have you had an opportunity to review any
25   documents to help yourself remember things?

1        A.    Yes, sir.

2        Q.    What basically have you reviewed?

3        A.    Just my write-up.

4        Q.    Your write-up is what?  What does that mean?

5              MR. HELPER:  It's a Tom Young document dated

6    October -- the date on it is October 21, '02.

7              MR. GREEN:  Give me a second.

8        Q.    (By Mr. Green)  Did you read over any deposition

9    transcripts?

10       A.    No.

11       Q.    Did not look over any other reports or complaints

12   that were filed against Mr. Gahr or Mr. Young?

13       A.    From the defendants' paperwork?

14       Q.    Yes, or people that worked at the airport.  Did

15   you look at any reports that were made alleging violations

16   against, for example, Gahr or Young?

17       A.    Yes, sir.

18       Q.    And when did you look at those?

19       A.    A week ago.

20       Q.    And you noticed, of course -- I guess I shouldn't

21   say "of course" -- that some of those reports were made

22   months after the alleged event?

23       A.    Yes, sir.

24       Q.    Did you question anybody about that as to why that

25   was done?

```
 1        A.    As explained, our legal -- I was out of the
 2  picture from mid December to March 16th.
 3        Q.    What year?
 4        A.    2002 into 2003.
 5        Q.    Okay. You got to the airport in Maui kind of to
 6  work full time -- I apologize, as I get older I forget.
 7  About what month was it when you began here after your
 8  training?
 9        A.    April 5th.
10        Q.    Of?
11        A.    Of '02.
12        Q.    And you worked continuously until when?
13        A.    December 15th of '02.
14        Q.    And then you came back?
15        A.    I went out on an accident that I had and stayed
16  out for three months and returned March 16th.
17        Q.    Over that period of time, there were people from
18  Wackenhut, and you are going to have to help me with this,
19  when TSA came on board, were there people from Wackenhut
20  that were transferred to TSA?
21        A.    Not transferred, no, sir.
22        Q.    What would you call what happened to them, if they
23  started working for TSA? How did that work?
24        A.    They went through testing, they had to pass the
25  same tests as normal screeners, they went on a selection
```

1  process, and they were guaranteed by the federal government
2  that if they were incumbents from the contract security
3  workforce, they tested and passed the test, they were
4  assured to have positions within TSA.

5      Q.   I see.  Did you have information, and I mean
6  personal knowledge, that there were people with Wackenhut
7  that wanted to work for TSA and perhaps there wasn't space
8  or job available?

9      A.   Screeners, sir?

10     Q.   In any position, screeners, whatever else they do
11 over at the gate when people try to get --

12     A.   There was a strict --  there was testing that we
13 had no control over.  The incumbents from Wackenhut went
14 through testing.  So as far as a list of somebody wanting to
15 work for us from Wackenhut, we continuously told them they
16 have to go on the computer and apply.

17     Q.   I understand.  What I'm saying is, did you have
18 personal information that there were people that actually
19 were hoping to work for TSA from Wackenhut?

20     A.   No.

21     Q.   Was the salary the same or different from TSA, if
22 you know, for screeners than it was for when they worked for
23 Wackenhut?

24     A.   No idea.  That was controlled through
25 headquarters.

1          Q.    Over the time you worked at this airport, from
2     time to time, did you hear local people use the word
3     "haole"?
4          A.    Yes, sir.
5               MR. HELPER:   Let me object to the word "local
6     people" as vague.
7          Q.    (By Mr. Green)   It is vague.   I'll put it a
8     different way because I don't want --
9          A.    I heard you use it several times this morning.
10         Q.    I have because I'm a haole.   I only talk about
11    myself and Tom like that.   But would you say that the word
12    "haole" was not used infrequently?   In other words, you
13    would hear it perhaps sometimes more than once during the
14    day and certainly a number of times during the week?
15         A.    Yes, sir.
16         Q.    What were the circumstances that you would hear
17    that?
18         A.    Meaning?
19         Q.    I mean how the term would be said?
20         A.    Just part of speech, not to be taken out of
21    context like you quote it, "fucking haole."   I mean, just
22    the word "haole."   We refer to all tourists as that:
23    "There's a lot of haoles in the lobby," "There's haoles
24    leaving," "There's haoles lined up at the check point."
25         Q.    You grew up here?

```
 1        A.    Yes, sir.
 2        Q.    Have you considered that that word is, to some
 3   white people, a derogatory term?
 4        A.    No, sir.
 5        Q.    Never considered that?
 6        A.    No.
 7        Q.    Of course, there's no doubt in your mind about
 8   "fucking haole," right?
 9        A.    Yes, sir.
10        Q.    Can you agree that the word "haole," if it's used
11   in certain context without the word "fucking," can be
12   derogatory to some people?  Like, "That damn haole"?
13              MR. HELPER:  Objection --
14        Q.    (By Mr. Green)  What in the hell are these haoles
15   doing?"  In your mind, would that be derogatory to you?
16              MR. HELPER:  Objection, compound, vague, lacks
17   foundation.
18        Q.    (By Mr. Green)  You can answer.
19        A.    I guess it depends on how it's used.
20        Q.    That's right.  Even if the word "haole" is used,
21   sometimes it could be not in an offensive way, and depending
22   how it's used it could be offensive, right?
23        A.    Yes, sir.
24        Q.    We talked about fucking haole.  I don't want to
25   belabor this, but have you ever heard Patty Igarashi use
```

```
 1  that term?
 2       A.   No, sir.
 3       Q.   Never did?
 4       A.   No, sir.
 5       Q.   Well, you used that, haven't you, fucking haole?
 6       A.   No, sir.
 7       Q.   You never used it?
 8       A.   Right now talking to you, yes, sir.
 9       Q.   I mean, when you were working over at the airport,
10  over in your office, have you used the word "fucking haole"?
11       A.   No, sir.
12       Q.   Have you heard Patty use the word "fucking haole"?
13       A.   No, sir.
14       Q.   Let me read you part of a deposition from
15  Mr. Young.  Do you know who Thomas Young is?
16       A.   Yes, sir.
17       Q.   Who is he?
18       A.   He was the screening manager for TSA.
19       Q.   Do you know what this lawsuit is about?
20       A.   Yes, sir.
21       Q.   What's it about?
22       A.   The entire lawsuit?
23       Q.   What do you think this case is about?
24       A.   It's about four or five white males over 40 who
25  claim that they were done wrong by or had been fired because
```

1    of their ethnicity.

2        Q.    I could not have said it better.  That's part of

3    my opening statement.  And, if you know, this group of males

4    probably never lasted more than three or four weeks on this

5    job.  Do you know that to be true?

6        A.    Yes, sir.

7        Q.    Tom young says, and I have no reason to believe

8    it's untrue, that he worked security for the president of

9    the United States.  Did you know that?

10       A.    Yes, sir.

11       Q.    What did you think --  when did you learn that?

12   Don't tell me if it's your lawyer who told you.  I mean, did

13   you learn it at any time while he was -- 30 days before he

14   was fired?

15       A.    No, sir.

16       Q.    He worked for Air Force One for the FBI and secret

17   service.  That's what he says.  You have no reason to

18   dispute that, right?

19       A.    No, sir.

20       Q.    That he, along with others, was given the

21   authority to screen and do security on everyone that went on

22   the president's plane.  That's what he says, and you have no

23   reason to dispute that, right?

24            MR. HELPER:  Objection, lacks foundation.

25       Q.    (By Mr. Green)  And you have no reason to dispute

1    that, do you?

2         A.    No, sir.

3         Q.    That he also checked luggage in people that went

4    into the White House, and you have no reason to dispute

5    that, right?

6              MR. HELPER:    If I can just have a running

7    objection as lacking foundation.

8         Q.    (By Mr. Green)    You can run it as long as you

9    want, Tom.

10              Now, let me tell you what else he says.    First of

11   all, he says he worked his entire life for the federal

12   government, and you have no reason to dispute that, right?

13        A.    I knew he was U.S. Army retired.

14        Q.    Worked in bomb disposal, did you know that?

15        A.    Yes.

16        Q.    At least on paper it seems like the guy had pretty

17   good credentials before he met the folks out here in

18   security?

19        A.    Yes, sir.

20        Q.    He says, and I want to make sure I quote him

21   properly.    He says that you were his first level supervisor;

22   is that right?

23        A.    At the time, yes, sir.

24        Q.    Apparently, he applied through the internet and

25   was hired and selected to report to work at the Maui

1   airport.  You knew that, right, at some point?

2       A.   Yes, sir.

3       Q.   Do you know whether the screening that Wackenhut

4   does is the same screening that TSA does, if you know?

5            MR. HELPER:  Vague.  Passenger screening?

6       Q.   (By Mr. Green)  Yeah.  When I go out there, and I

7   want to get on a plane, I get screened.  I go through a

8   metal detector and get wanded.

9       A.   Meaning, when we did it with Wackenhut to --

10      Q.   Is it the same type of screen that Wackenhut does

11  that TSA employees do, the screeners, if you know?  Are they

12  taught the same?

13      A.   No.

14      Q.   How are they taught differently?

15      A.   Change of SOP, standard operating procedures, were

16  changed from contract security companies to TSA employees.

17  There were some changes.

18      Q.   And there was a training, was there, given to TSA

19  employees about how to screen or wand people?

20      A.   Yes, sir.

21      Q.   Are you aware of any procedure that TSA had if

22  someone was written up?  In other words, if a complaint was

23  filed against that person, whether they would be told

24  automatically that a complaint had been filed?

25      A.   No, sir.

 1        Q.    You are saying there was no procedure, or you
 2   don't know of any?
 3        A.    I don't know of any.  I was not trained as a
 4   screener, so I don't know what they were trained in.
 5        Q.    I'm talking about if someone actually files a
 6   complaint of misconduct of any kind, something that would, I
 7   guess, go into the personnel file of an employee, that
 8   happens, right?
 9        A.    Now?
10        Q.    Yeah.  Back when Tom was working --
11        A.    No, sir, we had no HR personnel stood up yet. It
12   was basically three people.
13        Q.    What does that mean, what you just said?
14        A.    We had no personnel or HR office at that time.
15   Everything was being controlled out of Washington, D.C.
16        Q.    But if I was to write a complaint about Tom Young
17   saying that he did something wrong, where would that
18   complaint go, if it was in writing, if you know?
19        A.    As an employee or passenger?
20        Q.    Employee.
21        A.    It would probably be routed to the headquarters or
22   through our ombudsman or HR.
23        Q.    Is there a file for employees?  Was there a file
24   back then like a Tom Young personnel file or your personnel
25   file or something like that?

1        A.   No, sir.

2        Q.   How would someone know there was a report of

3   misconduct filed against someone unless the person told

4   them, "I just filed a report against you"?

5             MR. HELPER:   Objection, overbroad, vague.

6        Q.   (By Mr. Green)   You can answer.

7        A.   I guess when they bring you into the office and

8   tell you that you are being written up for or you're being

9   complained against.

10        Q.   Are you aware of any procedure that required

11   anyone to bring you in and tell you?

12             MR. HELPER:   Same objection.

13        Q.   (By Mr. Green)   Go ahead.

14        A.   On my side, as an inspector, our level of

15   management, yes.  If we're counseled or something goes

16   wrong, we're called in and, for lack of a better term, meet

17   your accuser and have them tell you that this is what you

18   did wrong.

19        Q.   Giving you an opportunity to perhaps explain

20   yourself and maybe counsel you not to do it again?

21        A.   Yes, sir.

22        Q.   Do you know if there was such a procedure in place

23   for TSA employees?

24        A.   No.

25             MR. HELPER:   Let me object, overbroad, vague,

```
 1   lacks foundation.
 2             MR. GREEN:  Which part is overbroad?
 3             MR. HELPER:  You are talking about one policy for
 4   all of TSA?
 5             MR. GREEN:  I'm talking about the people down at
 6   the gate.  I'm talking about the wanders, screeners, or
 7   whatever they call themselves.  You know of know of no
 8   policy where they are told about a complaint and given an
 9   opportunity to confront their accuser?
10             MR. HELPER:  Same objection.
11       Q.    (By Mr. Green)  You don't know anything about
12   that?
13       A.    No, sir.
14       Q.    If you know, can a complaint against an employee
15   be used as a basis for termination?  Only if you know.
16       A.    Yes.
17       Q.    Basis for discipline?
18       A.    Yes.
19       Q.    Do you know whether TSA had a system of
20   progressive discipline for the employees?
21       A.    Yes.
22       Q.    What is the progressive discipline that you aware
23   of?
24       A.    There was some termination offenses that was a
25   one-strike-and-you're-out, and then there was a, pretty
```

1    similar to ours, verbal/written, and then removal.

2        Q.    What does that mean, "verbal/written"?

3        A.    Verbal counseling first.

4        Q.    I see.    In other words, they might notify them, if

5    you do this again --

6        A.    Right.    Cut this out.    Then basically it went in

7    writing.

8        Q.    What's the one-strike?    What are examples of

9    those?

10       A.    I'm not for certain.    I know for some of the

11   screeners and employees early on there was a code of

12   conduct.    Basically, if you failed to screen an item, if you

13   showed up drunk for work, things like that, if you use the

14   x-ray equipment without it being turned on and --

15       Q.    How about leaving your table dirty, not cleaning

16   up your table?

17       A.    Failure to sterilize, that's not a single --

18       Q.    Are managers or supervisors required, if you

19   know -- I'm talking about TSA -- to notify employees of

20   complaints filed against them?    Any requirement that you

21   know of?

22       A.    I don't know.

23       Q.    This is what Mr. Young says, if I can find it.    Do

24   you remember the day he reported to work?

25       A.    Yes.

1    Q.   He says you were there.  Do you remember seeing

2  him, was it downstairs where your office is?

3        A.   Yes.

4        Q.   How many times, that you know of, has Mr. Young

5  been in your office?  And I know there's two offices, but

6  how many times has he been in either one of them, if you

7  know?

8        A.   No idea.

9        Q.   Ever see him in there?

10       A.   During his employment, yes, sir.

11       Q.   How many times?

12       A.   No idea.

13       Q.   He says that when he reported to work he went

14  downstairs, or some place, to your office.  Do you remember

15  that day?

16       A.   He says that he met me in the downstairs office?

17       Q.   He said he went down into the office and started

18  to go in.  He says he knocked on the door.  Let me give you

19  some background to see if it helps you to remember.  Started

20  for Wackenhut in October of 2002 when he went to Mr. Leong's

21  office -- I'm sorry, TSA -- went to Mr. Leong's office to

22  meet with him.  Do you remember that?

23       A.   No, sir.

24       Q.   Is Mr. Leong's office different than your office?

25       A.   There was one office.  It was a mop closet.

1    That's all we had at the time.

2        Q.    There were a couple of rooms. Do you remember
3    which one?

4        A.    The front there was a primary room and then there
5    was a little closet that we had our computers set up in,
6    yes, sir.

7        Q.    He says, and I'm going to his deposition which is
8    page 30 starting at line 14. Actually this is your counsel
9    is asking Mr. Young some questions, and he is giving answers
10   under oath. Follow along with me. He says -- start at line
11   4.   This is what he says, and I'm going in the middle of --
12   he's describing the office 20-by-20 in a smaller office to
13   the side that was his. Let me see who the "his" is. He is
14   talking about Mr. Leong's office.

15            "When I knocked on the door, there were probably
16   four people in the outer office.   There were about a half a
17   dozen people in his office with him, and I was asked to wait
18   outside.   He actually didn't meet me in the office, in his
19   office.   He came out and spoke to me in the hallway in the
20   airport."

21            Hold on a second.   Here it is.   I'm sorry for
22   stopping again.   "He came out and spoke to me in the hallway
23   in the airport."   That's line 8.

24            Question in line 9.   "In the hallway or in his
25   larger --   in this larger of the two rooms you're talking

1   about?"  And Mr. Young says, "No, in the hallway of the
2   airport."
3          "Question:  So you came into the larger room from
4   the hallway, right?
5          "Answer:  I knocked.  I knocked on the door from
6   the hallway of the airport of the larger office, yes.
7          "Did you ever go into that larger office?
8          "I stepped in a couple of feet.  I was asked to
9   wait outside.
10         "Question:  By who?
11         "I'm pretty sure it was Fil Carvalho."
12         Do you remember now that day --  you can stop
13   reading for a moment.  Do you remember that day now? Is it
14   coming back to you?
15     A.   No, sir.
16     Q.   Let's see if I can help you remember some more.
17         "Question:  And is this the occasion when you
18   claim to have heard somebody say something about your race?
19   And he says, "I don't claim to.  I heard it."
20         "Well, okay.  Tell me what happened."
21         He says, "I was asked to stand outside, and they
22   were going to get Mr. Leong to meet with me, and I actually,
23   during that particular incident, I heard two things:  I
24   heard a woman's voice -- basic, yeah, it was a woman's voice
25   almost immediately as I stepped back out, I heard a woman's

44

1    voice say, 'What the fucking?  He's a fucking haole.'"

2         He says, "I was a little bit shocked and within a

3    few moments of that I heard a man's voice say, 'I thought he

4    was a local guy.' And, honestly, I didn't know what to think

5    he says at that particular moment."

6         I'm on page 31, line 12.  "Now when you looked

7    into this, this larger of the two rooms you said, there were

8    four people in there, approximately four?"

9         He says, "Filbert Carvalho was in there, Patty --

10    I don't remember how to pronounce her last name, but she's

11    also a screening manager who was in there.  There was a

12    secretary who from a temporary service that was the

13    secretary for that office, there was probably, in Leong's

14    little office, there was probably five or six people.  I

15    believe they were probably from the roll-out team that was

16    there getting everything ready to go from the Wackenhut

17    security to the new TSA screeners."

18         Then if you go and turn to page 32, if you want to

19    turn the page, or you have the condensed copy.

20         The question in line 20, he says, "I'm very much

21    sure it was Patty.

22         "How about the male voice saying, 'I thought he

23    was local' or 'I thought he was from here'?

24         "I'm very sure it was Filbert Carvalho."

25         Did I read that correctly?

1    A.    Yes, sir.

2    Q.    Were you expecting someone named Tom Young -- you

3    shouldn't read anymore.  Were you expecting someone named

4    Tom Young to report to work?

5    A.    No.

6    Q.    Never knew there was a guy named Tom Young coming?

7    A.    No.

8    Q.    Had you spoken to him on the telephone?

9    A.    No.

10    Q.    At any time?

11    A.    No.

12    Q.    As a local person, I mean that by someone who grew

13    up here, when you hear names, last names, family names,

14    sometimes can you, in your own mind, kind of figure out what

15    the ethnicity is?

16    A.    Not anymore, sir.

17    Q.    Let's talk about before Tom got fired.  You can

18    probably identify Japanese names, right?

19    A.    Not really, sir.  Not anymore.  I know you know

20    what I mean.  Not anymore.  You can't tag someone's surname

21    to even their ethnicity nowadays.

22    Q.    Have you ever heard -- when you see the name

23    Young, have you known it to be sometimes a Chinese name?

24    A.    Yes, sir.

25    Q.    So now when we talk about the statement, "He's a

1  fucking haole," that he attributes to Patty Igarashi, do you
2  remember that day now?

3      A.   As far as her saying it?

4      Q.   Oh, absolutely, as far as her saying it.

5      A.   No, I don't remember it.  No.

6      Q.   And, of course, I guess that's something you would
7  remember if you heard it, right?

8      A.   Oh, yes, sir.

9      Q.   What Mr. Young is swearing to in his deposition I
10 guess is very similar or the same to what other white men
11 have accused this woman of doing to them, yes?

12     A.   Yes.

13     Q.   Now, did you -- when did you first become aware
14 that Mr. Young was fired -- terminated?

15     A.   I was told to do a write-up of some of the things
16 that he did.  The day that I walked in on October 31st I
17 believe was the day he was AWOL for duty.  I was told to do
18 a time line of some of the counseling that he had had
19 previously.  As far as the date of his termination and the
20 issuance, I was not privy to or -- I was not even there
21 when they terminated him.

22     Q.   He was a mobile screening part of the MS --

23     A.   Absolutely not.

24     Q.   He was not?

25     A.   No, sir.

1    Q.   Was the mobile screening force basically all white

2    males or white individuals?

3        A.   No, sir.

4        Q.   I want you to take a look at what I'll mark as

5    Plaintiff's Exhibit 1 for identification, October 17, 2002.

6    Let's do that first.

7            (Deposition Exhibit 1 was marked for identification.)

8            What was the ethnic makeup of the MSF, if you can

9    recall?

10       A.   There was male, female, black and white.

11       Q.   White, are we talking about Caucasian?

12       A.   Yes, sir.

13       Q.   Male and female Caucasians?

14       A.   Yes, sir.

15       Q.   And an Afro-American?

16       A.   Several.

17       Q.   And that group of the Caucasians, would those be

18   people that, if you know, were transferred here or moved

19   here for that position?

20       A.   They were not transferred.  The mobile screening

21   force was about 20 to 25 people that traveled across the

22   nation and helped the roll-out of airports.  They were fully

23   trained screeners that were sent to the airports to keep the

24   airport in operation while we trained our workforce to come

25   in.  So they had --  I believe only two of the MSF requested

1    to drop, which means this would become their home.

2         Q.    When I asked you earlier about your report

3    writing, do you remember that?

4         A.    Yes.

5         Q.    One of the things that I asked you, and this is

6    kind of what we call a predicate, a lead-in to this other

7    questions, is that if you became aware of allegations of

8    discrimination or other misconduct, you would not

9    intentionally tell anyone not to record those things in

10   writing?

11        A.    No, sir.

12        Q.    And when I ask you those questions, it wouldn't

13   just be pertaining to Tom Young, it would be to any

14   employee; is that right?

15        A.    Yes, sir.

16        Q.    This relates to Mr. Christopher Gahr.  Do you

17   remember Mr. Gahr?

18             (Deposition Exhibit 2 was marked for identification.)

19        A.    Yes, sir.

20        Q.    How do you know him?

21        A.    He was an MSF supervisor that came here to help

22   assist with the roll-out.

23        Q.    How long did he last?

24        A.    A week or two, sir.

25        Q.    White male?

1       A.   Yes, sir.

2       Q.   This is October 17, 2002.  It says it's from you,

3   special agent/acting screening manager through Howard

4   Tagamori to Lowery Leong.  Do you remember this?

5       A.   Yes, sir.

6       Q.   Regarding MSF supervisor, Christopher Gahr.   When

7   you just look at this for a moment, it says on the second

8   page at the bottom that this statement was prepared by you

9   on October 17, '02.  Do you see that?

10      A.   Yes, sir.

11      Q.   Was this something that when you look at this, the

12  date that it was prepared, did you have some bullet points

13  that you refreshed your memory from an earlier report, or

14  was this report prepared in its entirety on this date? Do

15  you understand the question?

16      A.   Yes, sir.

17      Q.   Do you know whether you had some notes or some

18  bullet points and then later on, some other day, sat down

19  and prepared this report?

20      A.   Yes, sir.

21      Q.   What happened?

22      A.   Probably out of the manager's log, bullet points,

23  or some notes.

24      Q.   Where would the manager's log be?

25      A.   At the checkpoint.

1    Q.    And so what would be the circumstances that you
2  would have gathered this information to make this report?

3    A.    I believe it was a complaint about -- there was a
4  complaint about him opening up the checkpoint, and then
5  there was a run-in that I had with him when I asked him,
6  through the FSD, asked him to relieve a --

7    Q.    What does that mean, FSD?

8    A.    Federal Security Director Lowery Leong.  When the
9  FSD walked by, he saw a screener with her hand bandaged, and
10 she was basically patting down and hand-wanding people.  And
11 because of limited use of her hand and no dexterity, no
12 feeling, and the public -- we didn't want the public to
13 think that they are being patted down by somebody who was
14 injured that couldn't feel them --

15    Q.    You really lost me with that.  You did not want
16 the public --

17    A.    If you were going through the airport, sir, and I
18 alarmed, and I had this big bandage on the hand, and you
19 knew I couldn't feel anything, and for security reasons, she
20 had no dexterity in her hands --

21    Q.    You know, I heard everything you said, because I
22 know you are speaking English, but I didn't understand any
23 of it.  Is there some regulation about that, about having
24 dexterity in both hands?

25    A.    You have to be able to pat down and feel an item

1    that --

2        Q.    The question I asked is, whether there's some

3    regulation about having dexterity in both hands?

4        A.    Yes, sir, fit for duty.

5        Q.    Do you have --

6              MR. HELPER:  Hang on a second.  Let him answer the

7    question.

8              THE WITNESS:  Fit for duty.

9        Q.    (By Mr. Green)  Is there somebody with one arm out

10   there?

11       A.    No, sir.

12       Q.    You got an employee that is missing an arm from

13   the elbow down, don't you?

14       A.    On Maui?

15       Q.    Yeah, on Maui.  You don't know anything about that

16   guy?

17       A.    No.

18       Q.    The guy has been written up in magazines.  You

19   don't know anything about him, right?

20       A.    No, sir.

21       Q.    Just talking about this splint, wasn't there an

22   offer that the person would remove the splint when the

23   person was approached?  Do you remember that, the offer to

24   take off the splint?

25       A.    I think the thing with that was her finger was

```
 1  dislocated, and she didn't have a doctor's letter stating
 2  that she could work without it was the problem.
 3        Q.   Did she say she was willing to work without it?
 4        A.   I don't recall.
 5        Q.   No one ever asked her?
 6        A.   No.
 7        Q.   Well, no one was picking on Gahr, were they?
 8        A.   No.
 9        Q.   Let's see what you wrote.  "At approximately 1900
10  hours on October 17, 2002, I was approached by TSA Screener
11  Harlan Russell.  He wanted to talk to me about my briefing
12  and how I handled issues regarding discriminatory remarks
13  and management issues."
14        A.   Yes, sir.
15        Q.   Does that refresh your memory about what
16  Mr. Russell wanted to talk to you about regarding
17  discriminatory remarks?
18        A.   Yes, sir.
19        Q.   What did he want to talk about?
20        A.   There was a group of people that was bothered by
21  Ms. Igarashi's phrase of "my people."
22        Q.   Whoa, whoa, let's go slow.  Listen, I know you are
23  a bright guy and I want to make sure what you say you need
24  to say and I understand it.
25             There were a group of people that were bothered by
```

1  Ms. Igarashi's comments about "my people."  Let's start with

2  who were the group of people?  Do you need -- you're reading

3  this.  Do you need to read this to refresh your memory about

4  the group of people?

5       A.   Yes, sir.

6       Q.   There's nothing in here about any group of people,

7       A.   There was no names.  There was another write-up

8  that mentions -- this guy is the supervisor, Rusty Harlan,

9  he came to me and said there was some scuttlebutt from

10 different screeners that were bothered by Patty's demeanor

11 and her referring to "my people."

12      Q.   Now, the group of people that -- this was Rusty,

13 right?

14      A.   Yes.

15      Q.   Rusty is -- what's his ethnicity, if you know?

16      A.   New Yorker.  I don't know his ethnicity.  He's a

17 white male from New York.

18      Q.   How long had he been out there as of October 17,

19 2002?

20      A.   He was on the first roll-out, so he came to the

21 airport day one.

22      Q.   So he is talking about a group of -- were you

23 able to distinguish or discern from him who comprised that

24 group that were a little bit unhappy with Ms. Igarashi?

25      A.   No.

1      Q.   Did you ask?

2      A.   I don't recall, sir.

3      Q.   I mean, you've been in law enforcement for 22

4  years.  I'm trying to figure out if we can identify -- you

5  tried to identify who the people were that were unhappy

6  about this woman?

7      A.   I can remember two.

8      Q.   What do you know about them?

9      A.   The Reinharts (phonetic).  They were a married

10  couple.

11      Q.   They are from the mainland, are they?

12      A.   Yes, sir.

13      Q.   Caucasians?

14      A.   Yes, sir.

15      Q.   Married?

16      A.   Yes, sir.

17      Q.   What was their job description?

18      A.   They were screeners.  One was a lead screener, the

19  other one a regular screener.

20      Q.   The group means how many, if you know?

21      A.   I'm not sure.  It was brought to me by Rusty, he's

22  a retired law enforcement officer, and just said that there

23  was some scuttlebutt that some people didn't appreciate the

24  way Patty had spoken with them.  Without getting into

25  finding out who they were or names or anything, I just

1  figured we'd come out and say, "There is no black, green,
2  red, white, there's no "my people," there's no Wackenhut.
3  We're all TSA."

4      Q.    You see, one of the things that I'm curious about,
5  if you can help me and then we'll take a break in a minute,
6  this is going to go longer than I thought it would, you see
7  when you are assigned out there to do what you do and you
8  have information about potential racial discrimination,
9  don't you report it to someone?

10     A.    At that point, it was not racial.  It was a
11 comment made of her people, meaning, contract security
12 screeners that were going to come to work once they got
13 trained.

14     Q.    When you say that -- I mean, we have people that
15 are disturbed, and you did nothing to find out if it was
16 racially intended, did you? Nothing, right?

17     A.    We did not feel--

18     Q.    Forget the "we" --

19     A.    The whole chain of command including myself --

20     Q.    I don't want to talk about "we."  Let's talk about
21 Rusty coming to you, and he wants to talk to you about how
22 you handled issues regarding discriminatory remarks and
23 management issues.  Do you see that?

24     A.    Yes.

25     Q.    You wrote the word "discriminatory remarks,"

56

```
 1   right?

 2       A.   Yes.

 3       Q.   I want to know what you did, if anything, to

 4   investigate this further?

 5       A.   I held a briefing.  Everybody was okay with me

 6   talking to Patty.

 7       Q.   Go slow. You held a briefing when?

 8       A.   Immediately.

 9       Q.   Immediately after talking with --

10       A.   Right after that shift.

11       Q.   Where was the meeting?

12       A.   Right after that shift, right next to the

13   checkpoint like we always had it.

14       Q.   Were these people working at the time you had the

15   meeting?

16       A.   No, it was after the entire shift.

17       Q.   Who was present at the meeting?

18       A.   All the screeners.

19       Q.   Was Patty there?

20       A.   Yes.

21       Q.   What was discussed?

22       A.   Basically that there is no "my people," there's no

23   Wackenhut, there's no nothing.  We're a team, we're rolling

24   out the airport.  It's us.

25       Q.   Was this discussion before or after the deposition
```

1   you took where Patty was talking about fucking haoles?

2           MR. HELPER:   Objection, assumes facts not in

3   evidence.

4       Q.   (By Mr. Green)   Excuse me, you have testified that

5   you were deposed on other cases, yes?

6       A.   Way after this, sir.   This was October.   This was

7   during roll-out.

8       Q.   The fucking haole with Patty came after this?

9       A.   Yes, sir.

10      Q.   What was the discrimination that, at least you

11  learned, Rusty believed was going on?

12      A.   They felt that Patty was siding more for the

13  incumbent screeners stating that they can screen more

14  people.   We push approximately 260 to 280 people per hour

15  through lane.   Patty was constantly on the newer employees,

16  white, black, purple, or whatever, that they were not

17  screening fast enough.

18      Q.   Go slow.   I don't know anybody who is purple, but

19  Patty was on the Caucasian employees from the mainland that

20  came here.   That's what she was doing, right?

21      A.   She was on anybody.

22      Q.   I don't care about anybody.   This complaint was a

23  group of white people from the mainland.   Those are the

24  people she was on, right?

25      A.   I don't see the word "white people" in here,

1  but...

2      Q.    But you know the discriminatory remarks, if you

3  know, had to do with this group of people who were nonlocal

4  people, people that came here from the mainland that were

5  brought in, and they were all white or maybe there was one

6  Afro-American, right?

7      A.    There were local screeners, too.

8      Q.    The one she was making discriminatory remarks

9  about them?

10     A.    Discriminatory, meaning, that they felt that a

11  whole working class, the incumbents that were coming in,

12  could screen better than the people that we had.

13     Q.    The incumbents --

14     A.    That never had experience.

15     Q.    Who are the incumbents?

16     A.    Have you read any of this stuff?

17     Q.    You don't get to ask me questions.  Who were the

18  incumbents?

19     A.    Wackenhut security screeners there was a contract

20  workforce that's been doing the job for years.

21     Q.    Local people?

22     A.    Not just locals, sir.  There's Caucasians that

23  came over also.

24     Q.    We can argue about this phrase.  Did you ever

25  write a report regarding the discussions you had with Patty

59

1    and the other people about local, white, blue, purple, any

2    color you used?  Did you write a report about that meeting?

3              MR. HELPER:  Other than this?

4        Q.    (By Mr. Green)  This is no report about this

5    meeting.  Did you ever write a report about the meeting?

6        A.    The managers.  The manager should have wrote the

7    report.

8        Q.    Officer, it's a yes-or-no question.

9        A.    No.

10       Q.    Is there anything you ever wrote about that group

11   of people and what Patty was doing that Rusty felt was

12   discriminatory?  Ever write a report about that?

13             MR. HELPER:  Other than this?  You're not calling

14   this a report?

15       Q.    (By Mr. Green)  We'll get through -- there ain't a

16   thing about this documenting any discrimination.  And you'll

17   see in a moment that he specifically says not to document

18   it.  So the question is whether you ever wrote a report?

19       A.    No.

20       Q.    Okay.  Who was there that was a supervisor?

21       A.    Rusty Harlan.

22       Q.    And he's the one that came to you?

23       A.    Yes.

24       Q.    So the meeting took about how long?

25       A.    Ten, 15 minutes.

1      Q.   And I guess everybody was fine, right?  Everybody
2    was fine, right? Is that what you are saying?

3      A.   I guess, yes, sir.

4      Q.   Well, I mean, because you didn't go any further
5    with that, right?

6      A.   Nobody went back to Rusty, Rusty didn't have any
7    individuals who complained, there was no reports made by
8    Rusty that an individual felt discriminated against.

9      Q.   I'm going to take a wild guess at this, and some
10   of that group who was uncomfortable with "my people," one or
11   more were involved in a lawsuit accusing her of calling them
12   a fucking haole.  How does that sound?

13            MR. HELPER:  At the time?  Objection, vague.

14     Q.   (By Mr. Green)  After.  After this Rusty coming to
15   you, one or more of those people in the group that did not
16   like the "my people" stuff wound up suing TSA, including
17   Patty, because she called them a fucking haole, and that's
18   true; isn't it?

19     A.   I'm not sure.

20     Q.   Well, maybe, right?

21     A.   Maybe.

22     Q.   Because those are some of the names you can't
23   remember in the depositions you gave, right?

24     A.   That was just one name that I could not remember,
25   sir.

```
 1        Q.    Now, let's think about the group you spoke to.
 2   When Rusty came to you, can you think of any of those people
 3   that filed a lawsuit against TSA and others because, aside
 4   from "my people," she called them fucking haoles?  Is it
 5   coming back now?
 6        MR. HELPER:    You're talking about aside from the
 7   plaintiffs in this case?
 8        MR. GREEN:    I'm not talking about this case.
 9        MR. HELPER:    Your previous question did not --
10        Q.    (By Mr. Green)    I'm talking about October 17, 2002
11   and Rusty in the group.  Some of those people wound up suing
12   because she called them a fucking haole, right?
13        MR. HELPER:    Objection, lacks foundation.
14        Q.    (By Mr. Green)    Isn't that true?
15        A.    I'm not sure.
16        Q.    Okay.  Maybe yes, maybe no.  Let's see what else
17   you wrote.  "He felt my concerns were in good faith and he
18   was satisfied." I guess that's Rusty you are talking about?
19        A.    Yes, sir.
20        Q.    "I had asked the screeners to confide in the
21   administration and allow time for correction within the
22   management team."  What did that mean?
23        A.    That we would basically counsel Patty on her
24   management styles and some of the phrases that she used.
25        Q.    When did you do that?
```

```
 1        A.    Immediately.

 2        Q.    Where was she counseled?

 3        A.    Downstairs.

 4        Q.    By who?

 5        A.    Lowery Leong.

 6        Q.    Who else was present?

 7        A.    I believe, I'm not sure, Howard Tagamori.

 8        Q.    We're talking about October 17, 2002, right?

 9        A.    Uhm-hm.

10        Q.    She was counseled, you tell me, about the same

11  day, right?

12        A.    Yes, sir.

13        Q.    So I'm going to guess that people you said were

14  there, if I look at the records, they were working that day,

15  right?

16        A.    Yes, sir.

17        Q.    And tell me what was said in the counseling?

18              MR. HELPER:   Objection, lacks foundation.

19              MR. GREEN:   What's the foundation?   He said there

20  was counseling.

21              MR. HELPER:   You have not established that he was

22  there.

23              MR. GREEN:   He said he was there.   You missed it.

24              MR. HELPER:   No, he didn't.

25        Q.    (By Mr. Green)   Did you say you were there or not?
```

63

1      A.   No, sir.

2      Q.   You didn't say you were there for the counseling?

3      A.   No.

4      Q.   So how do you know she was counseled?

5      A.   She was pulled in the office with Howard and

6  Lowery Leong.

7      Q.   How do you know that she was counseled?

8      A.   Because Lowery told me that the shit ends now, and

9  I'm going to talk to her about it.

10     Q.   Tell me what he told you.  What shit ends now?

11     A.   Just the reference to "my people," Wackenhut, and

12  she was counseled not to -- basically to stop saying it.

13     Q.   Stop being a racist basically, right?

14          MR. HELPER:  Objection, misstates the witness's

15  testimony.

16     Q.   (By Mr. Green)  Was that the inference that you

17  got "the shit stops now" --

18     A.   No, sir.

19     Q.   -- that she was being counseled for --

20     A.   It was not racial, sir.

21     Q.   Well, I'm only going by what your supervisor said,

22  discriminatory remarks.

23     A.   Nothing to do with race, sir.

24     Q.   You want to say that the discriminatory remarks --

25  listen, you can say it all you want. I don't care. You want

1  to say that discriminatory remarks has nothing to do with
2  racial?  Is that what you want to say?

3      A.    The way that it was brought to me as
4  discriminating that she was saying that the workforce we had
5  was nowhere compared to the workforce we had several days
6  before.

7      Q.    I think I'm working on the word "my people" as
8  being the discriminatory remark.  And that's what you
9  considered to be a discriminatory remark, right?

10     A.    Yes, sir.

11     Q.    So Leong says, "The shit stops now," and whatever
12 he said to her he said to her, right?

13     A.    Yes, sir.

14     Q.    Did any of the group that you counseled ever say,
15 At or around October 17th, she called me a fucking haole?

16     A.    No, sir.

17     Q.    That they heard her calling other white people
18 fucking haoles?

19     A.    No, sir.

20     Q.    So if she did call people fucking haoles, it must
21 have been after she was counseled, right?

22           MR. HELPER:  Objection, calls for speculation.

23     Q.    (By Mr. Green)  Right?

24     A.    Nobody ever came to me and said, "Patty called me
25 a fucking haole."

1    Q.   Well, let's see what else you wrote.  "I had also

2  asked for time and understanding as I would address these

3  issues and felt documentation was not warranted."  Why was

4  that?

5    A.   Basically because nobody came up and said, "The

6  reason that we feel discriminated against is because Patty

7  said this." It was just that they said that she was riding

8  us saying, "Wait until my people come back.  They can screen

9  better than you guys, they're better than you guys, they've

10 been doing it longer than you guys."

11   Q.   Mr. Carvalho, you're a better man than that. And

12 I'm going to ask you again, and if you want to take your

13 time, you got Harlan Russell, who is a supervisor, who is

14 talking about how you handled issues regarding

15 discriminatory remarks and management issues, and you decide

16 not to document what he said to you or the meaning, right?

17       MR. HELPER:  Objection, misstates the witness's

18 testimony and it's also argumentative, that better man than

19 that statement.

20   Q.   (By Mr. Green)  That was a compliment.  You decide

21 not to write down anything about what your conversation was

22 with Patty in that group, right?  That's your decision,

23 wasn't it?

24   A.   Yes, sir.

25   Q.   After this briefing, Christopher Gahr solicited

*IWADO COURT REPORTERS, INC.*
(808) 244-9300

1   the screeners on the evening shift to document these actions
2   and give them to him. Now, what did that mean? What was he
3   asking them to document?

4           The record should show that he is reading the
5   report.

6       A.    On our choice for us to handle certain issues
7   internally. He felt that a lot of the issues should have
8   been, I guess, escalated or --

9       Q.    He believes that the issue should have been
10  documented, right? That's what it says. He wanted --

11      A.    It's not just the issue of discrimination. There
12  was a lot of other things.

13      Q.    When you say "just," that just includes
14  discrimination to me, but it says that he went on to tell
15  the screeners on the evening shift to document these actions
16  and give them to him. He went on to tell the screeners that
17  he was keeping it for his files, in case he needed them
18  later. These actions bothered Harlan, Russell as he felt it
19  was an act of disloyalty with regard to my earlier briefing.

20          Tell me about that, what you know about that, what
21  Harlan, Russell told you about he thought it was an act of
22  disloyalty by Mr. Gahr.

23      A.    Our supervisors felt like they could handle things
24  in-house. Certain things needed to be corrected instead of
25  going outside, I guess, and he felt that they could handle

1  it without -- Chris Gahr was an MSF supervisor.  He came in,
2  these guys had already been on the ground for a while, they
3  had rapport with each other, Chris comes in with a black
4  book wanting to document stuff.

5      Q.   What it sounds like to me, and just correct me,
6  you know, you guys want to keep this in-house so there's no
7  reports in anyone's files. That's what that means, right?

8      A.   Keep what in-house?

9      Q.   You said you wanted to keep it in-house.

10     A.   We want to solve the problem.  No sense in airing
11 out laundry if we can clean it.

12     Q.   What does that mean "airing out laundry"?  Like,
13 putting it in writing?

14     A.   If we can correct something locally, something
15 that a supervisor can handle through counseling, that's what
16 we meant.  If it's something we can cure here without going
17 escalating to --

18     Q.   To what?

19     A.   To Washington or to whoever.

20     Q.   If someone feels that they were racially
21 discriminated against, do they have the right to have
22 someone put it in writing and have somebody take a look at
23 it outside the house?

24     A.   Yes.

25     Q.   You guys wanted to keep it in-house, right?

1          MR. HELPER:  Objection to the word "it" as vague.

2      Q.   (By Mr. Green)  I'm talking about any

3   discriminatory remark and anything Gahr wanted in writing,

4   you guys didn't want anything in writing.  And as you said,

5   you wanted to keep it in-house, that's true; isn't it?

6      A.   A lot of these things don't refer to racial.

7   Discriminatory, meaning, via the workforce.  You can go and

8   look at my workforce right now or Lowery's workforce --

9      Q.   When you say a lot of the things don't refer to

10  racial, if one percent does, you want to keep that in-house,

11  at least you did on October 17, 2002, right?  You're looking

12  at page 2, I'm not even close to page 2 yet.  You wanted to

13  keep it in-house, right?  That's what you said.

14         MR. HELPER:  Objection, misstates the evidence

15  about racial.

16     Q.   (By Mr. Green)  You wanted to keep the whole thing

17  in-house, right?  Please answer the question.

18     A.   We wanted to keep what the supervisors could

19  handle -- the good supervisors could handle.

20     Q.   And not put it in writing and maybe send it to

21  Washington, right?

22     A.   If we can handle it locally, yes.

23     Q.   Good.  Okay.  So apparently Harlan, Russell

24  confirmed that Chris Gahr had solicited statements from a

25  group of screeners; that's what he told you, right?

1      A.    Yes.

2      Q.    And he wants something in writing, Chris Gahr,

3  doesn't he?

4            MR. HELPER:  Objection, calls for speculation.

5      Q.    (By Mr. Green)  That's what it says, he solicited

6  statements.  He wanted something in writing, right?

7            MR. HELPER:  Calls for speculation.

8      Q.    (By Mr. Green)  Do you know one way or the other?

9  You keep reading; that's why we're not getting anywhere.  Do

10 you remember that's what Chris wanted something in writing?

11     A.    I'm reading what you are reading.

12     Q.    Fair enough.  Did he want something in writing, is

13 that your memory, when you made this report?

14     A.    Yeah, he wanted --

15           MR. HELPER:  Objection, calls for speculation.

16     Q.    (By Mr. Green)  Just answer the question.

17     A.    He was black booking everything, sir.  Yes, he

18 wanted something in writing.

19     Q.    What does that mean?

20     A.    He wrote down everything.  Everything we did.

21     Q.    That was not the local way, was it right?

22     A.    As far as?

23     Q.    You got a bunch of guys out here, men and women

24 that either grew up here or working here, no sense making

25 waves, we can handle this thing amongst each other, no sense

1  getting people in trouble.  That's really what it's about,
2  right?  Right?

3      A.    No.   Like I said, if we could handle it at a local
4  level, that's what we wanted to do.  Our supervisors handled
5  it.

6      Q.    That appears not to have been Mr. Gahr's style.
7  This guy is writing down everything, and it looks like he is
8  going to go out of state to Washington to report all kinds
9  of people.  At least that's the sense of this black book,
10  right?

11      A.    Yes.

12      Q.    "At 1935 hours after interviewing Harlan, Russell,
13  I went to the checkpoint.  I observed Greenisen, Theresa
14  performing her duties with a bandaged left hand.  I relieved
15  her of her post as I found that she had two dislocated
16  fingers.  The bandage and splints along with medical tape on
17  the left ring and middle finger did not allow for movement
18  or dexterity.  I brought this to the attention of Gahr,
19  Christopher, MSF/SPV, who then became very challenging and
20  insubordinate."

21          What was the challenging and insubordination?
22      A.    He refused to replace her.  He says, I'll take the
23  bandage off of her hand, dah, dah, dah, she can stay here.
24      Q.    I got no idea what the "dah, dah, dah" means.
25      A.    He said, "Just leave her in place.  It's okay."

71

1   We wanted a doctor's letter.  Why was her hand dislocated?
2   Did she do it at work?  Was it off site? What happened --
3        Q.   He says --
4             MR. HELPER:  Let him finish.
5        Q.   (By Mr. Green)  I'm sorry, go ahead. Are you done
6   with the answer?
7        A.   I guess so.
8        Q.   He wants to take off the bandage --
9             MR. HELPER:  Hang on.  Don't let him cut you off.
10  If you have more to say, finish it.  If he cuts your off,
11  raise your hand.
12       Q.   (By Mr. Green) So if he says she's willing to take
13  off the bandage and she can work, you said, no, let's remove
14  her, and we've got to get a doctor's note or something like
15  that, right?
16       A.   There was a statement called "fitness for duty"
17  when you came in to work.  If you had any injury that
18  hampered you from --  we need to know when it was done.  Was
19  it done when you were working?  Was it done outside and you
20  weren't able to perform your duties?  We had nothing on her.
21       Q.   I got you.
22       A.   So I wanted her off the site.  I wanted to know
23  why, and he wouldn't hear of it.  I said, "Listen, she needs
24  a doctor's note to return to work.  She can't just take it
25  off, now that we know the injury was there.

1       Q.   Did you report this in a writing that went into
2   Mr. Gahr's file, the fact that he had somebody there with a
3   bandaged left hand and dislocated fingers?

4       A.   And that he refused to remove her?  I believe so,
5   yes, sir.

6       Q.   And I want to know, did you put anything in
7   Patty's files regarding discriminatory remarks ever?

8       A.   I'm not sure if any of the other managers did, but
9   I believe she does have something in --

10      Q.   You just lost me.  You're too good of an officer.
11  Didn't you understand the question?

12      A.   I didn't --

13      Q.   Read it back, please.

14      A.   I didn't, no.

15      Q.   Let's take a break.

16           (A recess was taken.)

17      Q.   (By Mr. Green)  Let's go back to Exhibit 1 and I
18  just want to go down to the last paragraph on page 1 of your
19  report.  "Christopher Gahr asked to speak with me at 2115
20  hours regarding security issues."  Did that happen?

21      A.   Yes, sir.

22      Q.   "I had him relieved by another MSF supervisor and
23  asked him to meet me in the TSA office."  Did that happen?

24      A.   Yes, sir.

25      Q.   Who was present besides you and Gahr?

1      A.    I believe just him and I, sir.

2      Q.    If I'm correct, we went over -- Mr. Gahr, his

3    position at TSA was a screener?

4      A.    Screening --  he was a mobile security team

5    supervisor.

6      Q.    And he apparently had been trained in screening?

7      A.    Yes, sir.

8      Q.    And what was your training in screening?

9      A.    None.

10      Q.    And you were the one that went up to this person

11    with the bandaged hand, and you had concerns as to whether

12    she could screen effectively?

13      A.    According to the SOP, yes, sir.

14      Q.    He thought and you thought she could not?

15      A.    Yes, sir.

16      Q.    You had no experience in screening and he did?

17      A.    Yes, sir.

18      Q.    When we look at this last paragraph, "Gahr

19    admitted to soliciting the screeners for statements and

20    began to challenge the administrations choice to handle

21    these issues internally."  Did I read that correctly?

22      A.    Yes, sir.

23      Q.    Apparently he wanted something done other than

24    simply talking to people, he wanted documented.  Do you

25    remember that?

```
 1        A.    Yes, sir.

 2        Q.    You told him that his job was to supervise the

 3   screeners and their training and let the management deal

 4   with these issues, yes?

 5        A.    Yes.

 6        Q.    And the issues that I guess you were talking

 7   about, at least part of it, was to handle things internally,

 8   yes, if you could?

 9        A.    Yes, sir.

10        Q.    Did you ever tell any screener, or anyone working

11   for TSA, if they started calling Washington or recording

12   things you would have them terminated?

13        A.    No, sir.

14        Q.    You would remember if you said that?

15        A.    Absolutely.

16        Q.    I'm going to ask that this be marked as

17   Plaintiff's Exhibit 2 for identification, which is an

18   excerpt of the sworn deposition of Charles P. Turner.  If we

19   can do this later, you can copy it.  We'll mark page 66 and

20   67.  Do you know Mr. Turner?

21        A.    Briefly, yes, sir.

22        Q.    How do you know him?

23        A.    He was also a TSA screener Kahului airport.

24        Q.    He was trained where?

25        A.    Honolulu.
```

1          Q.    What's his ethnic background?

2          A.    White male.

3          Q.    White male.  How long did he work at the airport,

4    do you know?

5          A.    I don't know.

6          Q.    Was he fired?

7          A.    I believe so, yes, sir.

8          Q.    Do you know of any reason he does not like you?

9          A.    No, sir.

10         Q.    Any reason that he would say something under oath

11   about you that would be false?  Any reason you would know of

12   that he would perjure himself just to get you?

13         A.    Other than to build himself a case, no.

14         Q.    He says, and I'll read you from page 66, line 8.

15               MR. HELPER:  Can I show it to him?

16         Q.    (By Mr. Green)  Sure.  He is being asked, "Did you

17   report this incident to anyone?

18               "Answer:  Yes.

19               "Who to?  --  Hold on a second.  Let me see if I

20   can put you in context.  Let's go to page 63 for a moment.

21   Here's what he says, starting at line 6.

22               "How many times did you observe or did you hear

23   Ms. Igarashi say fucking haoles in any context?

24               His answer is: "The problem I run into was it was

25   quite frequent as she would say it, depending on whether

1    she's giving discipline to someone or whether she's upset

2    about something.  Okay.  I heard that --  I heard it may be

3    a total of 10 times while I was there at the airport."

4           Did I read that correctly?

5    A.    Yes, sir.

6    Q.    Of course, based on information you have as of

7    today, based on complaints by others, including people in

8    this lawsuit, she apparently, Ms. Igarashi, used that term

9    "fucking haoles" a number of times, yes?

10          MR. HELPER:  Objection, assumes facts not in

11   evidence.

12   Q.    (By Mr. Green)  Yes, based on the cases you've

13   taken depositions at and this case?

14   A.    Can you reask the question?

15   Q.    Yes.  Can you read that back?

16          (The record was read.)

17          MR. HELPER:  Same objection, plus lacks

18   foundation.

19   Q.    (By Mr. Green)  You can answer the question.

20   A.    According to the defendants, yes.

21   Q.    The plaintiffs.

22   A.    Plaintiffs.

23   Q.    Yeah.  Let's go back to page 66.  This is dealing

24   with Ms. Igarashi.

25          "Did you report this incident to anyone?

1            "Answer:  Yes."

2            And these are the answers that were given by

3    Mr. Turner.

4            "Who to?

5            "Answer:  The 800 number that I had to

6    Washington."

7            Let me stop there for a moment.  If you would stop

8    reading for a moment, Mr. Carvalho.  Did there come a time

9    that you were aware that certain Caucasian employees were

10   calling the 1 800 number in Washington and reporting

11   discrimination that they were experiencing or other matters

12   to people in Washington?

13       A.   I heard.

14       Q.   Who did you hear it from?

15       A.   Lowery Leong.

16       Q.   Do you remember about when it was that you heard

17   this?

18       A.   No, sir.  It was sometime during the roll-out.

19       Q.   Where was the conversation with Mr. Leong?

20       A.   Lowery had called me and told me that some people

21   had called the ombudsman.

22       Q.   Why would he tell you that, if you know?

23       A.   Basically, there was a complaint against Patty

24   Igarashi.

25       Q.   Did he say you need to handle this stuff?

1      A.    No, just to let me know that there was something
2   going on in the workforce and that Patty's name was
3   mentioned.

4      Q.    Did he tell you Mr. Leong get those people to stop
5   calling Washington?

6      A.    No, sir.

7      Q.    The answer on page 66, line 11, "The 800 number
8   that I had to Washington.

9            "Question:  And who -- what was your understanding
10  as to what that 800 number --

11           Then he interrupts and answers:  "That was for
12  human resource issues and policy issues and that it would be
13  investigated by Washington, is what my understanding was
14  when I was talking to the people, that they would refer it
15  to someone.

16           "Question:  And did you ever -- anybody ever
17  follow up with you on that?

18           "Answer:  No, never.  Not on any of the phone calls
19  that we made to Washington.  The only follow-up that we had
20  because of our phone calls to Washington was when we were
21  all taken into the TSA office, our entire shift, we were
22  told by Patti Igarashi and the guy who was supposedly the
23  special agent in charge of the TSA working for Leong, and --
24           "Mr. Carvalho?
25           "That's him.  Okay.  Phillippe or whatever his

1   first name is, I guess.

2          We were told by them that they knew we were

3   calling Washington and we were told specifically by him that

4   if he ever caught us calling Washington, if he found who it

5   was, that he would terminate us and take care of."

6          Did I read that correctly?

7   A.    Yes, sir.

8   Q.    You have no memory of this happening?

9   A.    That's because it didn't happen, sir.

10  Q.    This is a false statement under oath, right?

11  A.    I didn't say any of this.

12  Q.    Was it ever said in front of you by anyone else?

13  A.    No, sir.

14  Q.    Never heard it?

15  A.    No.

16  Q.    Never heard Patty Igarashi, I guess, ever say

17  "fucking haole" to anybody, right?

18  A.    No, sir.

19  Q.    Give me the October 18, '02 letter, the Chris Gahr

20  letter.

21         Do you know when Chris Gahr was terminated?

22  A.    Not the exact date.

23  Q.    On October 25, '02 is the date we have, and it may

24  or may not be correct, yes?

25  A.    Yes.

1        Q.     Mark that as the next, please.

2        A.     He wasn't terminated locally by Kahului airport.

3    He went to Oakland and Oakland airport issued his

4    termination.

5               (Deposition Exhibit 3 was marked for identification.)

6        Q.     Do you remember getting a copy of this?

7        A.     Yes, sir.

8        Q.     Handwritten to -- dated October 18, 2002 to you

9    from Ms. Igarashi regarding MSF - Chris Gahr.   Did you

10   receive it on or about October 18, 2002, if you know?

11       A.     I'm not sure.

12       Q.     Was this maintained in the files of TSA, if you

13   know? What I mean is, you don't throw these things out when

14   you get them?

15       A.     No, sir.

16       Q.     You file them, don't you?

17       A.     Yes.

18       Q.     This is on the 18th, she reports, "On October

19   16th, noticed Chris going through" -- what does that say,

20   girls?

21              MS. HEVICON:   "Our in files."

22       Q.     (By Mr. Green)   "Our in files and binders. When

23   asked what he was looking for he mentioned that he was

24   familiarizing himself."

25              Did I read that correctly?

1    A.    Yes, sir.

2    Q.    "As I read through" -- what does it say?

3          MS. KAGAWA:   "Newly issued."

4    Q.    (By Mr. Green)   "SOP/SD/EA he wanted to use the

5    desk area to do some paperwork.   I took binder and excused

6    myself outside."

7          When you read that, did you believe what she was

8    talking about of wanting to use the desk to be a complaint

9    about him -- the paragraph I just read to you?

10   A.    Has there been a complaint?

11   Q.    Yeah, that he wanted to use the desk for

12   paperwork, and she just excused herself.   She walked

13   outside. Did you consider that to be a complaint she was

14   making against him about having to leave that area and go

15   outside?

16   A.    No.

17   Q.    "Upon his de-briefing of the PM shift, he spoke

18   about keeping a clean checkpoint. He did not want to see

19   drinks or water bottles all over."   What does that say under

20   what, girls?

21   A.    Cubicle.

22   Q.    "And the cubicle should be clean from items that

23   are visible from the outside."

24         Did I read that correctly?

25   A.    Yes.

1    Q.    Is there some regulation about keeping those
2  checkpoints clean and keeping drinks or water bottles out
3  from plain view?  You're still reading.

4    A.    Just open coffee cups or water bottles from the
5  employees, yes, sir, in case they spill and desanitize the
6  search tables.

7    Q.    Seems reasonable to want to keep the area clean?
8    A.    Yes.

9    Q.    And she mentions this, for some reason, in her
10 letter to you.  Incidentally, did you speak to her
11 personally after you got this letter?

12   A.    About the letter?
13   Q.    About the letter.
14   A.    I'm not sure, sir.
15   Q.    You don't remember?
16   A.    No.

17   Q.    Is there any report in your file about meeting
18 with her or speaking to her about this letter?

19   A.    No, sir.

20   Q.    "I do not make any mention at that time, I just"
21        MR. HELPER:  I felt.

22   Q.    (By Mr. Green)  I'm sorry.  Where are you reading
23 from?  "I felt it would have been inappropriate in front of
24 the screeners."

25        Do you have any idea what she's talking about?

 1      A.   No, sir, I'm trying to -- is this a report from
 2   her, or did this come out of the manager's log?

 3      Q.   It's a letter that we were given by your lawyers
 4   from --

 5      A.   Is that from the manager's log?

 6      Q.   The personnel file.

 7      A.   Oh, okay, from the personal file.

 8      Q.   It's regarding Chris Gahr.  Did you know what she
 9   meant by that?

10      A.   No, sir.

11      Q.   What would be inappropriate in front of the
12   screeners.  But keeping an area clean, you don't know what
13   she meant by that?

14      A.   No, sir.

15      Q.   Sounds like he was doing what he was supposed to
16   be doing, right, at least in this paragraph?

17      A.   No, as in not understanding why it would be
18   inappropriate.

19      Q.   Turn to page 2 of the letter, paragraph 3 starting
20   with, "Feeling uncomfortable, I cleaned up checkpoint
21   cubicle area and waited outside."

22          Do you have an understanding as to why she would
23   be uncomfortable about cleaning up the checkpoint area?

24          MR. HELPER:  I think that's taking this out of
25   context without looking at the previous paragraphs.

1    Q.    (By Mr. Green)  Well, it only refers to the
2  cleaning up the cubicle of what I read.  I'm just following
3  up on it.  "He went on to mention that" -- what does that
4  say?  "that as an assistant checkpoint manager, this is how
5  we will be working."

6          Did I read that correctly?

7    A.    Where are you at, sir?

8    Q.    Paragraph 3 on page 2, it starts with "Feeling
9  uncomfortable."

10          Did I read that correctly?

11    A.    He was not an assistant checkpoint manager.  I'm
12  just trying to see --

13    Q.    Well, a lot of stuff I read from her I can't
14  understand; but, anyway, she called him --

15    A.    Seems like that's what he quoted.  That's what I'm
16  trying to get.

17    Q.    But I read it correctly, right?

18    A.    Yes, sir.

19    Q.    The next paragraph, "I was given a day off on
20  October 17, upon my return on October 18 we discussed a few
21  concerns.  I can discuss and go back to work, however, he
22  wanted to show me that he did not go through our files and
23  showed my some water bottles which were bothering him.  He
24  felt they were safety items.  Bottles were on floor in
25  cubicle against the wall."

1          Did I read that correct?

2      A.   Yes.

3      Q.   Those bottles should not have been there, if, in

4  fact, they were?

5      A.   I don't know.

6      Q.   Well, the next paragraph, the last paragraph on

7  the page, "As I was observing the checkpoint operation, he

8  walked over and wanted to discuss that I had circumvented

9  security or breached security and I used the carded door."

10         What is a carded door?

11     A.   There's a door on the side of the checkpoint, it's

12 behind the checkpoint, that is given to employees who have

13 undergone a 10-year background check.  You can swipe it

14 through and enter the airport facility.

15     Q.   Should she have used the carded door?

16     A.   Yes.

17     Q.   Was it okay for him to do that?

18     A.   No, he was not issued an AOA badge.

19     Q.   "He said that I should be walking through the" --

20 what does that say?

21     A.   WTMD.

22     Q.   What is that?

23     A.   Walk-through metal detector.

24     Q.   -- "WTMD each time I entered the checkpoint. He

25 stated that it was in the SOP.  Informed Fil was in

1    checkpoint and we could discuss with him.  We went over to

2    the TSA office and cleared up by your conversation."

3              Did I read that correctly?

4        A.   Yes, sir.

5        Q.   Do you have some understanding why she is writing

6    you this letter?  Why she did it?

7        A.   It seems just like things that she had run-ins

8    with Chris Gahr on him challenging her about keeping the

9    area clean, him challenging her about using her AOA badge to

10   enter the facilities.

11       Q.   This is something that is documented, right?  It's

12   something in writing, a complaint basically, and documenting

13   things, right?

14       A.   Yes, sir.

15       Q.   Something that obviously went into Chris Gahr's

16   file, right?

17              MR. HELPER:  Objection, calls for speculation.

18       Q.   (By Mr. Green) What did you do when you got this?

19       A.   I probably handed it to Mr. Leong.

20       Q.   That's the last you saw of it until probably

21   today?

22       A.   Yes.  I think this was actually wrote in a log

23   book, as like they do in the manager's minutes, what happens

24   during each shift.  And this is probably something given to

25   me to let me know this is what happened in my last couple of

1  shifts.

2      Q.    The manager's log book, have you ever seen

3  anything to you, Fil Carvalho, that's logged into that book?

4      A.    During the roll-out, sometimes, yes.  They flag it

5  to me, the next guy coming in.  Like, if I was the next guy

6  coming in, it would be to me.  So I would pick it up and see

7  where they left off, if there was anything.

8      Q.    Why would you get a letter like this?

9      A.    I don't recall getting this letter, sir.  I'm

10  sorry, I don't.

11     Q.    Do you remember getting anything else like this

12  from the same woman about any other employees?

13     A.    Yes.

14     Q.    What other employees?

15     A.    The Reinharts.

16     Q.    The Caucasian couple we talked about?

17     A.    Yes, sir.  I'm not sure if it's the male or the

18  female, but one time she had handwritten some documentation

19  on some issues that she had with one of the screeners.

20     Q.    You are talking about "she," you are talking about

21  Patty Igarashi?

22     A.    Yes, sir.

23     Q.    Do you remember, if you can summarize, the issues

24  she had with one or more of the Reinharts?

25     A.    Just challenging authority, asking them to be

1  assigned in a certain area and having to explain herself. I

2  don't know exactly.

3       Q.   Did you ever hear any conversation in front of

4  you, whether you were a part of it or not, that "no fucking

5  white guys are going to take our jobs at the airport"?

6       A.   No, sir.

7       Q.   Never heard anything like that?

8       A.   No, sir.

9       Q.   You would remember if you heard something like

10  that?

11      A.   Yes, sir.

12      Q.   You would be offended by that, would you?

13      A.   Yes, sir.

14      Q.   TSA counseling record October 19th.

15      A.   Were you done with this one?

16      Q.   Pat Collins, he's a white male, is he not?

17      A.   Yes, sir.

18      Q.   Tell me the chain of command that was out there.

19  In other words, going from Tagamori or Leong?

20      A.   During the roll-out, we initially started out with

21  three people:  myself, Bill Pursley, who was the

22  stakeholder, and Lowery Leong.

23      Q.   When did that roll-out start?

24      A.   October 6th.

25      Q.   Two thousand and what?

1          A.    Two.

2          Q.    Tell me about that.

3          A.    We rolled out that night, chain of command.

4    Basically, we brought over Pat that night, the night we

5    rolled out, and he was from Wackenhut.  He was the manager.

6    Patty Igarashi was the other manager who came over from

7    Wackenhut.  Howard Tagamori started the day of the roll-out,

8    but I stood in the back with Lowery observing the operation.

9    The first day of work we were rolling out and screening.

10   Basically, the chain of command went through --  I was

11   online with the managers.  I was actually assisting the

12   managers and the MSF coordination logistics with the

13   roll-out teams, and then up the line to Howard then to

14   Lowery Leong.

15         Q.    And the chain of command is who?

16         A.    It would be the managers.  At that time it would

17   have been Howard Tagamori then Lowery Leong.

18         Q.    When was the first time you were aware that there

19   was a civil rights complaint that was filed in this case by

20   Thomas Young?

21         A.    I believe January or February of '03.

22         Q.    Mark this as the next, please.

23               (Deposition Exhibit 4 was marked for identification.) 4?

24               Do you see a copy of this before today?

25         A.    No, sir.

1    Q.    This is a copy of Mr. Young's civil rights

2 complaint with attachments.   Number 7 is the date on which

3 most recent alleged discrimination occurred, and he has

4 written in handwritten words the 13th of November 2002.   Do

5 you see that?

6    A.    Yes, sir.

7    Q.    And then if you turn the page, he talks about an

8 attached letter, and the attached letter signed by

9 Mr. Young, at least purportedly, is dated March 15, 2003.

10 This is the officer civil rights to Ms. Wilson thanking her

11 for her letter dated February 25, '03 responding to my

12 letter of complaint.

13           He goes through some of the complaints or

14 allegations, and he is responding to specific complaints

15 that were apparently made against him by perhaps you and

16 others.

17           Number 1, "The FSD, DFSD, and a Screening Manager

18 harassed me because I am not a 'local' person."

19           What is the FSD and DFSD?

20    A.    FSD is Federal Security Director and DFSD is

21 Deputy Federal Security Director.   But that's wrong.   It

22 would have been the AFSD, the assistant.

23    Q.    Who would those people be?

24    A.    Howard Tagamori and Lowery Leong.

25    Q.    Who was who?

1        A.     The FSD would be Lowery Leong, and the AFSD, at

2    that time, was Howard Tagamori.

3        Q.     He says I'm not a local person.  "Local meaning of

4    Islander, Asian, or mixed Island/Asian/White heritage.  The

5    nature of the harassment was verbal and constituted vulgar

6    and demeaning language.  The Screening Manager called me a

7    'haouli' (a derogatory term for Caucasians) on numerous

8    occasions."

9        A.     That's wrong.

10       Q.     What's wrong?

11       A.     The definition for haole.

12       Q.     Excuse me, how do you know that?

13       A.     Because haole means white without breath, which

14   was the original meaning for haole.

15       Q.     It depends on how it's used, doesn't it?

16       A.     Okay.

17       Q.     Right? Is that right?

18       A.     There is no definition in any dictionary that says

19   it's derogatory.

20       Q.     Certain people, depending on how the word is

21   used --

22       A.     Interpretation, sir.

23              MR. HELPER:  Let him ask the question.

24       Q.     (By Mr. Green)  We can't talk over each other.

25   You can sit there all day and tell me what it says in the

1   dictionary about haole, but people can use the word "haole"

2   in a derogatory way, can they not?

3       A.   No, sir.

4       Q.   As far as you are concerned --

5       A.   My concern --

6       Q.   -- you want to say, under no circumstances can the

7   word "haole" be used in a derogatory way?

8       A.   As far as I was taught, my local upbringing, and

9   me being Hawaiian, yes, sir.  The word "haole" was taken out

10  of context by white people.

11      Q.   Let me ask you, all white people?

12      A.   Not all white people.

13      Q.   You just said "white people."  Which white

14  people --

15      A.   If doesn't need to be all.

16      Q.   Which white people take it out of context and

17  which ones don't, according to you?

18      A.   When they feel like they are different.  It's

19  haole -- we can go at this all day long.  There's groups

20  and factions of Hawaiians that fight with this, it's spelled

21  wrong.

22      Q.   In other words, if you are working down at TSA and

23  you hear Igarashi or any other nonwhite person say, "Hey,

24  haole, do this or do that," as far as you are concerned,

25  that's not derogatory?

1        A.    No, sir, that's not what I said.

2        Q.    I'm asking the question.

3        A.    Here, in reference to this document, it shows a

4    definition stating that haole, misspelled haole, a

5    derogatory term for Caucasians.  He misrepresented what the

6    word means. Nothing of what I said or hear at work or

7    otherwise in this document is misrepresented.

8        Q.    You can say that, but you see this is what

9    Mr. Young is saying about the nature of the harassment was

10   verbal and constituted vulgar and demeaning language.  She

11   would call me "haouli."  Do you see that?

12       A.    Yes, sir.

13       Q.    Were you there when she said it to him?

14       A.    No.

15       Q.    Do you know the context in which she said it?

16       A.    No, sir.

17       Q.    Do you know the tone of voice she used when she

18   said it?

19       A.    That's not what I'm debating.

20       Q.    No, there is no debate.  You don't know the tone

21   that she used it, do you, right?

22            MR. HELPER:  Just answer the question.

23            THE WITNESS:  No, I don't.

24       Q.    (By Mr. Green)  In fact, the way she did it may

25   well have been demeaning and vulgar, right?

94

```
 1        A.    I have no idea.  I wasn't there, sir.
 2        Q.    When you say just somebody calling someone a haole
 3   could never be vulgar, it could never be demeaning, you want
 4   to keep that answer, or do you want to say --
 5        A.    You're turning my words around --
 6              MR. HELPER:  Objection, the question misstates the
 7   witness's testimony.
 8        Q.    (By Mr. Green)  Do you believe the word "haole"
 9   can be used to be racially inappropriate at any time?
10        A.    No.
11        Q.    You don't believe it can be?
12        A.    The definition of the word "haole" is not as
13   stated in this document.
14        Q.    The question that I'm asking you is, do you
15   believe the word "haole" could never be used in a derogatory
16   demeaning or racial way?
17        A.    The word alone, no.
18        Q.    When you say "the word alone," you're saying
19   "haole" as the word can never be used that way?
20        A.    "Fucking haole," and depends on like you said.  I
21   am referring to just the document.
22        Q.    What document?
23        A.    The definition in the document.
24              MR. HELPER:  You've got to listen to his question.
25   He's left the document.
```

1    Q.    (By Mr. Green)   I want to know whether you believe
2    calling someone a haole, depending on how they do it and the
3    circumstances, can be demeaning and racially inappropriate?
4    Can that happen?

5        A.    Yes.

6        Q.    All right.   He says, "The nature of the harassment
7    was verbal and constituted vulgar and demeaning language.
8    The Screening Manager called me a 'haouli' (a derogatory
9    term for Caucasians) on numerous occasions.   On at least
10   four occasions, Ms. Igarashi (the Screening Manager)
11   admitted to me that she does not like "white people."

12            Did you ever hear her say that?

13       A.    No.

14       Q.    Did you ever get the impression Ms. Igarashi did
15   not like white people or some white people?

16       A.    No.

17            MR. HELPER:   Objection, compound, move to strike.

18       Q.    (By Mr. Green)   Do you understand the question?
19   Let me go at it a different way.

20            Do you believe that she did not like some white
21   people?

22       A.    I don't know who she liked or disliked.

23       Q.    Well, you worked with her.   Did you ever hear her
24   say anything that made you believe she was prejudiced
25   against some white people?

1          A.    No.

2          Q.    Never?

3          A.    No.

4          Q.    If she did call someone a "fucking haole," would

5     that be, in your mind, racially inappropriate?

6          A.    Yes, sir.

7          Q.    Would that give you a sense that she did not like

8     that person?

9          A.    Yes, sir.

10         Q.    Because they were Caucasian?

11         A.    Because she used the term "fucking haole."

12         Q.    Because they were Caucasian?

13               MR. HELPER:   Objection, calls for speculation.

14         Q.    (By Mr. Green)  I'm asking your opinion.  If in

15    fact she called someone a fucking haole, would you have the

16    opinion or impression that she did not like that person

17    because they were Caucasian?

18               MR. HELPER:   Same objection.

19         Q.    (By Mr. Green)  You can answer the question.

20         A.    Not just because they're Caucasian, sir.

21         Q.    That may be one of the reasons?

22               MR. HELPER:   Same objection.

23         Q.    (By Mr. Green)  He can answer.  He just doesn't

24    like the question.

25         A.    There can be three Caucasians and only one.  It

97

```
 1   doesn't mean you hate all three of them.

 2       Q.   I'm talking to one person and calling them a

 3   fucking haole.

 4       A.   Right.

 5       Q.   Do you believe that to be a racially insensitive

 6   remark?

 7       A.   Yes.

 8       Q.   Would that give you the impression that she did

 9   not like that --

10       A.   That particular person.

11       Q.   You can't keep talking until I finish the

12   question?

13       A.   You do it.

14       Q.   Why are we arguing?  You want to do this the right

15   way or not?  I ask the questions and you answer them.

16       A.   Yes, sir.

17       Q.   Let's not talk over each other; okay?

18       A.   Yes, sir.

19       Q.   Would you get the impression, if you heard her

20   call someone a fucking haole, that she did not like that

21   person because of the person's race being white?

22       A.   Yes.

23            MR. HELPER:  Objection, calls for speculation --

24            MR. GREEN:  Just answer the question.

25            MR. HELPER:  -- as to the state of mind.
```

1            MR. GREEN:  Answer the question.

2            MR. HELPER:  Please don't talk over my objections,

3   Counsel.

4       Q.   (By Mr. Green)  Answer the question.

5       A.   That particular person, yes, sir.

6       Q.   Okay.  "She frequently called the white screeners

7   'fucking haoulies.'"  Do you see that?

8       A.   Yes.

9       Q.   And, of course, based on your personal knowledge,

10  there had been allegations against her for saying that on

11  numerous occasions before this letter, right?

12      A.   Yes.

13           MR. HELPER:  Objection, misstates the testimony.

14      Q.   (By Mr. Green)  "'What did those fucking haoulies

15  want?'"

16           Did you ever hear her say in your presence, "What

17  do those fucking haoles want?"

18           MR. HELPER:  Objection, asked and answered about

19  five times now about "fucking haoles."

20      Q.   (By Mr. Green)  I can use "fucking haoles" a

21  million times if it's a different question.

22           Did you ever hear her say in your presence or ask

23  the question, "What do those fucking haoles want?"

24      A.   No, sir.

25      Q.   You would remember, I guess?

1      A.    Yes, sir.

2      Q.    "I was also subjected to vulgar terms and

3   demeaning comments by the FSD" -- and that was who?

4      A.    Lowery Leong.

5      Q.    -- "and DFSD," which would be Howard Tagamori,

6   right?

7      A.    Incorrect title, it's AFSD.

8      Q.    "I was told, 'shut your Goddamn mouth" by the DFSD

9   in the presence of the FSD and the FSD became upset when I

10  asked about training on the local procedures and used the

11  word 'fuck' numerous times; such as, 'just get the fuck out

12  there and learn it."

13            Did I read that correctly?

14     A.    You read it correctly, yes, sir.

15     Q.    Would that be something that, if you heard that,

16  you might write something down in a report about hearing

17  some supervisor tell an employee, "Just get the fuck out

18  there and learn it"?

19     A.    I would, yes, sir.  Is there any inference that I

20  was --

21     Q.    I just want to know if that's something you would

22  document.

23     A.    Yes.

24     Q.    That's not something you would keep in-house?

25     A.    No, sir.

1    Q.    "I knew I shouldn't have fucking picked you."

2          Did I read that correctly?

3    A.    So they're saying that --

4          MR. HELPER:  He is just asking you if --

5          THE WITNESS:  I'm just trying to gather who he is

6    saying said this. Okay.  Go ahead, sir.  Yes, that's what it

7    says.

8    Q.    (By Mr. Green)  Would that be something you would

9    document if you heard that?

10   A.    Yes.

11   Q.    You wouldn't keep that in-house?

12   A.    No.

13   Q.    Have you ever, in the time you worked at the

14   airport, ever put anything in writing that dealt with

15   someone talking about fucking haoles, racial comments about

16   haoles, or anything else?  Ever put anything in writing

17   about that?

18   A.    No, sir.

19   Q.    And you've been there how many years?

20   A.    Four years now.

21   Q.    Number 2, "The FSD, DFSD, and Screening Manager

22   conduct discriminatory hiring practices.  When I arrived for

23   the 'swearing-in,' I was asked by the Screening Manager" --

24   who would that be?

25   A.    I'm not sure who the manager was on that day.

1    Q.    What would be the choices?

2    A.    Pat Collins or Patty Igarashi.

3    Q.    "'What are your qualifications ... why do you

4    think you deserve this job,'" question mark, "'There are a

5    lot of local people out there that need this job more than

6    you.'"

7          Did I read that correctly?

8    A.    Yes, sir.

9    Q.    Have you ever heard that discussed while you

10   worked out there?

11   A.    No, sir.

12   Q.    Is that like a funny question?

13   A.    This is the first time I've even seen this

14   document.

15   Q.    You're laughing, so I wonder if I asked a funny

16   question.

17   A.    No, sir.

18   Q.    "After my encounter with the Screening Manager, I

19   was asked to wait outside the office.  While sitting there I

20   heard a voice say, 'What the hell, I thought he was a

21   local.'"

22         Did I read that correctly?

23   A.    Yes.

24   Q.    Did you say that when Tom Young reported to work?

25   A.    No, sir.

1      Q.   "I was right next to the door, there was no

2  mistake in what I heard.  The people in the office were the

3  DFSD, the FAA Special Agent" -- that would be you?

4      A.   Yes.

5      Q.  -- "and the Screening Manager, and a secretary.

6         "3.  The discriminatory hiring practices and

7  harassment combine and propagate to termination actions to

8  remove people that are not what the management desires.  The

9  falsifying of official federal counseling and termination

10  documents evidences this. Examples of this are clearly

11  identified in my complaint letter.

12         "4.  Proper counseling and administrative

13  protocols for TSA were not followed.  The only written

14  document I ever received was at my termination meeting.  I

15  was never informed that any conversation would be documented

16  as a verbal counseling session."

17         Do you see that?

18      A.   Yes.

19      Q.   Did you ever tell Tom Young that if he agreed to

20  leave town, transfer to another place --  was it Chris Gahr?

21  Strike that.

22         Did you tell Chris Gahr that if he agreed to

23  transfer to a different airport you would remove all

24  complaints from his file?

25      A.   No, sir, he actually made that request.

```
 1        Q.    Did you ever tell him you would do that?
 2        A.    No, sir.
 3        Q.    Give me the e-mails please, October 20, 4:32 p.m.
 4              (Deposition Exhibit 5 was marked for identification.)
 5              You see where it says 4:32 p.m.?  do you have the
 6   time?
 7        A.    Yes.
 8        Q.    It's from Chris Gahr sent Sunday, October 20,
 9   2002, 4:32 p.m. to you.  Do you remember getting this?
10        A.    Yes, sir.
11        Q.    Do you remember reading it?
12        A.    Yes, sir.
13        Q.    It says, "Filbert Carvalho:  The letter requesting
14   that I go back on MSF is in the next E-mail."
15              Do you know what he is referring to?
16        A.    Yes, sir.
17        Q.    What is he referring to?
18        A.    He was going to e-mail headquarters and tell them
19   that he wanted to go back on the road and not drop at Maui.
20        Q.    He wanted to leave Maui, right?
21        A.    Yes, sir.
22        Q.    Leave the airport, right?
23        A.    Yes, sir.
24        Q.    "In accordance with our agreement, I trust that
25   the statement against me will be destroyed.  Christopher
```

1   Gahr."

2          Was there an agreement?

3      A.   No, sir.

4      Q.   Tell me, when you read this, did you respond and

5   say, "What are you talking about?"?

6      A.   I immediately printed it, took it to the FSD, who

7   was present during the meeting, when he tried to get me to

8   sign something on a legal pad stating that I'd throw away

9   the documents against him.

10     Q.   I'm missing something.  Did you ever respond to

11  him and say, "What are you talking about?  We had no

12  agreement"?

13     A.   I was told not to.

14     Q.   By whom?

15     A.   Beth Anderson our legal at that time.

16     Q.   She told you not to respond to this?

17     A.   Yes, sir.

18     Q.   So it stood the way it was, "I trust that the

19  statement against me will be destroyed"?

20     A.   I was not, nor was the FSD, in the capacity to

21  destroy any of the write-ups over a deal to relocate.

22     Q.   If you don't understand the question, just tell

23  me.  I just asked you whether or not you ever responded to

24  this.

25     A.   No.  I didn't know it was a "yes" or a "no."

```
 1      Q.   Do you want her to read back the answer you gave
 2  me to the question?
 3           MR. HELPER:   There's no question.  Let's take two
 4  minutes off the record.
 5           (There was a discussion off the record.)
 6      Q.   One of the things that you told me earlier was
 7  that Chris Gahr was not terminated on Maui, right?
 8      A.   Yes, sir.
 9      Q.   He was terminated where? What are you reading?
10      A.   His receiving station in Oakland.
11      Q.   Did you attempt to have him terminated in Oakland?
12      A.   No, sir, the way it worked was --
13      Q.   Listen to the question.  The question was whether
14  you attempted to have him terminated in Oakland?
15      A.   No.
16      Q.   Did you take any steps to get him terminated in
17  Oakland?
18      A.   No.
19      Q.   Mark this as next, please.
20           (Deposition Exhibit 6 was marked for identification.)
21           This is dated October 21, 2002.  Is that the right
22  date?
23      A.   Yes.
24      Q.   And it's from you to Lisa Baker, TSA Employee
25  Relations?
```

1          A.    Uh-hm.

2          Q.    Where does she work?

3          A.    She was like our legal prior to Marty. She took

4    care of all of our employee stuff before we were assigned an

5    attorney.

6          Q.    Where are her offices, if you know?

7          A.    California somewhere, sir.

8          Q.    Do you remember drafting this memo?

9          A.    Yes.

10         Q.    Regarding who?

11         A.    Chris Gahr.

12         Q.    "This memo is regarding Mobile Screening Force

13   Supervisor Christopher Gahr, whose performance has been

14   problematic on numerous occasions."

15         A.    Yes.

16         Q.    What was the problematic things on numerous

17   occasions?

18         A.    There was an attachment that went with this that

19   listed the things that he did wrong.

20         Q.    And the things that were listed, which I'll show

21   you, where did you get that information from?

22         A.    From manager's logs an counseling from, I believe,

23   Pat Collins.   Right now, that's all I remember, from Pat

24   Collins.

25         Q.    And the reason you were writing this document to

107

1  Lisa Baker?

2       A.   Under instruction from the FSD, sir.

3       Q.   "Whose performance has been problematic on

4  numerous occasions.  The incidents involving less than

5  satisfactory performance were brought to Mr. Gahr's

6  attention beginning October 18"; that's right?

7       A.   Yes.

8       Q.   Brought to his attention by whom?

9       A.   Probably myself or Lowery Leong.

10      Q.   Well, don't guess.  Tell me what you brought to

11  his attention before his termination.

12      A.   I showed him the write-up from all the things that

13  he did wrong.

14      Q.   And written up by whom?

15      A.   Patrick Collins.

16      Q.   Things that were not kept in-house?

17      A.   Yes, sir.

18      Q.   Have you ever seen anything in any TSA employee's

19  file that dealt with racial remarks or discriminatory

20  conduct by anyone at TSA against a white male or other white

21  employee?

22      A.   No.

23      Q.   "To document Mr. Gahr's performance, attached

24  please find three TSA Counseling Records, a General

25  Counseling From, an October 17 report written by me, and two

1  emails sent to me from Mr. Gahr.

2          "It behooves me" -- I'm reading from paragraph 3.

3  "It behooves me to report that the decision has been made to

4  relieve Mr. Gahr from future employment obligations.

5  Effective immediately, we will no longer employ him here at

6  Kahului International Airport."

7          Did I read that correctly?

8      A.   Yes.

9      Q.   "Mr. Gahr has contacted MSF operations and has

10  been scheduled for deployment in Oakland, California.   I

11  would like you to review the attached statements and seek

12  grounds for removal."

13          Do you see that?

14     A.   Yes, sir.

15     Q.   Removal from what?

16     A.   From the TSA and MSF.

17     Q.   Where?

18     A.   From being on the MSF.

19     Q.   In Oakland, California?

20     A.   No, removal from TSA and from the MSF.

21     Q.   "His constant failure to perform to instructions

22  and SOP, along with his insubordination has caused

23  inefficiency at our checkpoint."

24          Do you see that?

25     A.   Yes.

```
 1        Q.   You were writing them to let them know he was
 2   making application to Oakland, and you were at least
 3   inferring that he should not be hired there; that's what
 4   this says, isn't it, paragraph 4, right?  See where it says
 5   "removal"?
 6        A.   Yes.
 7        Q.   You are suggesting at least to Ms. Baker that he
 8   be fired from Oakland, California?
 9        A.   We wanted him removed here.  He made provisions to
10   leave prior to until we could serve him.
11        Q.   I would like you to review the statements and seek
12   grounds for removal, you said that?
13        A.   Yes, sir.  Yes.
14        Q.   He'd already been fired here, had he not?
15        A.   No.
16        Q.   Were you suggesting that he be fired from Oakland,
17   California?
18        A.   He was not even fired yet.  He was part of the MSF
19   team.
20        Q.   Were you trying to prevent him --
21             MR. HELPER:  Wait.  Let him answer the answer.
22             THE WITNESS:  Yeah, can I?
23        Q.   (By Mr. Green)  Sure.  Go ahead.
24        A.   He did not belong to Kahului airport.  He was not
25   our employee.  We requested that they remove him from MSF or
```

1    terminate him. We didn't know until later that he was going

2    to Oakland.  I'm letting her know that he is requesting

3    through other channels to be reassigned to Oakland.

4        Q.    Right.  You were not intending to have him fired

5    at Oakland or not be hired, were you?

6        A.    We wanted him fired here, sir.

7        Q.    The question is whether or not you were trying to

8    make sure he was not rehired or fired in Oakland, right?

9    That was not the intent of this e-mail, right?

10            MR. HELPER:  Objection, vague, compound and

11   confusing.

12       Q.    (By Mr. Green)  Do you understand the question?

13       A.    No.

14       Q.    Were you trying to make sure he was not hired in

15   Oakland when you wrote this?

16       A.    Hire?  He was already hired.  He was a TSA

17   employee.

18       Q.    Where?

19       A.    On MSF, on the mobile screen force.

20       Q.    Had he already been hired in Oakland?

21       A.    You're not understanding.  He is part of a mobile

22   screening workforce that belonged to the government.  When

23   he gets fired, he is fired from the TSA mobile screening

24   force.  It's not a matter of being hired in Oakland.  So we

25   wanted to fire him here. We did not want him to go to

1    Oakland.  He made provisions to go to Oakland.

2        Q.    Right. And?

3        A.    And he got to Oakland.  So we're letting her know

4    that we're making provisions to fire him, serve him in

5    Oakland.  It was out of our control.  He belonged to another

6    dispatch that sent him away.

7        Q.    You weren't trying to make sure that whatever you

8    were sending to Lisa Baker would wind up over in Oakland so

9    maybe he would not be hired there.  That was not your

10    intent?

11        A.    You don't understand.

12        Q.    Maybe I don't.

13            MR. HELPER:  Let's go off the record.

14            (Deposition Exhibit 7 was marked for identification.)

15        Q.    (By Mr. Green)  You know, of course, that he made

16    plans to be transferred, be redeployed to Oakland?

17        A.    Yes.

18        Q.    And knowing that you wrote what I just read you,

19    your to/from to Lisa Baker, right, you knew he planned on

20    being deployed to Oakland and then you wrote that knowing

21    that, right?

22        A.    Yes.

23        Q.    In front of you is what?

24        A.    Employee discharge.

25            MR. HELPER:  If I can have a second?

1     Q.   (By Mr. Green)   Sure.   The date is October 25,

2   2002.   He is terminated, right?

3     A.   Yes.

4     Q.   Did you see a copy of this before?

5     A.   No.

6     Q.   First time you've seen it?

7     A.   Yes.

8     Q.   And this lists a number of things.   Apparently,

9   they talk about reasons for his discharge.   Do you know who

10   prepared this?

11     A.   Looks like it's from Howard Tagamori.

12     Q.   It has a number of things listed paragraph 1, "On

13   March 31, 2002, you were given a conditional appointment in

14   the excepted service with the Transportation Security

15   Administration as a Supervisory Transportation Security

16   Screener."   It goes on to say, "All new hires must complete

17   a one-year probationary period.   Employees may be terminated

18   during their probationary period for unacceptable

19   performance or for conduct issues."

20           Did I read that correctly?

21     A.   Yes, sir.

22     Q.   "On October 17, 2002, specifically you were the

23   assigned shift supervisory for the evening shift. You were

24   instructed to calibrate the ETD machine, lock all ETD

25   cabinets, place keys in metal box in file cabinet, put away

1    all checkpoint equipment, and log all lost and found items

2    at the end of your shift.  Upon opening the checkpoint on

3    October 18, 2002, it was discovered that all ETD cabinets

4    were not locked, keys had not been put away, checkpoint

5    equipment was lying chairs and scattered about the wanding

6    area."

7            Do you see that?

8        A.    Yes.

9        Q.    Who found those things, those deficiencies?

10       A.    I believe Patrick Collins.

11       Q.    "Further, all checkpoint radios were left on all

12   night."

13            That was Patrick Collins?

14       A.    Yes, sir.

15       Q.    "Therefore, the radios were not functioning or

16   indicated that the batteries needed to be replaced."

17       A.    Yes.

18       Q.    My sense is that he left these radios on

19   apparently.  Someone says that the batteries were drained,

20   yes?

21       A.    Yes.

22       Q.    Is that something that should be documented as

23   opposed to kept in-house?

24       A.    Yes.

25       Q.    Something more serious than maybe discriminatory

1   remarks about employees?

2       A.    I believe it was documented.

3       Q.    I'm asking you whether or not something like this

4   would be more serious than a discriminatory conduct against

5   other employees.  Do you know what I'm talking about?

6       A.    Yes, sir, I see what you are getting at.  No, they

7   are two separate incidences.

8       Q.    Which one do you think would be more serious:

9   leaving --

10          MR. HELPER:  Let me object, your term -- well, go

11  ahead and finish your question.

12      Q.    (By Mr. Green)  Which one, in your mind, would be

13  more serious --

14      A.    They're both serious.

15          MR. HELPER:  Let him finish the question.

16      Q.    (By Mr. Green)  -- not to log discriminatory

17  conduct or to log something where someone left on a radio

18  where the batteries were drained?

19          MR. HELPER:  Object to the phrase "discriminatory

20  conduct" as vague.

21      Q.    (By Mr. Green)  Well, I'll go back to where you

22  said, Don't log it down, don't write it down, let's keep it

23  in-house.  I want to find out whether leaving radios on

24  where the batteries were drained would be of equal

25  importance or seriousness.  You tell me.

1    A.    It's important.  There's no way you can compare

2  the two.

3    Q.    Would one just be as serious as the other, in your

4  mind, draining batteries as opposed to making discriminatory

5  remarks about someone?

6        MR. HELPER:  Same objection.

7    Q.    (By Mr. Green)  Go ahead.

8    A.    They are both equally important.

9    Q.    Are they both --

10    A.    The operation.

11    Q.    Are they both serious?

12    A.    Yes.

13    Q.    So apparently someone chose the document, and you

14  basically said in your other document that I showed you,

15  Let's keep it in-house, let's not log anything about

16  discrimination, right?

17    A.    That was taken out of context, but, yes, sir.

18    Q.    Well, I read what you wrote.

19    A.    Yes, sir.

20    Q.    Also it says, the next paragraph, "Also, on

21  October 17, 2002, a screener under your supervision, was

22  observed performing her duties with a bandaged left hand."

23        Do you see that?

24    A.    Yes.

25    Q.    We talked about you seeing someone that had the

```
 1  bandaged hand with dislocated fingers, right?
 2      A.   Yes.
 3      Q.   That was documented against this employee, right?
 4      A.   Yes.
 5      Q.   That was a serious infraction, did you believe
 6  that?
 7      A.   It was documented.
 8      Q.   Did you think it was a serious infraction?
 9      A.   Yes.
10      Q.   "October 19 and 20, 2002, you again failed to
11  follow procedures and direction by not properly calibrating
12  ETD machine and not placing keys in appropriate place as
13  directed."
14      A.   Yes.
15      Q.   Who found that?
16      A.   I believe Patrick Collins.
17      Q.   Did you actually speak to Mr. Collins about the
18  things that are in this letter that I read so far?
19      A.   This is the first time I seen this, but I've
20  talked to him about his report.
21      Q.   "Your conduct, as described above, is unacceptable
22  and will not be tolerated.  Therefore, it is my decision to
23  separate you from your position as the TSA effective the
24  close of business on the day you receive this notice."
25           Yes?
```

1      A.    Yes.

2      Q.    You can put that aside.

3      A.    Can I make a statement?

4            MR. HELPER:    No.

5      Q.    (By Mr. Green)    Are there other -- the offenses

6  that I read you, apparently I asked you earlier whether

7  there was progressive discipline, yes?

8      A.    Yes, sir.

9      Q.    Was there any progressive discipline on any of the

10  issues that I read to you so far?

11           MR. HELPER:    Objection, calls for speculation,

12  lacks foundation.

13           THE WITNESS:    I don't know.

14     Q.    (By Mr. Green)    You don't know whether he was

15  counseled or told he would be terminated if his conduct

16  continues?

17     A.    No.

18     Q.    Do you know what happened to Ms. Igarashi?    She

19  was terminated, was she?

20     A.    Yes.

21     Q.    Do you know why?

22     A.    No.

23     Q.    If you know.    You don't know why?

24     A.    No.

25     Q.    How long had she worked there?

1    A.    Several months.

2    Q.    When you were testifying in depositions where the

3  allegations that white employees made about her calling them

4  "fucking haoles," do you remember about what years or dates

5  those allegations were made?

6    A.    It was all --

7        MR. HELPER:  I'm sorry, let me be clear.  Are you

8  asking when the statements were made or when the allegations

9  about the statements were made?

10    Q.    (By Mr. Green)  I just want to know when the

11  allegations were made because she made statements.  Do you

12  remember about when that was?

13    A.    Between October '02 and January of '03.

14    Q.    October of '02 and January of '03.  So I can

15  assume, based on what you said, she was not terminated

16  between those dates?

17    A.    No.

18    Q.    If you know, was she terminated right after this

19  lawsuit was filed?

20    A.    I'm not sure. I was not at the airport when she

21  got terminated.

22    Q.    Was there a discussion about her termination?

23    A.    I was not.  I was out for four months.

24    Q.    When was the first time you learned that anyone,

25  I'm talking about Gahr or Young, filed an EEOC complaint?

| | | |
|---|---|---|
| 1 | A. | I'm not sure of the exact date. |
| 2 | Q. | Going back to the October 21, 2002 to/from to Lisa |

Baker, tell me about your discussions with Lowery Leong that
you reference in here?

MS. KAGAWA:  It's a memo to Lisa Baker.

THE WITNESS:  Exhibit 6?

Q. (By Mr. Green)  You said you prepared this under
the direction of Lowery Leong, right?

A. Yes.

Q. Tell me what it was, the circumstances of your
conversation where he told you to prepare this?

A. Basically, he looked at the write-ups, he looked
at the manager's log and everything, and he just told me to
prepare a document, send it to legal and see if we can have
him removed.

Q. Where did the conversation take place?

A. Downstairs TSA office.

Q. Who was present?

A. I'm not sure.

Q. What did Mr. Leong say to you, as best you can
recall?

A. Basically, take whatever I had documented and
forward it to Lisa Baker.

Q. Take whatever who had documented?

A. Whatever Patrick had documented against Chris.

1    Q.   Those were the things that were in his personal
2  file?

3         MR. HELPER:   Objection --

4         THE WITNESS:   We had no personnel files at that
5  time.

6    Q.   (By Mr. Green)   These things that were written
7  about Christopher Gahr, for example, where were these items
8  being maintained?

9    A.   There's Patrick's write-up that he had.

10   Q.   Where do you find these things, in someone's
11 drawer?

12   A.   Basically, they were kept in in-and-out boxes with
13 folders. We had no secretary, no HR staff at that time.

14   Q.   So there were separate folders for each employee?

15   A.   Yes.

16   Q.   It's my memory that Mr. Young was fired November
17 13, 2002.  Does that seem, the date, would be accurate?

18   A.   I don't know about being accurate.

19   Q.   Well, you remember I asked you earlier about
20 writing reports making them contemporaneous?

21   A.   Yes, sir.

22   Q.   Certainly, in 2003, if you know, Mr. Young had
23 filed at least an EEOC complaint for discrimination; you
24 knew that, right?

25   A.   Yes.

1    Q.   Let's mark this next, please.

2         (Deposition Exhibit 8 was marked for identification.)

3         Is there any conversation that you were part of,

4    or in your presence, where people talked about documenting

5    reasons to show why we got rid of Young after the EEOC

6    complaint was filed?  Do you remember any conversation like

7    that? Put something in his record or his file to show why he

8    was terminated?  Do you remember anything like that?  You're

9    reading.  You're not listening to me.

10   A.   No.

11   Q.   You don't remember any conversation like that?

12   A.   No.

13   Q.   Where people actually wrote things or asked to

14   write things to kind of dirty him up.  Do you remember

15   anything like that?

16   A.   No.

17   Q.   You are laughing again.

18   A.   I don't remember, sir.  I'm just trying to review

19   what's written here and what you are telling me.

20   Q.   I'm saying maybe it happened and maybe it didn't

21   or you were never --

22   A.   I don't recall.

23   Q.   -- a party one way or the other?

24   A.   Yes.

25   Q.   This is dated June 6, 2003 to Mr. R. Au, AFSD.

1  Who is that?

2      A.   He is the screening assistant federal security

3  director.

4      Q.   Subject:  Tom Young.  This was seven months after

5  his termination.  "AFSD H. Tagamori and SA F. Carvalho

6  advised me that Screening Manager P. Igarashi and I were to

7  train and advise the new Screening Manager Tom Young in his

8  duties and procedures."

9          You remember when you had that conversation?

10     A.   Yes.

11     Q.   When?

12     A.   I don't know the exact date.

13     Q.   Give me a year.  2003?

14     A.   No, I was out for the first three months of 2003.

15     Q.   It was after he was fired, wasn't it?

16     A.   Yes, sir.

17     Q.   "Mr. Young was assigned to us for one week to have

18 him shadow us and be shown the requirements of the job.

19 Mr. Young was shown the SOP and other documents which were

20 related to the checkpoint.  Mr. Young was also shown by me

21 the proper way to open the checkpoint, calibrated the ETDs,

22 X-ray machines, HHMT, and the WTMD.  I advised Mr. Young if

23 he had any questions regarding procedures that he could ask

24 P. Igarashi or I."

25          Do you see that?

1      A.    Yes.

2      Q.    Do you know anything about Tom Young shadowing

3   somebody to learn the requirements of the job?

4      A.    Yes.

5      Q.    Who asked him to do that, if anyone?

6      A.    I think Lowery Leong had partnered him up with

7   both an a.m. and p.m. manager.

8      Q.    Would that be a reasonable thing to ask Mr. Young

9   to do?

10     A.    Yes.

11          (Deposition Exhibit 9 was marked for identification.)

12     Q.    This is a sworn statement by Mr. Young that is

13   attested to on August 8, 2003.  Turn to page 3 of 10.  This

14   references his shadowing, as he was asked to do, to learn

15   his job.

16          Under answer 6, it says -- the question is:  "Were

17   the management officials, Mr. Carvalho, Patti Igarashi,

18   Lowery Leong aware of Complainant's race, color, sex, and

19   national origin when Complainant worked there?"

20          Of course you were, weren't you?

21          MR. HELPER:  Objection, overbroad.

22     Q.    (By Mr. Green)  You knew his race, color, and his

23   sex, didn't you?

24     A.    Yes.

25     Q.    "I know that they were aware as they mention of

124

1   his race, color, sex and national origin.

2           "In my first few days, I was supposed to do on the

3   job training 'shadowing' another manager. I was asking

4   questions about everything to learn my job. Ms. Igarashi

5   said, 'You fucking Haoles are all the same... you want to

6   know everything.'"

7           Did you know she said that?

8       A.   No, sir.

9       Q.   "On another occasion when I suggested a proper

10  protocol for a doorway she said to me, 'You white guys must

11  think alike... we had this other white guy from the mainland

12  who wanted to do the same thing.'"

13          Did you know she said that to him?

14      A.   No, sir.

15      Q.   "Of course, in both instances, she was talking

16  about Complainant." That refers to Mr. Gahr.  "She went on

17  to say, 'We had to fire him... I knew he wouldn't work

18  out... I knew the minute he walked in here... he is from the

19  mainland... he is a goofy white guy and wanted to make a lot

20  of changes... so we had to fire him.'"

21          Did you know she said that?

22      A.   No, sir.

23      Q.   No discussion about wanting to fire Mr. Gahr

24  within a few days after he arrived, nothing in your

25  presence?

*IWADO COURT REPORTERS, INC.*
(808) 244-9300

1       A.   No, sir.

2       Q.   "My response was 'just let me know if I make a

3    similar mistake!' But I had not suggested a mistake.  None

4    of the managers, including Ms. Igarashi, had received

5    training."

6            Is that true?

7            MR. HELPER:  Objection, overbroad, calls for

8    speculation.

9       Q.   (By Mr. Green)  Do you know if she received any

10   training in screening?  TSA training?

11      A.   No, she did not.

12      Q.   Had Mr. Gahr or Mr. Young received TSA screening?

13           MR. HELPER:  Objection, lacks foundation.

14           THE WITNESS:  Not Mr. Young, no.

15      Q.   (By Mr. Green)  Mr. Gahr did?

16      A.   Yes, sir.

17      Q.   "All of the TSA screener were very bright and well

18   trained."

19           Do you believe that to be true?

20      A.   Yes.

21      Q.   "The screeners, Ms. Igarashi and Mr. Carvalho,

22   knew the old Wackenhut way and very much resented anyone who

23   questioned anything or made good suggestions."

24           Do you believe that to be true?

25      A.   No.

```
 1        Q.    Did you say anything like that?

 2        A.    No.

 3        Q.    "All you would hear from Ms. Igarashi,?

 4   Mr. Carvalho and Pat Collins was, 'as soon as this training

 5   workforce is out of here, we are going back to the way we

 6   did it with Wackenhut."

 7              Did you say that?

 8        A.    No.

 9        Q.    Did Ms. Igarashi say that in your presence or

10   Mr. Collins?

11        A.    No.

12        Q.    Do you have the exhibit in front of you on June 6,

13   2003?

14        A.    Exhibit 8?

15              MR. HELPER:   The Collins memo.

16        Q.    (By Mr. Green)   Starting on paragraph 2,

17   "Mr. Young was then placed in the rotation of managers and

18   given his own shift.  On the days that I opened up the

19   checkpoint after he had been the closing manager I

20   discovered that certain procedures were not being followed.

21   I passed on to Mr. Young the information regarding these

22   problems and how they could be corrected."

23              Were you present when that was supposedly passed

24   on?

25        A.    No.
```

1     Q.    "These problems and errors continued to happen and

2  I advised SA F. Carvalho of this."

3          Did he do that?

4     A.    Yes.

5     Q.    Do you have that documented anywhere that you were

6  advised by him?

7     A.    Manager's log and also his write-up.

8     Q.    "These problems of errors continued to happen and

9  I advised Special Agent F. Carvalho of this.  He informed me

10  that I was to document these problems."

11          Did you do that?  Did you advise him to document

12  these problems?

13     A.    Yes.

14     Q.    Did you advise any white TSA employee to document

15  problems they were having with Patty Igarashi, or anyone

16  else, regarding racial remarks?

17     A.    No.

18     Q.    Next paragraph, "I instructed my supervisors and

19  MSF people to place in their shift logs any problems they

20  observed or that I pointed out to them when opening the

21  checkpoint.  I also kept notes for myself of these SOP and

22  procedural problems."

23          Do you see that?

24     A.    Yes.

25     Q.    This is coming from Mr. Collins?

1        A.    Yes.

2        Q.    Apparently he kept some notes and documented

3   procedural problems that were ongoing, yes?

4        A.    Yes.

5        Q.    Do you know if Mr. Collins, just if you know,

6   documented or had notes of any racial remarks that were

7   reported to him?

8        A.    I don't know.

9        Q.    "On November 10, 2002, at 0430 I opened the

10  checkpoint and discovered that the failure to follow the

11  procedure was still a problem after Mr. Young had closed the

12  night before."

13           It kind of sounds like this guy was incompetent,

14  doesn't it?

15           MR. HELPER:    Objection, argumentative.

16       Q.    (By Mr. Green)    Does it sound to you like

17  Mr. Young was incompetent?

18       A.    Not incompetent, no.

19       Q.    It sounds like he couldn't follow directions,

20  right?

21       A.    Yes.

22       Q.    He was told to do things, and he keeps right on

23  doing them, right?

24       A.    Yes.

25       Q.    I'm talking about the same guy that guarded the

1   president's plane, right?

2       A.   Yes.

3       Q.   "On that date two (2) of the three (3) X-ray

4   machines still had keys left in them.  The keys to the ETD

5   were left out in the open on top of the mailbox for the

6   PFSs."

7            What is PFSs?

8       A.   No idea, sir.

9       Q.   This was logged in the manager's log.  What does

10  that mean to you, if anything?

11      A.   They keep a composition notebook of key events

12  that happened, complaints, or anything in this notebook.

13      Q.   Have you looked over that log from time to time?

14      A.   During the roll-out, every day, yes, sir.

15      Q.   I'm just wondering.  This log has complaints or

16  notations regarding conduct by certain employees that would

17  be inappropriate, not following rules and regulations,

18  things like that?

19      A.   Yes, sir.

20      Q.   Have you ever seen in that log anything written

21  down about Patty Igarashi calling anyone a "fucking haole"?

22      A.   No, sir.

23      Q.   Ever seen anything in that log about any TSA

24  employee saying anything that was racially discriminatory

25  against any white employee at TSA?

1      A.    No.

2      Q.    "He instructed me to prepare a written report from

3    my notes. I prepared a report as instructed and turned it in

4    to him."

5            It goes on to say at the bottom, the very last

6    sentence, "The original report that was turned over to SA F.

7    Carvalho is not available."

8            Do you see that?

9      A.    Yes.

10     Q.    Where is the report that was turned over to you?

11     A.    No idea.

12     Q.    You lost it?

13     A.    I forwarded it through the chain of command to

14   Bobby Au.

15     Q.    You certainly kept a copy, didn't you?

16     A.    No.

17     Q.    Whatever you got, you just turned it over to him?

18     A.    Yes, sir.

19     Q.    If you look at the affidavit again, page 4 of 10,

20   the question at the bottom is, "Were you aware that

21   Complainant brought EEOC issues to the attention of

22   management?"  The Complainant being Gahr.  This is the

23   affidavit of Young.  "Be specific in whose attention it was

24   brought, when, where and how."

25            "Answer 7:  Yes, I knew.  After Ms. Igarashi told

```
 1   me those things about white people and Haoles, etc. there
 2   were other employee issues.  It was a wreck management-wise
 3   at OGG."
 4        Q.   That refers to the airport?
 5        A.   Yes, sir.
 6        Q.   "Some employees were not paid for weeks on end.
 7   Two married employees came to ask me asked about getting
 8   paid as they were broke and had not been paid for six
 9   weeks."
10        Q.   Were you aware of employees that were not paid for
11   weeks at a time?
12        A.   Yes, sir.
13        Q.   Do you know why that happened?
14        A.   Yes, sir.
15        Q.   Why?
16        A.   We were being controlled, a workforce of 45,000
17   people that were hired within three months out of one HR
18   office.
19        Q.   So not improbable that some people were having
20   financial problems because they were not paid?
21        A.   Yes, sir.
22        Q.   Do you know of any other married couple that was
23   working for TSA other than the people we spoke about, the
24   Reinharts?
25        A.   Yes.
```

*IWADO COURT REPORTERS, INC.*
(808) 244-9300

1        Q.   Who else?

2        A.   I'm not going to yell it out, but I need to think
3    about it.

4        Q.   Were they Caucasian?

5        A.   Ruth and Paulsons -- the Paulsons.

6        Q.   Were they Caucasian?

7        A.   Yes, sir.

8        Q.   "Ms. Igarashi saw them approach me" -- and that's
9    referring to the people that went up to ask about their
10   checks to Mr. Young.  "Ms. Igarashi saw them approach me and
11   asked, 'What do those fucking Haoles want.' I pulled her to
12   the side and told her that the employees were upset that she
13   was calling them 'fucking haoles.' She asked if I was going
14   to file a complaint against her too.  She said, 'Oh, yeah,
15   that fucking Haole we fired also filed a complaint against
16   me.' again referring to Complainant." I reiterated that I
17   was not filing a complaint, but thought she needed to not
18   use the term Haole as it was offending me in the workforce."

19            Of course, you had no knowledge that any of that
20   was going on between Igarashi and these white employees,
21   right?

22       A.   No.

23       Q.   Did you ever hear her use the word "fuck"?

24       A.   I'm not sure, not that I can recall.

25       Q.   You are not sure?

1       A.      No, sir.

2       Q.      She may have used the word "fuck"?

3       A.      Not that you can remember, no, sir.

4       Q.      Never heard her curse?

5       A.      No.

6       Q.      "However, within ten minutes, Mr. Tagamori, deputy

7    director of screening, called me into the office and was

8    screaming at me about the chain of command and I did not

9    know anything."

10           Did I read that correctly?

11      A.      Yes.

12           MR. HELPER:    And did I not know anything.

13           THE WITNESS:    And did I not know anything.

14      Q.      (By Mr. Green)   Is that a violation in the chain

15   of command based on what I just read to you previously that

16   two employees came over to him to ask about their paychecks,

17   and then Mr. Young says that he was a little upset and

18   suggested she not call white people "fucking haoles," is

19   that a breach of the chain of command?

20      A.      I don't see how they are related, her talking to

21   the manager, no, sir.

22      Q.      Turn to page 6 of 10.  Look at a couple of

23   paragraphs down starting with, "One day in a meeting with

24   Mr. Carvalho, Mr. Collins" -- do you see that, the second

25   paragraph?

1    A.    Yes.

2    Q.    "One day in a meeting with Mr. Carvalho,

3  Mr. Collins, Mr. Tagamori, Ms. Igarashi, and myself, Mr.

4  Carvalho said, 'Here is a list of the supervisors we were

5  going to use.' They were all locals."

6        Do you remember that meeting?

7    A.    No.

8    Q.    "Ms. Igarashi said, 'but we already called

9  Washington D.C. and we have to use the supervisors who have

10 been selected."

11       Do you remember her saying that?

12   A.    No.

13   Q.    "Mr. Carvalho said, 'no, we're not using those,

14 we're using these former Wackenhut people.'"

15       Do you remember that?

16   A.    No.

17   Q.    "As a result, we had the former Wackenhut

18 employees working as supervisors who were being paid as

19 screeners" --

20       Do you remember that happening?

21   A.    No.

22   Q.    -- "and we had TSA supervisors working as

23 screeners but being paid at supervisor level."

24       Do you remember that happening?

25   A.    No.

 1        Q.    "It was ugly because the TSA employees were
 2   trained one way, the Wackenhut employees were doing it their
 3   way and then you have the whole race and natural origin
 4   undercurrent."

 5              Did I read that correctly?

 6        A.    Yes.

 7        Q.    Of course, the screening was different between
 8   Wackenhut and TSA, how they were trained?

 9        A.    No, there was no difference.

10        Q.    They were trained the same way?

11        A.    Yes.  When they came back at the end of the
12   workforce, when Mr. Young was there, they had been retrained
13   by TSA and came back to work as incumbents trained by TSA as
14   government employees.

15        Q.    Take a look at page 7.  It says at the top, "After
16   that, Mr. Carvalho said if I saw anything, I needed to use
17   it to get rid of employees."

18              Did you ever say anything like that?

19              "Mr. Carvalho told the supervisors, including me,
20   that 'anything you see wrong, write them up and put it in
21   their personnel files; we need to get rid of these TSA
22   people so that we can get some of our Wackenhut people back
23   here."

24              Did you say anything like that?

25        A.    No.

```
 1        Q.    It sounds like this guy is perjuring himself,
 2   doesn't it?
 3            MR. HELPER:   Objection, calling for speculation.
 4        Q.    (By Mr. Green)   If giving a false statement under
 5   oath constitutes perjury, are you saying you never said
 6   this, or you don't remember saying this?
 7        A.    I'm saying I never said it.
 8        Q.    So we got a guy who is wearing under oath that you
 9   said it, and you're saying it never happened, right?
10        A.    Yes, sir.
11        Q.    Next paragraph, "At one point in a meeting with
12   the same three supervisors, Mr. Carvalho, Ms. Igarashi,
13   Mr. Collins, and myself, I expressed that since TSA spent so
14   much money training the employees, would it not be a good
15   idea to point out their errors in an effort to get them to
16   improve rather than firing them."
17            Do you remember that conversation?
18        A.    No.
19        Q.    Did it happen or didn't happen or you just know it
20   didn't happen?
21        A.    I don't recall.
22        Q.    "Mr. Carvalho's response was that he did not want
23   us to tell them how to improve or how to fix the problem and
24   they wanted it in the file so they could get rid of them."
25            Did you say that?
```

1      A.   No.

2      Q.   He's either mistaken or lying again, right?

3           MR. HELPER:   Objection, calls for speculation.

4      Q.   (By Mr. Green)   It's only one of two

5  possibilities.   It's either a mistake or he's lying, right?

6  It's either a mistake or lying?

7      A.   You still want yes-or-no answers, right?

8      Q.   Yeah.   It calls for a yes-or-no answer. It's

9  either a mistake or lying?

10      A.   Yes.

11      Q.   Look at the bottom.   "I heard Ms. Igarashi and

12  Mr. Carvalho" -- I can't see what he crossed out -- "speak

13  about screening procedures the 'Wackenhut' way.  I heard

14  both Ms. Igarashi and Mr. Carvalho say, 'as soon as they get

15  rid of these God-damned Haoles, we'll get back to the

16  Wackenhut way.'"

17           Do you see that?

18      A.   Yes.

19      Q.   Does the word "God-damned haoles," with the use of

20  the word "haoles" sound like it's discriminatory to you?

21      A.   Yes.

22      Q.   Okay.   "All of the mobile screening force" --   did

23  you say that what I just read you?

24      A.   No.

25      Q.   Did you hear Ms. Igarashi say it in your presence?

```
 1        A.    No.
 2        Q.    Apparently you've never heard her say anything
 3   derogatory about haoles, right?
 4        A.    Yes.
 5        Q.    Yes, you have not?
 6        A.    No, I have not heard.
 7        Q.    And you've never heard anyone complain about it
 8   until lawsuits, right?
 9        A.    Yes.
10        Q.    "All of the mobile screening force were really
11   competent and had the SOP down pat.  This really scared Ms.
12   Igarashi and Mr. Carvalho.  If MSF tried to change the way
13   she was doing things, she would really resist and once the
14   SOP was shown to her, she would get more frustrated."
15              You don't know anything about that, right?
16        A.    I do.
17        Q.    Who is Denise Vogel?
18        A.    A former screener.
19        Q.    What's her ethnic background?
20        A.    White female.
21        Q.    Did she live on Maui before she was hired by TSA?
22        A.    She was with Wackenhut.  She was an incumbent.
23        Q.    Did she live on Maui, if you know, for a number of
24   years?
25        A.    I'm not sure.
```

 1      Q.    Local girl, right?

 2      A.    I'm not sure.

 3      Q.    You are not sure?

 4      A.    No.

 5      Q.    You know she didn't come from the mainland to take

 6   this job though, right?

 7      A.    No, she was here already and employed by

 8   Wackenhut.

 9      Q.    Let's mark this next, please.

10              (Deposition Exhibit 10 was marked for identification.)

11              We were taking earlier about contemporaneous

12   filing of reports and things like that?

13      A.    Yes.

14      Q.    You said that, based on your review of this record

15   for this case, you had never seen late reporting in the

16   manner and form you have seen them in this case, right?

17   Yes?

18      A.    Could you restate the question?

19      Q.    Yeah.  Before this case, you've never seen the

20   kind of late reporting you have seen in this case?  You've

21   never seen it before, that's what you told me, right?

22      A.    Yes.

23      Q.    This is dated first week, November 2003.  Do you

24   see that?

25      A.    Yes.

*IWADO COURT REPORTERS, INC.*
(808) 244-9300

 1    Q.    A year after Gahr was fired -- Tom Young was

 2  fired.  8:30 a.m. Screener:  Denise Vogel, Detail of

 3  incident:  Per instruction from scheduling manager Gerry

 4  Yamada, I approached Tom Young for the following days

 5  schedule, however, he was overwhelmed by the goings on so I

 6  excused myself and said, 'I would return at the end of my

 7  shift.' When I did, he blew up and yelled 'You asked me that

 8  ten times already.' I said, 'whoa wait a minute not me, this

 9  is only my second time and because he was not able to do it

10  earlier.' He finally gave me my schedule and that was that.

11  Uilani Danley witnessed this incident."

12          Who is she?

13     A.    Another screener.

14     Q.    Caucasian?

15     A.    Yes.

16     Q.    Local girl, right, came from Wackenhut, did she?

17          MR. HELPER:  Let me object to the use of the term

18  "local" because I think it's contradictive the way you use

19  the word "local" before.

20     Q.    (By Mr. Green)  I think you're right.

21     A.    Incumbent.

22     Q.    She's an incumbent.  She witnessed the incident.

23  "This incident happened right outside the former Manager's

24  cubicle.  He yelled over the cubicle to me."

25          She seems to be a year off in her complaint?

1          MR. HELPER:   Objection, argument, lacks

2    foundation.

3          Q.   (By Mr. Green)  Doesn't she?  It says, "First week

4    November 2003" as the incident occurring, right?

5          A.   Yes.

6          MR. HELPER:   Lacks foundation to this witness.

7          Q.   Take a look at these next.

8               (Deposition Exhibit 11 was marked for identification.

9               To Patrick Collins regarding Tom Young.  We're back

10   to Uilani Danley regarding Tom Young, June 12, 2003.  You

11   see that date?

12         A.   Yes.

13         Q.   December, January, February, March, April, May,

14   June, seven months after he was terminated?

15         A.   Yes.

16         Q.   "To the best of my knowledge" -- you've been in

17   law enforcement for a long time, right?

18         A.   Yes.

19         Q.   "To the best of my knowledge, there was an

20   incident that happened on the 1st week of my employment with

21   TSA."

22               Do you know what her first week of employment was?

23   Can you give me an idea?

24         A.   Mid to end October 2002.

25         Q.   So it seems like she's now recounting something to

1    Mr. Collins for his files regarding Tom Young seven months
2    after it happened.  That's what it looks like, doesn't it?
3        A.    Yes.
4        Q.    "To the best of my knowledge, there was an
5    incident that happened on the 1st week of my employment with
6    TSA.  Two of my fellow employees Tina Perez and Denise Vogel
7    both had questions regarding their schedules with our
8    manager Tom Young.  Throughout the course of the day, Tom
9    Young made his way back to the checkpoint area, Denise Vogel
10   then approached him regarding her schedule, Tom replied back
11   in a very unprofessional manner yelling at Denise that he
12   told her that he would get back to her and to stop asking
13   him about the schedule.  Denise then told him that it was
14   the first time she had ever spoken to him regarding the
15   schedule since that morning.  He then stated that he had
16   mistaken her for someone else."
17            Do you see that?
18       A.    Yes.
19       Q.    Have you ever seen anyone at TSA write a report
20   referring to an incident that occurred seven months before?
21       A.    No.
22       Q.    Ever seen anyone -- strike that.  An incident
23   that apparently occurred substantially after, or at least a
24   time after an EEOC complaint was filed, yes? It appears that
25   way?

1    A.  · Yes.

2        Q.   Now, when I asked you about your investigative

3    career in law enforcement -- I want you to take a look at

4    these two documents side by side.  Mark these as the next.

5        (Deposition Exhibits 12-13 were marked for identification.

6        Turn them over for a second. Over the course of

7    your illustrious career in law enforcement, have you ever

8    interviewed people that were suspected of committing crimes?

9        A.   Yes.

10       Q.   People that you believe were just lying to you?

11       A.   Yes.

12       Q.   People that you asked to write statements?

13       A.   Yes.

14       Q.   People may be who had prepared statements and had

15   given them to you, yes?

16       A.   Yes.

17       Q.   For example, you are investigating an incident and

18   let's say a suspect prepared a written statement to give to

19   you.  In other words, not in your presence; okay?

20       A.   Yes.

21       Q.   Let's you know what an alibi defense is?

22       A.   Yes.

23       Q.   What does that mean to you?

24       A.   Means been somewhere else, doing something else

25   when it happened.

1        Q.   At the time I was accused of doing this thing, I

2   wasn't there, I was some place else, yes?

3        A.   Yes.

4        Q.   Sometimes they have a witness also prepare a

5   written statement, right?

6        A.   Yes.

7        Q.   And, of course, based on your training, you look

8   at the statements to see whether or not you believe they

9   were fabricated, yes?

10       A.   Yes.

11       Q.   And you have investigative techniques to do that,

12  right?

13       A.   Yes.

14       Q.   Take a look at these two.  The first one is --

15  we'll deal with -- we're back to Uilani Danley. This is the

16  day after the June 12th note -- or June 13th to Patrick

17  Collins again.  "To the best of my knowledge" -- you see

18  that?

19            MR. HELPER:  Let me interpose an objection, and if

20  I could have it as a running objection, to the extent you

21  are asking about these documents.  It's improper, lacks

22  foundation, as it stands now, and second, it looks like what

23  you are heading towards doing is asking him to serve as an

24  expert witness or law enforcement --

25            MR. GREEN:  That's your objection.

```
 1              MR. HELPER:  So that's my running objection, so I
 2   could just get it out all at once.  So if I could just have
 3   a continuing objection.
 4              MR. GREEN:  I got you, and I understand, and it's
 5   well taken.
 6        Q.   (By Mr. Green) She says, "To the best of my
 7   knowledge, I witnessed an incident that occurred during my
 8   1st week with TSA."  Do you see that?
 9        A.   Yes.
10        Q.   And then we look at what whatever number the court
11   reporter marked for Tina Perez. What exhibit number was
12   that?
13        A.   12.
14        Q.   Then we start with Tina Perez, this is June 13,
15   2003.  Her first sentence, "To the best of my knowledge,
16   during the first week of my employment with TSA."
17              Do you see that?
18        A.   Yes, sir.
19        Q.   The sentences are the same?
20        A.   Yes.
21        Q.   And, Tina Perez, her first week of employment
22   would have been when?
23        A.   She was also an incumbent, so the same time as
24   Uilani them.
25        Q.   So this was seven months after the termination of
```

1  Tom Young, yes?

2      A.   Yes.

3      Q.   She appears to be recounting something that

4  happened seven months before.  Both women appear to be doing

5  that, right?

6      A.   Yes.

7      Q.   She says, "I witnessed an incident that occurred

8  during my first week with TSA." And, of course, that's the

9  same thing that Perez wrote.  "It involved Tom Young and a

10 passenger that had brought a prohibited item a torch lighter

11 into the checkpoint."

12         Do you see that?

13     A.   Yes.

14     Q.   That I read from Ms. Danley's report.  Reading

15 from Ms. Perez, it says, "I witnessed an incident that

16 happened in the checkpoint. It involved Tom Young and an

17 irate passenger."

18         Do you see that?

19     A.   Yes.

20     Q.   Let me read back from Danley.  "It involved Tom

21 Young and a passenger that had brought a prohibited item a

22 torch lighter into the checkpoint.  This male passenger was

23 acting totally irate, yelling, swearing at the screeners,

24 and making obscene gestures using his middle finger."

25         Were you there when this happened?

1          A.    I came in after.

2          Q.    "Tom Young was there on scene, but could not

3    control the situation, because the next thing that I saw was

4    Filbert Carvalho taking over and calming the man down so

5    that he could proceed to the gates.  Tom was no where to be

6    seen."

7                Did I read that correctly?

8          A.    Yes.

9          Q.    Now, we turn to Ms. Perez's statement, "This

10   passenger was yelling, swearing at the screeners and making

11   obscene gestures with his middle finger regarding his butane

12   lighter that is a prohibited item.  Tom Young was the first

13   person to approach the passenger to try and control the

14   situation.  When I looked back at the passenger because he

15   was still very irate, Tom Young was nowhere to be found and

16   Filbert Carvalho was now handling the passenger."

17               Did I read that correctly?

18         A.    Yes.

19         Q.    The statements seems to be similar, don't they?

20         A.    Yes, sir.

21         Q.    And do you know if anyone asked them to write

22   these statements seven months or so after the incident?

23         A.    No, sir.

24         Q.    Do you know what caused them to write these

25   statements?

1      A.    I believe they were directed by their AFSD.  He

2  would direct them to --

3      Q.    Who was the AFSD?

4      A.    Bobby Au.

5      Q.    And this was seven months after the termination of

6  Mr. Young, right?

7      A.    Yes.

8      Q.    But certainly after the EEOC complaint was filed,

9  yes?

10     A.    Yes.

11     Q.    Do you know where Mr. Young was when you

12  approached this irate passenger?

13     A.    No.

14     Q.    Do you know what he was doing after you approached

15  that irate passenger?

16     A.    No.

17     Q.    Have you ever read his statement as to where he

18  was at the time?

19     Q.    Exhibit 4, which has already been marked -- hold

20  on a second.

21          MR. HELPER:  Can we take a one-minute break?

22          MR. GREEN:  It's my last question.

23          MR. HELPER:  Okay.  If you are serious about that.

24     Q.    (By Mr. Green)  I am serious about that.

25          Exhibit 9, if you will turn to a letter that

1    Mr. Young wrote to the Office of Civil Rights Arlene Patel.
2    Where am I now?  Turn to the third page, number C. "October
3    29th:  Stated I wasn't at the checkpoint at peak time and
4    that I failed to control a situation involving an irate
5    passenger.  Also, that I did not follow proper procedures
6    for screening a pilot. Concerning the not being at the
7    checkpoint on time, I was never counseled about this, I
8    challenge anyone to show a document I signed to that effect;
9    no oral of written counseling of any kind occurred.  I was
10   at the checkpoint, again ask my screeners.  Second part, a
11   passenger did become irate over a cigarette lighter that we
12   would not let him carry on board.  He was very irate and
13   became more and more agitated, I tried to talk to him and he
14   started shouting and barged through the walk through metal
15   detector, at that point four security officers surrounded
16   him and Mr. Carvalho engaged the passenger."
17              Is that true?
18              MR. HELPER:  Are you asking?
19        Q.    Were there security officers that surrounded him,
20   and you approached him?
21        A.    I don't recall the four security officers, no.
22        Q.    Well, if somebody barged through the metal
23   detector, it wouldn't be unusual for him to be surrounded?
24              MR. HELPER:  Hang on a second.  Assumes facts not
25   in evidence that he did in fact barge through the metal

1 | detector.

2 |      THE WITNESS:  When I got there, he was already in

3 | the holding area.

4 |     Q.  (By Mr. Green)  He had been through the metal

5 | detector?

6 |     A.  Yes.

7 |     Q.  "At that point four security officers surrounded

8 | him and Mr. Carvalho engaged the passenger, Mr. Leong was

9 | also on the floor at this time. I then asked the gentleman's

10 | wife to try and get her husband to calm down and she

11 | refused."

12 |     Did you hear him say that to the wife?

13 |     A.  No.

14 |     Q.  "I then called the airlines and got some of their

15 | personnel to come down and get the lighter and they assured

16 | the passenger they would get it to him at his destination."

17 |     Did airline personnel come down and take the

18 | lighter, if you know?

19 |     A.  No.

20 |     Q.  You don't know?

21 |     A.  No.

22 |     Q.  Do you know whether, in fact, Mr. Young went and

23 | called someone at the airlines to come down?

24 |     A.  No.

25 |     Q.  Did the man seem to calm down at some point?

1    A.    After I talked to him.

2    Q.    Do you know where his lighter was?

3    A.    Yeah, in the bin.

4    Q.    In fact, the airline personnel took it and told

5    him they'd give it to him when he got to his destination,

6    didn't they?

7    A.    The GSA.

8    Q.    Yeah.  Thank you very much.  I have no further

9    questions.

10                   (The deposition concluded at 12:01 a.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25