EDWARD H. KUBO, JR.   2499
United States Attorney
District of Hawaii

THOMAS A. HELPER  5676
Assistant U.S. Attorney
Room 6-100, PJKK Federal Building
300 Ala Moana Blvd.
Honolulu, Hawaii  96850-6100
Telephone: (808) 541-2850
Facsimile: (808) 541-3752
E-mail: tom.helper@usdoj.gov

Attorneys for Defendant

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| LUCAS BRUNO III, CHRISTOPHER GAHR, FRANK ROBERT PAULSON, CHARLES TURNER, and TOM YOUNG, <br><br> Plaintiffs, <br><br> vs. <br><br> MICHAEL CHERTOFF, Secretary, DEPARTMENT OF HOMELAND SECURITY, <br><br> Defendant. | CIVIL NO. 03-00567 JMS BMK <br><br> TRIAL BRIEF OF DEFENDANT MICHAEL CHERTOFF; CERTIFICATE OF SERVICE <br><br><br><br><br><br> Trial:  April 24, 2007 <br> Judge:  J. Michael Seabright |

TRIAL BRIEF OF DEFENDANT MICHAEL CHERTOFF

PRELIMINARY STATEMENT

Plaintiff Christopher Gahr brings this action pursuant to
Title VII, 42 U.S.C. § 2000e-16, and the Age Discrimination in
Employment Act, 29 U.S.C. 631(a).  He contends that the
Transportation Security Administration terminated him from his
job as a screening supervisor at Kahului Airport, Maui in October

2002 because of his race (Caucasian), color (white) and age (over 40).

In fact, the overwhelming evidence will show that TSA terminated Gahr because of serious and repeated performance problems that were observed and documented by three different managers in Gahr's four days at Kahului: Pat Collins, Patti Igarashi, and Filbert Carvalho. In particular, Collins (a Caucasian who lived most of his life on the mainland) noted that Gahr failed in one of his primary duties - shutting down the security screening checkpoint at the end of the night in a way that would make sure the sensitive screening equipment would work properly the next day. Worse, when Collins brought Gahr's failure up with Gahr the next day, Gahr indicated that he already knew all the procedures and that Collins (one of his immediate supervisors) had nothing to teach him. Collins had a similar experience the next day with Gahr, again finding the checkpoint in disarray, and again being brushed off when he tried to discuss the problems. He found problems at Gahr's check point yet again on the third day. Carvalho and Igarashi had similar experiences of trying to instruct Gahr about some basic points and having him simply refuse to listen. After four days of this, the managers came to the conclusion that Gahr simply was not to be trusted with a matter as important as supervising airline security at a new airport with scores of new employees, only a little more than

2

a year after 9/11.  They confronted Gahr with their concerns on October 21, 2001, and he initially brushed them off.  When they pressed their criticisms, however, Gahr offered to move to the Oakland airport if Carvalho destroyed the evidence documenting his failures.  Instead, Carvalho consulted with Kahului Federal Security Director Lowrey Leong and Assistant FSD Howard Tagomori about terminating Gahr.  After they approved, Carvalho forwarded the documentation to Washington along with a proposal to terminate Gahr.  After review of the documentation, personnel specialist Lisa Baker had no doubt that Gahr should be removed.  She approved the termination in time for the papers to be handed to Gahr when he arrived at the airport in Oakland on October 29.

Plaintiff's case rests on three thin reeds.  The first is Gahr's flat denial that he was ever insubordinate or disrespectful toward his managers; in particular, he denies that Collins ever counseled him, or even spoke to him, about problems that Collins saw with Gahr's running of the checkpoint.  Since Collins documented his encounters with Gahr in the screening manager's log book and on separate counseling forms, showed the counseling forms to others, and spoke to others about Gahr's bad attitude, Gahr's denials will be unconvincing to say the least. Plaintiff's second reed is the fact that Collins and Igarasahi occasionally used the phrase "fucking haole" (along with numerous other coarse or profane terms).  Although there is no doubt that

3

in some contexts this phrase can be highly offensive, in context here it will be shown to be used in an attempt at humor or in frustration, not as a indicator of deep-seated racial animus. Plaintiff's third reed consists of rumor, hearsay, and outright falsehood about various personnel actions other than Gahr's termination.  Ultimately, the evidence will show that the great majority of Caucasian screeners and supervisers performed well and were not subject to any adverse employment action – the same as the great majority of non-Caucasian screeners and supervisors who performed well.  On the other hand, a small minority of Caucasians had significant performance problems, and were disciplined or fired – the same as the non-Caucasian screeners who had performance problems.

STATEMENT OF FACTS

I.    <u>THE TRANSPORTATION SECURITY ADMINISTRATION</u>

In order to improve the security of the nation's aviation system following September 11, 2001, Congress passed the Aviation and Transportation Security Act, by which it created TSA and charged it with oversight of the nation's aviation security system.  <u>See</u> Pub. L. No. 107-71, § 101, 115 Stat. 597, 597-604 (2001).  Subsequently, Congress transferred TSA to the newly created United States Department of Homeland Security ("DHS"), whose primary mission is to "prevent terrorist attacks within the United States, . . . [and] reduce the vulnerability of the United

4

States to terrorism." Homeland Security Act of 2002, Pub. L. 107-296, § 101(6)(1), 116 Stat. 2135, 2142 (2002).

Prior to the establishment of TSA, airport security was handled by a variety of contractor, airport and airline personnel. TSA began taking over (also called "federalizing" or "rolling out") airports across the country starting in early 2002. TSA moved from east to west, starting with Baltimore-Washington International Airport. As the state farthest west, Hawaii's airports were among the last to be federalized.

TSA took two steps to control the federalization of hundreds of airports. First, TSA contracted with a corporation called NCS Pearson to test and hire new screeners and supervisors. Pearson accepted on-line applications, administered computerized tests to determine what job a given applicant was qualified for, and provided preliminary training. Second, TSA established a Mobile Screening Force (MSF; also called the National Screening Force), a group of trained screeners and supervisors. The MSF screeners, along with local screeners and supervisors who had private-sector experience, provided both formal and on-the-job training and supervision to new screeners and supervisors.

II.  KAHULUI INTERNATIONAL AIRPORT

A.  Roll Out.

Kahului International Airport federalized on October 6, 2002. Kahului is sometimes referred to by its airport code, OGG.

5

Prior to October 6, Wackenhut Security company handled passenger and baggage screening at Kahului. At midnight, control of passenger screening shifted to the new TSA workforce. Over a hundred new TSA employees, most of whom had never worked together before, were required to get the airport up and running in time to process thousands of passengers over the course of the day.

The roll-out was initially a process of barely controlled chaos. Passenger wait times stretched to over an hour in the first week. Tempers frayed and stress was high. Changing directives from TSA about how to accomplish various tasks such as passenger screening with hand-held metal detectors, also known as wanding, exacerbated the confusion. Supervisors worked long hours with no days off. There were some conflicts between MSF members and the permanent staff about procedures and policies, in part because the MSF members were unaware of certain Hawaii-specific policies established by TSA headquarters. By the end of week, however, matters were coming under control.

 B. <u>Chain of Command</u>.

The chain of command at Kahului started with FSD Leong, down to AFSD Tagomori. Carvalho was also acting as an AFSD. Below the AFSDs were the screening managers. At the time of the rollout and for the next several weeks, Collins and Igarashi were the only two screening managers. Collins took the day shift every day, and Igarashi the night shift. Beneath the screening

managers were the screening supervisors, including Gahr and three
or four others.  Under the screening supervisors came about 10
lead screeners, and under them almost 100 screeners.

    C.   <u>Checkpoint Structure</u>.

    As air travelers are probably aware, the checkpoint has
several stations, with screeners rotating to each at intervals.
The passenger entering the screening process first encounters a
screener advising passengers to remove shoes, take out their
boarding passes, and put their carry-on bags on the conveyor
belt.  Screeners are stationed at the walk-through metal
detector.  Others are stationed viewing the x-ray machine for
carry-on baggage.  Others are stationed to perform secondary
screening, using the hand-held metal detectors, or wands, on
passengers who have set off the walk-through metal detectors.
Others are stationed away from the checkpoints at exit lanes to
ensure no one accesses the secure portions of the airport without
going through screening.  At the time of the rollout at Kahului,
some screeners were stationed at the departure gates to do
additional screening, a practice that has been largely
discontinued.  Screeners communicated from the checkpoint to
other areas using hand-held two-way radios.

    One other station is of particular importance to this case.
The Explosive Trace Detector (ETD) machine is designed to detect
explosive residues on baggage.  Because the ETD machine is a

complex, expensive and delicate piece of machinery, it requires special care, including frequent testing ("calibration") to ensure its accuracy.  There were well-defined rules for both performing the calibration and for recording the results. Keeping the areas around the ETD machine clean was also important, to ensure that a suspicious substance on one bag did not spread to another.  The machine itself also had to be kept clean, including interior filters.  All this activity was to be recorded in a log.

The screening supervisor is responsible for the minute by minute operation of the checkpoint, including opening and closing.  The screening manager oversees the screening supervisor's running of the checkpoint, but is also responsible for numerous other TSA functions at the airport, including at the gates and exit lanes, and for liaison with the state (which owns the airport), the airlines, and airport law enforcement.

III. CHRISTOPHER GAHR's EMPLOYMENT AT TSA

    A.   Introduction.

Chris Gahr was hired by TSA in April 2002 as a member of the MSF.  He worked at a variety of other airports before coming to Kahului.  He came with the intention, approved by TSA management, of staying permanently at Kahului, a practice known as "dropping" from the MSF.  He started with a clean slate at Kahului;

supervisors there knew nothing about his background other than
that he was a member of the MSF.

B.    <u>October 17</u>.

Gahr arrived at Kahului for his first day of work on
October 17, 2002.  He was assigned to be a screening supervisor
on the afternoon/evening shift, under screening manager Igarashi.
On his arrival, day shift manager Collins gave him a brief run-
down of procedures that might be unique to Kahului, such as where
to find the keys to the ETD machine and to the roll-down
checkpoint doors, where lost and found items should go, and where
equipment such as cleaning supplies and batteries should be
stored.  Collins did not explain other aspects of the job,
assuming that Gahr knew them as an experienced MSF screening
supervisor.

Later on October 17, AFSD Carvalho observed that one of the
screeners working under Gahr, Theresa Greenisen, had a bandaged
hand.  Carvalho believed that she could not properly wand or pat
down passengers, and that the public would perceive her as not
providing security.  He told Gahr that he should send her home.
Gahr disagreed in a challenging and insubordinate manner,
insisting that Greenisen could work without the bandage.
Carvalho refused to allow her to do this unless she had an
approving doctor's note.  Carvalho recorded this incident in a
contemporaneous counseling note.

9

C.    <u>October 18</u>.

When Collins arrived at work early the next morning, he found the checkpoint in disarray.  Drawers on the ETD machine were open, leaving security manuals exposed.  The key to the rolldown doors covering the checkpoint was still in the keyhole where they could have been taken by a maintenance worker.  The screening tables were dirty, increasing the possibility that one bag could contaminate another.  Wands were left out.  The ETD machine had not been calibrated during Gahr's shift.  There was no record that Gahr had done any maintenance on the machine during his shift.  The hand-held radios had been left on all night so that the batteries had run down.

Collins and his crew cleaned the area, recalibrated the ETD machine, put the keys in the proper storage places, and opened the checkpoint on time.  Later, when Gahr came on for his afternoon shift, Collins approached him to discuss the condition of the checkpoint that morning.  Gahr interrupted Collins, informing him that Kahului was the smallest airport he had ever worked at, and that he had worked Collins' job at other airports.  He never addressed Collins' concerns, although Collins did make sure to remind Gahr to log off the ETD machine at the end of the night.  Collins documented the incident in both a counseling note and in the screening manager's log book, a notebook containing a running record of notable events on each shift.

D.   <u>October 19 and 20</u>.

When Collins came in to work the next morning, he again found significant problems with the checkpoint, though not as severe as the day before.  The ETD machine was not logged off, and the ETD recalibration and maintenance paperwork had not been properly completed.  The search tables were dirty again.  The key to one of the x-ray machines could not be found.  Collins again raised the issues with Gahr, again got the impression that Gahr was not listening to him, and again recorded the incident on a counseling form.  Collins had a similar experience with the checkpoint on the morning of October 20, which he recorded.  He did not speak to Gahr about the problems that day because Gahr had the day off.  Collins did speak to Fil Carvalho about the problems with Gahr, and the two men agreed that they would need to sit down with him.

Patti Igarashi was also having problems with Gahr.  Although she was ostensibly his direct supervisor, he was unwilling to take direction from her, and on several occasions accused her of committing security breaches.  Igarashi agreed with Collins and Carvalho that they should meet with Gahr.

E.   <u>October 21</u>.

On October 21, all three managers arranged to meet with Gahr.  Gahr was once again unwilling to listen to their concerns.  When Igarashi tried to speak he interrupted, demanding specifics.

11

When Collins provided specifics about Gahr's shortcomings by reading from his counseling forms, Gahr tried again to interrupt. Carvalho also provided specifics from his notes. At this point Gahr's demeanor changed. He said that it was obvious things were not working out for him here in Kahului, and that he had decided not to drop at Kahului. He offered a deal: if Carvalho would destroy the documentation, he would agree to move on to Oakland airport and drop there. Carvalho told him to put in his request to transfer but that Carvalho would make no guarantees. It was agreed that Gahr should not work at Kahului any more.

Later that day, Gahr emailed Carvalho, asking him to confirm that Carvalho would destroy the documentation. Carvalho did not respond. Instead, he consulted with his superiors, Leong and Tagomori, and recommended that Gahr be terminated. The superiors agreed, so Carvalho put together a package of all the counseling forms the managers had written up, along with a summary, and sent it to TSA personnel staff in Washington who would have to approve any employee termination of an MSF member. The packet was reviewed by Lisa Baker at TSA Washington. Baker saw the serious nature of the charges against Gahr and concurred that dismissal was appropriate. She was especially concerned about the failure to maintain the ETD machine. Baker promptly approved the dismissal and informed Carvalho. Carvalho found that Gahr had already left the island, and so arranged for termination papers

12

(signed by Tagomori) to be given to Gahr there on October 29, 2002.

LEGAL STANDARDS

I.  RACE DISCRIMINATION

The Title VII provision applicable to federal employees provides that "[a]ll personnel actions affecting employees ... shall be made free from any discrimination based on race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-16(a).  "Liability in a disparate treatment case 'depends on whether the protected trait [national origin, race, and gender] actually motivated the employer's decision.'"  Raytheon Company v. Hernandez, 124 S.Ct. 513, (2003) (quoting Hazen Paper Co. v. Biggins, 507 U.S. 604, 610 (1993).  Accordingly, this race and national-origin termination claim can be analyzed with the three part burden shifting scheme first enunciated in McDonnell Douglas v. Green, 411 U.S. 792 (1973).  In keeping with this scheme, plaintiff has the initial burden to establish a prima facie case of discrimination.  Id.  The plaintiff can satisfy his initial burden by "presenting facts which, if unexplained, reasonably give rise to an inference of discrimination."  Petty at 22.  If the plaintiff establishes a prima facie case, the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for taking the action.  McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).  The burden on the employer is one of

production rather than proof or persuasion.  Burdine, 450 U.S. at
254 ("The defendant need not persuade the court that it was
actually motivated by the proffered reasons").

If a defendant successfully provides a nondiscriminatory
reason for an employment action, the presumption of
discrimination disappears and the plaintiff must show that the
articulated nondiscriminatory rationale is pretext.  This means
the plaintiff must show by a preponderance of the evidence that
the proffered explanation is false and that "discrimination was
the real reason" for the adverse employment action.  St. Mary's
Honor Center v. Hicks, 509 U.S. 502, 515 (1993).  Plaintiff's
evidence "must be both specific and substantial."  Villiarimo v.
Aloha Island Air, Inc., 281 F.3d 1054 at 1062 (9th Cir. 2002)
citing Godwin v. Hunt Wesson, Inc., 150 F.3d 1217, 1222 (9th Cir.
1998).  Under McDonnell Douglas, "'the ultimate burden of
persuading the trier of fact that the defendant intentionally
discriminated against the plaintiff remains at all times with the
plaintiff.'"  Id. citing Reeves v. Sanderson Plumbing Products,
530 U.S. 133, 142-43 (2000).

Here, the parties have essentially conceded that plaintiff
has stated a prima facie case, and that defendant has produced a
non-discriminatory reason for the termination.  Accordingly, if
plaintiff fails to produce "substantial and specific" evidence of
discrimination, defendant will be entitled to judgment as a

matter of law on plaintiff's claim.  If plaintiff does produce
such evidence, the "ultimate questions" of whether plaintiff has
proven discrimination should go to the jury.

The trier of fact cannot find that an employer has
discriminated against an employee merely because the employer or
an adjudicator would have preferred that the employer conduct its
business differently.  Furnco Construction Corp. v. Waters, 438
U.S. 567, 580 (1978).  To determine whether a proffered
explanation for a personnel action is a pretext for
discrimination, the jury should not inquire into whether the
explanation was objectively incorrect, but whether an employer
honestly believed its reasons for its actions, "even if its
reason is 'foolish or trivial or even baseless.'"  Villiarimo v.
Aloha Island Air, Inc., 281 F.3d 1054, 1063 (9th Cir. 2002).  In
short, the defendant may make its decision for a good reason, a
bad reason, or for no reason at all, as long as its actions are
not taken for discriminatory reasons.  See Local 28, Sheet Metal
Workers v. EEOC, 478 U.S. 421, 462 (1980).

II.  AGE DISCRIMINATION

Courts use the same standards when analyzing claims under
Title VII and the ADEA, 29 U.S.C. 631(a).  See Godwin v. Hunt
Wesson, Inc., 150 F.3d 1217, 1219 (9th Cir. 1998).  The ADEA does
not provide for a jury trial when the defendant is a federal
employer.  Lehman v. Nakshian, 453 U.S. 156, 165 (1981).

DEFENDANT'S CASE

The reasons for Gahr's termination are set forth in the statement of facts above.  Quite simply, his pattern of breaching security regulations and refusing to acknowledge the seriousness of his breaches destroyed the trust his managers needed to have in a screening supervisor.  Discriminatory animus against Caucasians, or against persons over 40, played no role in the decision.

PLAINTIFF'S CASE

A.    <u>Introduction</u>.

Although plaintiff's failure to comply with pretrial exhibit disclosure deadlines, and his rather scattershot filings to date make it somewhat difficult to anticipate what exactly he will argue, some elements are clear.  Plaintiff will claim that Collins, Igarashi and Carvalho are all lying about their encounters with him; that Collins and Igarashi betrayed their true motivation by using the phrase "fucking haole"; and that a pattern of racial discrimination is apparent from other personnel decisions made at Kahului.  Defendant will address each of these contentions in turn.

B.    <u>Plaintiff's Claim That He Never Challenged His Managers' Authority</u>.

Plaintiff will contend that he simply did not commit the acts that he was accused of by managers Collins, Igarashi and Carvalho.  He will claim that Collins never criticized him about

16

checkpoint closing problems.  He will admit that he had a dispute with Carvalho but will claim that it was Carvalho who acted improperly.  He will admit to disputes with Igarashi but blame her for them.

Plaintiff will lose the credibility battle.  Collins' demeanor and background will be particularly important here, because the contradiction between his account and plaintiff's is so stark.  Collins is a decorated Vietnam war veteran, a long-time police investigator of violent crimes in the city of St. Louis Park, Minnesota.  He moved to Hawaii in 2001 after retiring from the police force.  He went to work for Wackenhut Security as a screener following 9/11 because his sense of patriotism motivated him to get back into the role of protecting the public. While at Wackenhut he was promoted (by Patti Igarashi) to a managerial position.  When Kahului was federalized he was hired as a screening manager, starting October 6, 2002.  He is Caucasian.

Collins' account will also be bolstered by his documentation of the incidents.  Gahr will apparently claim that Collins forged these documents after Gahr filed an EEO complaint.  This claim will be belied, first, by the simple physical evidence. Defendant will present the screening manager's log book in which Collins recorded his findings at the checkpoint on the morning of October 18.  The log book is filled with dated, chronological

17

entries from a variety of employees, and is self-evidently not forged.  Collins' counseling forms will also be presented, along with testimony from employees who saw the counseling forms at the time that Gahr's termination was being considered.  Plaintiff's forgery claim will also be contradicted by witnesses who saw the notes prior to Gahr's termination, including Lisa Baker in Washington, who has never met either Collins or Gahr, and was unaware that Gahr was Caucasian.  She approved the termination on the merits, because of the serious security breaches presented in the documentation.

The contradictions are less stark between Gahr's account of his encounters with Igarashi and Carvalho and the accounts of the managers themselves.  Carvalho is now deceased, but his deposition transcript and his comments to others in October 2002[1] make clear that he viewed Gahr as insubordinate and untrustworthy.  Igarashi will also testify that Gahr was consistently arrogant and resistant to supervision.

Other evidence will also fatally undermine Gahr's credibility.  In particular, there is strong evidence that Gahr has lied in this case about his background and employment history.  In his interrogatory answers and at his deposition,

---

[1] Carvalho's comments in October 2002 are admissible because they are offered to show his state of mind, not to prove the truth of the matter asserted.  See discussion of hearsay in the legal points section below.

plaintiff failed to reveal several employers for whom he worked
in the 1990s.  At his deposition he was notably evasive and prone
to claiming lack of memory about long periods of his employment.
The government's subsequent investigation has revealed that Gahr
worked for these employers in the mid-nineties.  Gahr
subsequently worked briefly for the San Bernardino County School
District.  He listed the earlier employers on his application,
but was fired for refusing to fill out a more extensive
background check.  He brought suit against the School District
for wrongful termination.  In the subsequent litigation, the
School District accused Gahr of lying about his job duties for
his previous employers and the reasons that his employment ended.
The case was settled before trial, so the accusations were not
resolved.

Based on this history, it seems clear that Gahr omitted the
employers from his work history in the current litigation in
order to avoid this kind of scrutiny.  Since Gahr's credibility
is a key issue in this case, the fact that he has apparently lied
in this litigation is crucial to the jury's full understanding of
the case.  Defendant does not intend to rehash the entire
previous litigation; that litigation is relevant only to
establishing Gahr's motive to lie.  Plaintiff has understandably
filed a motion <u>in limine</u> to exclude the evidence.

C.    <u>Plaintiff's Reliance on the Use of "Fucking Haole".</u>

Plaintiff will apparently make much of the forthright admissions by Collins and Igarashi that they used the phrase "fucking haole."  The demeanor and testimony of both witnesses will make clear that this phrase is not indicative of racial animus.  Both witnesses used colorful and profane vocabulary. They used it in references to persons out of hearing range – in other words, they said it about people, not to them.  They used the phrase in misplaced attempts at humor or in frustration – essentially as a synonym for "stupid tourist."

D.    <u>Plaintiff's Emphasis on Other Personnel Decisions.</u>

Plaintiff will apparently attempt to present cursory evidence of a wide variety of other personnel decisions made at TSA in an attempt to show a pattern of discrimination against Caucasians.  The testimony has nothing to do with the circumstances or facts surrounding Gahr's termination.  Instead it concerns matters such as promotions, demotions, work assignments and discipline.  Plaintiff has provided very little in the way of specifics about what personnel actions he may try to litigate.

Defendant has filed a motion in limine challenging the relevance and foundation of this sort of evidence.  The motion establishes a framework for evaluating the proffered evidence. Plaintiff should proffer exactly what personnel decisions it will

raise, in terms of the type of decision, the date, the identity of the individual affected, and the identity of the decision-maker.  The proffer should also summarize which of its witnesses will claim personal knowledge of each decision.

This proffer will allow defendant and the court to evaluate whether there is any admissible evidence to support the contention that discrimination played a role in a given personnel decision.[2]  It will also allow the court to determine if the probative value of the evidence is worth the time it would take to try the issue.  Finally, requiring plaintiff to make such a proffer would give defendant some notice about who it will need to call as rebuttal witnesses, and what documents it will need to gather as rebuttal exhibits.

Ultimately, the emphasis on other personnel decisions will help, not hurt, defendant's case.  The more personnel decisions are at issue, the more defendant will show that Caucasians and non-Caucasians alike were treated without regard to race.  Defendant's main concerns are first, that these side issues not be allowed to overwhelm the relatively simple matters that should be at the heart of the case, involving Gahr's interactions with management in his four days at work; and second, that defendant

---

[2] Defendant's preliminary investigation of some of the matters alleged in plaintiff's affidavits shows that, to an astonishing degree, the testimony of these witnesses is based not on personal knowledge, but on rumor, hearsay and misinformation.

be offered a fair opportunity to prepare for and rebut allegations regarding other employment decisions.

        E.    Age Discrimination.

Plaintiff has not revealed any evidence of age discrimination.  There is no either direct or circumstantial evidence to support such a claim, and the claim seems to be an afterthought.  Defendant will probably be entitled to a verdict on this claim at the close of plaintiff's evidence.

                POTENTIAL LEGAL AND EVIDENTIARY ISSUES

        A.    Admissibility of Out of Court Statements in a
              Discrimination Action.

Defendant's decision to terminate Gahr, as described in the Statement of Facts above, was a collaborative effort, involving input from a variety of supervisors.  The key issue in a discrimination case is whether these decision-makers were motivated by a discriminatory animus.  The inquiry into the state of mind of these decision-makers requires the trier of fact to consider out-of-court statements made to them.  The court's have routinely found that such statements are not barred by the hearsay exclusion of Federal Rule of Evidence 801 et seq.

Hearsay is an out-of-court statement used to prove the truth of the matter asserted.  Fed.R.Evid. 801(c).  Courts have routinely held that decision-makers in Title VII cases may

testify about reports from others to the extent they relied on
those reports in making personnel decisions.  Garner v. Missouri
Dept. of Mental Health, 439 F.3d 958, 959 (8th Cir. 2006)
(reports to decision-maker of employee's wrongdoing offered to
explain why decision-maker suspended employee, not for truth that
employee committed wrongdoing); Capobianco v. City of New York,
422 F.3d 47, 55-56 (2d Cir. 2005) (document in an ADA
discrimination plaintiff's file was admissible to show the
employer's state of mind in firing him); Luckie v. Ameritech
Corp., 389 F.3d 708 (7th Cir. 2004) (decision-maker's account of
negative information about employee given to decision-maker by
another admissible to show decision-maker's state of mind, not
truth of information); Aucutt v. Six Flags Over Mid-America,
Inc., 85 F.3d 1311, 1317 (8th Cir. 1996) (affidavit of a
supervisor containing a third party's description of an incident
involving discrimination plaintiff was properly considered
because the affidavit "was based on [the supervisor's] personal
knowledge of the reasons underlying the challenged employment
decision"); Wallace v. Texas Tech. Univ., 80 F.3d 1042, 1048,
n. 4 (5th Cir. 1996) (supervisor's knowledge of reports of
employee's misconduct admissible as offered to show supervisor's
state of mind, not truth of reports).

Here, Igarashi, Collins, Carvalho, Tagomori, Leong and Baker
all relied on reports from each other and from others in

determining that Gahr should be terminated.  Any hearsay
objection to testimony about such reports should be denied.

Conversely, the state of mind of the plaintiff and his
percipient witnesses is irrelevant to any matter at issue in this
case.  Hearsay objections to testimony about statements made by
others to such witnesses should be sustained.  This is
particularly important in this case, where so many witnesses
apparently heard second-hand reports about possible
discrimination against others, but who were not themselves
affected by the alleged discrimination.

    B.    <u>Plaintiff's Claims Not Arising From Title VII or the
ADEA</u>.

    1.  <u>Union and Whistle-Blowing Issues</u>.

Plaintiff's pretrial statement indicates he will attempt to
assert claims that were never raised either in his complaint or
in the administrative processing of his case, and that are not
actionable claims under Title VII.  For example, plaintiff lists
witnesses who will apparently testify about whistle blower or
union activities, apparently to support a claim that defendant
terminated because of such activities.  <u>See</u> Pretrial Statement at
10-11.

Plaintiff will apparently contend that he was fired in part
for trying to organize a union.  This claim was not raised as a
count in his Second Amended Complaint, however, and Gahr has not
identified any waiver of federal sovereign immunity that would

allow such a claim to be heard in this action.  Defendant may use these statements against Gahr, to show that even he does not really believe that racial discrimination motivated his termination; however, Gahr has no claim arising from any such contention.

      2.  <u>Plaintiff's Pay Shortage Issues</u>.

Plaintiff will apparently claim that TSA owed him money at the time of his termination.  Plaintiff contends that he will "show that Defendant dealt in bad faith, by refusing to pay plaintiff both compensation earned prior to termination, vacation payment and retirement payments which should have been returned to plaintiff at the time of termination."  Pretrial Statement at 5.

This claim was not raised as a count in his Second Amended Complaint, however, and Gahr has not identified any waiver of federal sovereign immunity that would allow such a claim to be heard in this action.

    C.  <u>Undisclosed Witnesses</u>.

Plaintiff's Witness List lists a number of witnesses who were never identified during the administrative processing of this case or in discovery.  These witnesses include Farah Taja Mohammed, Mukdam Kudham and Roger Yee.  All appear to be character witnesses, not witnesses with percipient knowledge of

matters at TSA Kahului.  The court should bar these witnesses from testifying.

    D.   <u>Previous Settlement</u>.

    This case previously involved four other plaintiffs in addition to Gahr.  One was dismissed on motion, and defendant settled with the other three.  The fact and amount of settlement are not admissible under Rule 408 of the Federal Rules of Evidence.

<u>CONCLUSION</u>

    Defendant will show that its supervisors were motivated by a desire to protect the flying public and to serve the country, not to indulge in petty personal vendettas against Caucasians. Defendant fully expects that the jury will return a defense verdict on plaintiff's race and color discrimination claims, and that the court will reach a similar conclusion on his age discrimination claims.

    DATED:  April 4, 2007, at Honolulu, Hawaii.

                    EDWARD H. KUBO, JR.
                    United States Attorney
                    District of Hawaii

                      /s/ Thomas A. Helper
                By _____
                    THOMAS A. HELPER
                    Assistant U.S. Attorney

                    Attorneys for Defendant

26

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

LUCAS BRUNO III, CHRISTOPHER )    CIVIL NO. 03-00567 JMS BMK
GAHR, FRANK ROBERT PAULSON,  )
CHARLES TURNER, and TOM      )    CERTIFICATE OF SERVICE
YOUNG,                       )
                             )
            Plaintiffs,      )
                             )
    vs.                      )
                             )
MICHAEL CHERTOFF, Secretary, )
DEPARTMENT OF HOMELAND       )
SECURITY,                    )
                             )
            Defendant.       )
_____)


CERTIFICATE OF SERVICE

    I HEREBY CERTIFY that, on the date and by the method of

service noted below, a true and correct copy of the foregoing was

served on the following at their last known address:

        Served by First Class Mail:

        Moises A. Aviles                April 4, 2007
        Aviles & Associates
        560 N. Arrowhead Ave., Suite 2A
        San Bernardino, CA  92401

        Served Electronically through CM/ECF:

        G. Todd Withy                   April 4, 2007
        Withylawcourt@aol.com, withylaw@aol.com

            Attorneys for Plaintiff
            CHRISTOPHER GAHR

    DATED:  April 4, 2007, at Honolulu, Hawaii.


                            /s/ Coleen Tasaka-Shoda
                            _____